**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMY PHILLIPS, <br><br>            Plaintiff, <br><br>       v. <br><br> THE DISTRICT OF COLUMBIA, <br><br>        Defendant. | Case No. 22-CV-277 |

**COMPLAINT**

1.      The Metropolitan Police Department of the District of Columbia (MPD) maintains a list of people whose requests for information under the D.C. Freedom of Information Act (FOIA) are set aside for special review by high-ranking officials, including the Chief of Police. People are put on this list when they publicly criticize MPD or when they request information that has the potential to embarrass MPD or its officers. Once on the list, the requesters face hurdles that the general public avoids: They may be charged money for public information that others get for free, they may have their requests delayed, or they may have their requests denied outright. Plaintiff Amy Phillips is on the list because she requested information that had the potential to—and in fact did—embarrass MPD, and she intends to continue requesting potentially embarrassing information. She brings this Action to stop MPD's flagrant constitutional violations.

## Parties

2.      Amy Phillips is a criminal-defense lawyer in Washington, D.C. She is an outspoken critic of MPD, and she often uses—and intends to continue using—FOIA to learn about MPD's operations and to publicly scrutinize those operations when they are illegal, immoral, or contrary to Phillips's sense of justice in her community.

3.      The District of Columbia is a municipal corporation formed pursuant to Article I of the United States Constitution. The District is sued for its policy and practice of discriminating against FOIA requesters on the basis of the content and viewpoint of their prior or anticipated speech.

## Jurisdiction and Venue

4.     Phillips brings this action under 42 U.S.C. § 1983 alleging violations of her rights under the First Amendment to the United States Constitution. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. Venue is proper in this Court because all the events alleged in this Action occurred within this judicial district.

## Phillips's Early Advocacy

5.     For several years, Phillips has been a vocal and public critic of MPD.

6.     In 2018, she began to invoke her rights under FOIA to obtain information with which she could evaluate and, if necessary, criticize MPD.

7.     Between 2018 and 2021, Phillips filed at least eight requests with MPD under FOIA.

8.     In one request, Phillips sought information concerning the activities of MPD's Disciplinary Review Division, the section of MPD responsible for disciplining and terminating officers who break the law or MPD policy. Phillips sought transcripts and information about past MPD Adverse Action Hearings, which are convened by MPD when the department wants to suspend or fire a police officer. Phillips sought to learn what types of criminal or misconduct accusations have been sustained against MPD officers, and what discipline, if any, MPD imposed for that misconduct.

9.     In another request, Phillips sought documents related to then–Chief of Police Peter Newsham's use of the term "zero-tolerance policing." Newsham had testified before the D.C. Council that MPD did not practice "zero-tolerance policing," stating that MPD "does not subscribe to" a kind of policing that includes "arresting

people for minor offenses such as open containers of alcohol or BB guns." Phillips sought to learn whether MPD had implemented any policies that would require MPD officers to live up to the Chief's testimony. The request also specifically sought information about policies governing MPD's specialized units, including the Gun Recovery Unit, Narcotics and Special Investigations Division, and Crime Suppression Teams, to determine whether the directives given to those units contradicted the Chief's promises to the community regarding arrests for minor offenses. The Gun Recovery Unit had recently been the subject of intense judicial and public scrutiny for car searches undertaken with questionable suspicion.

10.     Between 2018 and 2021, Phillips often sent tweets from a personal Twitter account that were critical of MPD and its officers.

## The Lojocano Adverse Action Hearing And MPD's Suspicious Response to FOIA Requests

11.     On March 7th, 8th, and 12th, 2019, Phillips attended an Adverse Action Hearing held by MPD's Disciplinary Review Division to adjudicate alleged misconduct by then-Officer Sean Lojocano.

12.     Adverse Action Hearings are held when MPD officers are accused of actionable misconduct, including criminal conduct. They are trial-like proceedings, with a panel of MPD officials acting as judges. The hearings are presumptively open to the public.

13.     Lojocano was alleged to have conducted unnecessarily invasive genital searches of members of the public.

14.     At least a dozen members of the public attended the Lojocano hearing, including a news reporter and employees of the American Civil Liberties Union of the District of Columbia (ACLU).

15.     Members of the public were not permitted to record the proceedings.

16.     MPD recorded the proceedings electronically, and that electronic recording was later used to create complete transcripts of the official proceedings.

17.     When Phillips entered the MPD building at which the Adverse Action Hearing was held, she signed a guest log with her full name.

18.     During the hearing, she sat in the public gallery, in full view of MPD officials. Throughout the proceeding and during breaks, Phillips could be seen carefully observing the proceedings, taking notes, and conversing with an ACLU attorney and a news reporter.

19.     The 2019 hearing resulted in a decision that Lojocano should be fired for his misconduct. That decision was later upheld by the Office of the Chief of Police.

20.     Lojocano's conduct led to intense criticism of MPD. One of the people whom Lojocano searched invasively had previously filed a lawsuit, in which he was represented by the ACLU, which the District settled for an undisclosed six-figure amount. And Lojocano's actions garnered significant negative press attention during the pendency of the lawsuit, which led to additional media coverage of the Adverse Action Hearing.

21.    On March 15, 2019, three days after the close of the Lojocano hearing, Phillips submitted a FOIA request for the tapes of the proceedings and a transcript of the proceedings.

22.    In another request, Phillips sought information concerning MPD's scheduling of disciplinary hearings and records from other hearings. Prior to January 2022 the only way to know whether a hearing—which was presumptively open to the public under D.C. law—was scheduled to occur was to travel to an MPD building; sign in with one's name; cross several locked doors; and read a calendar, which did not contain officers' names or the specific allegations against them, on a piece of paper posted outside a room with no public signage.

23.    Less than ninety minutes after Phillips submitted her Lojocano request through the District's online FOIA portal, she received a response denying her request in full. The response came from Latrina Crumlin, who identified herself as a "Staff Assistant, FOIA" for MPD. The response read "A release of such records would constitute as a [*sic*] clearly unwarranted invasion of personal privacy and is exempt from disclosure pursuant to D.C. Official Code § 2-534(a)(2) and (a)(3)(C)."

24.    This was wrong, and it was strange. Usually, MPD takes weeks or months to provide any substantive response to FOIA requests. And Crumlin's position appeared to be that the records of a *public* hearing—one that Phillips and many others attended—were *categorically* excludable as invasions of someone's privacy, which does not make any sense.

25.     Phillips, as permitted by D.C. law, appealed MPD's decision to the Mayor's Office of Legal Counsel.

26.     On April 2, 2019, that office issued an eight-page decision directing MPD to release the records that Phillips requested, but permitting some redactions.

27.     On May 21, 2019, Phillips emailed Inspector Vendette Parker, who was at the time MPD's FOIA Officer, inquiring when the responsive records would be produced. Parker wrote back that Phillips's request was "under reconsideration" and that "[a] decision should be finalized in the next week or so of which you will be informed."

28.     By June 2, 2019, Phillips had still received no records.

29.     So she sued the District in Superior Court seeking an injunction requiring the District to produce the records.

30.     Phillips's efforts to get information about the hearings were later covered in an article in the *Washington City Paper* that was broadly critical of MPD. In that article, Phillips was quoted criticizing MPD's and the D.C. Attorney General's Office's response to her requests. The article reads, in part:

> "I continue to be surprised at just how vociferously MPD is fighting against turning the[] [unredacted transcripts] over," [Phillips] says, noting her respect for D.C. Attorney General Karl Racine, whose office is defending the District in the case. . . . "[I]t is ludicrous to me that he's publishing op-eds in the media talking about his commitment to reforming the police department and making sure that people have access to better government, and then attorneys who work for him . . . are coming into court opposing a request like this one. That office is saying things publicly that I don't think is being born out in what they're doing in court. And it really makes me wonder if Mr. Racine

knows the positions that his staff attorneys are taking and
whether he would agree with them."

31.     While Phillips's lawsuit was pending, she filed two FOIA requests
seeking all emails to or from Newsham and other high-ranking MPD officials that
contain any version of Phillips's name. MPD produced several emails but noted that
it was withholding others pursuant to claimed FOIA exemptions. MPD has not
produced an index specifying the withheld records and the applicable exemptions.

32.     The District opposed Phillips's lawsuit in part. On September 26, 2019,
the night before the first hearing scheduled in Phillips's Superior Court case, MPD
began producing documents responsive to Phillips's requests, but with redactions
that Phillips believed were unwarranted. The parties briefed the District's motions
for summary judgment, which the court denied, reasoning that factual disputes about
the production remained.

33.     On January 12, 2022, Phillips voluntarily dismissed her Superior Court
case against the District with prejudice.

## A Whistleblower Comes Forward

34.     In early 2020, Phillips began communicating with Parker, who had just
retired as MPD's FOIA Officer.

35.     Parker began her career at MPD when she was 17 years old and served
for 21 years, attaining the rank of Inspector and serving for several years as
commander of the 7th District. From 2017 until her retirement in January of 2020,
Parker served as MPD's FOIA officer.

36.     Parker alerted Phillips to the existence of the watchlist policy.

37.     Parker submitted a signed declaration in Phillips's Superior Court case explaining, in part, MPD's policy and how it related to Phillips's requests. Upon seeing the declaration, the District asked that Phillips redact certain information to protect its claimed attorney–client privilege. Phillips then withdrew the declaration. She attaches it to this Complaint as Exhibit A, with the redactions requested by the District.

## MPD's Watchlist Policy

38.     MPD's ordinary process of responding to a FOIA request is straightforward: An intake assistant reviews the request to make sure it is seeking records in the possession of MPD, rather than some other District agency. If the request seeks documents from MPD, the intake assistant assigns the request to a FOIA specialist and notifies the MPD unit that likely has the responsive records. The intake assistant then emails the requester to confirm receipt of the request and notify the requester of the name and contact information of the assigned FOIA specialist. Then, the unit that possesses the records sends potentially responsive documents to the specialist, who reviews them for responsiveness and redacts any information that she deems exempt under the D.C. code or municipal regulations. Once that review is complete, a FOIA supervisor or the FOIA Officer reviews the proposed production, makes any necessary changes, and releases the documents to the requester. Although D.C. law permits MPD to charge requesters a fee for producing documents, MPD has historically not charged such a fee.

39.     Some requests, though, get special treatment.

40.     On Parker's first day assigned to the FOIA office, LeeAnn Turner, the Chief Operating Officer of MPD, explained the "expectations" for Parker in her new position.

41.     Turner explained that then-Chief Newsham felt that he was being "blindsided" by the media when reporters questioned him regarding records that they had received in response to FOIA requests.

42.     To prevent Newsham from being so blindsided in the future, Turner told Parker of an unofficial, unwritten policy requiring Parker to notify Newsham and Turner of FOIA requests that may lead to criticism of the department, specifically those originating from news reporters or people known to be critical of the department, or those containing requests for information with the potential to embarrass the department.

43.     Each week, Parker was to send an email to Newsham and Turner in which she listed all FOIA requests received the prior week. Parker was to highlight requests with the potential to embarrass Newsham or the department.

44.     Parker and Turner would then have a weekly meeting, on Tuesdays at 11:00 AM, at which Turner instructed Parker on how to process the last week's requests. Proposed responsive documents were to be presented to Turner in hard-copy form because, Turner said, she did not want to generate more records that would be subject to disclosure.

45.     On some weeks, when Parker presented Turner with lists of requests, Turner asked Parker to look into certain requesters to see if she could figure out why

they were seeking the records. Parker understood these requests to be indications that those requesters ought to be highlighted in the weekly emails Parker sent to Turner and Newsham, and Parker began highlighting subsequent requests from those people after Turner flagged them in conversation.

46. Over time, Parker identified the following people (among others) as requesters whom she should bring to the attention of Turner and Newsham: Eric Flack, a reporter with WUSA-9; Marina Marraco, a reporter with FOX-5 DC; the ACLU; Denise Krepp, an Advisory Neighborhood Commissioner; Lorenzo Greene, also an Advisory Neighborhood Commissioner; and Amy Phillips and other criminal-defense lawyers.

47. Similarly, Turner periodically advised Parker to look specifically into requests for information about the Gun Recovery Unit; personnel records of MPD officers; emails to or from Newsham or Turner; use-of-force records; stop-and-frisk records; and Adverse Action Hearing records.

48. Parker subsequently highlighted requests for information meeting these categories (among others).

49. Parker was also generally instructed to use her discretion to identify requests that may embarrass MPD, and she did.

50. At no point did Turner, Newsham, or anyone else instruct Parker not to flag requests from these people for special attention.

51.     On many occasions, Turner told Parker that she asked Newsham how the department should respond to a flagged request and that Newsham responded by directing the department's response.

52.     According to former colleagues of Parker, current Chief of Police Robert Contee has not ended or suspended the policy.

**The Watchlist Policy in Action**

53.     Parker estimates that between 2017, when she came to the FOIA office, and the end of 2019, when she retired, MPD delayed, denied, or improperly altered approximately 20 requests pursuant to the watchlist policy.

54.     The treatment of a several specific requests—some from news reporters and one from the ACLU—highlights the danger of being placed on MPD's watchlist and shows its operation in greater detail.

55.     In 2018 or 2019, as part of a city- and nationwide debate over police policies of stopping and frisking individuals without reasonable suspicion, representatives of the ACLU requested that MPD produce all records of stops and frisks conducted in the District over a certain period of time.

56.     When an MPD officer conducts a stop and frisk, the officer is required under the Neighborhood Engagement Achieves Results (NEAR) Act of 2016 to write a report describing the interaction and explaining what, if any, evidence justified the stop and frisk.

57.     The NEAR Act has been the subject of extensive litigation in Superior Court because, according to a group of plaintiffs, MPD systematically fails to comply with its data-collection requirements.

58.     Stop-and-frisk data, therefore, had a double potential to embarrass MPD: the data could expose improper police conduct, and the absence of required data could expose MPD failures to comply with D.C. recordkeeping requirements.

59.     Because these records had the potential to result in significant public criticism of MPD and because the request came from the ACLU, Parker flagged it for Turner as a request deserving special attention.

60.     At a meeting scheduled shortly thereafter, Turner asked Parker and the rest of the FOIA staff to help her figure out how they could avoid producing documents. Turner was explicit on this point, telling Parker and others that the goal of these meetings was to frustrate the ACLU's attempt to get these records.

61.     Someone in the group realized that because the records were obviously quite voluminous, MPD could perhaps justify charging the ACLU a significant amount for the records.

62.     Turner told Parker to generate an invoice for how much production of the records would cost using a formula that D.C. law provides and that is based on the amount of time necessary for production.

63.     Other similarly voluminous requests were produced without sending invoices.

64.     Turner told Parker that the specific purpose of generating this invoice was to deter the ACLU from pursuing the requested information.

65.     Parker generated the invoice and gave it to Turner. Because of the nature of the records, the invoice was for a very large amount of money.

66.     Turner expressed concern about this: Recently, Denise Krepp had publicly tweeted a copy of an invoice she had received from MPD for $5,387, which, Krepp contended, was improper under D.C. law. Turner felt that this was embarrassing to the department.

67.     So Turner suggested a middle ground: she instructed Parker to tell the ACLU that the request would likely be expensive to fulfill, and that Parker should offer to produce a random selection of responsive documents from each of MPD's seven districts so that the ACLU could review whether it wanted to proceed.

68.     Again, Turner specifically explained that the purpose of this process was to discourage the ACLU from seeking the requested records.

69.     Parker did as instructed and selected two stop-and-frisk reports at random from each district.

70.     When she gave the reports to Turner, Turner reviewed them to make sure they were not themselves embarrassing to the department.

71.     Upon concluding that they were not embarrassing, Turner instructed Parker to produce them to the ACLU, which she did.

72.     Eventually, MPD produced the data that the ACLU requested, but after a significant delay caused by the selective imposition of a fee and the resulting negotiations.

73.     Flack, the reporter for WUSA-9, had a similar experience with a similar request. In 2018, he too requested stop-and-frisk incident reports. When the FOIA office received this request, Parker flagged it for Turner because it came from Flack

and because it was potentially embarrassing. Turner asked Parker to redact certain information, which would be extremely time-consuming. After Parker and her staff spent two days doing so, Turner changed her mind and said it would be silly to do all that redacting. Turner simply held the request and instructed Parker not to produce the documents unless "Flack followed up." He did not, and the data was never produced.

74.     Also in 2018, a reporter requested documents that MPD officers must complete to get approval for part-time outside work. Parker flagged this request for Turner because it involved a news organization and had obvious potential to embarrass the department based on the contents of the documents produced. This reporter had previously written a story that criticized an MPD officer for his ticket-writing practices, and Turner told Parker that she was concerned that this request would lead to a story in a series connected with the earlier one.

75.     When Turner saw the collected records, she said that several of the documents—which had been generated on paper and then scanned into electronic form—were "crooked" (literally, not figuratively), and that releasing scanned documents that were not lined up on the page would make the department look unprofessional. On several occasions, Turner asked Parker whether she felt comfortable releasing documents that look this way, and asked whether Parker wasn't embarrassed to do so. Parker then asked the producing officer whether a better copy existed, and he confirmed that it did not. So Turner directed that the records not be produced, and they were not.

76.     The concern about aesthetics was pretext: the office regularly produced documents that did not look perfect, as it is of course required to do by FOIA. Turner's concern was, in fact, that the requesting reporter was planning to criticize MPD with the documents he requested.

77.     In 2018, an employee of Mayor Muriel Bowser was involved in a drunken altercation after an office party in the Mayor's office building. Ultimately, he was taken to the hospital in police custody and, therefore, a police officer wrote a report even though no charges were filed. Marina Marraco, the reporter for FOX-5 DC, learned of the incident and filed a FOIA request for the arrest report. When the FOIA office received the request, Parker flagged it for Turner because it came from a reporter and because it had obvious potential to embarrass the department.

78.     Turner told Parker to hold the request while she consulted with the Mayor's office and, after she did, Turner instructed Parker to redact the narrative section of the incident report before producing it. But Turner evidently did not realize that, pursuant to a separate law, police districts must produce unredacted copies of certain arrest reports. Marraco, then, received an unredacted copy from the police district alongside a redacted copy from the MPD FOIA office. On July 26, 2018, Marraco posted the images alongside each other on Twitter, writing: "Media gets redacted version. Anyone else: unredacted (only last names)."

79.     Turner was right to perceive a potential for embarrassment to MPD: Marraco then ran a story and posted a Tweet explaining that the Mayor's office employee had received special treatment by not being charged with a crime after his

conduct and noting the transparency problems arising from Marraco's interactions with MPD.

80.   On another occasion, many community groups (including the ACLU) requested MPD data on arrests for marijuana possession. When the FOIA office received the request, Parker flagged it for Turner because it came from the ACLU and because it had the obvious potential to embarrass the department. After Turner received the responsive data and discovered that it showed that a disproportionate number of the arrests occurred in neighborhoods with predominantly Black residents, she directed Parker and her staff to withhold the data while MPD officials gathered additional data regarding 9-1-1 calls and other calls for service so that they could argue that the disproportionate arrests were due to disproportionate requests rather than discrimination. It took at least a month to gather that additional data, and only after the data was ready did MPD respond to the FOIA request, despite having records in producible form at the beginning of that month.

81.   Pursuant to the policy, then, requesters on the watchlist always at least experience a delay in their requests while the department prepares for any criticism that may result. On some occasions, requesters are subject to fees that others don't need to pay. And on other occasions, requesters simply don't get information that they are entitled to. The policy was either implemented at the direction of the Chief of Police, or (without limitation) he acquiesced in its continued operation after receiving many emails specifically implementing the policy and personally discussing it on several occasions.

**The Harm to Phillips**

82.    According to Parker, Phillips first came to the attention of the FOIA office because she requested transcripts of Adverse Action Hearings, which records have the potential to embarrass MPD.

83.    Her request for records of the Lojocano hearing thus prompted double scrutiny: The request came from Phillips, who had been placed on the list for requesting similar records, and the request asked for records that themselves could embarrass the department.

84.    As explained above, the request was immediately denied under suspicious circumstances.

85.    Parker confirms that, contrary to the ordinary policy for FOIA requests, Turner herself directed the denial after an email flagging the request for Turner and Newsham.

86.    After Phillips was successful in appealing to the Mayor's Office of Legal Counsel, Turner and others in the FOIA office decided (as they believe they are permitted to do under D.C. law) to persist in withholding records.

87.    After Phillips threatened to sue MPD if it did not produce responsive records, Turner acquiesced and directed Parker to begin redacting the records to remove, among other things, the names and official job titles of witnesses who testified for and against Lojocano, even though those people testified in a public hearing.

88.     Parker began the process of redacting those records, but she had already been delayed because Turner—again contrary to ordinary practice—took time to consult with Newsham.

89.     Phillips intends to continue her advocacy and to continue requesting potentially sensitive records from MPD.

90.     If MPD's policy is not enjoined, then, Phillips's future requests will surely be delayed; may be subject to improper threats of fees; and may be denied wrongly outright, as her Lojocano request was.

## Claim for Relief

### *Count One*: Content- and Viewpoint-Based Restriction of Speech in Violation of the First Amendment Under 42 U.S.C. § 1983

91.     The District of Columbia maintains a policy of delaying, burdening, or denying FOIA requests on the basis of the content and viewpoint of speech that requesters will voice using the requested information and on the basis of the content and viewpoint of speech that requesters have voiced in the past.

92.     This policy was implemented by the Chief of Police, who is a delegated policymaker with respect to the subject of this suit under D.C. law.

93.     In the alternative, this policy was ratified by the Chief of Police, who is a delegated policymaker with respect to the subject of this suit under D.C. law.

94.     In the alternative, this policy is a custom or practice so pervasive as to take on the force of law.

95.     Phillips is subject to delays, burdens, and denial of FOIA requests that she will file in the future because of the content and viewpoint of her prior protected

speech and because of the content and viewpoint of the speech that she intends to voice with requested information in the future.

96.    The District has no good reason for imposing these burdens, let alone a reason that is narrowly tailored to forward a compelling government purpose.

97.    The District's policy, therefore, violates the First Amendment to the United States Constitution.

## Prayer for Relief

Plaintiff Amy Phillips respectfully requests:

- An injunction requiring the District to cease its policy of unfavorable treatment of certain FOIA requests and requesters (as described in the above Complaint) and to instead treat all FOIA requests in a materially identical fashion without regard to the content or viewpoint of the requesters' prior or anticipated speech. The injunction should include a way for Phillips and this Court to ensure continued compliance;
- A declaratory judgment that the District's policy of unfavorable treatment of certain FOIA requests and requesters (as described in the above Complaint) violates the United States Constitution;
- An award of nominal damages in the amount of $1;
- An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and,
- All other relief that this Court may consider just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,

Los Angeles, CA 90016
jason@gerstein-harrow.com
(323)-744-5293