## DECLARATION OF VENDETTE T. PARKER

I, Vendette T. Parker, declare the following:

1.  I am over the age of 18 and competent to render testimony contained herein based on my knowledge and experience as a former employee of the District of Columbia, Metropolitan Police Department (MPD).

2.  I retired from MPD in January 2020 at the rank of Inspector. I served as MPD's Freedom of Information Act (FOIA) Officer from October 2017 until my retirement.

3.  In 2019, Ms. Amy Phillips filed a FOIA request with MPD for the entire Adverse Action Hearing file for Officer Sean Lojocano including all electronic communications, such as emails, text messages, etc., associated with it.

4.  The request was received by MPD on the same day it was filed. The FOIA office began processing the request immediately.

5.  FOIA requests are generally processed as follows: (1) request is received by intake assistant; (2) the intake assistant reviews the request to ensure it is seeking records for which MPD is the repository; (3) once confirmed the request is one in which MPD holds records, the intake assistant assigns the request to a FOIA specialist and then sends a notification to the MPD unit likely to be in possession of the records that a request for records has been made and requests that unit to forward all responsive documents to the assigned FOIA specialist; (4) the intake assistant sends the requester

an email confirming receipt of the request and notifies the requester of the name and contact information of the FOIA specialist assigned to process the request; (5) the records are located and forwarded to the assigned FOIA specialist; (6) the FOIA specialist reviews the documents for responsiveness. Of the records that are responsive, the FOIA specialist prepares the records for release to the requester by redacting any information deemed exempt under DC Code, DCMR, or any other controlling authority; (7) upon completion, the proposed responsive records to be released are reviewed by the FOIA supervisor or the FOIA officer for completeness and accuracy; finally, (8) the responsive records are released to the requester.

6. Although this is generally how FOIA requests were processed, there was a different process for certain situations.

7. On my very first day assigned to the FOIA office, my new supervisor, the then Chief Operating Officer, LeeAnn Turner, conferenced with me and gave me her expectations of me in my new role. She explained first that the office was generating surplus Equal Employment Opportunity (EEO) complaints and that she wanted me to quell those intraoffice issues. Second, she explained that the then Chief of Police, Peter Newsham, felt he was being blindsided as the media and others confronted him with questions regarding records they had obtained from FOIA; records he was unaware had been released.

8. As a result and to prevent Chief Newsham from being blindsided in the future, Ms. Turner advised me of an unofficial,

2

unwritten policy that required the FOIA officer to notify Chief Newsham and Ms. Turner of any FOIA request originating from the media, certain identified individuals, or requests for certain records.

9. Although Ms. Turner did not name any specific individual in this meeting, she made it clear that I should bring to her attention any request coming from a person he has previously published a negative media article about Chief Newsham or MPD, if he uses the records for litigation if he is outspoken in City Council or community meetings in a negative way toward Chief Newsham or MPD, if the requester is the subject of a high profile incident, or if he repeatedly requests records that have the potential to be detrimental to Chief Newsham or MPD, regardless is of whether or not what is currently being requested is potentially detrimental.

10. Some examples are Eric Flack, WUSA9 reporter; Marina Marraco, Fox5 reporter; the ACLU; Denise Krepp ANC Commissioner; Lorenzo Greene, ANC Commissioner; Benjamin Douglass, Anti-Defamation League (ADL); Emily Barth, Public Defender's Office; and Amy Phillips, Public Defender's Office; among others.

11. Examples of requested records that would invoke the unofficial and unwritten procedure were requests for any Gun Recovery Unit (GRU) records, personnel records, the Chief's or Ms. Turner's emails, use of force records, stop and frisk records, any records related to a recent negative high profile event involving MPD, any type of statistics or data, and adverse action records, among others.

12. When such records were requested, Ms. Turner would often either direct me to or research the requester herself using publicly available sources such as google. Ms. Turner was interested in who the requester was to better predict the motivation of the requester for requesting the records they requested and how those records might be used (to harm MPD or Chief Newsham reputationally, in litigation, etc.).

13. To facilitate this unofficial and unwritten policy, I sent an email to Chief Newsham and Ms. Turner weekly which included a listing of all FOIA requests received the prior week, highlighting any requests that originated from the media, specific individuals, or sought certain records.

14. Additionally, Ms. Turner convened a weekly FOIA meeting every Tuesday at 11:00am where the highlighted FOIA requests were discussed and I was given specific instruction on how Ms. Turner wanted them handled.

15. Once these highlighted FOIA requests had been processed, I was required to present the proposed responsive records to Ms. Turner, at the aforementioned Tuesday meetings, for authorization to release. The proposed responsive records were to be presented to Ms. Turner in printed form. The Chief and Ms. Turner were averse to emails as they created material susceptible to FOIA laws or discovery in litigation.

16. The purpose of presenting the records to Ms. Turner was to allow her and Chief Newsham an opportunity to inspect what

records were about to be released in order to prepare in case any of the records being released would have a reputationally detrimental impact to Chief Newsham or MPD before the requester received the potentially detrimental records.

17. I have no knowledge of whether Ms. Turner and Chief Newsham actually met to discuss any proposed releasable records. I was never a part of their meetings. I only know that Ms. Turner told me she would discuss them with Chief Newsham.

18. In the case of Ms. Phillips, two criteria were met requiring her requests be elevated to the attention of Chief Newsham and Ms. Turner. Ms. Phillips was one of the specific individuals and she was requesting records pertaining to Lojocano; an officer involved in a high-profile incident.

19. The Public Defender's Office originally came to the attention of Chief Newsham and Ms. Turner due to the records its representatives sought in FOIA requests filed prior to the one at subject here and because she was a public defender requesting them. The PDS had previously requested all of the names and badge numbers for every officer assigned to each patrol district, the Narcotics and Special Investigations Division (NSID), and the Gun Recovery Unit (GRU). Ms. Phillips, in her capacity as a public defender, also requested copies of the transcripts for every Adverse Action Hearing that occurred during a specified time period, among other requests.

20. In compliance with MPD's unofficial FOIA policy, when Ms. Phillips's request for Lojocano's adverse action hearing transcripts

5

was received, I notified Ms. Turner of the request. She advised me to deny the request as the agency considered these documents to be personnel records and it was the agency's position not to release such records under the personal privacy exemption.

21. A letter was sent to Ms. Phillips notifying her that her request was denied and providing her with information on the appeal process.

22. There are two options once a District of Columbia government agency denies, in whole or part, a FOIA request. The requester may appeal to the MOLC (agency that handles FOIA complaints), or the requester may file a lawsuit to seek judicial remedy.

23. Ms. Phillips appealed the denial to the Mayor's Office of Legal Counsel (MOLC).

24. After consideration, the MOLC ruled that these records were a matter of public interest; the public's interest in the case outweighed Lojocano's privacy interest and that MPD should release the records.

25. Redacted

26. Redacted

27. Redacted

Redacted

28. Redacted

29. Redacted

30. Redacted

31. While the FOIA office awaited a decision from the Chief's office, Ms. Phillips contacted the FOIA office to follow up on the disposition of her request. I informed Ms. Phillips that MPD received the MOLC's ruling and was in the process of considering next steps. Ms. Phillips provided a deadline to begin receiving records and informed me should that deadline expire without receiving any, she would file a lawsuit.

32. Redacted

33. I contacted Ms. Phillips the same day and informed her that we would process and release responsive records to her as soon as possible.

34. **Redacted**

35. The records were stored on a shared drive to which members of OGC had access.

36. Ms. Phillips contacted me via email once again to ask the disposition of her request. I informed her that her request was still being processed. Ms. Phillips again threatened litigation.

37. Ms. Phillips's second threat was communicated to Ms. Turner via phone, not email.

38. Shortly afterward, in approximately June of 2019, I was notified by the District of Columbia, Office of the Attorney General (OAG), that Ms. Phillips had indeed filed a lawsuit seeking release of the requested records.

39. I advised Ms. Turner via phone conversation and reminded her that I had completed processing the records and they were ready to be released once authorized.

40. Redacted

41. Redacted

42. Redacted

43. Redacted

44. Redacted

45. The day before the scheduled hearing, Ms. Turner gave final authorization and all responsive records within FOIA's custody at that time were released with the exception of Body Worn Camera (BWC) footage.

46. BWC video was not processed as part of Ms. Phillip's request because Ms. Turner informed me that it was the agency's position that the BWC video was not responsive.

47. All records that the FOIA office received from MPD's Disciplinary Review Office in response to Ms. Phillips's request were saved on the aforementioned shared drive for which all FOIA specialists, FOIA supervisors, the FOIA officer, and several members of OGC had access. At no time did I store any records on a storage medium to which I only had access.

48. Additionally, all records that the FOIA office received from MPD's Disciplinary Review Office (repository unit for adverse action hearing records) in response to Ms. Phillips's request were processed by me then reviewed by Mr. Viehmeyer and Ms. Turner. The documents proposed for release, the applied redactions, and those withheld were approved by both.

49. Although I was the FOIA officer for MPD, it is not accurate that I approved nor made the final determination to release all records. In many situations, the approval to release documents, which ones, and when to release them were made by Ms. Turner and Chief Newsham. This case is an example of one of them.

50. **Redacted**

51.    Other examples of FOIA requests where Ms. Turner took control include: (1) a request in which outside employment records were requested in response to a recent news story on a local news channel.  The request generated hundreds of responsive documents.  One of the records appeared to have been faxed and was distorted and off center on the copy.  Ms. Turner was unhappy with the aesthetic of the record and refused to allow them to be released.  She directed me to contact the unit responsible for keeping the records to see if they had a better copy.  I contacted that unit and was informed the distorted copy was the only one they had.  When I told Ms. Turner this, she said the distorted copy looked unprofessional and refused to approve the release of the records; (2) a request which sought stop and frisk reports was delayed from release until each report was read and several meetings were held with a group of Ms. Turner's direct reports (Mr. Matthew Bromeland, then chief of staff; Ms. Kelly O'Meara, director of strategic change; Ms. Maureen O'Connell, director of policy and standards; Ms Heidi Fieselmann, special assistant to chief of police; Mr. Dustin Sternbeck, Public Information Officer, and me) where the ramifications of releasing the requested records were discussed and what the agency's response should be; (3) a request for injured person to hospital reports. After I gathered all of the responsive documents, Ms. Turner directed Commander Leslie Parson, Criminal Investigations Division, to conduct a full investigative follow-up on each report and update the classification of those needing updating.  Ms. Turner conferenced

with Commander Parson and me and went through each report before approving the records for release.

52. It should be noted here that Ms. Turner was aware of the time restraints the DC FOIA law placed on each agency and that her refusal to authorize release of records until the agency was comfortable with what was being released would put the agency in violation of the DC FOIA law's time restraints.

53. I did not convey MPD's unofficial and unwritten FOIA procedure to the OAG or any other authority because I felt intimidated. Four months prior to being assigned to the FOIA office, Chief Newsham took retributive action against me in what can only be defined an act of retaliation. I was demoted from commander to inspector after speaking up about a different incident and perceived that if I spoke up about the issues described in this statement that I would be retaliated against once more.

54. My statements here are being made from my memory of events that occurred at least three years ago and without the benefit of or ability to review notes or emails. I retired from MPD in 2020 and no longer have access to those verifying documents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my recollection.

10/18/2021
Date

Inspector Vendette T. Parker, retired