**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMY PHILLIPS, | |
| **Plaintiff,** | |
| v. | Civil Action No. 22-277 (JEB) |
| DISTRICT OF COLUMBIA, | |
| **Defendant.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**INTRODUCTION**

Plaintiff Amy Phillips's challenge to the District of Columbia's (the District) handling of her Freedom of Information Act (FOIA) request should be dismissed for lack of subject matter jurisdiction and a failure to state a claim for relief. She alleges that the Metropolitan Police Department (MPD) has a policy or practice of treating FOIA requests from certain individuals—individuals who are purportedly on a "watchlist" created by former MPD Chief Peter Newsham—differently than the requests of other individuals (the "watchlist policy").

As a threshold matter, plaintiff lacks standing under Article III because she has not alleged an imminent injury. Plaintiff fails to allege that she has any FOIA requests pending with MPD or that she intends to file any FOIA requests in the near future. Plaintiff's allegation that she expects to file unidentified requests at an unidentified time is insufficient to satisfy standing requirements when seeking prospective relief.

Plaintiff's Complaint should be dismissed because it fails to state a First Amendment claim. First, plaintiff's claim is one of selective enforcement, which is properly analyzed under the Equal

Protection Clause, not the First Amendment. Second, plaintiff's claim rests on the faulty assumption that the First Amendment entitles her to access certain government information. It does not. The Supreme Court has established that the protections of the First Amendment do not include the right to access any documents in the possession of the government. While some courts have found that the First Amendment may provide a right to government documents in very limited circumstances, none of those circumstances are present here.

Finally, even assuming plaintiff has stated a plausible claim for relief under the First Amendment, plaintiff cannot establish municipal liability under 42 U.S.C. § 1983 (Section 1983), because she has not alleged that the purported violation was caused by an express policy, the actions of a policymaker, or a custom or practice. The Court should grant the District's motion to dismiss.

## BACKGROUND

I.    **The Metropolitan Police Department's FOIA Procedure**

The District of Columbia Freedom of Information Act (FOIA), D.C. Code § 2-531 *et seq.*, was passed to ensure public access to "full and complete information regarding the affairs of government." D.C. Code § 2-531. FOIA provides that "a public body … shall within 15 days" of a request "reasonably describing any public record" either make the requested record available or notify the requestor of its determination not to produce the record and the reasons for its refusal. D.C. Code § 2-532(c)(1). If the request is for body-worn camera footage (BWC), the Metropolitan Police Department (MPD) "shall [respond to the request] within 25 days." D.C. Code § 2-532(c)(2)(A). The statute allows for extensions of the time limit for "unusual circumstances," provided that the requestor is given written notice "setting forth the reasons for extension and [the] expected date for determination." D.C. Code § 2-532(d)(1). Such extensions are limited to 15 days

2

for BWC and 10 days for all other records. *Id.* "Unusual circumstances" includes "[t]he need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records that are demanded in a single request." D.C. Code § 5-532(d)(2)(A). FOIA exempts certain categories of information from disclosure, such as personal information that, if released, "would constitute a clearly unwarranted invasion of personal privacy." D.C. Code § 2-534(a)(2).

If a FOIA request is denied in whole or in part, the statute provides that the requestor can appeal the agency's decision to the Mayor's office. D.C. Code § 2-537(a). Further, if the Mayor upholds the denial or fails to respond within a statutory time limit, or if the agency continues to withhold records after a decision by the Mayor that they must be produced, the requestor may bring a lawsuit in D.C. Superior Court "for injunctive or declaratory relief" to secure the release of the requested records. D.C. Code § 2-537(a)(1), (a)(2).

MPD has created a policy and procedure to ensure compliance with the requirements of FOIA. *See* General Order 204.05, Freedom of Information Act Requests, *available at* https://go.mpdconline.com/GO/GO_204_05.pdf. The FOIA officer designated to handle a request is responsible for logging the request, determining which elements of MPD are responsible for providing records, and forwarding the request to the appropriate commanding officer. *Id.* at 10–11. MPD's policy also reiterates the process by which a requestor can appeal the denial of the FOIA request to the Mayor's office, as set out in FOIA. *Id.* at 12–13.

## II.    **Plaintiff's 2019 FOIA Request and Related D.C. Superior Court Litigation**

In 2018, the ACLU-DC brought a lawsuit against then-MPD Officer Sean Lojacono for unreasonable search and seizure following a September 2017 incident in which he inappropriately conducted a search. *See* Patrick Madden and Miela Fetaw, *ACLU Files Suit Against MPD Officer Over 'Highly Intrusive' Search*, DCist (July 18, 2018), *available at*

https://dcist.com/story/18/07/18/aclu-stop-frisk-lawsuit-cottingham-dc-police-lojacono/;   Compl.

¶ 20 [1]. The details of the incident and ensuing lawsuit led to a large amount of media attention

and focus on MPD's handling of the case. Compl. ¶ 20.

Plaintiff attended the Lojacono Adverse Action hearing as a member of the public

interested in investigating allegations of police misconduct. Compl. ¶ 11. On March 15, 2019, a

few days after the Lojacono hearing concluded, plaintiff submitted a FOIA request "for the tapes

of the proceedings and a transcript of the proceedings." *Id.* ¶ 21. Plaintiff's request was allegedly

denied in full the same day it was submitted, because the "release of such records would

constitute … a clearly unwarranted invasion of personal privacy" and the records were therefore

"exempt from disclosure." *Id.* ¶ 23. Plaintiff appealed the denial of her request to the Mayor's

Office of Legal Counsel, which ruled that MPD should release the records with applicable

redactions. *Id.* ¶¶ 25–26. When she had not received responsive records by June 2, 2019, plaintiff

filed suit in D.C. Superior Court for violation of FOIA. *Id.* ¶¶ 28–29. Plaintiff states that the

District "began producing documents responsive to [her] requests," with redactions she "believed

were unwarranted," on September 26, 2019. *Id.* ¶ 32. The Superior Court case continued until

plaintiff voluntarily dismissed her lawsuit with prejudice on January 12, 2022. *Id.*

## III.    Plaintiff's Allegations In This Lawsuit

Plaintiff filed her Complaint in this case on February 2, 2022, alleging that MPD has a

policy of treating certain FOIA requests differently based on the identity of the requestor or subject

matter of the request by providing "special review by high-ranking officials." Compl. ¶ 1.

Specifically, plaintiff alleges that her 2019 FOIA request for a transcript was improperly handled,

in accordance with that policy. *Id.* ¶¶ 21, 82–84. Plaintiff argues that MPD's differential treatment

of certain FOIA requests amounts to a violation of the First Amendment's prohibition on content

4

and viewpoint discrimination. *Id*. ¶ 91. Plaintiff seeks declaratory and injunctive relief, as well as nominal damages and attorney's fees and costs. *Id*. at 19.

## LEGAL STANDARD

### I.   <u>Motion to Dismiss for Lack of Subject Matter Jurisdiction</u>

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating that the court's jurisdiction is proper by a preponderance of the evidence. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). "[S]ubject matter jurisdiction is, of necessity, the first issue for an Article III court." *Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### II.   <u>Motion to Dismiss for Failure to State a Claim</u>

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

**ARGUMENT**

**I.**   **Plaintiff Lacks Standing Under Article III Because She Fails To Allege the Likelihood of Future Injury.**

Plaintiff bears the burden of proving that this Court has jurisdiction to hear her claim. *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 89 (D.D.C. 2013). Plaintiff must therefore allege facts showing that she has "suffered an 'injury in fact', *i.e.*, 'an invasion of a legally protected interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id*. at 91 (quoting *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560 (1992)). However, "when a plaintiff seeks prospective declaratory or injunctive relief, allegations of past harms are insufficient." *Id*. Instead, a plaintiff must allege that she is "likely to be subjected to the policy again." *Id*. "This threat must be 'real and immediate,' or alternatively, 'realistic' in nature." *Id*. (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 1983)). A court "may not hear a claim for equitable relief that rests solely on a 'speculative claim of future injury.'" *Tipograph v. Dep't of Justice*, 146 F. Supp. 3d 169, 175 (D.D.C. 2015) (quoting *Lyons*, 461 U.S. at 111; *accord Citizens for Responsibility and Ethics in Washington (CREW) v. U.S. Dep't of Homeland Security*, 527 F. Supp. 2d 101, 106 (D.D.C. 2007) (granting motion to dismiss when alleged future injuries were "too speculative and remote" to support standing to seek prospective relief).

Here, plaintiff seeks only prospective relief: "Phillips is subject to delays, burdens, and denial of FOIA requests that she will file *in the future* because of the content and viewpoint of her prior protected speech … ." Compl. ¶ 95 (emphasis added); *id*. at 19 (requesting prospective injunctive and declaratory relief in Prayer for Relief).[1] But plaintiff does not allege that she has

---

[1]      As explained below in Section III, plaintiff has failed to allege the existence of a current policy as opposed to alleging a policy that previously existed under former Chief Newsham. Plaintiff's failure to allege the existence of a current policy also requires dismissal of her Complaint for lack of standing.

any FOIA requests pending with MPD or that she has any specific intent to file a FOIA request in the near future. She alleges only that she "intends to continue her advocacy and to continue requesting potentially sensitive records from MPD." *Id*. ¶ 89. Several courts in this District have found nearly identical allegations insufficient to establish standing for prospective relief.

As explained by Judge Lamberth,

> [Plaintiff] does not allege anywhere in its complaint or opposition brief that it has a FOIA request pending with the DHS or that it intends to file a specific request with the DHS for WAVES records in the near future. Without this information, the Court cannot say that the alleged future injury is either real or imminent. That [plaintiff] may one day file another FOIA request with the DHS does not represent a cognizable, palpable injury which presents a case or controversy for the Court to consider.

*CREW*, 527 F. Supp. 2d at 106. Although in the context of a motion for summary judgment, Judge Cooper's analysis in *Tipograph* is also instructive:

> If a plaintiff does not have a separate FOIA request pending before the agency that would be subjected to the challenged policy or practice, then the specificity with which the plaintiff indicates its intent to file future FOIA requests is crucial. A passing allegation that a plaintiff plans to file additional FOIA requests to the agency in the future will not suffice to establish standing to pursue a pattern or practice claim.

146 F. Supp. 3d at 176 (quotations and ellipses omitted).

Because plaintiff has failed to allege the existence of a current watchlist policy under Chief Contee (beyond a conclusory assertion, *see* Compl. ¶ 52), and has failed to allege any intent to file specific FOIA requests in the future, she has failed to establish standing to assert her claim.

## II.      **Plaintiff Fails To State a Claim Under the Free Speech Clause Because Her Claim Is Not Properly Raised Under the First Amendment, and Even If It Were, the Claim Fails as a Matter of Law.**

### A.      **Plaintiff's Challenge to the District's Compliance With FOIA Requirements Is Not Properly Raised as a First Amendment Claim.**

As a threshold matter, plaintiff has failed to state a viewpoint discrimination claim because

it is not properly raised under the First Amendment. Plaintiff, for example, does not raise a facial challenge to the constitutionality of FOIA but instead appears to bring an as-applied challenge, alleging that MPD fails to comply with FOIA's requirements when processing requests from certain individuals or based on certain subject matters. Compl. ¶ 91. Her theory is that the District violated the Free Speech Clause by failing to follow FOIA's requirements for her request while more favorably treating FOIA requests from others, *see id.* ¶¶ 38–52—conduct that plaintiff claims unconstitutionally discriminates "on the basis of the content and viewpoint of speech that requestors will voice using the requested information and on the basis of the content and viewpoint of speech that requestors have voiced in the past." *Id.* ¶ 18. Despite her reliance on the Free Speech Clause, plaintiff's claim is "in essence, one of selective enforcement." *Frederick Douglass Found., Inc. v. District of Columbia*, Civil Action No. 20-03346, 2021 WL 1166841, at *16 (D.D.C. Mar. 26, 2021) (quoting *Henderson v. Kennedy*, 253 F.3d 12, 17–18 (D.C. Cir. 2001)).

As this Court has found, "selective-enforcement claims are properly analyzed under the Equal Protection Clause, not the First Amendment, even if a plaintiff alleges that the selective enforcement occurred because the government sought to prevent the exercise of her free-speech rights." *Id.* at *5; *see Sanjour v. EPA*, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)) ("'Selective enforcement' is not, of course, a First Amendment cause of action; rather, as the Second Circuit has aptly observed, it lies in 'a murky corner of equal protection law.'"). When a plaintiff alleges that the law has been selectively applied, or failed to be applied, to her actions based on the content or viewpoint of her speech— as plaintiff does here—that "does not transform an equal protection 'selective enforcement' claim into a First Amendment 'as-applied' challenge." *Frederick Douglass Found.*, 2021 WL 1166841, at *5 (quoting *Sanjour*, 56 F.3d at 92 n.9). "The critical inquiry in such cases is thus ... whether

the government may constitutionally 'apply' the same rule to some individuals but not to others similarly situated." *Sanjour*, 56 F.3d at 92 n.9. Accordingly, the Court should not consider plaintiff's Free Speech Clause claim based on allegations of viewpoint-discriminatory enforcement of FOIA's requirements because her "true claim is one protesting the District's selective enforcement," which is "more properly analyzed under the Equal Protection Clause." *Frederick Douglass Found.*, 2021 WL 1166841, at *6.

   **B.      Even If Plaintiff's As-Applied Challenge Were Properly Raised Under the First Amendment, It Still Fails Because Plaintiff Does Not Have a Right To Access Government-Controlled Information and the District's Compliance with FOIA Requirements Withstands Constitutional Scrutiny.**

   **1.      There Is No First Amendment Right to Access a Government Record.**

   Even if plaintiff's as-applied challenge to MPD's compliance with FOIA requirements when processing certain FOIA requests were cognizable under the Free Speech Clause, plaintiff has failed to state a claim. Plaintiff contends that she has a First Amendment right to access particular government records in a particular manner. *See* Compl. ¶¶ 1, 38–52 (describing MPD's differing internal procedures to produce responses to FOIA requests). Not so. The Supreme Court has held that there is no First Amendment right to access government information. *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (plurality opinion). Even taking plaintiff's claims as true, her remedy lies in FOIA, not the First Amendment.

   The Supreme Court has "repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws." *McBurney v. Young*, 569 U.S. 221, 232 (2013) (collecting cases). In *Houchins*, the Supreme Court—in a plurality opinion—found that there is no First Amendment "right of access to government information or sources of information within the government's control." *Houchins*, 438 U.S. at 15. Since *Houchins*, courts have consistently applied the plurality's opinion to deny First Amendment claims seeking redress for denial of government

9

records. *See L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) (rejecting First Amendment challenge based on "governmental denial of access to information in its possession" and citing *Houchins*); *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 934 (D.C. Cir. 2003) (applying *Houchins* and rejecting plaintiff's First Amendment claim to the right to access government records concerning detained terrorism suspects); *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998) (applying *Houchins* and finding that the First Amendment did not create right to access motor vehicle records); *Begay v. Nat'l Archives & Recs. Admin.*, Civil Action No. 21-782, 2021 WL 4589085, at *2 (D.D.C. Oct. 6, 2021) (granting dismissal because "plaintiff's claim is a statutory one about whether he is entitled to all the records he requested, not a constitutional one about his [First Amendment] right to petition the government"). Indeed, the question of access to government information "is a question of policy which a legislative body might appropriately resolve one way or the other." *Houchins*, 438 U.S. at 12; *Fusaro v. Cogan*, 930 F.3d 241, 252 (4th Cir. 2019) (explaining that "regulations on [a government record's] distribution reflect policy judgments to which courts must ordinarily defer").

At bottom, plaintiff's Complaint is about access to government records. She only contends that MPD failed to provide her a single government record—the Lojacono transcript—in a timely manner, and she believes she was entitled to receive that document under FOIA. *See* Compl. at 18 ("The Harm to Phillips"); *id.* ¶¶ 82–87; Background, Section II. But FOIA governs the access to the document plaintiff sought, and, as plaintiff acknowledges, District law provides a process for seeking redress for District agencies' violations of FOIA. *See* Compl. ¶ 26 (plaintiff appealed MPD's decision to the Mayor's Office of Legal Counsel "as permitted by D.C. Law"); *id.* ¶ 29 (plaintiff brought suit in Superior Court "seeking an injunction requiring the District to produce documents"); Background, Section II. In fact, plaintiff followed this procedure to challenge MPD's

decision to withhold the Lojacono transcript based on the personal privacy exemption, and she received the transcript she sought after doing so. Background, Section II. Her only remaining dispute with MPD involved the redactions in the produced transcript, but plaintiff abandoned her challenge to MPD's production in Superior Court, when she voluntarily dismissed her case. *Id*. Plaintiff's dispute with MPD regarding the Lojacono transcript was based on the parties' differing interpretations of FOIA requirements; plaintiff's remedy would therefore implicate FOIA, not the First Amendment.

Additionally, the narrow exceptions to the rule that there is no First Amendment right to access government records do not apply here. The Supreme Court has recognized a single exception to the *Houchins* rule, allowing a First Amendment claim to proceed when it involves access to records from criminal proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–77 (1980). But that has no bearing on plaintiff's claim here. *See Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 934 (D.C. Cir. 2003) ("The narrow First Amendment right of access to information recognized in *Richmond Newspapers* does not extend to non-judicial documents that are not part of a criminal trial ... ."). Other courts to apply the First Amendment in cases involving access to government information have done so when a state law wholly denied access to government information to a certain group based on its eventual speech. *See, e.g.*, *Lanphere & Urbaniak v. State of Colo.*, 21 F.3d 1508, 1513 (10th Cir. 1994) (finding the First Amendment was implicated where a state law "disallow[ed] the release of records to those wishing to use them for commercial speech, while allowing the release of the same records to those having a noncommercial purpose"); *Fusaro v. Cogan*, 930 F.3d 241, 253 (4th Cir. 2019) (finding that the First Amendment could be implicated when a state law denies access to government records to certain groups and those records were closely tied to political speech). These non-binding

decisions are clearly distinct because, here, plaintiff does not even allege that the watchlist policy results in a categorial denial of documents; she merely alleges that the policy results in different internal MPD procedures. *See* Compl. ¶¶ 38–51. Without any cognizable exception to the *Houchins* rule present here, the Court should dismiss plaintiff's Complaint because she fails to state a claim under the First Amendment.

> **2.      The District's Application of FOIA Requirements Is Content- and Viewpoint-Neutral.**

Although plaintiff contends that there is a pattern to MPD's alleged mishandling of FOIA requests that amounts to viewpoint discrimination, Compl. ¶ 91, this conclusion is not borne out by the alleged facts or the law. To establish such a claim under the First Amendment, plaintiff must show that MPD engaged in "a pattern of unlawful favoritism," *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002), stemming from an official policy or custom of intentional discrimination, *see Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) ("[A] plaintiff must show that a municipality's content-discriminatory enforcement of an ordinance is the result of an intentional policy or practice."). Thus, plaintiff must show both that there was a "pattern" of discriminatory enforcement *and* that this pattern was the product of "a governmental policy or custom of intentional discrimination on the basis of viewpoint or content."[2] *Frederick Douglass Found.*, 2021 WL 1166841, at *9 (quoting *Brown v. City of Pittsburgh*, 586 F.3d 263, 294 (3d Cir. 2009)).

---

[2]      Plaintiff would also have to show that such a policy or custom exists to establish municipal liability under 42 U.S.C. § 1983. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 994 (1978); *Brown*, 586 F.3d at 296 (holding that even if officer did not enforce ordinance against other individual because of that individual's viewpoint, plaintiff "would still need to show that the officer's inaction was the product of an unlawfully discriminatory governmental policy or custom"). For essentially the same reasons, plaintiff fails to satisfy either of these requirements.

Here, plaintiff contends that the District has different procedures for processing "ordinary" FOIA requests versus "watchlist" FOIA requests. Compl. ¶¶ 38–51. This difference in procedures, as described in the Complaint, *id.*, and declaration of former Inspector Vendette Parker, *see* Compl., Ex. 1, does not evince a pattern of improperly handling FOIA requests based on the requestor's viewpoint or the content of the request. Even taking plaintiff's allegations as true, the alleged watchlist policy would merely involve a series of notifications that lead to MPD leadership's awareness and oversight of certain FOIA requests and responses. *See* Compl. ¶ 43 (Ms. Parker "was to send an email to Newsham and Turner in which she listed all FOIA requests received the prior week"); *id*. ¶ 44 ("Parker and Turner would then have a weekly meeting" to discuss "how to process" the requests), ("Newsham direct[ed] the department's response" to some flagged requests). Nothing in plaintiff's allegations regarding the policy even suggests that the watchlist policy procedures violate FOIA requirements. *See id*. ¶¶ 38–52. Thus, plaintiff has failed to allege that any policy involved improper application of FOIA requirements.

Moreover, there are strong practical reasons for MPD's engagement in a process involving MPD's leadership for high-profile requests, and plaintiff does not show that the difference in procedures between "ordinary" requests and "watchlist policy" requests were the result of "intentional discrimination." *Hoye*, 653 F.3d at 855. Plaintiff concedes that the alleged watchlist policy was put in place "[t]o prevent Newsham from being so blindsided" by media questions regarding MPD's responses to FOIA requests. Compl. ¶ 42. Ensuring the Chief of Police is adequately prepared to address high-profile matters in his public appearances is *not* a discriminatory motive behind any differing policies for handling FOIA requests. And it is an entirely plausible explanation, given that the alleged differences in procedures involve only notifications to MPD leadership and oversight in the responses. Compl. ¶¶ 38–52. The fact that

those affected by the watchlist policy tend to be litigants or journalists would also make sense, given that their requests are often high-profile and more likely to generate media inquiries. *See Brown*, 586 F.3d at 293 (finding that it is not enough to show "merely that the weight of [the government's] enforcement ... has tended to fall more heavily on those who advocate one viewpoint ... than on those who advocate another"). Thus, plaintiff cannot show that the watchlist policy evinces an intent to discriminate on the basis of the content of the request or viewpoint of the requestor.

Plaintiff also alleges a handful of instances in which MPD allegedly failed to properly apply FOIA's requirements, but, at most, plaintiff has identified mere isolated lapses of following proper FOIA procedures, which are "neither a 'pattern' of enforcement activity based on content or viewpoint, nor a showing of government 'intent[]' underlying the disparate application." *Frederick Douglass Found.*, 2021 WL 1166841, at *9 (quoting *Brown*, 586 F.3d at 294); *see United States v. Barnes*, Criminal Action No. 18-54, 2020 WL 4933600, at *5 (D.D.C. Aug. 24, 2020) ("Pointing to a handful of instances of allegedly inconsistent enforcement is not enough to justify declaring [a] statute unconstitutional as applied to conduct the parties do not dispute falls under its purview.").

Plaintiff's own experience with FOIA requests is telling. Notably, plaintiff alleges that she filed at least eight FOIA requests between 2018 and 2021. Compl. ¶ 7. And, though plaintiff alleges that she is on the watchlist and at least several of those requests involved subject matters that could lead to adverse treatment, she only alleges that *one* of her requests—the request for the Lojacono transcript—was improperly handled.[3] *See id*. ¶¶ 1, 8, 9, 24, 25. A single instance of

---

[3]     To the extent plaintiff believes she was improperly denied an "index specifying the withheld records and the applicable exemptions" in response to her FOIA request seeking emails

alleged impropriety does not show a pattern of mistreatment. Moreover, there is a plausible reason underlying MPD's initial decision not to release the Lojacono transcript: MPD believed the record was "exempt from disclosure" pursuant to the personal privacy exemption provided under FOIA. Compl. ¶ 23. Plaintiff's additional vague allegations that MPD's handling of the transcript request was "suspicious" does not amount to evidence that MPD intentionally discriminated against her based on the content or viewpoint of her speech. *See id*. ¶ 84; *id*. at 3 ("MPD's Suspicious Response to FOIA Requests").

Similarly, plaintiff fails to establish a pattern of FOIA violations by describing alleged incidents of "the watchlist policy in action." *Id*. ¶¶ 53–81. Plaintiff describes five incidents of the watchlist policy allegedly having an adverse effect on MPD's processing of certain FOIA requests. *See id*. ¶¶ 55–72 (alleging that ACLU received a delayed response to its request of "quite voluminous" stop and frisk data records that are the subject of "extensive litigation"); *id*. ¶¶ 72–74 (alleging that a journalist requested stop-and-frisk incident reports and MPD determined that the reports required redactions that would be "extremely time-consuming"; MPD chose to wait for the journalist to follow up before completing the request and the journalist did not follow up); *id*. ¶¶ 75–76 (alleging that MPD declined to produce documents to a journalist because the materials would make the agency look unprofessional, in violation of FOIA); *id*. ¶¶ 77–79 (alleging that MPD redacted a portion of a police incident report for a high-profile event in accordance with FOIA); *id*. ¶ 80 (alleging that MPD held its response to a FOIA request from the ACLU for an

---

from MPD officials (which she received), plaintiff is mistaken. *See* Compl. ¶ 31. "A Vaughn index, created by judicial fiat (not the FOIA), is a suggested mechanism to assure adequate adversary testing of the government's claimed exemptions and to assist the court in assessing the government's position during litigation." *Schotz v. Samuels*, 72 F. Supp. 3d 81, 91 (D.D.C. 2014) (citing *Vaughn v. Rosen*, 484 F.2d 820, 828 (D.C. Cir. 1973)). A government agency is *not* required to produce it "during the administrative process." *Id.*

additional month before release to allow MPD to prepare information that provided context for the data ACLU requested). In sum, plaintiff only alleges that a watchlist requestor failed to receive the requested documents *twice* and only alleges that *one* of these incidents ran afoul of FOIA requirements. *Id.* ¶¶ 75–76. In two other incidents, plaintiff alleges that MPD was delayed in producing extremely voluminous data in response to high-profile requests. *Id.* ¶¶ 55–72; 80. And in another incident, plaintiff does not even allege *any* adverse impact of MPD's redaction of an incident report from a high-profile event; plaintiff merely notes that while FOIA permitted the redaction, a separate law allowed the requestor to obtain the unredacted document elsewhere. *Id.* ¶¶ 77–79. At most, these allegations amount to a "handful of incidents" that do not suggest there is a pattern of adverse treatment. *Barnes*, 2020 WL 4933600, at *5.[4] Moreover, the fact that certain FOIA requests—like ones requesting voluminous data related to high-profile issues—may be treated differently is, again, not evidence of an intent to discriminate on the basis of viewpoint or content. Indeed, different procedures and responses may be appropriate when the FOIA requests arise from "sharply contrasting circumstances." *Frederick Douglass Found.*, 2021 WL 1166841, at *1. Taken together, plaintiff's allegations cannot establish the requisite pattern and intent necessary to state a viewpoint and content discrimination claim.

3.  **Even Assuming Plaintiff's Allegations Are True, the District's Interest in Maintaining Any "Watchlist Policy" Would Outweigh the Plaintiff's Interest in Eliminating It.**

Even if the First Amendment were the appropriate vehicle for plaintiff's claim *and* the Court found that plaintiff plausibly alleges MPD has a policy of discriminating based on content and viewpoint, plaintiff would still fail to state a claim because "the governmental interest

---

[4]     As explained below in Section III.C, plaintiff's allegation that there were 20 times when the watchlist policy was applied between 2017 and the end of 2019 is similarly unpersuasive. *See* Compl. ¶ 53.

outweighs the burden and cannot be achieved through means that do not infringe on First Amendment rights as significantly." *Legi-Tech, Inc. v. Keiper*, 766 F.2d 728, 735 (2d Cir. 1985) (citing *Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 586 n.7 (1983)); *Fusaro v. Cogan*, 930 F.3d 241, 260 (4th Cir. 2019) ("A regulation on access to [a tool used for communication but not actual speech] can merit First Amendment protection, but not necessarily heightened scrutiny.").

Here, the burden alleged is minimal and outweighed by the governmental interest. As described above, the process plaintiff alleges MPD follows for FOIA requests related to the "watchlist" simply involves MPD FOIA staff providing regular updates and information to MPD leadership. *See* Section II.B.2, above; *Connick v. Myers*, 461 U.S. 138, 151–52 (1983) ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."). Providing information up the chain of command to ensure that the Chief of Police is prepared to communicate to the press about high-profile matters or issues that may be the subject of future litigation is a sensible policy; MPD has a substantial government interest in providing accurate information to the public, both for its own sake and for the sake of fostering public confidence in the police force. *See Connick*, 461 U.S. at 150 (recognizing the "government's interest in the effective and efficient fulfillment of its responsibilities to the public"); *Shelton Police Union, Inc. v. Voccola*, 125 F. Supp. 2d 604, 624–25 (D. Conn. 2001) (finding the government has a substantial interest in ensuring that the police department's public statements are approved by department leadership, protecting the government's confidential information, and functioning as effectively as possible). Additionally, the added oversight of MPD leadership has the benefit of ensuring the accuracy and propriety of the information released in response to a FOIA request, especially those requesting voluminous

data or of particular interest to the public. This supports MPD's interest in providing accurate information to the public.

Moreover, the burden imposed on the "watchlist" requestors is minimal. Although the added notifications and involvement of leadership may take some small amount of time by those processing FOIA requests, there is no allegation that the policy itself demands any particular outcome that would be unfavorable to those affected by it. *See* Compl. ¶¶ 38–52.

Additionally, plaintiff's own assessment of who is affected by the alleged watchlist policy and what subject matters trigger MPD's different internal FOIA procedures shows that the change in procedure is narrowly tailored to address the purpose underlying it. Plaintiff alleges that members of the media, attorneys who may bring litigation, and high-profile subject matters all trigger the additional notifications and involvement of MPD leadership under the policy. *Id.* ¶¶ 46–47. As discussed above, this makes sense. These requests are the most likely to yield media questions for the Chief of Police, and it is important for MPD to ensure the accuracy of information provided in response to these requests and to public inquiries about them.

In sum, the minimal burden resulting from any watchlist policy would be far outweighed by the benefits it may create.

### III.   <u>Plaintiff Has Failed To Allege That Any Violation of Her First Amendment Rights Was Caused by a Municipal Policy or Practice.</u>

Even assuming plaintiff has adequately alleged a violation of her First Amendment rights, her claim still should be dismissed because she has failed to allege that the violation was caused by a municipal policy of the District. "Under 42 U.S.C. § 1983, municipalities can be held liable for constitutional violations committed by their employees only if a plaintiff shows that the municipality is the 'moving force' behind the constitutional violation, meaning that an 'official municipal policy of some nature caused a constitutional tort.'" *Hurd v. District of Columbia*, 997

F.3d 332, 337 (D.C. Cir. 2021) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978)). The D.C. Circuit has identified four ways such an official policy can be shown: (1) the municipality adopts a policy that violates the Constitution; (2) a "policy maker" within the government takes an unconstitutional action; (3) "the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware"; or (4) "deliberate indifference" to the risk of constitutional violations. *Hurd*, 997 F.3d at 337 (quoting *Baker v. D.C.*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)). Each theory of municipal liability has its own elements and, to survive a motion to dismiss, "a plaintiff must plead the elements of the relevant type of municipal policy." *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). Here, plaintiff seeks to establish municipal liability under the first three tests. Plaintiff, however, fails to plausibly allege the elements to support any of her theories of municipal liability.

## A.   Plaintiff Fails To Allege an Express Municipal Policy.

Plaintiff alleges that the District "maintains a policy of delaying, burdening, or denying FOIA requests on the basis of the content and viewpoint of speech that requestors will voice using the requested information and on the basis of the content and viewpoint of speech that requestors have voiced in the past." Compl. ¶ 91. However, establishing the existence of an explicit municipal policy requires plaintiff to show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Plaintiff essentially concedes the lack of an express municipal policy when she alleges that former Chief Newsham implemented an *unofficial, unwritten* policy at MPD requiring him to be notified when certain individuals made FOIA requests. Compl. ¶¶ 40–42; *see also Tyson v. District of Columbia*, Civil Action No. 20-

1450, 2021 WL 4860685, at *9 (D.D.C. Oct. 19, 2021) (rejecting argument that silence in express policy could be interpreted as its own express policy and analyzing claim under custom or practice prong); *accord Arashiba v. City of Minneapolis*, Civil Action No. 20-579, 2021 WL 3276305, at *7 (D. Minn. Jan. 21, 2021) ("Courts thus evaluate allegations of an unwritten policy under the standards used to analyze the sufficiency of a *Monell* custom claim.") (citation omitted).

Further, plaintiff does not seek to remedy a past violation of her rights; plaintiff seeks to prevent a *future* violation. Compl. ¶¶ 95–97. But all of plaintiff's allegations in support of the existence of an express policy concern actions of former Chief Newsham, who retired from MPD in January 2021. *Id*. ¶¶ 40–51. Plaintiff's sole allegation concerning Chief Contee is that "[a]ccording to former colleagues of Parker, current Chief of Police Robert Contee has not ended or suspended the policy." *Id*. ¶ 52. That is a quintessential conclusory allegation. Plaintiff's reliance on unidentified individuals, who may or may not still work at MPD and who may or may not have any basis to be aware of how FOIA requests are handled, is pure speculation and cannot state a claim for municipal liability under the express policy prong. *See Iqbal*, 556 U.S. at 678.

**B.**   **Plaintiff Fails To Allege Any Unconstitutional Conduct by a Current Policymaker.**

A plaintiff satisfies *Monell*'s second prong by alleging that "an authorized policymaker made a one-time decision that resulted in the alleged constitutional deprivation." *Wheeler v. American Univ.*, Civil Action No. 20-2735, 2022 WL 160226, at *22 (D.D.C. Jan. 18, 2022) (citation omitted). Here, plaintiff seeks to satisfy that standard by alleging that the watchlist policy "was ratified by the Chief of Police, who is a delegated policymaker with respect to the subject of this suit under D.C. law." Compl. ¶ 93. Plaintiff's assertion that the Chief of Police is a delegated policymaker for how to handle FOIA requests under District law is wrong.

"The Supreme Court narrowly interprets [the term municipal] 'policymaker' for the

purposes of § 1983 liability, and discretion in a job function is not enough." *Allen-Brown v. District of Columbia*, 54 F. Supp. 3d 35, 42 (D.D.C. 2014) (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (O'Connor, J., plurality op.)); *see also Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014) (holding discretion to make final decisions in individual cases "is insufficient to create municipal liability [for those decisions] unless the decisionmaker [also] had been granted final policymaking authority under D.C. Law in the [relevant] area."). Rather, "an individual must 'speak with final policymaking authority for the local governmental actor' as established by state law." *Allen-Brown*, 54 F. Supp. 3d at 42 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 709 (1989)). "'[W]hen [according to state law] a subordinate's decision is subject to review by the municipality's authorized policymakers,' those policymakers 'have retained the authority to measure the official's conduct for conformance with *their* policies.'" *Miner v. District of Columbia*, 87 F. Supp. 3d 260, 266 (D.D.C. 2015) (quoting *Praprotnik*, 485 U.S. at 127) (emphasis in original).

As explained above, the handling of FOIA requests, like those submitted by plaintiff, are governed by District law, and "[w]hether a particular official has final policymaking authority is a question of state law and the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the state's business." *Horse, et al. v. District of Columbia*, Civil Action No. 17-126, Tr. of Status Conference, at 62 (Sept. 17, 2019) [68]. As Judge Amy Berman Jackson explained when evaluating similar allegations, "[w]hile at first blush it would seem logical that the city's top law enforcement officer who is alleged to have been personally supervising the MPD response … would qualify, there is binding precedent that I have to follow that compels the conclusion that he was not." *Id*. Just as it was the case in *Horse*, it is the case here: "Chief of Police Newsham was constrained by policies

not of his own making and any decision to depart from those policies was not an act of the municipality." *Id*. at 64.

And, more generally, under District law, all members of the police force, including the Chief of Police, are subordinate to the Mayor and (ultimately) the Council, and thus non-policymakers for purposes of municipal liability. As the Court in *Miner* explained:

> In the District of Columbia, the Mayor is ultimately responsible for the police department, *see* D.C. Code § 5-101.03, and the Mayor appoints a Chief of Police, 'with the advice and consent of the [City] Council," D.C. Code § 5-105.01(a-1)(1), to administer the police department. All police officers are required to "respect and obey the Chief of Police as the head and chief of the police force, subject to the rules, regulations, and general orders of the Council [ ] and the Mayor [ ]." D.C. Code § 5-127.03.

87 F. Supp. 3d at 266. These provisions establish that all police officers and command officials, including the Chief, are subordinate to the policymaking authority of the Mayor, as ultimately constrained by the "rules, regulations, and general orders," which are within the Council's purview to issue. *See id.* ("Thus, by law, police officers below the level of the Chief of police—and, arguably, the Chief [himself] … are subordinates [under Supreme Court precedent]"); *see also Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (holding fire chief and assistant fire chief are not policymakers for municipal liability purposes because the "Mayor and the City Council have expressly reserved supervisory powers to themselves").

And, as the D.C. Circuit has reminded, "discretion is insufficient to create municipal liability unless the decision maker had been granted final policy making authority under D.C. law in the area [at issue in plaintiff's complaint]." *See Singletary*, 766 F.3d at 74 (citing *Pembaur*, 475 U.S. at 480–83 and n.12; *Praprotnik*, 485 U.S. at 129–30). Here, against the backdrop of the policies and procedures set forth in FOIA, that authority was lacking. The Chief was constrained by those policies and procedures when he allegedly implemented the watchlist policy; any alleged

decision that departed from express District policy was not an act of the municipality for purposes of Section 1983. *See Singletary*, 766 F.3d at 74 ("The board thus was 'constrained by polices not of [its] making,' and its decision to 'depart[ ]' from those policies by revoking [the plaintiff's] parole based on unreliable hearsay was not an 'act of the municipality' for purposes of § 1983."). Even assuming the Chief could be a policymaker for FOIA purposes, plaintiff fails to allege any facts showing that the Chief of Police *since January 2021* has ratified the purported watchlist policy. *See* Compl. ¶ 52. Therefore, plaintiff has failed to allege municipal liability under the second prong for her requested prospective relief.

**C.**      **Plaintiff Fails To Allege That MPD Ever Had a Custom or Practice of Treating FOIA Requests Differently Based on the Identity of the Requestor.**

To state a claim for liability based on a custom, a plaintiff must allege "concentrated, fully packed, precisely delineated scenarios" to support his or her allegations that such a policy or custom exists, *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (quoting *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988)), and that the custom is "pervasive," *Tabb v. District of Columbia*, 605 F. Supp. 89, 96 (D.D.C. 2009). The past events involving government actions should be identical to the alleged wrongdoing underlying plaintiff's claim. *Egudu*, 72 F. Supp. 3d at 41 (holding report "analyz[ing] data related to disorderly conduct arrests [but] tailored toward exposing racial disparities" could not show policy or custom of "violat[ing] an individual's free speech right or the right to be free from an unlawful seizure"); *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133–34 (D.D.C. 2011) (holding report could not evidence municipal custom where "plaintiff was not arrested for the offense examined in the report"). Plaintiff has failed to plausibly allege facts to plead the elements of this theory of municipal liability. In support of her custom or practice claim, plaintiff identifies five purportedly similar examples of the "watchlist policy" being enforced, but these dated and dissimilar events

23

fall far short of showing a "pervasive" custom.

First, as explained above, given that plaintiff's alleged custom was supposedly implemented and overseen by former Chief Newsham, and that plaintiff fails to allege any specific occurrences of the policy occurring under Chief Contee, plaintiff's custom or practice claim should fail for that reason alone. But plaintiff's claim also ignores how many FOIA requests MPD receives each year. According to plaintiff, Ms. Parker estimates that there were 20 times when the watchlist policy was applied between 2017 and the end of 2019, Compl. ¶ 53, but from October 1, 2017, to September 30, 2019, MPD received more than 2,600 FOIA requests.[5] And, from October 1, 2019, to September 30, 2020, MPD received an additional 1,600 FOIA requests.[6] Given the thousands of FOIA requests that MPD has received since 2017, plaintiff's failure to identify any alleged examples of it occurring over the last two years strongly counsels against finding that plaintiff has alleged a custom or practice. *See, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) ("Given the department's size [of over 1500 officers], and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct."); *Ramos v. City of Chicago*, 707 F. Supp. 345, 347 (N.D. 111. 1989) ("[A]lleging six incidents of police brutality over a ten[-]year period in a city as large as Chicago with a police force in excess of 10,000 members is unremarkable, and in no way indicates a policy or custom.").

---

[5]     *See*   https://os.dc.gov/sites/default/files/dc/sites/os/page_content/attachments/Individual%
20Agency%20FY%202018%20FOIA%20Reports%20updated%202.25.19.pdf;
https://os.dc.gov/sites/default/files/dc/sites/os/publication/attachments/Combined-FY19-FOIA-
Agency-Report.pdf.

[6]     *See*   https://os.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/images/FY-
2020-Individual-FOIA-Agency-Reports.pdf.

Indeed, it is well settled that the "persistent" and "pervasive" pattern necessary to show municipal custom cannot be inferred from events with no temporal proximity to the conduct allegedly giving rise to a Section 1983 plaintiff's constitutional injury. For example, in *Page*, the Court held that plaintiff's reference to two cases that previously recognized a District policy of authorizing the complained-of conduct was insufficient to support a claim of municipal liability and dismissed that claim. 999 F. Supp. 2d at 285–86. The Court in *Page* noted that the "policy being addressed [in the earlier cases] was one that existed at least seven years prior," and the plaintiff supplied no facts suggesting "the District persisted in its unconstitutional actions." *Id.* at 285–86. The Court reached substantially the same result in *Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014), by declining to credit as evidence of municipal custom a report, compilation of statistics, and Court opinion that predated the plaintiff's alleged injury by six, nine, and four years, respectively. *Id.* at 43. Here, the same rationale is dispositive of plaintiff's claim of a municipal custom.

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiff's Complaint with prejudice.

Dated:  March 11, 2022.                    Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Assistant Deputy Attorney General

*/s/ Richard P. Sobiecki*
RICHARD P. SOBIECKI [500163]
PAMELA A. DISNEY [1601225]

AMANDA PESCOVITZ [1735780]*
Assistant Attorneys General
Equity Section
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 805-7512
pamela.disney@dc.gov
richard.sobiecki@dc.gov
amanda.pescovitz1@dc.gov

*Counsel for Defendant*

---

*     Admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver). Practicing under the direct supervision of Fernando Amarillas, a member of the D.C. Bar, pursuant to D.C. App. R. 46-A(d)(2).