**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMY PHILLIPS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 22-CV-277-JEB |
| | ) |
| THE DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**THE DISTRICT OF COLUMBIA'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ................................................................ 1

I.     FACTS ........................................................................................ 2

II.    ARGUMENT ............................................................................... 5

     A.    Phillips Has Standing to Sue ............................................... 5

         1.    Phillips's Nominal-Damages Claim Is Alone Sufficient .............. 5

         2.    This Court Can Take Judicial Notice of Phillips's Pending
             Requests, or, in The Alternative, She Will Amend ...................... 7

     B.    Phillips States a First Amendment Claim ............................... 9

         1.    The First Amendment And Equal Protection Clauses Both
             Require Equal Treatment With Respect to Viewpoint .............. 11

         2.    Phillips Alleges Denial of a Public Benefit, Not Selective
             Enforcement of a Statute ............................................. 13

         3.    Phillips Does Not Claim That The First Amendment
             Entitles Her to Any Records ......................................... 16

         4.    The District's Policy Is Obviously Content-Based at Least,
             And Viewpoint-Based to Boot ...................................... 17

         5.    The District's Policy Does Not Come Close to Surviving
             Strict Scrutiny ........................................................ 20

     C.    The District Is Responsible For The Constitutional Violation
         Phillips Alleges ............................................................ 22

         1.    The Chief of Police Has Final Policymaking Authority
             Under The D.C. Freedom of Information Act ....................... 23

         2.    Phillips Pleads a Custom Claim in The Alternative ................. 26

         3.    Phillips Alleges a Current Policy by a Current
             Policymaker And Regardless Prevails on Her Damages
             Claim ................................................................... 27

III.   CONCLUSION ........................................................................ 28

# TABLE OF AUTHORITIES

**Cases**

*Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 310 F. Supp. 2d 216 (D.D.C. 2004) ................................................................................... 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 2, 28

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) .................. 23

*Banks v. District of Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005) ............. 24

*Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009) .......................... 18

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) .................................. 20

*Brown v. Wilhelm*, 819 F. Supp. 2d 41 (D.D.C. 2011) ................................ 26

*Byrd v. District of Columbia*, 807 F. Supp. 2d 37 (D.D.C. 2011) .......... 23, 24

*Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir.1994) ......................... 7

*Citizens for Resp. & Ethics in Washington v. SEC ["CREW v. SEC"]*, 858 F. Supp. 2d 51 (D.D.C. 2012) ................................................................. 7, 9

*Citizens for Responsibility and Ethics in Washington v. Executive Office of the President*, 587 F. Supp. 2d 48 (D.D.C. 2008) ...................................... 7

*Citizens for Responsibility and Ethics in Washington v. United States Dept. of Homeland Security*, 527 F. Supp. 2d 101 (D.D.C. 2007) ....................... 7

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........................................ 7

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .................................. 26

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) .............. 15

*Dave v. Dist. of Columbia Metro. Police Dep't*, 905 F. Supp. 2d 1 (D.D.C. 2012) ................................................................................................... 24, 25

*Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014) .............. 27

*Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316 (D.D.C. 2021) ................................................................................ passim

*Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019) ......................................... 19

*Harwin v. Goleta Water Dist.*, 953 F.2d 488 (9th Cir. 1991) ................................... 9, 11

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016) ............................................... 12, 19

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) ........................................................ 14

*Jones v. Horne*, 634 F.3d 588 (D.C. Cir. 2011) ........................................................... 26

*Juluke v. Hodel*, 811 F.2d 1553 (D.C. Cir. 1987) ........................................................ 11

*Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) .......................... 10, 15

*Lewis v. District of Columbia*, 643 F. Supp. 2d 119 (D.D.C. 2009) ........................... 26

*Natural Res. Def. Council v. Peña*, 147 F.3d 1012 (D.C. Cir. 1998) ........................... 7

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002) ........................ 8

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ................................................... 23

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ...................... 15

*Public Citizen v. Carlin*, 2 F. Supp. 2d 1 (D.D.C. 1997) .............................................. 7

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ........................................................... 12

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................ 10, 17, 19, 20

*Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014) .............................................. 11

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ........ 15, 17

*Sanders v. District of Columbia*, 85 F. Supp. 3d 523 (D.D.C. 2015) .................... 24, 25

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) .............................................................. 11

*Seattle Mideast Awareness Campaign v. King County (SeaMAC)*, 781 F.3d
    489 (9th Cir. 2015) ................................................................................................... 17

*Singletary v. District of Columbia*, 766 F.3d (D.C. Cir. 2014) ................................... 24

*Speiser v. Randall*, 357 U.S. 513 (1958) ...................................................................... 15

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................................. 6

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................................................ 12

*Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) ................................................... 14

*Trinity Lutheran Church of Columbia, Incorporated v. Comer*, 137 S. Ct. 2012 (2017) ............................................................................................. 15

*Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997) ............................. 24

*United States v. Armstrong*, 517 U.S. 456 (1996) ................................................... 13

*United States v. Barnes*, 481 F. Supp. 3d 15 (D.D.C. 2020) ............................... 10, 14

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ................................................. 5, 6

*Wagner v. FEC*, 854 F. Supp. 2d 83 (D.D.C. 2012) ................................................. 11

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ................................ 26

*Wayte v. United States*, 470 U.S. 598 (1985) .................................................... 13, 15

### Statutes

6-A D.C.M.R. § 800.7 ............................................................................................ 24

D.C. Code § 2-532(a) ...................................................................................... 14, 25

D.C. Code § 2-533(a)(1) ........................................................................................ 15

D.C. Code § 2-538(a) ............................................................................................ 25

D.C. Code Ann. § 2-537 ........................................................................................ 25

### Other Authorities

Charles Alan Wright, et al., *Speaking Motions—Material That May Be Considered on a Rule 12(b) Motion*, *in* 5C FEDERAL PRACTICE & PROCEDURE CIVIL (3d ed. 2021) ................................................................ 8

Complaint, Doc. 1, *Hecker v. Krepp*, 21-cv-00839 (D.D.C. March 29, 2021) .............. 17

Charles Alan, FACEBOOKLIVE, *J&PS Committee: Performance Oversight Hearing*, Feb. 17, 2022 ..................................................................................................... 6

General Order 204.05, Freedom of Information Act Requests, https://go.mpdconline.com/go/go_204_05.pdf ................................................. 22, 25

Mark Segraves, *'There Is No Watchlist': DC Police Chief Shoots Down Public Info Claim*, NBC4 WASHINGTON, Feb. 3, 2022, https://www.nbcwashington.com/news/local/there-is-no-watchlist-dc-police-chief-shoots-down-public-info-claim/2960345/ ........................................ 5, 20

*Request Status*, DISTRICT OF COLUMBIA FOIA PUBLIC ACCESS PORTAL,
    https://foia-dc.gov/app/CheckStatus.aspx ...............................................................9

Transcript, *Horse v. District of Columbia*, Doc. 68, 17-CV-126 (D.D.C. Sept.
    17, 2019)....................................................................................................................23, 24

## PRELIMINARY STATEMENT

This is a straightforward First Amendment case. Plaintiff Amy Phillips alleges, based on detailed information from the officer formerly in charge of the Metropolitan Police Department of the District of Columbia's Freedom of Information Act office, that former–Chief of Police Peter Newsham created and current–Chief of Police Robert Contee continues a policy of improperly delaying, hampering, and denying FOIA requests from people who criticize the police. Phillips criticizes the police. She brings this action for nominal damages to remedy the past harm caused by this policy and an injunction to prevent the harm it will surely cause in the future.

The District argues that Phillips lacks standing to sue because she does not allege imminent future harm, but the District ignores Phillips's claim to remedy *past* harm, which is alone sufficient for standing. The District argues that Phillips's claim is really about selective enforcement of a statute, but this is not so: the Complaint alleges that Philips was denied a non-discretionary public benefit, not there was illegal discretionary enforcement of a statute. Worse, the District appears to seriously contend that its policy of delaying requests from MPD critics—the District ignores that the policy resulted in outright denial on several occasions—is justified by the compelling interest MPD supposedly has in giving the Chief some extra time to spin his response. Finally, the District contends that it is not responsible anyway because the Chief is not a final policymaker for the District, but FOIA explicitly gives him final power to make and implement rules regarding information requests, Phillips alleges approximately twenty examples of the policy in action, and the District points to exactly zero *MPD critics* who were *not* subject to the policy. The District's motion

should be denied.

## I.   FACTS[1]

Phillips is a criminal-defense lawyer and outspoken critic of MPD's operations. (¶ 2.) In 2018, she began using D.C.'s Freedom of Information Act (D.C. Code § 2-532 *et seq*.) to uncover information about MPD practices that she believes to be illegal, immoral, or both (¶¶ 7–9), and began to use that information to publicly scrutinize those practices (*e.g.*, ¶ 10). As explained in more detail below, this Court can take judicial notice that several of those requests remain pending. And Phillips intends to make more requests. (¶ 89.)

In 2019, Phillips requested the transcript of a particularly controversial (¶ 20) disciplinary hearing regarding an MPD officer (¶ 21), where MPD officers had seen Phillips carefully observing, taking notes, and publicly chatting with an ACLU attorney and a news reporter (¶ 18). MPD's response to Phillips's request was odd: Even though decisions usually take weeks, and sometimes months, MPD denied Phillips's request in an hour and a half. (¶ 23.) And the District's justification for denying the records was nonsense. (¶ 24.)

Phillips was right to be suspicious. In early 2020, she began speaking to Inspector Vendette Parker, who had just retired as MPD's FOIA officer. (¶ 34.) Parker explained that on her first day in the FOIA office, MPD's Chief Operating Officer, LeeAnn Turner (who remains in her position today), told Parker of "an unofficial,

---

[1] Because the District moves to dismiss, Phillips's factual allegations are taken as true and all reasonable factual inferences are drawn in her favor. *E.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009). All citations are to the Complaint (Doc. 1) unless otherwise specified.

unwritten policy requiring Parker to notify [then–Chief of Police Peter] Newsham and Turner of FOIA requests that may lead to criticism of the department." (¶ 42.) To implement this policy, Parker was to email Turner and the Chief every week, highlighting requests with the potential to embarrass the department. (¶ 43.) Turner directed Parker to "look into" certain requests (¶ 45), and this process eventually led to a list of people whose requests were set aside for special scrutiny (¶ 46). The list included news reporters, advocacy groups, criminal-defense lawyers, and elected Advisory Neighborhood Commissioners (who are often neighborhood gadflies). (*Id.*) Turner also directed Parker to look out for requests asking for information that would likely be used to criticize MPD. (¶ 47.)

Parker explained the story behind the bizarre response to Phillips's 2019 request for the hearing transcript: Parker had flagged the request for Turner and the Chief in an email, and Turner had personally—contrary to ordinary FOIA procedures (¶ 38), and after consulting with the Chief himself (¶ 88)—directed that the request be denied (¶ 85). After Phillips successfully convinced the Mayor's office to issue an advisory opinion that the requests should be disclosed, Turner decided to persist in withholding them (¶ 86).

Phillips's experience was not unusual. On approximately 20 occasions between 2018 and 2020, MPD improperly delayed, denied, or altered FOIA requests because the requesters were MPD critics or the information they requested would likely lead to criticism. (¶ 53.) Parker recounts some particularly memorable examples, like the time a Mayor's Office staffer drunkenly punched someone and MPD (unsuccessfully)

3

suppressed the police report after consulting with the Mayor's office. (¶ 77.) Parker recounts the time MPD cooked up excuses to withhold records of officers' moonlighting requests (¶¶ 74–76); devised schemes to threaten fees for the *specific purpose* (¶ 60) of deterring the ACLU's attempts to get information about MPD stop-and-frisk practices (¶¶ 58–64); and withheld data that MPD *knew* showed a disparate rate of arrests for possession of marijuana in neighborhoods with predominantly Black populations (¶ 80) so that the Chief would have time to collect unrequested data regarding 9-1-1 calls in those neighborhoods to spin the racially disparate impact of MPD's policies as the result of citizens' propensity to call them (¶ 80). And we needn't speculate why MPD did these things, for Turner said the quiet part out loud on several occasions: The goal was to avoid "embarrass[ing]" the department or subjecting it to public criticism. (¶¶ 42, 60, 66, 70, 75.)

Since her retirement in 2020, Parker has been in touch with current FOIA office employees who report that the current Chief of Police continues the policy. (¶ 52.) Parker—and, therefore, Phillips—does not have an inside view of the specifics of the policy post-2020, but in recent testimony before the City Council, Chief Contee admitted that he still "reviews" some FOIA requests himself, not specifying which ones or why. *See* Councilmember Charles Alan, FACEBOOKLIVE, *J&PS Committee: Performance Oversight Hearing*, Feb. 17, 2022, at 6:15, *available at* https://m.facebook.com/CMcharlesallen/videos/209877087988897/?refsrc=deprecated &ref=sharing&_rdr. And he contended in a news interview that, although he denies being "briefed" on specific FOIA requests, he *will* review MPD policies to make sure

that a "watchlist" was not implemented in the past, implying that he has not yet conducted such a review. *See* Mark Segraves, *'There Is No Watchlist': DC Police Chief Shoots Down Public Info Claim*, NBC4 WASHINGTON, Feb. 3, 2022, https://www.nbcwashington.com/news/local/there-is-no-watchlist-dc-police-chief-shoots-down-public-info-claim/2960345/. And of course this Court may not accept his denial of a current policy, and instead must draw all reasonable inferences in Phillips's favor.

## II.   ARGUMENT

Taking the well-pleaded facts as true, the Complaint states an obvious First Amendment violation: MPD had (and at least plausibly still has) an explicit policy of denying or manipulating FOIA requests of its critics precisely because those critics are likely to engage in speech critical of MPD. Phillips is an MPD critic who has been wronged by this policy in the past and surely will be again unless the policy is enjoined. The District nonetheless urges dismissal on three grounds—standing, the merits, and municipal policy. All fail.

### A.   Phillips Has Standing to Sue

The District contends that this case should be dismissed because "plaintiff seeks only prospective relief" (Doc. 9-1 at 6) and a pending request is the *sine qua non* of a successful prospective challenge to the implementation of a freedom-of-information law (*id.* at 7). The District ignores Phillips's nominal-damages claim (19, third bullet), which is alone sufficient under *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). Regardless, Phillips in fact has pending requests.

#### 1.   *Phillips's Nominal-Damages Claim Is Alone Sufficient*

5

To satisfy the "'irreducible constitutional minimum'" of Article III standing, a plaintiff must establish "(1) an injury in fact (2) that is fairly traceable to the challenged conduct, . . . [and] seek (3) a remedy that is likely to redress that injury." *Uzuegbunam*, 141 S. Ct. at 797 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The District does not contest (nor could it) that Phillips alleges past harm (*e.g.*, ¶ 82–86) and that the harm is traceable to the challenged conduct (*e.g.*, ¶ 85). Instead, the District contends that Phillips has not alleged sufficient *future* harm to seek *prospective* relief. But the District ignores nominal damages.

In *Uzuegbunam*, a college student was threatened with disciplinary action under a campus-speech policy if he persisted in speech that he had a clear First Amendment right to voice. *Id.* at 797. In response to those threats, the student stopped speaking. *Id.* While that policy was in force, the plaintiff sued, seeking injunctive relief and nominal damages. *Id.* Shortly thereafter, the defendant college abandoned the challenged policy, and the student was able to speak, albeit after he wanted to. *Id.* The college argued that the case was therefore moot because Uzuegbunam did not seek relief that would redress the harm. *Id.* The Supreme Court disagreed, holding that "for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right." *Id.* at 808.

*Uzuegbunam* controls. Phillips alleges that the District intentionally delayed her access to public records because of her prior criticism of MPD and her anticipated future criticism of MPD. (*E.g.*, ¶¶ 82–86.) That delay created a "completed violation of a legal right" that is traceable to the alleged Constitutional violation. *Uzuegbunam*,

141 S. Ct. at 802. And Phillips seeks the princely sum of $1, which "provide[s] the necessary redress for a completed violation of a legal right." *Id.* The District's motion to dismiss for lack of standing should be denied.

>    2.    *This Court Can Take Judicial Notice of Phillips's Pending Requests, or, in The Alternative, She Will Amend*

Where, as here, "a plaintiff seeks injunctive or declaratory relief. . . [she] 'must allege a likelihood of future violations of [her] rights . . . not simply future effects from past violations.'" *Citizens for Resp. & Ethics in Washington v. SEC ["CREW v. SEC"]*, 858 F. Supp. 2d 51, 58 (D.D.C. 2012) (quoting *Natural Res. Def. Council v. Peña*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir.1994)) and citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). ""Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to merely conjectural or hypothetical—threat of future injury."" *Id.*

Even without having specifically alleged that FOIA requests are pending, her past requests and stated intention ought to meet the "likelihood of future violations" standard. But in the absence of controlling precedent from the D.C. Circuit or Supreme Court, courts in this district appear to have coalesced around a rule that, although "a party's impaired access to documents sought under FOIA [may] constitute[] sufficient injury," this is true only if the party has "outstanding requests" for documents with "the defendant agencies." *Id.* (citing and quoting *Citizens for Responsibility and Ethics in Washington v. Executive Office of the President*, 587 F. Supp. 2d 48, 60–61 (D.D.C. 2008); *Citizens for Responsibility and Ethics in*

*Washington v. United States Dept. of Homeland Security*, 527 F. Supp. 2d 101, 106 (D.D.C. 2007); *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 310 F. Supp. 2d 216 (D.D.C. 2004); *Public Citizen v. Carlin*, 2 F. Supp. 2d 1, 6 (D.D.C. 1997) (cleaned up)).

Applying the rule of these non-binding district court cases, Phillips has standing because she indeed has FOIA requests pending with MPD and will file more soon. In fairness to the District, Phillips did not plead the current status of her requests—she is not seeking a specific outcome on those requests, only equal treatment, and so did not think pleading the details was necessary—although she did note that she made at least eight requests, described in detail two that remain pending, and mentioned the closure of only one. (¶¶ 7–9, 22.) Now, though, this Court and the parties have two options: the Court may take judicial notice of the pending requests, which are public records whose status is publicly verifiable and beyond dispute. Or Phillips can amend the complaint. The former is preferable to avoid delay, but the latter will suffice.

In considering the District's motion, "judicial notice may be taken of . . . various documents that are matters of public record." *See, e.g.*, Charles Alan Wright, et al., *Speaking Motions—Material That May Be Considered on a Rule 12(b) Motion*, *in* 5C FEDERAL PRACTICE & PROCEDURE CIVIL § 1364 & n.42 (3d ed. 2021). Such matters include documents filed with public bodies so long as they are not offered for the truth of the matters stated in them—which would conflict with the well-pleaded complaint rule, as well as the rules against hearsay—but for the fact of the filing instead. *Id.*

n.42 (citing, *inter alia*, *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

The status of Phillips's requests given case numbers 2019-FOIA-04241 (pleaded at ¶ 22) and 2019-FOIA-00893 (pleaded at ¶ 8) is a matter of public record and can be easily verified using the District's public-access portal. *See, e.g.*, *Request Status*, DISTRICT OF COLUMBIA FOIA PUBLIC ACCESS PORTAL, https://foia-dc.gov/app/CheckStatus.aspx (search: 2019-FOIA-04241, Phillips; returning: "Received Date 4/10/2019 . . . . Status: In Process."); *id.* (search: 2019-FOIA-00893, Phillips; returning: "Received Date 11/07/2018 . . . . Status: In Process."). Phillips's pending requests satisfy the requirements of Article III standing, for the *current* Chief has them *pending* before him and has failed to produce records or issue an appropriate denial. *Compare id.*, *with CREW v. SEC*, 858 F. Supp. 2d at 52; *contra* (Doc. 91-at 6–7). In the alternative, Phillips respectfully requests leave to amend the Complaint to detail the status of these requests.

### B.   Phillips States a First Amendment Claim

On the merits, the District argues first that the Equal Protection Clause should govern here (Doc. 9-1 at 7), but "the doctrinal differences between an equal-protection and First Amendment as-applied approach are at times 'semantic rather than substantive,'" *Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316, 328 (D.D.C. 2021) (citation omitted), and regardless "[t]he Supreme Court has consistently held that discrimination *in the First Amendment context* is permissible only when the government can show that the discrimination is itself necessary to

9

serve a substantial governmental interest," *Harwin v. Goleta Water Dist.*, 953 F.2d 488, 490 (9th Cir. 1991) (emphasis added). Plus, this case does not implicate any of the rationales underlying the District's selective-enforcement cases because Phillips has an unequivocal statutory right to the information she seeks. *Contra, e.g.*, *United States v. Barnes*, 481 F. Supp. 3d 15, 25 (D.D.C. 2020) (noting that "[l]aw enforcement are permitted to "exercise enforcement authority" with some degree of discretion").

Next, the District argues that there is no First Amendment right to access government records. (Doc. 9-1 at 9.) This relies on the greater-includes-the-lesser fallacy. Although it is true that the Constitution did not require the District to adopt FOIA and permit citizens access to certain documents, FOIA is in fact the law. It requires that public documents be produced upon proper request. And the First Amendment forbids withholding those documents because of the content and viewpoint of requesters' protected speech. *See Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 766 (1988) (listing at least eight examples of cases where the Court has rejected the "'greater-includes-the-lesser' logic" and noting that "whatever power a city might have to prohibit all . . . speech in its parks, it could not allow [only] some . . . speech, depending on the exercise of unbridled discretion").

The District also argues that its policy is not viewpoint- or content-based because really all the Chief wanted was some extra time to prepare for public scrutiny, and "[e]nsuring the Chief of Police is adequately prepared to address high-profile matters in his public appearances is *not* a discriminatory motive . . . ." (Doc. 9-1 at 13 (emphasis in original).) But that's not all the policy requires (*e.g.* ¶¶ 42, 60,

10

66, 70, 75), and in any event a policy "that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) (quotations and citations omitted). Finally, the District's policy fails strict scrutiny because the policy has no legitimate purpose at all, and it imposes real burdens.

>    1.    *The First Amendment And Equal Protection Clauses Both Require Equal Treatment With Respect to Viewpoint*

The District argues that Phillips's case is really a "selective-enforcement" claim. (Doc. 9-1 at 8.) That argument is wrong, as Phillips explains below, but perhaps more importantly it doesn't matter. Whether analyzed under the Equal Protection Clause or the First Amendment, government action discriminating on the basis of the content or viewpoint of people's speech is unconstitutional unless narrowly tailored to forward a compelling government interest. *Compare, e.g., Sanjour v. EPA,* 56 F.3d 85, 92 n.9 (D.C. Cir. 1995) (noting that one may "prevail on a claim of selective enforcement [under the Equal Protection Clause] in this circuit" by showing that she was "'singled out from others similarly situated'" (quoting *Juluke v. Hodel*, 811 F.2d 1553, 1561 (D.C. Cir. 1987)), *and Riddle v. Hickenlooper*, 742 F.3d 922, 931–32 (10th Cir. 2014) (Gorsuch, J., concurring) ("[W]hatever level of scrutiny should apply to *equal* infringements of the right to contribute in the First Amendment context, the strictest degree of scrutiny [may be] warranted under Fourteenth Amendment equal protection doctrine when the government proceeds to discriminate against some persons in the exercise of that right." (emphasis in original) (citing, *inter alia, Wagner*

*v. FEC*, 854 F. Supp. 2d 83, 96 (D.D.C. 2012) (Boasberg, J.) ("There is precedent for importing scrutiny levels from First Amendment cases when an equal-protection challenge implicates First Amendment rights." (citing *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 92 (1972)))), *with, e.g.*, *Harwin*, 953 F.2d at 490 ("The Supreme Court has consistently held that discrimination *in the First Amendment context* is permissible only when the government can show that the discrimination is itself necessary to serve a substantial governmental interest." (emphasis added)).

Content- and viewpoint-neutrality are, after all, the core of the First Amendment. A ban on burning things during wildfire season does not violate the First Amendment even if it's applied to the burning of an American flag, but a ban on desecrating symbols does. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992) (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). Phrased differently, this sounds like a rule against discrimination: The government may punish all people who burn things but may not punish only those whose burning expresses (or appears to express) a disfavored viewpoint. *Id.*; *see also Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) ("[T]he government's reason . . . is what counts [in a First Amendment case]."). Attempting neatly to separate the "discrimination" at the heart of equal protection claims from the "disapproval of the ideas expressed" (*R.A.V.*, 505 U.S. at 385) at the heart of First Amendment claims may be a futile—and ultimately unnecessary—endeavor. *See also Frederick Douglass Found.*, 531 F. Supp. 3d at 328.

12

But to the extent that there is a context in which equal-protection analysis of regulations on expression seems most appropriate, it would be laws that discriminate in the allowance of expression across non-expressive dimensions. For example, a law that allows only people with even-numbered license plates to buy gas on Tuesdays is subject to rational-basis review, but a law that allows only people with even-numbered license plates to put bumper stickers on their cars is subject to strict scrutiny. Here, Phillips alleges that the District discriminates not only in who is allowed to participate in expression (people request public documents, after all, to read them, distribute them, and talk about them) but also across the dimension of expression (by slow rolling requests from people *because* they criticize the police). Hers is a paradigmatic First Amendment claim.

> 2.    *Phillips Alleges Denial of a Public Benefit, Not Selective Enforcement of a Statute*

Assuming it matters, which it probably doesn't, Phillips's claim is not a selective-enforcement claim anyway. The doctrine underlying selective-enforcement claims is concerned with the government's ability to exercise reasonable discretion in the *enforcement* of (usually penal) statutes and courts' fear that scrutinizing that discretion will jeopardize other constitutional values. *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (explaining that "broad discretion" granted to prosecutors as the "special province" of the Executive underlies the demanding standard for a selective-prosecution claim based on racial discrimination (citations and quotations omitted)); *Wayte v. United States*, 470 U.S. 598, 606 (1985) (denying claim that prosecution of only "vocal" refusals to register for the Selective Service

13

violates the First Amendment and Equal Protection Clause because the factors underlying prosecutors' discretion "are not readily susceptible to the kind of analysis the courts are competent to undertake").

The District's principal case is of a piece: In *Frederick Douglass Foundation*, this Court considered a claim that the District violated the First Amendment when it permitted Black Lives Matter protesters to chalk sidewalks but arrested—read: *enforced* a law against—anti-abortion protesters for doing the same. 531 F. Supp. 3d at 322. In rejecting this claim, the Court relied on (among other things) the observation that "'[l]aw enforcement are permitted to "exercise enforcement authority" with some degree of discretion based on "unique circumstances."'" *Id.* at 332 (quoting *United States v. Barnes*, 481 F. Supp. 3d 15, 24 (D.D.C. 2020) (quoting *Hodge v. Talkin*, 799 F.3d 1145, 1162 (D.C. Cir. 2015))). This Court further relied on cases holding that discretionary schemes for regulating protected speech are constitutional unless shown to be exercised in a discriminatory manner and requiring that where such a showing is made *only* by examples (more on that later) the examples must be precise and plentiful. *E.g. Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional."). That makes sense in discretionary schemes because so many potentially unknowable factors may underly the government's decision to enforce particular rules against particular people who violate them. *E.g.*, *Frederick Douglass Found.*, 531 F. Supp. 3d at 322. Selective-enforcement cases are about enforcement.

14

This case implicates none of these concerns. FOIA grants the public a right to access certain documents for any purpose, without any discretion granted to the government to decide whether to release those documents. *E.g.*, D.C. Code § 2-532(a) ("Any person has a right to inspect . . . any public record of a public body."). And, unlike in the context of penal enforcement, where the government's reasons for prosecuting or declining to should not be subject to "outside inquiry," *Wayte*, 470 U.S. at 607, FOIA explicitly requires a public body to explain why it's withholding any document, D.C. Code § 2-533(a)(1) (requiring a denial letter listing "[t]he specific reasons for the denial"), and it requires the public body *to publicize* those reasons, *id.* (b) (requiring "[e]ach public body of the District of Columbia [to] maintain a file of all letters of denial of requests for public records" and to make it "available to any person on request").[2]

Instead, this case is perhaps more analogous to a claim that Phillips has been unlawfully barred from a "metaphysical" public forum, *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995) (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983), and *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)), or denied a public benefit because of her viewpoints, *Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("It cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a limitation

---

[2] For what it's worth, MPD appears to be violating this rule. Phillips, in case number 2019 FOIA 06574, requested all denial letters. The District instead produced a spreadsheet of instances of requests it denied, but not the reasons for the denial or the letters themselves. Phillips has a request before the Mayor's office to review MPD's denial.

on free speech."). In *Speiser*, for example, the Court struck down a California scheme granting a tax exemption to veterans only if they prove that they do not "advocate the overthrow of the government." *Speiser*, 357 U.S. at 518. And, in the materially analogous free-exercise context, the Court in *Trinity Lutheran Church of Columbia, Incorporated v. Comer*, held that a state program providing used tires for playground resurfacing may not be denied to religious playground operators only. 137 S. Ct. 2012, 2022 (2017); *see also City of Lakewood*, 486 U.S. at 766 (describing "a host of other First Amendment cases" in which the Court considered "statutes or policies that embodied discrimination based on the content or viewpoint of expression, or vested officials with open-ended discretion that threatened the same, *even where it was assumed that a properly drawn law could have greatly restricted or prohibited the manner of expression or circulation at issue*" (emphasis added)). Here, through FOIA, the District has decided to offer any person access to public documents but then imposed a policy of selectively delaying and denying access to people who criticize the police. This is not—not that it matters—a selective-enforcement case. This is a paradigmatic free-speech case.

      3.    *Phillips Does Not Claim That The First Amendment Entitles Her to Any Records*

The District next argues that this case should be dismissed because there is no First Amendment right to access public documents and, "[a]t bottom, [Phillips's] Complaint is about access to government records." (Doc. 9-1 at 10.) The District tortures the meaning of "about" in this context. Phillips's complaint is "about" access to government records in the way that the claim in *Speiser* is "about" taxes, the claim

in *Trinity Lutheran* is "about" used tires, and the claim in *Rosenberger* is "about" the costs of printing paper. The plaintiffs in those cases did not claim that the First Amendment granted them tax exemptions, tires, and printing paper; they claimed that the First Amendment granted them access to those things without regard to the content of their speech. So too here. Phillips asks for an order requiring the District to "treat all FOIA requests in a materially identical fashion without regard to the content or viewpoint of the requesters' prior or anticipated speech" (Compl. p.19, first bullet) not an order that it grant *any* specific request.

### 4. The District's Policy Is Obviously Content-Based at Least, And Viewpoint-Based to Boot

Next up, the District argues that its watchlist policy is content- (and, *a fortiori*, viewpoint-) neutral because (a) Phillips has not sufficiently shown a "pattern of improperly handling FOIA requests based on the requestor's viewpoint or the content of the request" and (b) Phillips has not shown a "discriminatory motive" (Doc. 9-1 at 12–14). The District gets the facts wrong, and then the legal standard wrong, and then misapplies the wrong legal standards to the wrong facts anyway.

*First*, Plaintiffs need only show a "pattern" of content-discriminatory government actions where their claims are based *solely* on observed instances of content-discriminatory action.[3] *E.g., Brown v. City of Pittsburgh*, 586 F.3d 263, 294

---

[3] Perhaps now is an appropriate time to clarify how this Brief uses "viewpoint" and "content," although the distinction is immaterial here because the District appears to concede—as it must—that a content-based policy would occasion strict scrutiny, *e.g. Reed*, 576 U.S. at 165, and "the distinction between content and viewpoint discrimination is often 'not a precise one,'" *Frederick Douglass Found.*, 531 F. Supp. 3d at 330 (quoting *Rosenberger*, 515 U.S. at 831). By "content" we mean the general topic of speech, something like "police policies," for example; by "viewpoint" we mean positive or negative perspective, something

(3d Cir. 2009) ("[A] plaintiff whose evidence consists *solely* of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content." (emphasis added)). As explained above, this makes sense in the selective-enforcement context, where government motives are hard to probe: Because of the necessarily unpredictable nature of prosecutors' exercise of discretion, it would be far too easy to pluck, say, a handful of Republicans arrested for disorderly conduct under circumstances similar to those where a Democrat was not. *Cf. id.*

Here, though, Phillips alleges more: She specifically details the viewpoint-discriminatory instructions that Turner gave Parker on her first day and throughout her time at the MPD FOIA office. Turner directed Parker to flag requests "that may lead to *criticism* of the department." (¶ 42 (emphasis added).) The policy wouldn't flag a request for all honorable-duty commendations received by MPD officers, even though that may generate public attention. The purpose of the watchlist policy, Phillips alleges (in specific detail, based on facts learned from the former head of MPD's FOIA office herself) was to avoid embarrassing the department by denying

---

like "criticism of the police" as opposed to "support for the police," at a pretty high level of generality. Most people on the watchlist criticize MPD officers because (to grossly oversimply) the critics think the police arrest people too much (¶ 46), but at least one person criticizes MPD officers because she thinks the police don't arrest people enough, *compare* (*id.* (Denise Krepp is on the watchlist)), *with* Complaint, Doc. 1, *Hecker v. Krepp*, 21-cv-00839 (D.D.C. March 29, 2021) (alleging facts about Krepp's generally pro-police and pro-prosecution viewpoint); *cf. also Seattle Mideast Awareness Campaign v. King County (SeaMAC),* 781 F.3d 489, 496 (9th Cir. 2015) (regulating speech about the Israeli–Palestinian conflict is a content distinction; regulating speech favoring one side of that conflict would be a viewpoint distinction).

information to those who embarrassed it in the past and who might do so again in the future. And the District simply ignores the facts when it contends that "the alleged watchlist policy would merely involve a series of notifications that lead to MPD leadership's awareness and oversight of certain FOIA requests and responses." (Doc. 9-1 at 13.) The policy also required denying several requests (¶¶ 73, 75, 84, 86); *intentionally* delaying one *after* the records were ready for production (¶ 80); and concocting false obstacles for the purpose of frustrating others (¶¶ 61–66, 73 (detailing Turner's direction to deny reporter Eric Flack's request for documents unless he "followed up," which FOIA does not allow and which the general public does not have to do).

*Second*, the District is wrong to contend that its policy is content-neutral because it is motivated only by MPD's supposedly innocent desire to ensure that "the Chief of Police is adequately prepared to address high-profile matters in public appearances" because that desire is "*not* a discriminatory motive . . . ." (Doc. 9-1 at 13.) Wrong on the facts again: as explained in the prior paragraph, the policy was allegedly far worse, and those allegations are accepted as true here. And although the policy was indeed implemented to avoid the Chief getting "blindsided" at press conferences (*id.* (quoting ¶ 42)), the most efficient way to avoid such blindsiding is to deny the public the embarrassing information with which the Chief would otherwise be presented. And deny MPD did. (¶¶ 61–66, 73, 75, 84, 86.) But, in any event, even if this were the motivation behind the policy, it would still be subject to strict scrutiny because it is based on the content of the requestor's prior and anticipated speech.

19

*Reed*, 576 U.S. at 165 ("[A policy] that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech.").[4]

5. *The District's Policy Does Not Come Close to Surviving Strict Scrutiny*

Finally, the District contends that its "interest in maintaining any 'watchlist policy' would outweigh the Plaintiff's interest in eliminating it." (Doc. 9-1 at 16.) For starters, the District again ignores the worst facts about the policy (see above), and they are alone conclusive to rebut this argument: Phillips simply does not allege facts consistent with the District's theory that the policy is all about prepping the Chief. Instead, the policy requires suppressing information requested by people on the watchlist. (¶¶ 61–66, 73, 75, 84, 86.) Further, the District again gets the legal standard wrong: the content-based watchlist policy is subject to *strict* scrutiny, *Reed*, 576 U.S. at 165, which the District cannot come close to surviving even if it's somehow right that the policy "makes sense" (Doc. 9-1 at 13) and has interests that "outweigh" (*id.* at 16) Phillips's free-speech rights, *see, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564

---

[4] The District cites (Doc. 9-1 at 17) *Fusaro v. Cogan* for the proposition that "[a] regulation on access to [a tool used for communication but not actual speech] can merit First Amendment protection, but not heightened scrutiny." 930 F.3d 241, 260 (4th Cir. 2019) (second alteration in District's brief). The District doesn't explicitly say strict scrutiny shouldn't apply *here*, and *Fusaro* is off point regardless: There, Maryland restricted access to its list of registered voters (which could be used to facilitate speech) to Maryland citizens, *id.*; it did not limit access to the list based on an impermissible criterion like viewpoint. And the same analysis would apply even if requestors in fact wanted to make paper airplanes with the documents they request so long as the District was motivated by its perception of the speech that might result. *Heffernan*, 578 U.S. at 273 (upholding First Amendment claim where government mistakenly believed plaintiff was posting lawn signs for a disfavored political candidate even though he was really delivering them to his mother).

U.S. 786, 791–92 (2011) (rejecting a "simple balancing test" to determine whether "restrict[ions on] expression because of its message, its ideas, its subject matter, or its content" are permissible). Anyway, the District's public statements undercut its own argument. In Court, the District argues that it should be permitted to base its responses to public-information requests on the requestors' viewpoint. But the Mayor publicly said "[w]hat I will tell the chief and all directors is they have to handle FOIA requests expediently, and they should be agnostic to who the questioner is." *Segraves*, *supra*.

But even on its own terms, the District's argument is remarkable. The District argues that it should be permitted to break its own laws requiring prompt disclosure of public information and do so on the basis of requesters' viewpoints so that it can "ensure that the Chief of Police is prepared to communicate to the press" about the information. (*Id.* at 17.) This is so, the District says, because "MPD has a substantial government interest in providing *accurate* information to the public." (*Id.* (emphasis added).) Phillips has no quarrel with that statement on its own, but it would suggest the opposite policy: promptly disclosing the requested information. Instead, the District's policy is—at *best*—to give the Chief extra time to spin that information to his own ends. Consider the marijuana-arrests example (¶ 80), which the District must have in mind because it's the only example in the Complaint where the Chief was indeed "prepare[d]" (Doc. 9-1 at 17) to respond to the press. The ACLU requested information about marijuana arrests (*id.*); MPD, as it's required to under FOIA, gathered *accurate* information about those arrests (*id.*); then, when MPD reviewed

the information and discovered that it would expose a large (and hopefully embarrassing) racial bias in those arrests, it *withheld* the accurate information until it could come up with a story that was more favorable to its own interests (*id.*). Perhaps the racial disparity in marijuana arrests really was driven by differences in 9-1-1 calls—although this seems very unlikely—but that is for the public, not the Chief, to determine. To say that this is all done in the interest of ensuring that the public remains well informed—and to do even that after the Mayor has publicly said all departments should do the opposite—exemplifies chutzpah.

## C.    The District Is Responsible For The Constitutional Violation Phillips Alleges

In this Circuit, plaintiffs can show a municipal policy in four ways: "(1) 'the explicit setting of a policy by the government,' (2) 'the action of a policy maker within the government,' (3) 'the adoption through a knowing failure to act by a policy maker of actions by his subordinated that are so consistent that they have become custom, or (4) 'the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations." *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 74–75 (D.D.C. 2011) (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)). Phillips has pleaded options two and three.

The District argues that it cannot be held responsible for the constitutional violations alleged in this case because the Chief of Police is "subordinate to the policymaking authority of the Mayor." (Doc. 9-1 at 22.) But this is wrong with respect

to FOIA, which vests the Chief with unreviewable authority to make and implement rules, some of which the District cites in its own brief. (*Id.* at 3 (citing General Order 204.05, Freedom of Information Act Requests, https://go.mpdconline.com/go/go_204_05.pdf at 13 (signed by the Chief of Police, not the Mayor).)

In the alternative, Phillips pleads a municipal custom. In contending otherwise, the District argues that Phillips has pleaded only 20 examples out of thousands of FOIA requests, suggesting that those 20 examples are mere isolated lapses in judgment. (*Id.* at 24–25.) The District gets the denominator wrong: The relevant comparator is not an ordinary request, but a request from an MPD critic that might lead to criticism of MPD. The District identifies no such comparator being treated fairly.

Last, Phillips easily pleads an *ongoing* policy. Although her most recent inside information is from 2020, she offers a well-pleaded factual allegation, based on inside information—which is more than good enough to survive plausibility—that Chief Contee is continuing the policy. The District will have its chance to resist that allegation as a factual matter, but it cannot do so now on a motion to dismiss.

### 1. The Chief of Police Has Final Policymaking Authority Under The D.C. Freedom of Information Act

In *Pembaur v. City of Cincinnati*, the Supreme Court held that "[i]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." 475 U.S. 469, 480 (1986). Those appropriate circumstances, the Court explained, obtain whenever a policymaker

*herself* makes a challenged decision: "[W]here action is directed by those who establish governmental policy, the municipality is . . . responsible . . . ." *Id.* "Whether an official had final policymaking authority is a question of state law." *Id.* at 483.

The District argues first that the Chief of Police lacks final policymaking authority under D.C. law because he "was constrained by policies not of his own making" when he established the watchlist policy. (Doc. 9-1 at 21–22 (quoting Transcript, *Horse v. District of Columbia*, Doc. 68, 17-CV-126 (D.D.C. Sept. 17, 2019).) This is wrong. The District's core mistake is treating the Chief's policymaking authority as though he either has it whole-hog or not at all; in fact, he is a final policymaker for some decisions but not others. Under FOIA, he is a final policymaker.

This Court and the D.C. Circuit have addressed the final policymaking authority of D.C. officials many times. *See, e.g.*, *Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014); *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) *Byrd v. District of Columbia,* 807 F. Supp. 2d 37, 75 (D.D.C. 2011); *Banks v. District of Columbia*, 377 F. Supp. 2d 85, 91 (D.D.C. 2005). Courts hold that D.C. Officials have policymaking authority when "specific provisions in the D.C. Code grant[] the director authority to promulgate rules for the administration of his respective department with regard to the conduct at issue." *Byrd*, 807 F. Supp. 2d at 75. Courts have accordingly concluded that sometimes the Chief of Police has final policymaking authority, *Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 530 (D.D.C. 2015) ("Plaintiff contends that Chief Ramsey was the 'municipal policymaker' as to the Metropolitan Police Department. The Court agrees."), and sometimes he

does not, *Horse*, *supra*. The Chief has final policymaking authority, say the courts, when D.C. law delegates the challenged decision to him, even if it is "'[s]ubject to applicable laws, rules, regulations, and orders of the Mayor.'" *Sanders*, 85 F. Supp. 3d at 530 (quoting 6-A D.C.M.R. § 800.7); *see also Dave v. Dist. of Columbia Metro. Police Dep't*, 905 F. Supp. 2d 1, 12 (D.D.C. 2012) (Chief of Police was final policymaker sufficient for liability regarding employment matters).

FOIA grants the Chief authority to make final rules governing his department's treatment of public-information requests. Under FOIA, *public bodies* are tasked with making their *own* rules to govern the "time and place" of access to public records. D.C. Code § 2-532(a) ("reasonable rules that shall be issued by a public body after notice and comment"), (b) ("A public body may establish and collect fees . . . ."). One need look no further than the District's brief to know this: The "policies not of [the Chief's] own making" on which the District places so much weight (Doc. 9-1 at 22) are, in fact, of his predecessor's own making. *See* General Order 204.05, Freedom of Information Act Requests, https://go.mpdconline.com/go/go_204_05.pdf at 13 (signed by the Chief of Police, not the Mayor). This is further confirmed by the fact that the Mayor is required to conduct *oversight* of the FOIA activities of public bodies, which is inconsistent with her having final authority of those activities herself. D.C. Code § 2-538(a). And, finally, as explained in the Complaint, MPD itself takes the position that the Mayor's Office has only an advisory role in hearing appeals from public bodies. (¶¶ 26, 27); D.C. Code Ann. § 2-537. The Chief is the District of Columbia's final policymaker with respect

to FOIA requests sent to his department, just as he is with respect to employment decisions. *Sanders*, 85 F. Supp. 3d at 530; *Dave*, 905 F. Supp. 2d at 12.

Phillips, therefore, easily pleads that the Chief established municipal policy. As explained, he has final authority with respect to FOIA rules and regulations, and Phillips pleads facts that easily give rise to a reasonable inference that he directed the watchlist policy, and the District does not (and cannot) contend otherwise. (*See* Doc. 9-1 at 19–23.)

### 2.    *Phillips Pleads a Custom Claim in The Alternative*

In the alternative, Phillips pleads a custom ratified by the Chief. Plaintiffs can show a municipal policy "if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware" such that the "custom" took on the "force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *see also Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011); *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). Once such a showing is made, plaintiffs must plead only that the harm they suffered was the result of the alleged custom. *E.g.*, *Lewis v. District of Columbia*, 643 F. Supp. 2d 119, 122 (D.D.C. 2009); *see also Brown v. Wilhelm*, 819 F. Supp. 2d 41, 44 (D.D.C. 2011).

Here, Phillips alleges that on approximately twenty occasions over two years the director of MPD's FOIA office emailed *the Chief himself* to alert him to incoming FOIA requests that triggered the watchlist policy. (¶¶ 43, 53.) Phillips recites several memorable examples. (¶¶ 53–81.) And, after the Chief received these emails and met personally with Turner (¶ 88), Turner denied and otherwise obstructed many FOIA requests from people on the watchlist (¶¶ 61–66, 73, 75, 84, 86). Phillips, then, not

only pleads a custom of which "the supervisor *must have* been aware," *Praprotnik*, 485 U.S. at 130; she pleads a policy of which he *was in fact* aware.

In response, the District contends that Phillips simply hasn't shown enough individual instances of unconstitutional viewpoint discrimination to make a municipal policy because the District receives an awful lot of FOIA requests every year. (Doc. 9-1 at 24.) But the District gets the relevant comparator wrong here, as its own brief evidently understands. (*Id.* at 23 ("The past events involving government action should be *identical* to the alleged wrongdoing underlying plaintiff's claim." (citing *Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014)). The District points to exactly zero instances in which the District fairly treated a *controversial* FOIA request. Phillips has, therefore, at least pleaded the existence of a custom sufficient to occasion municipal liability.

      3.    *Phillips Alleges a* Current *Policy by a* Current *Policymaker And Regardless Prevails on Her Damages Claim*

Finally, the District argues that Phillips cannot show municipal policy because she pleads only the actions of the *former* Chief. (Doc. 9-1 at 20, 24.) There are two fatal problems with this argument. First, Phillips seeks nominal damages to recompense the harm she suffered while Peter Newsham—who implemented the watchlist policy—was himself Chief. The District is accordingly wrong when it says "plaintiff does not seek to remedy a past violation of her rights."[5] (Doc. 9-1 at 20.)

---

[5] If the District believes that Phillips' nominal-damages request is insufficient to allege redressable past harm—which would ignore binding Supreme Court precedent—Phillips would be happy to increase her damages request to include, for example, compensation for the time she wasted unnecessarily arguing with MPD.

Second, the District dismisses as "conclusory" Phillips's allegation that Chief Contee has continued his predecessor's unconstitutional policy. (*Id.* at 20.) The District, though, leaves out part of the allegation: Phillips alleges that "*[a]ccording to former colleagues of Parker*, current Chief of Police Robert Contee has not ended or suspended the policy." (¶ 52 (emphasis added).) This is not conclusory; it's conclusive. Sure, Phillips cannot allege specific instances because her principal source has left MPD, but she alleges—based on information from *within* the department—that the policy continues. Without identifying a source of information, perhaps this allegation would be the type of bare conclusion that fact-pleading rules would forbid. *See, e.g.*, *Iqbal*, 556 U.S. at 696. But Phillips pleads (in great detail) the operation of the policy under Chief Newsham and then alleges that *current* employees report that it continues. That is at least enough to give rise to a *plausible inference* that the policy continues. *Id.* The District will have a full and fair opportunity to deny that in discovery, on summary judgment, and at trial.

## III.   CONCLUSION

For the foregoing reasons, the Court should deny the District's motion to dismiss. It should take judicial notice of the status of Phillips's pending FOIA requests to the extent necessary to support standing. In the alternative, the Court should deny the motion to dismiss under 12(b)(6) for failure to state a claim, and should grant the motion to dismiss under 12(b)(1) for lack of standing with leave to amend to allege the present status of her outstanding FOIA requests and instruct that such an amendment would result in her having standing to proceed.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

29