**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **AMY PHILLIPS,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 22-277 (JEB)** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

This suit alleges that the District of Columbia's Metropolitan Police Department plays favorites in how it responds to requests for information under the local Freedom of Information Act. Plaintiff Amy Phillips, a public defender, contends that the District unlawfully flags FOIA requests from people critical of MPD, which leads to response delays and denials and constitutes a violation of her First Amendment rights. In moving to dismiss, the Government maintains that Phillips's allegations should instead have been labeled as a claim of selective enforcement under the Fifth Amendment. It further argues that, even if she has brought her suit under the correct constitutional provision, Plaintiff has not asserted a constitutional injury, established the existence of a policy that violates the First Amendment's restriction on content- and viewpoint-based regulation, or alleged a municipal policy for which the District can be held liable. Disagreeing on all fronts, the Court will deny Defendant's Motion.

I.     **Background**

Taking the facts as laid out by Plaintiff to be true, which the Court must do at this stage, the genesis of the controversy lies in an Adverse Action Hearing held by MPD's Disciplinary Review Division in March 2019 to adjudicate alleged misconduct by a former officer. <u>See</u> ECF

No. 1 (Complaint), ¶¶ 11–20.  Phillips, who is a criminal-defense attorney in the District and an "outspoken critic of MPD," attended the March 2019 hearings and soon after submitted a FOIA request to MPD for tapes and transcripts of the proceedings.  Id., ¶¶ 2, 11, 21.  This was not the first time — nor would it be the last — that Plaintiff used FOIA to request information from MPD.  Beginning in 2018, Phillips has such sought information on at least eight occasions, subsequently using the information to "evaluate and, if necessary, criticize MPD," which she has done, on a handful of occasions, using a personal Twitter account.  Id., ¶¶ 6–10.

The response Plaintiff received from MPD concerning her March 2019 FOIA request, however, was "strange."  Id., ¶ 24.  The request was denied in full less than ninety minutes after it was submitted.  Id., ¶ 23.  The Department's justification was "wrong" in Phillips's view, and the timeline was significantly faster than the weeks or months it normally took MPD to respond to FOIA requests.  Id., ¶ 24.  That was not the end of it, however.  After an appeal to the Mayor's Office of Legal Counsel and a suit in D.C. Superior Court that was covered in the local news, MPD began producing documents responsive to Phillips's requests in September 2019, albeit with redactions Plaintiff believes are unwarranted.  Id., ¶¶ 25–32.

In early 2020, Plaintiff began communicating with Vendette Parker, a recently retired MPD FOIA officer, who had worked on Phillips's request when she was still employed by the District.  Id., ¶¶ 34, 87–88.  Parker alerted Plaintiff to the Department's unofficial "watchlist policy," which singled out for special treatment FOIA requests that "may lead to criticism" of MPD, in particular those "originating from news reporters or people known to be critical of the department" or for information that could "embarrass the department."  Id., ¶¶ 36, 39, 42–43.  Requests within these parameters were flagged for higher-up officials and were often "delayed, denied, or improperly altered."  Id., ¶¶ 43–45, 53, 81.  This included Phillips's March 2019

FOIA request, which was flagged both because the records themselves might embarrass MPD and because Phillips had been placed on the Department's "watchlist" based on the content of previous record requests.  Id., ¶ 83.  As a result of this special screening, Phillips's request was denied at the behest of MPD's then-Chief Operating Officer and, even after Plaintiff's successful appeal, was subject to additional delays.  Id., ¶¶ 84–88.

In January 2022, Phillips brought this lawsuit against the District, alleging that its policy of "delaying, burdening, or denying" a subset of D.C. FOIA requests constitutes a content- and viewpoint-based restriction of speech in violation of the First Amendment.  Id., ¶¶ 91–97.  She seeks injunctive and declaratory relief, as well as an award of nominal damages.  Id. at 19.  The District now moves to dismiss the suit, asserting a number of deficiencies, including a lack of subject-matter jurisdiction and failure to state a claim for relief.  See ECF No. 9-1 (Def. MTD) at 1–2.  Although the former issue appears to no longer be contested, see ECF No. 13 (Def. Reply) at 1–2, the Court begins by addressing it, before turning to the District's merits arguments.

## II.     Legal Standard

Because Defendant seeks dismissal based on both lack of standing and failure to state a claim, the Court will apply the standards for Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

When a defendant seeks dismissal under Rule 12(b)(1), the plaintiff must show that the court has subject-matter jurisdiction to hear his claim.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); US Ecology, Inc. v. U.S. Department of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Absent subject matter jurisdiction over a case, the court must dismiss [the claim]."  Bell v. U.S. Department of Health & Human Services, 67 F. Supp. 3d 320, 322 (D.D.C. 2014).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's

claim, a Rule 12(b)(1) motion [also] imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

In policing its jurisdictional borders, a court must scrutinize the complaint, granting the plaintiff the benefit of all reasonable inferences that can be derived from the alleged facts. See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). A court need not rely "on the complaint standing alone," however, but may also look to undisputed facts in the record or resolve disputed ones. See Herbert v. National Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

Rule 12(b)(6), conversely, permits dismissal of a complaint for failure to state a claim upon which relief may be granted. In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Communications Corp., 16 F.3d

1271, 1276 (D.C. Cir. 1994)).  And it may consider not only "the facts alleged in the complaint,"
but also "any documents either attached to or incorporated in the complaint[,] and matters of
which [courts] may take judicial notice."  Equal Employment Opportunity Commission v. St.
Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).

III.   **Analysis**

The Court first considers the jurisdictional issue, as it must, see Steel Co. v. Citizens for a
Better Environment, 523 U.S. 83, 94 (1998), before turning to the merits of Defendant's Motion.

A.   Jurisdiction

Article III of the United States Constitution limits the jurisdiction of federal courts to
resolving "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  A party's standing "is an
essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan, 504
U.S. at 560.  Standing therefore represents a "predicate to any exercise of [the court's]
jurisdiction."  Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996).

To maintain standing, a plaintiff must meet three criteria.  First, she "must have suffered
an injury in fact — an invasion of a legally-protected interest which is (a) concrete and
particularized . . . and (b) actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S.
at 560 (citations and internal quotation marks omitted).  Second, "there must be a causal
connection between the injury and the conduct complained of — the injury has to be
fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the
independent action of some third party not before the court."  Id. (alterations in original) (citation
and internal quotation marks omitted).  Third, "it must be likely, as opposed to merely
speculative, that the injury will be redressed by a favorable decision."  Id. at 561 (citation and

internal quotation marks omitted).  A "deficiency on any one of the three prongs suffices to defeat standing."  US Ecology, Inc., 231 F.3d at 24.

Because Phillips seeks equitable relief as well as money damages, her claims raise two issues related to standing.  Whether she has standing to sue for nominal damages depends on whether she has suffered a "completed violation of a legal right" that is sufficiently particularized and fairly traceable to the alleged constitutional violation.  See Uzuegbunam v. Preczewski, 141 S. Ct. 792, 802 (2021).  Standing to sue for injunctive and declaratory relief, conversely, depends on establishing a likelihood of future injury.  See City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983).  Assuming that Plaintiff will succeed on her claim, as the Court must do at this stage, see Est. of Boyland v. U.S. Department of Agric., 913 F.3d 117, 123 (D.C. Cir. 2019), she clearly has standing to seek nominal damages, which Defendant does not contest.

Whether she has standing for injunctive relief is somewhat more involved.  When a plaintiff alleges prospective harms, the "threat must be 'real and immediate,' or alternatively, 'realistic' in nature."  Nat'l Sec. Counselors v. CIA, 931 F. Supp. 2d 77, 91 (D.D.C. 2013) (quoting Lyons, 461 U.S. at 102).  In a case such as this one, Phillips must thus demonstrate that she is "likely" to be "subjected to the [challenged] policy again."  Id.  Defendant argues that her general allegation that she plans to file additional FOIA requests in the future is insufficient to meet this standard.  See Def. MTD at 6–7; Compl., ¶¶ 89, 95; see also Citizens for Resp. and Ethics in Washington (CREW) v. U.S. Department of Homeland Sec., 527 F. Supp. 2d 101, 106 (D.D.C. 2007) (concluding that plaintiff's alleged future injury was neither "real [n]or imminent" where it had not alleged existence of pending FOIA request or specific intent to file one); Tipograph v. U.S. Department of Just., 146 F. Supp. 3d 169, 176 (D.D.C. 2015) (noting that

"passing allegation" of future intent to file FOIA requests "will not suffice to establish standing") (internal quotation marks and citation omitted).

This issue can, nevertheless, be easily resolved in Plaintiff's favor.  Unlike the cases on which the District relies, this is not an instance in which Phillips has merely expressed a plan to assert her rights under FOIA at some unspecified future point in time.  See, e.g., CREW, 527 F. Supp. 2d at 106 ("That [plaintiff] may one day file another FOIA request . . . does not represent a cognizable, palpable injury . . . .").  On the contrary, she has currently pending FOIA requests with the Department.  See ECF No. 10 (Pl. Opp.) at 8; see also Compl., ¶¶ 7–9, 22. These requests expose Plaintiff to a "threat of [future] injury" that is both "real and immediate."  Lyons, 461 U.S. at 102.

In moving to dismiss, Defendant observed that Phillips had not alleged that she has pending FOIA requests.  See Def. MTD at 6–7.  A court may, however, take "judicial notice" of facts that are a matter of public record when deciding a motion to dismiss.  See Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004); Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1222 (D.C. Cir. 1993); see also Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) ("In determining standing, we may consider materials outside of the complaint.").  The fact that two of Phillips's FOIA requests to MPD are still pending can be "readily determined" from the District's own FOIA public-access portal and is thus a matter of public record whose "accuracy cannot reasonably be questioned."  Hurd v. District of Columbia, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)); see also Kareem v. Haspel, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021) (applying this standard to resolve standing); Kapersky Lab v. U.S. Department of Homeland Sec., 909 F.3d 446, 464 (D.C. Cir. 2018) (taking judicial notice of "existence" of particular record).  Indeed, the District drops its standing argument

entirely in its Reply.  The Court will, therefore, take judicial notice of the pending FOIA

requests, which clearly suffice to establish an "imminent" risk of harm and bestow standing on

Plaintiff.  See Lujan, 504 U.S. at 560.

B.  Failure to State Claim

Moving to the merits, Defendant urges the Court to dismiss Phillips's Complaint on

several substantive grounds.  First, it argues that she erred in raising her claim under the First

Amendment instead of the Fifth Amendment, as it is more accurately characterized as a

selective-enforcement challenge.  See Def. MTD at 7–9.  Even if she did not miscategorize her

cause of action, the District submits, she has failed to allege an actual First Amendment injury

because she has no constitutional right to access the records she seeks.  Id. at 9–12.  Beyond that

question, the City further asserts that its alleged policy does not violate the First Amendment's

prohibition on content- or viewpoint-discriminatory regulations.  Id. at 12–18.  Finally, even had

Phillips successfully pled her constitutional claims as a general matter, Defendant contends that

no municipal liability attaches.  Id. at 18–25.

The Court takes up each position in turn.

1.  *Relevant constitutional framework*

Defendant's first argument is a familiar one to this Court.  The District submits that the

Court need not engage with the substance of Plaintiff's case because she has committed a fatal

threshold error in bringing this challenge under the First Amendment.  Id. at 7–9.  This is not, the

City says, a First Amendment issue at all; instead, "[P]laintiff's claim is 'in essence, one of

selective enforcement.'"  Id. at 8 (quoting Frederick Douglass Found., Inc. v. District of

Columbia (Frederick Douglass I), 531 F. Supp. 3d 316, 340 (D.D.C. 2021)).  Her decision not to

invoke the Fifth Amendment's Equal Protection Clause, then, would be reason enough for the Court to dismiss her Complaint.  See Def. MTD at 7–9.

Defendant wisely draws from this Court's own recent Opinions to make its case.  As the District points out, this Court has chosen to analyze under the Fifth Amendment (rather than the First) allegations that the enforcement of a facially neutral policy infringed on certain plaintiffs' speech rights.  The Court first confronted the matter in Frederick Douglass, where the plaintiff, an anti-abortion group, alleged that the District had violated a host of constitutional protections, including Fifth Amendment Equal Protection and First Amendment freedom of speech, when it enforced an ordinance prohibiting property defacement against the plaintiff's members but not against racial-justice protesters.  Because the suit "turn[ed] entirely on how the city enforced" the facially content-neutral ordinance, this Court determined that "Plaintiff's claim [was] better considered within the selective-enforcement framework of the Fifth Amendment than within that for as-applied First Amendment viewpoint-discrimination challenges."  Frederick Douglass Found., Inc. v. District of Columbia (Frederick Douglass II), 2021 WL 3912119, at *4 (D.D.C. Sept. 1, 2021).  It reached this conclusion after a lengthy examination — building on its earlier discussion in a previous iteration of the same case, see Frederick Douglass I, 531 F. Supp. 3d at 326–28 — of the overlap between the First and Fifth Amendment frameworks, recognizing that the D.C. Circuit has provided only "limited pronouncements" on the question of which framework should govern and that other Courts of Appeals are divided over how to categorize such claims.  Frederick Douglass II, 2021 WL 3912119, at *4–5; see also Sanjour v. EPA, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995) (en banc) (noting that selective-enforcement inquiry can incorporate examination of viewpoint-discriminatory motive but is distinct from First Amendment challenge).

Months later, this Court applied the same reasoning to another case in which a plaintiff alleged that the enforcement of a regulation — this time, traffic regulations restricting the location and size of demonstrations on the U.S. Capitol grounds — against him but not against others violated his constitutional rights.  See Mahoney v. U.S. Capitol Police Bd., 2022 WL 523009, at *1 (D.D.C. Feb. 22, 2022).  There, too, the plaintiff alleged both First and Fifth Amendment causes of action, and the Court again determined that the latter provided the better framework for its analysis.  Id. at *7–9.

This suit has not brought about a change of heart; indeed, the Court continues to believe that the Fifth Amendment's selective-enforcement framework was the wiser (even if not the only) option in those cases.  Plaintiff's claim differs from Frederick Douglass and Mahoney, however, in at least two ways that suggest it is best understood as a First Amendment facial challenge to the District's policy for executing its FOIA obligations.

First, the law underlying Plaintiff's claim is not a restriction on behavior that has been enforced against her but not against others; rather, it is a statutory obligation imposed on the Government — viz., to provide documents to requesters.  She complains not that the District has exercised its legitimate discretion in an illegitimate manner, but that it has denied her a benefit that the statute entitles her to receive.  In other words, she challenges a failure to comply with a statutory obligation, not an enforcement decision.

The second difference is an evidentiary one.  In many cases like these — including Frederick Douglass and Mahoney — plaintiffs lack insight into the reasoning behind the Government's behavior.  They rely, accordingly, on evidence of how the Government treats comparators in order to establish a pattern of enforcement from which a viewpoint-discriminatory rationale may be inferred.  See Hoye v. City of Oakland, 653 F.3d 835, 855 (9th

10

Cir. 2011). Such differential treatment makes for an archetypal selective-enforcement claim. But here, Plaintiff alleges the existence of an internal policy — the "watchlist policy" — that guides the District's application of D.C. FOIA. See Compl., ¶¶ 38–52. There is no need, then, to infer a policy from a pattern of enforcement; the policy is front and center. See Hoye, 653 F.3d at 856. The Court can, consequently, understand Plaintiff's claim as "a facial challenge to the city's enforcement policy (as distinct from a facial [or as-applied] challenge to the legislative enactment as written)." Id. at 855.

Ultimately, though, the Court need not choose among these frameworks because the question presented today is much simpler: was Phillips's decision to assert her claim under the First Amendment so incorrect that the Court must dismiss the Complaint for failure to state a claim? Stating the question provides its answer. As the Court's earlier discussion makes clear, the First and Fifth Amendments both provide appropriate frameworks for analyzing the sort of challenge Plaintiff brings in this case. It will thus decline Defendant's invitation to dismiss the Complaint on this front.

### 2. Existence of constitutional injury

Even accepting that Phillips has brought this suit under the proper amendment, the City contends, she has not established a constitutional injury. See Def. MTD at 9–12. That is because the First Amendment provides no right to access the documents she seeks, and so the denial of access cannot infringe on rights that never existed. Id. This case, in Defendant's view, is really a statutory one that belongs in Superior Court.

It is true that Plaintiff does not assert a right of access here — but that is beside the point, she believes. See Pl. Opp. at 13–17. Rather, she advances a claim based on the denial of a public benefit because of her expressed views. Id. at 15–17.

The Court concurs with this approach.  At its core, Phillips's argument is that the District has denied her something to which she is statutorily entitled because of her perceived viewpoint, which the District has gleaned from her social-media postings and attendance at certain MPD hearings, as well as the content of her FOIA requests.  See Compl., ¶¶ 5, 10, 82–83, 91, 95.  That government records are the "something" she is being denied here is of no consequence.  It has long been recognized that the First Amendment protects against differential treatment, including in the award of public benefits, based on a person's speech.  See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) (quoting Rumsfeld v. F. for Acad. and Institutional Rights, Inc., 547 U.S. 47, 59 (2006)) ("[W]e have held that the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech. . . .'"); Perry v. Sindermann, 408 U.S. 593, 597 (1972) (same); Speiser v. Randall, 357 U.S. 513, 518 (1958) ("It cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech.").  That is no less — and no more — true here.  Plaintiff's allegation that she has been denied access to records covered by the D.C. FOIA because of her viewpoint thus constitutes a constitutional injury.  The Court will not dismiss her Complaint on this ground either.

### 3.  *Constitutional validity of policy*

Defendant is not done yet.  Having mounted unsuccessful arguments against the categorization of Plaintiff's allegations, the City next tackles their substance, asserting that Phillips has not established a policy or practice of discrimination in violation of the First Amendment; that such policy (if it exists) is content and viewpoint neutral; and that the District's interests in maintaining the policy justify its existence.  See Def. MTD at 12–18.  The District goes 0 for 3.

First, Defendant's assertion that Plaintiff has not established a pattern of discriminatory enforcement of the D.C. FOIA statute misunderstands the nature of her suit.  It is correct, of course, that she must demonstrate "a discriminatory policy or practice," Frederick Douglass II, 2021 WL 3912119, at *5, to succeed on her claim — but she need not do both.  When a discriminatory policy has been alleged, "plaintiffs do not need to extrapolate from concrete enforcement actions to determine whether the government has a policy of enforcing the neutral written rule in a content-discriminatory manner."  Hoye, 653 F.3d at 856; see also Brown v. City of Pittsburgh, 586 F.3d 263, 294 (3d Cir. 2009).  Such is the case here.  Phillips has alleged the existence of a policy — the "watchlist policy" — that dictates how the District's obligations under D.C. FOIA will be executed.  See Compl., ¶¶ 38–52.  She has thus met her burden.  To the extent that Defendant's challenge derives from its disagreement with her depiction of the watchlist policy, its arguments are misplaced.  At this stage of the litigation, the Court is bound to take Plaintiff at her word, and disputes about the facts underlying the Complaint are for another day.  Sparrow, 216 F.3d at 1113.

Second, even the most cursory review of the watchlist policy makes clear that it is not content or viewpoint neutral on its face.  According to the Complaint, the District maintained "an unofficial, unwritten policy requiring [FOIA officers] to notify [Chief of Police Peter] Newsham and [Chief Operating Officer] LeeAnn Turner of FOIA requests that may lead to criticism of the department, specifically those originating from news reporters or people known to be critical of the department, or those containing requests for information with the potential to embarrass the department."  Compl., ¶ 42.  That evinces a clear intent to apply differential treatment to requests seeking certain content (information that would likely embarrass the police department) and expressing a certain viewpoint (criticism of the department).  The policy, then, "target[s] . . .

specific subject matter" and regulates "speech based on the specific motivating ideology or the opinion or perspective of the speaker." Reed v. Town of Gilbert, 576 U.S. 155, 168–69 (2015) (defining content- and viewpoint-based regulation) (internal quotation marks and citations omitted). It is, in other words, a paradigmatic example of a content- and viewpoint-based policy, the District's argument to the contrary notwithstanding.

Such content- and viewpoint-based regulations are subject to strict scrutiny and thus offend the First Amendment unless the Government can "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Id. at 165–66, 171. Defendant does not seriously contest this proposition, arguing instead that the strict-scrutiny standard does not govern here because it applies only to "facial challenges to laws that are explicitly content-based," while Plaintiff has mounted "only an as-applied challenge." Def. Reply at 9. But, as the above discussion makes clear, that misunderstands the nature of Plaintiff's challenge, which can be (and perhaps is best) understood as a facial challenge to the watchlist policy, even though Phillips never makes clear whether she is proceeding under a facial or as-applied theory. See supra at 10–11.

The District, then, must demonstrate that the watchlist policy furthers a compelling interest and is narrowly tailored to do so. On this record, it can do no such thing. Although the City asserts that it has "a substantial government interest in providing accurate information to the public," Def. MTD at 17, and "a compelling interest in maintaining 'close working relationships' between MPD leadership and FOIA staff for high profile requests," Def. Reply at 9–10, the Court is not convinced that it can consider these justifications at the motion-to-dismiss stage or that, if it could, those are sufficiently "compelling" interests to sustain a content-based policy. As Plaintiff points out, furthermore, it is not clear that the watchlist policy is narrowly (or at all)

tailored to serving those interests, see Pl. Opp. at 21–22, and Defendant offers little to explain how it is.  See Def. Reply at 10.  The Court will thus reject this argument for dismissal, too.

### 4.  Municipal liability

Finally, Defendant argues that Phillips's claims cannot proceed because, even if she has alleged the existence of a content- or viewpoint-based policy, it is not one for which the District can be held liable.  See Def. Reply at 10–16.  Indeed, a municipality "cannot be held liable [under section 1983] solely because it employs a tortfeasor."  Singletary v. District of Columbia, 766 F.3d 66, 72 (D.C. Cir. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Municipal liability for the constitutional violations of its employees arises only "when execution of [the municipality's] policy or custom . . . inflicts the injury."  Id. (quoting Monell, 436 U.S. at 694).  To proceed against the District, Plaintiff must, therefore, demonstrate not only that the "watchlist policy" violated her constitutional rights, but also that it was, in fact, a District policy or custom.  See Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (describing "two-step inquiry"); see also Triplett v. District of Columbia, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (to establish Monell liability, plaintiff must "show fault on the part of the city based on a course its policymakers consciously chose to pursue") (quoting Carter v. District of Columbia, 795 F.2d 116, 122 (D.C. Cir. 1986)).

In order to attribute a particular constitutional violation to a municipality, a plaintiff must demonstrate that the policy that led to the violation arose in one of four ways: (1) from "the explicit setting of a policy by the government"; (2) from "the action of a policy maker within the government"; (3) from "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent they have become 'custom'"; or (4) from "the failure of government to respond to a need . . . in such a manner as to show 'deliberate

indifference' to the risk . . . [of] constitutional violation[]." <u>Baker</u>, 326 F.3d at 1306 (citations

omitted).  Phillips alleges that the "watchlist policy" here can be attributed to the District under

either the second or third prong because the Chief of Police is a municipal policymaker.  <u>See</u> Pl.

Opp. at 22.

The District can be held liable only if "the decision to adopt th[e relevant] course of

action [was] properly made by [one of its] authorized decisionmakers." <u>Singletary</u>, 766 F.3d at

73 (quoting <u>Pembauer v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986).  Only the acts of a

"municipal policymaker" represent "act[s] of official government 'policy.'" <u>Id.</u> (quoting

<u>Pembauer</u>, 475 U.S. at 480–81).  This is true regardless of whether Phillips proceeds under the

theory that the Chief of Police adopted the "watchlist policy" himself or merely ratified the

custom or practice of his subordinates.  <u>See</u> <u>Blue v. District of Columbia</u>, 850 F. Supp. 2d 16,

26–27 (D.D.C. 2012) (explaining that "municipal liability may be imposed for a single decision

[made] by [a] municipal policymaker[]," but only if it was "deliberate choice" by "official[]

responsible for establishing final policy" on that matter) (quoting <u>Pembauer</u>, 475 U.S. at 480,

483); <u>Miner v. District of Columbia</u>, 87 F. Supp. 3d 260, 267 (D.D.C. 2015) (holding that

municipal liability could not arise from superior's "condon[ing]" acts of inferiors when she did

not herself have "final authority necessary to qualify as a 'policymaker' for <u>Monell</u> purposes").

The issue here, then, is whether the Chief of Police is a final policymaker.

This is a question of state law.  <u>See</u> <u>Triplett</u>, 108 F.3d at 1453 (citing <u>Jett v. Dallas Indep.</u>

<u>School Dist.</u>, 491 U.S. 701, 737 (1989)).  Policymaking authority can be designated "by a

legislative enactment" or "delegated by an official who possesses such authority." <u>Pembauer</u>,

475 U.S. at 483.  An official need not be a final policymaker on all issues or even on a given

issue for the entire municipality.  <u>See</u> <u>Sanders v. District of Columbia</u>, 85 F. Supp. 3d 523, 531

16

(D.D.C. 2015).  She need only be the final policymaker with respect to the subject matter at

hand.  See Singletary, 766 F.3d at 74 (noting that municipal liability depends on whether

decisionmaker was "granted final policymaking authority under D.C. law in the area [under

dispute]").  Courts, however, have generally held that "a final policy maker typically must be at

least an agency head or the governing body of an agency."  Miner, 87 F. Supp. 3d at 266

(internal quotation mark and citation omitted).  Any decisions "subject to review by [another]

authorized policymaker[]," moreover, cannot represent the acts of a final policymaker.  Id. at 267

(quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)).  Nor can "decision[s] to

'depart[]' from . . . policies" not of one's making.  See Singletary, 766 F.3d at 74 (quoting

Praprotnik, 485 U.S. at 127).

       Although the Chief of Police may not be a final policymaker for all purposes, District law

clearly renders him one for the purposes of this suit.  By statute, every public body subject to

FOIA is authorized to issue "reasonable rules . . . concerning the time and place of access" to

public records.  See D.C. Code § 2-532(a).  The adoption of such rules is not subject to review

by any other municipal decisionmaker.  Id.; see also Miner, 87 F. Supp. 3d at 266.  As the head

of MPD, the Chief of Police is the final policymaker with respect to internal MPD policy.  See

Sanders, 85 F. Supp. 3d at 530–31 (concluding that Chief of Police is "'municipal policymaker'

as to the Metropolitan Police Department"); see also D.C. Mun. Reg. 6-A § 800.1 ("The Chief of

Police is the chief executive officer of the Metropolitan Police Department . . . ."); id. § 800.16

(assigning Chief of Police "authority to plan and prescribe departmental policy").  Under FOIA,

therefore, the Chief of Police is a final decisionmaker with respect to the adoption of internal

FOIA processes and rules.  In fact, the explicit authority to promulgate rules distinguishes this

case from those in which agency heads did not satisfy the requirements for final policymaking

authority.  <u>See, e.g.</u>, <u>Singletary</u>, 766 F.3d at 74 (holding that Parole Board lacked relevant

authority because it was not "authorized to promulgate general rules or other policies"); <u>Horse v.</u>

<u>District of Columbia</u>, No. 17-1216, Tr. of Status Conf. at 66 (D.D.C. Sept. 27, 2019) (concluding

that "detailed rules and regulations" left Chief of Police with no independent policymaking

authority under particular statute).

    The District disputes this conclusion, arguing that the Mayor retains final policymaking

authority under FOIA.  <u>See</u> Def. Repl. at 12.  MPD's obligation to submit annual reports to the

Mayor and the D.C. Council on its "public-record disclosure activities" does not, however,

constitute "review" of the agency's rulemaking authority under the statute.  <u>See</u> D.C. Code § 2-

538(a).  In fact, the required reports bear only on the number of FOIA requests received and

processed and do not implicate the sphere of authority delegated to MPD — that is, its internal

procedures for processing such requests.  <u>See</u> <u>id.</u> §§ 2-532(a), 2-538(a).

    In addition, that some aspects of FOIA review are dictated by statute does not negate the

Chief of Police's status as final policymaker with respect to others.  <u>See, e.g.</u>, <u>id.</u> § 2-532(c)(1)-

(2)(A) (requiring responses to public records requests within 15 or 25 days).  It is well settled

that "policymaking authority [can be] shared among more than one official or body," each of

whom can operate as a final policymaker in different respects.  <u>See</u> <u>Praprotnik</u>, 485 U.S. at 126

(finding Civil Service Commission to be final policymaker where Mayor and Aldermen adopted

ordinances related to personnel administration and Commission "prescribed . . . rules for the

administration and enforcement" thereof).  The FOIA statute may have excluded some matters

from discretionary policymaking, but, at the same time, it expressly delegated others.  <u>See</u> D.C.

Code. § 2-532(a).  Although it is not entirely clear whether the Chief of Police could act as a

final policymaker if he were to adopt a policy that directly violated portions of the FOIA statute,

the Court need not resolve this issue.  Plaintiff's allegations of a "watchlist policy" fall squarely within the Chief's authority to issue rules regarding the "time and place of access" to MPD's records.  Id.  On this matter, the Chief is a final policymaker for the District, and his actions can, therefore, be attributed to it.  Monell is thus no obstacle to Phillips's suit at this stage.

## IV.     Conclusion

For these reasons, the Court will deny Defendant's Motion to Dismiss.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  May 2, 2022