## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMY PHILLIPS,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:22-cv-00277-JEB** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

### DEFENDANT'S REDACTED MOTION FOR SUMMARY JUDGMENT

Defendant District of Columbia (the District) moves for summary judgment under Federal Rule of Civil Procedure 56. A memorandum of points and authorities, statement of undisputed material facts, and proposed order are attached. Because this Motion is dispositive, the District has not sought Plaintiff's consent. *See* LCvR 7(m).

The accompanying memorandum and statement of undisputed material facts contains two sentences that have been redacted. Counsel for non-party witness Vendette Parker asked that portions of her deposition be marked confidential, and the redacted sentences refer to that testimony. Counsel, however, did not follow the correct procedures in the Protective Order [24]. And counsel also did not respond when the District asked him to explain the basis for his designation. It is the District's position that the testimony is not properly designated confidential. Nonetheless, as a courtesy to counsel, the District is filing a redacted version of the memorandum and will not yet include the testimony at issue. As the District informed counsel, he can file a motion to seal with the Court by February 21, 2024, explaining why the material should remain redacted. If he does not, then the District will file an unredacted memorandum and statement as well as the testimony.

Date: February 16, 2024.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

/s/ Matthew R. Blecher
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

/s/ Honey Morton
HONEY MORTION [1019878]
Assistant Chief, Equity Section

/s/ Adam J. Tuetken
ADAM J. TUETKEN [242215]
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]
AMANDA C. PESCOVITZ [1735780]*
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

---

\*      Admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver).
Practicing under the direct supervision of Matthew Blecher, a member of the D.C. Bar, pursuant
to D.C. App. R. 46-A(d)(2).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMY PHILLIPS,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:22-cv-00277-JEB** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

**REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 1

    I.     The District Makes Public Records Available. ..................................................... 1

    II.    MPD Processes FOIA Requests. ......................................................................... 3

    III.   Phillips Makes FOIA Requests. ........................................................................... 6

    IV.   Phillips Collaborates with Insp. Parker. ............................................................. 7

    V.    Phillips Sues the District. .................................................................................... 10

    VI.   Phillips Hires a Law Professor. ........................................................................... 11

LEGAL STANDARDS ................................................................................................... 13

    I.     Summary Judgment ............................................................................................. 13

    II.    Expert Admissibility ........................................................................................... 14

ARGUMENT ................................................................................................................... 14

    I.     There Was No Unconstitutional Policy Applied to Phillips's FOIA
          Requests, So Her Claim for Retrospective Relief Fails. ..................................... 14

         A.    The District Did Not Violate Phillips's First Amendment Rights. ........... 15

               1.    MPD Did Not Know of Phillips's Speech or Discriminate
                    Because of It. ............................................................................. 17

               2.    Often, Phillips Did Not Face Any Delays, Denials, or Fees. ........ 20

               3.    There Were Speech-Neutral Reasons for Every Delay,
                    Denial, or Charge Phillips Faced. ............................................. 22

                4.    Phillips Cannot Succeed on a Claim That MPD
                      Unconstitutionally Highlighted Her Requests for EOCOP. ......... 24

         B.    Even if There Were a First Amendment Violation, a Policy or
              Custom Was Not the Moving Force Behind It. ....................................... 27

1.      The Chiefs Did Not Take Any Unconstitutional Action Towards Phillips. ......................................................................... 27

2.      There Was No Custom of Unconstitutional Actions Towards Phillips About Which the Chiefs Knew. ........................ 30

3.      The Informational Presentation Did Not Set Forth a Watchlist Policy. ........................................................................... 33

II.     There Is No Evidence That a Watchlist Policy Continues Today, So Phillips's Claim for Prospective Relief Fails. ........................................................ 34

III.    The Kwoka Report Cannot Save Phillips's Claim Because It Is Inadmissible. ........................................................................................... 36

        A.      Prof. Kwoka's First Opinion Is Inadmissible. .......................................... 37

        B.      Prof. Kwoka's Second Opinion Is Inadmissible. ..................................... 42

CONCLUSION .............................................................................................................. 44

## INTRODUCTION

Amy Phillips brought this lawsuit to challenge an alleged policy—a policy that, discovery reveals, never existed.  For years, Phillips served the Metropolitan Police Department (MPD) with requests under the District's Freedom of Information Act (FOIA).  Unsatisfied with MPD's responses, she became convinced that a grand scheme was afoot.  To her, the top brass of MPD must keep a "watchlist" of individuals whose FOIA requests are delayed, denied, or burdened because the watchlist member criticizes MPD.  Phillips thinks she is on this watchlist mostly because she tweets about MPD (never mind that she has no evidence that anyone at MPD has read her tweets).  So she sued the District, alleging a first-of-its-kind claim that an agency's processing of FOIA requests can give rise to a First Amendment violation.

But this watchlist does not exist.  In fact, there is no evidence tying any delays, denials, or burdening of Phillips's FOIA requests to MPD's supposed animus towards her speech.  Even if there were, there is no evidence tying delays, denials, or burdens to a policy or custom of the Chief of MPD.  And even if there were, there is no evidence tying a policy or custom to the current Chief.  Because Phillips cannot tie her case together with evidence, the Court should grant summary judgment to the District.

## BACKGROUND

### I.     The District Makes Public Records Available.

The District's FOIA provides that "a public body . . . shall within 15 [business] days" of a request "reasonably describing any public record" either make the record available or notify the requester that it will not produce the record.  Def.'s Statement of Undisputed Material Facts (Def.'s SUMF) ¶ 1.[1]  Extensions of time to respond are permitted.  *Id.* ¶ 2.  If the request is for

---

[1]     When citing to the SUMF, internal quotation marks and citations are omitted.

body-worn camera (BWC) footage, MPD "shall [respond] within 25 days." *Id.* ¶ 3.  Although,

District law tolled FOIA deadlines during the COVID-19 emergency, which occupied about a

year of the relevant period in this case.  *Id.* ¶ 4.

A few aspects of FOIA are relevant here.  First, FOIA contains exemptions that may

result in withholding or redacting records.  *Id.* ¶ 5.  Second, an agency may charge fees for

processing requests.  *Id.* ¶ 6.  Or the agency may waive fees if "furnishing the information can be

considered as primarily benefiting the general public."  *Id.* ¶ 7.  To decide whether to waive fees,

the agency necessarily considers the identity of the requester and the uses she might make of the

information.  *See id.*  Nonetheless, MPD only rarely collects fees and only routinely attempted to

charge fees for a short period during the events in this case.  *Id.* ¶ 9.  Third, the head of each

agency (in this case, the Chief) is responsible for issuing "reasonable rules . . . concerning the

time and place of access" to public records.  *Id.* ¶ 10.  Fourth, any person denied records may

appeal the denial to the Mayor's Office of Legal Counsel (MOLC) and thereafter may seek

production through the Superior Court of the District of Columbia.  *Id.* ¶ 12.

As relevant to the events here, the number of FOIA requests directed at MPD spiked by

66% between FY2018 and FY2022 (from 1,252 in FY2018 to 2,084 in FY2022).  *Id.* ¶ 13.  Also

in that same period, the average number of days a request was pending with MPD jumped from

97 to 225.  *Id.* ¶ 14.[2]  Although these averages exceed the statutory maximum of 15 days, MPD's

processing times are neither secret nor unusual.  Public agency reports show that the citywide

---

[2]     These numbers reflect the total days that a request was with the agency before it was fully
closed—not just the days before a first response.  For example, if a request was denied, but then
the requester appealed to MOLC or brought a FOIA lawsuit, then the agency responded, the
request's age would reflect the litigation days.  These numbers also reflect requests in which
productions were rolling and started within a reasonable time but nonetheless took time to
complete.

average was 40.3 days in FY2020, 58.5 days in FY2021, and 49.42 days in FY2022.  *Id.* ¶ 15.  In FY2021 and FY2022, a dozen agencies had averages over 100 days.  *Id.* ¶ 16.  Six had averages over 200 days in FY2021, seven in FY2022.  *Id.*

## II.    MPD Processes FOIA Requests.

MPD's FOIA Office, led by the FOIA Officer, processes FOIA requests, collects responsive records from other MPD units, and reviews and redacts records.  Def.'s SUMF ¶ 17. Since 2017, the Office has had four FOIA Officers:  Liz Lyons (acting only), Insp. Vendette Parker, Lisa-Archie Mills (acting only), and Brandynn Reaves.  *Id.* ¶ 18.  Insp. Parker began working in the Office in April 2017, after then-Chief Peter Newsham demoted her from her position as 7th District Commander because she had "lost the morale" in her district and "concerns" had arisen "about the ways officers were being treated" by her.  *Id.* ¶ 19.  Insp. Parker had no prior FOIA experience.  *Id.* ¶ 20.  She took over as the FOIA Officer in October 2017.  *Id.* ¶ 21.  In that position, she regularly expressed to colleagues how much she disliked Chief Newsham.  *Id.* ¶ 22.

Insp. Parker reported directly to Leeann Turner, who was then, and still is, MPD's Chief Administrative Officer (formerly called the Chief Operating Officer).  *Id.* ¶ 23.  Turner is a member of what MPD employees call the Executive Office of the Chief of Police (EOCOP or COP), the office of the Chief and his/her leadership team.  *Id.* ¶ 24.  The Chiefs during the events here were Chief Newsham (September 2016 to December 2020), Chief Robert J. Contee III (January 2021 to May 2023), Interim Chief Ashan Benedict (May 2023 to July 2023), and Chief Pamela Smith (July 2023 to present).  *Id.* ¶ 25.  EOCOP is also an organizational unit for reporting purposes that includes other civilian units, including OGC and the FOIA Office.  *Id.* ¶ 26.

3

Insp. Parker left MPD more than four years ago, in January 2020.  *Id.* ¶ 27.  Archie-Mills then became acting FOIA Officer.  *Id.* ¶ 28.  Later, supervision of the Office moved from Turner's portfolio to the Office of General Counsel (OGC), where it remains.  *Id.* ¶ 29.  Reaves took over as FOIA Officer in May 2022.  *Id.* ¶ 30.

Under each FOIA Officer, some practices remained the same, while some did not.  Of import here, at all times, requesters submitted requests using an online platform called FOIAXpress, which Office staff used to track the status of each request.  *Id.* ¶ 31.  Through FOIAXpress, staff would routinely generate a report of all FOIA requests received in the prior week, showing basic information (*e.g.*, requester name, the request, and processing status).  *Id.* ¶ 32.  The FOIA Officer would then circulate the report to the Chief, Turner, and MPD's Director of Communications.  *Id.* ¶ 33.  Insp. Parker would also meet weekly with Turner to discuss FOIA requests.  *Id.* ¶ 34.

Turner's involvement with FOIA requests was varied but typical of a supervisor or agency executive.  Sometimes, Turner would ask Parker about a particular request to try to move it along toward closure, or to get a status update.  *Id.* ¶ 35.  Sometimes, she would help Insp. Parker identify the right units to contact for new requests, or help prod along those units, or suggest how to find better or additional information (including for requests by requesters on the alleged "watchlist").  *Id.* ¶ 36.  Sometimes, she would ensure that any data reported in response to a request was consistent with information that MPD had reported in other contexts.  *Id.* ¶ 37.  Sometimes, she would review proposed redactions or responsive documents and approve the package.  *Id.* ¶ 38.  Sometimes, she would ask Insp. Parker to wait to send a response so she could inform the Chief of the response before he received questions from the public about it— this would be a matter of hours or maybe days, not more.  *Id.* ¶ 39.  Other times, she would give

the Chief a heads up after the response went out.  *Id.* ¶ 40.  Sometimes, she would discuss policy issues with the Chief, OGC, or other MPD leaders, such as MPD's agency-wide interpretation of exemptions.  *Id.* ¶ 41.  Sometimes, she would ask questions about information that had already been released, after the fact, to better understand the information and to ensure the integrity of MPD operations.  *Id.* ¶ 42.  This varied engagement was commonly called "EOCOP Review" or "elevating a request" because the questions or pending requests would literally and figuratively be taken upstairs for discussion in Turner's office.  *Id.* ¶ 43.

But throughout all these discussions, Turner never discussed the viewpoint or prior or anticipated speech of any FOIA requesters with Insp. Parker.  *Id.* ¶ 46.  Nor is there evidence that any of Turner's directions to Insp. Parker were connected to the viewpoint of the requesters.  *Id.* ¶ 47.  To the contrary, requests would come to Turner's attention because of the information requested—because it was unusual, within her knowledge base, something a supervisor or executive should know about, or, in the words of a presentation created by the FOIA Office, "high profile" or "sensitive."  *Id.* ¶ 48.  Relatedly, requests from media entities were also more likely to come to Turner attention, as she regularly liaised with MPD's communications teams. *Id.* ¶ 54.

About a year into Insp. Parker's tenure, in response to one of the weekly reports described above, Chief Newsham asked, "[c]an we highlight the FOIA's that I should be alerted to?"  *Id.* ¶ 55.  Turner replied, "yes," and she asked Insp. Parker to identify new requests that Insp. Parker thought would be of interest.  *Id.* ¶ 56.  In her email conveying the next weekly report, Insp. Parker highlighted requests of which she thought EOCOP should be aware.  *Id.* ¶ 57.

In total, Insp. Parker sent 13 such emails including a weekly report and "highlighted" requests. *Id.* ¶ 58.  She highlighted 34 individual requests—out of 1,116 requests MPD received between October 2018 and August 2019—from 24 different requesters. *Id.* ¶ 59.  Amy Phillips was not one of those requests highlighted in emails, even though Phillips made eight requests during that period, each listing the "Public Defender Service" (PDS) as the requesting entity. *Id.* ¶ 60.  Nor did Insp. Parker highlight any requests from PDS. *Id.* ¶ 61.

Insp. Parker's highlighting was inconsistent, as she did not consistently highlight all requests by any requester.  For example, reporter Eric Flack filed ten requests, but Insp. Parker highlighted only four of them. *Id.* ¶ 62.  Similarly, reporter Evan Lambert filed eight requests, but Insp. Parker highlighted only two of them. *Id.* ¶ 63.

### III.    Phillips Makes FOIA Requests.

Amy Phillips enjoys a "hobby" of making FOIA demands of MPD.  Def.'s SUMF ¶ 65.  So much so, one friend crowned her "the queen of foia-ing mpd." *Id.* ¶ 66.  Another friend asked her, "[w]hat are the many ways I can screw with the police here through FOIAs," to which Phillips explained her ways and how she "learned it all just by . . . filing a bunch of things that got rejected and generally making an ass of myself." *Id.* ¶ 67.  She also explained to confidants that she made FOIA demands not because she has particular use for the documents, but "to troll MPD," and prove a "principle." *Id.* ¶ 68.  She refused to explain in this case how, if at all, she has used records she has obtained to benefit the public. *Id.* ¶ 69.  Indeed, she is not interested in "big picture policy questions." *Id.* ¶ 70.  Rather, as she told one fellow requester about her FOIA motivations, "I'm after the higher ups." *Id.* ¶ 71.

Phillips made 16 FOIA requests during the relevant period. *Id.* ¶ 86.  Many of those sought voluminous amounts of documents or were otherwise complex. *E.g.*, *id.* ¶¶ 97, 118, 146, 150.  For instance, Phillips requested every letter of denial MPD has ever sent in response to a

FOIA request in the more than 40 years that FOIA has been law.  *Id.* ¶ 120.  This request and others required, among other things, searches of emails and redactions of thousands of pages.  *E.g.*, *id.* ¶¶ 97, 118, 123, 146, 150.  Given the amount of work required, MPD could not process all Phillips's requests quickly.  *Id.*

Nonetheless, Phillips's requests occupied the time of the FOIA Office—not EOCOP.  No Chiefs ever got involved in Phillips's FOIA requests.  *Id.* ¶ 84.  Nor did EOCOP.  For nearly all of her requests, there is no evidence that EOCOP, other than counsel, discussed and took any actions regarding her requests.  *Id.* ¶¶ 91, 94, 98, 116, 119, 126, 129, 132, 135, 139, 143, 147, 151, 155.

Besides making FOIA requests, Phillips tweets from a personal Twitter account with little more than 3,000 followers—none associated with MPD.  *Id.* ¶ 72.  Sometimes, she tweets about MPD.  *Id.* ¶ 73.  But there is no evidence that anyone from MPD ever read her tweets or any other social media posts.  *Id.* ¶ 74.

**IV.   <u>Phillips Collaborates with Insp. Parker.</u>**

Phillips suspected that MPD was "improperly delaying" her requests.  Def.'s SUMF ¶ 157.  Although, she did not have "have any specific information that [she] was on a list or receiving special scrutiny."  *Id.*  One request prompted her to bring a FOIA lawsuit in D.C. Superior Court.  *Id.* ¶¶ 100–12.  Phillips had requested all materials related to an adverse action hearing (AAH), a disciplinary proceeding, for an MPD officer, Sean Lojacono.  *Id.* ¶ 100.  The request was originally denied because MPD then understood AAH materials for an individual officer to be exempted.  *Id.* ¶¶ 102–03.  After MOLC affirmed in part and remanded for MPD to process part of the request, the request required searching for, redacting, and producing thousands of pages.  *Id.* ¶ 108.  Phillips grew impatient with MPD's pace after a few weeks and sued the District to compel production of the records.  *Id.* ¶ 110.

For that lawsuit, she sought advice from her friend Michael Perloff, an attorney with the ACLU.  *Id.* ¶ 158.  Perloff introduced Phillips to Insp. Parker, who had recently left MPD.  *Id.* ¶ 159.  Both before and after her departure, Insp. Parker developed her own relationships with frequent FOIA requesters, like Perloff and Flack.  *Id.* ¶ 160.  ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

A relationship with Insp. Parker soon bore fruit for Phillips.  In her Lojacono lawsuit, the District had explained its production process to the court and suggested that Insp. Parker's initial search and production were inadvertently inadequate.  *Id.* ¶ 163.  To present a counter-narrative, Phillips enlisted Insp. Parker to write a declaration for her.  *Id.* ¶ 164.  Insp. Parker agreed because she was upset with how the District described her work.  *Id.* ¶ 165.

Insp. Parker's declaration described how, in her view, she was not responsible for any delays with the Lojacono request because she had looped in EOCOP about that request, who was responsible for the release decisions.  *Id.* ¶ 166.  Insp. Parker stated that, prior to the request, "Turner advised me of an unofficial, unwritten policy that required the FOIA officer to notify Chief Newsham and Turner of any FOIA request originating from the media, certain identified individuals, or requests for certain records."  *Id.* ¶ 167.  The purpose of this notification was to ensure that Chief Newsham was aware of records that had been released in case he was asked about them by the press or public.  *Id.* ¶ 168.  Insp. Parker would "highlight[ ]" requests in emails to Chief Newsham and Turner.  *Id.* ¶ 169.  It was solely up to Insp. Parker which requests were highlighted.  *Id.* ¶ 171.  Once a request was highlighted, Insp. Parker had "no knowledge of whether Turner and Chief Newsham actually met to discuss" any of the requests.  *Id.* ¶ 173.  Insp. Parker never told anyone of this practice until she left MPD.  *Id.* ¶ 174.

Insp. Parker notified Turner of Phillips's Lojacono request, although not through a highlighted email. *Id.* ¶ 175.  Insp. Parker notified Turner because the Lojacono disciplinary proceeding was a "high-profile" incident, and Phillips had previously requested other records, like Gun Recovery Unit (GRU) records and AAH transcripts, that EOCOP had asked to be made aware of because such records were either exempt or could reveal law enforcement and investigation strategies. *Id.* ¶ 176.  There is no evidence that Insp. Parker researched or was aware of Phillips's viewpoint or speech. *Id.* ¶ 177.  Nor is there evidence that Insp. Parker alerted Chief Newsham or Turner to any speech by Phillips. *Id.* ¶ 178.

This declaration, however, was not the work of Insp. Parker's hand alone.  Rather, Phillips had "several phone conversations" and emails with Insp. Parker about the content of her declaration. *Id.* ¶ 179.  Phillips reviewed drafts and made suggestions about what to include. *Id.* ¶ 180.  Although, Phillips had no knowledge herself of "what the specific practices are within MPD's FOIA Office." *Id.* ¶ 181.

Thanks to Phillips's handiwork, the declaration changed during the drafting process. Insp. Parker did not originally allege that the notification procedure was "unofficial" and "unwritten." *Id.* ¶ 182.  Insp. Parker added those descriptors later. *Id.* ¶ 183.  Next, Insp. Parker originally wrote that "Phillips came to the attention of Chief Newsham and Turner" when she "requested all the names and badge numbers for every officer assigned to each patrol district." *Id.* ¶ 184.  But "after talking to" Phillips, Insp. Parker changed her account of how Phillips came to the attention of Chief Newsham and Turner. *Id.* ¶ 185.  Also, Insp. Parker did not originally allege that "[t]he Chief and Turner were averse to e-mails as they created material susceptible to FOIA laws or discovery in litigation." *Id.* ¶ 186.  Insp. Parker added that line later. *Id.* ¶ 187. Last, Insp. Parker originally included that "[f]ive months prior to being assigned to the FOIA

9

office, Chief Newsham made a statement publicly regarding me that was false and belittling."

*Id.* ¶ 188.  After discussing that line with Phillips, Insp. Parker dropped it "because it would have

been a distraction."  *Id.* ¶ 189.

Phillips filed Insp. Parker's declaration with the Superior Court, but after MPD produced

more records, she voluntarily dismissed her suit.  *Id.* ¶ 112.

**V.     Phillips Sues the District.**

After dismissing her Superior Court case, Phillips used Insp. Parker's declaration as a

jumping off point to draft a federal complaint, adding dozens of allegations to Insp. Parker's

account.  Compl. [1].  Phillips alleged that MPD maintains a "watchlist" of MPD critics,

including Phillips, whose FOIA requests are sent to EOCOP, which then delays, denies, or

burdens them.  *Id.* ¶¶ 1, 81, 91.  Insp. Parker, however, had never used the term "watchlist."

Def.'s Ex. 2, Vendette Parker Dep. Tr. (Parker Dep.) at 453.

Phillips alleged that this watchlist violates the First Amendment, and she sued the District

under 42 U.S.C. § 1983.  Compl. ¶ 93.  She sought nominal damages, declaratory relief, and

injunctive relief.  *Id.*, Prayer.  Although she alleged that several individuals were on the

watchlist, *e.g.*, *id.* ¶¶ 54, 64, 73, no one else would join her suit, *see id.* ¶ 2.

Accepting these allegations as true, as it must, the Court declined to dismiss the case on

the pleadings.  *Phillips v. District of Columbia* (*MTD Op.*), No. 22-cv-277, 2022 WL 1302818

(D.D.C. May 2, 2022).  The Court explained that, "[a]t its core," Phillips's claim was that "the

District has denied her something to which she is statutorily entitled because of her perceived

viewpoint."  *Id.* at *6.  As such, her claim fit into the framework of cases holding that the

government cannot deny "public benefits" (here, government records) "based on a person's

perceived speech."  *Id.*  So she stated a First Amendment claim that MPD delayed, denied, or

burdened FOIA requests "from people critical of MPD," like Phillips.  *Id.* at *1.

A year-and-a-half of discovery followed.  The District produced over 16,000 documents.

District witnesses gave nearly 100 hours of testimony.  As discovery neared a close, Phillips

perhaps perceived that the facts did not show speech-based discrimination.  So she moved to

amend her Complaint to add a claim that the District should at least be liable under FOIA for

having a policy or practice of missing FOIA deadlines.  *Phillips v. District of Columbia* (*MTA

Op.*), No. 22-cv-277, 2023 WL 5607449, at *1 (D.D.C. Aug. 30, 2023).  She also moved to add

"a handful of factual allegations."  *Id.*  The District consented to the factual allegations but

opposed the new claim.  *Id.*  The Court agreed with the District and rejected Phillips's new

claim, "find[ing] inescapable the conclusion that she has not acted diligently."  *Id.* at *3.  Thus,

Phillips was allowed to amend her Complaint in September 2023 only to add factual allegations.

Am. Compl. [42].

## VI.  **Phillips Hires a Law Professor.**

After fact discovery, Phillips disclosed an expert witness, Prof. Margaret Kwoka.  Def.'s

SUMF ¶ 190.[3]  Prof. Kwoka is a law professor in Ohio who studies federal FOIA.  *Id.* ¶ 191.

Prof. Kwoka offered two opinions.  *Id.* ¶ 192.

Prof. Kwoka first opined that the alleged watchlist policy caused delays.  *Id.* ¶ 193.  She

reached this opinion by analyzing a spreadsheet produced by the District in discovery.  *Id.* ¶ 194.

That spreadsheet logged select information from FOIAXpress for each FOIA request (*e.g.*,

requester name, description of request, request age) during the relevant period.  *Id.* ¶ 195.  Prof.

Kwoka used that spreadsheet to perform a two-step method to determine "which requesters were

---

[3]      The Court did not require the District to produce a rebuttal expert prior to summary
judgment.  *See* Joint Status Rep. [51]; Nov. 13, 2023 Min. Order.

likely affected by the policy and what harms, if any, the policy caused for those requesters." *Id.* ¶ 196.

At step one, Prof. Kwoka categorized which requests were likely subject to the policy, which she understood to be that media, "high profile," and "sensitive" requests were sent to EOCOP. *Id.* ¶ 197. Relying on her own interpretation of those terms, she assumed that any request was subject to the policy if it appeared, to her, to have a "purpose" of "obtaining information" "to share it, in some form, with the broader public." *Id.* ¶ 198. She called these "oversight requests." *Id.* ¶ 199. She also created categories for requests she was "certain were subject to the policy": (1) Phillips's requests; (2) requests that had a note in the log saying "File Cabinet," "File Folder," or "EOCOP review"; and (3) requests made by individuals named in the Parker declaration. *Id.* ¶ 202.

As reflected in testimony that Prof. Kwoka did not consult, the designations "File Folder" or "File Cabinet" indicate only that the comments field had included privileged information that was removed by counsel when the District produced the spreadsheet in discovery. *Id.* ¶ 203. The designations do not denote EOCOP review. *Id.* Similarly, Prof. Kwoka did not consult any evidence confirming that "EOCOP review" meant EOCOP review of a request because it was media, high profile, or sensitive. *Id.* ¶ 204.

At step two, Prof. Kwoka compared the mean and median response times for each category. *Id.* ¶ 205. Because the response times for oversight requests and the three categories were higher than for non-oversight requests, she concluded that the alleged policy caused delays. *Id.* ¶ 206. The only other potential cause she tried to control for was complexity. *Id.* ¶ 207. Some of the FOIA logs are tagged "complex." *Id.* ¶ 208. This tag was sometimes automatically added by FOIAXpress to requests with a response time that exceeds the statutory maximum. *Id.*

¶ 209.  Prof. Kwoka, however, assumed that this tag meant that FOIA employees viewed the request as complex.  *Id.* ¶ 210.  Because those "complex"-tagged requests had shorter response times than requests Prof. Kwoka categorized as subject to the policy, she concluded that complexity was not the cause of delay.  *Id.* ¶ 211.

Prof. Kwoka's second opinion was that the alleged policy is not "necessary" or "justified by the statute's requirements."  *Id.* ¶ 212.  To reach that conclusion, she compared the alleged policy—as she understood it—to (1) FOIA practices she had encountered in her research, (2) a federal guide to FOIA best practices, and (3) a few policies that had been investigated in federal agencies.  *Id.* ¶ 213.  She concluded that the policy was atypical because its "defining feature" was that the head of the agency has "ultimate authority" over FOIA.  *Id.* ¶ 214.  She did not consider that this Court had ruled that District law—not the alleged policy—placed final authority over FOIA with the Chief.  *Id.* ¶ 215.

## LEGAL STANDARDS

### I.   <u>Summary Judgment</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive summary judgment, a plaintiff must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks and citation omitted).  Summary judgment in

the defendant's favor is warranted when the plaintiff "fails to make a showing sufficient to

establish the existence of an element essential" to her case. *Id.* at 322.

## II.   <u>Expert Admissibility</u>

"To survive summary judgment the non-moving party must 'produce

evidence . . . capable of being converted into admissible evidence.'" *Greer v. Paulson,* 505 F.3d

1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen v. DCCC*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)).

Accordingly, if expert testimony is "found wanting" for admissibility, the Court can exclude the

testimony "from its consideration in ruling on [a summary judgment] motion." *Arsanjani v.

United States*, No. 19-cv-1746, 2023 WL 3231101, at *3 (D.D.C. May 3, 2023) (Boasberg, C.J.)

(internal quotation marks and citation omitted), *appeal docketed*, No. 23-5109 (D.C. Cir. May

15, 2023).   The recently amended Fed. R. Evid. 702 governs expert admissibility and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods
> to the facts of the case.

## ARGUMENT

## I.   <u>There Was No Unconstitutional Policy Applied to Phillips's FOIA Requests, So Her Claim for Retrospective Relief Fails.</u>

To hold the District liable in damages for a constitutional violation is no easy task—and

Phillips does not rise to it. *See Atchinson v. District of Columbia*, 73 F.3d 418, 420 (D.C. Cir.

1996) ("The Supreme Court has read section 1983 as placing sharp restrictions on suits against

municipalities . . . .").   She must first show a constitutional violation. *Baker v. District of*

*Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  She cannot.  She must then show that "a municipal policy was the 'moving force' behind the constitutional violation."  *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).  She cannot.

### A.        The District Did Not Violate Phillips's First Amendment Rights.

The District did not delay, deny, or burden Phillips's FOIA requests because of her criticism of MPD, so the District never violated the First Amendment.  As this Court explained, government records made available through FOIA are a kind of public benefit.  *MTD Op.*, 2022 WL 1302818, at *6.  When dispersing benefits, the government cannot discriminate based on viewpoint.  *E.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 582–83 (1998).  The government, however, need not be content-neutral when dispersing benefits, *e.g.*, *id.* at 585; *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188–89 (2007), disclosing information in its possession, *FEC v. Int'l Funding Inst., Inc.*, 969 F.2d 1110, 1115 (D.C. Cir. 1992) (en banc), or "providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech," *Buxton v. Kurtinitis*, 862 F.3d 423, 428 (4th Cir. 2017) (internal quotation marks and citation omitted).  That is because many government programs require "content-based considerations," so imposing "absolute neutrality" on those programs would render them inoperable.  *Finley*, 524 U.S. at 585.  To avoid that "inconceivable" result, *id.* (internal quotation marks and citation omitted), impermissible content discrimination in this context occurs only when the government's "ai[m]" is "the suppression of dangerous ideas," *id.* at 587 (internal quotation marks omitted) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983)); *see also, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 360 (2009).

Nonetheless, "the Supreme Court has never struck down a denial of [a government benefit] on this ground."  *Camelot Banquet Rooms, Inc. v. SBA*, 24 F.4th 640, 646 (7th Cir. 2022).  The same goes for the D.C. Circuit.  *See Am. Ass'n of Pol. Consultants v. SBA*, 810 F.

App'x 8, 10 (D.C. Cir. 2020).  What is more, no court has ever struck down a FOIA law or practice as a violation of the First Amendment.  *See McBurney v. Young*, 569 U.S. 221, 232 (2013) ("This Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws."); *id.* at 226–27 (upholding Virginia's FOIA, which makes records available only to Virginians).  That makes sense because the government's determination of whether, how, and when to disclose its records is "generally is left to the 'political forces.'"  *Ctr. for Nat'l Sec. Stud. v. DOJ*, 331 F.3d 918, 934 (D.C. Cir. 2003) (quoting *Houchins v. KQED*, 438 U.S. 1, 15, (1978) (plurality)).

Phillips thus asks this Court to go where none has gone before.  To get there, Phillips must show that she was discriminated against "because of the views that [she] express[ed]" about MPD.  *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).  That is, Phillips's "specific motivating ideology," "opinion," or "perspective" must be "the rationale" for some adverse treatment.  *White Coat Waste Project v. WMATA*, No. 23-cv-1866, 2024 WL 68256, at *4 (D.D.C. Jan. 5, 2024) (Boasberg, C.J.) (internal quotation marks omitted) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  She must "show" that delays, denials, and burdens (*i.e.*, fees) were "in fact, made in retaliation for [her] exercise of the constitutional right of free speech."  *Perry v. Sindermann*, 408 U.S. 593, 598 (1972).  If, however, delays, denials, or fees were "unrelated" to her criticism, then her claim fails.  *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 695 (2010) (internal quotation marks and brackets omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

No reasonable jury could conclude that MPD discriminated against Phillips through FOIA "because of the views that [she] express[ed]" about MPD.  *Taxpayers for Vincent*, 466 U.S. at 804.  First, MPD officials did not know or care about Phillips's views.  Second, many of

Phillips's requests were not even delayed, denied, or burdened.  Third, any delays, denials, or fees were for speech-neutral reasons.  Finally, Phillips cannot prevail on a claim that her FOIA requests were highlighted for EOCOP awareness or such highlighting amounts to a First Amendment violation.

### 1.   MPD Did Not Know of Phillips's Speech or Discriminate Because of It.

Phillips's claim suffers from several "shortfalls in the evidence," but the most "fatal" is this:  MPD officials did not know of her speech, let alone discriminate because of it.  *Grimes v. District of Columbia*, 794 F.3d 83, 95 (D.C. Cir. 2015).  Government actors must know of the speech if they are to discriminate because of it.  *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018); *Amos v. District of Columbia*, 589 F. Supp. 2d 48, 56 (D.D.C. 2008).[4] Phillips alleges that MPD "perceived [her] viewpoint" through "her social-media postings and attendance at certain MPD hearings, as well as the content of her FOIA requests."  *MTD Op.*, 2022 WL 1302818, at *6.  But there is no evidence that anyone at MPD ever read Phillips's social media postings.  Def.'s SUMF ¶ 74.  There is no evidence that anyone at MPD took note of her attendance at hearings and thought it evinced a critical viewpoint.  *Id.* ¶ 75.  And there is no evidence that anyone in EOCOP used her FOIA requests to predict whether she was a critic of MPD.  *Id.* ¶ 76.  Accordingly, MPD witnesses denied knowing of Phillips's speech—in fact,

---

[4]      Retaliation cases like *Lozman*, *Amos*, and others cited in this brief are instructive because there is no "regulation of speech" here.  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022).  Without a law or policy telling her what she can and cannot say, Phillips must show some other government action was taken against her and that action was triggered by her speech.  Retaliation cases explain how to make that showing.  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  At bottom, the First Amendment principle underlying retaliation and typical content-neutrality cases—and at stake here—is the same:  The government must have harmed the plaintiff because of speech.

Chief Newsham and Chief Contee did not even know who Phillips was before her lawsuit.  *Id.* ¶ 77.

Phillips's own evidence further debunks her claim that MPD "perceived [her] viewpoint." *MTD Op.*, 2022 WL 1302818, at *6.  She admitted that she did not know if anyone had read her tweets or noticed her attendance at a hearing.  Def.'s Ex. 3, Amy Phillips Dep. Tr. (Phillips Dep.) at 24–28.  She also testified that "it would be hard to draw conclusions about my beliefs if the only piece of information you had about me was the information contained in" a FOIA request. *Id.* at 170–71.  Likewise, Phillips's expert testified that the information the FOIA Office gathers from requesters (*e.g.*, the request description, the requester's identity) "would not permit an inference about each individual requester's potential critique or whether the information they would receive would prompt public criticism if made more broadly available."  Def.'s Ex. 9, Margaret Kwoka Dep. Tr. (Kwoka Dep.) at 107.

Even so, Phillips must show more than knowledge of her speech.  She must also show that her speech caused MPD to take adverse action against her FOIA requests.  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *Hill v. Colorado*, 530 U.S. 703, 719 (2000).  Chief Newsham and Chief Contee, however, never knowingly touched Phillips's FOIA requests.  *Id.* ¶ 84.  More broadly, "EOCOP [n]ever consider[ed] whether or not a requester had been critical of MPD or Chief Newsham when determining how to respond to a FOIA request."  *Id.* ¶ 78.  Likewise, MPD never denied or delayed FOIA requests because MPD wanted to avoid criticism.  *Id.* ¶ 79.  Lastly, there is no evidence that anyone in MPD had conversations about whether to charge Phillips fees.  *Id.* ¶ 81.

In sum, Phillips's prior or anticipated "substantive message[s]"—whatever they may have been—were "irrelevant" to MPD's processing of her FOIA requests.  *City of Austin v.*

*Reagan Nat'l Advertising of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022).  Not once in the nearly 100 hours of testimony from MPD witnesses or the more than 16,000 documents produced by the District is there a "reference to the message [Phillips] wishes to convey."  *Mahoney v. Doe*, 642 F.3d 1112, 1118 (D.C. Cir. 2011).  Unsurprisingly, then, MPD witnesses consistently denied that a FOIA watchlist existed.  *Id.* ¶ 83.

Insp. Parker's testimony cannot call any of this into doubt; and, in all events, it fails to show a course of action taken "because of disagreement with [Phillips's] message[s]."  *Hill*, 530 U.S. at 719 (internal quotation marks omitted) (quoting *Ward*, 491 U.S. at 791).  Insp. Parker has "no knowledge" of whether Chief Newsham and Turner discussed Phillips's FOIA requests or what they decided to do about them.  *Id.* ¶ 173.  Further, Insp. Parker has no knowledge of what happened after she left MPD four years ago.  *See* Parker Dep. at 210–11.  So Insp. Parker and Phillips can only speculate whether EOCOP discussed Phillips's views and decided to act because of them.  But speculation is not enough to avoid summary judgment.  *Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004).  To the contrary, absent "clear or specific evidence," the Court must presume that MPD officials carried out their FOIA obligations constitutionally.  *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 21 (D.C. Cir. 2002).

Nor does Insp. Parker's account that she brought one Phillips request to Turner's attention bespeak of a First Amendment violation.  Insp. Parker testified that she brought Phillips's Lojacono request to Turner's attention "only" because Phillips previously asked for GRU records and AAH transcripts.  Parker Dep. at 206–07.  (There is no evidence that Insp. Parker brought any other Phillips requests to Turner's or Chief Newsham's attention besides the Lojacono request.  Argument § I.A.4, *infra*.)  So, Insp. Parker brought Phillips's request to Turner's attention because of "what she was asking for"—not because she had made prior

criticisms of which MPD was aware.  *Id.* at 217.  Indeed, Insp. Parker testified that she did not

have a Twitter account, *id.* at 241, and she only ever googled one requester, who was not

Phillips, *id.* at 222.  The reason that "what [Phillips] was asking for," *id.* at 217, was noteworthy

was *not* because it was potential ammo for Phillips to criticize MPD.  Rather, Insp. Parker

testified that EOCOP needed to be made aware of requests for AAH materials because it was

MPD's practice not to release them to anyone, as MPD viewed them as exempt.  *Id.* at 207.

Similarly, Insp. Parker testified that EOCOP needed to be made aware of requests for GRU

records because releasing them could reveal law enforcement and investigation strategies.  *Id.* at

49, 220–21.  Thus, Insp. Parker's "rationale" for informing Turner of Phillips's Lojacono request

was *not* Phillips's "specific motivating ideology," "opinion," or "perspective."  *White Coat*, 2024

WL 68256, at *4 (internal quotation marks omitted) (quoting *Rosenberger*, 515 U.S. at 829).

### 2.  <u>Often, Phillips Did Not Face Any Delays, Denials, or Fees.</u>

Phillips cannot "substantiate [ ] with evidence" her allegations that MPD delayed, denied,

or burdened her requests based on her speech because, often, MPD did not delay, deny, or

burden her requests at all.  *Grimes*, 794 F.3d at 95.  The fact that Phillips's requests were often

processed unremarkably and just like anyone else's dispels any "inference" that MPD "'singled

[Phillips] out' for 'disfavor' on account of [her] . . .  advocacy."  *White Coat*, 2024 WL 68256, at

*6 (quoting *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring)).  Plus, the fact

that she often did not face delays, denials, or fees means that she did not face any "sufficiently

adverse action" for those requests.  *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477

(2022).

To start, although delays are common, especially for complex requests, Phillips did not

face delays for a swath of her requests.  One request was closed in a day, another in 7 days, and

still another in 17 days (just 2 days over the statutory timeline, which is innocuous).  Def.'s Ex.

34, FOIAXpress Report re: A. Phillips Requests (Phillips Rep.).  In addition, Phillips conceded

that she did not perceive any improper delay or treatment of her three BWC requests.  Phillips

Dep. at 223.  On top of that, one of Phillips's requests was made when, by law, FOIA deadlines

were tolled due to COVID-19, and it was completed just a few weeks after the tolling order

expired.  Def.'s SUMF ¶ 138.  Altogether then, almost half of Phillips's requests did not

experience a delay.  Yet, Phillips alleged that she "*always* at least experience[d] a delay," Am.

Compl. ¶ 84 (emphasis added), and that allegation formed the "factual basis for [her] First

Amendment count," *MTA Op.*, 2023 WL 5607449, at *3.  So Phillips fails to "substantiate [her

allegations] with evidence"—and critical allegations at that.  *Grimes*, 794 F.3d at 94.

Or consider Phillips's allegation that her requests were routinely "denied outright."  Am.

Compl. ¶ 1.  Instead of denying all of Phillips's requests, MPD has produced reams upon reams

of records to Phillips.  *E.g.*, Def.'s SUMF ¶¶ 97, 118.  And MPD has spent days upon days

searching for, reviewing, and preparing records to meet Phillips's demands.  *Id.*  Because MPD

has produced thousands of pages of records to Phillips, it is "especially doubtful" that MPD is

discriminating against her because of her speech.  *See White Coat*, 2024 WL 68256, at *6

(rejecting claim that WMATA discriminated against an advertiser based on its viewpoint when

WMATA had approved one of its ads, although WMATA rejected others).

Then there is Phillips's allegation that she was charged fees thanks to her watchlist status.

Am. Compl. ¶ 1.  Although Phillips has cost MPD thousands of dollars in searching for and

producing her requested records, MPD did not charge Phillips fees for almost all of her requests.

*See, e.g.*, Def.'s SUMF ¶¶ 115, 118, 135, 138, 142.  What is more, MPD has granted her fee

waivers.  *E.g.*, *id.* ¶ 99.

### 3.   There Were Speech-Neutral Reasons for Every Delay, Denial, or Charge Phillips Faced.

To the extent Phillips experienced delays, denials, or fees, they all can be "justified without reference to" her criticism of MPD. *Christian Legal Soc'y*, 561 U.S. at 696 (internal quotation marks and brackets omitted) (quoting *Ward*, 491 U.S. at 791); *see Nieves*, 139 S. Ct. at 1722 (explaining that the government can defeat speech-retaliation claims by providing speech-neutral reasons for adverse actions).

Starting with delays, as Phillips already told the Court, "[t]he District's FOIA responses are delayed across the board" for all requesters. Sept. 27, 2023 H'rg Tr. (Sept. H'rg) [46] at 14; *see also* Def.'s SUMF ¶¶ 13–16. If delays are across the board, then delays are not the result of "directed viewpoint discrimination" towards Phillips. *Finley*, 524 U.S. at 583. Indeed, every delay in response to her FOIA requests is explainable by reasons unrelated to her speech. *E.g.*, Def.'s SUMF ¶¶ 97, 118, 138, 142, 146. Namely, Phillips's requests were complex and voluminous, requiring days, weeks, months, years of work. *Id.* ¶¶ 97, 118, 142, 146. For instance, she asked MPD to track down and produce—for no apparent reason—every FOIA denial in its history. *Id.* ¶ 120. Given demands like these, it is necessary, as Phillips's expert previously wrote, for agencies to "triage" and turn to simpler requests that they can complete more quickly, which further explains why Phillips's requests have longer times than many requesters. Margaret B. Kwoka, *Saving the Freedom of Information Act* 172 (2021); *see also id.* at 172–74. And Phillips certainly does not help alleviate MPD's backlog when she conscripts her friends to file fake FOIA requests "to troll MPD." Def.'s SUMF ¶ 68. But among the reasons for delays with Phillips's requests, speech discrimination was not one. MPD witnesses and Insp. Parker testified that they never delayed responses to suppress Phillips's speech. *Id.* ¶ 79.

Next, when MPD denied some of Phillips's requests, those denials were for reasons unrelated to her speech.  For the few denials, MPD provided a reasoned explanation grounded in the FOIA statute.  *Id.* ¶¶ 103, 128, 131.  Take the Lojacono request.  That request was initially denied based on a general policy MPD had adopted regarding personnel records.  *Id.* ¶ 103.  Far from "wrong" or "strange," Am. Compl. ¶ 24, even Insp. Parker agrees that MPD's denial of this request was utterly routine, Parker Dep. at 114, 268–69.  In other words, the denial was pursuant to a policy that "applie[d] equally" to anyone, *Hill*, 530 U.S. at 723, regardless of his or her "specific motivating ideology," *Rosenberger*, 515 U.S. at 829; *see also Boardman v. Inslee*, 978 F.3d 1092, 1109–10 (9th Cir. 2020).

To be sure, Phillips disagreed with these denials.  But a debatable denial does not a First Amendment violation make.  As Phillips's own expert wrote, agencies deny FOIA requests based on their expansive interpretations of FOIA laws all the time.  Margaret B. Kwoka, *Delegating Information Oversight* 6 (Mar. 8, 2023), https://ssrn.com/abstract=4382265.  To prove that the denials were instead the work of discrimination, Phillips needs to show that the reasoning behind them was pretextual.  *See Jeffries v. Barr*, 965 F.3d 843, 860 (D.C. Cir. 2020) (to survive summary judgment, a discrimination claimant must make a showing of pretext); *Nieves*, 142 S. Ct. at 1722 (a speech-retaliation claim is only actionable if "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences" (internal quotation marks omitted) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006))).  She cannot because Turner did not instruct FOIA employees to invoke exemptions and deny Phillips's requests in an effort to prevent the release of information that MPD did not want out.  Def.'s SUMF ¶ 80.  And the Chiefs never made any instructions regarding denials.  *Id.* ¶ 84.

Finally, MPD had speech-neutral reasons for declining to grant Phillips fee waivers. There is nothing facially suspect about fees because the FOIA statute authorizes agencies to charge them for the cost of processing requests, unless the agency waives them. *Id.* ¶¶ 6–7. MPD only charged fees to requesters for a short period during the events in this case. *Id.* ¶ 9. In the few times that MPD requested that Phillips pay fees, MPD explained to Phillips why she did not meet the statutory standard for waiver. *Id.* ¶ 89. That is unsurprising because Phillips herself refused to explain to the District how she used the records she gathered to benefit the public. *Id.* ¶ 69. Phillips cannot prove that MPD's fee requests were pretextual or that "she was subject to fees that others don't need to pay." Am. Compl. ¶ 85. As Insp. Parker testified, charging fees was, for a time, a policy "for everyone." Parker Dep. at 91.

### 4. Phillips Cannot Succeed on a Claim That MPD Unconstitutionally Highlighted Her Requests for EOCOP.

Phillips may argue that—delays, denials, or fees aside—it was unconstitutional for FOIA employees to "highlight" her requests for EOCOP. Am. Compl. ¶ 43. This theory succumbs to failures of proof and failures of law.

For starters, there is no evidence of a practice of highlighting Phillips's requests. There are no emails in which Insp. Parker or anyone in the FOIA Office highlighted Phillips's requests for EOCOP. Def.'s SUMF ¶ 60. That is significant because Insp. Parker testified that email highlighting would have been the only way she highlighted Phillips's requests for review. Parker Dep. at 62–63. To be sure, Insp. Parker said that she highlighted Phillips's requests in emails. *Id.* But there are no emails showing that she in fact did. Def.'s SUMF ¶ 60. Plus, she admitted that there was not a way to "go back and find out which requests [she] flagged for Turner pursuant to the watchlist policy." Parker Dep. at 218–19. As a result, her testimony that

she highlighted Phillips's requests "is so utterly discredited by the record that no reasonable jury could have believed [her]." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Highlighting aside, there is no evidence that EOCOP in fact *reviewed* Phillips's requests because she was a critic of MPD, let alone ordered that they be handled in a certain way on that basis. Def.'s SUMF ¶¶ 91, 94, 98, 116, 119, 126, 129, 132, 135, 139, 143, 147, 151, 155. EOCOP officials only discussed one Phillips request, the Lojacono request, but that discussion had nothing to do with Phillips's identity or her speech. *Id.* ¶¶ 101–05. Rather, EOCOP discussed that request in the context of deciding whether MPD would disclose disciplinary proceeding materials to any requester because such materials implicated privacy policies unspecific to Phillips. *Id.* EOCOP did not discuss whether to delay or deny that request because of Phillips's speech. *Id.*

Even if all Phillips's requests were somehow reviewed by EOCOP (they were not), that is no First Amendment violation. Looping in the head of an agency—who is also the FOIA policymaker—about a FOIA request does not regulate the requester's speech at all. *See Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 934–35 (denying access to government records does not abridge speech); *Hils v. Davis*, 52 F.4th 997, 1002 (6th Cir. 2022) ("[T]he Supreme Court in case after case has recognized the power of federal and state governments to close and open doors to *sensitive* information within their control." (emphasis added)). Nor is such highlighting "a sufficiently adverse action" against the requester. *Houston Cmty. Coll. Sys.*, 595 U.S. at 477. Highlighting is not "sufficient to deter a person of ordinary firmness in [the requester's] position from speaking again" because a requester is not even aware of the highlighting—it occurs as part of an internal agency process. *Scahill v. District of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Doe v. District of Columbia*, 796 F.3d 96, 106

(D.C. Cir. 2015)); *see Eggenberger v. W. Albany Township*, 820 F.3d 938, 943 (8th Cir. 2016) (denying access to records would not chill an ordinary person's speech). There is no precedent holding that taking a highlighter to an email or looping in a supervisor about a FOIA request "abridg[es] the freedom of speech." U.S. Const. amend. I.

Moreover, highlighting requests does not draw unconstitutional distinctions based on viewpoint or speech. Insp. Parker brought all kinds of requests to Turner's attention for all kinds of reasons. Def.'s SUMF ¶¶ 35–42, 48, 64. Phillips, nonetheless, thinks it is a free speech problem to highlight "high profile" or "sensitive" requests. *See* Am. Compl. ¶ 53. But "high profile" or "sensitive" refers to the records requested—not the requester's speech. Def.'s Ex. 1, Leeann Turner Dep. Tr. (Turner Dep.) at 177–80; *see id.* at 161–63. As Phillips's expert acknowledged, requesters of varying viewpoints—including pro-police viewpoints—request records that could be considered "high profile" and "sensitive." Def.'s SUMF ¶ 200. That is, a policy of elevating "high profile" and "sensitive" requests "does not appear to turn on whether you can identify a potential critique." *Id.* ¶ 201. Rather, those are flexible categories, "susceptible to multiple interpretations" that lack "the kind of directed viewpoint discrimination" required to make out a First Amendment violation. *Finley*, 524 U.S. at 583.

Further, the "ai[m]" of alerting EOCOP to such requests was not to "suppress[ ]" critical speech. *Id.* at 587 (internal quotation marks omitted) (quoting *Regan*, 461 U.S. at 550). The aim was to make the Chief aware of records that "had been released" in case he was "approached by different media or different journalists and asked questions" about the records. Def.'s SUMF ¶ 39. Insp. Parker herself called this practice was "reasonable." Parker Dep. at 214; *see Ysursa*, 555 U.S. at 360–61 (explaining that "distinction[s] based on the content of speech," made outside the context of direct regulation, are constitutional if "reasonable"). Because the practice

had a reasonable, speech-agnostic aim, Insp. Parker highlighted all sorts of requests from all sorts of requesters without knowing anything about their views of MPD.  Def.'s SUMF ¶ 64.

Phillips may respond that highlighting requests for EOCOP awareness is a constitutional problem because it creates delays.  But Phillips cannot show that for each or any one of her requests that experienced a delay, the delay resulted from EOCOP review alone.  In fact, it is not true that EOCOP review always caused delays.  *Id.* ¶ 44.  Moreover, any delays are "an incidental effect"—not the *purpose* of the review.  *Christian Legal Soc'y*, 561 U.S. at 695 (internal quotation marks omitted) (quoting *Ward*, 491 U.S. at 791); *see* Def.'s SUMF ¶ 45. Insp. Parker agrees.  When asked "are you aware of MPD ever delaying response to a FOIA request because they didn't want to release the information to the public," she testified "[n]ot for that reason."  Parker Dep. at 65–66.  At bottom, if there was unconstitutional action here, it would not have been the highlighting, but the ordering, at the EOCOP level, of delays, denials, or fees because of speech.  That, however, never happened.

## B.      Even if There Were a First Amendment Violation, a Policy or Custom Was Not the Moving Force Behind It.

As the above explains, none of Phillips's requests received unconstitutional treatment. But even if she could show otherwise, she could not also show that any unconstitutional treatment "directly" resulted from "*deliberate* action attributable to" the District, not just MPD employees.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997).  That is, Phillips's theories of *Monell* liability—the Chief ordered mistreatment of her requests, there was a custom of mistreating her requests, and a PowerPoint set a watchlist policy—all fail.

### 1.      The Chiefs Did Not Take Any Unconstitutional Action Towards Phillips.

Phillips cannot show that a District official "with final policymaking authority . . . caused the particular constitutional . . . violation at issue."  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701,

737 (1989).  Here, that official is the Chief of Police.  *MTD Op.*, 2022 WL 1302818, at *8.  And

the constitutional violation at issue is that Phillips's requests were delayed, denied, or burdened

because of her speech.  Am. Compl. ¶¶ 1, 99.  Yet, the Chiefs never ordered any actions be taken

regarding Phillips's requests.  Def.'s SUMF ¶ 84.  Nor did the Chiefs set any policies regarding

how requests from certain requesters—Phillips included—should be handled.  *Id.*

As a backup, Phillips alleges that the Chiefs "ratified" an unconstitutional policy

regarding her requests that their subordinates developed.  Am. Compl. ¶ 101.  In rare

circumstances, a plaintiff can prove a policy "[i]f the authorized policymakers approve a

subordinate's decision and the basis for it."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127

(1988) (plurality).  But "[s]imply going along with discretionary decisions made by one's

subordinates" is not enough.  *Id.* at 130.  Again, the Chiefs never discussed Phillips at all.  Def.'s

SUMF ¶ 84.  So they could not have "approve[d]" any "subordinate's decision" about how to

delay, deny, or burden Phillips's requests.  *Praprotnik*, 485 U.S. at 127 (plurality).

Nonetheless, Phillips may pitch a new theory that the Chief delegated his FOIA

policymaking authority to Turner or OGC, and the District can be liable under *Monell* for any

unconstitutional actions they took.  Def.'s Ex. 18, Pl.'s 3d Am. Resps. & Objs. to Def.'s 1st Set

of Interrogs. (Pl.'s Interrog. Resp.) at 12.  For a few reasons, this theory fails.

Off the bat, Phillips failed to plead this theory in her Amended Complaint—despite

amending at the end of discovery.  Am. Compl. ¶¶ 100–02.  A plaintiff must plead theories of

*Monell* liability.  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015).  If a plaintiff

raises a new theory of *Monell* liability at summary judgment, the Court can decline to consider it.

*Elkins v. District of Columbia*, 690 F.3d 554, 565 (D.C. Cir. 2012).  The Court has previously

28

refused to countenance Phillips's attempts to belatedly add new claims or spins on her claim.
*MTA Op.*, 2023 WL 5607449, at \*3.  It should do so again.

If the theory is considered, it fails on the merits because the Chiefs did not delegate to
Turner and OGC authority to make policy.  *Monell* requires that the official—whether via
delegation or not—have authority to "establish" "*policy*."  *Pembaur v. City of Cincinnati*, 475
U.S. 469, 484 n.12 (1986) (plurality) (emphasis added).  That means "the explicit authority to
promulgate rules."  *MTD Op.*, 2022 WL 1302818, at \*8; *see also, e.g.*, *Ryan v. District of
Columbia*, 306 F. Supp. 3d 334, 345 (D.D.C. 2018) (Brown Jackson, J.).  Such authority comes
from law.  *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997); *Praprotnik*,
485 U.S. at 126 (plurality).  It is not enough that an official has been delegated authority to make
"decisions" or exercise her "discretion."  *Pembaur*, 475 U.S. at 484 n.12 (plurality).  Instead,
*Monell* "distinguish[es] between an exercise of policymaking authority and an exercise of
delegated discretionary policy-implementing authority."  *Blue v. District of Columbia*, 850 F.
Supp. 2d 16, 27 (D.D.C. 2012) (Boasberg, J.) (internal quotation marks, citation, and emphases
omitted), *aff'd*, 811 F.3d 14 (D.C. Cir. 2015).

Nothing in "the D.C. Code specifically grants authority to [Turner or OGC] to
promulgate administrative rules . . . or policies and procedures.'"  *Ryan*, 306 F. Supp. 3d at 344
(internal quotation marks omitted) (quoting *Jones v. District of Columbia*, 241 F. Supp. 3d 81, 88
(D.D.C. 2017)).  Instead, as this Court already ruled, District law grants the Chief "authority to
issue rules" regarding FOIA.  *MTD Op.*, 2022 WL 1302818, at \*9.  There is nothing in the
record suggesting that the Chiefs delegated away that "rulemaking authority."  *Id.* at \*8.  While
the Chiefs stayed out of the day-to-day processing of FOIAs, they never said that Turner or OGC
could set FOIA rules and policies for all of MPD.  Def.'s SUMF ¶ 11.

Even if Turner and OGC had some policymaking authority, they did not have "the authority to make *final* policy." *Praprotnik*, 485 U.S. at 127 (plurality). Turner's and OGC's decisions, including suggestions about policy, were always "subject to review by another authorized policymaker," the Chief. *MTD Op.*, 2022 WL 1302818, at *9 (internal quotation marks, citation, and alterations omitted); *see* Def.'s SUMF ¶ 11. Phillips cannot argue otherwise that the Chief left all things FOIA to Turner or OGC because she avers that "[h]e had numerous communications regarding FOIA requests and responses to FOIA requests." Pl.'s Interrog. Resp. at 12–13.

Still, if Turner and OGC are the relevant policymakers for this suit, they never took any unconstitutional action towards Phillips. Turner never considered Phillips's criticism "when determining how to respond to a FOIA request." Def.'s SUMF ¶ 78. Plus, she never denied or delayed FOIA requests because MPD wanted to avoid criticism. *Id.* ¶¶ 79–80. And there is no evidence that OGC ordered that Phillips's requests be delayed, denied, or burdened because of her speech.

### 2.   There Was No Custom of Unconstitutional Actions Towards Phillips About Which the Chiefs Knew.

Nor can Phillips show that there was a custom of delaying, denying, or burdening her FOIA requests because of her speech. In *Monell* terms, a custom is "a persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers" that "caused the deprivation of [Phillips's] constitutional rights." *Carter v. District of Columbia*, 795 F.2d 116, 125–26 (D.C. Cir. 1986). For a practice to transform into a custom, the practice must be so consistent, persistent, and widespread that it is practically law. *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Baker*, 326 F.3d at 1306. To boot, the policymaker must have "knowingly

ignore[d]" the practice. *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)).

Phillips fails to prove that, not only were her FOIA requests consistently unconstitutionally handled, but their handling also "follow[ed] a common design" and reflected "a common or widespread pattern" such that a factfinder could infer that a "discernible 'policy'" underlay MPD's approach to them. *Carter*, 795 F.2d at 123–24. There could not have been a custom "of delaying, burdening, or denying [Phillips'] FOIA requests on the basis of . . . speech," Am. Compl. ¶ 99, when Phillips's requests regularly faced *no* delays, denials, or fees, Argument § I.A.2, *supra*. When she did face delays, denials, or fees, they were for speech-neutral reasons. Argument § I.A.3, *supra*. In other words, any delays, denials, or fees resulted from the unique facts of the request and its processing. *Id.* There is no common thread running through MPD's handling of Phillips's requests—other than that her speech was never considered. Thus, there was no "facially similar past wrongdoing" across her 16 requests. *Johnson v. District of Columbia*, No. 22-cv-3167, 2023 WL 2770392, at *5 (D.D.C. Apr. 4, 2023) (Boasberg, C.J.) (internal quotation marks omitted) (quoting *Leach v. District of Columbia*, No. 19-cv-947, 2022 WL 1316436, at *12 (D.D.C. May 3, 2022)).

Regardless, Phillips cannot prove that the Chiefs "knowingly ignore[d]" speech-motivated delays, denials, or burdens on her requests. *Jones*, 634 F.3d at 601 (internal quotation marks omitted) (quoting *Warren*, 353 F.3d at 39). Again, the Chiefs were not involved in the processing of Phillips's requests, so they could not have known whether there was a custom of mistreating them. Further, the first the Chiefs heard of an alleged watchlist was Phillips's complaint. Def.'s SUMF ¶ 85. Thus, they did not even have "notice . . . that allegations" of unconstitutional conduct "had been made." *Carter*, 795 F.2d at 123.

Nonetheless, Phillips may argue that MPD had a custom of notifying EOCOP of "high profile" or "sensitive" FOIA requests.  Am. Compl. ¶ 53.  This alleged custom cannot support her *Monell* claim for three reasons.  First, this practice is not unconstitutional.  Argument § I.A.4, *supra*; *see Canton*, 489 U.S. at 386–87 (holding that a constitutional policy is only actionable under *Monell* if "unconstitutionally applied by a municipal employee" who "has not been adequately trained and the constitutional wrong has been caused by that failure to train").  Put another way, this alleged custom is too "nebulous" and "removed from the constitutional violation" (intentional delays, denials, or fees because of speech) to support *Monell* liability. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985) (plurality).

Second, even if there were such a custom, there is no evidence that Phillips was subject to it, so there is no "link between [this alleged custom] and the deprivation of [her] federal rights." *Brown*, 520 U.S. at 404.  As Phillips's expert acknowledged, assuming there is a policy of elevating high profile or sensitive requests, "there is no . . . complete and accurate list of those requests that would have been subject to the policy."  Kwoka Dep. at 10.  Only one of Phillips's requests reached Turner or any Chief, the Lojacono request, but it reached EOCOP for reasons unrelated to Phillips's speech.  Def.'s SUMF ¶¶ 101–06.

Third, assuming that there was such a custom and Phillips was subject to it, Phillips cannot prove that the custom was the "'moving force' behind" speech-motivated delays, denials, or fees. *Baker*, 326 F.3d at 1306 (quoting *Canton*, 489 U.S. at 389).  That is, Phillips cannot "direct[ly]" attribute delays, denials, or fees to EOCOP review. *Brown*, 520 U.S. at 404.  Take delays.  The records of Phillips's requests do not show that EOCOP review accounted for any delay—because the records do not reflect EOCOP review at all. *See* Phillips Rep.  Yet, that is the kind of "detail" needed to "build a case" that delays resulted from EOCOP review. *Carter*,

795 F.2d at 124.  Or take denials and fees.  Denials or fees were not ordered by EOCOP after

EOCOP reviewed her requests.  Argument § I.A.3, *supra*.  Instead, denials or fees were the result

of other causes, namely the statute itself.  *Id.*  At bottom, the connection between an alleged

custom of notifying EOCOP of requests and abridgment of Phillips's speech is just "too

attenuated."  *Johnson*, 2023 WL 2770392, at *5.

<h3 style="text-align:center">3.    The Informational Presentation Did Not Set Forth a Watchlist Policy.</h3>

Finally, Phillips may argue that a bullet point in a PowerPoint evinces a "written version

of the [watchlist] policy."  Am. Compl. ¶ 53.  Phillips latches onto a presentation that explained

to MPD employees outside the FOIA Office how to maintain their records and respond to

inquiries from the FOIA Office.  Def.'s Ex. 23, FOIA Informational Presentation.  Among the

many things explained in 19 slides, the presentation contained one bullet point stating:  "Media

and high profile requests (or any other requests deemed sensitive) are sent to [EOCOP] for

review by the COP, prior to the FOIA office making a release to the public."  *Id.* at 15.  This

statement, however, does not represent either a *Monell* policy or the watchlist policy alleged in

this case.

First, this bullet point in a PowerPoint is not a policy under *Monell*.  *Monell* requires "a

policy statement, ordinance, regulation, or decision officially adopted and promulgated by that

body's officers."  *ANSWER v. District of Columbia*, 846 F.3d 391, 413 (D.C. Cir. 2017) (internal

quotation marks omitted) (quoting *Monell*, 436 U.S. at 690–91).  Such a policy must have been

"explicitly adopted" by "the District government or a policymaker in its employ."  *Jones*, 634

F.3d at 601.  In other words, a policy comes from "a government's *lawmakers*," not just its

employees.  *Connick*, 563 U.S. at 61 (emphasis added).  Here, no Chief—or anyone in

EOCOP—approved this statement, adopted it, or even read it before this lawsuit.  Def.'s SUMF

¶ 52.  Rather, this presentation was drafted solely by FOIA Office employees and lacked any

force of law.  *Id.* ¶ 51.  As such, it falls well short of something like an MPD General Order that could qualify as policy under *Monell*.  *Hawkins v. District of Columbia*, 923 F. Supp. 2d 128, 135 (D.D.C. 2013) (Boasberg, J.).

Second, this bullet point is not the watchlist policy alleged in the Amended Complaint or by Insp. Parker.  That alleged policy is supposed to be "unwritten" and "unofficial."  Def.'s Ex. 14, Decl. of Vendette Parker (Parker Decl.) ¶ 8; Am. Compl. ¶ 42.  This written statement is just that—written.  So it cannot be an "unwritten" and "unofficial" policy.  Insp. Parker agrees.  She testified that the PowerPoint "doesn't include the unwritten, unofficial policy of elevating certain requests from individuals critical of MPD."  Def.'s SUMF ¶ 53.  Quite right, per its plain text, the sentence does *not* direct, or even suggest, discrimination against MPD critics.  Argument § I.A.4, *supra*.  So, even if it constitutes official policy, it is constitutional on its face and thus not actionable under *Monell*.  *See Canton*, 489 U.S. at 386–87.

## II.    There Is No Evidence That a Watchlist Policy Continues Today, So Phillips's Claim for Prospective Relief Fails.

Even if Phillips could show that an unconstitutional watchlist policy existed, there is no evidence that it continues, as required if she wants injunctive and declaratory relief.  To seek such relief, Phillips "must show [she] is suffering an ongoing injury or faces an immediate threat of injury."  *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 689 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)).  Specifically, in a case challenging an alleged government policy (like this one), she must show that the policy currently exists, and she is likely to be subjected to it again.  *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987); *see also Rowe v. PChange Protective Servs., LLC*, No. 22-cv-3098, 2023 WL 2598683, at *3 (D.D.C. Mar. 22, 2023) (Boasberg, C.J.).  This is a "rigorous burden" that requires evidence.  *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir.

2015) (internal quotation marks omitted) (quoting *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)).

There is no evidence of a watchlist policy in force today.  Whether there is a watchlist policy here hinges on the Chief.  *MTD Op.*, 2022 WL 1302818, at *8–9.  So, for Phillips's prospective claims, the question is whether the Chief "as of the date of the Amended Complaint" continued an alleged watchlist policy.  *Kinsley v. Blinken*, No. 21-cv-962, 2021 WL 4551907, at *5 (D.D.C. Oct. 5, 2021) (Boasberg, J.) (internal quotation marks omitted) (quoting *G&E Real Est., Inc. v. Avison Young-Wash., D.C., LLC*, 168 F. Supp. 3d 147, 159 (D.D.C. 2016)).  When Phillips filed her Amended Complaint, Chief Smith had been serving for many months.  Def.'s SUMF ¶ 25.  Yet, there is zero evidence regarding Chief Smith in the record.  The Court cannot enjoin the supposed policies of a policymaker if there is nothing in the record about that policymaker and *her* policies.  *See Haase*, 835 F.2d at 911.  Even if the Court looked at evidence of the Chief's practices when the original Complaint was filed, Chief Contee did not continue any supposed watchlist policy, nor did he know of one.  Def.'s Ex. 5, Robert J. Contee III Dep. Tr. (Contee Dep.) at 31–32, 105–06, 131–36.

Phillips's only witness, Insp. Parker, cannot make up for these deficiencies.  Insp. Parker left MPD nearly four years ago, long before Chief Smith's tenure.  Def.'s SUMF ¶ 27. Accordingly, she testified that she had no knowledge of "how the FOIA Office currently processes requests."  Parker Dep. at 210.  Since she left in January 2020, she has not "had any discussions with anyone about how the FOIA Office processes requests."  *Id.* at 211.  She does not know who the current FOIA Officer is.  *Id.* at 210.  Nor was she aware of the FOIA Office's reorganization under OGC.  *Id.* at 461.  Further, she never trained anyone on how to identify

requesters for review, *id.* at 52, so no one could continue the policy as Insp. Parker uniquely described it, *see id.* at 199–204.

Regardless, Phillips need also show that she personally is "likely to be subjected to the policy again" and harmed. *Haase*, 835 F.2d at 911. That is, Phillips must bring forward evidence that her requests will "certainly" be delayed, denied, or burdened. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, (2013) (internal quotation marks omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Yet, as explained, MPD did not process Phillips's requests according to any policy, and often she did not face any delays, denials, or burdens. Thus, the Court cannot conclude with certainty that Phillips's future requests will face speech-motivated delays, denials, or burdens without "pil[ing] speculation atop speculation," *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C. Cir. 2012), about "how agencies will exercise discretion" in the future, *Union of Concerned Scientists v. DOE*, 998 F.3d 926, 930 (D.C. Cir. 2021). That is no way to get an injunction.

## III.   The Kwoka Report Cannot Save Phillips's Claim Because It Is Inadmissible.

Because the facts did not show a watchlist policy or that Phillips was harmed by it, Phillips recruited an outsider, Prof. Kwoka, to say that her watchlist theory was real. But the Court need not touch the Kwoka Report because it cannot create essential facts that Phillips lacks. The Report does not address, for example, whether MPD officials knew of or acted based on Phillips's speech, whether MPD denied or charged for Phillips's requests, and whether any Chief adopted or knew of a policy or custom. In any event, both of Prof. Kwoka's opinions are inadmissible.[5]

---

[5]      There are additional reasons why Prof. Kwoka's testimony is inadmissible that the District would present in a motion *in limine* if this case proceeds to trial. Mindful of space constraints, the District focuses only on the most obvious reasons for exclusion at this stage.

A.    **Prof. Kwoka's First Opinion Is Inadmissible.**

Prof. Kwoka's first opinion—that the alleged policy "caused delays"—is inadmissible for five reasons.  Kwoka Dep. at 216.

First, a layperson could perform Prof. Kwoka's methodology and reach his/her own conclusions.  *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016); *see* Fed. R. Evid. 702(a).  Prof. Kwoka first categorized which requests were subject to the alleged policy by asking whether a request met the "common understanding" of "high profile" or "sensitive."  Kwoka Dep. at 58.  Deciding whether a request is "high profile" or "sensitive" using the "common understanding" is a task that common people can do.  It does not require "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702(a).  Insp. Parker, for example, had no FOIA experience when she allegedly began highlighting requests.  Def.'s SUMF ¶ 20.  If anything, the "specialized knowledge," Fed. R. Evid. 702(a), that is useful here is knowledge of what events were "high profile" or "sensitive" in the local context, *see* Turner Dep. at 176–81.  But Prof. Kwoka did not review any local news or know anything about local issues at the time each of the more than 5,000 requests she categorized were made.

Prof. Kwoka's second step involved an equally lay task.  She ran the mean and median response times for the different categories of requesters and then compared which were higher.  Def.'s Ex. 37, Expert Rep. of Margaret B. Kwoka (Kwoka Rep.) at 15–16.  Lay people or the Court in chambers can calculate means and medians and draw conclusions from those basic computations.  *See* Common Core State Standards Initiative, *Common Core State Standards for Mathematics* 39–40 (Sept. 2023), http://tinyurl.com/yke3nm5n.  To borrow Prof. Kwoka's words, her analysis only requires "back-of-the-envelope math."  Kwoka, *Saving*, *supra*, at 74.  And to borrow this Court's words, "[y]ou need an expert for that?"  Sept. H'rg at 13; *see Sherrod v. McHugh*, 334 F. Supp. 3d 219, 272 (D.D.C. 2018) ("[A]n expert cannot be presented to the

jury solely for the purpose of constructing a factual narrative based upon record evidence."
(internal quotation marks omitted) (quoting *Highland Capital Mgmt L.P. v. Schneider*, 379 F.
Supp. 2d 461, 469 (S.D.N.Y. 2005))).

Second, Prof. Kwoka relied on too "subjective" a methodology. Fed. R. Evid. 702
advisory comm. note. The first step in Prof. Kwoka's method was subjective because she simply
assessed whether, in her judgment, she thought a request was likely subject to the policy, relying
on her own interpretation of a bullet point in a PowerPoint. Kwoka Dep. at 58. As a result, her
method is neither reliable nor testable because no two individuals would categorize requests the
same. *See* Kwoka Dep. at 199 ("Humans are involved in processing FOIA requests, and there
will always be some variation."). Indeed, Insp. Parker testified that that there is no way to
reconstruct who was subject to the alleged watchlist. Parker Dep. at 218–19. Yet, that was what
Prof. Kwoka tried to do: "recreate or approximate a list of those requests that would have been
subject to the policy." Kwoka Dep. at 10.

Further, Prof. Kwoka's categorization lacks the hallmarks of a reliable methodology,
which "can be challenged in some objective sense" and will produce similar results if replicated.
Fed. R. Evid. 702 advisory comm. note. As Prof. Kwoka conceded, there is no "reliable
way . . . to measure" "a rate of error." Kwoka Dep. at 98; *see* Fed. R. Evid. 702 advisory comm.
note (a court should consider "the known or potential rate of error of the technique or theory").
And she could "not say that other academics apply the same methodology." Kwoka Dep. at 84;
*see* Fed. R. Evid. 702 advisory comm. note (a reliable methodology "can be or has been tested").

Third, Prof. Kwoka's opinion does not "fit" the issues in this case. *Daubert v. Merrell
Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *see also* Fed. R. Evid. 702(a). Determining "fit"
"depends on the claims before the court." *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020).

The claim here is about an alleged policy that applied to "requests seeking certain content (information that would likely embarrass the police department) and expressing a certain viewpoint (criticism of the department)." *MTD Op.*, 2022 WL 1302818, at *7. To determine who was subject to that policy, Prof. Kwoka needed to create categories (in her words, "code") for individuals who sought embarrassing records or were critical of MPD. Prof. Kwoka, however, conceded that "there's no way to code for that specifically." Kwoka Dep. at 107. So she did not consider requesters' viewpoint or criticism when categorizing requests. *Id.* at 75–81.

Instead, Prof. Kwoka used a different category: requesters whose purpose is to share the information they gather. Def.'s SUMF ¶ 198. And she used that category based on her interpretation of a bullet point in a PowerPoint that Insp. Parker testified did not represent the watchlist policy. *Id.* Indeed, the alleged policy here has never been one that applies to any requester who wants to share information. *MTD Op.*, 2022 WL 1302818, at *7. Because Prof. Kwoka misinterpreted the policy and did not measure the speech discrimination at issue, her opinion does not fit this case. *See Maryland Shall Issue, Inc. v. Anne Arundel County*, 91 F.4th 238, 251–52 (4th Cir. 2024) (affirming exclusion of expert whose opinion was based on a misinterpretation of the policy at issue). Even if relevant, Prof. Kwoka's testimony poses a "danger" of "confusing the issues" because she testified about a different policy from the one at issue here. Fed. R. Evid. 403.

Fourth, Prof. Kwoka confused causation with correlation. *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1129 (D.C. Cir. 2001); *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013). Prof. Kwoka concluded that MPD's policy caused delays because those requests she categorized as subject to the policy had higher response times. Kwoka Rep. at 19; Kwoka Dep. at 216. But "[c]orrelation is not causation." *Navy Chaplaincy*, 738 F.3d at 429 (internal

quotation marks omitted) (quoting *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988)).  And "statistics can show only correlation and not causation."  *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000); *see also, e.g.*, 1 *McCormick on Evid.* § 209 n.1 (8th ed. 2022).  Simply because those requests allegedly subject to the policy had higher response times does not mean the policy *caused* the higher response times.  *See Meister*, 267 F.3d at 1129 ("[T]he mere simultaneous existence of the two [characteristics] clearly is not an appropriate methodology.").

Inferring causation requires controlling for other potential causes.  *Navy Chaplaincy*, 738 F.3d at 429.  What is more, "statistics cannot eliminate the possibility that factors other than those under consideration in the analysis cause the result."  Jason R. Bent, *The Statistics of Discrimination* § 2:7 (Oct. 2023).  Prof. Kwoka acknowledged other potential causes for delays—plus, she has written extensively about them.  Kwoka Dep. at 202–05; Kwoka, *Delegating*, *supra*, at 14–16.  But she only attempted to control for one:  complexity.  Def.'s SUMF ¶ 207.  Prof. Kwoka can "point to no serious effort at [ ] controls," besides for complexity, so her methodology is unreliable.  *Navy Chaplaincy*, 738 F.3d at 429.

Although Prof. Kwoka tried to control for complexity, her method was neither reliable nor based on "sufficient facts or data."  Fed. R. Evid. 702(b).  Prof. Kwoka assumed that requests tagged in FOIAXpress with "complex" meant that MPD characterized that request as complex "based on its internal knowledge of what it takes to respond."  Kwoka Dep. at 195.  Because those "complex"-tagged requests had shorter response times than requests she categorized as subject to the policy, she concluded that complexity was not the cause of delay.  Def.'s SUMF ¶ 206.  This methodology still reflects a confusion between correlation and causation and makes "too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see* Bent, *supra*, § 2.7.

Further, Prof. Kwoka did not consult any evidence about how MPD in fact uses the "complex" tag. Kwoka Dep. at 189–91; *see Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 299 (D.D.C. 2018) (expert methodology unreliable when the expert "did not review information critical to those opinions" including depositions and documents). As put by Prof. Kwoka herself, she had "no information about how MPD used this particular designation, other than what's apparent in the logs," Kwoka Dep. at 194, though she admitted that such information, if known, "[c]ertainly" could have affected her analysis, *id.* at 279–80. In other words, she had no information about what MPD thinks "complex" means, whether this tag was applied manually or automatically, when the tag was used or not, and whether the tag was used in any systematic way.

Indeed, on the last point, Prof. Kwoka ignored the information that does exist in the record. "[W]hat's apparent in the logs" is that the tag was *not* used in any systematic way: According to Prof. Kwoka, out of 5,737 total requests in the study period, MPD coded only 102 total requests as "complex." Kwoka Rep. at 16–17. And testimony that Prof. Kwoka did not review, confirms that MPD employees do not systematically use the "complex" tag to mark requests they feel are "complex." Def.'s SUMF ¶ 209. The tag thus does not reveal anything about a request's perceived complexity, so it was error to rely on it as a method to control for complexity. "Such blind reliance on 'facts' provided by [Phillips's] counsel—combined with [her] failure to review other sources of information that [she] conceded could have affected [her] analysis]—renders [her] expert report unreliable." *Campbell*, 311 F. Supp. 3d at 301.[6]

---

[6]     Prof. Kwoka made similar mistakes elsewhere. She categorized a request as "certain[ly]" subject to the policy if it included a note in the comments field stating, "File Folder," "File Cabinet," or "EOCOP [or COP] review." Kwoka Rep. at 15. The designations "File Folder" or "File Cabinet," however, just meant that the comments had included privileged information that

Fifth, and relatedly, Prof. Kwoka was not "qualified" to render an opinion about causation based on statistics when she lacked expertise in statistics or data science. Fed. R. Evid. 702; *see Rothe Dev., Inc. v. DOD*, 107 F. Supp. 3d 183, 203 (D.D.C. 2015) (excluding expert who opined on statistical issues but lacked expertise "in any statistical . . . methodology"), *aff'd on other grounds*, 836 F.3d 57 (D.C. Cir. 2016). Only limited causal inferences can be drawn from statistics, and constructing a methodology to draw those inferences requires expert study construction. *McCormick*, *supra*, §§ 209–209.1. As this Court presciently observed, "it seems to me you [ ] need a data scientist." Sept. H'rg at 14. Prof. Kwoka, however, has no expertise in statistics or data science. Kwoka Dep. at 31–33. Thus, she was not qualified to opine about causal conclusions to draw from a dataset.

### B.     Prof. Kwoka's Second Opinion Is Inadmissible.

Prof. Kwoka's second opinion—that the alleged policy was not "necessary" or "justified by the statute's requirements"—is inadmissible for three reasons. Kwoka Rep. at 8.

First, Prof. Kwoka improperly testified "on matters of law." *Weston v. WMATA*, 78 F.3d 682, 684 n.4 (D.C. Cir.), *amended on reh'g*, 86 F.3d 216 (D.C. Cir. 1996). An expert cannot testify that a defendant's conduct does not comport with statutory standards. *Burkhart v. WMATA*, 112 F.3d 1207, 1212–14 (D.C. Cir. 1997); *Convertino v. DOJ*, 772 F. Supp. 2d 10, 13 (D.D.C. 2010). That is just what Prof. Kwoka opined: The alleged policy departed from "the statute's requirements." Kwoka Rep. at 8; *see also id.* at 7 (opining about MPD's "procedural deviation" from FOIA); *Doe v. Colgate Univ.*, 760 F. App'x 22, 29 (2d Cir. 2019) (affirming exclusion of law professor's testimony about "procedural deficiencies" in university's Title IX

---

was removed. Def.'s SUMF ¶ 203. Nor is there evidence that "EOCOP [or COP] review" indicates review pursuant to the allegedly policy, rather than, for example, that the request sought records for which EOCOP was the custodian. *Id.* ¶ 204.

process).  She reached that opinion by "review[ing] the DC FOIA statute," Kwoka Dep. at 225,

and "secondary sources," Kwoka Rep. at 23, while using "no other specific training . . . other

than [her] legal background," Kwoka Dep. at 22.  The Court is more than capable of analyzing

the same sources as Prof. Kwoka and reaching its own conclusions.  *Compare* Kwoka Rep. at 23,

27–28 (basing her opinion on inspector general reports), *with Am. Ctr. for L. & Just. v. Dep't of

State*, 289 F. Supp. 3d 81, 91 (D.D.C. 2018) (Boasberg, J.) (reviewing an inspector general report

to conclude that the agency did not have an unlawful policy of delaying FOIA requests).

Second, Prof. Kwoka relied on a serious misunderstanding of District law and the facts of

this case.  *See Burkhart*, 112 F.3d at 1213 (expert opinion inadmissible when it "grossly

misstated the law"); Fed. R. Evid. 702(b).  Prof. Kwoka reasoned that the "defining feature" of

the alleged policy is that the Chief retains final authority on FOIA responses, Kwoka Rep. at 23,

this feature was "not typical" for federal agencies, *id.* at 24, and so the policy "interferes with the

orderly administration of the FOIA statute" and "does not conform to typical FOIA procedures,"

*id.* at 30.  Prof. Kwoka overlooked that District law—not the alleged policy—gives the Chief

final authority over FOIA, as *this Court held*.  *MTD Op.*, 2022 WL 1302818, at *8–9.  So her

comparisons to federal FOIA practices are misplaced because District law differs from the

federal FOIA in this crucial respect.  Further, her opinion is unhelpful because it "was rooted in"

an understanding of the case in "direct conflict with the district court's legal conclusion."  *United

States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012).  Indeed, she acknowledged that if the

statute gave final authority to "the head of the agency for final approval," her analysis would be

different.  Kwoka Dep. at 245–46.  Again, the admission that she failed to review information

that could have affected her analysis renders it unreliable.  *Campbell*, 311 F. Supp. 3d at 301.

Third, Prof. Kwoka opined on MPD's administration of FOIA without understanding MPD's administration or basic facts of this case.  *See* Fed. R. Evid. 702(b).  Prof. Kwoka did not have knowledge of, *e.g.*, MPD's process for responding to a FOIA request, Kwoka Dep. at 258–62; the FOIA Office's, EOCOP's, and MPD's structure, *id.* at 263–66; and the roles of the key players involved in FOIA, EOCOP, and the alleged policy, *id.*; *id.* at 35.  But to opine on MPD's practices and compare those practices to other agencies' practices required a review of more facts about MPD's practices.  *Campbell*, 311 F. Supp. 3d at 299–301.

To illustrate, Prof. Kwoka compared the alleged policy to federal policies that were found problematic (under federal FOIA, not the First Amendment) because "senior agency officials and/or political appointees" reviewed FOIA responses.  Kwoka Rep. at 25.[7]  But she had no knowledge of who was a "political appointee" in MPD.  Kwoka Dep. at 263–65.  She also had no basis to conclude whether MPD's FOIA Officer was a "senior agency official."  *Id.* at 265–66.  In fact, she had no knowledge of who in EOCOP was responsible for reviewing responses.  *Id.* at 262.  Thus, Prof. Kwoka could not reliably compare MPD's alleged policy to federal policies in which senior agency officials and/or political appointees reviewed FOIA responses when she did not even know if MPD had similar distinctions.

## CONCLUSION

The Court should grant summary judgment in favor of the District.

Date: February 16, 2024.                              Respectfully submitted,

                                                      BRIAN L. SCHWALB
                                                      Attorney General for the District of Columbia

                                                      STEPHANIE E. LITOS

---

[7]    In tension with her opinion, Prof. Kwoka previously wrote that agencies fail to meet their FOIA obligations in part because "political appointees and high-level government officials are unlikely to view FOIA as a core part of their responsibilities."  Kwoka, *Delegating*, *supra*, at 15.

Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTION [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]
AMANDA C. PESCOVITZ [1735780]*
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

---

\*      Admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver). Practicing under the direct supervision of Matthew Blecher, a member of the D.C. Bar, pursuant to D.C. App. R. 46-A(d)(2).