# EXHIBIT 2

Page 1

```
 1            UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
 2
      ------------------------------:
 3    AMY PHILLIPS,                  :
                                     :
 4            Plaintiff,             :
                                     :
 5        vs.                        : Case No.:
                                     : 22-277 (JEB)
 6    DISTRICT OF COLUMBIA,          :
                                     :
 7            Defendant.             :
      ------------------------------:
 8
 9
10      VIDEOTAPED DEPOSITION OF VENDETTE PARKER
11         CONTAINS A CONFIDENTIAL PORTION
12
13    DATE:           September 21, 2023
14    TIME:           9:36 a.m.
15    LOCATION:       Williams & Connolly, LLP
                      680 Maine Avenue, Southwest
16                    Washington, D.C 20024
17    REPORTED BY:    Shari R. Broussard, RPR, CSR
                      Reporter, Notary
18
19
20
21          Veritext Legal Solutions
          1250 Eye Street, NW, Suite 350
22            Washington, D.C. 20005
```

```
                                            Page 2
 1              A P P E A R A N C E S
 2   On behalf of Plaintiff:
 3        KRYSTAL C. DURHAM, ESQUIRE
          MICHAEL LINHORST, ESQUIRE
 4        J.R. FLEURMONT, ESQUIRE
          NICK GAMSE, ESQUIRE
 5        ANNA J. HROM, ESQUIRE       (Via Zoom)
          Williams & Connolly, LLP
 6        680 Maine Avenue, Southwest
          Washington, D.C. 20024
 7        (202) 434-5493
          kdurham@wc.com
 8              - and -
          CHARLES GERSTEIN, ESQUIRE
 9        Gerstein Harrow LLP
          810 7th Street, Northeast, Suite 301
10        Washington, D.C. 20002
11   On behalf of Defendant:
12        RICHARD SOBIECKI, ESQUIRE
          MATEYA KELLEY, ESQUIRE
13        AMANDA PESCOVITZ, ESQUIRE   (Via Zoom)
          MATTHEW BLECHER, ESQUIRE    (Via Zoom)
14        Office of the Attorney General for the
            District of Columbia
15        Equity Section, Public Interest Division
          400 6th Street, Northwest, Suite 10100
16        Washington, D.C. 20001
          richard.sobiecki@dc.gov
17
     On behalf of the Deponent:
18
          JOHN E. CARPENTER, ESQUIRE
19        800 Connecticut Avenue, Northwest, Suite 300
          Washington, D.C. 20006
20        (202) 997-3377
21   ALSO PRESENT:
          Mark Viehmeyer, Esquire, MPD
22        Nicole Lynch, Esquire, MPD
          Jonathan Perry, Video Technician
```

                                                Page 3

1                      C O N T E N T S
2    EXAMINATION BY:                              PAGE
3        Counsel for Plaintiff           8, 405, 459
4        Counsel for Defendant              184, 450
5        Counsel for Deponent                    462
6    CONFIDENTIAL PORTION - Pages 402 to 403
7    PLAINTIFF'S DEPOSITION EXHIBITS:    *      PAGE
8    345 LinkedIn Profile                         11
9    346 MPD Profile                              11
10   347 Text Messages, Bates PARKER01664 to 69   64
11   348 e-mails Re: Approved FOIAs, Bates
         DC_2022_CV_00277_00061121 to 22          85
12
     349 Excerpt from Exhibit A to Defendant's
13       Second Amended Response to
         Interrogatory 3 (3/17/23)                88
14
     350 Request Details Report, Request
15       2018-FOIA-05476                         100
16   351 Excerpt from Exhibit A to Defendant's
         Second Amended Response to
17       Interrogatory 3 (3/17/23)               137
18   352 e-mails Re: New FOIA Request
         2019-FOIA-01046 w/attachments           138
19
     353 Text Messages, Bates PARKER00815 to 16  163
20
     354 e-mail between Flack and Parker, Bates
21       Parker-Phillips_113                     166
22   355 Text Messages, Bates PARKER02000 to 03  170

Page 4

1   PLAINTIFF'S DEPOSITION EXHIBITS:   *          PAGE

2   356 Plaintiff Amy Phillips' Responses and
          Objections to Defendant's First Set
3         of Interrogatories                      406

4   357 e-mails Re: Holiday Reading - REVISED
          Assignments, Bates DC_2022_CV_0277-
5         00054159 to 62                          433

6

7   DEFENDANT'S DEPOSITION EXHIBITS:             PAGE

8   1  e-mails Re: Quon Declaration, Bates
          PHILLIPS-15897 to 901                   321

9

    2  e-mails Re: Declaration of Vendette
10        Parker, Bates PHILLIPS-15881 to 88      327

11  3  Subpoena                                   334

12  4  Op-ed, Bates Parker-Phillips_621 and
          569 to 71                               350

13

    5  Text Messages, Bates PARKER84              362

14

    6  Text Messages, Bates PARKER89              366

15

    7  Text Messages, Bates PARKER289             368

16

    8  Text Messages, Bates PARKER339             369

17

    9  Text Messages, Bates PARKER366             374

18

    10 Text Messages, Bates PARKER580             376

19

    11 Text Messages, Bates PARKER582             378

20

    12 Text Messages, Bates PARKER776             381

21

    13 Text Messages, Bates PARKER 1213 to 14     385

22

Page 5

```
 1   DEFENDANT'S DEPOSITION EXHIBITS:              PAGE
 2   14 e-mail from Parker to Flack, 8/14/19,      391
          Bates Parker-Phillips_114
 3
     15 Memo to Assistant Chief of Police from
 4        Michael Anzallo, 12/10/12, Bates
          Parker-Phillips_470 to 508              395
 5
 6
     PREVIOUSLY MARKED/REFERRED TO:
 7
     6   Bates DC_2022_cv_00277-133569 to 73
 8
     9   Bates DC_2022_cv_00277-56223 to 26
 9
     22  Bates DC_2022_cv_00277-51141 to 44
10
     23  Bates DC_2022_cv_00277-155580 to 91
11
     49  Bates DC_2022_cv_00277-4983 to 84
12
     55  Bates DC_2022_cv_00277-15222 to 24
13
     56  Bates DC_2022_cv_00277-15231 to 36
14
     57  Bates DC_2022_cv_00277-156528 to 31
15
     85  Bates DC_2022_cv_00277-98693 to 702
16
     86  Bates DC_2022_cv_00277-129365 to 72
17
     87  Bates DC_2022_cv_00277-1397 to 99
18
     88  Bates DC_2022_cv_00277-119281
19
     89  Bates DC_2022_cv_00277-126045 to 49
20
     102 Bates DC_2022_cv_00277-88936 to 37
21
     111 Bates Parker-Phillips_142 to 54
22
     115 Bates DC_2022_cv_00277-133531 to 32
```

Page 6

1   PREVIOUSLY MARKED/REFERRED TO:              PAGE

2   132 Bates DC_2022_cv_00277-15678 to 84

3   139 Bates DC_2022_cv_00277-71639 to 40 and

        Adverse Action Hearing Title Pages

4

    140 Bates DC_2022_cv_00277-1650 to 51 and

5          Redacted Adverse Action Hearing Title Pages

6   149 Bates DC_2022_cv_00277-66474 to 75

7   175 Bates DC_2022_cv_00277-3941 to 49

8   207 Bates DC_2022_cv_00277-6516 to 639

9   288 Bates PARKER821 to 22

10  289 Bates PARKER2005 to 06

11  292 Bates PARKER2221 to 22

12  308 FOIA Request Description

13

14

15

16

17

18

19

20

21

22  (* Exhibits attached to transcript.)

Page 7

1                P R O C E E D I N G S

2           VIDEO TECHNICIAN:  We are now on the

3    record.  The time is 9:36 a.m.  Today's date is

4    September 21st, 2023.

5           This is Media Unit 1 of the deposition

6    of Vendette Parker taken by counsel for the

7    plaintiff in the matter of Amy Phillips versus the

8    District of Columbia, case filed in the U.S.

9    District Court for the District of Columbia, Case

10   Number 22-277 (JEB).  We're at the offices of

11   Williams & Connolly, 680 Maine Avenue, Southwest

12   in Washington, D.C.

13          The videographer is Jonathan Perry and

14   the court reporter is Shari Broussard, both here

15   on behalf of Veritext.

16          All counsel appearances will be noted on

17   the stenographic record.

18          Would the reporter please swear in the

19   witness.

20   WHEREUPON,

21                     VENDETTE PARKER

22   called as a witness, and having been sworn by the

Page 8

1    notary public, was examined and testified as

2    follows:

3                 EXAMINATION BY COUNSEL FOR PLAINTIFF

4    BY MS. DURHAM:

5         Q    Good morning, Inspector Parker.

6         A    Good morning.

7         Q    My name is Krystal Durham and I

8    represent the plaintiff in this matter, Amy

9    Phillips.

10                Please state your full name for the

11   record.

12        A    Vendette Toprera Parker.

13        Q    Is this your first time being deposed?

14        A    No.

15        Q    How many times have you been deposed?

16        A    Three.

17        Q    Have those depositions related to your

18   job at the MPD FOIA Office?

19        A    Yes.  No, just two -- two of them.

20        Q    And were those the Goggins and the West

21   case?

22        A    Goggins and -- yeah.  Well, I don't know

Page 9

1    what the West case is.

2         Q    Okay.  When was the last time you were

3    deposed?

4         A    Last year.  Or earlier this year.  I'm

5    sorry, I think it was this year.

6         Q    And what was that case about?

7         A    That was a case, Charlotte Djoussou

8    versus District of Columbia.

9         Q    And what was the subject matter of that

10   lawsuit?

11        A    I believe she's suing for retaliation.

12   She's an MPD sergeant.  She's suing for

13   retaliation and discrimination.

14        Q    And what was your role with respect to

15   that case?

16        A    They had me as a witness, but I didn't

17   have firsthand information about what they were

18   asking.

19        Q    Prior to today, have you and I ever met?

20        A    No.

21        Q    Prior to today, have you and I ever

22   spoken?

Page 10

1       A       No.

2       Q       Is there any reason that you can't give

3   truthful testimony today?

4       A       No, there isn't.

5       Q       What is your highest level of education?

6       A       I have a law degree.

7       Q       And are you a member of a state bar?

8       A       Yes.

9       Q       Which one?

10      A       Maryland and the District of Columbia.

11      Q       Where did you attend college?

12      A       Mitchell Hamline School of Law in St.

13  Paul, Minnesota.

14      Q       And where are you currently employed?

15      A       The Federal Reserve Board of Governors.

16      Q       And what's your job title?

17      A       Senior protection analyst.

18      Q       And what are your job responsibilities?

19      A       I oversee the physical and technical

20  security at all Federal Reserve Banks that process

21  cash and coin.

22      Q       I want to show you what has been marked

Page 11

1    as Exhibit 345.

2              (Deposition Exhibit Number 345 was

3              marked for identification.)

4    BY MS. DURHAM:

5         Q    This is your LinkedIn profile, correct?

6         A    Yes.

7         Q    And is it accurate?

8         A    It is.

9         Q    Okay.

10             (Deposition Exhibit Number 346 was

11             marked for identification.)

12   BY MS. DURHAM:

13        Q    I'm handing you what has been marked as

14   Exhibit 346.

15             Have you seen this document before?

16        A    Yes.

17        Q    Is this your biography that was on the

18   MPD website?

19        A    Yes.

20        Q    Is it accurate?

21        A    It's limited, but yes.

22        Q    When you say "it's limited," do you mean

Page 12

1    there is more information?

2        A     There was a more updated biography, but

3    this one was the one prior to that one.

4        Q     And what does the updated biography have

5    that this one doesn't?

6        A     The updated biography included a

7    promotion to commander and then it included --

8    well, I think the -- the only one that was ever

9    published on line was the promotion to commander.

10       Q     But there were other awards and

11   commendations that you received that are not

12   included in this biography?

13       A     No.

14       Q     Okay.  Is it true that you joined law

15   enforcement when you were 17 years old?

16       A     Yes.

17       Q     Did you join MPD at that age?

18       A     Yes.

19       Q     And you rose through the ranks from

20   police cadet to commander of the 7th District; is

21   that correct?

22       A     Yes.

Page 13

1      Q     How long were you employed at MPD?

2      A     Twenty-six and-a-half years.

3      Q     And while you were at MPD, you attended

4  and completed college; is that correct?

5      A     Yes.

6      Q     And you received numerous awards and

7  commendations during your career at MPD, correct?

8            MR. SOBIECKI:  Object to form.

9            THE WITNESS:  Yes.

10  BY MS. DURHAM:

11      Q     Were you also the interim chief of

12  police to the chief of police?

13      A     Yes.

14      Q     Which chief of police were you the

15  interim staff to?

16      A     Chief Cathy Lanier.

17      Q     And at some point were you transferred

18  to the FOIA Office?

19      A     Yes.

20      Q     What was your rank prior to being

21  transferred to the FOIA Office?

22      A     Inspector.

Page 14

```
 1       Q    Prior to -- you were inspector?

 2       A    Yes.

 3       Q    And where were you inspector before you

 4  were transferred to the FOIA Office?

 5       A    Patrol Services Bureau.

 6       Q    When were you assigned to the FOIA

 7  Office?

 8       A    In April of 2017.

 9       Q    And did you become FOIA Officer in

10  October of 2017?

11       A    Yes.

12       Q    What were your responsibilities as the

13  FOIA Officer?

14       A    To oversee the processing of FOIA

15  requests.

16       Q    And as FOIA Officer, were you the head

17  of the MPD's FOIA Office?

18       A    Yes.

19       Q    How many people did you supervise as the

20  FOIA Officer?

21       A    Between eight and ten.

22       Q    And did you report to EOCOP, the
```

Page 15

```
 1   Executive Office of the Chief of Police, when you

 2   were the FOIA Officer?

 3        A    Yes.

 4        Q    And who did you directly report to in

 5   the EOCOP?

 6        A    Ms. Leeann Turner.

 7        Q    Did you indirectly report to anyone else

 8   in EOCOP?

 9        A    No.

10        Q    Whose decision was it to transfer you to

11   the FOIA Office?

12        A    I don't know who made the decision.

13        Q    Did you write a declaration in support

14   of Ms. Phillips' D.C. Superior lawsuit against the

15   District of Columbia?

16        A    Yes.

17        Q    And you're aware that that same

18   declaration was filed with the complaint in this

19   lawsuit, correct?

20        A    Yes.

21        Q    I'm going to hand you what has been

22   previously marked as tab -- sorry -- Exhibit 111.
```

Page 16

1          Ms. Parker, I've handed you your

2     declaration; is that correct?

3          A    Yes.

4          Q    And did you -- I'm just going to ask you

5     did you write this declaration because you were a

6     disgruntled former employee seeking revenge on

7     MPD?

8               MR. SOBIECKI:  Object to the form.

9               THE WITNESS:  No.

10    BY MS. DURHAM:

11         Q    And if we jump to the last page of

12    Exhibit 111 -- sorry.  Actually I'll withdraw that

13    question.

14              And the declaration that was filed, did

15    you sign that declaration under the penalty of

16    per- -- perjury?

17         A    Yes.

18         Q    And did you sign the declaration stating

19    that its contents were true and accurate?

20         A    To the best of my knowledge, yes.

21         Q    And do you still maintain that your

22    declaration is true and correct?

Page 17

1       A    Yes.

2       Q    If someone testified that you simply

3   misunderstood the policies and practices of MPD's

4   FOIA Office, would that be true?

5            MR. SOBIECKI:  Object to form.

6            THE WITNESS:  It may be true in their

7   opinion, but I don't think I misunderstood the

8   policies.

9   BY MS. DURHAM:

10      Q    And if someone testified that your

11  declaration was wrong in its description of the

12  FOIA Office's policies and practices, would that

13  be true?

14           MR. SOBIECKI:  Object to form.

15           THE WITNESS:  Not -- not in my opinion,

16  no.

17  BY MS. DURHAM:

18      Q    And is your declaration based on what

19  you witnessed and experienced firsthand while at

20  the FOIA Office?

21      A    Yes.

22      Q    So I'd like to walk through your

Page 18

1  declaration paragraph by paragraph.  So let's

2  start at page one if we can.  It's Bates ending in

3  823 (sic).

4          Is paragraph two true and accurate?

5      A    Yes.

6      Q    Why did you decide to retire in January

7  of 2020?

8      A    For two reasons.  One, I had some health

9  issues and the other reason is I didn't feel that

10 I was best being utilized at MPD.  I had another

11 job opportunity that I thought I would be better

12 utilized in.

13     Q    And when you say that you didn't feel

14 you were being best utilized, what do you mean?

15     A    I -- I didn't -- I thought that I could

16 better serve the Agency than being a FOIA agent --

17 FOIA Officer.

18     Q    Okay.  And for the time being I want to

19 skip paragraphs three and four, but I will come

20 back to those.

21          Is paragraph five true and accurate?

22          MR. SOBIECKI:  Object to form.

```
 1              THE WITNESS:  Yes.
 2    BY MS. DURHAM:
 3        Q    Is paragraph six true and accurate?
 4              MR. SOBIECKI:  Object to form.
 5              THE WITNESS:  Yes.
 6    BY MS. DURHAM:
 7        Q    Is paragraph seven true and accurate?
 8              MR. SOBIECKI:  Object to form.
 9              THE WITNESS:  Yes.
10    BY MS. DURHAM:
11        Q    And in paragraph seven you write that on
12    the first day at the FOIA Office, you met with
13    Chief Operating Officer Leeann Turner, correct?
14        A    Yes.
15        Q    Did you meet with Ms. Turner in person?
16        A    Yes.
17        Q    And during that meeting you write that
18    she told you that there was a surplus of EEO
19    complaints in the FOIA Office, correct?
20        A    Yes.
21        Q    Did she tell you what those complaints
22    were about?
```

Page 20

1        A    Yes.

2        Q    And what were those complaints about?

3        A    There was a FOIA specialist who had

4   filed more than one, but I don't remember how

5   many, complaints against one of the supervisors in

6   the office.

7        Q    Okay.  And who was the FOIA Officer when

8   you joined the FOIA Office?

9        A    I can't remember his name.

10       Q    Was it Don Kaufmann?

11       A    Don Kaufmann, yes.

12       Q    And was Ms. Turner your direct

13   supervisor?

14       A    You know what?  If I can go back.  I

15   don't remember if Don was the FOIA Officer or if

16   Liz Lyons -- I can't remember which one.  I think

17   it was Liz Lyons.

18       Q    So at some point Ms. Lyons was the FOIA

19   Officer?

20       A    Yes.

21       Q    And was Ms. Turner your direct

22   supervisor for the entire time that you were at

Page 21

1    the FOIA Office?

2          A     Yes.

3          Q     And who did Ms. Turner report to?

4                MR. SOBIECKI:  Object to form.

5                THE WITNESS:  Chief Newsham.

6    BY MS. DURHAM:

7          Q     I'm sorry?

8          A     Chief Newsham.

9          Q     Thank you.

10               And you write in paragraph seven that

11   Ms. Turner told you that Chief Newsham felt

12   blindsided by media and others who had confronted

13   him with questions regarding records they had

14   obtained from FOIA that he was unaware had been

15   released, correct?

16         A     Yes.

17         Q     Did Ms. Turner describe any of the

18   specific incidents that had left Chief Newsham

19   feeling blindsided?

20         A     No.

21         Q     Is paragraph eight true and accurate?

22               MR. SOBIECKI:  Object to form.

Page 22

1          THE WITNESS:  Yes.

2    BY MS. DURHAM:

3      Q    And you write that when you joined the

4    FOIA Office, Ms. Turner told you about a policy of

5    elevating certain requests for review by the

6    EOCOP, correct?

7          MR. SOBIECKI:  Object to form.

8          THE WITNESS:  She told me there were --

9    she told me the type of requests that she'd like

10   to review prior to them being released.

11   BY MS. DURHAM:

12     Q    And did you understand that to mean that

13   there were certain kinds of requests that

14   Ms. Turner in her EOCOP role liked to review

15   before they were released to the public?

16     A    Yes.

17     Q    And what kinds of requests did

18   Ms. Turner tell you that you should elevate for

19   EOCOP review?

20          MR. SOBIECKI:  Object to form.

21          THE WITNESS:  Any media request, any

22   request that was seeking documents that were a hot

1   topic.  I think that was pretty much it at the

2   beginning.

3   BY MS. DURHAM:

4       Q    When you say "at the beginning," did

5   Ms. Turner ever give you any other guidance about

6   what kinds of requests to elevate to EOCOP for

7   review?

8              MR. SOBIECKI:  Object to form.

9              THE WITNESS:  So as time went on, there

10  were certain people who were requesting --

11  requesting documents that were of a hot topic, so

12  whenever those people made requests, she wanted to

13  see the -- she wanted to see what was being

14  released prior to it being released.

15  BY MS. DURHAM:

16      Q    And when you say "certain people," who

17  identified those people for you?

18      A    We both did.

19      Q    And how did you identify those people?

20      A    We had a weekly meeting in her office

21  where we went over outstanding FOIA requests or

22  requests that I needed authorization to release.

Page 24

1    And as we went over those requests, she would say

2    let me -- you know, let me see these before they

3    go out.

4         So once she identified a person that she

5    wanted to see their requested documents before

6    going out, if they made any additional requests, I

7    just brought them to her attention.

8         Q    And did you bring them to her attention

9    because you understood that for those requesters,

10   she would want to review what potential public --

11   what potential records they were going to get?

12        MR. SOBIECKI:  Object to form.

13        THE WITNESS:  That was my understanding.

14   BY MS. DURHAM:

15        Q    And what kinds of people -- I'll

16   withdraw that.

17        Can you provide me examples of the

18   people that Ms. Turner identified in those

19   meetings?

20        MR. SOBIECKI:  Object to form.

21        THE WITNESS:  Some of them were like

22   elected officials, like ANC commissioners, some

Page 25

1  were community activists, and then the media, I --

2  we had to take media requests to her anyway.

3  BY MS. DURHAM:

4      Q    And what did you understand the purpose

5  of providing the draft responses to those

6  requesters for EOCOP review?

7      A    She --

8          MR. SOBIECKI:  Object to form.

9          THE WITNESS:  She wanted to prepare --

10  if there was going to be something potentially

11  negative against the Agency, she wanted to have

12  advanced notice and prepare a response prior to

13  those records being released.

14  BY MS. DURHAM:

15     Q    And when you say she wanted to know that

16  there was going to be something potentially

17  negative, did that involve both the content of the

18  potential public records and how the requester

19  would use those records?

20         MR. SOBIECKI:  Object to form, leading.

21         THE WITNESS:  She wouldn't know if it

22  was going to be negative against the Agency, but

Page 26

```
 1   she would make a guess based on the documents that
 2   were being released.
 3   BY MS. DURHAM:
 4        Q    And when Ms. Turner told you about MPD's
 5   policy, as you describe it in paragraph eight, she
 6   was explaining to you a policy that was already in
 7   place, correct?
 8        A    Yes.
 9        Q    Ms. Turner did not ask you to create any
10   policies; is that correct?
11        A    No.
12             MR. SOBIECKI:  Object to form.
13   BY MS. DURHAM:
14        Q    And she explained to you how things
15   worked in that -- and she -- I'll withdraw that.
16             She explained to you how things worked
17   and what her expectations of you were, correct?
18        A    Yes.
19             MR. SOBIECKI:  Object to form, leading.
20   BY MS. DURHAM:
21        Q    Do you know who created the policy of
22   elevating certain requests from certain requesters
```

Page 27

1  for EOCOP review?

2          MR. SOBIECKI:  Object to form.

3          THE WITNESS:  No.

4  BY MS. DURHAM:

5      Q    And you write that Ms. Turner told you

6  that part of your job responsibilities as FOIA

7  Officer were to notify Chief Newsham and

8  Ms. Turner of any FOIA requests originating from

9  the media, certain individuals, I think you

10 described elected officials, community activists,

11 or requests for certain records; is that correct?

12     A    Not Chief Newsham.  I had to notify her.

13     Q    Okay.  And you knew that she reported to

14 Chief Newsham?

15     A    Yes.

16     Q    Did you and others in the FOIA Office

17 use the term "EOCOP review" to describe that

18 escalation or elevation policy?

19     A    Yes.

20     Q    So when individuals in the FOIA Office

21 wrote that a request or a proposed response had

22 been sent for EOCOP review, did that mean that

Page 28

1    requests were with EOCOP review -- or with EOCOP

2    for review before the FOIA Office released them?

3              MR. SOBIECKI:  Object to form.

4              THE WITNESS:  It meant that the --

5    the -- those requests were pending approval from

6    EOCOP.

7    BY MS. DURHAM:

8        Q    And when you say "pending approval,"

9    does that mean that the FOIA Office could not

10   release public records or responses to certain

11   requests from certain requesters until you got

12   approval from EOCOP?

13       A    Yeah.

14             MR. SOBIECKI:  Object to form.

15             THE WITNESS:  Yes.

16   BY MS. DURHAM:

17       Q    And you couldn't release things to

18   the -- I'll withdraw that.

19             You couldn't release certain -- I'm

20   sorry, I'll withdraw that too.

21             You couldn't release responses to

22   certain requests or certain requesters prior to

Page 29

```
 1   EOCOP approval even though you were the FOIA
 2   Officer; is that correct?
 3              MR. SOBIECKI:  Object to form.
 4              THE WITNESS:  Yes.
 5   BY MS. DURHAM:
 6        Q    Besides Ms. Turner, did anyone else ever
 7   provide you with instructions about what kinds of
 8   requests or requesters to elevate to EOCOP for
 9   review?
10        A    No.  Just Liz -- Liz Lyons, who was -- I
11   believe she was the FOIA Officer when I first got
12   to the office.  She also just reiterated that
13   media requests needed to go to Ms. Turner.
14        Q    Did she explain to you why media
15   requests needed to go to Ms. Turner?
16        A    That was the policy of the office.
17        Q    Is paragraph nine true and accurate?
18              MR. SOBIECKI:  Object to form.
19              THE WITNESS:  Yes.
20   BY MS. DURHAM:
21        Q    And you write that Ms. Turner did not
22   provide you with specific names.
```

Page 30

1           Do you see that?

2      A    Yes.

3      Q    But I think you just -- well, I'll

4  withdraw that.

5           She didn't provide you with names in

6  that first initial meeting; is that correct?

7      A    That's correct.

8      Q    But earlier you testified that as you

9  were working, she identified specific individuals

10 whose requests she wanted to see?

11     A    Based on what they were requesting.  So

12 she reviewed all of the FOIA requests that were

13 pending, so -- and based on what was being asked,

14 she would say I want to see this request before it

15 goes out.

16     Q    And what guidance did Ms. Turner provide

17 you about how you were supposed to identify which

18 requests required notification for her?

19          MR. SOBIECKI:  Object to form.

20          THE WITNESS:  If it was something -- if

21 it was a hot topic, meaning something that was in

22 the media, if it was something that could

Page 31

1  detrimentally -- could have a det- -- detrimental

2  effect on the Agency, meaning that it was a

3  negative story.

4  BY MS. DURHAM:

5      Q    And could a negative story be something

6  that was critical of MPD?

7          MR. SOBIECKI:  Object to form.

8          THE WITNESS:  Yes.

9  BY MS. DURHAM:

10     Q    And you write that she told you that you

11 should bring to her attention any requests coming

12 from a person that had previously published a

13 negative article about Chief Newsham or MPD,

14 correct?

15     A    Right.  That was the hot topic.  That's

16 what I meant by hot topic.

17     Q    That's what you mean by hot topic?

18     A    Yes.

19     Q    And did she provide you with any

20 guidance about how you were supposed to identify

21 whether or not a person had published a negative

22 media -- media article about Chief Newsham or MPD?

Page 32

```
 1      A    No.
 2      Q    Was -- and, again, when you say --
 3  actually withdraw that.
 4           You also write that she -- you say
 5  typically a person is placed and remains on the
 6  identified individual list if he -- if he is
 7  outspoken in City Council and community meetings
 8  in a negative way toward Chief Newsham or MPD.
 9           Do you see that?
10           MR. SOBIECKI:  Object to form.
11           THE WITNESS:  Which --
12           MR. SOBIECKI:  I'm sorry, which part --
13           MR. CARPENTER:  Where are you reading
14  from?
15           MS. DURHAM:  I'm on paragraph nine.
16           MR. SOBIECKI:  Objection.  Misstates.
17           MS. DURHAM:  Okay.  I will try to cure
18  the objection.
19  BY MS. DURHAM:
20      Q    You write, "Typically a person is placed
21  and remains on the identified individual list no
22  matter whether or not the records being requested
```

Page 33

1   are potentially detrimental to Chief Newsham or

2   MPD if" -- and I'm going to skip and ask

3   specifically about this one -- "if he is outspoken

4   in City Council or community meetings in a

5   negative way toward Chief Newsham or MPD."

6           Do you see that?

7       A   Yes.

8           MR. SOBIECKI:  Objection, misstates the

9   document.

10  BY MS. DURHAM:

11      Q   And when you write "in a negative way,"

12  do you mean critical of MPD or Chief Newsham?

13      A   Yes.

14      Q   I'm handing you what's been previously

15  marked as Exhibit 149.  And this is a

16  January 23rd, 2018 e-mail from Ms. Lisa

17  Archie-Mills to you.

18          Do you see that?

19      A   Yes.

20      Q   And Ms. Archie-Mills was already

21  employed in the FOIA Office when you arrived; is

22  that correct?

Page 34

 1      A    Yes.

 2      Q    And if you look at the attachment behind

 3  the second blue sheet, Ms. Archie-Mills sent you

 4  the presentation which is called "FOIA

 5  Informational Presentation."

 6           Do you see that?

 7      A    Yes.

 8           MR. SOBIECKI:  I'm sorry, Counsel, I

 9  only have one blue sheet in mine.

10  BY MS. DURHAM:

11      Q    Did you offer any feedback on this

12  PowerPoint presentation?

13      A    No.

14           MR. CARPENTER:  There's only one blue

15  sheet.

16           MR. SOBIECKI:  Oh, okay.  I thought she

17  said the second one.

18           MR. CARPENTER:  Okay.  Yeah, there's

19  only one blue sheet.

20           MR. SOBIECKI:  Sorry.

21  BY MS. DURHAM:

22      Q    And did anyone in EOCOP review this

Page 35

1  presentation before you -- before it was sent to

2  you?

3            MR. SOBIECKI:  Object to form.

4            THE WITNESS:  I don't know.

5  BY MS. DURHAM:

6      Q    And if we look at -- so unfortunately

7  the Bates numbers are not -- there's no page --

8  page numbers on the informational PowerPoint, so

9  I'm going to direct you to the slide that starts

10 "What do we need from you?"  It looks like this

11 (indicating).

12     A    Okay.  I'm there now.

13     Q    And do you see the fourth bullet point

14 from the bottom that's in bold?

15     A    Yes.

16     Q    And it says, "Media and high profile

17 requests (or any other requests deemed sensitive)

18 are sent to the Executive Office of the Chief of

19 Police (EOCOP) for review by the COP, prior to the

20 FOIA Office making a release to the public."

21            Do you see that?

22     A    Yes.

Page 36

1      Q    And here does COP mean Chief of Police?

2      A    Yes.

3      Q    And --

4           MR. SOBIECKI:  Object to form.

5   BY MS. DURHAM:

6      Q    -- did you draft this PowerPoint

7   presentation?

8      A    No.

9      Q    Do you know who wrote the language here?

10     A    I -- I don't know for sure, no.

11     Q    Is the statement on slide 14 consistent

12  with what Ms. Turner told you about the EOCOP

13  review policy on your first day?

14          MR. SOBIECKI:  Object to form.

15          THE WITNESS:  Is this slide 14?

16  BY MS. DURHAM:

17     Q    Yes, yes, I'm sorry.

18     A    Yes.

19     Q    And is the statement on, and now we've

20  established this is slide 14, consistent with the

21  FOIA Office's practice as it existed when you were

22  at the FOIA Office?

Page 37

```
 1      A    Yes.

 2           MR. SOBIECKI:  Object to form.

 3           I apologize, Inspector Parker, I don't

 4    want to talk over you.  If you can just give me a

 5    second for an objection.

 6    BY MS. DURHAM:

 7      Q    And --

 8           MR. CARPENTER:  Wait a minute.  What was

 9    that request?

10           MR. SOBIECKI:  I just wanted a second to

11    make my objection so I don't talk over her.

12    That's all.

13           MR. CARPENTER:  Okay.  He's preserving

14    the record for the objection, so --

15           MR. SOBIECKI:  I just don't want to be

16    rude, that is all.

17           MR. CARPENTER:  Don't want to be rude.

18           MR. SOBIECKI:  Rude, yes.

19           MR. CARPENTER:  Okay.  Well, that's

20    good.

21    BY MS. DURHAM:

22      Q    Ms. -- and Ms. Turner told you that the
```

Page 38

```
 1   reason for the elevation of certain requests for
 2   EOCOP review was to avoid negative press or
 3   negative commentary from community leaders; is
 4   that correct?
 5           MR. SOBIECKI:  Object to form.
 6           THE WITNESS:  Initially.  As time went
 7   on, she also wanted to make sure the records were
 8   accurate before they went out.
 9   BY MS. DURHAM:
10       Q    Okay.  We'll talk about that.
11           When you wrote in your declaration -- so
12   I want to go back to Exhibit 111.  And if you
13   could keep that one out too just in case.
14       A    Okay.
15       Q    When you wrote in your declaration in
16   2021 that there was an unwritten, unofficial
17   policy, did you have the benefit of having this
18   2018 PowerPoint with you?
19           MR. SOBIECKI:  Object to form.
20           THE WITNESS:  No.
21   BY MS. DURHAM:
22       Q    And though it covers some of what you've
```

Page 39

1   described, it doesn't include the unwritten or

2   unofficial policy of elevating certain requests

3   from individuals critical of MPD; is that correct?

4           MR. SOBIECKI:  Object to form.

5           THE WITNESS:  I'm sorry, can you say it

6   one more time?

7   BY MS. DURHAM:

8       Q    Sure.  Though the PowerPoint includes

9   some of the policy of EOCOP, it doesn't include

10  the unwritten, unofficial policy of elevating

11  certain requests from individuals critical of MPD;

12  is that correct?

13          MR. SOBIECKI:  Object to form.

14          THE WITNESS:  That's correct.

15  BY MS. DURHAM:

16      Q    That was an additional component of the

17  policy that's not captured on the PowerPoint

18  presentation, correct?

19          MR. SOBIECKI:  Object to form.

20          THE WITNESS:  Yes, that's correct.

21  BY MS. DURHAM:

22      Q    And if we go back to -- sorry.  And just

Page 40

1    so that the record is clear, when I say

2    "unofficial policy," I just mean something that's

3    not written down.

4              Do you understand that?

5        A    That's my --

6              MR. SOBIECKI:  Object to form.

7              THE WITNESS:  I'm sorry.  That's my

8    understanding, yes.

9    BY MS. DURHAM:

10       Q    Okay.  And when you worked at MPD, there

11   could be policies that weren't necessarily written

12   down that agencies or offices were expected to

13   follow; is that correct?

14             MR. SOBIECKI:  Object to form.

15             THE WITNESS:  That's correct.

16   BY MS. DURHAM:

17       Q    And I want to turn you back to

18   Exhibit 111 (sic) in that same slide 14 that we

19   looked at that says "What do we need from you?"

20       A    Exhibit 111 is the declaration.

21       Q    Oh, I'm so sorry.  Exhibit --

22             MR. LINHORST:  149.

Page 41

1   BY MS. DURHAM:

2        Q     149.

3              MS. DURHAM:   Thank you, Mike.

4              THE WITNESS:   I'm here.

5   BY MS. DURHAM:

6        Q     And there's a sentence that follows the

7   one we looked at earlier that says, "The COP will

8   have the final decision as to what information

9   will be released."

10             Do you see that?

11       A     Yes.

12       Q     And when you were at the FOIA Office,

13  did the CO- -- did the Chief of Police have final

14  decision-making authority as to what information

15  would be released in response to a FOIA request?

16       A     Sometimes, yes.

17       Q     When you say "sometimes," what do you

18  mean?

19       A     There were lesser requests that we just

20  released requests for incident reports that are

21  public documents or accident reports where we had

22  the language to release depending on if you were

Page 42

1   involved in the accident or not involved in the

2   accident, but some lesser requests we were able to

3   just release.

4        Q    And for EOCOP review, did Chief -- did

5   the Chief of Police delegate the majority of that

6   EOCOP review and EOCOP supervision of the FOIA

7   Office responsibility to Ms. Turner?

8             MR. SOBIECKI:  Object to form.

9             THE WITNESS:  I -- I would be guessing

10  if I said yes, but that's who I reported to.

11  BY MS. DURHAM:

12       Q    While you were working at the FOIA

13  Office, there was a backlog of delayed requests,

14  correct?

15       A    Yes.

16       Q    Would you be surprised to learn that as

17  of March 2023, the oldest open request dating back

18  to 2017 are from Michael Perloff, Amy Phillips,

19  Eric Flack, Peter Hermann, and a law professor

20  that was known to be critical of the MPD?

21            MR. SOBIECKI:  Object to form.

22            THE WITNESS:  No, I'm not surprised.

Page 43

1  BY MS. DURHAM:

2      Q    Why aren't you surprised?

3      A    I think some of the requests they were

4  asking for was a lot of data that needed -- or the

5  department wanted to be cleaned up before it was

6  released.  So I don't know what -- which of their

7  requests are pending, but I do remember that some

8  involved requests that the Agency wanted cleaned

9  up before it was released.

10     Q    And when you say "cleaned up," what do

11  you mean?

12     A    So one request I remember was for use of

13  force information.  And it's a free text database.

14  So depending on who's putting the information in,

15  it's different information for each incident.  And

16  they wanted to standardize that across each --

17  each incident so that it would be consistent

18  before it was released -- before the information

19  was released.

20     Q    And is there -- so I'll take that in

21  pieces.

22          When a FOIA requester makes a request,

Page 44

1    is the FOIA Office required to create data to

2    respond to the request?

3         A    No.

4         Q    And so the statute requires MPD or

5    any -- the -- I'm sorry, I'll withdraw that.

6              The FOIA statute requires MPD or any

7    other agency to release information and data

8    that's already in the possession of the Agency; is

9    that correct?

10             MR. SOBIECKI:  Object to form.

11             THE WITNESS:  Yes.

12   BY MS. DURHAM:

13        Q    And so there's no requirement to

14   standardize or clean up, as you say, data before

15   you release it; is that right?

16             MR. SOBIECKI:  Object to form.

17             THE WITNESS:  Correct.

18   BY MS. DURHAM:

19        Q    And so -- I'll withdraw that.

20             Is there anything in the FOIA statute

21   that allows for the MPD to delay releasing

22   information in response to a FOIA request to

Page 45

1    sanitize or clean it up?

2              MR. SOBIECKI:  Object to form.

3              THE WITNESS:  There is one provision

4    that allows an extension if it's a large volume

5    that's being -- a large volume of information

6    that's being requested.  We've used it, but it

7    gives you, I think, an extra 14 days.

8    BY MS. DURHAM:

9         Q    So it doesn't --

10        A    And then you should release on a rolling

11   basis after that.

12        Q    So when you say "an extra 14 days," does

13   that -- that provision allow for you to take years

14   to respond to information -- to requests?

15        A    It doesn't say that, no.

16        Q    Is the extra 14 days all that's allowed

17   for in that provision --

18             MR. SOBIECKI:  Object to form.

19   BY MS. DURHAM:

20        Q    -- that you're referencing?

21             MR. SOBIECKI:  Object to form.

22             THE WITNESS:  I believe so.  I haven't

Page 46

1   read it in awhile, but I -- I believe so.

2   BY MS. DURHAM:

3       Q    Did EOCOP review -- add additional time

4   to the FOIA Office's ability to respond to FOIA

5   requests that were subject to review?

6               MR. SOBIECKI:  Object to form.

7               THE WITNESS:  Some of them, yes.

8   BY MS. DURHAM:

9       Q    Sometimes EOCOP review could take weeks;

10  is that correct?

11              MR. SOBIECKI:  Object to form.

12              THE WITNESS:  Yes.

13  BY MS. DURHAM:

14      Q    Did it sometimes take months for EOCOP

15  review and approval to be completed?

16              MR. SOBIECKI:  Object to form.

17              THE WITNESS:  Yes.

18  BY MS. DURHAM:

19      Q    In your experience, did it sometimes

20  take years for EOCOP review to be completed?

21              MR. SOBIECKI:  Object to form.

22              THE WITNESS:  I can't remember that.

Page 47

1    BY MS. DURHAM:

2        Q    I'd like to go back to Exhibit 111 and

3    I'll direct you to paragraph ten.  You list here a

4    number of names of requesters who were flagged for

5    EOCOP review.

6            Do you see that?

7        A    Yes.

8        Q    Is paragraph ten true and accurate?

9            MR. SOBIECKI:  Object to form.

10           THE WITNESS:  Yes.

11   BY MS. DURHAM:

12       Q    And how do you know that these

13   requesters were among the requesters that should

14   be flagged pursuant to the EOCOP review policy?

15           MR. SOBIECKI:  Object to form.

16           THE WITNESS:  Based on some of the --

17   well, in the case of Eric Flack, based on his

18   prior reporting.  Marina Marraco was based on her

19   prior reporting.  And for both of them it was

20   documents that they were asking for.  Denise Krepp

21   was critical of the Chief on a number of

22   occasions, so her request needed to be reviewed.

Page 48

1  Lorenzo Greene was involved in an incident that

2  made a lot of media attention, so he later made a

3  request about that incident.  So his request had

4  to be reviewed.  Benjamin Douglass was critical of

5  the Agency's training in Israel and he made

6  several requests about that training.  He also

7  spoke out at City Council members (sic), so his

8  request made -- had to be reviewed.  Emily Barth

9  was a public defender and she requested a lot of

10  information about the Gun Recovery Unit.  She --

11  her request had to be reviewed because of what she

12  was asking for.  And Amy Phillips also made a lot

13  of requests for Gun Recovery Unit information and

14  her requests had to be reviewed.

15  BY MS. DURHAM:

16      Q    Were you required to elevate every FOIA

17  request generally for EOCOP review?

18           MR. SOBIECKI:  Object to form.

19           THE WITNESS:  No.

20  BY MS. DURHAM:

21      Q    And you -- you talk about Amy Phillips'

22  request having to be elevated because it was for

Page 49

1   gun recovery.

2          Who pointed out that Amy Phillips'

3   request should be elevated?

4          MR. SOBIECKI:  Object to form.

5          THE WITNESS:  Her request initially

6   needed to be elevated because every week I had to

7   send in all new requests.  And she wanted all of

8   the gun recoveries, their names, their badge

9   numbers, the arrests that -- there were quite a

10  few things she asked for about that.  So she

11  initially came to our attention with that request

12  and I was told, before we release that, to bring

13  it upstairs for review.

14  BY MS. DURHAM:

15     Q    And you say initially that's why she was

16  elevated.

17          Did there come another reason why you

18  elevated the request?

19     A    She made similar requests with similar

20  information.

21     Q    And was it Ms. Turner -- or I'll just

22  withdraw that.

Page 50

1          Who in EOCOP reviewed draft responses to

2    certain FOIA requests?

3          A    Ms. Turner.

4          Q    And if you look at paragraph 11, is

5    paragraph 11 true and accurate?

6               MR. SOBIECKI:  Object to form.

7               THE WITNESS:  Yes.

8    BY MS. DURHAM:

9          Q    And we looked at the PowerPoint

10   presentation earlier that said requests that were

11   deemed sensitive were elevated for EOCOP review.

12              Do you recall being required to elevate

13   FOIA requests for sensitive information?

14         A    Yes.

15         Q    And that was in addition to high-profile

16   and media requests; is that correct?

17         A    Yes.

18         Q    And you list a number of issues here

19   such as stop and frisk or adverse action records.

20              Were those issues considered sensitive

21   to MPD consistent with the policy you described?

22              MR. SOBIECKI:  Object to form.

```
 1              THE WITNESS:  Yes.
 2    BY MS. DURHAM:
 3        Q    And if we go to paragraph 12, is
 4    paragraph 12 true and accurate?
 5              MR. SOBIECKI:  Object to form.
 6              THE WITNESS:  Yes.
 7    BY MS. DURHAM:
 8        Q    All right.  Sorry, I have the wrong
 9    document.  Back on track.
10              So did Ms. Turner ever instruct you to
11    do research on requesters?
12        A    Yes.
13        Q    Why did Ms. Turner ask you to do
14    research about requesters?
15              MR. SOBIECKI:  Object to form.
16              THE WITNESS:  She wanted to know who the
17    person was or who the organization was to try and
18    guess what they may do with the documents once
19    received.
20    BY MS. DURHAM:
21        Q    And what do you mean by guess what they
22    may do with the documents once they're received?
```

Page 52

1      A      If it would end up being something that

2   would be used negatively against the Agency.

3      Q      And when you say if it would be used as

4   something negative against the Agency, could that

5   include criticism of the Agency?

6      A      Yes.

7             MR. SOBIECKI:  Object to form.

8   BY MS. DURHAM:

9      Q      And did Ms. Turner give you the

10  instructions to research requesters to better

11  predict the motivation of a requester on the phone

12  or in person or over e-mail?

13     A      Usually it was in person.

14     Q      Did you ever instruct anyone else to

15  research the identity of a requester based on the

16  instructions that you received from Ms. Turner?

17     A      No, I did it myself.

18     Q      How did you inform Ms. Turner of the

19  results of your research about a requester?

20     A      In our meetings verbally.

21     Q      When you say "in our meetings," do you

22  mean the weekly meetings that you had with her on

Page 53

1    Tuesday?

2         A    Yes.

3         Q    Did you regularly discuss specific

4    requesters with Ms. Turner and the requests?

5              MR. SOBIECKI:  Object to form.

6              THE WITNESS:  It just depended on the

7    request.

8    BY MS. DURHAM:

9         Q    And when you say "it depended on the

10   request," did it depend on the request and how the

11   requester could potentially use the information?

12             MR. SOBIECKI:  Object to form.

13             THE WITNESS:  Yes.

14   BY MS. DURHAM:

15        Q    Would Ms. Turner send you text messages

16   requesting the identity of requesters for certain

17   requests?

18        A    No.

19        Q    Would Ms. Turner call you and ask you

20   who a requester was for a particular request?

21        A    Yes.

22        Q    And were you ever required to provide

Page 54

1    information about the identity of certain

2    requesters when discussing certain FOIA requests?

3              MR. SOBIECKI:  Object to form.

4              THE WITNESS:  Yes.

5    BY MS. DURHAM:

6         Q    If Ms. Turner testified that she never

7    focused on the identity of a requester, would that

8    be true in your experience?

9              MR. SOBIECKI:  Object to form.

10             THE WITNESS:  No.

11   BY MS. DURHAM:

12        Q    I'm going to hand to you what has been

13   previously marked as Exhibit 115.  And this is a

14   text message thread between Ms. Turner and Chief

15   Newsham on September 9th, 2019.

16             Do you see that?

17        A    Yes.

18        Q    And Chief Newsham writes "Who are --

19   "Who are FOIAs from?"

20             Do you see that?

21        A    Yes.

22        Q    And then Ms. Turner says, "I'm waiting

Page 55

 1   on that.  At least one was a news organization.

 2   Will send as soon as I get it."

 3           Do you see that?

 4      A    Yes.

 5      Q    And then she says "From Vendette:  Shyla

 6   Palm (from Canary in a Coal Mine) requested BWC.

 7   Peter Hermann (Washington Post) requested all

 8   e-mails and other correspondence sent from MPD to

 9   DCFEMS that property, its condition, or requests

10   for inspections."  Chief Newsham says, "Just two."

11           Do you see that?

12      A    Yes.

13      Q    And then Ms. Turner writes, "And Evan

14   Lambert.  She just sent the third one."

15           Do you see that?

16      A    Yes.

17      Q    And did Ms. Turner regularly ask you who

18   had made certain FOIA requests?

19           MR. SOBIECKI:  Object to form.

20           THE WITNESS:  I don't know about

21   regularly, but she has asked who the FOIA

22   requesters were on some requests.

Page 56

1   BY MS. DURHAM:

2        Q    And if we go back to Exhibit 111, which

3   is your declaration -- actually I'll withdraw the

4   question.

5            For -- is paragraph 13 true and

6   accurate?

7            MR. SOBIECKI:  Object to form.

8            THE WITNESS:  Yes.

9   BY MS. DURHAM:

10       Q    I'm going to hand to you what has been

11  previously marked as Exhibit 85.  The earliest

12  e-mail in this thread is an e-mail from you to

13  Chief Newsham, Leeann Turner and Dustin Sternbeck

14  on October 18th, 2018.

15           Do you see that?

16       A    Yes.

17       Q    And are these the kinds of weekly

18  e-mails that you would send to Chief Newsham and

19  Ms. Turner notifying them of the prior week's new

20  FOIA requests?

21           MR. SOBIECKI:  Object to form.

22           THE WITNESS:  Yes.

1  BY MS. DURHAM:

2      Q    And sending Chief Newsham these weekly

3  e-mails about new FOIA requests, did that have

4  anything to do with clearing the backlog at the

5  FOIA Office?

6           MR. SOBIECKI:  Object to form.

7           THE WITNESS:  I don't think so.

8  BY MS. DURHAM:

9      Q    Did someone instruct you to send these

10  weekly e-mails?

11      A    Yes.

12      Q    Who instructed you to send these weekly

13  e-mails?

14      A    This was the practice that had been

15  going on prior to my assignment in the office, so

16  I just continued once I took over the office.

17      Q    And who informed you of the practice of

18  sending these weekly e-mails to Chief Newsham,

19  Ms. Turner and Mr. Sternbeck?

20      A    Liz Lyons.

21      Q    And -- and did you send these -- did you

22  or someone else in the FOIA Office send these

Page 58

```
 1   weekly e-mails every week to Ms. Turner and Chief
 2   Newsham?
 3           MR. SOBIECKI:  Object to form.
 4           THE WITNESS:  Yes.
 5   BY MS. DURHAM:
 6       Q   Would it be surprising to you if the
 7   District has said that many of the weekly e-mails
 8   for the weeks Ms. Phillips submitted requests
 9   apparently do not exist?
10           MR. SOBIECKI:  Object to form.
11           THE WITNESS:  They should be there.  I
12   don't know what happened.
13   BY MS. DURHAM:
14       Q   After your e-mail, do you see that Chief
15   Newsham sends an e-mail to Ms. Turner that says
16   "Can we highlight the FOIAs that I should be
17   alerted to?"
18       A   Yes.
19       Q   And then you see that Ms. Turner replies
20   "Yes"; is that correct?
21       A   Yes.
22       Q   At some point did Ms. Turner instruct
```

Page 59

```
 1   you that you should highlight requests of

 2   significance for Chief Newsham?

 3        A    Yes.

 4        Q    Did you have that conversation in person

 5   or on text message or --

 6        A    It wasn't on text, but I don't know if

 7   it was in person or on the phone.  But it was

 8   verbally.

 9        Q    What did Ms. Turner tell you to do?

10        A    To highlight the ones that -- that I

11   believe should be brought to the -- the chief's

12   immediate attention.

13        Q    And what did you use as your basis for

14   deciding which requests to highlight?

15        A    What she had already told me.  If it was

16   media or a hot topic or from someone that has been

17   previously critical of the Agency.

18        Q    I'm going to hand you what is marked as

19   Exhibit 175.

20             This is a December 18th, 2018 e-mail

21   from you to Chief Newsham, Leeann Turner and

22   Dustin Sternbeck.
```

```
                                            Page 60

 1           Do you see that?

 2      A    Yes.

 3      Q    And the subject line is "New FOIA

 4  Requests December 9th, 2018 to December 15th,

 5  2018."

 6           Do you see that?

 7      A    Yes.

 8      Q    And you write, "Please see attached new

 9  FOIA requests.  Highlighted are three requests of

10  significance.  There are two highlighted requests

11  without narrative descriptions.  I have attached

12  those requests for your review."

13           Do you see that?

14      A    Yes.

15      Q    Is this an example of a weekly e-mail

16  where you highlighted certain requests for Chief

17  Newsham?

18      A    I highlighted for Leeann because she --

19  she directed me to highlight for her, but yes.

20      Q    And she directed you to highlight

21  requests of significance because as we saw in the

22  -- well, I'll withdraw the question.
```

Page 61

1           You did that because she called you and

2    said please highlight certain requests; is that

3    correct?

4        A    Yes.

5        Q    Did you -- I'll withdraw that.

6           And when she gave you the instruction to

7    highlight certain requests in your weekly e-mails,

8    she told you to send those requests -- those

9    highlighted requests not to just her but to Chief

10   Newsham as well; is that correct?

11          MR. SOBIECKI:  Objection.  Leading.

12          THE WITNESS:  They -- no.  Ms. Lyons

13   instructed me that this weekly report was to go to

14   Chief Newsham, to Leeann Turner and to Dustin

15   Sternbeck.  That was a directive.  The -- who they

16   were sent to didn't come from Leeann.

17   BY MS. DURHAM:

18       Q    When you sent this weekly e-mail with

19   the highlighted requests, did Ms. Turner ever tell

20   you they weren't supposed to go to Chief Newsham,

21   only to her?

22       A    No.

Page 62

1      Q    And though you didn't necessarily

2  understand why you were highlighting the requests,

3  we just looked at an e-mail where we see that

4  Chief Newsham made that request to Ms. Turner; is

5  that correct?

6      A    Yeah.

7           MR. SOBIECKI:  Object to form.

8           THE WITNESS:  Yes.

9  BY MS. DURHAM:

10     Q    And if we look at the attachments behind

11  the first blue sheet -- and I apologize that it's

12  not in color, but I think we can tell the

13  highlighting -- on this one you flagged requests

14  from Kara Brandefsky from the ACLU, Elaine Stamp

15  who's from the ACLU, if you look later her request

16  is there, and then Stacy Cowley or -- yeah, Cowley

17  from the New York Times.

18          Do you see that?

19     A    Yes.

20     Q    Did you regularly request -- flag

21  requests from the ACLU?

22     A    Yes.

Page 63

1      Q     And why was that?

2      A     I believe it's because of -- I think the

3   first time that they were flagged there was a

4   request for stop and frisk -- they wanted all of

5   the 251s or incident reports that were stop and

6   frisk.

7      Q     And then why did you continue to

8   highlight the requests?

9      A     Because I was told to.

10     Q     And who told you to?

11     A     Ms. Turner.

12     Q     Did you ever highlight Ms. Phillips'

13  request either in a weekly e-mail or otherwise for

14  EOCOP?

15            MR. SOBIECKI:  Object to form.

16            THE WITNESS:  Yes.

17  BY MS. DURHAM:

18     Q     Did you highlight Ms. Phillips' request

19  in a weekly e-mail?

20     A     Yes.

21     Q     Did you ever highlight Ms. Phillips'

22  request in person or any other way for EOCOP?

Page 64

```
 1             MR. SOBIECKI:  Object to form.
 2             THE WITNESS:  No.
 3   BY MS. DURHAM:
 4       Q    I'm handing you what will be marked as
 5   Exhibit 347.
 6             (Deposition Exhibit Number 347 was
 7             marked for identification.)
 8   BY MS. DURHAM:
 9       Q    These are text messages between you and
10   Ms. Phillips.
11             Do you see that?
12       A    Yes.
13       Q    And on Bates ending in 665, Ms. Phillips
14   writes, "I just got a FOIA response in which MPD
15   claims that Newsham only ever received two e-mails
16   with my name in them, both forwards of news
17   stories about me."  And then she says, "Is there
18   any way that could be true, or are they
19   withholding e-mails you sent him related to FOIAs
20   I filed."
21             Do you see that?
22       A    Yes.
```

Page 65

```
 1      Q    And then if we look at Bates ending in
 2   667, you respond in part, "Sounds like strategic
 3   games being played again."
 4           Do you see that at the very top?
 5           MR. CARPENTER:  It's, yeah, first --
 6   first text, right.
 7           MS. DURHAM:  Yes?
 8           THE WITNESS:  Yes.
 9   BY MS. DURHAM:
10      Q    What did you mean by "strategic games
11   being played again"?
12      A    When there was a request that they, that
13   MPD didn't want to be released, they came up with
14   reasons not to release it.
15      Q    And when you say "they came up with
16   reasons not to release it," what kind of reasons
17   did MPD come up with?
18           MR. SOBIECKI:  Object to form.
19           THE WITNESS:  Privacy -- the privacy
20   privilege.  Mostly the privacy privilege.
21   BY MS. DURHAM:
22      Q    And are you aware of MPD ever delaying
```

Page 66

1    response to a FOIA request because they didn't

2    want to release the information to the public?

3              MR. SOBIECKI:  Object to form.

4              THE WITNESS:  Not for that reason.

5    BY MS. DURHAM:

6         Q    You say then -- actually I will withdraw

7    that.

8              If we look at 668 at the second text,

9    you write in part, "MPD overuses the privacy

10   exemption.  I have argued against it in numerous

11   requests but was overruled.  They use it as a

12   defense of releasing embarrassing documents and I

13   suspect what Mr. Pitman said in that e-mail was

14   embarrassing."

15             Do you see that?

16        A    Yes.

17        Q    When you say MPD overuses the privacy

18   exemption, is that what you were just referencing

19   when you said that strategic games are being

20   played?

21        A    Yes.

22             MR. SOBIECKI:  Object to form.

Page 67

1  BY MS. DURHAM:

2       Q    And when you say you argued against it

3  in numerous requests, who are you arguing with?

4       A    With Ms. Turner.

5       Q    And when you say you were overruled,

6  does that mean that EOCOP reviewed -- overruled

7  your argument that the privacy exemption did not

8  apply?

9            MR. SOBIECKI:  Objection.  Form.

10            THE WITNESS:  Yes.

11  BY MS. DURHAM:

12       Q    And then you write, "They use it as a

13  defense to releasing embarrassing documents."

14            Do you see that?

15       A    Yes.

16       Q    What do you mean by "they use it as a

17  defense to releasing embarrassing documents"?

18       A    Records that would make MPD look bad.

19            MS. DURHAM:  I'm going to take a break.

20  We've been going for about an hour.  Is that okay?

21            MR. CARPENTER:  Are you okay?

22            THE WITNESS:  I'm fine.

Page 68

1          MS. DURHAM:  Let's take a break.

2          MR. CARPENTER:  You want to take a

3     break?

4          MS. DURHAM:  Sure.

5          VIDEO TECHNICIAN:  Off the record at

6     10:38.  This ends Media Unit 1.

7          (Brief recess.)

8          VIDEO TECHNICIAN:  On the record at

9     10:55.  This begins Media Unit 2 in the deposition

10    of Ms. Vendette -- Vendette Parker.

11    BY MS. DURHAM:

12       Q    Welcome back, Inspector Parker.

13            After the -- after the FOIA Office

14    flagged a draft response for EOCOP review, what

15    happens next?

16       A    I take it upstairs and we sit and go

17    through what the request is and what the proposed

18    response is.  And then I get an answer on whether

19    it's okay to release or to make changes or request

20    additional documents.

21       Q    And when you say "take it upstairs," do

22    you mean that you would physically go upstairs to

Page 69

1    Ms. Turner's office?

2         A    Yes.

3         Q    And I want to direct you back to

4    Exhibit 111.  I'm looking at paragraph 14.  Is

5    paragraph 14 true and accurate?

6         A    Yes.

7              MR. SOBIECKI:  Object to form.

8    BY MS. DURHAM:

9         Q    And are the weekly meetings -- I'll

10   withdraw that.  Were the weekly meetings you

11   describe in paragraph 14 only focused on the

12   backlog?

13             MR. SOBIECKI:  Object to form.

14             THE WITNESS:  No, they were -- the

15   weekly meetings were focused on what the -- the

16   proposed releases of FOIA requests were.  So we

17   went over what I felt was ready to be released.

18   BY MS. DURHAM:

19        Q    And did you discuss every FOIA request

20   that the FOIA Office was responding to or just

21   certain ones?

22        A    Just the ones that I thought were ready

Page 70

1    for release.

2         Q    If Ms. Turner testified that her primary

3    focus and involvement with the FOIA Office was on

4    clearing the backlog; is that true?

5              MR. SOBIECKI:  Object to form.

6              THE WITNESS:  It's partly true.

7    BY MS. DURHAM:

8         Q    And why do you say it's partly true?

9         A    Because she was also focused on what was

10   being released and making sure that it was

11   accurate or making sure that she was prepared or

12   the Agency was prepared if anything released was

13   used negatively against the Agency.

14        Q    And so part of Ms. Turner's focus was

15   what documents were being released to certain

16   requesters that could be used to be critical of

17   MPD; is that correct?

18             MR. SOBIECKI:  Object to form.

19             THE WITNESS:  Yes.

20   BY MS. DURHAM:

21        Q    If she testified that she only

22   periodically discussed requests that you flagged

Page 71

1    for her, is that true?

2             MR. SOBIECKI:  Object to form.

3             THE WITNESS:  We discussed all of the

4    requests that I flagged for her.

5    BY MS. DURHAM:

6        Q    And if she testified that the Tuesday

7    meetings were really only about the backlog, would

8    that be true?

9             MR. SOBIECKI:  Object to form.

10            THE WITNESS:  No.

11   BY MS. DURHAM:

12       Q    During your weekly meetings with

13   Ms. Turner, did you discuss -- sorry, I'll

14   withdraw that.

15            In paragraph 14 you write that during

16   the meetings, the Tuesday meetings with

17   Ms. Turner, you discussed the highlighted FOIA

18   requests.  That's correct, right?

19            MR. SOBIECKI:  Object to form.

20            THE WITNESS:  Yes.

21   BY MS. DURHAM:

22       Q    Did anyone else attend your weekly

Page 72

1    meetings with Ms. Turner?

2        A    In the beginning Ms. Lyons was there,

3    but after she was transferred, then it was just

4    Ms. Turner and myself unless she invited someone

5    else for a specific request.

6        Q    And did you discuss the highlighted FOIA

7    requests or the flagged FOIA requests in any other

8    meetings?

9            MR. SOBIECKI:  Object to form.

10            THE WITNESS:  Yes.

11    BY MS. DURHAM:

12        Q    What meetings were those?

13        A    There was a Monday staff meeting of all

14    of her direct reports and -- and there were times

15    during that meeting we would discuss FOIA

16    requests.  And depending on what the request was,

17    she would set up meetings with the units that were

18    responsible for the documents or the repository

19    for those documents.  She would have them come to

20    her office and we would discuss those FOIA

21    requests.

22        Q    And for the Monday staff meetings, are

Page 73

1    those the Lunch Bunch meetings?

2              MR. SOBIECKI:  Object to form.

3         A    Yes.

4    BY MS. DURHAM:

5         Q    At your Tuesday weekly meetings with

6    Ms. Turner, did she give you instructions on how

7    she wanted you to handle responses to certain FOIA

8    requests?

9              MR. SOBIECKI:  Object to form.

10             THE WITNESS:  Yes.

11   BY MS. DURHAM:

12        Q    I'll direct you to paragraph 15 of your

13   declaration on Exhibit 111.  You write -- sorry.

14             Is paragraph 15 true and accurate?

15             MR. SOBIECKI:  Object to form.

16             THE WITNESS:  Yes.

17   BY MS. DURHAM:

18        Q    You write that once highlighted FOIA

19   requests were processed, you had to present the

20   draft responses to Ms. Turner at your Tuesday

21   meetings; is that correct?

22        A    Yes.

Page 74

1      Q    And was that for the purpose of her

2   providing you with instructions on how to respond

3   or deal with the FOIA requests?

4           MR. SOBIECKI:  Object to form.

5           THE WITNESS:  It was to get her

6   authorization for release.

7   BY MS. DURHAM:

8      Q    Because -- and is that because for

9   certain requests you had to get her authorization

10  before the FOIA Office could release the

11  information to the requester?

12     A    Yes.

13          MR. SOBIECKI:  Objection.  Leading.

14          THE WITNESS:  Yes.

15  BY MS. DURHAM:

16     Q    I'm handing you what has been marked as

17  Exhibit 102.

18          VIDEO TECHNICIAN:  Counsel, I think you

19  just pulled your microphone out of your clip.

20          MS. DURHAM:  Sorry about that.

21  BY MS. DURHAM:

22     Q    This is a December 6th, 2017 e-mail

Page 75

1    thread between you and Ms. Turner.

2            Do you see that?

3        A    Yes.

4        Q    And if you look at the very first e-mail

5    which is at the bottom of Bates 936, the subject

6    line there is "Post report - did you release

7    info?"

8            Do you see that?

9        A    Yes.

10        Q    And is the "Post report" a reference to

11    The Washington Post?

12        A    Yes.

13        Q    Were Post journalists on the list of

14    individuals that you would elevate for EOCOP

15    review?

16        A    The Washington Post is a media outlet,

17    so anything coming from The Washington Post would

18    have been elevated for review.

19        Q    And if you could keep 102 out, I'm going

20    to -- do you see where you respond, "Good Morning.

21    Yes, ma'am"?

22        A    Yes.

Page 76

1       Q    So you tell Ms. Turner that you released

2  the information?

3       A    Yes.

4       Q    And Ms. Turner writes, "I thought you

5  were going to talk to OGC and circle back."

6            Do you see that?

7       A    Yes.

8       Q    Is OGC here a reference to the Office of

9  the General Counsel?

10      A    Yes.

11      Q    And you replied, "This is the one that

12  Chief Anzallo was speaking to the FBI about.  We

13  said to redact their concerns to be on the safe

14  side and then release.  The OGC one was dignitary

15  escorts."

16            Do you see that?

17      A    Yes.

18      Q    And just so that I'm clear, when you say

19  "to be on the safe side and then release," does

20  the release there refer to releasing information

21  to the requester in response to the FOIA request?

22      A    Yes.

Page 77

1      Q    And in your 10:30 -- I'm sorry, your

2  7:10 a.m. e-mail here, this is the one that Chief

3  Anzallo was speaking to the FBI about, "We said to

4  redact their concerns," et cetera, are you

5  detailing a conversation that you and Turner had

6  about how to respond to the FOIA request from The

7  Washington Post?

8            MR. SOBIECKI:  Object to form.

9            THE WITNESS:  Yes.

10  BY MS. DURHAM:

11      Q    And did Ms. Turner instruct you on how

12  she would like for you to deal with the request

13  that you're talking about here?

14      A    I don't remember this, but from the

15  writing, yes.

16      Q    And then Ms. Turner responds to you and

17  she says, "Did you talk to Anzallo first?  This is

18  one I would have liked to run by the Chief.  No

19  sense in damaging relationships with the FBI.  Did

20  we let them know?"

21            Do you see that?

22      A    Yes.

Page 78

1      Q     And when you received this e-mail or

2    reading it today, did you understand Ms. Turner to

3    be indicating that she would have liked to run the

4    proposed release by Chief Newsham prior to the

5    information being released?

6              MR. SOBIECKI:  Object to form.

7              THE WITNESS:  Yes.

8    BY MS. DURHAM:

9      Q     Did you understand that she would have

10   liked to get Chief Newsham's approval before the

11   information was released to The Washington Post?

12             MR. SOBIECKI:  Objection.  Leading.

13             THE WITNESS:  I don't think if she would

14   have wanted his approval or that she just wanted

15   to bring to his attention.

16   BY MS. DURHAM:

17     Q     And then Ms. Turner writes, "Let's

18   discuss this morning so we are" -- I think there's

19   supposed to be an "on" there -- "on the same page

20   about releases."

21             Do you see that?

22     A     Yes.

Page 79

1      Q     And releases here is a reference to

2    releasing information in response to a FOIA

3    request; is that correct?

4      A     Yes.

5      Q     Did you discuss releases with her that

6    morning?

7      A     I don't remember.

8      Q     Did you understand Ms. Turner to mean --

9    I'll withdraw that.

10           Did you understand getting on the same

11   page about releases to mean that the FOIA Office

12   was not allowed to release anything for certain

13   requests until there was EOCOP approval?

14           MR. SOBIECKI:  Objection.  Leading.

15           THE WITNESS:  I think -- I think what

16   she was giving me probably was more instruction on

17   how they should be handled, how -- how I should

18   handle certain releases before they're released.

19   BY MS. DURHAM:

20     Q     And what do you mean by she was giving

21   you more instruction on how you should handle

22   certain releases before they're released?

Page 80

1      A    To make sure that I was clear that I

2 understood how she wanted them to be -- I mean,

3 how she wanted the process to go before they were

4 released.

5      Q    And what is your understanding of how

6 Ms. Turner wanted the process to go before certain

7 information was released to certain requesters?

8      A    To run them past her.

9      Q    So when you review this e-mail, you

10 think this was a reiteration of instructions she

11 had given you previously?

12      A    Yes.

13           MR. SOBIECKI:  Object to form.

14           THE WITNESS:  Yes.

15 BY MS. DURHAM:

16      Q    If we go back to Exhibit 111, you write

17 in paragraph 15 that "The Chief and Ms. Turner

18 were averse to e-mails as they created material

19 susceptible to FOIA laws or discovery in

20 litigation."

21           Do you see that?

22      A    Yes.

Page 81

1      Q    What do you mean that Chief Newsham and

2  Ms. Turner were averse to materials susceptible to

3  FOIA laws or discovery in litigation?

4      A    She told me not to e-mail her, to bring

5  the stuff to her in person because they didn't

6  like -- neither she nor the Chief liked e-mails.

7      Q    Did she elaborate on why they didn't

8  like e-mails?

9      A    For the reasons here, because they could

10  be FOIAed later or because they could be used in

11  lawsuits.

12      Q    Was it your understanding that Chief

13  Newsham and Ms. Turner avoided communicating

14  certain issues over e-mail because they believed

15  that those e-mails would be archived and

16  potentially produced in the future either in

17  response to a FOIA request or discovery in

18  litigation?

19              MR. SOBIECKI:  Object to form.

20              THE WITNESS:  That's my understanding.

21  BY MS. DURHAM:

22      Q    I'm going to show you what has

Page 82

1    previously been marked as Exhibit 6.

2              I've handed you a text message thread

3    between Ms. Turner and Mr. Bromeland that's dated

4    March 5th, 2020, and I want to direct you to the

5    bottom page ended in Bates number 572.  And at

6    9:06 Mr. Bromeland writes, "Are we releasing the

7    eup foia today?  Late Friday.  I forgot it was

8    Thursday today.  Laugh out loud."

9              Do you see that?

10       A    Yes.

11       Q    And Ms. Turner writes, "Shit.  I don't

12   have it ready.  Let me ping Patricia."

13             Do you see that?

14       A    Yes.

15       Q    And then Mr. Bromeland responds, "She's

16   working on.  I'll have to call John tomorrow to

17   get some feedback."

18             Do you see that?

19       A    Yes.

20       Q    Ms. Turner says, "I didn't want to put

21   the release part in e-mail.  Might want to notify

22   Mark and Dustin offline."

Page 83

1          Do you see that?

2      A    Yes.

3      Q    Is Ms. Turner's statement about -- here

4  that she did not want to put details related to a

5  FOIA request consistent with your experience that

6  Ms. Turner avoided putting certain things in

7  e-mail?

8          MR. SOBIECKI:  Object to form.

9          THE WITNESS:  Yes.

10 BY MS. DURHAM:

11     Q    And when discussing -- sorry, I'll

12 withdraw that.

13          In your experience, what kind of things

14 did Ms. Turner avoid putting in e-mail?

15          MR. SOBIECKI:  Object to form.

16          THE WITNESS:  Our discussions about --

17 so I mainly dealt with her with FOIA-related items

18 and it was our deliberations about FOIA.  She

19 didn't want those in e-mail.

20 BY MS. DURHAM:

21     Q    And how often did you and Ms. Turner

22 deliberate about FOIA-related issues?

Page 84

1        A    Often.

2        Q    And all of those conversations --

3   I'll -- I'll withdraw that.

4             Typically those conversations, like you

5   said, happened in person, correct?

6        A    In --

7             MR. SOBIECKI:  Object to form.

8             THE WITNESS:  In person or over the

9   phone.

10  BY MS. DURHAM:

11       Q    And then Ms. Turner writes, "Might want

12  to notify Mark and Dustin offline."

13            Do you see that?

14       A    Yes.

15       Q    Given your experience with Ms. Turner,

16  do you understand Ms. Turner to be telling

17  Mr. Bromeland to communicate with Mark and Dustin

18  off of e-mail or a place that could be susceptible

19  to disclosure in response to a FOIA request or

20  discovery in litigation?

21            MR. SOBIECKI:  Object to form, leading.

22            THE WITNESS:  I think she means -- well,

Page 85

1    yes, but I think she's telling him to talk to them

2    verbally.

3    BY MS. DURHAM:

4         Q      Verbally.

5                And did you receive similar instructions

6    from Ms. Turner about discussing things offline?

7                MR. SOBIECKI:   Object to form.

8                THE WITNESS:   Not specifically.   She

9    just told me to bring the -- bring the proposed

10   requests up to her and call her, you know, if we

11   needed to talk about anything, just not to put it

12   in e-mail.

13               (Deposition Exhibit Number 348 was

14               marked for identification.)

15   BY MS. DURHAM:

16        Q      I'm handing you what has been marked as

17   Exhibit 348.

18               This is a December 17th, 2019 and

19   December 18th, 2019 e-mail thread between Stefanie

20   Herbach and you.

21               Do you see that?

22        A      Yes.

Page 86

1      Q    And Ms. Herbach writes, "Hi Inspector

2   Parker, I have a couple FOIAs that Leeann

3   approved," and then she provides you with a list

4   of FOIA numbers.

5           Do you see that?

6           MR. CARPENTER:  Halfway down.

7   BY MS. DURHAM:

8      Q    Sorry.  At the very bottom on 121.

9      A    I don't see that.  Oh, I do see that.

10     Q    Okay.

11     A    I'm sorry, I do.

12     Q    She says, "Leeann said they're all good

13  to go out."

14          Do you see that?

15     A    Yes.

16     Q    And is that you getting approval from

17  EOCOP for release of the information to the FOIA

18  requesters?

19     A    Yes.

20     Q    And then she says, "I have the originals

21  on my desk.  Let me know if you want me to bring

22  them down."

Page 87

1          Do you see that?

2     A    Yes.

3     Q    And is Ms. Herbach referencing the fact

4  that you provided Ms. Turner hard copies instead

5  of providing her with electronic copies?

6          MR. SOBIECKI:  Object to form.

7          THE WITNESS:  Yes.

8  BY MS. DURHAM:

9     Q    At the time that you were at the FOIA

10 Office, did the FOIA Office maintain everything

11 electronically?

12    A    Yes.

13    Q    But for Ms. Turner and her review, you

14 printed things out; is that correct?

15    A    Yes.

16    Q    I want to talk briefly about one of the

17 requests that Ms. Turner approved responses for.

18 And you'll see on Exhibit 348 the FOIA number

19 2019-FOIA-0- -- it's the one you have in front of

20 you.  I'm sorry, did I say the wrong exhibit

21 number?

22        A    Ah.

Page 88

1        Q    348, yeah.  2009 (sic) FOIA-01564.

2             Do you see that?

3        A    Yes.

4             (Deposition Exhibit Number 349 was

5             marked for identification.)

6   BY MS. DURHAM:

7        Q    I'm handing you what has been marked as

8   Exhibit 349.

9             So I'll represent to you that this is a

10  spreadsheet excerpt that the District produced to

11  Ms. Phillips in response to one of our discovery

12  requests.  The -- the information here has been

13  extracted from FOIA Express.

14             Do you know what FOIA Express is?

15       A    Yes.

16       Q    And was FOIA Express used to track

17  information about the processing of a FOIA

18  request?

19       A    Yes.

20             MR. SOBIECKI:  Object to form.

21  BY MS. DURHAM:

22       Q    And this particular -- and do you see on

1    the first page the Request ID number is

2    2019-FOIA-01564?

3         A    Yes.

4         Q    And that's the same FOIA number that we

5    looked at on Exhibit 48; is that correct?

6         A    Yes.

7         Q    And if we look at the note on page six

8    in the Comments section -- are you there?

9         A    Yes.

10        Q    There's a note here that says on

11   July 31st, 2019, the FOIA Office was awaiting an

12   update from EOCOP on how we are going to proceed.

13             Do you see that?

14        A    Yes.

15        Q    What does that mean?

16             MR. SOBIECKI:  Object to form.

17             THE WITNESS:  I can only -- this is a

18   guess, that this request was with Ms. Turner

19   waiting on her to approve it for release or if

20   it -- we needed to do anything additional with it.

21   BY MS. DURHAM:

22        Q    And at the top of the box it says on

Page 90

1    January 22nd, 2019, "Fee waiver

2    requested...awaiting Inspector Parker's decision."

3             Do you see that?

4        A    Yes.

5        Q    And then on January 31, 2019, it says,

6    "No fee waivers being granted at this time."

7             Do you see that?

8        A    Yes.

9        Q    Why were fee waivers not being granted

10   in January -- on January 31st of 2019?

11       A    So there are specific provisions in the

12   FOIA statute of when we can waive fees and -- I

13   don't know what this request is, I can only assume

14   that it didn't fall within those provisions.

15       Q    Do you see how it says, "No fee waivers

16   being granted at this time"?

17       A    Yes.

18       Q    Was that a general policy or is that

19   specific to this request?

20             MR. SOBIECKI:  Object to form.

21             THE WITNESS:  That was the policy --

22   that's -- so I don't have enough context for this

Page 91

1    answer, but fee waivers, that was for the whole

2    office.  It was for everyone.

3    BY MS. DURHAM:

4        Q    And why weren't fee waivers being

5    granted in 2019?

6              MR. SOBIECKI:  Object to form.

7              THE WITNESS:  So they were being

8    granted.  It just depended on whether the request

9    fell in -- within the provisions of the FOIA

10   statute.  I'm guessing that this one didn't.

11   BY MS. DURHAM:

12       Q    Did you ever have any conversations with

13   anyone in EOCOP about fee waiver requests?

14       A    No.

15       Q    Going back to Exhibit 111, looking at

16   paragraph 16, is paragraph 16 true and accurate?

17             MR. SOBIECKI:  Object to form.

18             THE WITNESS:  Yes.

19   BY MS. DURHAM:

20       Q    Is paragraph 17 true and accurate?

21             MR. SOBIECKI:  Object to form.

22             THE WITNESS:  Yes.

Page 92

1   BY MS. DURHAM:

2       Q    You write that you know what Ms. Turner

3   told you with respect to discussing proposed

4   releasable records of Chief Newsham.

5            Do you see that?

6            MR. SOBIECKI:  Object to form.

7            THE WITNESS:  Yes.

8   BY MS. DURHAM:

9       Q    What did Ms. Turner tell you about

10  proposing responses to Chief Newsham?

11      A    There were some requests that she said

12  she wanted to let the Chief see before she made a

13  determination or before she gave me a

14  determination.

15      Q    Were you ever part of any of those

16  conversations between Ms. Turner and Chief

17  Newsham?

18      A    No.

19      Q    I would like to go back to paragraph

20  three.  Is paragraph three true and accurate?

21           MR. SOBIECKI:  Object to form.

22           THE WITNESS:  Yes.

Page 93

1  BY MS. DURHAM:

2      Q    And I'm handing you what has been

3  previously marked as Exhibit 55.

4           MS. DURHAM:  I have to stand, John, my

5  arms are short.

6  BY MS. DURHAM:

7      Q    Exhibit 55 is a FOIA request from

8  Ms. Phillips and she requests "unredacted copies

9  of any and all documents, recordings, or other

10  materials related to the Adverse Action Hearing

11  for MPD Officer Sean Lojocano."

12           Do you see that?

13     A    Yes.

14     Q    And is that the request that you are

15  describing in paragraph three?

16     A    Yes.

17     Q    And then if you could turn to paragraph

18  18.

19           MR. CARPENTER:  Eighteen of 111?

20           MS. DURHAM:  Yes, of Exhibit 111.  I'm

21  sorry about that.

22  BY MS. DURHAM:

Page 94

1      Q     Is paragraph 18 true and accurate?

2            MR. SOBIECKI:  Object to form.

3            THE WITNESS:  Yes.

4  BY MS. DURHAM:

5      Q     And you state that Ms. Phillips met two

6  criteria that required her requests to be elevated

7  for EOCOP review, correct?

8      A     Yes.

9      Q     You say first, she was one of the

10 specific individuals and, second, she was

11 requesting records pertaining to Lojocano, an

12 officer involved in a high-profile incident.

13           Do you see that?

14     A     Yes.

15     Q     And are the criteria that you're

16 describing in paragraph 18 the same criteria that

17 we discussed earlier where EOCOP required certain

18 requests to be elevated for their review?

19     A     Yes.

20     Q     And I think you already said this, but

21 just in case it's not clear, you did not develop

22 the criteria on your own; is that correct?

Page 95

1          MR. SOBIECKI:  Object to form.

2          THE WITNESS:  That's correct.

3    BY MS. DURHAM:

4       Q    And if Ms. Turner testified that you

5    decided on your own which requests to elevate

6    without any guidance from her, is that incorrect?

7          MR. SOBIECKI:  Object to form.

8          THE WITNESS:  That's partly incorrect.

9    BY MS. DURHAM:

10      Q    When you say "it's partly incorrect,"

11   why do you say that?

12      A    Because I used my discretion on which

13   requests to bring to her attention, but it was

14   based on the criteria she provided.

15      Q    So she provided you with the criteria

16   and then you followed her instructions; is that

17   correct?

18         MR. SOBIECKI:  Object to form.

19         THE WITNESS:  Yes.

20   BY MS. DURHAM:

21      Q    Is paragraph 19 true and accurate?

22         MR. SOBIECKI:  Object to form.

Page 96

```
 1            THE WITNESS:  Yes.
 2    BY MS. DURHAM:
 3        Q    And you note in paragraph 19 that the
 4    Public Defender's Office came to the attention of
 5    Chief Newsham and Ms. Turner due to requests that
 6    they had submitted.
 7            Do you see that?
 8        A    Yes.
 9        Q    And is that correct?
10        A    Yes.
11        Q    And if I call the Public Defender's
12    Service PDS, will you know that I'm talking about
13    the Public Defender's Service?
14        A    Yes.
15        Q    I'm handing you what has previously been
16    marked as Exhibit 131 -- I'm sorry, 132.  I'm
17    handing you what has been previously marked as
18    Exhibit 132.
19            And this is a Request Details Report
20    regarding a request from Emily Barth from PDS and
21    Ms. Barth requests -- if we look at the Bates
22    ending in 678 -- I'm sorry, 679, we see that
```

Page 97

1    Ms. Barth is requesting the complete MPD First

2    District Roster for all First District employees.

3              Do you see that?

4         A    Yes.

5         Q    And you may not recall this, so -- but

6    do you recall that Ms. Barth filed these kinds of

7    requests for all of the districts, not just the

8    First District?

9         A    Yes, she did.

10        Q    And is this the request that you are

11   talking about in paragraph 19 when you wrote "The

12   PDS had previously requested all of the names and

13   badge numbers for every officer assigned to each

14   patrol district"?

15        A    Yes.

16        Q    And if we look at the created date, this

17   shows that this request was submitted in July of

18   2017.

19             Do you see that?

20        A    Yes.

21        Q    And then at the top under the "MPD

22   Additional Fields," it says COP Review

Page 98

1   August 24th, 2018.

2           Do you see that?  I'm sorry, on Bates

3   ending in 679 at the top under "MPD Additional

4   Fields."

5       A   Oh, yes.

6       Q   Does that note there mean that the

7   proposed response was sent to the Chief of Police

8   for review prior to release on August 24th, 2018?

9           MR. SOBIECKI:  Object to form.

10          THE WITNESS:  It was sent to Ms. Turner,

11  not to the Chief of Police.

12  BY MS. DURHAM:

13      Q   And do you know one way or another

14  whether or not Ms. Turner and Chief Newsham ever

15  discussed this request?

16          MR. SOBIECKI:  Object to form.

17          THE WITNESS:  No, I don't.

18  BY MS. DURHAM:

19      Q   And if we look at the Bates ending 680

20  and we look at the -- under "Action History," we

21  look at the fifth row, it says, "Saved received

22  correspondence letter of type Request with subject

1    'Final Response'" on March 28th, 2019.

2          Does that indicate that that is when the

3    FOIA Office responded to Ms. Barth's request?

4        A    Yes.

5        Q    And so from August of 2018 to March of

6    2019, when the FOIA Office finally responded, was

7    a draft response with EOCOP?

8          MR. SOBIECKI:  Object to form.

9          THE WITNESS:  This one went back and

10   forth a few times.  The -- I don't think the first

11   draft was approved and changes had to be made.

12   BY MS. DURHAM:

13       Q    Do you recall what kind of changes had

14   to be made?

15       A    So I believe the first draft had the

16   officers' names.  I think we sent out for their

17   badge numbers -- we sent out for some of the

18   information that was asked for and then sent it

19   upstairs.

20          We -- I think the -- what took a while

21   for this request was they were asking for each

22   employee who had a body worn camera.  That took

Page 100

1    quite some time to get.

2            And we had a -- like an Excel

3    spreadsheet that had the fields, the officer and

4    each individual's badge.  I don't think we gave

5    out CAD numbers.  Definitely didn't give out cell

6    phone numbers or assignments.  We gave -- we had

7    it listed just all of these officers for the

8    district.  And it went back and forth for -- a

9    couple of times.  I think we ended up referring

10   the person to -- the requester to the MPD -- not

11   MPD, the District of Columbia employee -- on the

12   main -- on the website of the -- of the -- the

13   D.C. Government's website there's a -- a link to

14   all employees for the D.C. Government.  I think we

15   ended up just giving out that link.

16      Q    Okay.  Can I show you -- I'm handing you

17   what has been marked as Exhibit 350.

18            (Deposition Exhibit Number 350 was

19            marked for identification.)

20   BY MS. DURHAM:

21      Q    And this is a FOIA request for gun

22   recovery data on Bates ending 920.

Page 101

1              Do you see that?

2         A    Yes.

3         Q    And I think earlier you testified that

4    Amy Phillips had made a request for gun recovery

5    data.

6              Were you misremembering that it was

7    Emily Barth?

8              MR. SOBIECKI:  Objection to form,

9    leading.

10              THE WITNESS:  I may have been.  I -- I

11    may have been.

12    BY MS. DURHAM:

13         Q    And today you're testifying -- you know,

14    this is in 2018, so you're testifying from your

15    memory in 2023; is that correct?

16         A    Yes.

17              MR. SOBIECKI:  Object to form.

18              THE WITNESS:  Yes.

19    BY MS. DURHAM:

20         Q    And this request was submitted on

21    June 14th, 2018.

22              Do you see that?

Page 102

1        A    Yes.

2        Q    And if we go back to Exhibit 11 -- 111

3   and we look at paragraph 19, the PDS request that

4   you describe here occurred before Ms. Phillips'

5   Lojocano request, which is Exhibit 55; is that

6   correct?

7        A    Yes.

8        Q    And in paragraph 19 you reference

9   Ms. Phillips' request for copies of the

10   transcripts for every adverse action hearing that

11   occurred during a certain period of time.

12             Do you see that?

13        A    Yes.

14        Q    Was this request elevated -- was the

15   request that you described in paragraph 19

16   elevated for EOCOP review?

17             MR. SOBIECKI:   Object to form.

18             THE WITNESS:   Yes.

19   BY MS. DURHAM:

20        Q    Were you given any instructions on how

21   to process or -- actually I'll withdraw that

22   question.

Page 103

1           Did you regularly flag or highlight

2   Public Defender's -- sorry, I'll withdraw that.

3           Did you regularly flag or highlight

4   requests from PDS for EOCOP review?

5           MR. SOBIECKI:  Object to form.

6           THE WITNESS:  It depended on what was

7   being asked.  We had public defenders that would

8   ask for arrest packages.  We didn't flag those.

9   BY MS. DURHAM:

10      Q    But if you got a request from PDS that

11  was for information that could be used to be

12  critical towards MPD, would you flag those

13  requests for EOCOP review?

14          MR. SOBIECKI:  Object to form.

15          THE WITNESS:  Yes.

16  BY MS. DURHAM:

17      Q    I'm handing you what has been marked as

18  Exhibit 139.

19          MR. CARPENTER:  Are we done with 350?

20          MS. DURHAM:  Yes.

21  BY MS. DURHAM:

22      Q    This is a March 28th, 2019 e-mail that

1    you sent to Ms. Turner with the subject line

2    "Transcripts."

3            Do you see that?

4        A    Yes.

5        Q    And I have not included every single --

6    all the transcripts that you sent, just the first

7    page of every one.  I'm trying to not kill trees.

8    But do the attachments appear to be adverse action

9    hearing transcripts?

10       A    Yes.

11       Q    And you write, "Good Afternoon," and

12   then you see that the rest is redacted.

13           Do you see that?

14       A    Yes.

15       Q    When you sent this e-mail to Ms. Turner

16   and I guess Mr. Viehmeyer is on there too, were

17   you asking for legal advice?

18           MR. SOBIECKI:  Well, I'm going to object

19   and instruct the witness that giving -- that the

20   privilege is the District's to not go into any

21   communications between yourself and the attorneys,

22   but if you can do that without --

1          MR. CARPENTER:  You're -- you're

2   instructing my witness?

3          MR. SOBIECKI:  Well, I'm not

4   instructing.  I'm advising that she should not

5   reveal privileged information because it is our

6   privilege even though she's a former employee.

7          MR. CARPENTER:  Okay.

8          MS. DURHAM:  I'll -- I'll reask my

9   question.

10  BY MS. DURHAM:

11      Q    Were you asking Ms. Turner for legal

12  advice?

13      A    I don't remember this.

14      Q    Do you recall providing transcripts to

15  Ms. Turner in response to Ms. Phillips' request?

16      A    Yes.

17      Q    And one other question about

18  Exhibit 139, do you see the attachments here?

19  There are a number of them that you sent, correct?

20      A    Yes.

21      Q    And you sent more than four, correct?

22      A    Yes.

1       Q     I'm handing you what has been marked as

2    Exhibit 140.  This is a December 21st, 2019 e-mail

3    from you to Ms. Phillips.

4             Do you see that?

5       A     Yes.

6       Q     And this is in response to her 2019 FOIA

7    request 00893.

8             Do you see that?

9       A     Yes.

10      Q     And though you provided Ms. Turner with

11   a number of transcripts in March of 2019, which we

12   just looked at on Exhibit 139, if you look at the

13   attachments, you only sent four transcripts to

14   Ms. Phillips; is that correct?

15      A     Yes.

16      Q     Was that at the instruction of EOCOP?

17            MR. SOBIECKI:  Object to form.

18            THE WITNESS:  No.  It was -- she was

19   getting rolling releases, meaning that her -- this

20   request was probably a backlogged request.  We

21   couldn't get it all out to her at one time, so as

22   they were being processed, she would get periodic

1    releases.

2    BY MS. DURHAM:

3        Q    Do you know if any other release was

4    made after this request?

5        A    I can't remember.

6        Q    Do you know if Ms. Phillips ever

7    received any other transcripts than these four?

8        A    I can't remember.

9        Q    Given the number -- I'll withdraw that.

10       Given your experience as a FOIA Officer

11   and the fact that in March of 2019 you sent way

12   more than four transcripts to Leeann Turner, would

13   you have thought that more than these four

14   transcripts would be released in response to

15   Ms. Phillips' FOIA request?

16       MR. SOBIECKI:  Object to form.

17       THE WITNESS:  I -- I don't know.  I --

18   I can't really answer that.  I can't say --

19   because I can't remember what else -- how many

20   other requests were being processed.

21       I do know that we were short staffed

22   during that time, so -- and the person who

Page 108

```
 1   actually was processing these requests resigned,

 2   so they had to be reassigned.

 3   BY MS. DURHAM:

 4        Q    And did you make that reassignment?

 5        A    Yes.

 6        Q    If we look at Exhibit 139, your e-mail

 7   to Ms. Turner and Mr. Viehmeyer evidence the fact

 8   that MPD had more than four transcripts -- I'm

 9   sorry, I'll withdraw that.

10             Your e-mail to Ms. Turner and

11   Mr. Viehmeyer evidences the fact that MPD had more

12   than four adverse action hearing transcripts in

13   its possession, correct?

14             MR. SOBIECKI:  Object to form, leading.

15             THE WITNESS:  Yes.

16   BY MS. DURHAM:

17        Q    And MPD had those documents in its

18   possession in March of 2019 when you sent this

19   e-mail; is that correct?

20             MR. SOBIECKI:  Object to form.

21             THE WITNESS:  Yes.

22   BY MS. DURHAM:
```

Page 109

1        Q    I'm handing you what has been marked as

2    Exhibit 207.  And this is an August 5th, 2019

3    e-mail from Ms. Clairessa Atkinson to

4    Ms. Archie-Mills and the subject line is "Review

5    of Marked FOIA Denial Letters - 2019-FOIA-06574."

6              Do you see that?

7        A    Yes.

8        Q    And so we don't have to take a lot of

9    time, I'll represent that the FOIA number is for

10   Ms. Phillips' FOIA request for all letters of

11   denial of request for public records since the

12   relevant law making such denial letters was passed

13   which was in 1976.

14             Do you see where Ms. Atkinson writes in

15   bold, "This is an Amy Phillips case"?

16       A    Yes.

17       Q    Were members of the FOIA Office

18   generally familiar with Ms. Phillips?

19             MR. SOBIECKI:  Object to form.

20             THE WITNESS:  Yes, some of them.

21   BY MS. DURHAM:

22       Q    And here Ms. Phillips (sic) is flagging

Page 110

1   that this request is for Amy Phillips; is that

2   correct?

3              MR. SOBIECKI:   Object to form.

4   BY MS. DURHAM:

5       Q    Oh, I'm sorry, I'll correct my question

6   because I said Ms. Phillips twice.

7              Here Ms. Atkinson, who is a FOIA

8   specialist, was flagging that this request was for

9   Amy Phillips; is that correct?

10             MR. SOBIECKI:   Object to form.

11             THE WITNESS:   Yes.

12  BY MS. DURHAM:

13      Q    And if we look at the attachment past

14  the first blue sheet -- well, there's only one, so

15  past the blue sheet, we see a spreadsheet.

16             Do you see that?

17      A    Yes.

18      Q    And it has the request ID number, the

19  received date, the request description, and then

20  the final disposition.

21             Do you see that?

22      A    Yes.

Page 111

1      Q    Whose decision was it to provide

2    Ms. Phillips with only the spreadsheet instead of

3    the actual denial letters that she requested?

4      A    I don't remember.  I don't remember who

5    made that final decision.  I don't think -- this

6    was the result of a -- she was initially denied

7    this information.

8          I think she filed a -- a -- an appeal

9    with the Mayor's Office of Legal Counsel and we

10   were directed to release I think the spreadsheet.

11   I think the spreadsheet was given to her as a

12   result of the -- the -- the Mayor's Office of

13   Legal Counsel's determination, so I don't -- I

14   know this one didn't go to the Chief's office, but

15   I don't remember who made the decision to give her

16   a spreadsheet.

17     Q    If we go back to Exhibit 111, and we

18   look at paragraph 20, is paragraph 20 true and

19   accurate?

20          MR. SOBIECKI:  Object to form.

21          THE WITNESS:  Yes.

22   BY MS. DURHAM:

Page 112

1       Q    How did you notify Ms. Turner of

2   Ms. Phillips' request for Mr. Lojocano's adverse

3   action hearing transcripts?

4       A    By phone.

5       Q    When you informed -- I'll withdraw that.

6            When you notified Ms. Turner of

7   Ms. Phillips' request, did she ask you who Amy

8   Phillips was?

9       A    No.

10      Q    Would she have already -- given your

11  experience and your discussions with her at the

12  time that you notified her of Mr. Lojocano's

13  request, would she have been familiar with who Amy

14  Phillips was?

15           MR. SOBIECKI:  Objection.  Calls for

16  speculation.

17           THE WITNESS:  I can't remember.  I can't

18  remember.

19  BY MS. DURHAM:

20      Q    Were you excited or agitated when you

21  notified Mrs. Phillips of -- I'm sorry -- notified

22  Ms. Turner of Ms. Phillips' request?

Page 113

1          MR. SOBIECKI:  Object to form.

2          THE WITNESS:  Neither.

3   BY MS. DURHAM:

4       Q    What did you tell Ms. Turner when you

5   notified her of Ms. Phillips' request?

6       A    That there was a request for Officer

7   Lojocano's records -- adverse action records.

8       Q    And did Ms. Turner tell you to deny the

9   request?

10      A    Yes.

11      Q    Is paragraph 21 in Exhibit 11 -- I'm

12  sorry, Exhibit 111 true and accurate?

13         MR. SOBIECKI:  Object to form.

14         THE WITNESS:  It's true and accurate.

15  BY MS. DURHAM:

16      Q    I'm handing you what has been previously

17  marked as Exhibit 56.  This is a Request Details

18  Report for Ms. Phillips' Lojocano request.  And if

19  we go to Bates ending in 233 and we look at the

20  last row before we get to "Assigned," it says the

21  request was received by the FOIA Office on

22  March 15th, 2019 at 10:14 a.m.

Page 114

1           Do you see that?

2       A    Yes.

3       Q    And then if you go up a few rows to

4   "Final Disposition," it says the request was

5   closed at 11:33 a.m., in less than 90 minutes.

6           Do you see that?

7       A    Yes.

8       Q    And you denied Ms. Phillips' request

9   because Ms. Turner directed you to do so; is that

10  correct?

11          MR. SOBIECKI:   Objection.

12          THE WITNESS:   Yes, and because it was

13  the practice to not release personnel records.

14  BY MS. DURHAM:

15      Q    Who established that practice?

16      A    That was the practice employed prior to

17  me being assigned.

18      Q    If I could take you back to the request

19  which is Exhibit 55.

20          MR. CARPENTER:   Do you have 55?

21          She has 55.

22  BY MS. DURHAM:

Page 115

1      Q    Great.  And if we look at the first

2  page, Ms. Phillips requests "Any and all

3  documents, recordings, or other materials related

4  to the Adverse Action Hearing for MPD Officer Sean

5  Lojocano conducted by the MPD Disciplinary Review

6  Division on March 7th, 8th and 12th of 2019."

7           Do you see that?

8      A    Yes.

9      Q    And then if we -- so she was

10  requesting -- and then if we look at number one,

11  she asked for "Any and all tapes or transcripts of

12  the adverse action hearing."

13           Do you see that?

14      A    Yes.

15      Q    And she says, "My understanding from

16  attending the hearing in person is that the tapes

17  are already extant" -- "extant, and that the panel

18  chair ordered that the transcript of this hearing

19  would be available today, March 15th, 2019."

20           Do you see that?

21      A    Yes.

22      Q    She also asked for -- if we look at the

Page 116

1    next page and you look at E, she asked for body

2    worn camera documents.

3            Do you see that?

4        A    Yes.

5        Q    And so she was asking for -- for

6    transcripts and body worn camera footage, not

7    Officer Lojocano's personnel file; is that

8    correct?

9        A    Those were considered part of his

10   personnel records.

11       Q    And -- and adverse action transcript --

12   sorry, adverse action hearings are public,

13   correct?

14       A    Yes.

15       Q    And so anybody from the public, if they

16   can access the calendar and figure out which day

17   the hearings are, they can attend; is that

18   correct?

19            MR. SOBIECKI:   Object to form.

20            THE WITNESS:   Yes.

21   BY MS. DURHAM:

22       Q    And if you look at 223, the paragraph

1    begins "Please note."

2              Do you see that?

3        A    Yes.

4        Q    Inspector Parker writes, "Please note

5    that I was present in person" -- I'm sorry,

6    Inspector Parker does not write, Ms. Phillips

7    write, "Please note that I was present in person

8    and attended the entire hearing, along with

9    between four and twenty other public attendees at

10   various points of the hearing."

11             Do you see that?

12       A    Yes.

13       Q    And she says, "I listened in person to

14   every word of the testimony, and watched all of

15   the exhibits presented.  I am therefore already in

16   possession of all names, contact information, and

17   other information spoken out loud on the record."

18             Do you see that?

19       A    Yes.

20       Q    "MPD has, in response to past requests,

21   asserted that such information requires

22   redaction."

Page 118

1           Do you see that?

2      A    Yes.

3      Q    "I am making clear that this information

4  was already made available in public in my

5  presence, therefore, no justification for

6  redacting these records, as the information in

7  them is already public and known to me

8  personally."

9           Do you see that?

10     A    Yes.

11     Q    "If MPD disagrees and asserts a FOIA

12 exemption for any portion of the materials, I

13 request a Vaughn Index detailing the portions

14 redacted, and the specific FOIA exemption that MPD

15 asserts applies to this already public information

16 that I have personally already heard presented."

17          Do you see that?

18     A    Yes.

19     Q    Are you aware of Ms. Phillips ever being

20 provided a Vaughn Index?

21     A    No.

22     Q    Her request was denied outright; is that

Page 119

1   correct?

2       A    Yes.

3            MR. SOBIECKI:  Object to form.

4            THE WITNESS:  Yes.

5   BY MS. DURHAM:

6       Q    And Ms. Turner directed you to deny

7   Ms. Phillips' request in -- in total?

8            MR. SOBIECKI:  Object to form.

9            THE WITNESS:  Yes.

10  BY MS. DURHAM:

11      Q    I'm handing you what has been previously

12  marked as Exhibit 57.  And this is an e-mail

13  thread from Ms. Crumlin -- initially from

14  Ms. Crumlin -- I'll withdraw that.

15           This is an e-mail thread between

16  Ms. Phillips, Ms. Crumlin, Ms. Archie-Mills,

17  Ms. Leon, and you.

18           Do you see that?

19      A    Yes.

20      Q    And in the first e-mail Ms. Crumlin

21  provides -- or writes that Ms. Phillips' request

22  is denied in full.

Page 120

1          Do you see that?

2      A    Yes.

3      Q    And Ms. Phillips writes back and informs

4  the FOIA Office that she attended a three-day

5  hearing in person.

6          Do you see that?  On March 15th, 2019 at

7  12:39 p.m.?

8      A    Yes.

9      Q    And you respond at the top of Bates

10 ending in 529, "We will take a second look at your

11 request for reconsideration and provide you with a

12 response shortly."

13         Do you see that?

14     A    Yeah.

15     Q    When you wrote "we," who were you

16 talking about?

17     A    The Agency.

18     Q    Did you talk to Ms. Turner about

19 Ms. Phillips' request for reconsideration?

20     A    Yes.

21     Q    Did you talk about it in person or over

22 e-mail?

Page 121

1     A    I can't remember if it was in person or
2    on the phone, but it wasn't over e-mail.
3     Q    And -- and ultimately you had a call
4    with Ms. Phillips; is that correct?
5     A    Yes.
6     Q    Why did you call Ms. Phillips?
7     A    I don't -- I don't know.  I don't
8    remember why.
9     Q    But the request for reconsideration was
10   denied; is that correct?
11    A    Yes.
12    Q    I'm handing you what has been marked as
13   Exhibit 22.  So this is an e-mail forwarding
14   Ms. Phillips' response to the denial of her
15   request and the e-mail is between you and
16   Mr. Bromeland.
17         Do you see that?
18    A    Yes.
19    Q    Why did you forward this e-mail to
20   Mr. Bromeland?
21         MR. SOBIECKI:  And, again, I would just
22   caution the witness to not reveal any privileged

Page 122

1   communications with counsel in answering Ms.

2   Durham's questions.

3            THE WITNESS:  I don't remember.

4   BY MS. DURHAM:

5        Q    Mr. Bromeland was in the EOCOP; is that

6   correct?

7        A    Yes.

8        Q    And going back to Exhibit 111.

9            MR. CARPENTER:  That's your declaration?

10           THE WITNESS:  Uh-huh.

11  BY MS. DURHAM:

12       Q    Going to paragraph 22.  Is paragraph 22

13  true and accurate?

14           MR. SOBIECKI:  Object to form.

15           THE WITNESS:  Yes.

16  BY MS. DURHAM:

17       Q    Is paragraph 23 true and accurate?

18       A    Yes.

19       Q    Is paragraph 24 true and accurate?

20       A    Yes.

21       Q    Is paragraph 25 true and accurate?

22           MR. SOBIECKI:  Object to form.

Page 123

1              THE WITNESS:  Yes.

2     BY MS. DURHAM:

3          Q     And when Ms. Turner gave you

4     instructions, was that verbally either in person

5     or over the phone?

6          A     Yes.

7          Q     Is paragraph 26 true and accurate?

8              MR. SOBIECKI:  Object to form.

9              THE WITNESS:  Yes.

10    BY MS. DURHAM:

11         Q     Is paragraph 27 true and accurate?

12             MR. SOBIECKI:  Object to form.

13             THE WITNESS:  Yes.

14    BY MS. DURHAM:

15         Q     Is paragraph 28 true and accurate?

16             MR. SOBIECKI:  Object to form.

17             THE WITNESS:  Yes.

18    BY MS. DURHAM:

19         Q     Did Ms. Turner explain to you why she

20    did not agree with MOLC's opinion that the records

21    were a matter of public interest?

22         A     No.

1    Q    Is paragraph 29 true and accurate?

2         MR. SOBIECKI:  Object to form.

3         THE WITNESS:  Yes.

4  BY MS. DURHAM:

5    Q    How did Ms. Turner advise you that she

6  needed to speak to Chief Newsham?

7    A    Verbally.

8    Q    And Ms. Turner informed you verbally

9  that she was going to check with Chief Newsham to

10 determine how MPD should proceed given MOLC's

11 decision; is that correct?

12   A    Yes.

13   Q    Do you know what Chief Newsham decided?

14   A    I don't remember.

15   Q    In your experience at the FOIA Office,

16 was it unusual for EOCOP to decide that the FOIA

17 Office would not comply with a MOLC ruling?

18        MR. SOBIECKI:  Object to the form.

19        THE WITNESS:  This was the first time

20 that she had ever questioned the MOLC's ruling

21 since I had been assigned.

22 BY MS. DURHAM:

1      Q    If the FOIA Office had decided not to

2   follow a MOLC ruling, would that be because EOCOP

3   directed the FOIA Office not to do so?

4           MR. SOBIECKI:  Object to form.

5           THE WITNESS:  Yes.

6   BY MS. DURHAM:

7      Q    Is paragraph 30 true and accurate?

8           MR. SOBIECKI:  Object to form.

9           THE WITNESS:  Yes.

10  BY MS. DURHAM:

11     Q    Is paragraph 31 true and accurate?

12          MR. SOBIECKI:  Object to form.

13          THE WITNESS:  Yes.

14  BY MS. DURHAM:

15     Q    Is paragraph 32 true and accurate?

16          MR. SOBIECKI:  Object to form.

17          THE WITNESS:  Yes.

18  BY MS. DURHAM:

19     Q    How did you inform Ms. Turner that

20  Ms. Phillips had threatened litigation?

21     A    I think I called her.

22     Q    Is paragraph 33 true and accurate?

1          MR. SOBIECKI:  Object to form.

2          THE WITNESS:  Yes.

3   BY MS. DURHAM:

4      Q    In your experience, was it typical that

5   the FOIA Office would send fee invoices after the

6   FOIA Office had already done the work?

7          MR. SOBIECKI:  Object to form.

8          THE WITNESS:  Yes.

9   BY MS. DURHAM:

10     Q    So you do the work and then you send an

11  invoice?

12         MR. SOBIECKI:  Object to form.

13         THE WITNESS:  We send an estimate up

14  front to see if the requester is willing to pay.

15  They have the option to say I don't want to pay

16  and we won't process.  But once we finish

17  processing, we actually know the time that we

18  spent processing and we can do an invoice.

19  BY MS. DURHAM:

20     Q    Is paragraph 33 true and accurate?

21         MR. SOBIECKI:  Object to form.

22         THE WITNESS:  Yes.

```
 1  BY MS. DURHAM:

 2       Q    Is paragraph 34 true and accurate?

 3            MR. SOBIECKI:  Object to form.

 4            THE WITNESS:  Yes.

 5  BY MS. DURHAM:

 6       Q    Is paragraph 35 true and accurate?

 7            MR. SOBIECKI:  Object to form.

 8            THE WITNESS:  Yes.

 9  BY MS. DURHAM:

10       Q    And when you say shared drive, does that

11  mean a drive where members other than just you

12  have access?

13       A    Yes.

14       Q    And do you recall what the shared drive

15  was called?

16       A    I believe it was the G drive.

17       Q    Is paragraph 36 true and accurate?

18            MR. SOBIECKI:  Object to form.

19            THE WITNESS:  Yes.

20  BY MS. DURHAM:

21       Q    Is paragraph 37 true and accurate?

22            MR. SOBIECKI:  Object to form.
```

Page 128

```
 1              THE WITNESS:  Yes.
 2    BY MS. DURHAM:
 3         Q    Were you present for the call between
 4    Ms. Phillips and Ms. Turner?
 5         A    Ms. Phillips called me.  She didn't call
 6    Ms. Turner.
 7         Q    And somehow she was connected to
 8    Ms. Turner?
 9         A    No, I communicated her second threat to
10    Ms. Turner.
11         Q    Oh, got it.  Got it.
12              So when Ms. Phillips called you, you
13    then called Ms. Turner and let her know that
14    Ms. Phillips had threatened litigation again; is
15    that correct?
16         A    Yes.
17         Q    Is paragraph 38 true and accurate?
18              MR. SOBIECKI:  Object to form.
19              THE WITNESS:  Yes.
20    BY MS. DURHAM:
21         Q    Is paragraph 39 true and accurate?
22              MR. SOBIECKI:  Object to form.
```

1           THE WITNESS:  Yes.

2    BY MS. DURHAM:

3        Q    When you notified Ms. Turner of the

4    lawsuit, do you recall what she said?

5        A    She told me to have the Office of

6    General Counsel sign off on the records or make

7    sure that they were okay with my redactions.

8        Q    And was that conversation over the phone

9    or in person?  Do you recall?

10       A    It was over the phone.

11       Q    Is paragraph 40 true and accurate?

12           MR. SOBIECKI:  Object to form.

13           THE WITNESS:  Yes.

14   BY MS. DURHAM:

15       Q    Is paragraph 41 true and accurate?

16           MR. SOBIECKI:  Object to form.

17           THE WITNESS:  Yes.

18   BY MS. DURHAM:

19       Q    Is paragraph 42 true and accurate?

20           MR. SOBIECKI:  Object to form.

21           THE WITNESS:  Yes.

22   BY MS. DURHAM:

1      Q     Is paragraph 43 true and accurate?

2            MR. SOBIECKI:  Object to form.

3            THE WITNESS:  Yes.

4   BY MS. DURHAM:

5      Q     Is paragraph 44 true and accurate?

6            MR. SOBIECKI:  Object to form.

7            THE WITNESS:  Yes.

8   BY MS. DURHAM:

9      Q     Is paragraph 45 true and accurate?

10            MR. SOBIECKI:  Object to form.

11            THE WITNESS:  Yes.

12   BY MS. DURHAM:

13      Q     Is paragraph 46 true and accurate?

14            MR. SOBIECKI:  Object to form.

15            THE WITNESS:  Yes.

16   BY MS. DURHAM:

17      Q     How did Ms. Turner inform you that MPD's

18   position was that BWC footage was not responsive?

19      A     It was in -- I sent her the records --

20   well, I carried her the records and in our

21   follow-up meetings about whether they could be

22   released, she didn't authorize the body worn

Page 131

1    camera.

2        Q    Do you know why she didn't authorize the

3    body worn camera footage to be released?

4        A    I -- I can't remember.  I -- I do

5    remember her saying it's nonresponsive, but I

6    don't remember the reason why she felt it was

7    nonresponsive.

8        Q    Is body worn camera footage in your

9    experience a public record?

10            MR. SOBIECKI:  Object to form.

11            THE WITNESS:  Yes.

12   BY MS. DURHAM:

13       Q    And we looked at Ms. Phillips' request

14   earlier.  She asked specifically for body worn

15   camera footage; is that correct?

16       A    Yes.

17       Q    But the FOIA Office did not release the

18   body worn camera footage in response to

19   Ms. Phillips' request because EOPOC directed the

20   FOIA Office not to; is that correct?

21       A    Yes.

22            MR. SOBIECKI:  Objection.  Leading.

Page 132

1   BY MS. DURHAM:

2        Q     Is paragraph 47 true and accurate?

3              MR. SOBIECKI:  Object to form.

4              THE WITNESS:  Yes.

5   BY MS. DURHAM:

6        Q     Is paragraph 48 true and accurate?

7              MR. SOBIECKI:  Object to form.

8              THE WITNESS:  Yes.

9   BY MS. DURHAM:

10       Q     Is paragraph 49 true and accurate?

11             MR. SOBIECKI:  Object to form.

12             THE WITNESS:  Yes.

13  BY MS. DURHAM:

14       Q     And in paragraph 49 you say, "It is not

15  accurate that I approved nor made the final

16  decision (sic) to release all records.  In many

17  situations, the approval to release documents,

18  which ones, and when to release them were made by

19  Ms. Turner and Chief Newsham."

20             Do you see that?

21       A     Yes.

22       Q     And is Ms. Phillips' Lojocano request an

Page 133

```
 1   example of a request where the decision of what to
 2   release came from EOCOP prior to the FOIA Office
 3   being able to release anything?
 4              MR. SOBIECKI:  Object to form.
 5              THE WITNESS:  Yes.
 6   BY MS. DURHAM:
 7      Q    And when we review e-mails or documents
 8   and there's a reference to EOCOP review, that is a
 9   reference to review -- or, sorry, is that a
10   reference to review by someone who is employed
11   outside of the FOIA Office?
12              MR. SOBIECKI:  Object to form.
13              THE WITNESS:  Yes.
14   BY MS. DURHAM:
15      Q    Did you use the term "EOCOP review" to
16   refer to yourself?
17      A    No.
18      Q    So if anybody testified that you used
19   "EOCOP review" to refer to yourself, that would be
20   incorrect?
21              MR. SOBIECKI:  Object to form, leading.
22              THE WITNESS:  Yes, that's incorrect.
```

1   BY MS. DURHAM:

2        Q    And was all of the FOIA Office

3   instructed that certain requests should be

4   elevated for EOCOP reviews?

5             MR. SOBIECKI:  Object to form.

6             THE WITNESS:  They knew that some

7   requests would go upstairs for review, but they

8   didn't make the determinations, they all had to

9   submit their proposed request to a supervisor.

10  And in consultation with me, sometimes we would

11  decide what went upstairs.

12  BY MS. DURHAM:

13       Q    And when you made that decision about

14  what went upstairs, were you using the

15  instructions and guidance that you had received

16  from Leeann Turner to determine which should

17  actually -- and I'm using your words here -- "go

18  upstairs"?

19            MR. SOBIECKI:  Object to form.

20            THE WITNESS:  Yes.

21            MS. DURHAM:  Let's take a break.

22            VIDEO TECHNICIAN:  Off the record at

Page 135

1   12:08.   This ends Media Unit Number 2.

2              (Whereupon, at 12:08 p.m., a

3              luncheon recess was taken.)

4                    *    *    *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

                                                          Page 136

1           A F T E R N O O N   S E S S I O N

2                                   (12:56 p.m.)

3    Whereupon,

4                      VENDETTE PARKER

5    was called for continued examination, and having

6    been previously duly sworn, was examined and

7    testified further as follows:

8              VIDEO TECHNICIAN:  On the record at

9    12:56.  This begins Media Unit 3 in the deposition

10   of Vendette Parker.

11             RESUMED EXAMINATION BY COUNSEL FOR

12             PLAINTIFF

13   BY MS. DURHAM:

14       Q    Welcome back, Inspector Parker.

15             I want to look back again at

16   Exhibit 111.  Paragraph 50.

17             Is paragraph 50 true and accurate?

18             MR. SOBIECKI:  Object to form.

19             THE WITNESS:  Yes.

20   BY MS. DURHAM:

21       Q    Is paragraph 51 true and accurate?

22             MR. SOBIECKI:  Object to form.

1            THE WITNESS:  Yes.

2    BY MS. DURHAM:

3        Q    In subpart one of paragraph 51, you

4    state that there was a request seeking outside

5    employment records.

6            Do you see that?

7        A    Yes.

8        Q    And you write, when Ms. Turner saw the

9    records that the FOIA Office received, she was

10   unhappy with how they looked.

11           Do you see that?

12       A    Yes.

13           (Deposition Exhibit Number 351 was

14           marked for identification.)

15   BY MS. DURHAM:

16       Q    I'm handing you what has been previously

17   marked as Exhibit 3- -- or, I'm sorry, I'll

18   withdraw that.

19           I'm handing you what has been marked as

20   Exhibit 351.  This is another excerpt from the

21   FOIA Express output that the District provided to

22   Ms. Phillips.

1          Do you see the request ID number is

2    2019-FOIA-01046?

3        A    Yes.

4        Q    And do you see that the requester is

5    Eric Flack?

6        A    Yes.

7        Q    And the received date of the request is

8    November 16th, 2018.

9             Do you see that?

10       A    Yes.

11       Q    And then if we look at page 2 of 16, do

12   you see the request is for PD180B forms?

13            Do you see that?

14       A    Yes.

15       Q    And are PD180 forms forms regarding

16   officers' outside employment?

17       A    Yes.

18       Q    Is this the request that you are

19   referring to in subpart one of paragraph 51?

20       A    I think so.

21            (Deposition Exhibit Number 352 was

22            marked for identification.)

1    BY MS. DURHAM:

2         Q    Okay.  So I'm handing you what is a

3    large document.  I'm not going to ask you about

4    98 percent of the document and the exhibit number

5    is 352.  And this is a December 6th, 2018 e-mail

6    from Adminbox ORM to Latrina Crumlin copying you

7    and others.  And do you see in the subject line it

8    has the FOIA request number 2019-FOIA-01046?

9         A    Yes.

10        Q    And that is the same exhibit number that

11   we just looked at on Exhibit 351; is that correct?

12        A    Yes.

13        Q    And do you see where it says, "The FOIA

14   Request is for 2018 MPD Outside Employment Form

15   PD1-" -- I'm looking at the second paragraph, I'm

16   sorry -- "Form PD180B (Employer's Agreement to

17   Conditions of Employment)."

18             Do you see that?

19        A    Yes.

20        Q    And so these records are records that

21   were collected and provided to the FOIA Office to

22   respond to Mr. Flack's request; is that correct?

Page 140

1        A     Yes.

2        Q     And if we look at the attached records

3   starting after the certification on Bates ending

4   in 563 --

5        A     Okay.

6        Q     -- and you just flip through and look

7   at, for example, 565 and 573, the records are a

8   bit off center or distorted.

9              Do you see that?

10       A     Yes.

11       Q     Is this an example of -- or is this what

12  you were talking about in paragraph 51 when you

13  said Ms. Turner was unhappy with the aesthetic of

14  the record and refused to allow them to be

15  released?

16             MR. SOBIECKI:  Object to form.

17             THE WITNESS:  Yes, she -- she was, but

18  there was -- it was one -- like the example of, I

19  guess the page is 579, where it was smeared, and

20  then there's one where the record is kind of

21  sideways or at an angle.  She wanted me to go back

22  to the Office of Risk Management and recopy it

Page 141

 1   straight.  So when I went back to Risk Management,

 2   that was how it was sent to them.  It was

 3   apparently faxed or scanned to them and the record

 4   was sideways, so they couldn't provide me with

 5   anything different.  And so when I told her that,

 6   she wanted me to go back to the member and have

 7   the member recreate the document so that it could

 8   be straight.

 9   BY MS. DURHAM:

10        Q    And when we look at the documents that

11   are here in Exhibit --

12             MR. LINHORST:  352.

13   BY MS. DURHAM:

14        Q    -- 352 --

15             MS. DURHAM:  Thank you, Mike.

16   BY MS. DURHAM:

17        Q    -- the substance that's responsive to

18   Mr. Flack's request is here; is that correct?

19        A    Yes, it looks like it.

20        Q    Are you aware of any exemption to the

21   FOIA statute that exempts disclosure because EOCOP

22   does not like how the records look aesthetically?

 1              MR. SOBIECKI:  Object to form.

 2              THE WITNESS:  No.

 3   BY MS. DURHAM:

 4       Q    But you write in paragraph 51 that the

 5   records were not released to Mr. Flack because

 6   Ms. Turner decided they looked unprofessional; is

 7   that correct?

 8       A    Right.  She wanted me to go back to the

 9   member and have them recreate the document so that

10   it would look straight and clear.

11       Q    And the document being straight isn't a

12   basis to not provide a requester with information;

13   is that correct?

14              MR. SOBIECKI:  Object to form.

15              THE WITNESS:  That's correct.

16   BY MS. DURHAM:

17       Q    Do you know -- actually I want to ask

18   one more.

19              If we look at exhibit -- back at

20   Exhibit 351 --

21       A    Okay.

22       Q    -- and we go to page seven, do you see

Page 143

1   that the disposition date was October 6th, 2021?

2       A    Yes.

3       Q    And does the disposition date mean

4   that's the close date?

5       A    I believe so, yes.

6       Q    And if you look at page 6 of 16, do you

7   see the note that indicates that on October 5th,

8   2021 an Are You Still Interested Inquiry was

9   closed -- I mean was sent on October 5th, 2021?

10      A    Yes, I do.  I see it.

11      Q    And the Are You Still Interested Inquiry

12  was sent on October 5th, 2021 even though on

13  December 6th, 2018, the FOIA Office had received

14  documents as evidenced in Exhibit 352; is that

15  correct?

16      A    Yes.

17      Q    If we go back to Exhibit 111, and we

18  look at paragraph 52, is paragraph 52 -- I'll give

19  you a chance to review it -- is paragraph 52 true

20  and accurate?

21          MR. SOBIECKI:  Object to form.

22          THE WITNESS:  Yes.

1    BY MS. DURHAM:

2         Q    And if we look at paragraph 53, is

3    paragraph 53 true and accurate?

4              MR. SOBIECKI:  Object to form.

5              THE WITNESS:  Yes.

6    BY MS. DURHAM:

7         Q    When you were given the title

8    inspector -- or I'll withdraw that.

9              What was your title before you were

10   given the title inspector?  I'm not sure of all

11   the technicalities, so I'm not sure if I'm using

12   the proper terms, but do you understand what I'm

13   asking?

14        A    Yeah.

15        Q    Okay.  So what was your title before

16   becoming inspector is what I'm asking?

17        A    Commander.

18        Q    And was changing from commander to

19   inspector a demotion?

20        A    Yes.

21        Q    Why were you demoted to inspector?

22        A    It's -- there were two ANC commissioners

Page 145

in the Seventh District.  One had been the victim
of a burglary and the other was charged with
simple assault for assaulting his competitor.  He
was running for reelection and there was someone
running against him and he threw a brick at that
person and was charged.  Both of these incidents
were investigated by the Seventh District
Detective's Office and they both were unhappy
about how their cases were handled.

The ANC Commissioner who had been
burglarized was complaining that no detectives had
contacted her and the other one felt that he was
only charged because the girlfriend of his
competitor was the sergeant in the Seventh
District Detective's Office.  So they both felt
that their cases were somehow being directed by
the girlfriend and they wanted her removed from
the Seventh District Detective's Office.

So they called me and I told them that
they don't work for me, but I would speak with
their commander -- the commander that's in charge
of the detectives.  In turn, they wanted to speak

1   with the commander that was in charge of the

2   detectives.  And I relayed the message, but he

3   refused, he said he wasn't going to call them

4   because he wouldn't tell them anything differently

5   than what I had told them.

6           So they wanted to speak with the -- that

7   commander's supervisor, which was an assistant

8   chief.  I relayed the message to that person and

9   he also refused to call.

10          So I'm trying to mediate between the ANC

11  Commissioners and the two officials who wouldn't

12  call them.  And they told me that if they didn't

13  call, they were going to speak up about this at an

14  upcoming council hearing.

15          The Chief had a -- he was still interim

16  at the time and there was a state of the City

17  Council hearing that was coming up.  So both ANC

18  Commissioners told me if -- if these -- if the

19  commander of the detectives or the assistant chief

20  in charge didn't call them, they were going to

21  bring this out in the -- in the council hearing.

22          So I conveyed that threat to both that

Page 147

1    commander and that assistant chief as well as to

2    the chief's chief of staff and they all told me

3    not to worry about it, they're aware of this, it's

4    not a big deal.

5         So the two ANC Commissioners did testify

6    at the council hearing and they said exactly what

7    they said they were going to say and the Chief got

8    questioned about it.  And their issue was they

9    wanted the detectives to be moved under me, the

10   commander.  They testified that they trusted me

11   and knew that if the detectives were under me,

12   their complaints would get handled.

13        So when the Chief was questioned about

14   it, he -- I don't know -- I don't remember his

15   exact words, but it was something to the effect of

16   I was the highest ranking official at the Seventh

17   District and I just didn't understand my

18   authority.

19        So I sent him a text -- as soon as I

20   heard that I sent him a text saying that's not

21   what happened.  I couldn't do what they were

22   asking, which is to remove somebody from the

1   detective's office because the detectives didn't

2   fall under me, and the next day he stopped

3   speaking to me.  I tried to talk to him.  He

4   wouldn't speak to me.  He -- the whole dynamic

5   changed and shortly thereafter I was demoted.

6        Q    And you've referenced the Chief a number

7   of times in your answer, are you referencing Chief

8   Newsham?

9        A    Yes.

10       Q    Did he ever respond to your text

11  message?

12       A    No.

13       Q    When you told him that what he said was

14  inaccurate, did you feel you were being critical

15  of Chief Newsham?

16            MR. SOBIECKI:  Object to form.

17            THE WITNESS:  No, I -- I -- because I

18  don't know if the message ever got to him because

19  I never spoke with him directly, I spoke to his

20  chief of staff and to the other commander and the

21  assistant chief.

22            So I was trying to explain in a text

1    message that it wasn't that I didn't understand my

2    authority, that I couldn't do what the ANC

3    Commissioners wanted me to do because the

4    detectives don't work for me.  And then I said I

5    didn't drop the ball and I named the two people

6    that did, I said so and so and so and so did, and

7    I guess it didn't go well.

8    BY MS. DURHAM:

9         Q    And when you said the whole dynamic

10   changed, what do you mean?

11        A    I had a pretty decent relationship --

12   working relationship with the Chief prior to that

13   text message and he didn't speak to me afterwards.

14   He wouldn't speak or respond or talk to me

15   afterwards.

16        Q    How soon after you sent the text message

17   were you demoted?

18        A    I think two months.

19        Q    And if anyone had -- if there had been

20   testimony that the reason you were demoted is

21   because the officers that reported to you had lost

22   faith in your ability to lead them, would that be

1   true?

2          MR. SOBIECKI:  Object to form.

3          THE WITNESS:  No.  And I provided the

4   Chief with several letters from officers in

5   support of me, but his -- the reason he gave me

6   for the demotion was that officers didn't like the

7   way I was doing the schedule at 7D.  I -- the lost

8   faith, that wasn't the reason he gave me.

9   BY MS. DURHAM:

10     Q    And what do you mean by they didn't like

11  the way you were doing the schedule?

12     A    That's all that he said.  He didn't

13  elaborate.

14     Q    Prior to being demoted -- actually

15  I withdraw that.

16          Was there any disciplinary action with

17  respect to your demotion other than the demotion?

18     A    No.

19     Q    Was there any informal or formal

20  feedback that indicated that you had

21  underperformed in any way prior to the demotion?

22          MR. SOBIECKI:  Object to form.

Page 151

1          THE WITNESS:  No.  My performance

2    evaluation for that year was at the highest level

3    that you could receive.

4    BY MS. DURHAM:

5      Q    And was that exceptionally exceeds

6    expectations?

7      A    Yes.

8      Q    So I'm going to ask you this just

9    directly.  Did you make anything up with respect

10   to how MPD's FOIA Office or EOCOP operated because

11   you were upset with MPD, Chief Newsham or anyone

12   else?

13         MR. SOBIECKI:  Object to form.

14         THE WITNESS:  No.

15   BY MS. DURHAM:

16     Q    Did you lie in your sworn statement

17   because you were upset that Chief Newsham demoted

18   you?

19         MR. SOBIECKI:  Object to form.

20         THE WITNESS:  No.

21   BY MS. DURHAM:

22     Q    Did you lie in your sworn statement

Page 152

```
 1   because you wanted to pay back MPD for demoting

 2   you?

 3             MR. SOBIECKI:  Object to form.

 4             THE WITNESS:  No.

 5   BY MS. DURHAM:

 6       Q    Did you make up the list or the policy

 7   and practice because you wanted to get revenge on

 8   Chief Newsham?

 9             MR. SOBIECKI:  Object to form.

10             THE WITNESS:  No.

11   BY MS. DURHAM:

12       Q    Did you make up the watchlist policy and

13   practice because you wanted to get revenge on MPD?

14             MR. SOBIECKI:  Object to form.

15             THE WITNESS:  No.

16   BY MS. DURHAM:

17       Q    And is it -- is -- well, we'll go back

18   to Exhibit 111.

19             Is paragraph 54 true and accurate?

20             MR. SOBIECKI:  Object to form.

21             THE WITNESS:  Yes.

22   BY MS. DURHAM:
```

Page 153

1        Q     You write that -- oh, I'm sorry.

2              Is paragraph -- I'm not sure if I did

3    this, so is paragraph 53 -- I think I did.  Is

4    paragraph 53 true and accurate?

5              MR. SOBIECKI:  Object to form.

6              THE WITNESS:  Yes.

7    BY MS. DURHAM:

8        Q     And you write in paragraph 53, "I was

9    demoted from commander to inspector after speaking

10   up about a different incident and perceived that

11   if I spoke up about the issues described in this

12   statement that I would be retaliated against once

13   more."

14             Do you see that?

15       A     Yes.

16       Q     And when you say that you perceived that

17   if you spoke up about the issues you would be

18   retaliated against, what did you mean?

19       A     I actually confided in some officials at

20   MPD and some former officials of MPD and was given

21   advice that if I spoke up about it, I would need

22   to be very careful and to watch everything that I

Page 154

1  did because I probably would get retaliated

2  against again.

3      Q    And when you say "retaliated against,"

4  does that mean receive negative treatment because

5  you spoke up and were critical?

6           MR. SOBIECKI:  Object to form.

7           THE WITNESS:  Yes.

8  BY MS. DURHAM:

9      Q    And had that -- and that was the advice

10 that you got from other MPD officials; is that

11 correct?

12          MR. SOBIECKI:  Object to form.

13          THE WITNESS:  Yes.

14 BY MS. DURHAM:

15     Q    And are you aware of whether or not that

16 advice was given to you because they had seen

17 other individuals be critical of MP- -- MPD and be

18 retaliated against?

19          MR. SOBIECKI:  Object to form.

20          THE WITNESS:  Yes.

21 BY MS. DURHAM:

22     Q    And had you witnessed that when other

Page 155

1  people were critical of MPD, they were retaliated

2  against?

3             MR. SOBIECKI:  Object to form.

4             THE WITNESS:  Kind of, yes.  I mean, not

5  directly.  There was always a reason or a

6  justification for actions, but it's the -- it --

7  it could go either way.

8  BY MS. DURHAM:

9      Q    Okay.  And I know you testified that

10  paragraph 54 is true and accurate.

11             You write that your statements were made

12  from memory of events that occurred at least three

13  years ago; that's correct?  Is that correct?

14      A    Yeah.

15      Q    And when you wrote your declaration, you

16  say that you didn't have the benefit or ability to

17  review notes or e-mails; is that correct?

18      A    Yes.  Yes.

19      Q    Do you remember every single request

20  that was elevated for EOCOP review during your

21  time at the FOIA Office?

22             MR. SOBIECKI:  Object to form.

Page 156

1           THE WITNESS:  No.

2      BY MS. DURHAM:

3           Q    And your intention with your declaration

4      was not to capture and provide details of every

5      single conversation or elevation for EOCOP review,

6      correct?

7                MR. SOBIECKI:  Objection.  Leading.

8                THE WITNESS:  Correct.

9      BY MS. DURHAM:

10          Q    You were providing examples of

11     elevations for EOCOP review; is that correct?

12               MR. SOBIECKI:  Objection.  Leading.

13               THE WITNESS:  Yes.

14     BY MS. DURHAM:

15          Q    And your declaration does not include an

16     exhaustive list of every elevation; is that

17     correct?

18               MR. SOBIECKI:  Objection.  Leading.

19               THE WITNESS:  Yes.

20     BY MS. DURHAM:

21          Q    And if you had access to FOIA Express

22     records, e-mails, do you believe that you could

Page 157

1    identify more examples?

2              MR. SOBIECKI:  Object to form.

3              THE WITNESS:  Yes.

4    BY MS. DURHAM:

5         Q    You worked with Ms. Archie-Mills in the

6    FOIA Office; is that correct?

7         A    Yes.

8         Q    I want to show you what has been

9    previously marked as Exhibit 288.  This is a

10   July 19th, 2020 text message between you and

11   Ms. Archie-Mills.

12             Do you see that?

13        A    Yes.

14        Q    And July 2020 was after you had retired;

15   is that correct?

16        A    Yes.

17        Q    You send Ms. Archie-Mills an article by

18   Rich Miles titled "How the D.C. Police Department,

19   DoJ and D.C. Attorney General's Office shield the

20   bad actions of cops."

21             Do you see that hyperlink?

22        A    Yes.

Page 158

1      Q    And you write, "Hey, ma'am.  Just read

2   an interesting article.  I see Amy Phillips is

3   still busy.  Saw she's suing MPD over FOIA related

4   stuff."

5            Do you see that?

6      A    Yes.

7      Q    And Ms. Archie-Mills writes, "Thanks for

8   sharing the article.  Shaking my head.  As the

9   saying goes 'the more things change, the more they

10  stay the same.'"

11           Do you see that?

12     A    Yes.

13     Q    Ms. Archie-Mills, did she ever tell you

14  that she believed anything in the article was

15  false?

16           MR. SOBIECKI:  Object to form.

17           THE WITNESS:  No.

18  BY MS. DURHAM:

19     Q    Did you tell Ms. Archie-Mills about your

20  decision to write this declaration?

21     A    No.

22     Q    Okay.  I'm going to show you

Page 159

1    Exhibit 118 -- I'm sorry, Exhibit 289.

2              MR. CARPENTER:  This is what exhibit

3    number again?

4              MS. DURHAM:  Exhibit 289.  It's on the

5    exhibit sticker, 289.

6    BY MS. DURHAM:

7        Q    This is an October 19th, 2021 text

8    message thread between you and Ms. Archie-Mills.

9              Do you see that?

10       A    Yes.

11       Q    And that is -- if you compared that date

12   to the date of the Exhibit 111, which is your

13   declaration, that is the day after you signed the

14   declaration on October 18th, 2021.

15             Do you see that?

16       A    Yes.

17       Q    You write, "Hey there.  Do you have a

18   few minutes to talk today after 4 o'clock."

19             Do you see that?

20       A    Yes.

21       Q    And Ms. Archie-Mills responds, "Good

22   evening.  Yes, I will call you once I get home.

Page 160

1    Commuting now."

2           Do you see that?

3      A    Yes.

4      Q    Does that refresh your recollection that

5    Ms. Archie-Mills and you discussed your

6    declaration?

7      A    We discussed my declaration when I knew

8    that it was going to be used in this lawsuit but

9    not before.

10     Q    Okay.  And what did you discuss with

11   Ms. Archie-Mills?

12     A    I let her know that it was going to be

13   coming out.

14     Q    Did you tell her about the content of

15   your declaration?

16     A    I don't -- I don't think so.  I don't

17   remember, but I don't think so.

18     Q    Did you tell her that you were going to

19   be talking about things that you witnessed while

20   you were at the FOIA Office?

21     A    Yes.

22     Q    How did Ms. Archie-Mills respond?

Page 161

1      A     She was neutral.  I called to, one, give

2   her a heads-up but also to apologize to her in

3   case she got dragged into it.  I figured she would

4   be.

5      Q     And how did she respond to that?

6      A     She was neutral.  It was neither

7   positive nor negative.

8      Q     Did you ever -- once you were aware that

9   the lawsuit was going to be filed, did you ever

10  talk to Ms. Archie-Mills about the lawsuit that

11  Ms. -- Ms. Phillips was filing in this matter?

12     A     That's -- that's what I talked to her

13  about.  So I didn't talk to her about the original

14  lawsuit that Ms. Phillips filed because that

15  didn't really concern Lisa.

16            I filed that -- I gave that -- the -- I

17  originally gave the declaration because there was

18  a court hearing that Ms. Phillips had and the

19  Government said that I had hid documents, that the

20  reason she didn't get some of the documents from

21  her request was because they realized I had hidden

22  documents in a drive that I only had access to and

Page 162

1    they didn't come to realize that until after I
2    retired.
3             So that wasn't true.  I didn't hide any
4    documents.  No documents were ever placed in a
5    drive that only I had access to.  So I wrote the
6    declaration initially to clear that up since that
7    was on the record in court.
8             After I gave her the declaration, she
9    had some back and forth with the Attorney
10   General's Office about attorney-client privilege
11   because I had mentioned the General Counsel in the
12   declaration and she sought counsel about that.
13   And once she sought counsel, they realized they
14   had potentially a different case.
15            So she decided to drop her first lawsuit
16   and initiate this one.  So this is the lawsuit
17   that I actually talked to Lisa about because I
18   figured she would be dragged into this one.
19        Q    Got it.
20            I'm going to hand you what has been
21   marked as Exhibit 290.  Actually I'll withdraw
22   that exhibit.

Page 163

```
 1              (Deposition Exhibit Number 353 was
 2              marked for identification.)
 3    BY MS. DURHAM:
 4        Q    Okay.  I'm handing you what has been
 5    marked as Exhibit 353.  This is a July 17th, 2020
 6    text message between you and Mr. Perloff.
 7              Do you see that?
 8        A    Yes.
 9        Q    And Michael Perloff is affiliated with
10    the ACLU; is that correct?
11        A    Yes.
12        Q    And he writes in part, "I wanted to
13    reach out because Amy Phillips asked me for your
14    contact information.  She's working on a FOIA
15    lawsuit and may want to call you about it.  Can I
16    give her your cell phone number?"
17              Do you see that?
18        A    Yes.
19        Q    And you respond in part, "I read the
20    article about Amy's FOIA lawsuit.  Found it super
21    interesting especially since what Assistant Chief
22    Contee was quoted as saying was a blatant
```

Page 164

1    full-throated lie.  Sure, you may pass on my

2    number.  I'm happy to help."

3           Do you see that?

4       A    Yes.

5       Q    What did you mean when you wrote that

6    the statement that Chief Contee made was a blatant

7    full-throated lie?

8       A    He stated in that article that those

9    officers who are on the Lewis (ph) list, they

10   take -- they make effort not to put them on

11   investigating -- make them investigators on cases

12   since they can't testify, but that's not true

13   because we don't know who's on the list because

14   we're not told.

15      Q    I'm handing you what has been marked as

16   Exhibit 292.  This is a March 1st, 2022 text

17   message that you sent to Ms. Archie-Mills.  You

18   wrote in part, "Someone just called me and told me

19   Contee is pissed with me right now.  I have no

20   regrets about my decision to help Amy.  I only

21   regret if it has caused you or any other FOIA team

22   member any problems."

1              Do you see that?

2        A    Yes.

3        Q    Who told you that Chief Contee was

4   pissed with you?

5        A    A community member.

6        Q    And why was Chief Contee pissed with

7   you?

8        A    Because I gave the declaration to Amy

9   and made allegations that the FOIA Office was

10  delaying processing requests.

11       Q    And you write, "I have no regrets about

12  my decision to help Amy."  And just so the record

13  is clear, is the Amy here that you're referring to

14  Amy Phillips?

15       A    Yes.

16       Q    Inspector Parker, at some point prior to

17  retiring, did you decide to begin communicating

18  personally with journalists regarding their FOIA

19  requests?

20       A    Yes.

21       Q    And why did you make that decision?

22       A    So I -- initially they called the office

Page 166

1    and they would ask about what's going on with

2    their request because they were taking extended

3    periods of time to be processed.  And I don't know

4    how it transitioned to personal conversations, but

5    I believe -- I remember one was they wanted to

6    tell me something off record and talking on a

7    government phone there's always the threat that it

8    may be recorded.  So they asked if I could speak

9    with them off of a government phone.

10                (Deposition Exhibit Number 354 was

11                marked for identification.)

12   BY MS. DURHAM:

13        Q    I'm handing you what has been marked as

14   Exhibit 354.  This is an August 9, 2019 e-mail --

15   or an August 2019 e-mail thread with you and Eric

16   Flack.

17                Do you see that?

18        A    Yes.

19        Q    And at the end of -- at the bottom, the

20   end of Mr. Flack's first request, he says, "And

21   how's this for wording of my other FOIA:  I would

22   like to request copies of all incident reports of

Page 167

1    injured reports to a hospital and dates when any

2    of the requested reports were upgraded to police

3    investigations, and the new va classification."

4            Do you see that?

5        A    Yes.

6        Q    Was Mr. Flack asking you for guidance

7    about how to word his FOIA because depending on

8    the wording, the FOIA Office may respond

9    differently?

10       A    Yes.

11       Q    And so you in your response, in part,

12   you provide him with the language that will get

13   him the documents that he's looking for; is that

14   correct?

15       A    Right.  He -- well, he told me what he's

16   looking for, the story that he's working on, and

17   he wanted help with the best wording to get what

18   he needed for his story.

19       Q    Do -- in your experience, do requesters

20   need to be very specific in order to get what

21   they're looking for from the FOIA Office?

22       A    Sometime- --

1          MR. SOBIECKI:  Object to form.

2          THE WITNESS:  Sometimes, yes.

3  BY MS. DURHAM:

4    Q   Were requests from certain requesters

5  denied based on the wording of their request in

6  your experience?

7          MR. SOBIECKI:  Object to form.

8          THE WITNESS:  They weren't denied, but

9  they may not have gotten what exactly they were

10  looking for because the wording wasn't specific

11  enough.

12  BY MS. DURHAM:

13    Q   And who -- I'll withdraw that.

14          Did EOCOP ever weigh in on a response to

15  a FOIA request and remove documents because the

16  wording wasn't specific enough?

17          MR. SOBIECKI:  Object to form.

18          THE WITNESS:  Ms. Turner weighed in on

19  wording on responses sometimes.  I don't think --

20  I don't know if I remember her removing any

21  documents.

22  BY MS. DURHAM:

Page 169

1      Q    You don't recall one way or the other?

2      A    I don't.

3      Q    Following your retirement, when you met

4   with Ms. Phillips, did you discuss with her what

5   you observed with respect to the policies and

6   practices in the FOIA Office?

7      A    Yes.

8           MR. SOBIECKI:  Object to form.

9   BY MS. DURHAM:

10     Q    And with respect to the declaration that

11  you wrote, did Ms. Phillips force you to write it?

12     A    No, the declaration was more for me than

13  for her.  It was to clear that I did not put

14  anything into a drive that I only had access to.

15  I wasn't hiding documents.

16     Q    And you wrote the declaration yourself;

17  is that correct?

18     A    Yes.

19     Q    Did Ms. Phillips promise you anything in

20  exchange for the declaration?

21     A    No.

22     Q    Did anyone at any time promise you

Page 170

1   anything in exchange for the declaration?

2       A    No.

3           (Deposition Exhibit Number 355 was

4           marked for identification.)

5   BY MS. DURHAM:

6       Q    I'm handing you what has been marked as

7   Exhibit 355.  This is a December 19th, 2021 text

8   message thread between you and Mr. Perloff.

9           Do you see that?

10      A    Yes.

11      Q    And you have communicated with

12  Mr. Perloff on the ACLU since you left the FOIA

13  Office, correct?

14      A    Yes.

15      Q    Did Mr. Perloff offer you anything in

16  connection with your declaration?

17      A    No.

18      Q    So the first text message says, "So I

19  see you're trying to make trouble" -- "make some

20  trouble."

21          Do you see that?

22      A    Yes.

1      Q    And did you understand him to be talking

2   about your declaration?

3      A    Yes.

4      Q    And I want to focus on the exchange that

5   begins at 6:32 p.m. about a little more than the

6   middle of the page down on Bates ending in 001.

7           Do you see that he says, "How are you

8   feeling about that?"

9      A    Yes.

10     Q    And you say, "I told the truth.  So not

11  worried about that."

12          Do you see that?

13     A    Yes.

14     Q    And your position continues to be that

15  your declaration is the truth; is that correct?

16     A    Yes.

17     Q    And then Mr. Perloff says, "I think you

18  did something very brave.  Also most of the people

19  in the declaration besides Newsham don't look that

20  bad."

21          Do you see that?

22     A    Yes.

1    Q    And you write, "That makes me feel

2  better.  Funny you used the word brave.  I thought

3  long and hard about the potential consequences for

4  agreeing to write the statement."

5         Do you see that?

6    A    Yes.

7    Q    What potential consequences were you

8  concerned about?

9    A    About being called a disgruntled

10  employee, that I'm only doing this to retaliate

11  against the Agency, and I was worried that my name

12  would be maligned.

13    Q    So you were concerned that because you

14  told the truth, that the MPD would engage in some

15  kind of smear campaign against you; is that

16  correct?

17    A    Yes.

18         MR. SOBIECKI:  Object to form, leading.

19  BY MS. DURHAM:

20    Q    And were you concerned that because you

21  told the truth, the MPD would try to, I think you

22  said malign your name; is that correct?

Page 173

```
 1              MR. SOBIECKI:  Object to form.
 2              THE WITNESS:  Yes.
 3   BY MS. DURHAM:
 4       Q    And do you mean that they would make up
 5   things about you that were not true?
 6              MR. SOBIECKI:  Object to form.
 7              THE WITNESS:  Not make up things, but
 8   just describe me as disgruntled, that this -- I'm
 9   only doing this because I'm unhappy about my
10   demotion.
11   BY MS. DURHAM:
12       Q    And you weren't disgruntled; is that
13   correct?
14       A    That's correct.
15       Q    So if they said that you were some
16   disgruntled employee, that would have been a false
17   allegation or a false assertion, correct?
18       A    It would be a --
19              MR. SOBIECKI:  Object to form.
20              THE WITNESS:  -- a false
21   characterization.
22   BY MS. DURHAM:
```

1        Q    And you thought that they would make

2    up -- or I'll withdraw that.

3             You thought they would say those things

4    because you had been critical of them; is that

5    correct?

6             MR. SOBIECKI:  Object to form.

7             THE WITNESS:  Yes.

8    BY MS. DURHAM:

9        Q    You write at 6:44 p.m. that you were

10   disappointed in yourself for not doing the right

11   thing while all this was happening just to save

12   yourself.

13            Do you see that?

14       A    Yes.

15       Q    What did you mean by that?

16       A    To save -- I didn't speak up while I was

17   still working at MPD to save myself because I

18   didn't want to be retaliated against again.

19       Q    And when you say you didn't speak up,

20   are you talking about you didn't speak up about

21   the things that you were witnessing because you

22   didn't want to be retaliated against?

Page 175

1      A    Yes.

2      Q    And as you were experiencing and

3  witnessing the things that you were witnessing at

4  the FOIA Office, did you believe that they were

5  wrong?

6      A    Yes.

7           MR. SOBIECKI:  Object to form.

8  BY MS. DURHAM:

9      Q    So you say at 6:54 (sic) p.m. -- you say

10 you were decided -- you decided it was time for

11 you to be the person that you were meant to be and

12 do what's right from now on.

13          Do you see that?

14     A    Yes.

15     Q    And was part of doing what was right was

16 calling out the wrongs that you witnessed MPD do?

17     A    Yes.

18          MR. SOBIECKI:  Object to form.

19 BY MS. DURHAM:

20     Q    Earlier you testified regarding whether

21 the elevation policy resulted in delays.

22          Do you remember that?

1          A     Yes.

2          Q     And if we look at 7:07 -- I'm sorry, the

3     text message at 7:05 p.m., Mr. Perloff writes --

4     and that's on -- you're there.  Okay --

5     Mr. Perloff writes, "Interesting.  And did Newsham

6     or other supervisors deliberately slow walk

7     responses?"  You say, "I know of one person's

8     requests.  She deliberately delayed."

9                When you said that to Mr. Perloff was

10    that true?

11         A     Yes.

12         Q     And so you witnessed Ms. Turner or EOCOP

13    deliberately delay responses to at least one

14    person's request; is that correct?

15                MR. SOBIECKI:  Object to form.

16                THE WITNESS:  Yes.

17    BY MS. DURHAM:

18         Q     And you then write, "The others Leeann

19    disregarded" -- "just disregarded the time

20    restraints until she and Newsham were comfortable

21    with what was being released and prepared for any

22    backlash."

1          Do you see that?

2      A    Yes.

3      Q    And you saw for other requests that were

4  elevated for EOCOP review that Turner just

5  disregarded the FOIA statute time limitations; is

6  that correct?

7          MR. SOBIECKI:  Object to form.

8          THE WITNESS:  Yes.

9  BY MS. DURHAM:

10     Q    And you -- Mr. Perloff says, "How long

11  did that usually take?"  And then you respond,

12  "Depends on requests.  Example, stop and frisk was

13  delayed for months, use of force records delayed

14  for over a year."

15          Do you see that?

16     A    Yes.

17     Q    So sometimes the EOCOP review could

18  result in delays of months or more than a year; is

19  that correct?

20          MR. SOBIECKI:  Object to form.

21          THE WITNESS:  Yes.

22          MR. CARPENTER:  Counsel, I've got you at

Page 178

1    about three hours and 32 minutes.

2              MR. LINHORST:  I've got three -- three

3    hours.

4              MS. DURHAM:  Yeah, I think we're --

5              VIDEO TECHNICIAN:  Three hours.

6              MS. DURHAM:  Yeah, three hours.

7              MR. CARPENTER:  Three hours.

8              MS. DURHAM:  John, don't try to take my

9    time.

10             MR. LINHORST:  Excluding breaks.

11             MR. CARPENTER:  Huh?

12             MR. LINHORST:  Did you exclude breaks?

13             MR. CARPENTER:  Oh, oh, I -- I just

14   took -- I just -- oh, okay.

15             MS. DURHAM:  John, do you want me to

16   have less time and not more?

17   BY MS. DURHAM:

18        Q    Here's Exhibit 308.

19             MR. CARPENTER:  I just want four hours

20   both sides.  That's all I'm asking for.

21             MS. DURHAM:  I'm on top of it.

22             MR. CARPENTER:  You've got three hours.

 1              MS. DURHAM:  We have around three hours

 2    right now.

 3              MR. CARPENTER:  Okay.

 4    BY MS. DURHAM:

 5       Q    I've handed the witness --

 6              MR. CARPENTER:  Maybe I did exclude the

 7    breaks, okay.

 8    BY MS. DURHAM:

 9       Q    I've handed the witness what has been

10    marked as Exhibit 308.

11              MS. DURHAM:  Thank you for checking on

12    the time though, John, I appreciate that.

13              MR. CARPENTER:  No problem.  As you can

14    see, I'm a very good timekeeper.

15              MS. DURHAM:  Yes.

16    BY MS. DURHAM:

17       Q    So I asked you earlier some questions

18    regarding some of the most delayed FOIA requests.

19              Do you recall that?

20       A    Yes.

21       Q    And you said that you were not surprised

22    to hear that some of the oldest requests were from

Page 180

1    Eric Flack, Michael Perloff and Amy Phillips.

2              Do you remember that?

3              MR. SOBIECKI:  Object to form.

4              THE WITNESS:  Yes.

5    BY MS. DURHAM:

6        Q    And what I've handed you in Exhibit 308

7    is a spreadsheet of the nine oldest open requests

8    from FOIA Express, which was produced to us by the

9    District in March of this year.

10             If you look at the request date for

11   many -- for these requests, these requests are

12   from 2018 and 2019.

13             Do you see that?

14       A    Yes.

15       Q    And Mr. Flack is one of the people that

16   you identified on the -- the list of people that

17   you would elevate for EOCOP review because they

18   were critical; is that correct?

19             MR. SOBIECKI:  Object to form.

20             THE WITNESS:  Yes.

21   BY MS. DURHAM:

22       Q    And Mr. Perloff is one of the critics

Page 181

1    that you identified that would be elevated for

2    EOCOP review?

3         A    The ACLU.

4         Q    Oh, I'm sorry, yes, the ACLU.

5              And the ACLU was -- I'm sorry, withdraw

6    that.

7              Michael Perloff was at the AC- -- ACLU;

8    is that correct?

9         A    Yes.

10        Q    And Ms. Phillips is one of the critics

11   that you identified?

12        A    Yes.

13        Q    And Mr. Hermann is a media requester

14   from The Washington Post, correct?

15        A    Yes.

16        Q    And you -- I think earlier you didn't

17   have the benefit of the spreadsheet, so you said

18   that you believed some of the requests had to do

19   with data.

20             If we look at Ms. Phillips' 893 request,

21   which is on the second page near the bottom, I'll

22   represent to you that that is her adverse action

1    hearings request that we discussed where we saw

2    that you had sent the transcripts to Ms. Turner

3    and Mr. Viehmeyer in March of 2019.

4              Do you recall that?

5        A    Yes.

6        Q    And so that's not a data request; is

7    that correct?

8        A    No.

9        Q    And that -- the documents -- or the

10   transcripts were provided to Ms. Turner and

11   Viehmeyer in March of 2019; is that correct?

12             MR. SOBIECKI:  Object to form.

13             THE WITNESS:  I think just the

14   transcripts, but they hadn't been processed.

15   BY MS. DURHAM:

16       Q    Okay.  So the transcript had been

17   provided.

18             And if we look at the first page where

19   Mr. Hermann is asking for a copy of ORM's audit

20   information, that's not a data request, right?

21   That's for a specific report; is that correct?

22             MR. SOBIECKI:  Object to form.

Page 183

1              THE WITNESS:  Yes.

2    BY MS. DURHAM:

3       Q    And if we look at Mr. Balasubramanian's

4    request for communication between the office of CM

5    Jack Evans and the office of the MPD Chief, that

6    is not for data; is that correct?

7              MR. SOBIECKI:  Object to form.

8              THE WITNESS:  That's correct.

9              MS. DURHAM:  I'd like to take a break to

10   figure out if I am at a good stopping point to

11   pass the witness.

12             MR. CARPENTER:  Okay.  It's already

13   almost 2 o'clock.  Can we just -- how much time do

14   you need?

15             THE WITNESS:  I don't need a break.

16             MS. DURHAM:  I only need like three

17   minutes.  Sorry.

18             MR. CARPENTER:  Let's take five minutes.

19             MS. DURHAM:  Okay.  Five minutes.

20             VIDEO TECHNICIAN:  Off the record at

21   1:48.  This ends Media Unit Number 3.

22             (Brief recess.)

Page 184

1                    VIDEO TECHNICIAN:  On the record at

2       2:05.  This begins Media Unit 4 in the deposition

3       of Vendette -- Vendette Parker.

4                    MS. DURHAM:  I will reserve the rest of

5       my time and pass the witness to the District.

6                    EXAMINATION BY COUNSEL FOR DEFENDANT

7       BY MR. SOBIECKI:

8          Q    Good afternoon, Inspector Parker.  Rich

9       Sobiecki.  I've got a few questions for you.

10                   Before I begin, Ms. Durham asked you at

11      the beginning if you and Ms. Durham had ever

12      spoken before today.

13                   Do you recall those questions?

14         A    Yes.

15         Q    Had you ever spoken to any of the

16      lawyers representing Ms. Phillips in this case

17      before today?

18         A    No.

19         Q    Have you ever spoken to Mr. Gamse before

20      today?

21         A    No.

22         Q    Have you ever spoken to Charlie Gerstein

Page 185

1   before today?

2        A    Yes.

3        Q    Oh, okay.  When -- when -- when was the

4   first time you spoke with Mr. Gerstein?

5        A    He called to ask if he could use the

6   declaration in this case.

7        Q    And what did you talk about in that

8   conversation with Mr. Gerstein?

9        A    The declaration.  That's what I

10  remember.

11       Q    Did you talk about anything other than

12  whether he could use the declaration in this case?

13       A    We talked about the information in the

14  declaration.

15       Q    Did you talk about anything not in the

16  declaration?

17       A    I don't think so.  I don't remember

18  that.

19       Q    Did he tell you he -- strike that.

20            Did he ask you any -- strike that.

21            Did he ask you any questions related to

22  the drafting of Ms. Phillips' complaint in this

Page 186

```
 1  case that you know of?

 2            MS. DURHAM:  Objection to form.

 3            THE WITNESS:  I don't think so.  I don't

 4  remember that, no.

 5            THE REPORTER:  I'm sorry, you don't

 6  think so what?

 7            THE WITNESS:  I don't remember that.

 8            THE REPORTER:  All right.  Thank you.

 9  BY MR. SOBIECKI:

10      Q    So other than Mr. -- how many times did

11  you speak to Mr. Gerstein?

12      A    I think twice.

13      Q    Okay.  And why did you speak with him

14  the second time?

15      A    I can't remember.  I -- I -- I can't

16  remember.

17      Q    Okay.  Do you remember if that was

18  before or after Ms. Phillips filed this lawsuit?

19  And I'll tell you she filed it February 2nd, 2022.

20            MS. DURHAM:  I will object to the form

21  of that question.

22            THE WITNESS:  It was before.
```

Page 187

1   BY MR. SOBIECKI:

2       Q    So both times you talked to him were

3   before February 2022?

4       A    Yes.

5       Q    Have you spoken to him since February of

6   2022?

7       A    No.

8       Q    When was the last time you spoke with

9   Amy Phillips?

10      A    It was shortly after the lawsuit was

11  filed.

12      Q    What did you talk about?

13      A    There was -- well, we texted.  There was

14  an article that came out in Above the -- no, The

15  Reason, there's a blog called The Reason, and it

16  spoke about this lawsuit.  I think that was the

17  last thing we talked about.

18      Q    Okay.  Do you recall anything else about

19  your conversation other than talking about that

20  article?

21      A    No.

22      Q    You mentioned you know Ms. Archie-Mills;

Page 188

1    is that right?

2          A    Yes.

3          Q    Would you consider Ms. Archie-Mills a

4    friend of yours?

5          A    Yes.

6          Q    Have you ever known Ms. Archie-Mills to

7    not be truthful?

8          A    No.

9          Q    And you worked with Ms. Archie-Mills for

10   about two-plus years in the FOIA Office, right?

11         A    Yes.

12         Q    Did you think Ms. Archie-Mills did a

13   good job working in the FOIA Office?

14              MS. DURHAM:  Objection to the form.

15              THE WITNESS:  Yes.

16   BY MR. SOBIECKI:

17         Q    Any -- any issues with her job

18   performance while you were her supervisor?

19         A    No.

20         Q    Okay.  Now, you're aware that

21   Ms. Phillips alleges in this lawsuit that the MPD

22   FOIA Office maintains what she refers to as a

Page 189

1    watchlist policy?  You're aware of that, right?

2        A    Yes.

3        Q    And so if I -- and the watchlist policy

4    that Amy Phillips alleges in existence is based on

5    your declaration, right?

6        A    Yes.

7             MR. CARPENTER:  Objection.  Form.

8    BY MR. SOBIECKI:

9        Q    So if I use the term "watchlist policy"

10   in my questions, can we just have an understanding

11   that I'm referring to what you describe in your

12   declaration?

13       A    Yes.

14       Q    Okay.  If you could look at Exhibit 111,

15   which is your declaration.

16            Inspector Parker, how many hours did you

17   spend drafting your declaration ballpark?

18       A    Maybe four or five.

19       Q    And four or five in one sitting?  Was it

20   spent -- spread over several days?

21       A    It was one day.

22            MS. DURHAM:  Objection to form of that

Page 190

1   question.

2          THE WITNESS:  Oh.  Several hours over

3   one day.

4   BY MR. SOBIECKI:

5      Q    Okay.  So in terms of drafting it, your

6   recollection is that you did it pretty much in one

7   day?

8      A    Well, let -- no.  Let me -- I started it

9   and then stopped, but then I picked it back up and

10  finished it in one day.

11     Q    Did you rely on any documents when you

12  were drafting your declaration?

13     A    No.

14     Q    And what I mean by that is when you were

15  drafting this, did you look at any documents and

16  you were like, oh, that refreshes my memory as to

17  things that happened when I was working in the

18  FOIA happened?  Has that happened?

19          MS. DURHAM:  Objection to the form of

20  that question.

21          THE WITNESS:  No, I didn't have any

22  documents to look at.

Page 191

1   BY MR. SOBIECKI:

2       Q    When you were drafting your declaration,

3   did you have any conversations with people that

4   refreshed your memory as to events that happened

5   when you worked in the FOIA Office?

6       A    No.

7       Q    Did you call or text anyone for

8   information that you then put into your

9   declaration?

10      A    No.

11      Q    So the declaration is completely based

12  on your memory; is that fair?

13      A    Yes.

14      Q    Okay.  Now, we also -- there was a -- a

15  number of questions -- I believe you have

16  Exhibit 149 in front of you.

17      A    Yes.

18      Q    All right.  Exhibit 149 is a -- is a

19  PowerPoint presentation and I'm going to just ask

20  a few questions.  My apologies if you already

21  answered these, but did you draft Exhibit 149, the

22  FOIA Informational Presentation?

1       A    No.

2       Q    Do you know who drafted it?

3       A    No.

4       Q    Do you know who this presentation was

5    given to?

6       A    Yes.

7       Q    Who was that?

8       A    It was given to the different units of

9    MPD to explain why they have to turn over

10   documents when there's a FOIA request.

11      Q    And are they sometimes called searching

12   units in the FOIA Office?

13      A    Yes.

14      Q    Did you edit this presentation at all?

15      A    No.

16      Q    And so if you could turn -- I believe

17   we've been referring to it as slide 14.  I think

18   you know the one I mean with the note on it.

19      A    Yes.

20      Q    And then if you could -- well, I'll wait

21   until you're there.

22      A    I'm here.

Page 193

1      Q    And if you could also take Exhibit 111

2   and maybe even put it next to it.  And if you need

3   to -- I'm going to ask generally about paragraph

4   seven, eight and nine.

5      A    Okay.

6      Q    So in Exhibit 149, we have this note

7   that discusses EOCOP review of some requests,

8   fair?

9      A    Yes.

10     Q    And then in Exhibit 111, we have what

11  we're calling the watchlist policy, right?

12     A    Yes.

13     Q    Okay.  So, Inspector Parker, I want to

14  try to understand the difference between these two

15  practices.  Are you with me?

16          MS. DURHAM:  Object to the form of that

17  question.

18  BY MR. SOBIECKI:

19     Q    Do you generally understand what I'm --

20  okay.

21     A    I think so.

22     Q    All right.  So let's start with

Page 194

1   Exhibit 149 and what we're referring to as the

2   EOCOP practice.  Do you see it says, "Media and

3   high profile requests (or any other requests

4   deemed sensitive) are sent to the Executive Office

5   of the Chief of Police."

6            Do you see that?

7       A    Yes.

8       Q    And so "media," does that mean all media

9   requests or a subset of media requests?

10      A    All --

11           MR. CARPENTER:  Object to the form.  She

12  said she didn't have anything to do with the

13  drafting of this document.

14           THE WITNESS:  All --

15           MR. CARPENTER:  Go ahead.

16           THE WITNESS:  All media requests.

17  BY MR. SOBIECKI:

18      Q    And "high profile requests," do you know

19  what "high profile requests" is referring to

20  there?

21      A    Anything that's a hot topic in the news,

22  a high profile topic in the news.

Page 195

1      Q     And how about "sensitive requests"?

2      A     Sensitive are I guess the same meaning:

3  High profile or could have a negative impact on --

4  on the Agency's reputation.

5           MR. CARPENTER:  Don't guess.  We don't

6  want you to guess.

7  BY MR. SOBIECKI:

8      Q     The practice of sending certain media,

9  high profile, sensitive requests to EOCOP

10 described here, based on your experience in the

11 FOIA Office, were FOIA specialists aware of this

12 practice?

13     A     Can you repeat that?

14     Q     Sure.  So this note is describing how

15 media, high profile and sensitive requests are

16 sent to the EOCOP, right?

17     A     Yes.

18     Q     Were FOIA specialists aware that media,

19 high profile and sensitive requests were sent to

20 the EOCOP?

21     A     Yes.

22     Q     Was Ms. Archie-Mills aware of this

Page 196

1    practice?

2         A    Yes.

3         Q    So it wasn't a secret, was it?

4         A    No.

5              MS. DURHAM:  Objection to form.

6    BY MR. SOBIECKI:

7         Q    And it's in writing because we're

8    looking at it right here, correct?

9         A    Yes.

10        Q    Now, then we have in Exhibit 111 the

11   watchlist policy which you describe as unwritten,

12   right?

13        A    Yes.

14        Q    And I believe you told Ms. Durham that

15   this is a -- kind of a -- well, strike that.

16             Who else was aware in the FOIA Office of

17   the watchlist policy that you describe in

18   paragraph seven, eight and nine of your

19   declaration?

20        A    All of the specialists knew that certain

21   requests had to go to the Chief's office for

22   review before being released.

1      Q    Okay.  Well, now, Inspector Parker, I

2   want to -- are you referring to the practice

3   that's described in 149, the practice of sending

4   media, high profile or sensitive requests, or are

5   you referring to the unofficial, unwritten policy

6   where certain requests are flagged for Ms. Turner

7   and Chief Newsham?

8              MS. DURHAM:  Objection to the form.

9              THE WITNESS:  They're the same.  When I

10   wrote the declaration, I had forgotten about this

11   PowerPoint.  I actually didn't -- I forgot about

12   it until it was presented today.

13   BY MR. SOBIECKI:

14      Q    Okay.  I want to make sure I understand.

15   What you're describing in paragraph seven, eight

16   and nine is the same practice as what's described

17   in the note in this presentation?

18              MR. CARPENTER:  Object to the form.

19              MS. DURHAM:  Objection to the form.

20              THE WITNESS:  Yes, and seven, eight and

21   nine were what was -- what was explained to me on

22   my first day in FOIA.  I didn't get this

1   PowerPoint until much later.

2   BY MR. SOBIECKI:

3        Q    So if you look at your declaration,

4   Exhibit 111, paragraph nine, this PowerPoint

5   presentation doesn't refer to flagging requests

6   from individuals who have previously published a

7   negative media article about Chief Newsham or MPD,

8   does it?

9        A    Well, that would be -- that would be

10  under the -- the sensitive definition.

11       Q    And if I was a FOIA specialist, how

12  would I know that?  Could you explain -- strike

13  that.

14            MS. DURHAM:  I'll object to form.

15  BY MR. SOBIECKI:

16       Q    As -- as you just explained what it

17  means to be a sensitive request, that that

18  includes individuals who previously published a

19  negative media article about Chief Newsham or MPD,

20  did you explain that to the FOIA specialists?

21            MS. DURHAM:  Objection to the form of

22  the question.

1          THE WITNESS:  No, because I reviewed --

2    I reviewed their -- I reviewed their proposed

3    responses before they were released, so I would

4    make that determination.

5    BY MR. SOBIECKI:

6        Q    Okay.  Well, I'm -- I'm trying to find

7    out the entire universe of individuals who were

8    aware that requests coming from a person who has

9    previously published a negative media article

10   about Chief Newsham or MPD should be flagged for

11   Ms. Turner.

12          MS. DURHAM:  Objection to form.

13   BY MR. SOBIECKI:

14       Q    So who else in the FOIA Office was aware

15   of that?

16          MS. DURHAM:  Objection to the form of

17   the question.

18          THE WITNESS:  I can't answer that.  I

19   don't know.

20   BY MR. SOBIECKI:

21       Q    Did you ever discuss that with

22   Ms. Archie-Mills?

Page 200

1        A    I did.

2        Q    And so your testimony is that you

3    informed Ms. Archie-Mills that you were to bring

4    requests from persons who have previously

5    published negative media articles about Chief

6    Newsham or MPD to Ms. Turner?

7        A    Not in those words.  I would just tell

8    her that this request needs to go upstairs for

9    review.

10        Q    Would you tell her anything else other

11    than -- strike that.

12             I want to understand the situation.  You

13    and Ms. Archie-Mills are looking at a FOIA

14    request.  Okay?

15        A    Yes.

16             MS. DURHAM:  Objection to the form of

17    the question.

18    BY MR. SOBIECKI:

19        Q    And then --

20             MR. CARPENTER:  Wait a minute.

21    BY MR. SOBIECKI:

22        Q    -- for certain requests you would tell

Page 201

1   Ms. Archie-Mills that this request needs to go

2   upstairs?

3        A    Yes.

4        Q    But you wouldn't tell her -- strike

5   that.

6             You didn't tell her that the reason it

7   needed to go upstairs was because the requester

8   was a person who previously published a negative

9   media article about Chief Newsham or MPD?

10       A    No.

11       Q    Okay.  We talked about Lisa

12  Archie-Mills.

13            Did you tell anyone in the FOIA Office

14  that requests needed to go to Ms. Turner if the

15  requester had previously published a negative

16  media article about Chief Newsham or MPD?

17       A    No.

18       Q    The next part of paragraph nine --

19  again, I understand these are the categories of

20  individuals who were subject to the watchlist

21  policy -- you write if the individual uses the

22  records for litigation, if he is outspoken in City

```
 1    Council or community meetings in a negative way
 2    towards Chief Newsham or MPD.
 3         A    Yes.
 4         Q    So -- do you see that?
 5         A    Yes.
 6              MS. DURHAM:  I'll object to the form of
 7    the question.
 8              MR. CARPENTER:  What paragraph is that
 9    again?
10              MR. SOBIECKI:  Paragraph nine.  We're
11    going to stay on paragraph nine.
12    BY MR. SOBIECKI:
13         Q    Did you tell anyone else in the FOIA
14    Office at any time that individuals who used
15    records for litigation or are outspoken in City
16    Council or community meetings in a negative way
17    towards Chief Newsham, that their request had be
18    taken to Ms. Turner?
19         A    No.
20         Q    The next element of paragraph nine is if
21    the requester is the subject of a high profile
22    incident.
```

1          Now, is that the same as high profile
2    request in the PowerPoint presentation?
3          A     It could be, yes.  It depends.
4          Q     How would it be different?
5          A     The high profile incident may -- this --
6    this -- the requester may not be the subject of a
7    high profile incident, but they may be requesting
8    documents related to a high profile incident.
9          Q     And in terms of applying that standard
10   which you just described, were you the only one
11   who did that in the FOIA Office?
12         A     Who did -- who made the decision?
13         Q     Yes, ma'am.
14               MS. DURHAM:  Objection to the form.
15               THE WITNESS:  Yes.
16   BY MR. SOBIECKI:
17         Q     Ms. Archie-Mills wasn't responsible for
18   making that decision, right?
19         A     No.
20         Q     Okay.  In paragraph nine of your
21   declaration you say the watchlist policy would
22   apply to someone who repeatedly requests records

Page 204

1   that have the potential to be detrimental to Chief

2   Newsham or MPD, regardless of whether or not what

3   is currently being requested is potentially

4   detrimental.

5          Do you see that?

6      A   Yes.

7      Q   Did you discuss this criteria of the

8   watchlist policy with anyone in the FOIA Office?

9          MS. DURHAM:  Objection to form.

10         THE WITNESS:  No.

11  BY MR. SOBIECKI:

12     Q   And so you were solely responsible in

13  the FOIA Office for determining who met the

14  criteria of a record requester -- strike that.

15         In terms of who repeatedly requested

16  records that had the potential to be detrimental

17  to Chief Newsham or MPD, you were the only person

18  in the FOIA Office who made an assessment of

19  whether a request met that standard, right?

20         MS. DURHAM:  Objection to the form.

21         THE WITNESS:  Yes.

22  BY MR. SOBIECKI:

1     Q     Now I'd like to go on to paragraph ten

2  of your declaration, please.  In paragraph ten you

3  were listing some examples of individuals and I --

4  I want to understand why these individuals are in

5  paragraph ten.

6          The watchlist policy, was every FOIA

7  request from Eric Flack subject to the watchlist

8  policy?

9     A     Yes.

10    Q     Was every FOIA request from Marina

11  Marraco subject to the watchlist policy?

12    A     Yes.

13    Q     The ACLU, was every request subject to

14  the watchlist policy?

15    A     Yes.

16    Q     Denise Krepp, was every FOIA request

17  subject to the watchlist policy?

18    A     Yes.

19    Q     And would your answer be the same for

20  Lorenzo Greene, Benjamin Douglass, Emily Barth,

21  and Amy Phillips?

22    A     Yes.

1        Q    I believe you testified earlier Amy

2   Phillips made it onto the watchlist -- watchlist

3   policy because of a request she sent about the Gun

4   Recovery Unit; is that right?

5        A    Yes.

6        Q    Was there any other reason other than a

7   request for -- strike that.

8             If I say "GRU," do you know that to mean

9   the Gun Recovery Unit?

10       A    Yes.

11       Q    Other than a request concerning records

12  of GRU, was Amy Phillips on the list for any other

13  reason?

14            MS. DURHAM:  Objection to the form.

15            MR. SOBIECKI:  It's clunky.  I'll reask

16  that.

17  BY MR. SOBIECKI:

18       Q    Was the only reason Amy Phillips was on

19  the watchlist because of her request concerning

20  GRU records?

21            MS. DURHAM:  Objection to the form.

22            THE WITNESS:  And the -- I think she

Page 207

1   asked for transcripts of every adverse action

2   hearing we had for a specific period of time.

3   BY MR. SOBIECKI:

4        Q    And did you discuss that request with

5   Ms. Turner?

6        A    I did, yes.

7        Q    Why did you take that request to

8   Ms. Turner?

9        A    Because of what she was asking for, the

10  adverse action hearings.

11       Q    And I -- I believe you testified earlier

12  it was the practice in the FOIA Office not to

13  release adverse action hearing transcripts to

14  anyone, right?

15            MS. DURHAM:  Objection to the form.

16            THE WITNESS:  Yes.

17  BY MR. SOBIECKI:

18       Q    You testified earlier you were assigned

19  to the FOIA Office in April 2017, right?

20       A    Yes.

21       Q    You didn't have any experience

22  processing FOIA requests before that, right?

1      A    No.

2      Q    And I apologize if you answered this, do

3  you know why you were reassigned to the FOIA

4  Office as opposed to, say, Internal Affairs?

5      A    I don't, no.

6      Q    Were you involved in that decision at

7  all?

8      A    No.

9      Q    And I -- I don't mean to make this

10  simple, but you just showed up one day and they

11  said you'll be reassigned to the FOIA Office?

12      A    Yes.

13      Q    Like sometimes that's how a police

14  officer does.

15           MR. CARPENTER:  Is that a question?

16           MR. SOBIECKI:  No, no question.

17           MS. DURHAM:  I'll object to the

18  statement.

19  BY MR. SOBIECKI:

20      Q    Okay.  I'd like to -- if you could turn

21  back to paragraph five of your declaration,

22  please.

Page 209

```
 1      A      Before you ask your next question --
 2      Q      Uh-huh.
 3      A      -- the reason I was sent to FOIA is
 4    because my supervisor retired, so I had to be
 5    reassigned.  But I don't know why it was FOIA
 6    versus anywhere else.
 7      Q      And who was that supervisor?
 8      A      Diane Grooms.
 9      Q      In paragraph five, the first sentence,
10    you write, "FOIA requests are generally processed
11    as follows," and then you list eight steps; fair?
12      A      Yes.
13      Q      Now, in paragraph five you're describing
14    the process that existed when you were the FOIA
15    Officer, right?
16      A      Yes.
17      Q      Do you know who the FOIA Officer was
18    before you?
19      A      Ms. Liz Lyons, Elizabeth Lyons.
20      Q      And Don Kaufmann was at some point the
21    FOIA Officer?
22      A      I don't know if he was the FOIA Officer.
```

1    He may have been -- it wasn't clear for me the

2    role of Liz Lyons and Don Kaufmann, so I don't --

3    I know Liz was in charge of our unit.  I believe

4    she was the FOIA Officer.  I'm not sure between

5    she and Don which were -- which one was.

6         Q    Do you know who became the FOIA Officer

7    after you retired?

8         A    No, I don't.

9         Q    Do you know who the current FOIA Officer

10   is?

11        A    No.

12        Q    In paragraph five -- strike that.

13             Do you have any basis to believe what

14   you describe in paragraph five is how the MPD FOIA

15   Office currently processes requests?

16             MS. DURHAM:  Objection to the form.

17             THE WITNESS:  I don't -- I don't know.

18   BY MR. SOBIECKI:

19        Q    You don't know one way or the other how

20   the FOIA Office currently processes requests,

21   right?

22        A    I don't, no.

1     Q    Since you left the FOIA Office in

2  January of 2020, have you had any discussions with

3  anyone about how the FOIA Office processes

4  requests?

5     A    No.

6     Q    Do you have any sense of how the FOIA

7  Office processed requests before April of 2017

8  when you joined the office?

9     A    Not really.  I worked in units where

10  they requested documents and I had to turn them

11  over, but I don't have -- I didn't have a working

12  knowledge.

13     Q    I'd like to talk about paragraph seven

14  now, please.

15          In paragraph seven you're describing a

16  conversation that you had with Ms. Turner, right?

17     A    Yes.

18     Q    Could you please tell me as close as you

19  can remember the exact words that Ms. Turner used

20  in that conversation?

21          MS. DURHAM:  I'll object to the form.

22          THE WITNESS:  She told me what she

Page 212

1    expected of me working in the office and that she

2    needed me to be the eyes and ears of the Chief

3    because the people in there had released documents

4    and the Chief felt blindsided at press conferences

5    or felt blindsided in the public because he would

6    be -- he would get approached by different media

7    or different journalists and asked questions that

8    I guess took him off balance.  He -- he didn't

9    know that these documents had been released, so

10   she asked me to be the eyes and ears in the FOIA

11   Office for her.

12   BY MR. SOBIECKI:

13        Q    Do you recall if she actually used the

14   word "blindsided"?

15        A    Yes, she did.

16        Q    In terms of EEO complaints, do you

17   recall if she used the word "surplus"?

18        A    I'm not sure she used that word.

19        Q    Okay.  Now, you mentioned with regard to

20   EEO complaints there was one specialist who had

21   several complaints, right?

22        A    Yeah.

Page 213

1     Q     Did she mention anything other than the

2    one specialist with several complaints?

3          MS. DURHAM:  Objection to form.

4          THE WITNESS:  She said there was some

5    infighting in the office, but she didn't say who

6    the infighting was with.  She only mentioned the

7    one specialist I guess that was the main person

8    generating complaints or making complaints.

9    BY MR. SOBIECKI:

10    Q     Is it fair to say Ms. Turner wanted the

11   office to run smoother?

12    A     Yes.

13    Q     Other than what you've just described,

14   do you recall anything else that Ms. Turner said

15   in that conversation?

16    A     No.  Those were the two main points that

17   she made in the meeting.  It wasn't a long

18   meeting.

19    Q     You were a police officer more than 20

20   years, right, Inspector Parker?

21    A     Yes.  Oh, I'm sorry.  If I can go back.

22    Q     Sure.

1      A    She -- she did tell me where my office

2  would be, my hours, just the -- the normal stuff.

3      Q    So based on your experience as a police

4  officer for more than 20 years, do you think it

5  was reasonable for the Chief of Police to want to

6  be prepared to answer questions from the media?

7            MS. DURHAM:  Objection to form.

8            MR. CARPENTER:  Object to form.

9            THE WITNESS:  It's reasonable, yes.

10  BY MR. SOBIECKI:

11      Q    Okay.  All right.  So if we look at

12  paragraph eight, and it's on the top of page

13  three, you write there that Ms. Turner wanted you

14  to flag requests from certain identified

15  individuals.

16            Do you see that?

17      A    Yes.

18      Q    Could you please list for me everyone

19  you recall falling into that category?

20            MS. DURHAM:  Objection to form.

21            THE WITNESS:  I can't remember.  I don't

22  know -- I don't know if she actually named

Page 215

```
 1   individuals in the first meeting.  The individuals

 2   became named as we went on.

 3   BY MR. SOBIECKI:

 4        Q    How would you keep track?

 5        A    I just remembered.  It wasn't a long --

 6   it's not -- it's not a lot of people, so I just

 7   remembered.

 8        Q    Did you ever write them down?

 9        A    No.

10        Q    You said it was not a long list.  More

11   than five?

12        A    Yes.

13        Q    More than 20?

14        A    No.

15        Q    Roughly ten; is that a fair estimate?

16        A    That's --

17             MS. DURHAM:  Object to form.

18             THE WITNESS:  -- probably fair.

19   BY MR. SOBIECKI:

20        Q    And within that -- those approximately

21   ten, that includes Mr. Flack, Ms. Marraco,

22   Ms. Krepp, Mr. Greene, Douglass, Barth, and Amy
```

1    Phillips, right?

2        A    Right, but she didn't -- in that list

3    she didn't specifically name some of these.  Some

4    of these people, it was the request that they were

5    making that initially got them flagged.

6        Q    Okay.  I want to -- I want to better

7    understand that.

8             So Mr. Flack, were all of his requests

9    flagged or did it depend on the content of his

10   request?

11            MS. DURHAM:  Objection to the form --

12            THE WITNESS:  All --

13            MS. DURHAM:  -- asked and answered.

14            THE WITNESS:  All of his requests were

15   flagged.

16   BY MR. SOBIECKI:

17       Q    And how about Ms. Marraco, was it all of

18   the requests or did it depend on the content?

19       A    It was all of those.

20       Q    So for any of the individuals identified

21   in paragraph ten, did it depend on the content of

22   their request or were all of their requests

Page 217

1  flagged?

2      A    So Eric Flack and Marina Marraco were

3  going to be flagged because they're media and all

4  media requests had to be flagged, but they were

5  also critics of the Chief.

6          The AC- -- the ACLU was the content

7  usually of what they were requesting because it

8  was different people from the ACLU.  Denise Krepp,

9  it was the content initially of what she requested

10  and then it became her because I think she

11  testified a few times negatively about MPD.  I

12  don't think she testified specifically about the

13  Chief, I think she testified about the Agency.

14          Lorenzo Greene was the content of what

15  he was asking for.  Benjamin Douglass was the

16  content of what he was asking for and then he

17  became a person because he also testified at

18  council hearings negatively about MPD's training

19  in Israel.

20          Emily Barth was the nature of -- of the

21  content what she was asking for and Amy Phillips

22  was what she was asking for.

1    Q    Thank you.

2         So let's put aside media because you

3    said all the media got flagged.

4         If it wasn't a member of the media, how

5    would you determine whether the request should be

6    flagged for Ms. Turner?

7         MS. DURHAM:  Object to the form.

8         THE WITNESS:  Usually by what they were

9    asking for and after a while the person, if they

10   were someone who was an out- -- a pretty outspoken

11   critic.

12   BY MR. SOBIECKI:

13   Q    Were there any written criteria that you

14   would look at in determining whether or not they

15   should be flagged for Ms. Turner?

16        Again, putting aside media, did you ever

17   make a list of the requests that you were flagging

18   for Ms. Turner?

19        MS. DURHAM:  Objection to form.

20        THE WITNESS:  No.

21   BY MR. SOBIECKI:

22   Q    So if I was trying to go back and find

Page 219

1   out which requests that you flagged for Ms. Turner

2   pursuant to the watchlist policy, how would I do

3   that?

4        A     I don't think you could.

5        Q     Paragraph 11 of your declaration, just

6   at the end there you say "among others."

7             Other than the categories that you list

8   in paragraph 11, do you recall any other

9   categories that were subject to the watchlist

10  policy?

11       A     There was a request about marijuana

12  arrests, there were -- there's a request about

13  outside employment.  I think one reporter had done

14  a story on it and then several reporters later

15  began asking about it.  There was -- I would need

16  a few minutes to think about it, but I do remember

17  marijuana arrests is not listed here, that was

18  one, and the outside employment one was another

19  big one.

20       Q     And what's listed here, is it -- is it

21  fair also -- I mean, if we put aside Ms. Turner

22  and Ms. -- strike that.

Page 220

1          We talked about high profile items,
2    right?
3          A    Yeah.
4          Q    Gun Recovery Unit, is that a high
5    profile item?
6          A    Yes.
7          Q    It's in the news a lot in the District?
8          A    Yes.
9          Q    Do you think it's reasonable for the
10   Chief and Ms. Turner to know if documents
11   concerning GRU were going to be given to the
12   media?
13              MR. CARPENTER:  Object to the form.
14              MS. DURHAM:  I'll object to the form.
15              THE WITNESS:  But they didn't want me --
16   they -- I couldn't release GRU documents.
17   BY MR. SOBIECKI:
18         Q    Why not?
19         A    They told me not to.
20         Q    Is that -- and did they say because of
21   the safety of the officers or what reason were you
22   given?

```
                                            Page 221

 1          MS. DURHAM:  Object to form.

 2          THE WITNESS:  They -- the reason that --

 3   for our denial, and I can't remember the specific

 4   wording now, but it was -- it had to do with

 5   tactical or strategic planning or strategic -- I

 6   can't remember the exact wording, but it was -- it

 7   was a privacy interest that we -- we don't release

 8   our strategies.

 9   BY MR. SOBIECKI:

10      Q    Have you ever heard the phrase "law

11   enforcement privilege"?

12      A    Yes.

13      Q    And, again, generally the police don't

14   want to tell the bad guys how they investigate

15   their crimes because it could help them avoid

16   being caught; is that fair?

17          MS. DURHAM:  Objection to the form.

18          THE WITNESS:  Yes.

19   BY MR. SOBIECKI:

20      Q    And so as we look at paragraph 11, stop

21   and frisk, is that -- do you call that a high

22   profile issue in the District?
```

1      A     At one point.  I'm not sure if it still

2   is, but yes.

3      Q     All right.  Let's move to paragraph 12,

4   please.

5            In paragraph 12 you talk about the

6   Googling of requesters, right?

7      A     Yes.

8      Q     Could you please list for me every

9   requester that Ms. Turner asked you to Google?

10           MS. DURHAM:  Objection to the form.

11           THE WITNESS:  I can't remember now.

12   BY MR. SOBIECKI:

13      Q     Can you remember any of them?

14      A     None.  Well, Judicial Watch.  That's one

15   that I remember, but I -- I can't remember.

16      Q     Under the FOIA statute, are requests

17   from media treated differently from other requests

18   in terms of charging a fee?

19           MS. DURHAM:  Objection to the form.

20           THE WITNESS:  I don't remember.

21   BY MR. SOBIECKI:

22      Q     Well, do you recall under the FOIA

Page 223

1    statute that media members are not charged a fee?

2            MS. DURHAM:  Objection to the form.

3            THE WITNESS:  I don't remember that.

4    BY MR. SOBIECKI:

5        Q    Okay.  Well, I'll represent to you that

6    media members do not get charged a fee.

7        A    Okay.

8        Q    So given that, would it matter if a

9    request was coming from a media member in terms of

10   how you handled the request?

11       A    Not when I Googled the -- the Judicial

12   Watch because we weren't charging fees at that

13   time.  We started charging later.

14       Q    So I want to make sure I understand

15   this.  You recall that at one point Ms. Turner

16   asked you to Google Judicial Watch?

17       A    Yes.

18       Q    And why did she ask you to Google

19   Judicial Watch?

20       A    To see who it was.

21       Q    Do you know if Ms. Turner did that

22   because she wanted to know if they were a media

Page 224

1   organization?

2          MS. DURHAM:  I will object to the form

3   of the question.

4          THE WITNESS:  I don't know why she

5   asked.

6   BY MR. SOBIECKI:

7      Q    You don't know one way or another why

8   Ms. Turner wanted to know?

9      A    Right.

10     Q    I just want to circle back briefly.  We

11  talked about which requests you brought to

12  Ms. Turner.  You've told me all media requests

13  were brought to Ms. Turner, right?

14     A    Yes.

15     Q    I just want to make sure the record is

16  clear on this.  Did you bring every FOIA request

17  from Amy Phillips to Ms. Turner?

18         MS. DURHAM:  Objection to the form,

19  asked and answered.

20         THE WITNESS:  I can't remember if I

21  brought every one.  Maybe at first, but it did

22  become that, yes, I did start taking every one.

1   BY MR. SOBIECKI:

2       Q    Do you recall how many FOIA requests Amy

3   Phillips submitted when you were a FOIA Officer?

4       A    No, I don't.

5       Q    Any ballpark idea whatsoever?

6            MS. DURHAM:  Objection to the form of

7   that question.

8            THE WITNESS:  No.

9   BY MR. SOBIECKI:

10      Q    Do you know if Ms. Turner knew you were

11  bringing Amy Phillips' requests to her attention?

12           MS. DURHAM:  Objection to the form.

13           THE WITNESS:  I don't think she knew Amy

14  Phillips because her requests were taken because

15  of what she was asking for.

16  BY MR. SOBIECKI:

17      Q    Okay.  And returning to paragraph 12,

18  did you ever Google a requester on your own, not

19  because Ms. Turner had told you to?

20      A    No.

21      Q    So just to recap, paragraph 12 you're

22  talking about the Googling and I'll ask my

Page 226

1    question:  You recall that Ms. Turner asked you to

2    Google one entity and that entity was Judicial

3    Watch, right?

4         A    Yes.

5              MS. DURHAM:  Objection to the form,

6    misstates the testimony.

7    BY MR. SOBIECKI:

8         Q    Could we look at paragraph 13, please.

9              Now, in 13 you say, "I sent an e-mail to

10   Chief Newsham and Ms. Turner weekly which included

11   a listing of all FOIA requests received the prior

12   week, highlighting any requests that originated

13   from the media, specific individuals, or sought

14   certain records."

15             Do you see that?

16        A    Yes.

17        Q    Was that the practice from when you

18   started in the FOIA Office in October of 2017?

19        A    When I started, it was just sending all

20   of the requests.  Later Ms. Turner asked me to

21   highlight any ones that are of significance.

22        Q    And the ones you highlighted, those were

Page 227

1  because they met the criteria of the watchlist

2  policy we talked about earlier?

3      A   Yes.

4      Q   Okay.  So Inspector Parker, on one hand

5  you highlighted some requests that came in because

6  they met the criteria of the watchlist policy,

7  right?

8      A   Yes.

9      Q   If you didn't highlight a request, that

10 meant it didn't meet the criteria of the watchlist

11 policy, right?

12         MS. DURHAM:  Objection to the form.

13         THE WITNESS:  Yes.

14 BY MR. SOBIECKI:

15     Q   The weekly -- do you recall Ms. Durham

16 asking you some questions about did you send the

17 weekly e-mail every single week?

18         Do you recall that?

19     A   Yes.

20     Q   And then she made a representation about

21 what the District said regarding weekly e-mails.

22         Do you recall that?

Page 228

```
1        A     Yes.
2        Q     When you were a FOIA Officer, you were
3   in law school, right?
4        A     Yes.
5        Q     And that was in Minnesota?
6        A     Yes.
7        Q     This is before COVID, right?
8        A     Yes.
9        Q     Did you ever go to attend classes in
10  person in Minnesota?
11       A     Yes.
12       Q     And during that time you would be out of
13  the FOIA Office, right?
14       A     Yes.
15       Q     And I'm not looking to pry, but you had
16  some medical issues as well during your time as
17  FOIA Officer, right?
18       A     At the end, yes.
19       Q     And you had to take some leave for those
20  medical issues, right?
21       A     Yes.
22       Q     So would it surprise you to learn that
```

Page 229

```
 1    there may have been a handful of weeks where the

 2    weekly e-mail was not sent?

 3         A    In my absence Lisa sent the weekly

 4    e-mail.

 5         Q    So you don't know what happened when you

 6    were gone, your understanding is that

 7    Ms. Archie-Mills was going to send it?

 8              MS. DURHAM:  Objection to the form.

 9              MR. CARPENTER:  I'll object to form.

10              THE WITNESS:  Yes.

11    BY MR. SOBIECKI:

12         Q    Did you ever go -- when did you start

13    law school, Inspector Parker?

14         A    August, 2018.

15         Q    And how did -- how did you manage that,

16    going -- having a full-time job in D.C. and being

17    in law school in Minnesota?

18         A    The law school was a hybrid program, so

19    you -- we went two-thirds on campus, one-third

20    online, but the two-thirds on campus we -- we went

21    twice a semester on campus from Sunday to Sunday

22    and our classes were from 8:30 a.m. to 6:00 p.m.
```

1      Q    So if I -- if I'm understanding, so for

2   two -- two full weeks each semester you would be

3   in Minnesota?

4      A    Yes, but not consecutive.

5      Q    So during your time as FOIA Officer,

6   approximately eight weeks you spent in Minnesota?

7      A    Yes.

8      Q    And during that time you don't know one

9   way or the other whether a weekly e-mail was sent

10  to Ms. Turner and Chief Newsham, right?

11     A    I didn't pay attention.

12     Q    The weekly e-mails that you sent to

13  Ms. Turner and Chief Newsham, do you recall if

14  Chief Newsham ever responded to your e-mails?

15     A    No, he didn't.

16     Q    Do you know one way or the other whether

17  Ms. Archie-Mills ever spoke with Chief Newsham

18  about any FOIA requests?

19          MS. DURHAM:  I'll object to the form.

20          THE WITNESS:  I don't know.

21  BY MR. SOBIECKI:

22     Q    You were asked a number of questions

Page 231

1    about Ms. Turner wanting to receive records in

2    hard-copy form.

3              Do you recall that?

4        A    Yes.

5        Q    Was it ever the case in your time as

6    FOIA Officer that it would be easier to review a

7    document if it was in hard copy as opposed to an

8    electronic version?

9        A    I guess it depends on the person who's

10   reviewing it.  It could have been.  I don't know.

11       Q    And you were also asked some questions

12   about not wanting to say things in e-mails.

13             Do you recall that?

14       A    Yes.

15       Q    Is it sometimes the case that having a

16   conversation like we are now is -- is easier than

17   trying to talk over e-mail?

18       A    It is, but the reason I included that is

19   because that's actually something she said to me.

20       Q    And did Ms. Phillips tell you to include

21   that line about --

22             MS. DURHAM:  I'll object to the form.

1   BY MR. SOBIECKI:

2       Q    Okay.  I'm referring you to paragraph

3   15.  The last sentence says, "The Chief and

4   Ms. Turner were averse to e-mails as they created

5   material susceptible to FOIA laws or discovery in

6   litigation."

7            Do you see that?

8       A    Yes.

9       Q    Did Amy Phillips suggest that you

10  include that language?

11           MS. DURHAM:  I'll object to the form.

12           THE WITNESS:  I don't think she

13  suggested I include it.  I know that she corrected

14  my spelling of averse in -- in a draft.

15  BY MR. SOBIECKI:

16      Q    So Ms. Phillips reviewed drafts of the

17  declaration, right?

18      A    Yes.

19      Q    Did she make any suggestions as to what

20  you should include?

21      A    I don't -- I think she asked me -- yeah,

22  she did, but I -- I can't -- I'd have to actually

Page 233

1   refer back.  But she did, yes.

2       Q    Okay.  Can you look at paragraphs of

3   your declaration, 25, 26, and 27, please, and if

4   you want to take a second to look at those.  I

5   know we spent a lot of time with this today.

6       A    Twenty-four, 25, and 26?

7       Q    Twenty-five, 26 and 27.

8            MR. CARPENTER:  Twenty-five, 26, and 27.

9            THE WITNESS:  Okay.

10  BY MR. SOBIECKI:

11      Q    When you were drafting your declaration,

12  do you remember your memory of these events in

13  paragraphs 25, 26, and 27 changing over time?

14           MS. DURHAM:  I will object to form.

15           THE WITNESS:  My memory changing or the

16  draft changing?

17  BY MR. SOBIECKI:

18      Q    Your memory changing.

19      A    No.

20      Q    So like in paragraph 26 you say, "I

21  spoke with Mr. Terry Ryan and Mr. Ronald Harris,"

22  right?

Page 234

1        A    Yes.

2        Q    You don't recall Ms. Turner speaking

3   with Mr. Ryan and Mr. Harris, do you?

4             MS. DURHAM:  I'll object to the form.

5             THE WITNESS:  Not for this item, no.

6   BY MR. SOBIECKI:

7        Q    And in --

8        A    Not initially anyway.  She did

9   afterwards, I mean, a little later on.

10       Q    And did Ms. Phillips suggest that you

11  say "I spoke with Mr. Ryan and Mr. Ronald Harris"?

12       A    No.

13            MS. DURHAM:  Objection to the form.

14  BY MR. SOBIECKI:

15       Q    Would you turn to paragraph 49, please.

16            In paragraph 49 the second sentence you

17  wrote, "In many situations, the approval to

18  release documents, which ones, and when to release

19  them were made by Ms. Turner and Chief Newsham."

20            I just want to be clear.  It was Ms.

21  Turner who made these decisions, right, not Chief

22  Newsham?

1      A    Yes, but there are some requests that

2  she said she wanted to run past the Chief.  I

3  don't know if she did or didn't, so...

4      Q    Okay.  Again, talking about the

5  watchlist policy, could you estimate for me how

6  many requests you brought to Ms. Turner's

7  attention under that -- what we're calling a

8  policy?

9           MS. DURHAM:  Objection to the form.

10          MR. CARPENTER:  During what period of

11  time?

12  BY MR. SOBIECKI:

13      Q    Your time as FOIA Officer.

14      A    I couldn't guess.

15      Q    Can you give me any estimate?

16          MS. DURHAM:  I'll object to the form.

17          THE WITNESS:  It's a lot.  I don't know.

18  BY MR. SOBIECKI:

19      Q    More than 20?

20      A    Yes.

21          MS. DURHAM:  I'll object to the form,

22  asked and answered.

Page 236

1   BY MR. SOBIECKI:

2        Q     More than a hundred?

3        A     Yes.

4              MS. DURHAM:  I'll object to the form,

5   asked and answered.

6   BY MR. SOBIECKI:

7        Q     More than a thousand?

8        A     No.

9        Q     More than 500?

10             MS. DURHAM:  Object to the form.

11             THE WITNESS:  I don't -- I don't know.

12  I -- I -- I don't know.  More than a hundred, but

13  I -- I don't know if it was more than 500.

14  BY MR. SOBIECKI:

15       Q     Okay.  Just -- you had a Tuesday meeting

16  with Ms. Turner, right?

17       A     Yes.

18       Q     And you discussed many FOIA requests,

19  right?

20       A     Yes.

21       Q     Some were subject to the watchlist

22  policy and some were not?

 1        A    Yes.

 2        Q    I believe you mentioned staffing during

 3   your examination in the -- in the morning.

 4             Was staffing an issue during your time

 5   as FOIA Officer?

 6        A    Yes.

 7        Q    Could you tell me a little bit more

 8   about that.  What was the issue with staffing?

 9        A    We had some turnover.  I had four

10   openings -- or four openings for paper review and

11   four openings for body worn camera review and

12   there -- there was -- and I had an opening for two

13   supervisors, so there had been times when I only

14   had one supervisor and I only had two body worn

15   camera specialists and three -- three paper

16   specialists, so I -- I would be short on both

17   sides.

18        Q    And MPD received many FOIA requests; is

19   that fair?

20        A    Yes.

21        Q    And I'll represent to you it was more

22   than a thousand each year.

Page 238

1           Does that sound roughly --

2      A    Yes.

3      Q    -- accurate?

4      A    Yes.

5      Q    Do you recall how long under the FOIA

6   statute MPD has to respond to a FOIA request?

7      A    I think it's 14 -- 14 or 15 days.

8      Q    I'll tell you that it's 15 days.

9           And do you recall that MPD can get an

10  extension of that of 10 to 15 days?

11     A    Yes.

12     Q    During your time as FOIA Officer, did

13  MPD respond to every request within the statutory

14  time frame?

15     A    No.

16     Q    Was part of the reason MPD did not

17  respond to every FOIA request within the statutory

18  time frame staffing?

19     A    Yes.

20     Q    If you had more people, you could have

21  got the request done quicker; fair?

22     A    In some of the cases, yes, that's fair.

1      Q    And I believe you talked about

2  voluminous requests.  Well, did --

3      A    Yeah.

4      Q    Strike that.

5           I'll say did MPD sometimes request a

6  voluminous amount of material?

7      A    Yes.

8      Q    And those took time, right?

9      A    Yes.

10      Q    Some requests required an OCTO search,

11  right?

12      A    Yes.

13      Q    Can -- can you tell me a little bit

14  about what an OCTO search is.  How does that

15  process work?

16      A    If a requester is asking for e-mails,

17  OCTO is the repository for the D.C. Government's

18  e-mail.  So we would have to make a request to

19  OCTO to pull the e-mails and then send them to

20  us -- send them back to the agency of request.

21  Then they needed to be processed, meaning a

22  specialist would need to go through and see if

1   they were responsive to the request.

2        Q    All right.  So the FOIA Office tells

3   OCTO we'd like you to do this search, right?

4        A    Yes.

5        Q    And then OCTO does their search?

6        A    Yes.

7        Q    Did the FOIA Office have any control

8   over how quickly OCTO did those searches?

9        A    No.

10        Q    You would get the documents back when

11   OCTO said they were ready; fair?

12        A    Yes.

13        Q    Talking about OCTO searches -- strike

14   that.

15             Would the way a search was framed to

16   OCTO depend on what results you got back?

17             MS. DURHAM:  Objection to the form.

18             THE WITNESS:  Yes.

19   BY MR. SOBIECKI:

20        Q    And by that I mean, sometimes -- strike

21   that.

22             In submitting an OCTO search, you would

Page 241

1    sometimes put terms in parentheses, right?  If you

2    wanted to use an "or"?

3         A    Yes.

4         Q    Let me ask that better.  If I wanted all

5    documents referring to water or coffee, I would

6    tell OCTO water or coffee, right?

7              MS. DURHAM:  Objection to form.

8              THE WITNESS:  Yes.

9    BY MR. SOBIECKI:

10        Q    I'm going to -- I'm going to move on

11   from that.

12             Do you have a Twitter account, Inspector

13   Parker?

14        A    No.

15        Q    Have you ever had a Twitter account?

16        A    No.

17        Q    All right.  Let me go back to the -- the

18   OCTO search briefly.

19             If you received a request for all

20   e-mails mentioning Amy Phillips, what search terms

21   would you give to OCTO?

22        A    Just that, all e-mails that include Amy

Page 242

1    Phillips.

2         Q    And would you put Amy Phillips in quote

3    and say search for that?

4         A    So I know there's -- it's called a

5    boolean search and I -- I would have to look at

6    the key to see if you use parentheses or quotes.

7    I -- I can't remember which ones you use, but yes,

8    that's the idea.

9         Q    Who in the FOIA Office was responsible

10   for determining what search terms would be given

11   to OCTO?

12        A    Kimberly Robinson.  And -- and she would

13   consult with whatever specialist was assigned the

14   request.

15        Q    Would Ms. Robinson or the specialist

16   consult with you on every OCTO search they were

17   submitting?

18        A    No.

19        Q    Sometimes they would just do it on their

20   own, right?

21        A    Yes.

22        Q    All right.  So if I put -- if I give a

Page 243

1  search to OCTO and I put Amy Phillips in quote --

2  all right?  Are you with me -- would they give me

3  back documents where Phillips, Amy was present?

4          MS. DURHAM:  Objection to the form.

5          THE WITNESS:  I'm not sure.  I can't

6  remember.

7  BY MR. SOBIECKI:

8      Q    Okay.

9          MR. CARPENTER:  How do you spell OCTO?

10         THE WITNESS:  O-C-T-O.  Office of the

11 Chief Technology.

12         MR. CARPENTER:  Okay.

13 BY MR. SOBIECKI:

14     Q    Inspector Parker, I'd like to show you

15 what's been previously marked as Plaintiff's

16 Exhibit 86.

17         Plaintiff's Exhibit 86 is -- is a -- is

18 one of the weekly e-mails we've been talking

19 about, right?

20     A    Yes.

21     Q    And it's from you to Ms. Turner,

22 Mr. Sternbeck.  Mr. -- Chief Newsham is not on

Page 244

1    this e-mail, is he?

2         A     No.

3         Q     Did sometimes you not send the weekly

4    e-mails to Chief Newsham?

5              MS. DURHAM:  Objection to the form.

6              THE WITNESS:  I -- I can't remember.

7    I -- I don't want to guess, but I -- I can't

8    remember why he's not on here.

9    BY MR. SOBIECKI:

10        Q     But based on Plaintiff's Exhibit 86,

11   it's fair to say Chief Newsham didn't receive

12   every single weekly e-mail, right?

13             MS. DURHAM:  Objection to form.

14             THE WITNESS:  That's right.

15   BY MR. SOBIECKI:

16        Q     And this weekly e-mail is from

17   October 23rd, 2018, right?

18        A     Yes.

19        Q     And in the body of the e-mail you say,

20   "Please find attached all requests received last

21   week.  Below is a list of highlights."

22             Do you see that?

Page 245

1      A    Yes.

2      Q    And you highlight one request and that's

3  from Evan Lambert, right?

4      A    Yes.

5      Q    Why did you put this request from Evan

6  Lambert in the body of the e-mail?

7      A    Because Leeann asked me to start pulling

8  out the ones that are of significance and put them

9  in the body of the e-mail for easy reference.

10     Q    And when you say "significance," is that

11 the same as the watchlist policy?

12     A    Yes.

13     Q    So for this weekly request -- oh, I'm

14 sorry, strike that.

15          For this weekly e-mail, Plaintiff's

16 Exhibit 86, the FOIA request that met the

17 watchlist policy were the one by Evan Lambert?

18     A    Yes.

19     Q    I should have asked that better.

20          Okay.  So can you turn over to the

21 attachment, please, and I'm going to direct you to

22 Bates ending in 9366.

1          Do you see that?  And the top says,

2     "Tuesday's Report Received between 10/14 and

3     10/20," right?

4          A    Yes.

5          Q    And the first request is from Kimbriell

6     Kelly?  Do you see that?

7          A    Yes.

8          Q    And the organization is The Washington

9     Post?

10         A    Yes.

11         Q    And that's a media organization, right?

12         A    It is, yes.

13         Q    And you didn't flag that as meeting the

14    watchlist policy, right?

15         A    Yes, clearly not.

16              MS. DURHAM:  Sorry.  I just want to

17    object to the document to the extent we can't see

18    what the requests are actually for, but you can

19    answer.

20    BY MR. SOBIECKI:

21         Q    And then if you turn over to Bates 9367,

22    the first request is from a Justin Balding from

Page 247

1    Dateline NBC.

2          A     Yes.

3          Q     Have you ever heard of Dateline NBC?

4          A     Yes.

5          Q     Is it fair to call Dateline NBC a media

6    organization?

7          A     It is, yes.

8          Q     And that request was not flagged as

9    meeting the watchlist policy, right?

10         A     This one was a show.  It went to -- it

11   went to PIO to work with this requester because

12   they were doing a specific show about a -- a case

13   that happened that MPD investigated.

14         Q     Why did you flag the Evan Lambert

15   request, Inspector Parker?

16         A     Because it was a media request.

17         Q     Is that the only reason?

18         A     Yes.

19         Q     I'd like to show you what's been

20   previously marked as Plaintiff's Exhibit 87.

21               Plaintiff's Exhibit 87 is a -- one of

22   the weekly e-mails, right?

Page 248

1      A    Yes.

2      Q    And it's January 10th, 2019 from you to

3   Ms. Turner, Chief Newsham, and Mr. Sternbeck,

4   right?

5           Inspector Parker, do you see you blind

6   copied yourself on this?

7      A    Yes.

8      Q    Why did you do that?

9      A    I did that for a lot of my e-mails.

10     Q    Why?

11     A    I don't remember the reason why.

12     Q    Okay.  And you write, "Please see

13   attached new FOIA requests.  Requests of

14   significance have been highlighted and are listed

15   below."

16          Do you see that?

17     A    Yes.

18     Q    And then if you turn the page over, you

19   see that you have flagged four requests, right?

20     A    Yes.

21     Q    One from Nathan Baca, one from P.J.

22   D'Annunzio, one from Eric Flack, and one for

Page 249

1    Colbert King, right?

2        A    Yes.

3        Q    Why did you flag -- well, strike that.

4            If you need time to review them, please,

5    but was the only reason these requests were

6    flagged was because they were from members of the

7    media?

8            MS. DURHAM:  I would object to the form.

9            THE WITNESS:  Yes.

10   BY MR. SOBIECKI:

11       Q    Because if you look at, on the second

12   page, Colbert King's request -- do you see that?

13       A    Yes.

14       Q    -- Mr. King is requesting the total

15   number of unsolved homicides in the District of

16   Columbia, right?

17       A    Yes.

18       Q    Are you aware that that information is

19   on the MPD website?

20           MS. DURHAM:  Objection to form.

21           THE WITNESS:  I'm not sure, but it's

22   still -- because it's a media request, even if

Page 250

1    it's a simple response, we still had to run it

2    past Leeann.

3    BY MR. SOBIECKI:

4        Q    So, again, so I -- I apologize about the

5    format, but if you could flip to the attachment.

6    And there are no pages.  Let me count for you.  If

7    you could turn to the fourth page.  It has a

8    report date of January 10th, 2019 at the top.

9        A    Yes.

10       Q    The second request on that page is from

11   the Wall Street Journal, right?

12       A    Yes.

13       Q    And the Wall Street Journal is a media

14   organization, right?

15       A    Yes.

16       Q    And then the fourth request on that page

17   is also from the Wall Street Journal, right?

18       A    Yes.

19       Q    And neither of those requests were

20   flagged in your e-mail, right?

21       A    No.

22       Q    And then if you turn over to the next

Page 251

1    page where the first request is TGV Rockets.

2            Do you see that?

3        A    Yes.

4        Q    The fourth request is from the Milwaukee

5    Journal Sentinel.

6            Do you see that?

7        A    Yes.

8        Q    And that's also a media organization,

9    right?

10       A    Yes.

11       Q    And then if you turn over to the next

12   page, we see a request from CNN Investigations.

13           CNN is a media organization, right?

14       A    Yes.

15       Q    So looking at Plaintiff's Exhibit 87,

16   why didn't you flag those other media requests,

17   Inspector Parker?

18       A    It looks like I had a bad week and just

19   missed them.

20       Q    I'd like to show you Plaintiff's

21   Exhibit 88.

22           MR. SOBIECKI:  And I apologize, one of

Page 252

1   you will receive a version with some highlighting

2   on it.  You're welcome.

3   BY MR. SOBIECKI:

4       Q    All right.  Plaintiff's Exhibit 88,

5   Inspector Parker, is another one of the weekly

6   e-mails, right?

7       A    Yes.

8       Q    And it's from you to Chief Newsham,

9   Ms. Turner, Mr. Sternbeck, right?

10      A    Yes.

11      Q    Why did you copy Mr. Sternbeck on this

12  e-mail?

13      A    He is -- he was the director of PIO,

14  Public Information Office, so he got copies of the

15  FOIA requests in case he got any media inquiries

16  about the same.

17      Q    Okay.  So, again, this is a weekly

18  e-mail from March 19th, 2019, and you write,

19  "Requests of significance have been highlighted on

20  the attached and are listed below.  The request

21  highlighted below is an ACLU (retained by subject

22  of video) request for BWC of June 13th, 2018,

Page 253

1    Sheriff Road event."

2              Do you see that?

3        A    Yes.

4        Q    And you flagged this because it met the

5    watchlist policy criteria, right?

6        A    Yes.

7        Q    Do you recall this FOIA request seeking

8    BWC from the Sheriff Road event?

9        A    Yes.

10       Q    Do you recall if this request received

11   any special treatment while you were FOIA Officer?

12       A    It didn't.

13       Q    This request was treated just like all

14   the other ones?

15       A    Yes.

16       Q    You testified earlier that when you were

17   FOIA Officer you started having communications

18   with members of the media regarding their FOIA

19   requests.

20             Do you recall that?

21       A    Yes.

22       Q    Could you list for me which members of

Page 254

1   the media you had conversations with regarding

2   their FOIA requests?

3           MS. DURHAM:  Objection to the form.

4           THE WITNESS:  Quite a few of them.

5   BY MR. SOBIECKI:

6       Q    Which ones do you recall?

7       A    Eric Flack, Evan -- I -- if I mess their

8   names up, please forgive me -- Evan Lambert,

9   Marina Marraco, Emily -- not Emily Barth --

10  Emily -- there was a Channel 5, Emily -- I can't

11  remember Emily's last name, but she was from

12  Channel 5, Colbert King, Peter Hermann.  There

13  were quite a few journalists who would call and

14  ask for updates on their FOIA requests or ask

15  questions about their FOIA requests or

16  dissatisfied with what they got as a response for

17  their FOIA request.

18      Q    Do you -- do you see this e-mail has

19  your signature block on it, Inspector Parker?

20      A    Yes.

21      Q    And it has your office number of

22  (202)724-4264, right?

Page 255

1       A    Yes.

2       Q    So the media members who you were

3  speaking to, when they called you, were they

4  calling your office number?

5            MS. DURHAM:  Object to the form.

6            THE WITNESS:  Yes.

7  BY MR. SOBIECKI:

8       Q    Were any of media members you just

9  listed calling your personal cell phone?

10      A    Yes.

11      Q    Which ones?

12      A    Eric Flack.

13      Q    Were there any other media members who

14  called you on your personal cell phone other than

15  Eric Flack?

16      A    No.

17      Q    Did Michael Perloff ever call you on

18  your personal cell phone while you were FOIA

19  Officer?

20      A    Yes.

21      Q    So we have Mr. Flack and Mr. Perloff.

22           Any others?

1     A     That called me?  I don't think so.

2     Q     And why did Mr. Perloff call you on your

3  personal cell phone as opposed to your office

4  line?

5          MS. DURHAM:  Objection to the form.

6          MR. CARPENTER:  If you know.

7          THE WITNESS:  Because he had

8  questions -- he had a fear of the Government line

9  being recorded.

10 BY MR. SOBIECKI:

11    Q     Did Mr. Perloff tell you that, that he

12 had a fear of your government line being recorded?

13         MS. DURHAM:  Objection to form.

14         THE WITNESS:  He --

15         MR. CARPENTER:  It was Mr. Flack, wasn't

16 it?  I thought the question was for Mr. --

17         THE WITNESS:  It was Mr. Perloff.

18         MR. CARPENTER:  Oh, Mr. Perloff.  I'm

19 sorry.

20         THE WITNESS:  He didn't say those words.

21 He just said can we talk offline or off the

22 Government phone.

1  BY MR. SOBIECKI:

2       Q    Did you think there was anything

3  nefarious about his desire to talk offline using

4  your personal cell phone?

5            MS. DURHAM:  Objection to form.

6            THE WITNESS:  No.

7  BY MR. SOBIECKI:

8       Q    And how about Mr. Flack, why did he call

9  you on your personal cell phone?

10      A    He was looking for a source for stories

11  that he was working on.

12      Q    How did you come to know Mr. Flack?

13      A    From FOIA.

14      Q    You met him because he had -- strike

15  that.

16           Mr. Flack submitted a FOIA request,

17  right?

18      A    Yes.

19      Q    Mr. Flack submitted many FOIA requests,

20  right?

21      A    Yes.

22      Q    And through processing his FOIA

Page 258

1    requests, you got to know him a little bit, right?

2         A    Yes.

3         Q    And that developed to the point where he

4    asked if he could call you on your personal cell

5    phone?

6         A    Yes.  He got frustrated with how long

7    his requests were taking to -- to be released and

8    he asked questions about -- well, he didn't ask

9    questions, he made threats about doing a story on

10   FOIA.  So Mr. Flack and I started talking because

11   I tried to talk him down from doing stories and

12   reassuring him that he would get his request -- he

13   would get his responses soon.

14        Q    Do you think it was appropriate to

15   discuss FOIA requests with Mr. Flack on your

16   personal cell phone?

17             MR. CARPENTER:  Object to form.

18             MS. DURHAM:  Object to the form.

19             THE WITNESS:  I believe so.  I thought

20   it was fine.

21   BY MR. SOBIECKI:

22        Q    Would those records then be subject to

Page 259

```
 1   FOIA if you were talking about FOIA requests on

 2   your personal cell phone?

 3           MS. DURHAM:  Objection to form.

 4           THE WITNESS:  We didn't talk about the

 5   records, we talked about his requests and when he

 6   could get them.

 7   BY MR. SOBIECKI:

 8       Q    And you do not consider that special

 9   treatment, right?

10       A    I talked to many requesters about their

11   requests and -- and when they could expect to get

12   them.  He wasn't the only one.

13       Q    But in terms of your personal cell

14   phone, the only individuals were Mr. Perloff and

15   Mr. Flack, right?

16           MS. DURHAM:  Object to form.

17           THE WITNESS:  Yes.

18   BY MR. SOBIECKI:

19       Q    Okay.  So going back to Plaintiff's

20   Exhibit 88, if you turn over to the back page of

21   the first one, it's the second page of the

22   document, do you see the -- it says, "Tuesday's
```

Page 260

1    Report Received Between March 10th, 2019 and

2    March 16th, 2019."

3              Do you see that?

4         A    Yes.

5         Q    And the first request is from Scott

6    MacFarlane, NBC Washington, right?

7         A    Yes.

8         Q    And Mr. MacFarlane is a member of the

9    media, right?

10        A    Yes.

11        Q    But you didn't --

12             MR. CARPENTER:  I would have -- I would

13   have flagged that one.

14             MR. SOBIECKI:  Thank you, John.

15             MR. CARPENTER:  Sorry.

16   BY MR. SOBIECKI:

17        Q    And then if you turn -- I apologize for

18   the double siding.  I would just kill the trees.

19   The back page of the second page, the second

20   request is from Hiroko Tabuchi.

21             Do you see that?

22        A    Yes.

1      Q      And he's from the New York Times, right?

2      A      Yes.

3      Q      And that's a member of the media?

4      A      It is.

5      Q      And then the third request on that page

6   is from Benjamin Douglass, right?

7      A      Yes.

8      Q      And Mr. Douglass was named in your

9   declaration as someone whose requests were

10  flagged, right?

11           Do you recall that?

12     A      Yes.

13     Q      But this request from Mr. Douglass was

14  not flagged, right?

15     A      No, it wasn't.

16     Q      Why didn't you flag this request from

17  Mr. Douglass?

18     A      Again, this was sent at 9:53 p.m. and

19  the other one was sent at 5:11 p.m.  These were

20  long days.  I just missed them.

21     Q      Things happen, right?

22     A      Right.

Page 262

1    Q    And then if you turn to the back of the

2  third page, the second request on there is from

3  Peter Jamison.

4         Do you see that?

5    A    Yes.

6    Q    And Mr. Jamison was from The Washington

7  Post?

8    A    Yes.

9    Q    And then if you turn over to the next

10  page, the top request is from Michael Miller.

11         Do you see that?

12    A    I do, yes.

13    Q    And Mr. Miller is from The Washington

14  Post as well, right?

15    A    Yes.

16    Q    And then if you turn to the back of the

17  last page, the second request is from Amy

18  Phillips, isn't it?

19    A    Yes.

20    Q    And that request was not flagged in the

21  body of your e-mail, right?

22    A    No.

Page 263

1      Q    And I'll represent to you that FOIA
2   request 2019-FOIA-03684 -- sorry I'm going too
3   fast -- is her request for records concerning Sean
4   Lojocano.
5      A    Okay.
6      Q    But you didn't flag that one as meeting
7   the watchlist policy, right?
8      A    No, I missed it.
9           MR. CARPENTER:  I missed it, I missed
10  it?
11          THE WITNESS:  I missed it.
12          MR. CARPENTER:  Oh, okay.
13  BY MR. SOBIECKI:
14     Q    I'd like to show you what's been
15  previously marked as Plaintiff's Exhibit 89.
16          Plaintiff's Exhibit 89 is another one of
17  the weekly e-mails, right?
18     A    Yes.
19     Q    It's from you to Chief Newsham,
20  Ms. Turner, and Mr. Sternbeck, correct?
21     A    Yes.
22     Q    And you write, "Requests of significance

Page 264

1    have been highlighted on the attached and are

2    listed below," right?

3         A    Yes.

4         Q    And there are two requests here from

5    Mr. Perloff, right?

6         A    Yes.

7         Q    And why did you flag these requests from

8    Mr. Perloff?

9         A    They were from the ACLU.

10        Q    Any other reasons?

11        A    No.

12        Q    And so if you turn to the back of the

13   second page, the -- the fourth request is from

14   Allison Papson, right?

15        A    Yes.

16        Q    And she's with FOX 5?

17        A    Yes.

18        Q    And FOX 5 is a media source, right?

19        A    Yes.

20        Q    Apologies.

21             MR. CARPENTER:  Do you want to take a

22   break?

Page 265

1          MR. SOBIECKI:  Yeah, yeah, I apologize.

2     I didn't realize it had been that long.  Now would

3     be a good time for a break.

4          VIDEO TECHNICIAN:  Off the record at

5     3:15.  This ends Media Unit Number 4.

6          (Brief recess.)

7          VIDEO TECHNICIAN:  On the record at

8     3:37 p.m.  This begins Media Unit Number 5 in the

9     deposition of Vendette Parker.

10    BY MR. SOBIECKI:

11         Q     Welcome back, Inspector Parker.

12         Would you ever review drafts of

13    responses prepared by FOIA specialists?

14         A     Yes.

15         Q     And do you recall this morning Ms.

16    Durham asked you about Ms. Turner reviewing drafts

17    of responses?

18         A     Yes.

19         Q     And she asked if Ms. Turner's review

20    added time to the process.

21         Do you recall that?

22         A     Yes.

Page 266

1      Q    And you said it did add time, right?

2      A    Sometimes.

3      Q    Does your review of FOIA specialists'

4   draft responses add time to the process?

5      A    Sometimes.

6      Q    And do you think there's anything

7   inappropriate about a supervisor reviewing the

8   work of someone who reports to them?

9      A    No.

10     Q    Because it would have been quicker,

11   right, if the FOIA specialist just sent out the

12   request without any review, right?

13     A    It would have, but our -- the difference

14   is the reasons behind my delay and some of the

15   reasons behind her delay.

16     Q    What do you mean by that?  How are the

17   reasons different?

18     A    My reasons for delay was either I

19   thought the response was incomplete or that we

20   needed additional documents and sometimes her

21   responses -- I mean, her delays were because she

22   didn't like the way they looked or she wanted the

Page 267

```
 1   data cleaned or she had different responses -- she

 2   had different reasons for her responses.

 3       Q    Were you always familiar with her

 4   reasons for -- strike that.

 5            I'd like to take you back to Plaintiff's

 6   Exhibit 56, please.

 7       A    Yes.

 8       Q    Plaintiff's Exhibit 56 is the Amy

 9   Phillips Lojocano request.

10            Do you recall that?

11       A    Yes.

12       Q    And you were asked some questions about

13   the timing of the denial.

14            Do you recall that?

15       A    Yes.

16       Q    And I believe you testified that

17   Ms. Turner told you to deny this request over a

18   phone call; is that right?

19       A    Yes.

20       Q    Were you in the office when you called

21   Ms. Turner?

22       A    Yes.
```

Page 268

1      Q     Did you call her from your desk phone?

2      A     Yes.

3      Q     And did you call Ms. Turner's desk --

4   desk phone?

5      A     Yes.

6      Q     And do you recall how long that

7   conversation lasted?

8      A     Not very long.  She's very busy, very

9   busy.

10     Q     Do you recall who sent out the denial

11  letter for the -- Ms. Phillips' Lojocano request?

12     A     The administrative assistant, Latrina

13  Crumlin.

14     Q     And Ms. Crumlin is a staff assistant,

15  right?

16     A     Yes.

17     Q     She's not a FOIA specialist?

18     A     No.

19     Q     You mentioned that some requests earlier

20  could be handled very quickly.

21           Do you recall that?

22     A     Yes.

1      Q    Would Ms. Crumlin have form responses

2    that she could send out in response to certain

3    requests?

4      A    Yes.  They're programmed in FOIA

5    Express.

6      Q    Do you know if Ms. Crumlin used one of

7    the form responses in responding to Ms. Phillips?

8      A    Yes.  It's on another exhibit that I saw

9    the -- I saw the response that was a form

10   response.

11     Q    And did you tell Ms. Crumlin to send out

12   that form response?

13     A    Yes.

14     Q    And that -- strike that.

15          How did you inform Ms. Crumlin to send

16   out that form response?  Did you call her?  Did

17   you e-mail?  Do you know?

18     A    I probably just walked over to her desk

19   and told her in person.

20     Q    Would that have been unusual, for you to

21   give Ms. Crumlin direction just by walking over

22   and talking to her?

Page 270

1        A     No, not at all.

2        Q     I'd like to ask you now about

3   Plaintiff's Exhibit 292, which is the text message

4   between you and Ms. Archie-Mills and you wrote,

5   "Someone just called me and told me Contee is

6   pissed with me right now."

7              Do you see that?

8        A     Yes.

9        Q     Who called you?

10       A     A community member.

11       Q     What was that community member's name?

12       A     Robert Pittman.

13       Q     Do you know Mr. Pittman?

14       A     Yes.

15       Q     Who is Mr. Pittman?

16       A     He is -- I believe he is the Chair of

17   the CAC, Chief's Advisory Council.

18       Q     What is the Chief's Advisory Council?

19       A     It's a community group that gives --

20   they liaise between the community and the Chief on

21   community concerns.

22       Q     Is he an MPD employee?

Page 271

1       A     No.

2       Q     He is just a community member who

3  volunteers on this committee?

4       A     Yes.

5       Q     Okay.  I'd like to go now to Plaintiff's

6  Exhibit 351, please.

7             Before I ask you questions about this, I

8  just want to talk more generally about the FOIA

9  Office.

10            You became FOIA Officer October 2017,

11  right?

12       A     Yes.

13       Q     We've heard the term "backlog" used

14  today, right?

15       A     Yes.

16       Q     Could you explain to me what do you mean

17  when you say "backlog"?

18       A     Any request that's past the -- the 15

19  days that we're supposed to release it.

20       Q     And during your time as the FOIA

21  Officer, would you have preferred the backlog to

22  be bigger or smaller?

Page 272

 1              MS. DURHAM:  I'm going to object.

 2              THE REPORTER:  I'm sorry, did you

 3      object?

 4              MS. DURHAM:  Objection to form.

 5      BY MR. SOBIECKI:

 6         Q    Okay.  And was that true -- strike that.

 7              Is it fair to say that everyone in the

 8      FOIA Office would have preferred the backlog to be

 9      smaller?

10         A    Yes.

11         Q    And Ms. Turner too wanted the backlog to

12      be reduced, right?

13         A    Yes.

14         Q    So how did you -- let me start over.

15              How do FOIA requests come in to the FOIA

16      Office?

17         A    They come in through FOIA Express, they

18      come in by mail, by e-mail, by phone, or someone

19      can walk in with a request.

20         Q    And during your time as FOIA Officer,

21      how were FOIA requests assigned once they came in?

22         A    The -- the staff assistant assigned them

Page 273

1    out to the different specialists.

2         Q    And would she make those assignments

3    with input from you or just by herself?

4         A    Just by herself.  We had two senior

5    specialists that got -- got the most complicated

6    requests and then two junior specialists who got

7    the more simple ones, and then the body worn

8    camera requests were just given out in rotation.

9         Q    Just so I -- the structure of the FOIA

10   Office, you were the FOIA Officer, right?

11        A    Yes.

12        Q    And there were two supervisory

13   specialists?

14        A    Yes.

15        Q    Ms. Archie-Mills and Saray Leon?

16        A    Yes.

17        Q    And Ms. Leon -- let me start over.

18             And then there were eight FOIA

19   specialists, four for BWC and four for documents,

20   right?

21        A    Yes.

22        Q    And Ms. Archie-Mills was the supervisor

Page 274

1   of the document FOIA specialists and Ms. Leon was

2   the supervisor of the BWC specialists, right?

3        A    Yes.

4        Q    So a document FOIA request comes in to

5   Ms. Crumlin and she will assign it to one of the

6   four document FOIA specialists, right?

7        A    Or the BWC specialists, yes.

8        Q    Let's assume it's a document request.

9             So going back, how would Ms. Crumlin

10  determine which of those four document specialists

11  to assign the request to?

12       A    She would read the request.  If it was

13  complicated, she would give it to one of the two

14  senior specialists.  If it looked to be something

15  simple or simpler, she would give it to one of the

16  two junior specialists, and if she wasn't sure,

17  she would talk to Lisa about it.

18       Q    An incident report would probably be a

19  simple request?

20       A    Yes.

21       Q    A voluminous OCTO request, is that

22  likely to be a complex one?

1      A     Yes.

2            MS. DURHAM:  Objection to the form.

3            THE WITNESS:  Yes.

4    BY MR. SOBIECKI:

5      Q     Based on your experience, did

6    Ms. Crumlin do a fairly good job in determining

7    which request should go to which specialist?

8      A     Yes.

9            MS. DURHAM:  Object to the form.

10   BY MR. SOBIECKI:

11     Q     How did you as the FOIA Officer track

12   FOIA requests?

13     A     You can manipulate FOIA Express into

14   different spreadsheets depending on what you

15   wanted to see.  So I'd just go in and pull the

16   categories that I wanted to see.  I could put in

17   any request older than 15 days and it would give

18   me all of those requests, or whatever range I put

19   in.

20     Q     How would you keep track of people who

21   were doing their work?

22     A     I could go in and pull all requests

Page 276

1   assigned to a specific specialist.

2       Q    Would -- would specialists have a quota

3   each week that they were expected to complete of

4   FOIA requests?

5       A    No, they didn't.

6       Q    Is that because every request is

7   different?

8       A    Yes.

9       Q    Some requests take longer, some requests

10  take shorter; fair?

11          MS. DURHAM:  Objection to form.

12          THE WITNESS:  Yes.

13  BY MR. SOBIECKI:

14      Q    But I believe you just testified if a

15  request was not responded to in the statutory time

16  frame, it would go on what we call the backlog,

17  right?

18      A    Yes.

19      Q    How did you manage requests on the

20  backlog?

21      A    I met with the specialists every week.

22  I actually sat down with them every week and got

Page 277

1    updates on where they were with each request.

2              Some of the requests I would take over

3    myself.  Like some of the requests, if they went

4    upstairs to Ms. Turner and there was just small

5    things that needed to be fixed, then I would just

6    do them myself so that the specialist could move

7    on to their next request and they didn't have new

8    requests piling up on old requests.

9        Q    Would you go in to FOIA Express and

10   assign the requests to yourself?

11       A    No.

12       Q    Did you ever assign requests to yourself

13   in FOIA Express?

14       A    Yes.

15       Q    Under what circumstances would you

16   assign a request to yourself in FOIA Express?

17       A    If it was a new request, like an

18   incident report or an accident report or something

19   that was simple, I would just immediately assign

20   it to myself before it went to anyone else and

21   handle it and release it.

22       Q    Would you ever assign complex requests

Page 278

1    to yourself?

2         A    No.

3         Q    And then in terms of reducing the

4    backlog, you would just meet with the specialist

5    each week, see what they needed and do it that

6    way?

7              MS. DURHAM:  I'll object to form.

8              THE WITNESS:  Right, and come up with a

9    plan to get it done.  Sometimes we moved around

10   requests.  A specialist might have had too many

11   requests and I would need to give it to someone

12   else.

13   BY MR. SOBIECKI:

14        Q    Let's say a specialist was out of the

15   office and you wanted to know the status of a FOIA

16   request they were working on.  How would you do

17   that?

18        A    I would look in FOIA Express under the

19   remarks or I would just go into the shared drive

20   and look at what's there, what's been done and

21   what needs to be done.

22        Q    You said "remarks."  Is there a comments

Page 279

1    field in FOIA Express?

2         A    Yes.

3         Q    Did you provide instructions to the FOIA

4    specialists as to how they should use the comments

5    field in FOIA Express?

6         A    No.  They all had -- most of the

7    specialists were there before I got there, so they

8    were already instructed.  They just continued to

9    do what they were taught.

10        Q    So there were no written guidelines as

11   to how to use the comments section in FOIA

12   Express, right?

13        A    No.

14        Q    Each specialist had their own system for

15   how they used the comments?

16        A    Yes.

17        Q    And was it common for a FOIA specialist

18   to indicate, say, by their initials in the

19   comments what comment they made?

20        A    Yes.

21        Q    Because sometimes multiple specialists

22   could make comments in a same -- in the same FOIA

Page 280

1    request, right?

2         A    Yes.

3         Q    Did you ever make comments in FOIA

4    Express?

5         A    I probably did.  I can't remember.  I

6    don't know.

7         Q    Would you say it was your regular

8    practice to make comments in FOIA Express?

9         A    No, it wasn't.

10        Q    So you met with Ms. Turner about FOIA

11   requests, right?

12        A    Yes.

13        Q    And she would provide you some

14   instructions on how she wanted the FOIA request

15   handled, right?

16        A    Yes.

17        Q    Would you put her instructions in the

18   comments of FOIA Express?

19        A    No, I usually wrote them on the actual

20   request that I took upstairs to her.

21        Q    And they stayed on the paper, you didn't

22   go back to your office and then have your own like

Page 281

1    an electronic version of those comments, right?

2         A    No, I didn't.

3         Q    Okay.  So how would you track requests

4    that you needed to work on based on feedback from

5    Ms. Turner?

6         A    I had a -- a box on my desk or if it was

7    something that I needed to give back to the

8    specialist, then they would track it or they

9    usually put it in the remarks.  We --

10        Q    Okay.

11        A    I'm sorry, if I can add.

12        Q    Uh-huh.

13        A    We also had weekly staff meetings where

14   all of us would get together and I would print out

15   all of the pending FOIA requests, I also would

16   make notes on that as well, a written note.

17        Q    Are you familiar with an "Are You Still

18   Interested" letter?

19        A    Yes.

20        Q    What is that?

21        A    It is when the request has gone to the

22   backlog, we'll send out a letter to see if the

Page 282

1    requester is still interested.  If they're not

2    interested, then we close it out.

3        Q    Was that was a practice -- excuse me.

4            Was that a practice that existed when

5    you became FOIA Officer in October of 2017?

6        A    Yes.

7        Q    You didn't come up with the "Are You

8    Still Interested"?

9        A    No.

10       Q    Did you ever raise any concerns about

11   the practice of sending out "Are You Still

12   Interested" letters?

13       A    No.

14       Q    Did you think it was a reasonable

15   approach to dealing with FOIA requests?

16       A    Yes.

17       Q    And if we're looking at Exhibit 351,

18   which is the request from Eric Flack, if you see,

19   if you turn to page 16 -- or, I'm sorry, 6 of 16,

20   Mr. Flack received an "Are You Still Interested"

21   letter for this request, right?

22       A    Yes.

Page 283

1      Q    And then if you turn to page 11, it

2    says, "Request Withdrawn," right?

3      A    Yes.

4      Q    And then if you look at the front

5    page -- so this came in November 2018 and then was

6    closed on October 6th, 2021, right?

7      A    I don't see the date.

8      Q    I apologize.  If you look on page six,

9    it says the closed date.

10      A    Yes.

11      Q    So this request was pending for more

12    than a year when you were FOIA Officer, right?

13      A    Yes.

14      Q    Do you recall what, if anything, you did

15    to try to move this request along?

16      A    This was the request that I went back to

17    the Office of Risk Management to ask if they had a

18    better copy of some of the requests that were

19    either smeared or illegible or not copied

20    straight.  And they didn't have -- they did

21    look -- Lieutenant -- what was her name?  There

22    was a lieutenant in risk management and I can't

1    think of her name.  But she -- she actually

2    checked while I was standing there.  They didn't

3    have any different copies.  So I took it back to

4    Leeann and Leeann told me to go to the members and

5    have them -- have them redo the form.  So I gave

6    the list to -- Regina Campbell -- Gamble -- that

7    was the lieutenant's name, Regina Gamble.  I gave

8    the list to her and told her to contact these

9    members and have them redo their paperwork and

10   that was the last that I remember of this one.

11        Q    So this is an example of a request that

12   you were personally working on, right?

13        A    Yeah.

14        Q    But if you look on page 6 of 16, there's

15   no -- nothing in the comments that would tell me

16   that you were working on this request, right?

17        A    No.

18        Q    Do you recall when you retired what

19   happened to this request?

20             Did you assign it to someone else?

21             MS. DURHAM:  I'll object to form.

22             THE WITNESS:  So prior to my retirement,

Page 285

1   we -- Lisa and I went through each request that

2   was on the backlog and we actually did a follow-up

3   on each request.  I actually brought her up to

4   date on all of the requests that I had been

5   working on.  I -- I actually sat down with -- I

6   didn't know where -- or who was going to take over

7   leadership of the FOIA Office and I -- I sat down

8   with a couple of the attorneys in the Office of

9   Attorney -- of the General Counsel and also

10  brought them up to date on where each request was,

11  what had been done, and the work that we had just

12  done that prior month to my retirement.

13  BY MR. SOBIECKI:

14       Q    You retired on January 18th, 2020,

15  right?

16       A    Yes.

17       Q    Were you working in the weeks prior to

18  your retirement?

19       A    Yes.

20       Q    Did you go on medical leave in November

21  of 2019?

22       A    I did.

Page 286

1        Q    Were you on medical leave from
2    November 2019 until your retirement?
3        A    No.
4        Q    You came back -- do you recall how often
5    you were in the office during that time?
6        A    I was in the office every day.  I was on
7    limited duty.
8        Q    How about the two weeks prior to your
9    retirement.  Were you in the office those weeks?
10       A    No, I cleared out.
11       Q    All right.  So just closing the loop on
12   this, you need a better copy, you went to I
13   believe a sergeant?
14       A    Lieutenant.
15       Q    Lieutenant.
16            And then after you couldn't get a better
17   copy, what did you do after that?
18       A    I advised Leeann that there were no
19   better copies, this was all that the Office of
20   Risk Management had.
21       Q    What did Ms. Turner say to you?
22       A    She told me to have them go back to the

Page 287

```
 1   member to redo the form.

 2        Q    Did you do that?

 3        A    Yes.

 4        Q    And what happened after that?

 5        A    Lieutenant Gamble told me she would

 6   handle it.

 7        Q    And what happened after that?

 8        A    That's the last I remember from this

 9   request.

10        Q    Did you follow up with Lieutenant

11   Gamble?

12        A    I followed up with her about a month

13   before I retired.

14        Q    And so as far as Ms. Turner knew, you

15   were working on this -- you were working on trying

16   to get the better copies, right?

17        A    Right.

18        Q    Okay.  Can we go to Plaintiff's

19   Exhibit 308, please.  It's a big one on a binder

20   clip.

21             Plaintiff's Exhibit 308, Inspector

22   Parker, do you recall Ms. Durham asking you about
```

Page 288

1   several of these requests and asking if they were

2   data requests?

3        A    Yes.

4        Q    And you told her no, right?

5        A    Yes.

6        Q    So let's look at the one on the top.  "I

7   am requesting all documented communications

8   between the office of council member Jack Evans

9   and the Office of MPD Chief."

10            And what year range are they looking for

11   documents, Inspector Parker?

12       A    2015 to 2019.

13       Q    Would you consider that a voluminous

14   request?

15       A    I don't know.  It would depend on what

16   the OCTO search responses were.

17       Q    Well, did they provide search terms or

18   are they asking for all communications?

19            MS. DURHAM:  I'll object to the form.

20            THE WITNESS:  They're -- it looks like

21   they're asking for all communications.

22   BY MR. SOBIECKI:

Page 289

1        Q    And are they asking for communications

2   from certain individuals in council member Jack

3   Evans' office or everyone in Jack -- Jack Evans'

4   office?

5             MS. DURHAM:  I'll object to the form.

6             THE WITNESS:  It says the office of Jack

7   Evans and -- and the Office of the MPD Chief.

8   BY MR. SOBIECKI:

9        Q    And do you interpret office as meaning

10  everyone in the office?

11            MS. DURHAM:  I'll object to form.

12            THE WITNESS:  Yes.

13  BY MR. SOBIECKI:

14       Q    And so is it fair to say a request for

15  all communications for more than five -- four-year

16  period for everyone in two offices is voluminous?

17            MS. DURHAM:  Object to form.

18            THE WITNESS:  I wouldn't know until the

19  responses came back.

20  BY MR. SOBIECKI:

21       Q    Would it surprise you if that request

22  turned back many documents?

Page 290

1           MS. DURHAM:  I'll object to form.

2           THE WITNESS:  I don't know.  I don't

3    know how often they communicated, so I -- I

4    couldn't take a guess on this one.

5    BY MR. SOBIECKI:

6       Q    And once documents come back from OCTO,

7    are they just produced to the requester without

8    anyone in the FOIA Office looking at them?

9           MR. SOBIECKI:  Object to the form.

10          THE WITNESS:  No, they're not.

11   BY MR. SOBIECKI:

12      Q    A FOIA specialist would review every

13   page of the document, right?

14      A    Yes.

15      Q    And do they review the -- the documents

16   for redactions?

17      A    If they're needed.  They -- they review

18   for responsiveness and then of those documents

19   they find responsive, they do a review to see if

20   any redactions need to be made.

21      Q    So redactions, if I'm understanding,

22   will be made for both nonresponsive material and

Page 291

1   private information; is that right?

2        A    Yes.  Well, if it's nonresponsive, they

3   don't redact.

4        Q    Okay.

5        A    They just exclude.

6        Q    In your experience, could the redaction

7   process sometimes take a great deal of time?

8             MS. DURHAM:  Objection to form.

9             THE WITNESS:  Yes.

10  BY MR. SOBIECKI:

11       Q    Because the specialists has to go

12  manually and redact each piece of information,

13  right?

14            MS. DURHAM:  Object to form.

15            THE WITNESS:  Yes.

16  BY MR. SOBIECKI:

17       Q    Have you ever redacted documents when

18  you were FOIA Officer?

19       A    Yes.

20       Q    And could you describe that process for

21  me?

22       A    So it's done in Adobe and depending on

1   what the document is, you program in the black

2   redaction tool and you can go line by line or you

3   can redact both paragraphs or redact the whole

4   page.

5        Q    This might be inartful, but you -- you

6   take the cursor and you create a box around the

7   material you want to redact and then it blacks it

8   out; is that right?

9        A    It doesn't black out until you apply it,

10  but it puts a red box to let -- to indicate what

11  is going to be redacted first and then you hit

12  apply and it will black it out.

13       Q    But you have to go -- unless you're

14  redacting an entire page, you have to go word by

15  word, right?

16       A    Yes.  But you can do words in a group.

17       Q    You can only create one black box at a

18  time?

19       A    Yes.

20       Q    So the second request on this

21  Plaintiff's Exhibit 308 is from Peter Hermann.

22            Do you see that?

Page 293

1        A     Yes.

2        Q     There are a number of legitimate reasons

3    under the FOIA statute why documents cannot be

4    released to a requester; fair?

5        A     Yes.

6              MS. DURHAM:  Object to the form of the

7    question.

8    BY MR. SOBIECKI:

9        Q     Do you know if a document relates to a

10   pending criminal investigation, that document can

11   be released?

12       A     It's generally not released, no.

13       Q     So if the document Mr. Hermann was

14   requesting here, this audit, was related to a

15   pending criminal investigation, that would be a

16   reason why it can't be released, right?

17       A     I don't know that we audit pending, but,

18   I mean the premise of your question, yes.

19       Q     I'll rephrase.

20             You don't know one way or the other

21   where the document Peter Hermann was requesting

22   was involved in a pending criminal investigation,

Page 294

1    do you?

2        A    I don't, no.

3        Q    And if you could turn over to the next

4    page, you were asked a few questions about Amy

5    Phillips' request 2019-FOIA-00893, right?

6        A    Yes.

7        Q    And this is the request Amy Phillips is

8    looking for transcripts of adverse action

9    hearings, right?

10       A    Yes.

11       Q    But this is not the Lojocano request,

12   she wants all the transcripts, right?

13       A    Yes.

14       Q    And the practice is to redact certain

15   information from those transcripts, right?

16       A    Well, the practice was to deny adverse

17   action hearings.  I don't remember what happened,

18   but there was some conversation and a decision was

19   made to release them.

20       Q    Do you recall the -- the process of

21   producing Officer Lojocano's Adverse Action

22   Hearing transcript generally?

Page 295

1       A       The process?

2       Q       Well, strike that.

3               Do you recall whether the transcript

4       from Officer Lojocano's hearing was redacted?

5       A       Yes, it was.

6       Q       And how many pages -- do you have an

7       estimate of how long was transcript was?

8       A       I don't remember.

9       Q       Would it surprise you if I told you it

10      was many hundreds of pages?

11      A       Many hundreds?  That would surprise me.

12      Q       Well, let's assume a transcript was 500

13      pages.

14              Do you think it would take a while to

15      redact an adverse action hearing transcript of 500

16      pages?

17      A       Yes.

18      Q       So if this request from Ms. Phillips

19      involved, let's say, more than 5,000 pages, that

20      would take some time to redact it, right?

21      A       Yes.

22      Q       Do you have any estimate as to how much

Page 296

1    time?

2              MS. DURHAM:  I'll object to form.

3              THE WITNESS:  I don't -- I don't have an

4    estimate.  It would take some time because they're

5    not just redacting, they have to read the context

6    of what's being redacted as well as what is being

7    redacted, so it's more than just blacking out

8    words.  It takes some time.

9    BY MR. SOBIECKI:

10        Q    In your experience supervising FOIA

11   specialists, have they generally tried to perform

12   their redactions as quickly as possible?

13        A    Yes.

14        Q    I'd like to show you what's been marked

15   as Plaintiff's Exhibit 49.  Plaintiff's Exhibit 49

16   is an e-mail from Latrina Crumlin to Amy Phillips.

17              Do you see that?

18        A    Yes.

19        Q    And you are copied on this e-mail,

20   right?

21        A    Yes.

22        Q    And if you turn over to the back page,

1    the last sentence says, "If MPD does not" -- I

2    apologize, let me start at the top.

3              It says, "Please advise this office

4    within five business days from the date of this

5    notification, your willingness to pay.  In the

6    meantime your request will be placed on hold

7    pursuant to 1 DMCR Section 405.6.  If MPD does not

8    receive your response within five business days

9    from the date of this notification, it will

10   presume that you are no longer interested in

11   pursuing your request and it will close the

12   request as constructively withdrawn."

13             Are you familiar with that language

14   generally, Inspector Parker?

15        A    Yes.

16        Q    And so what happens, if I have it right,

17   someone submits a FOIA request, right?

18        A    Yes.

19        Q    A FOIA request is submitted.

20             And then an estimate is provided as to

21   how much it will cost to provide -- to respond to

22   that FOIA request, right?

1        A     Yes.

2        Q     And if the estimate is more than $0, one

3    of these letters go out, right?

4        A     Yes.

5        Q     Was this practice of sending out these

6    letters in place before you became FOIA Officer?

7        A     No.

8        Q     How did this -- strike that.  Let me

9    start over.

10            Do you know why these letters started

11   being sent out?

12       A     Yes.

13       Q     Why?

14       A     Ms. Turner wanted to cut down on the

15   number of requests we had, so this was an attempt

16   to -- to reduce the amount of FOIA requests that

17   MPD had to process.

18       Q     So your recollection is that it was

19   Ms. Turner's idea to implement this practice?

20       A     Yes.

21       Q     Do you recall attending a meeting run by

22   the mayor's office of all the FOIA Officers where

1  they encouraged each agency to start charging more

2  fees?

3           MS. DURHAM:  I'll object to the form of

4  the question.

5           THE WITNESS:  Yes.

6  BY MR. SOBIECKI:

7      Q    What do you recall about that?

8      A    I recall that it was the FOIA

9  training -- we had FOIA training annually at the

10  Mayor's Office and in this particular training

11  they asked if every agency was charging and most

12  agencies were not.  And so they told us that you

13  can charge, you know, you can charge for FOIA.  So

14  when I came back from the training and gave her

15  the update on -- on what the training was about, I

16  let her know.

17      Q    And is that the reason Ms. Turner

18  started having these letters sent out?

19           MS. DURHAM:  Objection to the form.

20           THE WITNESS:  I can tell you the stated

21  reason that she gave me and that was she thought

22  that charging FOIA requesters would reduce the

Page 300

1    amount of FOIA requests that we received.

2    BY MR. SOBIECKI:

3        Q    And so this request, if you look at the

4    bottom of the first page, it does say the request

5    indicates the fee for this will be in excess of

6    $0.

7            Do you see that?

8        A    Yes.

9        Q    Do you recall what Ms. Phillips'

10   response to this letter was?

11       A    I believe she quoted the FOIA statute

12   and said that she was exempt.  Well, she was --

13   she was exempt from being charged.

14       Q    Is that called a fee waiver?

15       A    I don't think that's -- we're not

16   waiving her fee.  I think she was exempt based on

17   the -- the statute.

18       Q    Not a fee waiver, a request -- I

19   apologize.

20       A    Not a statute, the -- the FOIA -- well,

21   yes, the statute.

22       Q    Was her request for an exemption denied?

Page 301

1        A     I don't think so.

2        Q     Well, do you recall granting her request

3   for an exemption?

4        A     I don't think she got an exemption.

5              Well, yeah, she did get an exemption,

6   yes.

7        Q     So your recollection is that you made

8   the decision to exempt Ms. Phillips for fees

9   relating to this request?

10       A     I don't know if it was to -- I remember

11  that there was one request that she did get

12  exempted for, but it was after I spoke with -- I

13  sent in her -- she sent in a justification to be

14  exempt and I sent that to general counsel and I

15  was told that she was right.

16       Q     You don't recall telling Ms. Phillips

17  that you had decided that she was not entitled to

18  a FOIA exemption, do you?

19              MS. DURHAM:  I'll object to the form of

20  the --

21              THE WITNESS:  That I said that she was

22  entitled --

Page 302

1          MS. DURHAM:  -- question.

2          MR. CARPENTER:  Wait a minute.

3          THE WITNESS:  -- to an exemption?

4          MR. CARPENTER:  Two people.

5          MR. SOBIECKI:  I'll -- I'll rephrase.

6    BY MR. SOBIECKI:

7      Q    Ms. Phillips requested an exemption from

8    fees, right?

9      A    Yes.

10     Q    Do you recall telling Ms. Phillips that

11   you made the decision that she was not entitled to

12   an exemption for fees?

13         MS. DURHAM:  So I will object -- object

14   to the form of the question.

15         THE WITNESS:  Initially, yes.

16   BY MR. SOBIECKI:

17     Q    Then what happened?

18     A    Then she sent a letter justifying why

19   she is and I sent that to General Counsel and they

20   agreed.

21     Q    And did you inform Ms. Phillips of this?

22     A    Yes.

Page 303

1        Q     And this request -- did the FOIA Office

2   respond to this request?

3        A     I -- I guess we did.  I don't remember.

4        Q     Okay.

5        A     I don't know if this is the request

6   that -- that that communication went back and

7   forth over.  She had a couple of different

8   requests.

9        Q     The fee letter we're looking at,

10   Inspector Parker, this was sent to all requesters,

11   right?

12        A     Yes.

13        Q     Ms. Turner didn't tell you to just send

14   this to certain requesters, she told you to send

15   it to everyone?

16        A     Yes, those that it applied to.

17        Q     Could you look at Plaintiff's

18   Exhibit 132, please.  Plaintiff's Exhibit 132 is

19   the request from Emily Barth for First District

20   employees that we discussed this morning.

21             Do you recall that?

22        A     Yes.

Page 304

```
 1       Q    Did you raise this request with

 2   Ms. Turner?

 3       A    Yes.

 4       Q    Why?

 5       A    Because it was asking for all officers'

 6   information -- I mean, all officers, their names,

 7   badge numbers, CADs, body worn camera, because of

 8   the information that was being asked.

 9       Q    She also wanted to know --

10       A    And that -- I'm sorry, I didn't mean to

11   cut you off.  And that it was just every -- this

12   is just one, but it was about nine requests that

13   came in:  One for each district, one for narcotics

14   and special investigations division and I believe

15   another for the criminal investigations division.

16       Q    Part of what she wanted to know is where

17   officers were assigned, right?

18       A    Yes.

19       Q    And she wanted to know which units

20   officers were assigned to?

21       A    Yes.

22       Q    And it wasn't MPD's practice to reveal
```

Page 305

```
 1   which officers were assigned to which units,

 2   right?

 3        A     I don't think so, no.

 4        Q     That would -- it could present a safety

 5   issue to the officers, right?

 6        A     Personally I don't think so, but I

 7   don't -- I don't think -- that wasn't the reason

 8   that -- that it wasn't given out.

 9        Q     Well, if you were an undercover officer

10   and you were identified as being an undercover

11   officer with your name, that could present a

12   safety issue, right?

13        A     That could, yes.

14              MS. DURHAM:  I'll object to the form of

15   the question.

16   BY MR. SOBIECKI:

17        Q     Is there anything in this request that

18   would be embarrassing or reputationally

19   detrimental to MPD?

20        A     No.

21        Q     I'd like to show you what's been

22   previously marked as Plaintiff's Exhibit 9.  So if
```

1   you want to -- if need to take a few minutes to

2   flip through this, please do, Inspector Parker.

3           So you see at places in this e-mail it

4   refers to the Lunch Bunch, right?

5       A    Yes.

6       Q    And is this the Monday staff meeting you

7   referred to earlier today?

8       A    Yes.

9       Q    And I believe you said these individuals

10  were direct reports of Ms. Turner, but is that --

11  is that right?  Are these individuals direct

12  reports?

13      A    Yes.

14      Q    Did Mr. Bromeland report to Ms. Turner?

15      A    Yes.

16      Q    Not Chief Newsham?

17      A    He was Chief Newsham's Chief of Staff,

18  but he still reported in that he reported through

19  Leeann to the Chief.

20      Q    Did -- did anyone report to Chief

21  Newsham directly or did they all report through

22  Ms. Turner?

```
 1            MS. DURHAM:  I'll object to form.
 2            THE WITNESS:  The assistant chiefs and
 3   some civilian equivalents reported directly to
 4   Chief Newsham.
 5   BY MR. SOBIECKI:
 6        Q    Okay.  Do you remember this request --
 7        A    Yes.
 8        Q    -- Inspector Parker?
 9             What is this request about?
10        A    This was an Eric Flack request.  I
11   believe he asked for all -- it was -- I think it
12   was stop and frisk, all -- all incident reports of
13   stop and frisk in a -- in a specified period of
14   time.
15        Q    If you need to reference it, is this the
16   request you're referring to in paragraph 51 of
17   your declaration, which is Exhibit 111, the second
18   request?
19        A    Yes.
20        Q    And what do you recall about this
21   request?
22        A    There were -- there were a lot of
```

Page 308

1    reports where she wanted us to read the narrative

2    of each report to see if there were any that were

3    going to stand out as negative or detrimental.

4         Q    Are you aware that officers prepare two

5    versions of a report:  One internal and one for

6    the public?

7         A    Those are two different reports.  One is

8    a -- 251 is the public report, the 252 is the

9    internal report.

10        Q    But they will -- they're two reports for

11   the same incident?

12        A    One is a supplemental to the other one.

13        Q    And the public one is meant for the

14   public and the internal one is meant to stay

15   private in MPD, right?

16        A    Right.  It has more information on it.

17        Q    The internal one will have like the

18   victims' names and things like that, right?

19        A    The public one has the victims' names,

20   the internal one will have the suspect's name and

21   witness names.

22        Q    I see.

Page 309

1          Do you recall any other information that
2     would be contained in only the internal reports?
3          A     Maybe addresses or -- I mean, any
4     information that would assist the detectives in
5     their follow-up of whatever the event was.
6          Q     And so in responding to this FOIA
7     request, the decision was made to produce the
8     internal reports, right?
9          A     No.  This is -- a stop and frisk is an
10    incident report, so it's only public, there is no
11    internal report that attaches to this.
12         Q     So your recollection is that for stop
13    and frisk there were no internal reports.
14               So your recollection is that in
15    responding to this request the purpose of this --
16    strike that.
17               The purpose of this review being
18    discussed in this e-mail, Plaintiff's Exhibit 9,
19    was to redact pieces of information like suspects'
20    names, from those internal reports you just talked
21    about, right?
22         A     There are no internal reports.  These

1  are all public reports and there shouldn't have

2  been any suspect information because it's an

3  incident, there's no suspect, there's no crime.

4      Q    So what is your recollection as to the

5  point of reviewing these narratives?

6          MS. DURHAM:  Objection to form.

7          THE WITNESS:  The stop and frisk, what

8  it does is describe the officer's reason for

9  stopping and frisking a person, what happened,

10  what -- I mean, if it's detailed enough, it will

11  give the reasons, you know, what led up to the

12  stop and frisk.  So she wanted us to read each one

13  and make sure there was nothing detrimental in the

14  narratives.

15  BY MR. SOBIECKI:

16      Q    Were there redactions associated with

17  this exercise?

18      A    There were initially, yes.  She told me

19  to redact.

20      Q    She told you to redact what?

21      A    Because some of the officers had

22  incorrectly completed these 251s and they did

Page 311

1    include names that shouldn't haven't been in

2    there.

3         Q    I'm not sure I understand.

4              Names such as?

5         A    Maybe a witness --

6              MS. DURHAM:  I'll object to form.

7              THE WITNESS:  -- or somebody that was

8    stopped that -- the only name that should have

9    been on a stop and frisk is the person that was

10   actually stopped, but some of the narratives had

11   witness names or other people who were not frisked

12   but who were there.

13   BY MR. SOBIECKI:

14        Q    I see.  And so she wanted you to go

15   through and redact those other -- the names that

16   shouldn't have been in that?

17        A    Yes.  It also had information,

18   addresses.  It just -- it had information that

19   shouldn't have been in the public -- in the public

20   report.

21        Q    So Ms. Turner's goal was to prevent

22   private information from becoming public; fair?

Page 312

1      A    Correct.  Well, I'm -- that's me
2   speculating, but...
3           MR. CARPENTER:  Don't speculate.
4   BY MR. SOBIECKI:
5      Q    All right.  So I just want to make sure
6   I'm -- I'm clear.  In going through those reports
7   and performing the redaction exercise, did
8   Ms. Turner tell you to redact information that was
9   detrimental to MPD?
10     A    She did initially, but because these are
11  public documents, I did do redactions, but we
12  never used the redactions.
13     Q    And was that talked about at the Lunch
14  Bunch or was that a conversation just between the
15  two of you?
16     A    That was a conversation just between she
17  and I.
18     Q    And how would the other members of the
19  Lunch Bunch -- well, do you know if the other
20  members of the Lunch Bunch knew they should be
21  redacting for detrimental information?
22     A    They were never supposed to redact.

Page 313

1   They were only supposed to read the assigned

2   reports and give feedback on what they thought

3   about the report, if there was any in their stack

4   that could be detrimental.

5        Q    So your recollection is there was a

6   Lunch Bunch meeting and Ms. Turner told all of

7   these individuals to review and look for

8   information that could be detrimental?

9        A    Yes.

10       Q    How regularly were the Lunch Bunch

11  meetings held, Inspector Parker?

12       A    Every Monday.

13       Q    And would you attend each one?

14       A    Yes.

15       Q    Did everyone attend each one?

16       A    If they were available, yes.

17       Q    And who was part of the Lunch Bunch?

18       A    Kelly O'Meara -- not Kelly.  Well, yeah,

19  Kelly O'Meara, Matt Bromeland, Dustin Sternback.

20  I'm missing one person.

21            MR. CARPENTER:  Heidi.

22            THE WITNESS:  Oh, Heidi -- so I'm

Page 314

1    missing two people -- and Marina Marraco.

2    BY MR. SOBIECKI:

3        Q    So everyone -- there's no one not listed

4    on the e-mail who wasn't a member of the Lunch

5    Bunch; is that right?

6        A    You're saying there's no one not listed?

7        Q    Fair.  Do you recall -- I'll state it

8    better.

9            Do you recall anyone being a member of

10   the Lunch Bunch who isn't on that -- those

11   e-mails?

12       A    No, this is it.

13       Q    Do you know if this request, stop and

14   frisk, was ever completed?

15       A    It wasn't released before I was retired.

16       Q    And the e-mail we were looking at is

17   from early in 2019, right?

18       A    Yes, February 2019.

19       Q    So what did you do to -- in the next

20   year to see that this request was completed?

21           MS. DURHAM:  I'll object to the form.

22           THE WITNESS:  So this request, like

1   quite a few of the other ones, I would bring back

2   up to her and I just couldn't get an answer for

3   release.

4          This one I wanted to release because

5   these are all public documents and the requester

6   could have just went to the -- the -- could have

7   went to the -- the -- I can't remember the name of

8   the office now.  There's an office that you can

9   walk in in -- in headquarters and get a copy of a

10  public document.  You could actually e-mail and

11  have the -- the report e-mailed to you.  They

12  could have just done that and got these reports.

13         So I argued that there shouldn't have

14  been any redactions.  And this one along with

15  several others I repeatedly asked her could it be

16  released and I never got clear guidance on -- on

17  being able to release them.

18  BY MR. SOBIECKI:

19     Q    Did everyone complete their required

20  reading and perform their redactions?

21     A    I don't remember.  I did the redactions.

22  No one else did redactions.

1      Q     They reviewed them.

2            Do you know if people completed their

3   reviews?

4      A     I don't remember.

5      Q     So you don't know if this was ever ready

6   for release or not?

7      A     The redactions had been done and turned

8   over to Ms. Turner, so I think we moved on from

9   this meeting.  We had two or three meetings about

10  this and we moved on from it.

11     Q     I want to talk about, again, about the

12  drafting of the declaration process.  I don't

13  think you need a -- a copy of it.

14           Amy Phillips reached out to you about

15  her Superior Court case; is that right?

16     A     I don't think she reached out about the

17  case, she reached out about something else and in

18  that conversation she told me she had a hearing

19  coming up.

20     Q     And what did she say?  How did the

21  declaration -- strike that.

22           How did you -- why did you start

1  drafting the declaration?

2      A    I -- because I -- so the -- the court

3  hearing was online because of COVID and so I -- I

4  clicked on a link and listened to it.  And when I

5  heard that -- the OAG say -- I don't remember

6  which one it was, but I -- I heard them say that

7  they weren't able to release -- or the reason that

8  they didn't release some of the documents was

9  because I had hid the documents on a drive that

10 only I had access to and they didn't.  MPD didn't

11 realize that until after my retirement.

12          After the hearing, I reached out to her

13 and told her that was untrue and she asked me

14 would I put that in writing and I told her yes.

15     Q    How did you know that the hearing was

16 going on?

17     A    She told me.

18     Q    So Amy Phillips reached out to you and

19 said I've got this case, I have a hearing coming

20 up?

21     A    She --

22          MS. DURHAM:  I'll object to form.

1           THE WITNESS:  She reached out about
2    something else and in that conversation she told
3    me that she had a hearing coming up.
4    BY MR. SOBIECKI:
5        Q    What did she reach out about?
6        A    It's actually in one of these -- one of
7    these exhibits.  There is a text chain.  I can't
8    remember what -- I didn't read -- I can't remember
9    what it was, but there's an exhibit of a text
10   chain -- text chain that has it.
11       Q    You signed your declaration October 18th
12   of 2021, right?
13       A    Yes.
14       Q    Did the conversation with Amy Phillips
15   happen in 2021 or 2020?
16       A    It happened early in 2021 I believe.
17       Q    Okay.  So you were talking to
18   Ms. Phillips about something else.  She told you
19   the hearing was going on and you tuned in, right?
20       A    Yes.
21       Q    You heard the OAG attorney talking about
22   processing of the Lojocano request and you felt

Page 319

```
 1   some of what he was saying was inaccurate, right?
 2        A    Yes.
 3        Q    And your recollection is that you then
 4   reached out to Ms. Phillips to -- what did you
 5   tell Ms. Phillips?
 6             MS. DURHAM:  I'll object to the form of
 7   the question.
 8             THE WITNESS:  That what was said at the
 9   hearing wasn't true.
10   BY MR. SOBIECKI:
11        Q    And the idea of writing a declaration,
12   was that your idea or Ms. Phillips' idea?
13        A    It was hers.  She asked me would I put
14   that in writing.
15        Q    So could you take out Exhibit 353,
16   please.
17             MR. CARPENTER:  You got it?
18             THE WITNESS:  Yes.
19   BY MR. SOBIECKI:
20        Q    Is this the text exchange you were
21   talking about?
22        A    No, it's not.
```

Page 320

1       Q     All right.  Did you end up talking to

2    Amy Phillips --

3       A     No, there's a --

4       Q     -- after Mr. Perloff reached out?

5       A     There's a text thread.  It's a little

6    longer than this.  I'll try to flip through the

7    exhibits --

8       Q     That's okay.  I'm not -- I'm going to

9    move on.

10            You proposed during that conversation to

11   Ms. Phillips that you would draft -- oh, wait.

12   Ms. Phillips proposed that you write a

13   declaration?

14      A     She asked would I put -- put my

15   statement in writing, yes.

16      Q     Did she -- what statement?

17            MS. DURHAM:  I'll object to the form of

18   the question.

19            THE WITNESS:  That what was stated in

20   the -- in the trial about my actions and when I

21   told her that wasn't true, she asked would I put

22   that in writing.

Page 321

1   BY MR. SOBIECKI:

2       Q    Regarding -- she asked you to put in

3   writing what you told her about the processing of

4   the Lojocano request, right?

5       A    Yes.

6       Q    Did she ask you to put anything else in

7   the declaration?

8       A    Just how FOIAs were processed.

9       Q    And I believe at the beginning you

10  testified you spent about four or five hours

11  working on the declaration, right?

12      A    In one day.  I started the declaration

13  on -- one day and got busy with school, didn't

14  finish it.  And then she contacted me later, a few

15  months later, and I told her I need -- hadn't

16  finished it, I'll finish it up that day.

17      Q    Inspector Parker, any time you need a

18  break, please, I know it's a long day.

19      A    Thank you.

20          (Defendant's Exhibit Number 1 was

21          marked for identification.)

22  BY MR. SOBIECKI:

1      Q    I'm going to show you what we're marking

2    as Defendant's Exhibit 1.

3           Defendant's Exhibit 1 is an e-mail from

4    you to Amy Phillips on October 8th, 2021, right?

5      A    Yes.

6      Q    And do you see --

7           MS. DURHAM:  Sorry.  There's

8    highlighting on this.  I just want to make sure

9    that's not attorney work product.

10          MR. SOBIECKI:  Thank you.  Oh, no, no,

11   no, that's how it was produced.  Thank you.

12          MR. CARPENTER:  This is an e-mail with

13   the declaration attached?

14          MR. SOBIECKI:  Correct.

15          MR. CARPENTER:  Yeah.

16          MR. SOBIECKI:  Correct.

17   BY MR. SOBIECKI:

18     Q    So do you see that the first e-mail in

19   this chain is Friday, September 17th, 2021, right?

20          Do you see that?  It's just at the

21   bottom.

22     A    Ah, yes.

Page 323

```
 1       Q     There's no text on it.

 2       A     Yes.

 3       Q     But if you look above that, the subject

 4   is "Quon Declaration."

 5             Do you see that?

 6       A     Yes.

 7       Q     Do you know what the Quon declaration

 8   is?

 9       A     It was Teresa Quon's declaration for the

10   case.

11       Q     Before -- and did you -- did

12   Ms. Phillips send you the Quon declaration?

13       A     Yes.

14       Q     Did you read it?

15       A     Yes.

16       Q     What was your reaction?

17       A     I don't remember.

18       Q     And so this e-mail October 8th, 2021,

19   you send a draft of your declaration to

20   Ms. Phillips, right?

21       A     Yes.

22       Q     And you ask her to let you know --
```

1   "Please let me know if I'm moving in the right

2   direction," right?

3        A    Yes.

4        Q    And if you could, do you have

5   Plaintiff's Exhibit 111, your final declaration

6   there?

7        A    Yes.

8        Q    So -- and, again, I -- I hope this

9   doesn't get too confusing, but I'm going to ask

10  you to take the October 8th version and go to

11  paragraph seven.

12       A    Okay.

13       Q    Do you see it says, "MPD leadership had

14  a policy that required the FOIA Officer to notify

15  the then Chief of Police, Peter Newsham, and the

16  then Chief Operating Officer, Ms. Leeann Turner,

17  of any FOIA request originating from the media,

18  certain identified individuals, or requests for

19  certain records."

20            Do you see that?

21       A    Yes.

22       Q    That's not in your final declaration, is

Page 325

1    it?

2         A    No, it isn't.

3         Q    Why not?  Why did you change that?

4         A    Because this was just thoughts.  When I

5    first started, I just was writing stuff down.  It

6    wasn't intended to be final, it was just intended

7    for me to remember.

8              MR. CARPENTER:  Early draft.

9    BY MR. SOBIECKI:

10        Q    What did you mean by "MPD leadership"?

11        A    Leadership of MPD, the -- Ms. Turner and

12   the Chief.  My -- that was my leadership.

13        Q    Hang on one second.  A moment ago -- the

14   clock is running.

15             And did you discuss this draft with

16   Ms. Phillips?

17        A    No, not -- not the first draft.

18        Q    And if you turn over to the next page of

19   this draft, you're going to see highlighting on

20   there.  I assume this is your highlighting?

21        A    Yes.

22        Q    Why did you highlight these paragraphs?

1    A    These were things that I needed to

2    expand on.

3    Q    So you see in paragraph 12 it says,

4    "Phillips came to the attention of Chief Newsham

5    and Turner due to the records she sought in FOIA

6    requests she filed before the one at subject here.

7    She had previously requested all the names and

8    badge numbers for every officer assigned to each

9    patrol district."

10           Do you see that?

11    A    Yes.

12    Q    But that -- that's not accurate, right?

13    A    No, that's not accurate.

14    Q    So -- and you ended up changing that,

15    right?

16    A    Yes.

17    Q    How did you -- why did you change that?

18    A    I changed that after talking to her.

19    She corrected me.

20    Q    She told you that that was actually

21    Emily Barth who made the request?

22    A    Yes.

1      Q    Okay.

2           (Defendant's Exhibit Number 2 was

3           marked for identification.)

4  BY MR. SOBIECKI:

5      Q    I'm showing you what's been marked as

6  Defendant's Exhibit 2.  Defendant's Exhibit 2 is

7  another e-mail from you to Ms. Phillips on

8  October 10th sending a draft of the declaration,

9  right?

10     A    Yes.

11     Q    And if you look down, Friday,

12 October 8th at 4:42 Ms. Phillips says, "I'm happy

13 to discuss by phone once you're finished."

14          And you talked to Ms. Phillips about the

15 declaration, right?

16     A    Yes.

17     Q    How long did that conversation last?

18     A    This one -- on the Sunday, October 10th?

19     Q    Well, in the October 8th e-mail she

20 says, "I'm happy to discuss by phone once you're

21 finished."

22     A    Okay.

Page 328

1      Q    And then you guys spoke and you sent

2   another version, right?

3      A    Yes.  Well, I talked to her on

4   October 10th, I didn't talk to her on October 8th.

5   I took an Amtrak home from Florida to D.C. and I

6   spoke to her during that time.

7      Q    And then so if you look at the draft

8   attached to your October 10th e-mail and go to

9   paragraph seven, that's still the same MPD

10  leadership language, right?

11     A    Yes.

12     Q    Why did you leave that in there?

13     A    I made a correction.  I mean, I changed

14  the -- so this first one that you -- the Exhibit 1

15  was like an outline.  That was me getting started.

16  And as I filled in my outline, this is just where

17  the paragraphs came together.

18     Q    Okay.  And if you go -- could you look

19  at paragraphs 16 and 17 of your October 10 draft.

20     A    Yes.

21     Q    And then if you look at your final

22  draft -- I'll point you to those paragraphs --

Page 329

```
1    paragraphs 25, 26 and 27.  Would you turn to

2    those?

3         A    Yes.

4         Q    So in this draft of October 10th you

5    say, "I informed Turner of the MOLC's decision.

6    She sought counsel from MPD's general counsel on

7    what MPD's options were."

8              Do you see that?

9         A    Yes.

10        Q    And then in your final version you say,

11   "She directed me to seek counsel from MPD's

12   general counsel."

13             Do you see that?

14        A    Yes.

15        Q    So it changed from the October 10th

16   draft to your final draft, right?

17        A    Yes.

18        Q    Why did you change it from Ms. Turner

19   sought counsel to you seeking counsel?

20        A    Because it was more specific on who

21   actually spoke with general counsel.  She told me

22   to go talk to them, she didn't talk to them
```

Page 330

1    directly.

2          Q    So when you were saying "she sought" --

3    in the October 10 draft when you wrote "she sought

4    counsel from MPD's general counsel," you were

5    referring to yourself?

6          A    In the October 10th it sounds like she

7    went to them directly, but "she" -- "she sought

8    counsel," what I meant by that was that she wanted

9    some counsel from -- from our OGC.  But the way

10   that it is written makes it sound like she went to

11   them herself.  So in -- in proofreading this, I

12   just didn't like the way that sounded, so I

13   changed it so it would be clear that she told me

14   she wanted an opinion from our general counsel,

15   but she told me to go get it.

16         Q    And then in the next paragraph, 17 of

17   your October 10 draft, you say, "MPD's general

18   counsel advised Ms. Turner that the MOLC's ruling

19   was advisory and not obligatory."

20              Do you see that?

21         A    Yes.

22         Q    And then in your final one you say, "I

1  informed Ms. Turner" -- I apologize.

2        MR. SOBIECKI:  Could we take a break?

3  I'll tighten this up.  We've been going for over

4  an hour.

5        VIDEO TECHNICIAN:  Off the record at

6  4:43.  This ends Media Unit Number 5.

7        (Brief recess.)

8        VIDEO TECHNICIAN:  On the record at

9  5:08.  This begins Media Unit 6 in the deposition

10  of Vendette Parker.

11  BY MR. SOBIECKI:

12      Q    Inspector Parker, we were talking about

13  the drafting of your declaration, right?

14      A    Yes.

15      Q    So you told Amy Phillips about the

16  watchlist policy in October of 2021, right?

17      A    After her hearing.  I don't remember

18  when that -- I think it was in February she had a

19  hearing.

20      Q    Was that the first time you told someone

21  about the watchlist policy?

22      A    No.

Page 332

1        Q    Who was the first person you told about

2    the watchlist policy?

3        A    I think I spoke to Chief Anzallo about

4    it.

5        Q    And when was that?

6        A    It was while I was in the FOIA Office

7    and he was one of the people that I talked to.  I

8    was seeking advice on what to do.

9        Q    And I guess while you were FOIA Officer

10   you went to Chief Anzallo and you told him about

11   this illegal activity going on in the FOIA Office?

12       A    I didn't frame it that way, but yes.

13       Q    Well, your -- according to your

14   declaration, the activities of what was going on

15   in the FOIA Office were improper, right?

16       A    Yes.

17       Q    And did you convey the substance of

18   what's in your declaration to Chief Anzallo?

19       A    The bulk of it, yes.

20       Q    And who else did you tell about this

21   other than Amy Phillips and Chief Anzallo?

22       A    I may have -- I -- I don't remember.  I

Page 333

1   may have told Michael Perloff, but I -- I don't

2   remember.

3        Q    So just so I can get my arms around

4   this.  We have -- you told Chief Anzallo while you

5   were the FOIA Officer.

6             Do you remember if that was early in

7   your tenure as FOIA Officer or near the end?

8             MS. DURHAM:  Object to the form of the

9   question.

10            THE WITNESS:  It was probably in the

11  middle, neither the beginning -- definitely not

12  the beginning.

13  BY MR. SOBIECKI:

14       Q    Because you learned more about the

15  policy as you went on?

16       A    Yes.

17       Q    You retired in January of 2020, right?

18       A    Yes.

19       Q    All right.  And then the next time you

20  discussed the watchlist policy was with Amy

21  Phillips sometime in 2021?

22       A    I think so, yes.

Page 334

```
 1      Q     Okay.

 2            (Defendant's Exhibit Number 3 was

 3            marked for identification.)

 4   BY MR. SOBIECKI:

 5      Q     I'd like to show you what's been marked

 6   as Defendant's Exhibit 3.

 7            Could you tell me if you recognize

 8   Defendant's Exhibit 3?

 9      A     I think so, yes.  I think this was the

10   first subpoena for this case.

11      Q     And you're a lawyer, right, Inspector

12   Parker?

13      A     Yes.

14      Q     Have you ever practiced law?

15      A     No, not officially.

16      Q     You've been at the Federal Reserve ever

17   since you passed the Bar, right?

18      A     Yes.

19      Q     Well, when you say "not officially,"

20   what do you mean?

21      A     I volunteer in Baltimore.  I write Wills

22   and estate documents for elderly, low income, but
```

Page 335

1    under a pro bono organization.

2         Q    Does your work at the Federal Reserve

3    involve any legal work?

4         A    No.

5         Q    Did you -- all right.  So Defendant's

6    Exhibit 3 is a subpoena to you from the District

7    for some documents, right?

8         A    Yes.

9         Q    And if you turn -- there's an

10   attachment, right?

11        A    Yes.

12        Q    And there's the caption of the case,

13   right?

14             And then do you -- do you see the

15   heading "Instructions" on page three?

16             MR. CARPENTER:  Page three.

17             THE WITNESS:  Are you talking about

18   this?

19   BY MR. SOBIECKI:

20        Q    Oh, sorry.  If you keep going, there

21   will be something that says "Attachment."

22        A    Yes.

                                                    Page 336

1        Q    And if you could turn to page three of

2   that, please.

3             Well, first, let me ask, did you review

4   this document at any point, Inspector Parker?

5        A    Yes.

6        Q    When approximately did you first look at

7   it?

8        A    I don't know.  When it was sent to me.

9   It was sent to me in an e-mail.

10       Q    And let me preface for going forward

11  with my questions I -- I don't want any of your

12  conversations with Mr. Carpenter.  Okay?

13       A    Yes.

14       Q    I might ask you some yes or no

15  questions, but please don't go into any

16  conversations with Mr. Carpenter.

17            And is Mr. Carpenter the only lawyer who

18  represents you in this matter?

19       A    Yes.

20       Q    So you see on page three Instructions,

21  one, it says, "These requests are continuing in

22  nature."

Page 337

```
 1            Do you see that?
 2      A    Yes.
 3      Q    And then instruction three says, "Unless
 4   otherwise stated, the relevant time period for all
 5   requests is for documents and communications
 6   created or originating on or after October 1,
 7   2017."
 8            Do you see that?
 9      A    Yes.
10      Q    And then if you keep going, on page four
11   you'll see "Requests for Production of Documents."
12            Do you see that?
13      A    Yes.
14      Q    And in number one it says, "All
15   communications between you and the following
16   individuals."
17            Do you see that?
18      A    Yes.
19      Q    And there's a list of names and letter F
20   is Eric Flack, right?
21      A    Yes.
22      Q    Okay.
```

1       A     Letter G.

2       Q     Oh, right.  I apologize, letter G.

3             And then little I is Michael Perloff,

4    right?

5       A     Yes.

6       Q     And if you -- I apologize.  If you turn

7    back to page two, you'll see number seven, defines

8    communications, right?

9       A     Yes.

10      Q     I won't read all of it to you, but take

11   what time you need, but you see communications is

12   defined to include text messages, right?

13      A     Yes.

14      Q     So we sent this to -- to you via your

15   lawyer on March 30th, 2023.

16            Did you do anything to look for

17   documents that were responsive to the subpoena?

18      A     Yes.

19      Q     What did you do to look for documents

20   that were responsive to the subpoena?

21      A     I went into my e-mail and highlighted

22   the -- well, typed the person's name into the

1    search bar for any e-mails that came up and text

2    messages I just had in my phone.

3        Q    And did you do that at the same time?

4             Let me strike that.

5             MS. DURHAM:  I object to the form of the

6    question.

7    BY MR. SOBIECKI:

8        Q    Part of your search involved looking

9    through your e-mails, right?

10       A    Yes.

11       Q    Part of your search involved looking

12   through your text messages, right?

13       A    Yes.

14       Q    Did you do those two searches around the

15   same time or was there, you know, did time pass in

16   between those searches?

17            MS. DURHAM:  I'll object to the form of

18   the question.

19            THE WITNESS:  The e-mail search I did

20   and the text messages I knew which people I had

21   texted with.  What I tried to do with the text

22   message was extract them from my phone, not so

Page 340

1    much of a search because I knew what I had, I

2    mean, who I had texted with and who I hadn't.

3    BY MR. SOBIECKI:

4         Q    Okay.  So we -- we looked through -- you

5    looked through your e-mail, you looked through

6    your text messages.

7              What else did you do?

8         A    That's it.

9         Q    Do you have a -- a computer at -- at

10   home, a personal computer?

11        A    Yes.

12        Q    Does it have a hard drive?

13        A    I guess, yes.

14        Q    If -- if you wanted to save a document

15   on your computer, you could do that?

16        A    Yes.

17        Q    Did you search your computer for any

18   documents responsive to our subpoena?

19        A    I don't save documents on my laptop.  I

20   have a laptop, but I don't save documents on it.

21   I save them on a zip drive.  And I don't have any

22   documents saved --

                                                        Page 341

1          Q     Okay.

2          A     -- regarding this or from these people

3    except for Amy.

4          Q     And could you go to page five of the

5    attachment, please.  And number six says, "All

6    communications and documents still in your

7    possession created or received in your role and

8    time as an employee of MPD, including but not

9    limited to e-mails to or from the e-mail address

10   vendetteparker@dc.gov."

11               Do you see that?

12         A     Yes.

13         Q     What did you do to search for documents

14   responsive to number six?

15         A     I don't have any documents from when I

16   was an employee of MPD.  I didn't take any

17   documents with me.

18         Q     Have you obtained any documents from MPD

19   since you retired?

20         A     No, I haven't.

21         Q     So just MPD has a web- -- and I don't

22   mean these to be trick questions.  MPD has a

Page 342

1   website, right?

2       A    Yes.

3       Q    And there are certain documents on the

4   website, certain general orders, right?

5       A    Yes.

6       Q    And then there are other MPD documents

7   not on the website, right?

8       A    Yes.

9       Q    There are some confidential documents,

10  right?

11      A    Yes.

12      Q    There are certain general orders that

13  are not available to the public, right?

14      A    They're all available, but they're

15  redacted if they're not public.

16      Q    So me not being a police officer, I

17  could not get a copy of one of the unredacted --

18  or an unredacted general order, right?

19           MS. DURHAM:  I'll object to the form of

20  the question.

21  BY MR. SOBIECKI:

22      Q    Yeah, okay.  I'll reask that.

1        If I just opened up Google now and went

2   to the MPD page and looked at the general orders,

3   there are going to be some that are redacted,

4   right?

5        A    Yeah.

6             MS. DURHAM:  I'll object to the form of

7   that question.

8   BY MR. SOBIECKI:

9        Q    If I sent a FOIA request for an

10  unredacted copy of a general order, would I get

11  that?

12            MS. DURHAM:  Object to the form of the

13  question.

14            THE WITNESS:  Unredacted, you would get

15  the link to the general orders.

16  BY MR. SOBIECKI:

17       Q    Okay.  You were asked some questions

18  about your relationship with Chief Newsham.

19            Do you recall those questions?

20       A    Yes.

21       Q    Now, before your demotion, would you

22  consider Chief Newsham a friend?

Page 344

1       A     No.

2       Q     Would you consider him a mentor?

3       A     No.

4       Q     Did you ever seek advice from Chief
5   Newsham when you were commander of the Seventh
6   District?

7       A     No.

8       Q     Do you recall texting Chief Newsham on
9   September 8th, 2015, "Good evening, sir.  Is it
10  possible to get on your calendar for a 20-minute
11  new commander mentoring conference?"

12            Do you recall doing that?

13      A     No.

14      Q     Do you recall texting Chief Newsham on
15  January 4th, 2016 at 6:38 p.m., "Hello Chief.  Got
16  my first and formal grievance today.  I
17  temporarily detailed an officer returning to full
18  duty after a couple of years of noncontact to
19  cover a shortage on a different shift days off
20  from when he's assigned.  He wants to grieve.  The
21  PSA only had five people on that shift, four are
22  out sick.  I detailed him and one other officer to

Page 345

```
 1  help pick up slack.  Any advice?"
 2           Do you recall that?
 3       A    So that was -- he's in charge -- he
 4  negotiates with the union, so you go to him with
 5  union questions.  But I don't remember saying
 6  that.
 7       Q    Do you recall seeking advice from Chief
 8  Newsham regarding union issues while you were the
 9  commander of the Seventh District?
10       A    When I first got there, he contacted me
11  and told me to sit down with -- he's the chief
12  shop steward for the detectives at 7D, or he
13  was -- Pemberton, Gregory Pemberton.  And so I sat
14  down with Gregory Pemberton.  It didn't go well
15  and I reached out to him to talk to him about how
16  I should handle the situation with -- with
17  Detective Pemberton.
18       Q    So in that instance you sought some
19  advice from Chief Newsham as to how you could
20  better fulfill your role as commander of the
21  Seventh District; fair?
22       A    No, because Pemberton was not a member
```

Page 346

1    of 7D, he worked at the 7D Detective's Office.

2    And he had an issue with me, although we didn't

3    know each other, and Chief Newsham told me to sit

4    down with him to try to smooth things over.  It

5    didn't go well, so I went back to Chief Newsham to

6    talk to him about it.

7         Q    Well, when you were commander of the

8    Seventh District, a formal grievance was filed

9    against you, right?

10        A    I can't remember.  It may have been.

11        Q    Officers were upset with how you were

12   doing the scheduling, right?

13        A    I don't -- I don't remember an informal

14   grievance about the schedule.  It may have been.

15   I'm not saying that it wasn't, I just don't

16   remember.

17        Q    Do you recall texting Chief Newsham on

18   February 11th, 2016 at 11:53 a.m., "Hello, sir.

19   Do you have a moment to counsel a rookie commander

20   who had two incidents with a lieutenant come up

21   this morning?"

22             MS. DURHAM:  I -- I'm sorry.  I would

Page 347

 1   just object to the extent that you're relying on

 2   text messages that have not been produced to the

 3   plaintiff.

 4              MR. SOBIECKI:  I'm just asking if she

 5   recalls.

 6              MS. DURHAM:  Right.  But to the extent

 7   that you're relying on text messages as the source

 8   for your information, I would ask that those text

 9   messages be provided.

10              To the extent that -- let me clean this

11   up.

12              MR. SOBIECKI:  Take your time.

13              MS. DURHAM:  To the extent that you're

14   relying on text messages and documents from

15   Ms. Parker's personnel file that were either not

16   produced or that the District refused to produce,

17   I will object to the extent that you have not

18   provided that information to the plaintiff.

19   BY MR. SOBIECKI:

20       Q    Inspector Parker, do you recall texting

21   Chief Newsham on May 10th, 2016, "Chief, if you

22   have a free moment, may I give you a call

1    regarding a union matter and the schedule?"

2         A    I don't remember.

3         Q    Do you recall on June 3rd, 2016 offering

4    to let Chief Newsham drive your car?

5         A    Drive my car?  I don't -- no, I don't

6    remember.

7         Q    Have you ever owned a white Range Rover?

8         A    Yes.

9         Q    Do you recall ever offering Chief

10   Newsham the opportunity to drive your white Range

11   Rover?

12        A    I don't remember.

13        Q    Do you recall seeking advice from Chief

14   Newsham on June 9th, 2016?

15        A    I don't.

16        Q    In 2016 Chief Lanier announced she was

17   retiring, right?

18        A    Yes.

19        Q    And there was uncertainty as -- as to

20   who would be the next Chief, right?

21        A    Yes.

22        Q    Do you recall telling Chief Newsham that

1   you hoped he became the next Chief of Police?

2        A    I do.

3        Q    And do you recall congratulating Chief

4   Newsham --

5        A    Yes.

6        Q    -- on his elevation?

7             So -- and then near the end of 2017 you

8   were demoted by Chief Newsham, right?

9        A    Yes.

10       Q    And you were angry about being demoted

11  by Chief Newsham, right?

12       A    I was disappointed in my -- my demotion.

13  I wasn't angry.  I knew that it was coming.  The

14  dynamic had changed.  I -- I think I testified to

15  that earlier.  Once I sent the text message -- I

16  had a, I believe, a very nice working relationship

17  with him and once I sent the text message, it was

18  all changed.

19       Q    During your time as FOIA Officer, you

20  regularly expressed to people how much you

21  disliked Chief Newsham, right?

22       A    I had --

```
 1            MS. DURHAM:  Object to the form.
 2            THE WITNESS:  I had, yes.
 3  BY MR. SOBIECKI:
 4       Q    And --
 5            MR. CARPENTER:  What was the answer?  I
 6  missed the answer.
 7            THE WITNESS:  I had.
 8            MR. CARPENTER:  Okay.
 9  BY MR. SOBIECKI:
10       Q    Do you know who Colbert King is?
11       A    Yes.
12       Q    Have you ever e-mailed with Colby King?
13  Does he go by Colby King?
14            I'll use Colbert.  Let me strike that.
15            Did you ever e-mail with Colbert King?
16       A    Yes.
17       Q    Did you ever draft any op-ed for Colbert
18  King?
19       A    Yes.
20            (Defendant's Exhibit Number 4 was
21            marked for identification.)
22  BY MR. SOBIECKI:
```

```
                                                Page 351

 1        Q    I'd like to show you what's marked as

 2   Defendant's Exhibit 4.

 3             Now, I -- I do want to ask -- you know,

 4   we've had a few different document productions

 5   from you, Inspector Parker.

 6             So you see the first page is an -- of

 7   Defendant's Exhibit 4 is an e-mail from you to

 8   Colbert King on May 22nd, 2019, right?

 9        A    Yes.

10        Q    And this was when you were FOIA Officer,

11   right?

12        A    Yes.

13        Q    And the Bates number on that is

14   Parker-Phillips_000621.

15             Do you see that?

16        A    Yes.

17        Q    And then if you turn over, the Bates

18   number of the next page is 00569 and then it

19   continues, right?

20             Do you see that?

21        A    Yes.

22        Q    So, I -- again, I don't want to mislead
```

Page 352

```
 1   you that these were not produced consecutively,
 2   but am I right that the pages at 00569 are the
 3   attachment to the e-mail at 00621?
 4        A    Yes.
 5        Q    And if you want to review this, it's --
 6   is it fair to say you don't have kind words about
 7   Chief Newsham in this op-ed?
 8        A    That's true.
 9        Q    And, in fact, you say, "Why has MPD
10   reversed course and grown increasingly hostile
11   towards its minority communities lately?  The
12   answer is Peter J. Newsham," right?
13        A    I don't know exactly where you are.
14             MR. CARPENTER:  Can you -- can you
15   direct her to --
16   BY MR. SOBIECKI:
17        Q    Oh, I apologize.  So in the third
18   paragraph --
19             MR. CARPENTER:  The third paragraph.
20             THE WITNESS:  Okay.
21   BY MR. SOBIECKI:
22        Q    -- it begins, "So, what happened?"
```

Page 353

1       A    Yes.

2       Q    Why did you send this op-ed to Colbert

3  King?

4       A    He actually was working on something

5  else and he asked me to write this that -- he

6  asked me to write it as an op-ed, but it was --

7  then he turned it into something else.  So it --

8  it never went forward.

9       Q    Why -- do you know why Colbert King

10  approached you to write a negative op-ed about

11  Chief Newsham?

12      A    I don't think he approached me to write

13  a negative op-ed.  I think he approached me to

14  write my thoughts.

15      Q    Do you know why he approached you?

16      A    We had -- he's talked to me about his

17  FOIA requests.  He doesn't have a high opinion of

18  the police department or Chief Newsham.

19      Q    Did he have any reason to think that you

20  also did not have a high opinion of Chief Newsham?

21      A    Not at that time.

22      Q    So --

Page 354

1     A     Not until I wrote this.

2     Q     Sorry.  So I just want to make sure I

3   have this.  Colbert King knew you from the FOIA

4   Office; is that right?

5     A     Yes.

6     Q     And while you were FOIA Officer, he

7   asked if you could write an op-ed about Chief

8   Newsham?

9     A     That wasn't our first conversation, but

10  it eventually got there, yes.

11    Q     Was the idea that your name would be on

12  this op-ed?

13    A     Yes.

14    Q     Did you tell anyone at MPD you had

15  drafted this op-ed?

16    A     I did not.

17    Q     And was this op-ed ever published?

18    A     It wasn't.

19    Q     Do you know Marvin Haiman, Inspector

20  Parker?

21    A     Yes.

22    Q     And he goes by Ben; is that right?

Page 355

1      A    Yes.

2      Q    How do you know Mr. Haiman?

3      A    He works at MPD.

4      Q    Did you ever work with Mr. Haiman?

5      A    I've worked with him, yes.

6      Q    In what context did you work with

7  Mr. Haiman?

8      A    Just he worked in the same circle.  I've

9  never worked directly with him, but we worked in

10 the same circle.

11     Q    Mr. Haiman is not a sworn officer,

12 right?

13     A    No.

14     Q    What position did he hold when you

15 worked with him?

16     A    I actually don't know what his position

17 was.  He worked -- I don't -- I don't know.  I

18 don't remember what his position was.  But he

19 eventually became the Director of Professional

20 Response- -- no, the Director -- yeah,

21 Professional Response- -- goodness.  I don't think

22 it was Professional Responsibility.  I can't

Page 356

1    remember the name of the division he eventually

2    became director of.  And I, handling FOIA

3    requests, I had to go to him to get approval for

4    some requests that came from his office.

5         Q    Did you have any problems with

6    Mr. Haiman while you were at MPD?

7         A    No, not really.

8         Q    Any negative interactions with Mr.

9    Haiman while you were at MPD?

10        A    Not personally, no.

11        Q    Did you have any views of Mr. Haiman's

12   job performance?

13        A    I wasn't a fan.

14        Q    How so?  Why were you not a fan of

15   Mr. Haiman?

16        A    I -- I just didn't think that he was

17   qualified for the -- some of the positions that he

18   held.  I thought there were -- honestly, I thought

19   there were better qualified people for some

20   positions that he held.

21        Q    Which positions did you not think he was

22   qualified for?

Page 357

1       A       The Director of -- I keep --

2       Professional Responsibility keeps coming to mind,

3       but that's not the name of his -- his bureau --

4       the bureau head that he was given.

5       Q       And why did you think he was not

6       qualified?

7       A       I thought that there were better

8       qualified people for that position.

9       Q       Did you have any opinion on Mr. Haiman's

10      performance -- job performance in that position?

11      A       I don't have an opinion.  I didn't pay

12      too much attention to it.  I didn't think he

13      deserved to be there, so -- but he was there.

14      There was nothing I could do about it.  I didn't

15      dwell on it.

16      Q       Okay.  So let's separate his

17      qualifications and whether he deserved to be

18      there.

19              Do you have any opinion on whether

20      Mr. Haiman was qualified to hold any position he

21      had at MPD?

22      A       I think --

Page 358

1          MS. DURHAM:  Object to the form.

2          THE WITNESS:  I felt there were better

3    --

4    BY MR. SOBIECKI:

5      Q    I'll -- I'll reask that question then.

6          Do you think Mr. Haiman was unqualified

7    to hold any position he held at MPD?

8          MS. DURHAM:  I'll object to the form.

9          THE WITNESS:  I thought there were

10   better qualified people.

11   BY MR. SOBIECKI:

12     Q    I -- I appreciate that, Inspector

13   Parker, but did you think he was unqualified?

14         MS. DURHAM:  I'll object to the form and

15   note that she --

16         THE WITNESS:  It's the same answer.

17         MS. DURHAM:  -- asked and answered the

18   question.

19         MR. CARPENTER:  I believe she's trying

20   to answer the question.

21         THE WITNESS:  I thought there were

22   better qualified people.

Page 359

1   BY MR. SOBIECKI:

2       Q    Okay.  But here's the difference,

3   Inspector Parker, I'm trying to get at.  There can

4   be many people who are qualified to do a job, but

5   there can also be people who are even more

6   qualified, right?

7           Are you with me?

8       A    Uh-huh.

9       Q    So --

10          MS. DURHAM:  I'll object to the form of

11  that question.

12  BY MR. SOBIECKI:

13      Q    -- what I want to understand is did you

14  think Mr. Haiman was not qualified to do his job

15  or just that there were more qualified people for

16  his job?

17          MS. DURHAM:  I will object to the form

18  of the question, asked and answered.

19          THE WITNESS:  I think there were people

20  better qualified for the position.

21  BY MR. SOBIECKI:

22      Q    So, again, I -- I do need an answer to

Page 360

```
 1   my question, you have no opinion on whether he was
 2   qualified or not; is that fair?
 3              MS. DURHAM:  Objection.
 4              THE WITNESS:  I --
 5              MS. DURHAM:  Asked and answered.
 6   Objection to the form.
 7              THE WITNESS:  I don't have an answer for
 8   that.  I just think that there were other people
 9   who were more qualified.
10   BY MR. SOBIECKI:
11       Q    Such as?  Who did -- well, let me ask.
12   Who did you think was more qualified than
13   Mr. Haiman?
14       A    I don't --
15              MR. CARPENTER:  For what position?
16              MS. DURHAM:  So I object to the form of
17   that question too.
18   BY MR. SOBIECKI:
19       Q    I'll ask my questions.
20       A    I don't remember her last name, but her
21   first name was Kathleen.
22       Q    Kathleen.  And was this his position at
```

Page 361

1   the Professional Development Bureau?

2        A    Professional Development, yes, that's

3   it.  Thank you.

4        Q    So Mr. Haiman was the head of the

5   Professional Development Bureau and you thought

6   there was at least one person more qualified to

7   head that and her name was Kathleen?

8        A    Yes.

9        Q    Anyone else who you thought was more

10  qualified than Mr. Haiman?

11       A    Angela Simpson, but I don't know -- I

12  don't think Angela put in for the position.  But

13  she would have been a better pick.

14       Q    Ms. Simpson is wonderful, I agree with

15  you.

16            MS. DURHAM:  I'll object to that

17  statement.

18  BY MR. SOBIECKI:

19       Q    Uh-huh.

20            MR. CARPENTER:  Are you going to move to

21  strike?

22            MS. DURHAM:  I'd like to move to strike.

Page 362

```
 1              (Defendant's Exhibit Number 5 was
 2              marked for identification.)
 3   BY MR. SOBIECKI:
 4        Q    I'd like to show you Defendant's
 5   Exhibit 5.
 6              Now, Inspector Parker, you've -- you've
 7   texted with Eric Flack hundreds of times, right?
 8        A    Yes.
 9        Q    Would you consider Mr. Flack a friend of
10   yours?
11        A    I would consider him -- not a friend, I
12   wouldn't use the word friend, no.
13        Q    So Defendant's Exhibit 5 is a text
14   exchange between you and Mr. Flack in August of
15   2018.
16              Do you see that?
17        A    Yes.
18        Q    And you were an employee of MPD at this
19   time, right?
20        A    Yes.
21        Q    A sworn officer.  Let me clarify.
22        A    Yes.
```

Page 363

1    Q    And Eric Flack says, "So I decided to

2    get something on air about that Pot data you kept

3    telling me about."

4            Do you see that?

5    A    Yes.

6    Q    Do you know what Mr. Flack is referring

7    to regarding that "Pot data"?

8    A    He's talking about marijuana arrests.

9    Q    And, yeah, I should have clarified,

10   yeah.  So when he says "pot," he means marijuana

11   in that circumstance, right?

12   A    Yes.

13   Q    And what -- what marijuana data

14   concerning arrests did you give him?

15           MS. DURHAM:  Objection to the form.

16           THE WITNESS:  I didn't give him any

17   informa- -- any data.  I just told him that there

18   was several other requests about marijuana data

19   that he may want to also look at.

20   BY MR. SOBIECKI:

21   Q    And then at the end, at 11:59 p.m., you

22   text him, "PIO's phone was blowing up all day

Page 364

1    about it.  Lots of interest from countless

2    outlets - all with the same questions.  Good

3    you're getting it out first."

4               Do you see that?

5          A    Yes.

6          Q    So Eric Flack ran a story about the --

7    the data you gave -- you were telling him about,

8    right?

9          A    I don't remember honestly.  He may have,

10   I don't know.  I don't remember.

11         Q    Do you recall whether Mr. Flack's

12   reporting on this was critical of MPD?

13         A    I don't remember the report.  I don't

14   remember.

15         Q    Generally speaking, would you describe

16   Mr. Flack as a fan of MPD?

17         A    I think he's a fan of the Agency.  He

18   wasn't a fan of specific people on the Agency.

19         Q    If Mr. Flack -- are you familiar with

20   Mr. Flack's reporting?

21         A    Some of it, yes.

22         Q    Okay.  Have you ever known him to be

Page 365

1    critical of MPD?

2        A    Yes.

3        Q    And do you know Mr. Flack's opinion of

4    Chief Newsham?

5        A    Yes.

6        Q    What is Mr. Flack's opinion of Chief

7    Newsham?

8        A    He doesn't think favorably of Chief

9    Newsham.

10       Q    And Chief Newsham does not think

11   favorably of Mr. Flack; is that fair?

12           MS. DURHAM:   Objection to form.

13           THE WITNESS:   That's fair.

14   BY MR. SOBIECKI:

15       Q    Let me ask you.   Do you know Chief

16   Newsham's -- whether Chief Newsham thinks

17   favorably of Mr. Flack?

18       A    It's been told to me that he doesn't

19   think favorably of Mr. Flack.

20       Q    So why did you tell Mr. Flack about the

21   pot data?

22       A    Well, he --

Page 366

```
 1            MR. CARPENTER:  Objection.  I -- I don't
 2   think that's what she testified to.
 3   BY MR. SOBIECKI:
 4        Q    You can answer.
 5        A    I thought he'd be interested in it.
 6        Q    Why did you think he'd be interested in
 7   it?
 8        A    Because there were several other media
 9   outlets that were interested in it.
10        Q    Do you recall what the substance of the
11   information was that you told him?
12        A    I don't.  I just know it's about
13   marijuana arrests.
14            (Defendant's Exhibit Number 6 was
15            marked for identification.)
16   BY MR. SOBIECKI:
17        Q    Let me show you what's been marked as
18   Defendant's Exhibit 6.  Defendant's Exhibit 6 is
19   another text message exchange between you and
20   Mr. Flack from August 12th, 2018.
21            Do you see that?
22        A    Yes.
```

1      Q     You text Mr. Flack, "Hey there, did you

2   get a package today?"

3            Do you see that?

4      A     Yes.

5      Q     Did you send Mr. Flack a package?

6      A     According to this I did.

7      Q     So do you recall sending Mr. Flack a

8   package?

9      A     I don't.

10      Q     Do you see next to your message there it

11   says, "DELETED"?

12      A     Yes.

13      Q     Did you delete this text message?

14      A     I didn't delete any text messages.

15      Q     You have a cell phone I understand,

16   right?

17      A     Yes.

18      Q     How long have you had your cell phone?

19      A     This one I've had since last year.

20      Q     So in 2018 you had a different phone?

21      A     Yes.

22      Q     Have you switched phones a few times

Page 368

1    since 2018?

2         A     I usually get every upgrade -- every

3    year a new iPhone.

4         Q     And when you go in to get the new phone,

5    does the technician generally transfer the data

6    from your old phone to your new phone?

7         A     No, they tell you to log into your

8    account and everything should automatically

9    download.

10        Q     Do you have an iPhone?

11        A     Yes.

12        Q     Do you back up to the Cloud?

13        A     Sometimes, but right now it's not

14   backing up because I'm out of -- I'm out of space.

15        Q     Cloud space?

16        A     Yes.

17        Q     Okay.  So why -- do you know why it says

18   "DELETED" next to this text message?

19        A     I don't.

20        Q     Do you ever delete text messages?

21        A     I don't.

22               (Defendant's Exhibit Number 7 was

Page 369

```
 1            marked for identification.)
 2   BY MR. SOBIECKI:
 3       Q    Okay.  I'd like to show you what's been
 4   marked as Defendant's Exhibit 7.  So Defendant's
 5   Exhibit 7 is a text message from July 19th, 2019,
 6   which is -- oh.  I'm going to -- I'm going to move
 7   on from that.  You can put that to the side.  It
 8   can be -- still be Defendant's Exhibit 7.
 9            Well, let me ask you, do you -- I
10   apologize.  Defendant's Exhibit 7, you write to
11   Mr. Flack, "Oh no.  I mailed it to your home
12   address.  Might it be there?"
13            MS. DURHAM:  Sorry.  Objection to the
14   form and where does it indicate that she texted
15   Mr. Flack?  I might be just missing it.
16            MR. SOBIECKI:  All right.  Fair enough.
17   We'll move on.
18            (Defendant's Exhibit Number 8 was
19            marked for identification.)
20   BY MR. SOBIECKI:
21       Q    Defendant's Exhibit 8.  Defendant's
22   Exhibit 8 is a text message exchange between you
```

1    and Mr. Flack from September of 2019, right?

2         A    Yes.

3         Q    In the second text message Mr. Flack

4    writes to you, "Hey there!  A little later for

5    sure.  I did an interview with police union am

6    turning a piece today" and you respond, "Okay.

7    Got a possible story.  Hope it's not the same."

8              Do you see that?

9         A    Yes.

10        Q    And your message is marked deleted,

11   right?

12             Do you see that?

13        A    Yes.

14        Q    And then the next -- two, three, four,

15   five, six, seven, eight, nine, ten -- eleven

16   messages are marked deleted.

17             Do you see that?

18        A    Yes.

19        Q    And in the third deleted message you

20   say, "Okay.  Had a plainclothes black officer

21   profiled by two white sergeants at police station

22   because of his dreadlocks.  Turned into a physical

Page 371

1    fight.  Black officer put out on noncontact."

2            Do you see that?

3        A   Yes.

4        Q   Why are you sharing that with Mr. Flack?

5        A   It was a story.

6        Q   And why are you sharing a story with

7    Mr. Flack?

8        A   Because it was a story.

9        Q   And why would you share a story with

10   Mr. Flack?

11           MS. DURHAM:  Objection.

12           THE WITNESS:  He's a journalist.

13   BY MR. SOBIECKI:

14       Q   And why -- okay.  Why did you think

15   Mr. Flack needed to know this?

16       A   Because it's a story.

17       Q   Did you want him to report on this?

18       A   If he found it interesting.

19       Q   Did you find it interesting?

20       A   I did.

21       Q   So you were hoping he would report on

22   this?

Page 372

1      A     If he found it interesting, yes.

2      Q     Is it fair to describe the story you're

3  proposing as being critical of MPD?

4      A     I don't know if it's critical of MPD,

5  but I think it was unfair to the officer who was

6  involved in this incident.

7      Q     Do you know if Mr. Flack did report on

8  this incident?

9      A     I don't.

10      Q     But just you see, Inspector Parker, the

11  deleted messages are only the ones where you're

12  sharing this inside information with Mr. Flack.

13           Do you see that?

14           MS. DURHAM:  I will object to the form

15  of the question and the implication that

16  Ms. Parker deleted the text messages because she's

17  already testified that she did not delete any text

18  messages.  So I will object to the implication of

19  the question as well.

20           MR. SOBIECKI:  Counsel, I will object to

21  the speaking objection.  We've had a good day.

22  Let's -- let's stay the course.  Object to form is

Page 373

```
 1  fine.
 2            MR. CARPENTER:  Is there no question?
 3            (The reporter read the record
 4             as requested.)
 5            MR. SOBIECKI:  What was my -- what was
 6  my question?
 7            (The reporter read the record
 8             as requested.)
 9  BY MR. SOBIECKI:
10       Q    Do you see that?
11            MS. DURHAM:  I will make my same
12  objection if it's the same question.
13            THE WITNESS:  Yes.
14            MR. CARPENTER:  And -- and -- and the
15  witness has testified that she -- she has deleted
16  no messages, so I think it's fair to say she has
17  no knowledge regarding deletions.
18  BY MR. SOBIECKI:
19       Q    Okay.  I still may inquire.
20            All right.  Did you share potential
21  stories with any other reporters during your time
22  as FOIA Officer?
```

1       A      No.

2       Q      So Mr. Flack was the only one?

3       A      Yes.

4       Q      And why Mr. Flack?  Why did you send

5   that story to him as opposed to other reporters?

6       A      Mr. Flack was the reporter I had the

7   best rapport with.

8              (Defendant's Exhibit Number 9 was

9              marked for identification.)

10  BY MR. SOBIECKI:

11      Q      I show you what's been marked as

12  Defendant's Exhibit 9.  Defendant's Exhibit 9 is a

13  text message exchange between you and Mr. Perloff,

14  right?

15      A      Yes.

16      Q      From November 13th, 2019, right?

17      A      Yes.

18      Q      And this is just two months before you

19  retired, right?

20      A      Yes.

21      Q      And Mr. Perloff writes, "Thanks again

22  for talking tonight.  I really appreciate all the

1    information and the trust you place in us by

2    sharing it.  When we have decided how to use it, I

3    will let you know."

4             What is Mr. Perloff referring to there?

5        A    I don't know.  I don't remember what

6    he's referring to, but he's asked me many

7    questions about cases that the ACLU are either

8    working on or thinking about working on.

9        Q    Did you share nonpublic information with

10   him?

11       A    No.

12       Q    Well, do you recall what information you

13   shared?

14       A    It was always opinion.  He would ask me

15   opinion about cases that they either are working

16   on or thinking about working on.

17       Q    Do you recall any examples?

18       A    One example is a Department of

19   Corrections case about how mentally ill arrestees

20   are treated -- or what is the policy for handling

21   the mentally ill or a person in mental crisis.

22       Q    When -- when Mr. Perloff wrote "the

Page 376

1    trust you placed in us by sharing it," do you know

2    what he meant by that?

3            MS. DURHAM:  I'll object to the form.

4            MR. CARPENTER:  I'd object to the form.

5            THE WITNESS:  I don't know specifically

6    what he was talking about in this, but I -- I just

7    know the type of questions he would ask or what we

8    would talk about.

9            (Defendant's Exhibit Number 10 was

10           marked for identification.)

11   BY MR. SOBIECKI:

12       Q    I'm handing you Defendant's Exhibit 10.

13   Defendant's Exhibit 10 is another text exchange

14   between you and Mr. Perloff and this is

15   January 15th, 2020, which is three days before you

16   retire, right?

17       A    Yes.

18       Q    And, in fact, you were out of the office

19   the week before you retired, right?

20       A    Yes.

21       Q    And Mr. Perloff asks you, "Before you

22   finish" -- "officially finish, I was wondering if

Page 377

1    you could help me with one last request:  Is there

2    any way we could get the Sheriff Road videos

3    before you go?"

4            Do you see that?

5        A    Yes.

6        Q    And he's referring to a FOIA request of

7    his, right?

8        A    Yes.

9        Q    And you worked on it for him, right?

10       A    I'm not involved with this.  The only

11   thing I did was called and get an update on where

12   they were in the process because the FOIA Office

13   that processed video, we send them out to a vendor

14   so, the only thing I could get was an update on

15   where they were in the process.

16       Q    In response to Mr. Perloff reaching out

17   to you, was action taken on his FOIA request?

18       A    Oh, I don't -- I don't know.  I just

19   reached out to find out where they were in the

20   process.

21       Q    Well, I think we talked earlier that

22   Mr. Perloff and Mr. Flack were the only FOIA

Page 378

1    requesters who contacted you on your personal cell

2    phone, right?

3        A    Yes.

4            (Defendant's Exhibit Number 11 was

5            marked for identification.)

6    BY MR. SOBIECKI:

7        Q    Defendant's Exhibit 11 is another --

8        A    And -- I'm sorry, and in response to

9    that previous, Amy Phillips also.

10       Q    You had interactions with Amy Phillips

11   on your personal cell phone about her FOIA

12   requests?

13       A    Well, I didn't start talking to her

14   until after I retired, but yes.

15       Q    Okay.  During your time as FOIA Officer,

16   did you communicate with Amy Phillips on your

17   personal cell phone about her FOIA requests?

18       A    No.

19       Q    Defendant's Exhibit 10, this is the

20   day -- did I say Defendant's --

21           MR. CARPENTER:  This is 11.

22   BY MR. SOBIECKI:

1       Q    Eleven.  I apologize.  Defendant's

2  Exhibit 11 is a text message the day after

3  Defendant's Exhibit 10 between you and

4  Mr. Perloff, right?

5       A    Yes.

6       Q    And you write, "Good Morning.  You

7  should get the videos for the guy in the chair

8  today.  You should also get an updated invoice for

9  the other two Sheriff Road videos today as well,"

10  right?

11       A    Yes.

12       Q    And he says, "That's great news!  Thanks

13  for helping us with this even as you're heading

14  out."

15            So your -- your actions helped

16  Mr. Perloff get what he was looking for, right?

17            MS. DURHAM:  I'll object to the form.

18            THE WITNESS:  I -- no.  I -- I called to

19  find out where they were in the process.  I didn't

20  do anything to make them speed up or slow down or

21  anything.  I just called to see where they were in

22  the process.

```
                                            Page 380

 1   BY MR. SOBIECKI:

 2        Q    And then Mr. Perloff writes, "We also

 3   got approval to have a lunch for you at our

 4   office."

 5             Do you see that?

 6        A    Yes.

 7        Q    Did Mr. Perloff have a lunch for you at

 8   his office?

 9        A    No.

10        Q    Did any other FOIA requesters offer to

11   have a lunch for you at their offices?

12        A    No.

13        Q    And then in the next text at 4:28 you

14   tell him, "By the way, I have some news you may

15   want to prepare for."

16             Do you see that?

17        A    Yes.

18        Q    What were you referring to there?

19        A    I don't know.  I don't remember.

20        Q    Why wouldn't you have just texted him,

21   Inspector Parker?

22        A    I don't know what it is.  I -- I don't
```

Page 381

```
 1   remember what this was about.
 2        Q    And then in the final one you said,
 3   "Okay.  Call me when you have some time."
 4             Do you see that?
 5        A    Yes.
 6        Q    Was there times in your communications
 7   with Perloff that you would prefer to speak with
 8   him over the phone as opposed to texting?
 9        A    There were times we spoke on the phone,
10   yes.
11        Q    And was that because you didn't want to
12   put information in writing in a text message?
13        A    It was probably because it was a longer
14   conversation that would be better spoken than in a
15   text -- better communicated verbally than in a
16   text.
17        Q    And sometimes there are conversations
18   that are easier to have in person or over the
19   phone as opposed to text message, right?
20        A    Correct.
21             (Defendant's Exhibit Number 12 was
22             marked for identification.)
```

Page 382

1   BY MR. SOBIECKI:

2       Q    Defendant's Exhibit 12 is a text

3   exchange between you and Mr. Flack from June of

4   2020, right?

5       A    Yes.

6       Q    And I'll direct your attention to the

7   fourth from the top.  This is another one that's

8   marked "DELETED," but you don't know why this has

9   "DELETED" next to it, right?

10      A    I don't.  I'm assuming that the message

11  was deleted, but I don't know why it was deleted.

12      Q    Because the first text message where he

13  says, "Hi there V!  How are you making it through

14  all of this," that's not deleted, right?

15      A    Right.

16      Q    And then you respond, "Hmmmmm...I'm

17  finishing up a conference call.  Can I call you in

18  ten minutes."

19           That's not deleted either, right?

20      A    Right.

21      Q    And then he says, "Of course!  Whenever

22  you are free my friend!"

Page 383

1              That's not deleted, right?

2        A     Right.

3        Q     And you text, "Another possible story...

4   chief cites arbitration as a reason he can't get

5   rid of bad officers.  Truth is, arbitrators award

6   bad officers their jobs back because agency makes

7   mistakes in termination process close to

8   70 percent of time," and you continue.

9              Do you see that?

10       A     Yes.

11       Q     And there's "DELETED" next to that one?

12       A     Yes.

13       Q     And the "chief" in this, you're

14   referring to Chief Newsham, right?

15       A     Yes.

16       Q     So you're providing information negative

17   about Chief Newsham to Eric Flack, right?

18       A     I don't think this is negative.  This

19   is -- he's making a statement, but he -- the

20   officers that were terminated and got their jobs

21   back were under his watch as Chief.  So it's not

22   directly attributed to him, it's just that his

Page 384

1    statement was not accurate.

2         Q    You continue in the last sentence, "His

3    management team should" -- "management team should

4    do a better job doing their jobs and avoid making

5    mistakes that will lead to reinstate nets based on

6    technicalities."  And the "his" there is referring

7    to Chief Newsham, right?

8         A    Is -- what line are you on?

9         Q    Sorry.  So it's the -- the third line.

10        A    Oh, in the same paragraph?

11        Q    Yes.

12        A    Yes, I see it.

13        Q    You're referring to Chief Newsham there,

14   right?

15        A    Yes.

16        Q    You're saying Chief Newsham should be

17   doing a better job, right?

18             MR. CARPENTER:  The management team.

19             THE WITNESS:  Of the management team,

20   not --

21   BY MR. SOBIECKI:

22        Q    Fair enough.  Chief Newsham's management

Page 405

1    Electronically or hard copy?

2          A     Electronically.

3          Q     And where electronically?  On your

4    computer?

5          A     On a zip drive.

6          MR. SOBIECKI:  Thank you.  I have no

7    more questions at this time.  I'll reserve the

8    rest of my time.

9          MR. CARPENTER:  And, Krystal, before you

10   get started, if -- if I could just very quickly.

11   We have taken a break and I had -- previously

12   before the break there was one question where I

13   instructed the witness not to provide an answer.

14   I'm withdrawing that instruction.  So if you want

15   to pursue that question and get an answer, the

16   instruction has been withdrawn.  And the last

17   thing I want to do is to get into any kind of a

18   motion fight with either side in this -- in this

19   litigation.  So I don't know if you want --

20         MR. SOBIECKI:  Still no questions at

21   this time.  I'll reserve the remainder of my time.

22               FURTHER EXAMINATION BY COUNSEL FOR

```
 1            PLAINTIFF
 2    BY MS. DURHAM:
 3        Q    All right.  I'm going to hand you what
 4    will be marked as Exhibit 350- --
 5            MR. LINHORST:  356.
 6    BY MS. DURHAM:
 7        Q    -- 356.
 8            MS. DURHAM:  Thank you, Michael.
 9            (Plaintiff's Exhibit Number 356 was
10            marked for identification.)
11    BY MS. DURHAM:
12        Q    And then we'll represent that these are
13    interrogatory answers that were provided to the
14    District from Ms. Phillips, and I will direct your
15    attention to page five.
16            The District asked Ms. Phillips to
17    identify the factual basis for her allegation in
18    paragraph 52 of her complaint that "according to
19    former colleagues of Parker, current Chief of
20    Police Robert Contee has not ended or suspended
21    the 'watchlist' policy."
22            Do you see that?
```

Page 407

1       A    Yes.

2       Q    Do you recall telling Ms. Phillips that?

3       A    Yes.

4       Q    Who told you that under Chief Contee the

5  watchlist policy continued?

6       A    Lisa Archie-Mills.

7       Q    I want to start where we ended.

8            You were shown a number of text messages

9  and e-mails with Eric Flack.

10           Do you recall that?

11      A    Yes.

12      Q    And you were asked a number of questions

13  about your feelings about Marvin Haiman.  Do

14  you -- and whether Marvin Haiman was qualified for

15  his job.

16           Do you recall that?

17      A    Yes.

18      Q    Whatever your beliefs about Marvin

19  Haiman, did you write the declaration that's at

20  Exhibit 111 because you felt Mr. Haiman was

21  unqualified?

22      A    No.

1      Q    Did you write Exhibit 111 because you

2  wanted to exact revenge on Marvin Haiman for some

3  reason?

4      A    No.

5      Q    Did you write Exhibit 111 because you

6  were upset with Chief Newsham for some reason?

7      A    No.

8      Q    Did you write Exhibit 111 because it's

9  true?

10     A    Yes.

11     Q    You were asked if it was reasonable for

12 the Chief of Police to be informed about certain

13 requests.

14          Do you recall that question?

15     A    Yes.

16     Q    Is it unreasonable for the MPD to

17 withhold information from the public for weeks,

18 months and sometimes years after EOCOP was

19 notified about the request and draft responses

20 existed?

21     A    Yes.

22          MR. SOBIECKI:   Object to form.

Page 409

1                THE WITNESS:  Yes.

2    BY MS. DURHAM:

3        Q    And in your view, without consideration

4    for the watchlist policy, wouldn't it be possible

5    for the Chief of Police to be made aware of a

6    response to a FOIA request at the time the

7    response was being provided to the requester?

8                MR. SOBIECKI:  Object to form.

9                THE WITNESS:  Yes.

10               MS. DURHAM:  But that's not what

11   happened in your experience, correct?

12               MR. SOBIECKI:  Object to form.

13               THE WITNESS:  No, it's not.

14   BY MS. DURHAM:

15       Q    What happened in your experience was

16   that EOCOP review had to happen before you could

17   release responses to certain requesters, correct?

18               MR. SOBIECKI:  Object to form.

19               THE WITNESS:  Yes.

20   BY MS. DURHAM:

21       Q    And the EOCOP review process was about

22   more than just awareness, correct?

Page 410

1          MR. SOBIECKI:  Objection.  Leading.

2          THE WITNESS:  Yes.

3    BY MS. DURHAM:

4      Q    EOCOP was involved -- I'll withdraw

5    that.

6          Do you know of any exception in the FOIA

7    statute that allows the FOIA Office to respond to

8    a FOIA request differently because documents may

9    be used to be critical of MPD?

10         MR. SOBIECKI:  Object to form.

11         THE WITNESS:  No.

12   BY MS. DURHAM:

13     Q    You were asked some questions about if

14   Ms. Phillips made suggestions about what to

15   include in your declaration.

16         Do you recall those questions?

17     A    Yes.

18     Q    Did Ms. Phillips ever suggest that you

19   should include anything in your declaration that

20   was untrue?

21     A    No.

22     Q    And, in fact, I think we talked about

Page 411

1    one specific example where Ms. Phillips corrected

2    something that was incorrect in your declaration.

3            Do you recall that?  With respect to her

4    request?

5        A    Yes.

6        Q    You were asked some questions about

7    staffing turnover.

8            The staffing in the FOIA Office did not

9    have anything to do with EOCOP review, correct?

10           MR. SOBIECKI:  Object to form.

11           THE WITNESS:  No.

12   BY MS. DURHAM:

13       Q    The staffing in the FOIA Office did not

14   have anything to do with how long EOCOP review

15   took, correct?

16           MR. SOBIECKI:  Objection.  Leading.

17           THE WITNESS:  No.

18   BY MS. DURHAM:

19       Q    You're saying no to my questions, but do

20   you mean yes, I'm correct?

21       A    I'm saying that the staffing issues did

22   not have any -- any connection to the -- the

Page 412

1   Chief's review of FOIA requests, no.

2        Q    And so that the record is clear, I'll

3   ask it this way:  Did the staffing in the FOIA

4   Office have anything to do with EOCOP review?

5        A    No.

6        Q    Did the staffing in the FOIA Office have

7   anything to do with how long EOCOP review took?

8             MR. SOBIECKI:  Object to form.

9             THE WITNESS:  No.

10  BY MS. DURHAM:

11       Q    I want to show you Exhibit 86.

12       A    Do I have it?

13       Q    You do.

14       A    They got out of order.

15       Q    Do you want to split the stack and I'll

16  look with you.

17       A    It has to be in this stack.

18       Q    I think it was from Mr. Sobiecki's

19  questions.  Here you go.

20       A    Thank you.

21       Q    Now I'm out of order.  I may have put

22  mine in that stack.

Page 413

1          MR. CARPENTER:  Here's 86.  Did you say

2    86?

3          MS. DURHAM:  Yes.  Can I actually just

4    borrow this for a minute?

5    BY MS. DURHAM:

6      Q    And this e-mail was sent on

7    October 23rd, 2018.

8          Do you see that?

9      A    Yes.

10     Q    And Mr. Sobiecki pointed out to you that

11    you only sent this e-mail to Ms. Turner and

12    Mr. Sternbeck.

13         Do you see that?

14     A    Yes.

15     Q    Do you recall that the e-mail -- if you

16    could pull out Exhibit 85.

17         Do you have that in front of you?

18     A    Yes.

19     Q    Exhibit 85 was sent on October 18th,

20    2018.

21         Do you see that?

22     A    Yes.

1      Q     And that is the week before you sent

2    this e-mail to Ms. Turner -- I'm sorry.   That is

3    the week before you sent Exhibit 86 to Ms. Turner

4    and Mr. Sternbeck.

5             Do you see that?

6      A     Yes.

7      Q     And so that -- this October 23rd, 2018

8    e-mail would have been the next e-mail that you

9    sent after you got the instructions from

10   Ms. Turner to highlight certain requests; is that

11   correct?

12     A     Yes.

13     Q     And would it be fair -- I'll withdraw

14   that.

15            Is it possible that the reason you don't

16   send this e-mail to Chief Newsham is because this

17   e-mail is a test run to see if you are following

18   Leeann Turner's directions?

19            MR. SOBIECKI:   Object to form.

20            THE WITNESS:   No, I think I just

21   inadvertently left him off.

22   BY MS. DURHAM:

Page 415

1       Q    Okay.  So typically when you sent these

2   weekly e-mails highlighting certain requests, you

3   included Chief Newsham?

4            MR. SOBIECKI:  Object to form.

5            THE WITNESS:  Yes.

6   BY MS. DURHAM:

7       Q    So I think you were asked some questions

8   about not including him on all the weekly e-mails.

9            Your standard practice was to include

10  Chief Newsham on the weekly e-mails where you

11  highlighted certain requests, correct?

12           MR. SOBIECKI:  Object to form.

13           THE WITNESS:  Yes.

14  BY MS. DURHAM:

15      Q    And here you highlight Evan Lambert.

16           Do you see that?

17      A    Yes.

18      Q    Are you aware that Evan Lambert had been

19  critical of MPD in his reporting?

20           MR. SOBIECKI:  Object to form.

21           THE WITNESS:  No, I'm not aware.  Well,

22  I'm aware that he's been critical of D.C.

Page 416

1  Government.  I'm not sure of anything specific to

2  MPD.

3  BY MS. DURHAM:

4      Q    And you also flagged requests from the

5  ACLU.

6           Were you aware that the ACLU regularly

7  litigated against and released statements that

8  were negative about MPD?

9      A    Yes.

10      Q    Can you also pull out Exhibit 56 from

11  your stack.

12           MR. CARPENTER:  You got it?

13           THE WITNESS:  Yes.

14  BY MS. DURHAM:

15      Q    And Exhibit 56 is the Request Details

16  Report for Ms. Phillips' Lojocano request.

17           Do you see that?

18      A    Yes.

19      Q    And we talked about this earlier.

20           Do you recall that?

21      A    Yes.

22      Q    And this request was sent and denied on

1    March 15th, 2019; is that correct?

2         A    Yes.

3         Q    And if you could pull out Exhibit 88.

4    This is an e-mail that you sent to Chief Newsham

5    on March 19th, 2019.

6              Do you see that?

7         A    Yes.

8         Q    And March 19th, 2019 is after

9    March 15th, 2019, correct?

10        A    Yes.

11        Q    And I think when Mr. Sobiecki showed you

12   this document, he directed you to the last page.

13             Do you see that?

14             MR. CARPENTER:  Are you talking about

15   88?

16             MS. DURHAM:  Yes, of Exhibit 88.

17             THE WITNESS:  Yes.

18   BY MS. DURHAM:

19        Q    And he said you didn't highlight

20   Ms. Phillips' request, correct?

21        A    Correct.

22        Q    But you did highlight Ms. Phillips'

1    Lojocano request because you brought it to

2    Ms. Turner on March 15th when it was made,

3    correct?

4              MR. SOBIECKI:  Object to form.

5              THE WITNESS:  Yes.

6    BY MS. DURHAM:

7        Q    And there's no reason to flag a request

8    for EOCOP review or for Chief Newsham that's

9    already been denied, correct?

10             MR. SOBIECKI:  Object to form.

11             THE WITNESS:  That's true, but I also

12   wanted to add the other ones that he -- that the

13   OAG pointed out that I didn't flag that should

14   have been flagged, although they were not flagged,

15   they still were brought to the Chief -- or to Ms.

16   Turner's attention through our weekly meetings.

17             I just -- if you notice the signature

18   block, I was in charge of two different, at this

19   point, in charge of two different offices working

20   extremely long hours that it just was an

21   inadvertent oversight.

22   BY MS. DURHAM:

Page 419

1        Q    And just so I'm clear, you flagged

2   requests in other ways than just these highlighted

3   weekly e-mails, correct?

4             MR. SOBIECKI:  Object to form.

5             THE WITNESS:  Yes.

6   BY MS. DURHAM:

7        Q    You would discuss them with Ms. Turner

8   at the weekly meetings, correct?

9             MR. SOBIECKI:  Object to form.

10            THE WITNESS:  Yes.

11  BY MS. DURHAM:

12       Q    So you can't just look at the weekly

13  e-mails to determine which requests were always

14  highlighted or flagged for EOCOP, correct?

15            MR. SOBIECKI:  Object to form.

16            THE WITNESS:  Correct.

17  BY MS. DURHAM:

18       Q    And that's the case with Ms. Phillips'

19  request in Exhibit 88, correct?

20            MR. SOBIECKI:  Object to form.

21            THE WITNESS:  Correct.

22  BY MS. DURHAM:

Page 420

1      Q    You were asked about Mr. Perloff and his

2  request to talk offline and whether or not that

3  was nefarious and you responded no, correct?

4      A    Correct.

5      Q    Mr. Perloff is not a D.C. employee; is

6  that correct?

7      A    Correct.

8      Q    And D.C. employees' communications are

9  subject to FOIA statutes and can be released to

10  the public or in response to discovery in

11  litigation; is that correct?

12          MR. SOBIECKI:  Object to form.

13          THE WITNESS:  Tangible communications,

14  yes.

15  BY MS. DURHAM:

16      Q    So communications online, like e-mails

17  or government messages; is that correct?

18          MR. SOBIECKI:  Object to form.

19          THE WITNESS:  Correct.

20  BY MS. DURHAM:

21      Q    Do you think there's something nefarious

22  about a D.C. employee potentially avoiding

Page 421

1  communicating about certain issues to avoid

2  disclosure to the public or discovery in

3  litigation?

4          MR. CARPENTER:  Object to form.

5          MR. SOBIECKI:  Object to form.

6          THE WITNESS:  It could be.  It depends

7  on what it is.

8  BY MS. DURHAM:

9     Q    And in the case of Chief Newsham and

10 Leeann Turner, you write in your declaration that

11 the reason they communicated offline was to avoid

12 disclosure in response to FOIA requests or

13 discovery in litigation, correct?

14         MR. SOBIECKI:  Objection to form, asked

15 and answered.

16         THE WITNESS:  That's what I was told,

17 yes.

18 BY MS. DURHAM:

19    Q    And you were told that by Ms. Turner; is

20 that correct?

21         MR. SOBIECKI:  Objection.  Form, asked

22 and answered.

1          THE WITNESS:  Yes.

2    BY MS. DURHAM:

3      Q    And I just want to make sure that this

4    is clear.  I may have asked this already, so I

5    apologize.

6          You -- when you were deciding what to

7    highlight in those weekly e-mails, you based that

8    highlighting on the criteria that Ms. Turner had

9    previously given you as outlined in paragraph nine

10   of Exhibit 111, correct?

11         MR. SOBIECKI:  Objection.  Form, asked

12   and answered.

13         THE WITNESS:  That as well as ongoing

14   guidance as -- as time went on, yes.

15   BY MS. DURHAM:

16     Q    And that instruction involved whether or

17   not someone had been critical of MPD either in

18   reporting or in the community, correct?

19         MR. SOBIECKI:  Objection.  Form.

20         THE WITNESS:  Correct.

21   BY MS. DURHAM:

22     Q    You were asked if your declaration was

Page 423

1    drafted based on your memory.

2            Do you recall those questions?

3        A    Yes.

4        Q    Have you seen a number of documents

5    today that are consistent with your declaration?

6            MR. SOBIECKI:  Objection.  Form.

7            THE WITNESS:  Yes.

8    BY MS. DURHAM:

9        Q    Has that helped refresh your

10   recollection about the practices and policies that

11   you witnessed while at the FOIA Office?

12           MR. SOBIECKI:  Objection.  Form.

13           THE WITNESS:  I remember the practices

14   and policies, yes, without looking at the draft.

15   BY MS. DURHAM:

16       Q    You were asked about Are You Still

17   Interested letters.

18           Do you remember that?

19       A    Yes.

20       Q    Is it reasonable to collect and process

21   documents that are responsive to certain requests

22   and then hold them for a number of years and then

Page 424

1   send an Are You Still Interested letter?

2           MR. SOBIECKI:  Object to form.

3           THE WITNESS:  Can you repeat that

4   question?

5   BY MS. DURHAM:

6       Q    Sure.  Is it reasonable for the -- I'll

7   withdraw that.

8           Is it reasonable to collect and process

9   documents that are responsive to certain requests

10  and then hold them for a number of years and then

11  send an Are You Still Interested letter?

12          MR. SOBIECKI:  Objection.  Form.

13          THE WITNESS:  I don't think so.

14  BY MS. DURHAM:

15      Q    So we -- we talked a little bit about --

16  or, I'm sorry, you and Mr. Sobiecki talked

17  about -- I'll withdraw that.

18          With respect to adverse action hearing

19  transcripts, you mentioned that adverse action

20  hearing transcripts were personnel files.

21          Do you recall that?

22      A    Yes.

Page 425

1          Q     And an adverse action hearing happens

2     when a cop has been accused of a bad act; is that

3     correct?

4               MR. SOBIECKI:  Object to form.

5               THE WITNESS:  Misconduct.

6     BY MS. DURHAM:

7          Q     Misconduct.  Okay.

8          A     Yes.

9          Q     And which release of the information in

10    an adverse action hearing could result in negative

11    press or negative commentary about MPD; is that

12    correct?

13              MR. SOBIECKI:  Objection.  Form, calls

14    for speculation.

15              THE WITNESS:  Yes.

16    BY MS. DURHAM:

17         Q     I'm going to hand to you what has been

18    marked as Exhibit 23.  Oh, sorry, let me take

19    that -- this one.  Okay.  No, you can have that

20    one.  Sorry.

21              And I want to direct you to -- well, the

22    bottom of 580 shows an e-mail from Robert Pittman

```
 1    on June 25th, 2020 to Chief Newsham and Kelly
 2    O'Meara.
 3              Do you see that?
 4         A    Yes.
 5         Q    And Mr. Pittman writes, "I don't know
 6    how to" -- 581.  I'm sorry.  "I don't know how to
 7    navigate stories like this one.  These are the
 8    types of issues that will be thrown in my face and
 9    I will be questioned why I stand up for the
10    police.  I even have some listservs that are not
11    actively blocking me from sending out
12    notifications about police related events.  It
13    doesn't matter that I never offer an opinion, only
14    provide the notice I'm now being censored."
15              And do you see that the information that
16    Mr. Pittman sends to Chief Newsham is the same
17    article that you sent to Ms. Archie-Mills by Mitch
18    Ryals entitled "How the" -- "How the D.C. Police
19    Department, DoJ and D.C. Attorney General's Office
20    Shield Cops' Bad Acts."
21              Do you see that?
22         A    Yes.
```

1      Q    And if we look at Bates ending in --

2  well, this article is critical of MPD, correct?

3           MR. SOBIECKI:  Object to form.

4           THE WITNESS:  Yes.

5  BY MS. DURHAM:

6      Q    If we look at Bates ending in 582, I

7  want to direct you to the third paragraph from the

8  top that says, "The rules around adverse action

9  hearings are minor barriers to the public's access

10  to information about the police misconduct in D.C.

11  More significant efforts appear in three active

12  lawsuits in which MPD, the United States

13  Attorney's Office for the District of Columbia,

14  and the Office of the Attorney General for the

15  District of Columbia defend a system that allows

16  the identities and bad actions of police offers to

17  stay secret."

18           Do you see that?

19      A    Yes.

20      Q    And so the content in the adverse action

21  hearings was sensitive to MPD; is that correct?

22           MR. SOBIECKI:  Objection.  Leading.

Page 428

```
 1              THE WITNESS:  It could be.  It depends.
 2      BY MS. DURHAM:
 3          Q    Does it depends on the basis for the
 4      adverse action hearing?
 5          A    Yes.
 6          Q    And do you see the next paragraph -- I'm
 7      sorry, the -- two paragraphs after that one where
 8      it says, "For the past year, Phillips has
 9      challenged those systems in a lawsuit over access
10      to records of an adverse action hearing in
11      March 2019 that resulted in former Officer Sean
12      Lojocano's termination.  Lojocano was fired for an
13      invasive buttock and genital search of a man he
14      saw drinking alcohol in the passenger seat of a
15      car."
16              Do you see that?
17          A    Yes.
18          Q    And so the content -- you said earlier
19      that the reason that you elevated Ms. Phillips'
20      request was because of the content of them.
21              Do you recall that?
22              MR. SOBIECKI:  Object to form.
```

Page 429

1           THE WITNESS:  Yes.

2    BY MS. DURHAM:

3       Q    And the content of Ms. Phillips' request

4    could be used to cast MPD or Chief Newsham in a

5    negative light; is that correct?

6           MR. SOBIECKI:  Objection.  Form,

7    leading, calls for speculation.

8           THE WITNESS:  It could, but I think that

9    Ms. Turner believed that the Public Defender's

10   Office was collecting adverse action hearings to

11   be used as defense in the future -- or to use to

12   help defend folks in the future.

13   BY MS. DURHAM:

14      Q    And so that's -- and that's why you

15   elevated it, the request?

16      A    Right.

17      Q    And were there other --

18      A    Well, for this particular request it was

19   because it involved Lojocano and that was a -- a

20   hot topic in the media.

21      Q    And on 583 if we look at the -- the

22   statement at the top by Ms. Phillips, she writes,

Page 430

1   "'This is such a fascinating look inside at what

2   appears to be a dispute in the police department

3   between what's written in the rulebook about

4   what's legal versus what officers who are getting

5   on-the-job training in the streets are actually

6   being trained to do,' Phillips says, 'And what

7   they're actually being trained to do appears to be

8   really objectionable.'"

9           Do you see that?

10      A    Yes.

11      Q    And so Ms. Phillips is criticizing MPD

12  here; is that correct?

13          MR. SOBIECKI:  Object to form.

14          THE WITNESS:  Yes.

15  BY MS. DURHAM:

16      Q    And I know you talked about this

17  specific request and Ms. Phillips' request for

18  other adverse action transcripts and what

19  Ms. Turner believed was happening with those

20  requests.

21          For other requests from Amy Phillips,

22  were those elevated for EOCOP review because the

1  content could be used to be negative or critical

2  of MPD?

3          MR. SOBIECKI:  Object to form.

4          THE WITNESS:  Yes.

5  BY MS. DURHAM:

6      Q    Can you pull out Exhibit 49.

7          When you were shown Exhibit 49, you

8  weren't given a copy of the request by

9  Mr. Sobiecki, correct?

10     A    No.

11     Q    And your testimony there was just

12 based on -- well, I'll withdraw that.

13         And Mr. Sobiecki didn't show you any

14 correspondence that he was asking you about,

15 correct?

16     A    No.

17     Q    And the only thing that you got with

18 respect to this request was the FOIA number that's

19 listed on the subject line; is that correct?

20         MR. SOBIECKI:  Object to form.

21         THE WITNESS:  Yes.

22 BY MS. DURHAM:

Page 432

1      Q    And do you recall the content of every
2  FOIA request by number?
3      A    No.
4      Q    And particularly do you recall the
5  content of every FOIA request that's -- by number
6  that's from 2018?
7      A    No.
8      Q    Can you pull out Tab 30 -- I'm sorry,
9  Exhibit 132.
10          MR. CARPENTER:  You got it?
11  BY MS. DURHAM:
12     Q    It's the Request Details Report if that
13  helps.
14          You were -- and I can give you a minute
15  to review it.  It's the Emily Barth request that
16  went to EOCOP for review.
17     A    Okay.
18     Q    You were asked if there was anything
19  about the request that was embarrassing or
20  sensitive to MPD and I believe you testified no.
21          As far as you're aware, PDS is a
22  criminal defense organization that represents

                                           Page 433

1    individuals accused of crimes; is that correct?

2              MR. SOBIECKI:  Objection.  Leading.

3              THE WITNESS:  Well, earlier I was asked

4    was there anything that was -- that would bear

5    negative on MPD.  I said no.  But I wasn't asked

6    sensitivity and various sensitive information in

7    this request.

8    BY MS. DURHAM:

9        Q    And are you aware that sometimes PDS is

10   critical of MPD officers in court when it's

11   calling into question the officer's credibility or

12   actions taken by officers?

13             MR. SOBIECKI:  Object to form.

14             THE WITNESS:  Yes.

15             (Plaintiff's Exhibit Number 357 was

16             marked for identification.)

17   BY MS. DURHAM:

18       Q    I'm handing you what will be marked as

19   Exhibit 357.

20             MR. CARPENTER:  What is this again,

21   exhibit number?

22             MS. DURHAM:  357.

1   BY MS. DURHAM:

2       Q    This is a February 26th, 2019 e-mail

3   from -- the top e-mail is from you to Heidi

4   Fieselmann and if you look at the content of the

5   e-mail, this deals with the Lunch Bunch review of

6   stop and frisk requests.

7            Do you see that?

8       A    Yes.

9       Q    And Ms. Fieselmann on February 26th

10  says, "Hey Inspector - Thank you for resending!

11  Two quick questions.  Are we supposed to just flag

12  anything that may need to be flagged and (2) are

13  we sending both the internal and external

14  narratives."

15           Do you see that?

16      A    Yes.

17      Q    And you respond, "Yes, we are sending

18  both external and internal and yes, please flag

19  anything that makes your eyes go" -- insert

20  picture?

21      A    Yes.

22      Q    And for the record I'll describe it as a

Page 435

1    baby making an ugh face; is that correct?

2              MR. SOBIECKI:  Object to form.

3              THE WITNESS:  Yes.

4    BY MS. DURHAM:

5       Q    Is the direction that you give to Heidi

6    Fieselmann consistent with the direction that Ms.

7    Turner gave the group and you for what to flag in

8    the stop and frisk reports?

9              MR. SOBIECKI:  Object to form.

10             THE WITNESS:  I think so, yes.

11   BY MS. DURHAM:

12      Q    And during your testimony you used the

13   term "she" when you were talking about something

14   being detrimental to the narratives.

15             Is the "she" that you were referencing

16   there Ms. Turner?

17             MR. SOBIECKI:  Object to form.

18             THE WITNESS:  I don't remember.

19   BY MS. DURHAM:

20      Q    You don't remember the testimony?

21      A    I don't -- I don't -- yeah, I don't

22   remember the testimony or the context of the

Page 436

1    question.

2        Q    Okay.  So you were asked about your

3    relationship with Chief Newsham.

4             Do you recall that?

5        A    Yes.

6        Q    And you were asked about your draft

7    op-ed.

8             Do you recall that?

9        A    Yes.

10       Q    Can you pull out Defendant's Exhibit 4.

11            MR. CARPENTER:  You got it?

12            THE WITNESS:  Not yet.

13            MS. DURHAM:  I may need to take a quick

14   break.

15            MR. CARPENTER:  She has the exhibit in

16   front of her.

17            MS. DURHAM:  I may have to take a quick

18   break because I might have left it in the break

19   room.  Can one of you go check to see if I -- can

20   we just go off the record real quick.

21            VIDEO TECHNICIAN:  Off the record at

22   7:06.

Page 437

```
 1              (Brief recess.)
 2              VIDEO TECHNICIAN:  On the record at
 3      7:09.
 4      BY MS. DURHAM:
 5          Q    So you were asked about Defendant's
 6      Exhibit 4.
 7              Do you recall those questions?
 8          A    Yes.
 9          Q    And Defendant's Exhibit 4 is a draft
10      op-ed that you wrote for Colbert King from The
11      Washington Post, correct?
12          A    Yes.
13          Q    And is anything in this op-ed untrue?
14              MR. SOBIECKI:  Objection.
15              THE WITNESS:  Not to my knowledge, no.
16      BY MS. DURHAM:
17          Q    And you write that -- sorry, I want to
18      turn to page 348.  And you write here that it's
19      your belief that Chief Newsham had a questionable
20      character; is that correct?
21              MR. SOBIECKI:  Object to form.
22              MR. CARPENTER:  Where -- where in the
```

Page 438

1    document?

2              THE WITNESS:  That's a conclusion.  I

3    don't know if it's stated that way.

4    BY MS. DURHAM:

5         Q    Sorry.  On page two you write, "How can

6    officers be expected" -- this is the second

7    paragraph -- "be expected to be upstanding when

8    the person responsible for guiding their behavior

9    is of questionable character."

10              Do you see that?

11        A    Oh.  Yes, I do, yes.

12        Q    And you questioned Chief Newsham's

13   character in this, correct?

14        A    Yes.

15        Q    And did you make up anything in your

16   declaration, Exhibit 111, because you thought

17   Chief Newsham had questionable character?

18              MR. SOBIECKI:  Objection.  Asked and

19   answered, form.

20              THE WITNESS:  No, there's no opinion in

21   the declaration.  The declaration is factual.

22   BY MS. DURHAM:

Page 439

1      Q    And you write that in paragraph -- you

2   write that -- in the second bottom -- the second

3   to last paragraph you write, "He is not interested

4   in building coalitions with minority communities.

5   Building coalitions requires transparency."

6           Did you believe that Chief Newsham was

7   not a transparent leader?

8           MR. SOBIECKI:  Object to form.

9           THE WITNESS:  No, I don't believe he is.

10  BY MS. DURHAM:

11     Q    And is that consistent with the

12  practices that you witnessed at the FOIA Office?

13          MR. SOBIECKI:  Object to form.

14          THE WITNESS:  I didn't really deal with

15  Chief Newsham in the FOIA Office, it was always

16  Ms. Turner, so I'm not sure what his communication

17  was.

18  BY MS. DURHAM:

19     Q    You say that he's also condescending --

20  oh, sorry.  I want to go back to -- well, I'll

21  just finish this.  Actually let me go to paragraph

22  three that's in the middle.  You say, "When

1    challenged by the media or community leaders

2    regarding these disturbing tactics, instead of a

3    sincere response to evaluate the tactic that

4    caused the upsetting incident, Peter Newsham

5    cowers behind an adversarial disposition;

6    defending the outdated, provocative, and hostile

7    behaviors of his members and refuses to

8    acknowledge the harm they've caused."

9              Do you see that?

10       A    Yes.

11       Q    In your experience, Chief Newsham didn't

12   like criticism; is that correct?

13              MR. SOBIECKI:  Object to form.

14              THE WITNESS:  That's correct.

15   BY MS. DURHAM:

16       Q    And in paragraph four, the last

17   sentence -- or the last -- second to the last

18   sentence, you say, "He's also condescending to

19   anyone in the community who dares to disagree with

20   him."

21              Do you see that?

22       A    Yes.

1      Q    And is that consistent with your

2  understanding and what you witnessed while you

3  were with MPD, that Chief Newsham did not like

4  criticism?

5           MR. SOBIECKI:  Object to form.

6           THE WITNESS:  Yes.

7  BY MS. DURHAM:

8      Q    And did you write this op-ed because of

9  the things that you had witnessed when you were at

10 MPD?

11          MR. SOBIECKI:  Object to form.

12          THE WITNESS:  Sorry.  Repeat.

13 BY MS. DURHAM:

14     Q    Did you write this op-ed -- this op-ed

15 because of the things you had witnessed when you

16 were at MPD?

17          MR. SOBIECKI:  Object to form.

18          THE WITNESS:  Yes.

19 BY MS. DURHAM:

20     Q    Were you trying to call attention to

21 injustices that you witnessed so that you could in

22 some way cast light on them?

Page 442

```
 1              MR. SOBIECKI:  Object to form, leading.
 2              THE WITNESS:  Yes.
 3              MR. CARPENTER:  Can I have that back if
 4    you're done?
 5              MS. DURHAM:  Yes, of course.  Thank you.
 6    BY MS. DURHAM:
 7         Q    I'm sorry.  In Exhibit 4 --
 8              MR. CARPENTER:  Defense Exhibit?
 9    BY MS. DURHAM:
10         Q    -- Defense Exhibit 4 you write that
11    Chief Newsham disdained accountability.
12              Do you recall that?
13         A    Yes.
14         Q    Is one of the ways that Chief Newsham
15    could be held accountable by having information
16    released to -- in response to a FOIA request?
17              MR. SOBIECKI:  Object to form.
18              THE WITNESS:  Yes.
19    BY MS. DURHAM:
20         Q    Is one of the reasons you communicated
21    with journalists that were -- I'll withdraw that.
22              So when Mr. Sobiecki was asking you
```

Page 443

1    questions, you were shown a number of text

2    messages with Eric Flack, you were showed the

3    e-mail with Colbert King, and you were showed

4    communications that occurred while you were at the

5    FOIA Office.

6              Do you recall those questions?

7         A    Yes.

8         Q    Is one of the reasons that you

9    communicated with journalists that were critical

10   of MPD while at the FOIA Office was because you

11   saw that the requests were being treated

12   differently than other requesters?

13             MR. SOBIECKI:  Object to form.

14             THE WITNESS:  I don't think so.  I just

15   think there was a rapport there.  I communicated

16   with quite a few requesters on the office phone.

17   It's just these two asked if they could talk away

18   from the Government phone and I just agreed.

19   BY MS. DURHAM:

20        Q    And Mr. Sobiecki read to you a number of

21   messages that he said that you deleted.

22             Do you recall that?

Page 444

```
 1       A    Yes.
 2            MR. SOBIECKI:  Object to form.
 3  BY MS. DURHAM:
 4       Q    And do you recall your testimony that
 5  you did not delete those text messages, correct?
 6       A    Yes.
 7       Q    I'm sorry, do you recall your testimony
 8  that you did not delete those text messages?
 9       A    Yes.
10       Q    And they aren't actually deleted because
11  Mr. Sobiecki was reading them to you, correct?
12       A    Correct.
13       Q    And so they exist and we've reviewed
14  them today, correct?
15            MR. SOBIECKI:  Objection.  Asked and
16  answered, form.
17            THE WITNESS:  Correct.
18  BY MS. DURHAM:
19       Q    If we look at Defense Exhibit 10 --
20       A    Can I just add to your last question
21  that I was an investigator at MPD for quite a long
22  time, so I'm aware that you can't delete text
```

Page 445

1   messages and that if you tried, it still comes up.

2   So I didn't delete any text messages.

3           MR. CARPENTER:  Do you got 10?

4           THE WITNESS:  No, I'm still looking for

5   it.

6   BY MS. DURHAM:

7       Q    You were asked about this text message

8   chain with you and Mr. Perloff.

9           Do you see that?

10      A    Yes.

11      Q    Or do you recall those questions?

12      A    Yes.

13      Q    If Mr. Perloff had e-mailed you on your

14  government e-mail, would you have also called and

15  checked on the status of his request?

16          MR. SOBIECKI:  Object to form, calls for

17  speculation.

18          THE WITNESS:  Yes.

19  BY MS. DURHAM:

20      Q    And when other requesters e-mailed you

21  on your government e-mail about the status of the

22  request, did you call and check on the status of

Page 446

1   their request for them?

2          MR. SOBIECKI:  Object to form.

3          THE WITNESS:  Or check it myself, yes.

4   BY MS. DURHAM:

5      Q    And you were not giving Mr. Perloff any

6   special treatment because he had your cell phone

7   number, correct?

8          MR. SOBIECKI:  Object to form.

9          THE WITNESS:  Correct.

10  BY MS. DURHAM:

11     Q    You were asked about talking to

12  Mr. Flack and whether or not you knew he was

13  critical of Chief Newsham.

14         Do you recall those questions?

15     A    Yes.

16     Q    You have First Amendment rights to

17  express your personal opinion, correct?

18         MR. SOBIECKI:  Object to form, calls for

19  a legal conclusion.

20         THE WITNESS:  Correct.

21  BY MS. DURHAM:

22     Q    You're a lawyer, correct?

1      A     Yes.

2      Q     And so as a lawyer, do you know that you

3  have First Amendment rights to express your

4  personal opinion?

5           MR. SOBIECKI:  Object to form, calls for

6  expert testimony.

7           THE WITNESS:  Sometimes, yes.

8  BY MS. DURHAM:

9      Q     Okay.  And if you are critical of MPD,

10  that is your First Amendment right, correct?

11           MR. SOBIECKI:  Object to form, leading,

12  calls for expert opinion.

13           THE WITNESS:  Yes.

14           THE REPORTER:  Leading what?

15           MR. SOBIECKI:  Oh.  Leading, calls for

16  expert opinion.

17  BY MS. DURHAM:

18      Q     I'm not calling for any expert opinions

19  when I'm asking my questions, so if you're giving

20  me an expert opinion, we have not designated you

21  as an expert and I'm not calling for your expert

22  opinion.

Page 448

1          If you are critical of MPD, that is your

2     First Amendment right, correct?

3               MR. SOBIECKI:  Objection.  Form.

4               THE WITNESS:  Correct.

5     BY MS. DURHAM:

6          Q    And you are allowed to have negative

7     feelings about MPD and Chief Newsham, correct?

8               MR. SOBIECKI:  Objection.  Form,

9     leading.

10              THE WITNESS:  Correct.

11    BY MS. DURHAM:

12         Q    There's nothing nefarious about you

13    expressing your negative feelings about MPD and

14    Chief Newsham, correct?

15         A    Correct.

16         Q    That is consistent with what you

17    understand about your First Amendment rights,

18    correct?

19              MR. SOBIECKI:  Objection.  Form.

20              THE WITNESS:  Correct.

21    BY MS. DURHAM:

22         Q    Did you lie about anything because of

Page 449

1   your negative feelings about MPD?

2          MR. SOBIECKI:  Objection.  Form, asked

3   and answered.

4          THE WITNESS:  No.

5   BY MS. DURHAM:

6      Q    Did you lie about anything because of

7   your negative feelings about Chief Newsham?

8          MR. SOBIECKI:  Objection.  Form, asked

9   and answered.

10         THE WITNESS:  No.

11         MS. DURHAM:  I will reserve the rest of

12  my --

13  BY MS. DURHAM:

14     Q    Oh.  You were asked some questions about

15  redactions taking a long time.

16         Do you recall that?

17     A    Yes.

18     Q    Adverse action redactions don't take

19  three to four years in your experience, correct?

20         MR. SOBIECKI:  Objection.  Form, calls

21  for speculation.

22         THE WITNESS:  No, they should not, no.

```
                                        Page 450

  1            MS. DURHAM:  I will reserve the rest of

  2   my time and pass the witness.

  3            MR. CARPENTER:  Can we have a time --

  4   time check?  How much time?

  5            VIDEO TECHNICIAN:  Three hours 47

  6   minutes.

  7            MR. CARPENTER:  Okay.

  8            FURTHER EXAMINATION BY COUNSEL FOR

  9            DEFENDANT

 10   BY MR. SOBIECKI:

 11       Q    Inspector Parker, to you does the phrase

 12   "EOCOP review" mean a review by Leeann Turner?

 13       A    Yes.

 14       Q    With regard to Plaintiff's Exhibit 356,

 15   I -- I'll ask my question.  If you want to pull it

 16   out, please, I'll give you all the time.

 17            You were asked some questions about

 18   whether the watchlist policy continued and you

 19   talked about -- you referenced the conversation

 20   with Ms. Archie-Mills.

 21            Do you remember that?

 22       A    Yes.
```

Page 451

```
 1        Q    Please tell me what exactly did
 2   Ms. Archie-Mills say to you in that conversation?
 3        A    She just said it's still happening.
 4        Q    What is still happening?
 5        A    The same process that happened when I
 6   was there was the same process that was
 7   happening --
 8        Q    When did --
 9        A    -- at that time.
10        Q    When did you have this conversation with
11   Ms. Archie-Mills?
12        A    2021.  I don't remember exactly.
13        Q    Was it over phone or by text?
14        A    Over phone.
15        Q    And did Ms. Archie-Mills say something
16   to the effect of same old same old?
17        A    No, she said exactly that it's still
18   happening.  I think that was her exact words, it's
19   still happening.
20        Q    And in -- in that statement what is the
21   "still" referring to?
22             Did you bring up something and then she
```

Page 452

1   said it's still happening or --

2              MS. DURHAM:  I'll object to the form of

3   the question.

4   BY MR. SOBIECKI:

5       Q    I'll -- I'll rephrase.

6              Why did Ms. Archie-Mills say it's still

7   happening?

8              MS. DURHAM:  I'll object to the form of

9   the question.

10             THE WITNESS:  We were talking about

11  FOIA.  I don't know exactly what prompted it.  I

12  just remember her saying that it's still

13  happening.  We were talking about the process of

14  having to go upstairs and get the requests

15  reviewed.

16  BY MR. SOBIECKI:

17      Q    So was it -- was Ms. Archie-Mills

18  talking about the process of having -- hold on --

19  when -- strike that.

20             When in 2021 did you have this

21  conversation?

22      A    I don't remember exactly.

Page 453

1    Q    Do you know if Ms. Archie-Mills was
2  referring to Leeann Turner?
3    A    She wasn't referring to anyone.  She
4  just said it's still happening.  The -- the
5  process is still happening the same way.
6    Q    The process of having to take certain
7  FOIA requests upstairs?
8    A    Yes.
9    Q    But she didn't use the phrase
10 "watchlist," did she?
11         MS. DURHAM:  I'll object to the form of
12 the question.
13         THE WITNESS:  No, I don't think anyone
14 used the word "watchlist."  I think that was
15 something the media started.
16 BY MR. SOBIECKI:
17    Q    In this conversation, do you recall what
18 you said to prompt Ms. Archie-Mills to say it's
19 still happening?
20    A    I just remember we were talking about
21 the process of having to go upstairs.  I don't
22 know my exact words.  I don't remember my exact

Page 454

1    words.

2         Q    And she didn't say who she went upstairs

3    with, she just said she went upstairs?

4              MS. DURHAM:  Objection.  Asked and

5    answered.

6              THE WITNESS:  She didn't say, but the

7    understanding is that she was talking about having

8    to take the requests up to Ms. Turner.

9    BY MR. SOBIECKI:

10        Q    That was your understanding of what she

11   said?

12        A    That is my understanding, yes.

13             MR. SOBIECKI:  I think at this time I

14   will reserve.  Wait, hold on.

15   BY MR. SOBIECKI:

16        Q    Do you know, Inspector Parker, whether

17   Theresa Vargas has ever said anything negative

18   about MPD?

19        A    I don't think I know who Theresa Vargas

20   is.

21        Q    I'm going to read you some more names.

22   If you don't know who they are, you can just tell

Page 455

1   me.

2       A    Okay.

3       Q    All right.  So -- let me rephrase.

4            So for each of these individuals, I'll

5   try to make this shorter for all of us, I want to

6   know if you know if this person has ever said

7   anything negative about MPD.

8            Nathan Baca?

9       A    I don't know.

10           MS. DURHAM:  I'll just object as outside

11  the scope of the redirect.

12  BY MR. SOBIECKI:

13      Q    Michelle Bridgman?

14      A    I don't know who that is.

15      Q    Christopher Cox?

16      A    I don't know who that is.

17           MS. DURHAM:  Objection.  Foundation,

18  form.

19           MR. SOBIECKI:  All right.  No, and

20  I'll -- I'll accept that those continue throughout

21  all of my list.

22           MS. DURHAM:  Yeah, and I'm going to make

Page 456

1   my objection.

2   BY MR. SOBIECKI:

3        Q    Christopher Cox?

4             MS. DURHAM:  Objection.  Foundation and

5   form.

6        A    I don't know who that is.

7        Q    Michelle Dillon?

8             MS. DURHAM:  Objection.  Foundation and

9   form.

10            THE WITNESS:  I don't know who that is.

11  BY MR. SOBIECKI:

12       Q    Hillary Gay?

13            MS. DURHAM:  Objection.  Foundation and

14  form.

15            THE WITNESS:  I don't know that person.

16  BY MR. SOBIECKI:

17       Q    Stacy Cowley?

18            MS. DURHAM:  Objection.  Foundation and

19  form.

20            THE WITNESS:  I don't know that person.

21  BY MR. SOBIECKI:

22       Q    Adam McGill?

1           MS. DURHAM:  Objection.  Foundation and

2   form.

3           THE WITNESS:  I don't know who it is.

4   BY MR. SOBIECKI:

5       Q    Paula -- Pamela Leahigh.

6           MS. DURHAM:  Objection.  Foundation and

7   form.

8           THE WITNESS:  I don't know that person.

9   BY MR. SOBIECKI:

10      Q    Adam McGill?

11          MS. DURHAM:  Objection.  Foundation and

12  form.

13          THE WITNESS:  I don't know that person.

14  BY MR. SOBIECKI:

15      Q    Lara Moehlman?

16          MS. DURHAM:  Objection.  Foundation and

17  form.

18          THE WITNESS:  I don't know that person.

19  BY MR. SOBIECKI:

20      Q    Michael Schiller?

21          MS. DURHAM:  Objection.  Foundation and

22  form.

```
 1            THE WITNESS:  I don't know that person.
 2   BY MR. SOBIECKI:
 3       Q    James Scott?
 4            MS. DURHAM:  Objection.  Foundation and
 5   form.
 6            THE WITNESS:  I don't know that person.
 7   BY MR. SOBIECKI:
 8       Q    Jesse Seidman?
 9            MS. DURHAM:  Objection.  Foundation and
10   form.
11            THE WITNESS:  I don't know that person.
12   BY MR. SOBIECKI:
13       Q    Brandon Smith.
14            MS. DURHAM:  Objection.  Foundation and
15   form.
16            THE WITNESS:  I think Brandon Smith is
17   an ANC commissioner.
18   BY MR. SOBIECKI:
19       Q    Do you recall him saying anything
20   negative about --
21       A    No.
22            MS. DURHAM:  Objection.  Foundation and
```

Page 459

```
 1    form.

 2    BY MR. SOBIECKI:

 3         Q    Charles Spirtos?

 4              MS. DURHAM:  Objection.  Foundation and

 5    form.

 6              THE WITNESS:  I don't know that person.

 7    BY MR. SOBIECKI:

 8         Q    Krista Swanson?

 9              MS. DURHAM:  Objection.  Foundation and

10    form.

11              THE WITNESS:  I don't know that person.

12    BY MR. SOBIECKI:

13         Q    Martha Belisle?

14              MS. DURHAM:  Objection.  Foundation and

15    form.

16              THE WITNESS:  I don't know that person.

17              MR. SOBIECKI:  All right.  I'm done.  I

18    reserve.

19              FURTHER EXAMINATION BY COUNSEL FOR

20              PLAINTIFF

21    BY MS. DURHAM:

22         Q    I have two questions for you.  For that
```

Page 460

1   long list that Mr. Sobiecki just read to you, did
2   he tell you any of the organizations that any of
3   those people were affiliated with?
4        A    No.
5        Q    Did he show you any documents for any of
6   those individuals just now?
7        A    No.
8        Q    Do you have any idea what Leeann Turner
9   knows or knew about any of those individuals?
10       A    No.
11       Q    And so if those requests went up for
12  EOCOP review because either Ms. Turner pulled them
13  out of a stack or pulled them off a list that you
14  sent, you wouldn't know why she did that or if she
15  knew whether or not they had been critical of MPD,
16  correct?
17            MR. SOBIECKI:  Objection.  Form.
18            THE WITNESS:  I don't think she would
19  have pulled anything upstairs.  Everything was
20  brought to her attention.
21            MS. DURHAM:  And I will take a break, a
22  quick break.

Page 461

1          MR. GAMSE:  We can stay on the record.
2    BY MS. DURHAM:
3       Q    When Ms. Turner -- I'm sorry, I'll
4    withdraw that.
5          When Ms. Archie-Mills told you that
6    requests were still going upstairs, is OGC
7    upstairs as well?
8          MR. SOBIECKI:  Object to form.
9          THE WITNESS:  No.
10   BY MS. DURHAM:
11      Q    They were somewhere else physically?
12      A    Yes.
13      Q    But in terms of elevation, were they
14   above the FOIA Office?
15      A    They were a different office.
16      Q    Are you aware that after you retired,
17   OGC -- the FOIA Office started reporting to the
18   OGC?
19          MR. SOBIECKI:  Objection.  Form,
20   foundation.
21          THE WITNESS:  No, I wasn't.
22   BY MS. DURHAM:

```
                                        Page 462

1       Q    And so you don't know if when Ms.

2    Archie-Mills said that it's still happening, she

3    could have been talking about OGC or who she was

4    directly reporting to, correct?

5              MR. SOBIECKI:  Objection.  Form,

6    foundation, leading.

7              THE WITNESS:  She could have been, yes.

8    BY MS. DURHAM:

9       Q    You just know that she was saying that

10   the policy you described was still happening; is

11   that correct?

12             MR. SOBIECKI:  Objection.  Form,

13   misstates prior testimony.

14             THE WITNESS:  Yes.

15             MS. DURHAM:  No further questions.

16             MR. SOBIECKI:  Of course.  Sorry.

17             MR. CARPENTER:  Yeah, if I may, I just

18   have --

19             VIDEO TECHNICIAN:  Would you put your

20   microphone on, please, Mr. Carpenter.

21             MR. CARPENTER:  Oh, I'm sorry.

22             EXAMINATION BY COUNSEL FOR THE DEPONENT
```

Page 465

1                    CERTIFICATE OF NOTARY PUBLIC

2            I, SHARI R. BROUSSARD, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears

5    in the foregoing deposition was duly sworn by me;

6    that the testimony of said witness was taken by me

7    in stenotype and thereafter reduced to typewriting

8    under my direction; that said deposition is a true

9    record of the testimony given by said witness;

10   that I am neither counsel for, related to, nor

11   employed by any of the parties to the action in

12   which this deposition was taken; and, further,

13   that I am not a relative or employee of any

14   counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in

16   the outcome of this action.

17

18                          *Shari R. Broussard*

19                          SHARI R. BROUSSARD

                         Notary Public in and for the

20                         District of Columbia

21

     My commission expires:

22   August 14, 2025

Page 466

1          A C K N O W L E D G E M E N T

2               O F   D E P O N E N T

3

4

   I, VENDETTE PARKER, do hereby acknowledge

5

   I have read and examined the foregoing pages of

6

   testimony, and the same is a true, correct and

7

   complete transcription of the testimony given by

8

   me, and any changes or corrections, if any, appear

9

   in the attached errata sheet signed by me.

10

11

12

13

14

15

16

17

18

19

   _____        _____

20 Date                       VENDETTE PARKER

21

22

Page 467

1   John E. Carpenter, Esquire

    800 Connecticut Avenue, Northwest, Suite 300

2   Washington, D.C. 20006

       jecindc1@gmail.com

3   IN RE:  Amy Phillips vs. District of Columbia

4   Dear Mr. Carpenter:

5       Enclosed please find your copy of the

6   deposition of VENDETTE PARKER, along with

7   the original signature page.  As agreed, you will

8   be responsible for contacting the witness

9   regarding signature.

10      Within 30 days from October 3, please

11  forward errata sheet and original signed signature

12  page to counsel:  Krystal C. Durham and Richard

13  Sobiecki.

14      If you have any questions, please do not

15  hesitate to call.   Thank you.

16  Yours,

17  *Shari R. Broussard*

18  Shari R. Broussard, RPR, CSR

    Reporter/Notary

19

    cc:  Krystal C. Durham, Esquire

20       Richard Sobiecki, Esquire

21

22

Page 468

1   Veritext Legal Solutions

    1250 Eye Street, Northwest

2   Suite 350

    Washington, D.C. 20005

3   (202) 857-DEPO

4                 E R R A T A   S H E E T

5   Case Name:  Amy Phillips vs. District of Columbia

6   Witness Name:  VENDETTE PARKER

7   Deposition Date:  Thursday, September 21, 2023

8   Job No.:   6080982

9   Page No.   Line No.     Change/Reason for Change

10

11

12

13

14

15

16

17

18

19

20

21

    _____        _____

22  Signature                           Date

**[& - 12th]**

| & | | |
|---|---|---|
| **&**   1:15 2:5 7:11 | | |

| **0** | | |
|---|---|---|
| **0**  87:19 298:2 300:6 | | |
| **000509**   396:15 | | |
| **00054159**   4:5 | | |
| **00061121**   3:11 | | |
| **000621**   351:14 | | |
| **001**   171:6 | | |
| **00277**   3:11 | | |
| **00277-119281** 5:18 | | |
| **00277-126045** 5:19 | | |
| **00277-129365** 5:16 | | |
| **00277-133531** 5:22 | | |
| **00277-133569** 5:7 | | |
| **00277-1397** 5:17 | | |
| **00277-15222** 5:12 | | |
| **00277-15231** 5:13 | | |
| **00277-155580** 5:10 | | |
| **00277-156528** 5:14 | | |
| **00277-15678** 6:2 | | |
| **00277-1650**   6:4 | | |

**00277-3941**   6:7
**00277-4983** 5:11
**00277-51141** 5:9
**00277-56223** 5:8
**00277-6516**   6:8
**00277-66474** 6:6
**00277-71639** 6:3
**00277-88936** 5:20
**00277-98693** 5:15
**00470**   396:12
**00569**   351:18 352:2
**00621**   352:3
**00893**   106:7 294:5
**01046**   3:18 138:2 139:8
**01564**   88:1 89:2
**0277**   4:4
**03**   3:22
**03684**   263:2
**05476**   3:15
**06**   6:10
**06574**   109:5

| **1** | | |
|---|---|---|
| **1**   4:8 7:5 68:6 297:7 321:20 322:2,3 328:14 337:6 | | |
| **10**   4:18 238:10 328:19 330:3 330:17 376:9 376:12,13 378:19 379:3 444:19 445:3 | | |
| **10/14**   246:2 | | |
| **10/20**   246:3 | | |
| **100**   3:15 | | |
| **10100**   2:15 | | |
| **102**   5:20 74:17 75:19 | | |
| **10:14**   113:22 | | |
| **10:30**   77:1 | | |
| **10:38**   68:6 | | |
| **10:55**   68:9 | | |
| **10th**   248:2 250:8 260:1 327:8,18 328:4 328:8 329:4,15 330:6 347:21 | | |
| **11**   3:8,9 4:19 50:4,5 102:2 113:11 219:5,8 221:20 283:1 378:4,7,21 379:2 | | |
| **111**   5:21 15:22 16:12 38:12 40:18,20 47:2 | | |

56:2 69:4
73:13 80:16
91:15 93:19,20
102:2 111:17
113:12 122:8
136:16 143:17
152:18 159:12
189:14 193:1
193:10 196:10
198:4 307:17
324:5 407:20
408:1,5,8
422:10 438:16
**113**   3:21
**114**   5:2
**115**   5:22 54:13
**118**   159:1
**11:33**   114:5
**11:53**   346:18
**11:59**   363:21
**11th**   346:18
**12**   4:20 51:3,4
222:3,5 225:17
225:21 326:3
381:21 382:2
**12/10/12**   5:4
**121**   86:8
**1213**   4:21
**1250**   1:21
468:1
**12:08**   135:1,2
**12:39**   120:7
**12:56**   136:2,9
**12th**   115:6
366:20

**13**  4:21 56:5
226:8,9 385:14
385:18,18
**131**  96:16
**132**  6:2 96:16
96:18 303:18
303:18 432:9
**137**  3:17
**138**  3:18
**139**  6:3 103:18
105:18 106:12
108:6
**13th**  252:22
374:16
**14**  4:21 5:2
36:11,15,20
40:18 45:7,12
45:16 69:4,5
69:11 71:15
192:17 238:7,7
391:9,13,13
465:22
**140**  6:4 106:2
**142**  5:21
**14524**  465:18
467:17
**149**  6:6 33:15
40:22 41:2
191:16,18,21
193:6 194:1
197:3
**14th**  101:21
391:15
**15**  5:3 73:12,14
80:17 232:3

238:7,8,10
271:18 275:17
395:21 396:3,3
**15881**  4:10
**15897**  4:8
**15th**  60:4
113:22 115:19
120:6 376:15
417:1,9 418:2
**16**  3:19 91:16
91:16 138:11
143:6 282:19
282:19 284:14
328:19
**163**  3:19
**166**  3:21
**16th**  138:8
260:2
**17**  12:15 91:20
328:19 330:16
**170**  3:22
**175**  6:7 59:19
**17th**  85:18
163:5 322:19
**18**  93:18 94:1
94:16
**184**  3:4
**18th**  56:14
59:20 85:19
159:14 285:14
318:11 413:19
**19**  95:21 96:3
97:11 102:3,8
102:15

**1976**  109:13
**19th**  157:10
159:7 170:7
252:18 369:5
417:5,8
**1:48**  183:21
**1st**  164:16

---

**2**

**2**  4:9 68:9
135:1 138:11
183:13 327:2,6
327:6 434:12
**20**  111:18,18
213:19 214:4
215:13 235:19
344:10 464:6
**20001**  2:16
**20002**  2:10
**20005**  1:22
468:2
**20006**  2:19
467:2
**20024**  1:16 2:6
**2009**  88:1
**2015**  288:12
344:9
**2016**  344:15
346:18 347:21
348:3,14,16
**2017**  14:8,10
42:18 74:22
97:18 207:19
211:7 226:18
271:10 282:5
337:7 349:7

**2018**  3:15
33:16 38:18
56:14 59:20
60:4,5 98:1,8
99:5 101:14,21
138:8 139:5,14
143:13 180:12
229:14 244:17
252:22 283:5
362:15 366:20
367:20 368:1
413:7,20 414:7
432:6
**2019**  3:18
54:15 85:18,19
87:19 89:2,11
90:1,5,10 91:5
99:1,6 103:22
106:2,6,11
107:11 108:18
109:2,5 113:22
115:6,19 120:6
138:2 139:8
166:14,15
180:12 182:3
182:11 248:2
250:8 252:18
260:1,2 263:2
285:21 286:2
288:12 294:5
314:17,18
351:8 369:5
370:1 374:16
391:15 417:1,5
417:8,9 428:11

434:2
**202**  2:7,20
254:22 468:3
**2020**  18:7 82:4
157:10,14
163:5 211:2
285:14 318:15
333:17 376:15
382:4 385:19
426:1
**2021**  38:16
143:1,8,9,12
159:7,14 170:7
283:6 318:12
318:15,16
322:4,19
323:18 331:16
333:21 451:12
452:20
**2022**  3:11 4:4
5:7,8,9,10,11
5:12,13,14,15
5:16,17,18,19
5:20,22 6:2,3,4
6:6,7,8 164:16
186:19 187:3,6
464:7
**2023**  1:13 7:4
42:17 101:15
338:15 468:7
**2025**  465:22
**207**  6:8 109:2
**21**  1:13 113:11
468:7

**21st**  7:4 106:2
**22**  3:11 5:9 6:9
6:11 121:13
122:12,12
**22-277**  1:5 7:10
**223**  116:22
**22nd**  90:1
351:8
**23**  5:10 122:17
425:18
**233**  113:19
**23rd**  33:16
244:17 413:7
414:7
**24**  5:12 122:19
**24th**  98:1,8
**25**  122:21
233:3,6,13
329:1
**251**  308:8
**251s**  63:5
310:22
**252**  308:8
**25th**  426:1
**26**  5:8 123:7
233:3,6,7,8,13
233:20 329:1
**26th**  434:2,9
**27**  123:11
233:3,7,8,13
329:1
**28**  123:15
**288**  6:9 157:9
**289**  6:10 159:1
159:4,5

**28th**  99:1
103:22
**29**  124:1
**290**  162:21
**292**  6:11
164:16 270:3
**29th**  385:22
386:1
**2:05**  184:2
**2nd**  186:19

**3**

**3**  3:13,17 4:11
136:9 137:17
183:21 334:2,6
334:8 335:6
467:10
**3/17/23**  3:13,17
**30**  125:7 432:8
467:10
**300**  2:19 467:1
**301**  2:9
**308**  6:12
178:18 179:10
180:6 287:19
287:21 292:21
**30th**  338:15
**31**  5:14 90:5
125:11
**31st**  89:11
90:10
**32**  5:22 125:15
178:1
**321**  4:8
**327**  4:10

**33**  125:22
126:20
**334**  4:11
**34**  127:2
**345**  3:8 11:1,2
**346**  3:9 11:10
11:14
**347**  3:10 64:5,6
**348**  3:11 85:13
85:17 87:18
88:1 437:18
**349**  3:12 88:4,8
**35**  127:6
**350**  1:21 3:14
4:12 100:17,18
103:19 406:4
468:2
**351**  3:16
137:13,20
139:11 142:20
271:6 282:17
**352**  3:18
138:21 139:5
141:12,14
143:14
**353**  3:19 163:1
163:5 319:15
**354**  3:20
166:10,14
**355**  3:22 170:3
170:7
**356**  4:2 406:5,7
406:9 450:14
**357**  4:4 433:15
433:19,22

**36**   5:13 127:17
**362**   4:13
**366**   4:14
**368**   4:15
**369**   4:16
**37**   5:20 127:21
**374**   4:17
**376**   4:18
**378**   4:19
**38**   128:17
**381**   4:20
**385**   4:21
**39**   128:21
**391**   5:2
**395**   5:4
**3:15**   265:5
**3:37**   265:8
**3rd**   348:3

**4**

**4**   4:12 159:18
  184:2 265:5
  350:20 351:2,7
  436:10 437:6,9
  442:7,10
**40**   6:3 129:11
**400**   2:15
**402**   3:6
**403**   3:6
**405**   3:3
**405.6.**   297:7
**406**   4:3
**41**   129:15
**42**   129:19
**43**   130:1

**433**   4:5
**434-5493**   2:7
**44**   5:9 130:5
**45**   130:9
**450**   3:4
**459**   3:3
**46**   130:13
**462**   3:5
**47**   132:2 450:5
**470**   5:4 396:21
**48**   89:5 132:6
**49**   5:11,19 6:7
  132:10,14
  234:15,16
  296:15,15
  431:6,7
**4:28**   380:13
**4:42**   327:12
**4:43**   331:6
**4:55**   387:9
**4th**   344:15

**5**

**5**   4:13 254:10
  254:12 264:16
  264:18 265:8
  331:6 362:1,5
  362:13
**5,000**   295:19
**50**   136:16,17
**500**   236:9,13
  295:12,15
**508**   5:4
**509**   396:20,22
**51**   6:4 136:21
  137:3 138:19

  140:12 142:4
  307:16
**52**   143:18,18,19
  406:18
**529**   120:10
**53**   144:2,3
  153:3,4,8
**54**   5:21 152:19
  155:10
**55**   5:12 93:3,7
  102:5 114:19
  114:20,21
**56**   5:13 113:17
  267:6,8 416:10
  416:15
**563**   140:4
**565**   140:7
**569**   4:12
**57**   5:14 119:12
**572**   82:5
**573**   140:7
**579**   140:19
**580**   425:22
**581**   426:6
**582**   427:6
**583**   429:21
**5:08**   331:9
**5:11**   261:19
**5th**   82:4 109:2
  143:7,9,12

**6**

**6**   4:14 5:7 82:1
  143:6 282:19
  284:14 331:9
  366:14,18,18

**6080982**   468:8
**62**   4:5
**621**   4:12
**639**   6:8
**64**   3:10
**665**   64:13
**667**   65:2
**668**   66:8
**678**   96:22
**679**   96:22 98:3
**680**   1:15 2:6
  7:11 98:19
**69**   3:10
**6:00**   229:22
**6:05**   390:1
**6:07**   404:14
**6:32**   171:5
**6:35**   404:17
**6:38**   344:15
**6:44**   174:9
**6:54**   175:9
**6th**   2:15 74:22
  139:5 143:1,13
  283:6

**7**

**7**   4:15 368:22
  369:4,5,8,10
**70**   383:8
**702**   5:15
**71**   4:12
**72**   5:16
**724-4264**
  254:22
**73**   5:7

**75** 6:6
**7:05** 176:3
**7:06** 436:22
**7:07** 176:2
**7:09** 437:3
**7:10** 77:2
**7:30** 464:10,11
**7d** 150:7
  345:12 346:1,1
  393:17
**7th** 2:9 12:20
  115:6

**8**

**8** 3:3 4:16
  369:18,21,22
**8/14/19** 5:2
**800** 2:19 467:1
**810** 2:9
**823** 18:3
**84** 5:11 6:2
**85** 3:11 5:15
  56:11 413:16
  413:19
**857** 468:3
**86** 5:16 243:16
  243:17 244:10
  245:16 412:11
  413:1,2 414:3
**87** 5:17 247:20
  247:21 251:15
**88** 3:13 4:10
  5:18 251:21
  252:4 259:20
  417:3,15,16
  419:19

**89** 5:19 263:15
  263:16
**893** 181:20
**8:30** 229:22
**8th** 115:6 322:4
  323:18 324:10
  327:12,19
  328:4 344:9

**9**

**9** 4:17 5:8
  166:14 305:22
  309:18 374:8
  374:12,12
**90** 114:5
**901** 4:8
**91** 5:10
**920** 100:22
**936** 75:5
**9366** 245:22
**9367** 246:21
**98** 139:4
**99** 5:17
**997-3377** 2:20
**9:06** 82:6
**9:36** 1:14 7:3
**9:53** 261:18
**9th** 54:15 60:4
  348:14

**a**

**a.m.** 1:14 7:3
  77:2 113:22
  114:5 229:22
  346:18

**ability** 46:4
  149:22 155:16
**able** 42:2 133:3
  315:17 317:7
  393:15
**above** 187:14
  323:3 461:14
**absence** 229:3
**ac** 181:7 217:6
**accept** 455:20
**access** 116:16
  127:12 156:21
  161:22 162:5
  169:14 317:10
  427:9 428:9
**accident** 41:21
  42:1,2 277:18
**account** 241:12
  241:15 368:8
**accountability**
  442:11
**accountable**
  442:15
**accurate** 11:7
  11:20 16:19
  18:4,21 19:3,7
  21:21 29:17
  38:8 47:8 50:5
  51:4 56:6 69:5
  70:11 73:14
  91:16,20 92:20
  94:1 95:21
  111:19 113:12
  113:14 122:13
  122:17,19,21

123:7,11,15
  124:1 125:7,11
  125:15,22
  126:20 127:2,6
  127:17,21
  128:17,21
  129:11,15,19
  130:1,5,9,13
  132:2,6,10,15
  136:17,21
  143:20 144:3
  152:19 153:4
  155:10 238:3
  326:12,13
  384:1
**accused** 425:2
  433:1
**acknowledge**
  440:8 466:4
**aclu** 62:14,15
  62:21 163:10
  170:12 181:3,4
  181:5,7 205:13
  217:6,8 252:21
  264:9 375:7
  416:5,6
**act** 425:2
**action** 6:3,5
  50:19 93:10
  98:20 102:10
  104:8 108:12
  112:3 113:7
  115:4,12
  116:11,12
  150:16 181:22

[action - allegation]                                            Page 6

207:1,10,13
294:8,17,21
295:15 377:17
424:18,19
425:1,10 427:8
427:20 428:4
428:10 429:10
430:18 449:18
465:11,16
**actions**  155:6
157:20 320:20
379:15 389:21
427:16 433:12
**active**  427:11
**actively**  426:11
**activists**  25:1
27:10
**activities**
332:14
**activity**  332:11
**acts**  426:20
**actual**  111:3
280:19
**actually**  16:12
32:3 56:3 66:6
102:21 108:1
126:17 134:17
142:17 150:14
153:19 162:17
162:21 197:11
212:13 214:22
231:19 232:22
246:18 276:22
284:1 285:2,3
285:5 311:10

315:10 318:6
326:20 329:21
353:4 355:16
413:3 430:5,7
439:21 444:10
464:1
**adam**  456:22
457:10
**add**  46:3 266:1
266:4 281:11
418:12 444:20
**added**  265:20
**addition**  50:15
**additional**  24:6
39:16 46:3
68:20 89:20
97:22 98:3
266:20 400:9
**address**  341:9
369:12
**addresses**
309:3 311:18
**adminbox**
139:6
**administrative**
268:12
**adobe**  291:22
**advanced**
25:12
**adversarial**
440:5
**adverse**  6:3,5
50:19 93:10
102:10 104:8
108:12 112:2

113:7 115:4,12
116:11,12
181:22 207:1
207:10,13
294:8,16,21
295:15 424:18
424:19 425:1
425:10 427:8
427:20 428:4
428:10 429:10
430:18 449:18
**advice**  104:17
105:12 153:21
154:9,16 332:8
344:4 345:1,7
345:19 348:13
**advise**  124:5
297:3
**advised**  286:18
330:18
**advising**  105:4
**advisory**
270:17,18
330:19
**aesthetic**
140:13
**aesthetically**
141:22
**affairs**  208:4
396:9
**affiliated**  163:9
460:3
**afternoon**
104:11 184:8

**age**  12:17
**agencies**  40:12
299:12
**agency**  18:16
25:11,22 31:2
43:8 44:7,8
52:2,4,5 59:17
70:12,13
120:17 172:11
217:13 239:20
299:1,11
364:17,18
383:6
**agency's**  48:5
195:4
**agent**  18:16
**agitated**  112:20
**ago**  155:13
325:13
**agree**  123:20
361:14
**agreed**  302:20
443:18 467:7
**agreeing**  172:4
**agreement**
139:16
**ah**  87:22
322:22
**ahead**  194:15
**air**  363:2
**alcohol**  428:14
**alerted**  58:17
**allegation**
173:17 406:17

**allegations**
165:9
**alleges**   188:21
189:4
**allison**   264:14
**allow**   45:13
140:14 400:4,8
**allowed**   45:16
79:12 448:6
**allows**   44:21
45:4 410:7
427:15
**amanda**   2:13
**amazing**
387:16
**amended**   3:13
3:16
**amendment**
446:16 447:3
447:10 448:2
448:17
**amount**   239:6
298:16 300:1
**amtrak**   328:5
**amy**   1:3 4:2 7:7
8:8 42:18
48:12,21 49:2
101:4 109:15
110:1,9 112:7
112:13 158:2
163:13 164:20
165:8,12,13,14
180:1 187:9
189:4 205:21
206:1,12,18

215:22 217:21
224:17 225:2
225:11,13
232:9 241:20
241:22 242:2
243:1,3 262:17
267:8 294:4,7
296:16 316:14
317:18 318:14
320:2 322:4
331:15 332:21
333:20 341:3
378:9,10,16
430:21 467:3
468:5
**amy's**   163:20
**analyst**   10:17
**anc**   24:22
144:22 145:10
146:10,17
147:5 149:2
458:17
**angela**   361:11
361:12
**angle**   140:21
**angry**   349:10
349:13
**anna**   2:5
**announced**
348:16
**annually**   299:9
**answer**   68:18
91:1 107:18
148:7 199:18
205:19 214:6

246:19 315:2
350:5,6 352:12
358:16,20
359:22 360:7
366:4 399:11
399:12,14,19
400:1,4,9
405:13,15
463:10,12,12
463:14
**answered**
191:21 208:2
216:13 224:19
235:22 236:5
358:17 359:18
360:5 394:22
395:19 398:17
421:15,22
422:12 438:19
444:16 449:3,9
454:5
**answering**
122:1
**answers**   406:13
**anticipate**
404:7
**anybody**
116:15 133:18
**anymore**
389:20
**anyway**   25:2
234:8
**anzallo**   5:4
76:12 77:3,17
332:3,10,18,21

333:4 396:8
**apologies**
191:20 264:20
**apologize**   37:3
62:11 161:2
208:2 250:4
251:22 260:17
265:1 283:8
297:2 300:19
331:1 338:2,6
352:17 369:10
379:1 386:1
422:5
**apparently**
58:9 141:3
**appeal**   111:8
**appear**   104:8
427:11 466:8
**appearances**
7:16
**appears**   430:2
430:7 465:4
**applied**   303:16
**applies**   118:15
**apply**   67:8
203:22 292:9
292:12
**applying**   203:9
**appreciate**
179:12 358:12
374:22
**approach**
282:15
**approached**
212:6 353:10

353:12,13,15
**appropriate**
258:14 399:5
**approval**   28:5
28:8,12 29:1
46:15 78:10,14
79:13 86:16
132:17 234:17
356:3 380:3
**approve**   89:19
**approved**   3:11
86:3 87:17
99:11 132:15
**approves**
388:18
**approximately**
215:20 230:6
336:6
**april**   14:8
207:19 211:7
**arbitration**
383:4
**arbitrators**
383:5
**archie**   33:17,20
34:3 109:4
119:16 157:5
157:11,17
158:7,13,19
159:8,21 160:5
160:11,22
161:10 164:17
187:22 188:3,6
188:9,12
195:22 199:22

200:3,13 201:1
201:12 203:17
229:7 230:17
270:4 273:15
273:22 407:6
426:17 450:20
451:2,11,15
452:6,17 453:1
453:18 461:5
462:2
**archived**   81:15
**argued**   66:10
67:2 315:13
**arguing**   67:3
**argument**   67:7
**arms**   93:5
333:3
**arrest**   103:8
**arrestees**
375:19
**arrests**   49:9
219:12,17
363:8,14
366:13
**arrived**   33:21
**article**   31:13,22
157:17 158:2,8
158:14 163:20
164:8 187:14
187:20 198:7
198:19 199:9
201:9,16
392:16 400:17
400:20 401:1
402:14 426:17

427:2
**articles**   200:5
**aside**   218:2,16
219:21
**asked**   30:13
49:10 55:21
99:18 103:7
115:11,22
116:1 131:14
163:13 166:8
179:17 184:10
207:1 212:7,10
216:13 222:9
223:16 224:5
224:19 226:1
226:20 230:22
231:11 232:21
235:22 236:5
245:7,19 258:4
258:8 265:16
265:19 267:12
294:4 299:11
304:8 307:11
315:15 317:13
319:13 320:14
320:21 321:2
343:17 353:5,6
354:7 358:17
359:18 360:5
375:6 394:22
395:18 397:4
398:1 406:16
407:12 408:11
410:13 411:6
415:7 420:1

421:14,21
422:4,11,22
423:16 432:18
433:3,5 436:2
436:6 437:5
438:18 443:17
444:15 445:7
446:11 449:2,8
449:14 450:17
454:4 463:5,22
464:1
**asking**   9:18
43:4 47:20
48:12 99:21
104:17 105:11
116:5 144:13
144:16 147:22
167:6 178:20
182:19 207:9
217:15,16,21
217:22 218:9
219:15 225:15
227:16 239:16
287:22 288:1
288:18,21
289:1 304:5
347:4 386:8
394:10 399:17
431:14 442:22
447:19
**asks**   376:21
386:13 390:3
**assault**   145:3
**assaulting**
145:3

[asserted - aware]                                                    Page 9

| | | | |
|---|---|---|---|
| **asserted**  117:21 | **assume**  90:13 | **attention**  24:7 | **authorize** |
| **assertion** | 274:8 295:12 | 24:8 31:11 | 130:22 131:2 |
| 173:17 | 325:20 | 48:2 49:11 | **automatically** |
| **asserts**  118:11 | **assuming** | 59:12 78:15 | 368:8 |
| 118:15 | 382:10 | 95:13 96:4 | **available** |
| **assessment** | **atkinson**  109:3 | 225:11 230:11 | 115:19 118:4 |
| 204:18 | 109:14 110:7 | 235:7 326:4 | 313:16 342:13 |
| **assign**  274:5,11 | **attached**  6:22 | 357:12 382:6 | 342:14 |
| 277:10,12,16 | 60:8,11 140:2 | 406:15 418:16 | **avenue**  1:15 2:6 |
| 277:19,22 | 244:20 248:13 | 441:20 460:20 | 2:19 7:11 |
| 284:20 | 252:20 264:1 | **attorney**  2:14 | 467:1 |
| **assigned**  14:6 | 322:13 328:8 | 157:19 162:9 | **averse**  80:18 |
| 97:13 113:20 | 466:9 | 162:10 285:9 | 81:2 232:4,14 |
| 114:17 124:21 | **attaches**  309:11 | 318:21 322:9 | **avoid**  38:2 |
| 207:18 242:13 | **attachment** | 426:19 427:14 | 83:14 221:15 |
| 272:21,22 | 34:2 110:13 | 463:4 465:14 | 384:4 421:1,11 |
| 276:1 304:17 | 245:21 250:5 | **attorney's** | **avoided**  81:13 |
| 304:20 305:1 | 335:10,21 | 427:13 | 83:6 |
| 313:1 326:8 | 341:5 352:3 | **attorneys** | **avoiding** |
| 344:20 | 386:17 396:22 | 104:21 285:8 | 420:22 |
| **assignment** | **attachments** | **attributed** | **awaiting**  89:11 |
| 57:15 | 3:18 62:10 | 383:22 | 90:2 |
| **assignments** | 104:8 105:18 | **audit**  182:19 | **award**  383:5 |
| 4:4 100:6 | 106:13 | 293:14,17 | **awards**  12:10 |
| 273:2 | **attempt**  298:15 | **august**  98:1,8 | 13:6 |
| **assist**  309:4 | 402:17 | 99:5 109:2 | **aware**  15:17 |
| **assistant**  5:3 | **attend**  10:11 | 166:14,15 | 65:22 118:19 |
| 146:7,19 147:1 | 71:22 116:17 | 229:14 362:14 | 141:20 147:3 |
| 148:21 163:21 | 228:9 313:13 | 366:20 391:15 | 154:15 161:8 |
| 268:12,14 | 313:15 | 465:22 | 188:20 189:1 |
| 272:22 307:2 | **attended**  13:3 | **authority**  41:14 | 195:11,18,22 |
| 396:6,8 | 117:8 120:4 | 147:18 149:2 | 196:16 199:8 |
| **associated** | **attendees**  117:9 | **authorization** | 199:14 249:18 |
| 310:16 | **attending** | 23:22 74:6,9 | 308:4 409:5 |
| | 115:16 298:21 | | 415:18,21,22 |

416:6 432:21
433:9 444:22
461:16
**awareness**
409:22
**awhile** 46:1

**b**

**baby** 435:1
**baca** 248:21
455:8
**back** 18:20
20:14 38:12
39:22 40:17
42:17 47:2
51:9 56:2
68:12 69:3
76:5 80:16
91:15 92:19
99:9 100:8
102:2 111:17
114:18 120:3
122:8 136:14
136:15 140:21
141:1,6 142:8
142:19 143:17
152:1,17 162:9
190:9 208:21
213:21 218:22
224:10 233:1
239:20 240:10
240:16 241:17
243:3 259:19
259:20 260:19
262:1,16
264:12 265:11

267:5 274:9
280:22 281:7
283:16 284:3
286:4,22
289:19,22
290:6 296:22
299:14 303:6
315:1 338:7
346:5 368:12
383:6,21
385:11 402:17
439:20 442:3
**backing** 368:14
**backlash**
176:22
**backlog** 42:13
57:4 69:12
70:4 71:7
271:13,17,21
272:8,11
276:16,20
278:4 281:22
285:2
**backlogged**
106:20
**bad** 67:18
157:20 171:20
221:14 251:18
383:5,6 425:2
426:20 427:16
**badge** 49:8
97:13 99:17
100:4 304:7
326:8

**balance** 212:8
**balasubrama...**
183:3
**balding** 246:22
**ball** 149:5
**ballpark**
189:17 225:5
**baltimore**
334:21
**banks** 10:20
**bar** 10:7
334:17 339:1
**barred** 464:5
**barriers** 427:9
**barth** 48:8
96:20,21 97:1
97:6 101:7
205:20 215:22
217:20 254:9
303:19 326:21
432:15
**barth's** 99:3
**based** 17:18
26:1 30:11,13
47:16,17,18
52:15 95:14
168:5 189:4
191:11 195:10
214:3 244:10
275:5 281:4
300:16 384:5
422:7 423:1
431:12
**basis** 45:11
59:13 142:12

210:13 406:17
428:3
**bates** 3:10,11
3:19,20,22 4:4
4:8,10,12,13,14
4:15,16,17,18
4:19,20,21 5:2
5:4,7,8,9,10,11
5:12,13,14,15
5:16,17,18,19
5:20,21,22 6:2
6:3,4,6,7,8,9,10
6:11 18:2 35:7
64:13 65:1
75:5 82:5
96:21 98:2,19
100:22 113:19
120:9 140:3
171:6 245:22
246:21 351:13
351:17 396:11
427:1,6
**bear** 433:4
**becoming**
144:16 311:22
**began** 219:15
**beginning** 23:2
23:4 72:2
184:11 321:9
333:11,12
396:21
**begins** 68:9
117:1 136:9
171:5 184:2
265:8 331:9

**[begins - bring]** Page 11

352:22
**behalf** 2:2,11
  2:17 7:15
**behavior** 438:8
**behaviors**
  440:7
**belief** 437:19
**beliefs** 407:18
**believe** 9:11
  29:11 45:22
  46:1 59:11
  63:2 99:15
  127:16 143:5
  156:22 166:5
  175:4 191:15
  192:16 196:14
  206:1 207:11
  210:3,13 237:2
  239:1 258:19
  267:16 270:16
  276:14 286:13
  300:11 304:14
  306:9 307:11
  318:16 321:9
  349:16 358:19
  388:11 393:13
  432:20 439:6,9
**believed** 81:14
  158:14 181:18
  429:9 430:19
**belisle** 459:13
**ben** 354:22
**benefit** 38:17
  155:16 181:17

**benjamin** 48:4
  205:20 217:15
  261:6
**best** 16:20
  18:10,14
  167:17 374:7
**better** 18:11,16
  52:10 172:2
  216:6 241:4
  245:19 283:18
  286:12,16,19
  287:16 314:8
  345:20 356:19
  357:7 358:2,10
  358:22 359:20
  361:13 381:14
  381:15 384:4
  384:17 385:1
**big** 147:4
  219:19 287:19
**bigger** 271:22
**binder** 287:19
**biography**
  11:17 12:2,4,6
  12:12
**bit** 140:8 237:7
  239:13 258:1
  424:15
**black** 292:1,9
  292:12,17
  370:20 371:1
**blacking** 296:7
**blacks** 292:7
**blatant** 163:22
  164:6

**blecher** 2:13
**blind** 248:5
**blindsided**
  21:12,19 212:4
  212:5,14
**block** 254:19
  418:18
**blocking**
  426:11
**blog** 187:15
**blowing** 363:22
**blue** 34:3,9,14
  34:19 62:11
  110:14,15
**board** 10:15
**body** 99:22
  116:1,6 130:22
  131:3,8,14,18
  237:11,14
  244:19 245:6,9
  262:21 273:7
  304:7
**bold** 35:14
  109:15
**bono** 335:1
**boolean** 242:5
**borrow** 413:4
**bottom** 35:14
  75:5 82:5 86:8
  166:19 181:21
  300:4 322:21
  396:12 425:22
  439:2
**box** 89:22
  281:6 292:6,10

292:17
**brandefsky**
  62:14
**brandon**
  458:13,16
**brave** 171:18
  172:2
**break** 67:19
  68:1,3 134:21
  183:9,15
  264:22 265:3
  321:18 331:2
  404:2 405:11
  405:12 436:14
  436:18,18
  460:21,22
**breaks** 178:10
  178:12 179:7
**brick** 145:5
**bridgman**
  455:13
**brief** 68:7
  183:22 265:6
  331:7 404:15
  437:1
**briefly** 87:16
  224:10 241:18
**bring** 24:8
  31:11 49:12
  78:15 81:4
  85:9,9 86:21
  95:13 146:21
  200:3 224:16
  315:1 451:22

**bringing** 225:11

**bromeland** 82:3,6,15 84:17 121:16 121:20 122:5 306:14 313:19

**brought** 24:7 59:11 224:11 224:13,21 235:6 285:3,10 418:1,15 460:20

**broussard** 1:17 7:14 465:2,19 467:18

**bryant** 393:13 393:16,20

**building** 439:4 439:5

**bulk** 332:19

**bullet** 35:13

**bunch** 73:1 306:4 312:14 312:19,20 313:6,10,17 314:5,10 434:5

**bureau** 14:5 357:3,4 361:1 361:5 396:7,9 403:7

**burglarized** 145:11

**burglary** 145:2

**business** 297:4 297:8

**busy** 158:3 268:8,9 321:13

**buttock** 428:13

**bwc** 55:6 130:18 252:22 253:8 273:19 274:2,7

**c**

**c** 2:1,3 3:1 7:1 243:10 402:1 403:1 466:1 467:12,19

**cac** 270:17

**cad** 100:5

**cadet** 12:20

**cads** 304:7

**calendar** 116:16 344:10

**call** 53:19 82:16 85:10 96:11 121:3,6 128:3,5 146:3 146:9,12,13,20 159:22 163:15 191:7 221:21 247:5 254:13 255:17 256:2 257:8 258:4 267:18 268:1,3 269:16 276:16 347:22 381:3 382:17,17 441:20 445:22

467:15

**called** 7:22 34:4 61:1 125:21 127:15 128:5 128:12,13 136:5 145:19 161:1 164:18 165:22 172:9 185:5 187:15 192:11 242:4 255:3,14 256:1 267:20 270:5,9 300:14 377:11 379:18,21 397:18 445:14

**calling** 175:16 193:11 235:7 255:4,9 433:11 447:18,21

**calls** 112:15 425:13 429:7 445:16 446:18 447:5,12,15 449:20

**camera** 99:22 116:2,6 131:1 131:3,8,15,18 237:11,15 273:8 304:7

**campaign** 172:15

**campbell** 284:6

**campus** 229:19 229:20,21

**canary** 55:6

**captain** 387:22 388:2

**caption** 335:12

**capture** 156:4

**captured** 39:17

**car** 348:4,5 428:15

**career** 13:7

**careful** 153:22

**carpenter** 2:18 32:13 34:14,18 37:8,13,17,19 65:5 67:21 68:2 86:6 93:19 103:19 105:1,7 114:20 122:9 159:2 177:22 178:7 178:11,13,19 178:22 179:3,6 179:13 183:12 183:18 189:7 194:11,15 195:5 197:18 200:20 202:8 208:15 214:8 220:13 229:9 233:8 235:10 243:9,12 256:6 256:15,18 258:17 260:12 260:15 263:9 263:12 264:21 302:2,4 312:3

313:21 319:17
322:12,15
325:8 335:16
336:12,16,17
350:5,8 352:14
352:19 358:19
360:15 361:20
366:1 373:2,14
376:4 378:21
384:18 389:7
389:10,12
395:11 398:17
399:8,11,15,22
400:2,6,11
402:20 404:4,8
404:11 405:9
413:1 416:12
417:14 421:4
432:10 433:20
436:11,15
437:22 442:3,8
445:3 450:3,7
462:17,20,21
463:1 464:4,8
467:1,4
**carried** 130:20
**case** 1:5 7:8,9
8:21 9:1,6,7,15
38:13 47:17
94:21 109:15
161:3 162:14
184:16 185:6
185:12 186:1
231:5,15
247:12 252:15

316:15,17
317:19 323:10
334:10 335:12
375:19 419:18
421:9 468:5
**cases** 145:9,16
164:11 238:22
375:7,15
**cash** 10:21
**cast** 429:4
441:22
**categories**
201:19 219:7,9
275:16
**category**
214:19
**cathy** 13:16
**caught** 221:16
**caused** 164:21
440:4,8
**caution** 121:22
**cc** 467:19
**cell** 100:5
163:16 255:9
255:14,18
256:3 257:4,9
258:4,16 259:2
259:13 367:15
367:18 378:1
378:11,17
446:6
**censored**
426:14
**center** 140:8

**certain** 22:5,13
23:10,16 26:22
26:22 27:9,11
28:10,11,19,22
28:22 38:1
39:2,11 50:2
53:16 54:1,2
55:18 60:16
61:2,7 69:21
70:15 73:7
74:9 79:12,18
79:22 80:6,7
81:14 83:6
94:17 102:11
134:3 168:4
195:8 196:20
197:6 200:22
214:14 226:14
269:2 289:2
294:14 303:14
324:18,19
342:3,4,12
408:12 409:17
414:10 415:2
415:11 421:1
423:21 424:9
453:6
**certificate**
465:1
**certification**
140:3
**certify** 465:4
**cetera** 77:4
**chain** 318:7,10
318:10 322:19

389:22 445:8
**chair** 115:18
270:16 379:7
**challenged**
428:9 440:1
**chance** 143:19
**change** 158:9
325:3 326:17
329:18 468:9,9
**changed** 148:5
149:10 326:18
328:13 329:15
330:13 349:14
349:18
**changes** 68:19
99:11,13 466:8
**changing**
144:18 233:13
233:15,16,18
326:14
**channel** 254:10
254:12
**character**
437:20 438:9
438:13,17
**characterizati...**
173:21
**charge** 145:21
146:1,20 210:3
299:13,13
345:3 418:18
418:19
**charged** 145:2
145:6,13 223:1
223:6 300:13

**[charging - clear]** Page 14

| | | | |
|---|---|---|---|
| **charging** | 96:5 98:7,11 | 344:14,15 | 196:21 270:17 |
| 222:18 223:12 | 98:14 124:6,9 | 345:7,11,19 | 270:18 412:1 |
| 223:13 299:1 | 124:13 132:19 | 346:3,5,17 | **chiefs** 307:2 |
| 299:11,22 | 146:8,15,19 | 347:21,21 | 385:3 |
| **charles** 2:8 | 147:1,2,7,13 | 348:4,9,13,16 | **choose** 398:15 |
| 459:3 | 148:6,7,15,20 | 348:20,22 | **chose** 398:12 |
| **charlie** 184:22 | 148:21 149:12 | 349:1,3,8,11,21 | **christopher** |
| **charlotte** 9:7 | 150:4 151:11 | 352:7 353:11 | 455:15 456:3 |
| **check** 124:9 | 151:17 152:8 | 353:18,20 | **circle** 76:5 |
| 393:5 436:19 | 163:21 164:6 | 354:7 365:4,6 | 224:10 355:8 |
| 445:22 446:3 | 165:3,6 183:5 | 365:8,10,15,16 | 355:10 |
| 450:4 | 194:5 197:7 | 383:4,13,14,17 | **circumstance** |
| **checked** 284:2 | 198:7,19 | 383:21 384:7 | 363:11 392:20 |
| 445:15 | 199:10 200:5 | 384:13,16,22 | **circumstances** |
| **checking** | 201:9,16 202:2 | 385:6,7 392:1 | 277:15 |
| 179:11 | 202:17 204:1 | 392:6,9,13,16 | **cites** 383:4 |
| **chief** 5:3 13:11 | 204:17 212:2,4 | 394:12,14 | **city** 32:7 33:4 |
| 13:12,14,16 | 214:5 217:5,13 | 395:7,13,15 | 48:7 146:16 |
| 15:1 19:13 | 220:10 226:10 | 396:6,8 400:17 | 201:22 202:15 |
| 21:5,8,11,18 | 230:10,13,14 | 402:17 403:1,4 | **civilian** 307:3 |
| 27:7,12,14 | 230:17 232:3 | 406:19 407:4 | **claims** 64:15 |
| 31:13,22 32:8 | 234:19,21 | 408:6,12 409:5 | **clairessa** 109:3 |
| 33:1,5,12 | 235:2 243:11 | 414:16 415:3 | **clarified** 363:9 |
| 35:18 36:1 | 243:22 244:4 | 415:10 417:4 | **clarify** 362:21 |
| 41:13 42:4,5 | 244:11 248:3 | 418:8,15 421:9 | **classes** 228:9 |
| 47:21 54:14,18 | 252:8 263:19 | 426:1,16 429:4 | 229:22 |
| 55:10 56:13,18 | 270:20 288:9 | 436:3 437:19 | **classification** |
| 57:2,18 58:1 | 289:7 306:16 | 438:12,17 | 167:3 |
| 58:14 59:2,21 | 306:17,17,19 | 439:6,15 | **clean** 44:14 |
| 60:16 61:9,14 | 306:20 307:4 | 440:11 441:3 | 45:1 347:10 |
| 61:20 62:4 | 324:15,16 | 442:11,14 | **cleaned** 43:5,8 |
| 76:12 77:2,18 | 325:12 326:4 | 446:13 448:7 | 43:10 267:1 |
| 78:4,10 80:17 | 332:3,10,18,21 | 448:14 449:7 | **clear** 40:1 |
| 81:1,6,12 92:4 | 333:4 343:18 | **chief's** 59:11 | 76:18 80:1 |
| 92:10,12,16 | 343:22 344:4,8 | 111:14 147:2 | 94:21 118:3 |

142:10 162:6
165:13 169:13
210:1 224:16
234:20 312:6
315:16 330:13
412:2 419:1
422:4
**cleared** 286:10
**clearing** 57:4
70:4
**clearly** 246:15
**clicked** 317:4
**client** 162:10
**clip** 74:19
287:20
**clock** 325:14
**close** 143:4
211:18 282:2
297:11 383:7
**closed** 114:5
143:9 283:6,9
**closing** 286:11
**cloud** 368:12
368:15
**clunky** 206:15
**cm** 183:4
**cnn** 251:12,13
**coal** 55:6
**coalitions**
439:4,5
**coffee** 241:5,6
**coin** 10:21
**colbert** 249:1
249:12 254:12
350:10,14,15

350:17 351:8
353:2,9 354:3
437:10 443:3
**colby** 350:12
350:13
**colleagues**
404:10 406:19
**collect** 423:20
424:8
**collected**
139:21
**collecting**
429:10
**college** 10:11
13:4
**color** 62:12
**columbia** 1:1,6
2:14 7:8,9 9:8
10:10 15:15
100:11 249:16
427:13,15
465:20 467:3
468:5
**come** 18:19
49:17 61:16
65:17 72:19
162:1 257:12
272:15,17,18
278:8 282:7
290:6 346:20
**comes** 274:4
445:1
**comfortable**
176:20

**coming** 31:11
75:17 146:17
160:13 199:8
223:9 316:19
317:19 318:3
349:13 357:2
**command**
393:2,3 394:15
**commander**
12:7,9,20
144:17,18
145:21,21
146:1,19 147:1
147:10 148:20
153:9 344:5,11
345:9,20 346:7
346:19 393:17
**commander's**
146:7
**commendatio...**
12:11 13:7
**comment**
279:19
**commentary**
38:3 425:11
**comments** 89:8
278:22 279:4
279:11,15,19
279:22 280:3,8
280:18 281:1
284:15
**commission**
465:21
**commissioner**
145:10 458:17

**commissioners**
24:22 144:22
146:11,18
147:5 149:3
**committee**
271:3
**common**
279:17
**communicate**
84:17 378:16
**communicated**
128:9 170:11
290:3 381:15
421:11 442:20
443:9,15
**communicating**
81:13 165:17
421:1
**communication**
183:4 303:6
439:16
**communicati...**
104:21 122:1
253:17 288:7
288:18,21
289:1,15 337:5
337:15 338:8
338:11 341:6
381:6 420:8,13
420:16 443:4
**communities**
352:11 439:4
**community**
25:1 27:10
32:7 33:4 38:3

165:5 202:1,16
270:10,11,19
270:20,21
271:2 422:18
440:1,19
**community's**
394:14
**commuting**
160:1
**compared**
159:11
**competitor**
145:3,14
**complaining**
145:11
**complaint**
15:18 185:22
406:18
**complaints**
19:19,21 20:2
20:5 147:12
212:16,20,21
213:2,8,8
**complete** 97:1
276:3 315:19
466:7
**completed** 13:4
46:15,20
310:22 314:14
314:20 316:2
**completely**
191:11
**complex**
274:22 277:22

**complicated**
273:5 274:13
**comply** 124:17
**component**
39:16
**computer**
340:9,10,15,17
388:4 405:4
**concern** 161:15
**concerned**
172:8,13,20
**concerning**
206:11,19
220:11 263:3
363:14
**concerns** 76:13
77:4 270:21
282:10
**concluded**
464:13
**conclusion**
438:2 446:19
**condescending**
439:19 440:18
**condition** 55:9
**conditions**
139:17
**conducted**
115:5
**confer** 404:9
**conference**
344:11 382:17
**conferences**
212:4

**confided**
153:19
**confidential**
1:11 3:6 342:9
389:4 396:4
397:5 399:6
400:15 401:5
403:12 463:5,7
**confirm** 464:2
**confirmation**
397:19,22
398:2,19
**confronted**
21:12
**confusing**
324:9
**congratulating**
349:3
**connected**
128:7
**connecticut**
2:19 467:1
**connection**
170:16 402:16
402:22 403:2
411:22
**connolly** 1:15
2:5 7:11
**consecutive**
230:4
**consecutively**
352:1 396:14
**consequences**
172:3,7

**consider** 188:3
259:8 288:13
343:22 344:2
362:9,11
**consideration**
409:3
**considered**
50:20 116:9
**consistent**
36:11,20 43:17
50:21 83:5
423:5 435:6
439:11 441:1
448:16
**constructively**
297:12
**consult** 242:13
242:16
**consultation**
134:10
**contact** 117:16
163:14 284:8
**contacted**
145:12 321:14
345:10 378:1
**contacting**
467:8
**contained**
309:2
**contains** 1:11
**contee** 163:22
164:6,19 165:3
165:6 270:5
406:20 407:4

| | | | |
|---|---|---|---|
| **content** 25:17 | 327:17 354:9 | 389:18 405:1 | 143:15 154:11 |
| 160:14 216:9 | 381:14 392:20 | 431:8 464:1 | 155:13,13,17 |
| 216:18,21 | 394:16 395:2,3 | 467:5 | 156:6,8,11,17 |
| 217:6,9,14,16 | 450:19 451:2 | **copying** 139:6 | 157:6,15 |
| 217:21 427:20 | 451:10 452:21 | **correct** 11:5 | 163:10 167:14 |
| 428:18,20 | 453:17 | 12:21 13:4,7 | 169:17 170:13 |
| 429:3 431:1 | **conversations** | 15:19 16:2,22 | 171:15 172:16 |
| 432:1,5 434:4 | 84:2,4 91:12 | 19:13,19 21:15 | 172:22 173:13 |
| **contents** 16:19 | 92:16 166:4 | 22:6 26:7,10 | 173:14,17 |
| **context** 90:22 | 191:3 254:1 | 26:17 27:11 | 174:5 176:14 |
| 296:5 355:6 | 336:12,16 | 29:2 30:6,7 | 177:6,19 |
| 435:22 | 381:17 | 31:14 33:22 | 180:18 181:8 |
| **continue** 63:7 | **convey** 332:17 | 38:4 39:3,12 | 181:14 182:7 |
| 383:8 384:2 | **conveyed** | 39:14,18,20 | 182:11,21 |
| 455:20 | 146:22 | 40:13,15 42:14 | 183:6,8 196:8 |
| **continued** | **cop** 35:19 36:1 | 44:9,17 46:10 | 263:20 312:1 |
| 57:16 136:5 | 41:7 97:22 | 50:16 58:20 | 322:14,16 |
| 279:8 407:5 | 425:2 | 61:3,10 62:5 | 381:20 387:4 |
| 450:18 | **copied** 248:6 | 70:17 71:18 | 394:12 395:16 |
| **continues** | 283:19 296:19 | 73:21 79:3 | 409:11,17,22 |
| 171:14 351:19 | **copies** 87:4,5 | 84:5 87:14 | 411:9,15,20 |
| **continuing** | 93:8 102:9 | 89:5 94:7,22 | 414:11 415:11 |
| 336:21 | 166:22 252:14 | 95:2,17 96:9 | 417:1,9,20,21 |
| **control** 240:7 | 284:3 286:19 | 101:15 102:6 | 418:3,9 419:3 |
| 389:1,21 | 287:16 388:1 | 105:19,21 | 419:8,14,16,19 |
| **conversation** | 388:19 397:15 | 106:14 108:13 | 419:21 420:3,4 |
| 59:4 77:5 | **cops** 157:20 | 108:19 110:2,5 | 420:6,7,11,17 |
| 129:8 156:5 | 426:20 | 110:9 114:10 | 420:19 421:13 |
| 185:8 187:19 | **copy** 182:19 | 116:8,13,18 | 421:20 422:10 |
| 211:16,20 | 231:2,7 252:11 | 119:1 121:4,10 | 422:18,20 |
| 213:15 231:16 | 283:18 286:12 | 122:6 124:11 | 425:3,12 427:2 |
| 268:7 294:18 | 286:17 315:9 | 128:15 131:15 | 427:21 429:5 |
| 312:14,16 | 316:13 342:17 | 131:20 139:11 | 430:12 431:9 |
| 316:18 318:2 | 343:10 387:15 | 139:22 141:18 | 431:15,19 |
| 318:14 320:10 | 387:17,19 | 142:7,13,15 | 433:1 435:1 |

437:11,20
438:13 440:12
440:14 444:5
444:11,12,14
444:17 446:7,9
446:17,20,22
447:10 448:2,4
448:7,10,14,15
448:18,20
449:19 460:16
462:4,11 466:6
**corrected**
232:13 326:19
411:1
**correction**
328:13
**corrections**
375:19 466:8
**corresponden...**
55:8 98:22
431:14
**cost** 297:21
**council** 32:7
33:4 48:7
146:14,17,21
147:6 202:1,16
217:18 270:17
270:18 288:8
289:2
**counsel** 3:3,4,5
7:6,16 8:3 34:8
74:18 76:9
111:9 122:1
129:6 136:11
162:11,12,13

177:22 184:6
285:9 301:14
302:19 329:6,6
329:11,12,19
329:19,21
330:4,4,8,9,14
330:18 346:19
372:20 405:22
450:8 459:19
462:22 465:10
465:14 467:12
**counsel's**
111:13
**count** 250:6
**countless** 364:1
**couple** 86:2
100:9 285:8
303:7 344:18
**course** 352:10
372:22 382:21
442:5 462:16
**court** 1:1 7:9
7:14 161:18
162:7 316:15
317:2 400:6
433:10
**cover** 344:19
**covers** 38:22
**covid** 228:7
317:3
**cowers** 440:5
**cowley** 62:16
62:16 456:17
**cox** 455:15
456:3

**create** 26:9
44:1 292:6,17
**created** 26:21
80:18 97:16
232:4 337:6
341:7
**credibility**
433:11
**crime** 310:3
**crimes** 221:15
433:1
**criminal**
293:10,15,22
304:15 432:22
**crisis** 375:21
**criteria** 94:6,15
94:16,22 95:14
95:15 204:7,14
218:13 227:1,6
227:10 253:5
422:8
**critic** 218:11
**critical** 31:6
33:12 39:3,11
42:20 47:21
48:4 59:17
70:16 103:12
148:14 154:5
154:17 155:1
174:4 180:18
364:12 365:1
372:3,4 410:9
415:19,22
422:17 427:2
431:1 433:10

443:9 446:13
447:9 448:1
460:15
**criticism** 52:5
440:12 441:4
**criticizing**
430:11
**critics** 180:22
181:10 217:5
**crumlin** 119:13
119:14,16,20
139:6 268:13
268:14 269:1,6
269:11,15,21
274:5,9 275:6
296:16
**csr** 1:17 467:18
**cure** 32:17
**current** 210:9
406:19
**currently** 10:14
204:3 210:15
210:20
**cursor** 292:6
**cut** 298:14
304:11
**cv** 3:11 4:4 5:7
5:8,9,10,11,12
5:13,14,15,16
5:17,18,19,20
5:22 6:2,3,4,6,7
6:8

| d | | | |
|---|---|---|---|
| **d**  7:1 402:1 | 297:9 466:20 | 439:14 | **decisions** |
| 403:1 466:1,2 | 468:7,22 | **dealing**  282:15 | 234:21 |
| **d'annunzio** | **dated**  82:3 | **deals**  434:5 | **declaration**  4:8 |
| 248:22 | **dateline**  247:1 | **dealt**  83:17 | 4:9 15:13,18 |
| **d.c**  1:16 | 247:3,5 | **dear**  467:4 | 16:2,5,14,15,18 |
| **d.c.**  1:22 2:6,10 | **dates**  167:1 | **december** | 16:22 17:11,18 |
| 2:16,19 7:12 | **dating**  42:17 | 59:20 60:4,4 | 18:1 38:11,15 |
| 15:14 100:13 | **david**  393:13 | 74:22 85:18,19 | 40:20 56:3 |
| 100:14 157:18 | **day**  19:12 | 106:2 139:5 | 73:13 122:9 |
| 157:19 229:16 | 36:13 116:16 | 143:13 170:7 | 155:15 156:3 |
| 239:17 328:5 | 120:4 148:2 | **decent**  149:11 | 156:15 158:20 |
| 415:22 420:5,8 | 159:13 189:21 | **decide**  18:6 | 159:13,14 |
| 420:22 426:18 | 190:3,7,10 | 124:16 134:11 | 160:6,7,15 |
| 426:19 427:10 | 197:22 208:10 | 165:17 | 161:17 162:6,8 |
| 467:2 468:2 | 286:6 321:12 | **decided**  95:5 | 162:12 165:8 |
| **damaging** | 321:13,16,18 | 124:13 125:1 | 169:10,12,16 |
| 77:19 | 363:22 372:21 | 142:6 162:15 | 169:20 170:1 |
| **dares**  440:19 | 378:20 379:2 | 175:10,10 | 170:16 171:2 |
| **data**  43:4 44:1 | **days**  45:7,12,16 | 301:17 363:1 | 171:15,19 |
| 44:7,14 100:22 | 189:20 238:7,8 | 375:2 | 185:6,9,12,14 |
| 101:5 181:19 | 238:10 261:20 | **deciding**  59:14 | 185:16 189:5 |
| 182:6,20 183:6 | 271:19 275:17 | 422:6 | 189:12,15,17 |
| 267:1 288:2 | 297:4,8 344:19 | **decision**  15:10 | 190:12 191:2,9 |
| 363:2,7,13,17 | 376:15 467:10 | 15:12 41:8,14 | 191:11 196:19 |
| 363:18 364:7 | **dc**  3:11 4:4 5:7 | 90:2 111:1,5 | 197:10 198:3 |
| 365:21 368:5 | 5:8,9,10,11,12 | 111:15 124:11 | 203:21 205:2 |
| **database**  43:13 | 5:13,14,15,16 | 132:16 133:1 | 208:21 219:5 |
| **date**  1:13 7:3 | 5:17,18,19,20 | 134:13 158:20 | 232:17 233:3 |
| 97:16 110:19 | 5:22 6:2,3,4,6,7 | 164:20 165:12 | 233:11 261:9 |
| 138:7 143:1,3 | 6:8 | 165:21 203:12 | 307:17 316:12 |
| 143:4 159:11 | **dc.gov**  2:16 | 203:18 208:6 | 316:21 317:1 |
| 159:12 180:10 | **dc.gov.**  341:10 | 294:18 301:8 | 318:11 319:11 |
| 250:8 283:7,9 | **dcfems**  55:9 | 302:11 309:7 | 320:13 321:7 |
| 285:4,10 297:4 | **deal**  74:3 77:12 | 329:5 | 321:11,12 |
| | 147:4 291:7 | | 322:13 323:4,7 |

323:9,12,19
324:5,22 327:8
327:15 331:13
332:14,18
407:19 410:15
410:19 411:2
421:10 422:22
423:5 438:16
438:21,21
**deemed** 35:17
50:11 194:4
**defend** 427:15
429:12
**defendant** 1:7
2:11 3:4 184:6
450:9
**defendant's**
3:12,16 4:2,7
5:1 321:20
322:2,3 327:2
327:6,6 334:2
334:6,8 335:5
350:20 351:2,7
362:1,4,13
366:14,18,18
368:22 369:4,4
369:8,10,18,21
369:21 374:8
374:12,12
376:9,12,13
378:4,7,19,20
379:1,3 381:21
382:2 385:14
385:18,18
391:9,13,13

395:21 396:3,3
436:10 437:5,9
**defender** 48:9
**defender's** 96:4
96:11,13 103:2
429:9
**defenders**
103:7
**defending**
440:6
**defense** 66:12
67:13,17
429:11 432:22
442:8,10
444:19
**defined** 338:12
**defines** 338:7
**definitely** 100:5
333:11
**definition**
198:10
**degree** 10:6
**delay** 44:21
176:13 266:14
266:15,18
**delayed** 42:13
176:8 177:13
177:13 179:18
**delaying** 65:22
165:10
**delays** 175:21
177:18 266:21
**delegate** 42:5
**delete** 367:13
367:14 368:20

372:17 444:5,8
444:22 445:2
**deleted** 367:11
368:18 370:10
370:16,19
372:11,16
373:15 382:8,9
382:11,11,14
382:19 383:1
383:11 443:21
444:10
**deletions**
373:17
**delgado** 395:12
**deliberate**
83:22
**deliberately**
176:6,8,13
**deliberations**
83:18
**demoted**
144:21 148:5
149:17,20
150:14 151:17
153:9 349:8,10
393:16,21
395:6,13,13,15
**demoting** 152:1
402:18
**demotion**
144:19 150:6
150:17,17,21
173:10 343:21
349:12

**denial** 109:5,11
109:12 111:3
121:14 221:3
267:13 268:10
**denied** 111:6
114:8 118:22
119:22 121:10
168:5,8 300:22
416:22 418:9
**denise** 47:20
205:16 217:8
**deny** 113:8
119:6 267:17
294:16
**department**
43:5 157:18
353:18 375:18
426:19 430:2
**department's**
386:21
**departments**
386:8
**depend** 53:10
216:9,18,21
240:16 288:15
**depended** 53:6
53:9 91:8
103:6
**depending**
41:22 43:14
72:16 167:7
275:14 291:22
**depends** 177:12
203:3 231:9
400:11 421:6

428:1,3
**depo** 468:3
**deponent** 2:17
3:5 462:22
**deposed** 8:13
8:15 9:3
**deposition** 1:10
3:7 4:1,7 5:1
7:5 11:2,10
64:6 68:9
85:13 88:4
100:18 136:9
137:13 138:21
163:1 166:10
170:3 184:2
265:9 331:9
401:5 464:10
464:12 465:3,5
465:8,12 467:6
468:7
**depositions**
8:17
**describe** 21:17
26:5 27:17
69:11 102:4
173:8 189:11
196:11,17
210:14 291:20
310:8 364:15
372:2 434:22
**described**
27:10 39:1
50:21 102:15
153:11 195:10
197:3,16

203:10 213:13
462:10
**describing**
93:15 94:16
195:14 197:15
209:13 211:15
**description**
6:12 17:11
110:19
**descriptions**
60:11
**deserved**
357:13,17
**designated**
447:20
**desire** 257:3
**desk** 86:21
268:1,3,4
269:18 281:6
**det** 31:1
**detailed** 310:10
344:17,22
**detailing** 77:5
118:13
**details** 3:14
83:4 96:19
113:17 156:4
416:15 432:12
**detective**
345:17
**detective's**
145:8,15,18
148:1 346:1
**detectives**
145:11,22

146:2,19 147:9
147:11 148:1
149:4 309:4
345:12
**detector** 402:4
**determination**
92:13,14
111:13 199:4
**determinations**
134:8
**determine**
124:10 134:16
218:5 274:10
419:13
**determining**
204:13 218:14
242:10 275:6
**detrimental**
31:1 33:1
204:1,4,16
305:19 308:3
310:13 312:9
312:21 313:4,8
435:14
**detrimentally**
31:1
**develop** 94:21
**developed**
258:3
**development**
361:1,2,5
396:7 403:7
**diane** 209:8
**difference**
193:14 266:13

359:2
**differences**
386:10
**different** 43:15
141:5 153:10
162:14 192:8
203:4 212:6,7
217:8 266:17
267:1,2 273:1
275:14 276:7
284:3 303:7
308:7 344:19
351:4 367:20
386:8 418:18
418:19 461:15
**differently**
146:4 167:9
222:17 410:8
443:12
**dignitary** 76:14
**dillon** 456:7
**direct** 20:12,21
35:9 47:3 69:3
72:14 73:12
82:4 245:21
306:10,11
352:15 382:6
406:14 425:21
427:7
**directed** 60:19
60:20 111:10
114:9 119:6
125:3 131:19
145:16 329:11
417:12

**direction**
269:21 324:2
435:5,6 465:8
**directions**
414:18
**directive** 61:15
**directly** 15:4
148:19 151:9
155:5 306:21
307:3 330:1,7
355:9 383:22
462:4
**director** 252:13
355:19,20
356:2 357:1
403:6
**disagree**
440:19
**disagrees**
118:11
**disappointed**
174:10 349:12
395:17
**disciplinary**
115:5 150:16
**disclosure**
84:19 141:21
421:2,12
**discovery**
80:19 81:3,17
84:20 88:11
232:5 420:10
421:2,13
**discretion**
95:12

**discrimination**
9:13
**discuss** 53:3
69:19 71:13
72:6,15,20
78:18 79:5
160:10 169:4
199:21 204:7
207:4 258:15
325:15 327:13
327:20 419:7
**discussed** 70:22
71:3,17 94:17
98:15 160:5,7
182:1 236:18
303:20 309:18
333:20
**discusses** 193:7
**discussing** 54:2
83:11 85:6
92:3 404:21
**discussions**
83:16 112:11
211:2
**disdained**
442:11
**disgruntled**
16:6 172:9
173:8,12,16
**disliked** 349:21
**disposition**
110:20 114:4
143:1,3 440:5
**dispute** 430:2

**disregarded**
176:19,19
177:5
**dissatisfied**
254:16
**distorted** 140:8
**district** 1:1,1,6
2:14 7:8,9,9
9:8 10:10
12:20 15:15
58:7 88:10
97:2,2,8,14
100:8,11
137:21 145:1,7
145:15,18
147:17 180:9
184:5 220:7
221:22 227:21
249:15 303:19
304:13 326:9
335:6 344:6
345:9,21 346:8
347:16 406:14
406:16 427:13
427:15 465:20
467:3 468:5
**district's**
104:20
**districts** 97:7
**disturbing**
440:2
**division** 2:15
115:6 304:14
304:15 356:1

**djoussou** 9:7
**dmcr** 297:7
**document**
11:15 33:9
51:9 139:3,4
141:7 142:9,11
194:13 231:7
246:17 259:22
274:1,4,6,8,10
290:13 292:1
293:9,10,13,21
315:10 336:4
340:14 351:4
388:3,5 396:18
396:21 400:10
402:2 417:12
438:1 463:16
463:20,21,21
**documented**
288:7
**documents**
22:22 23:11
24:5 26:1
41:21 47:20
51:18,22 66:12
67:13,17 68:20
70:15 72:18,19
93:9 108:17
115:3 116:2
132:17 133:7
141:10 143:14
161:19,20,22
162:4,4 167:13
168:15,21
169:15 182:9

| | | | |
|---|---|---|---|
| 190:11,15,22 | 210:2,5 | **dreadlocks** | 45:8,19 46:2,8 |
| 192:10 203:8 | **double**  260:18 | 370:22 | 46:13,18 47:1 |
| 211:10 212:3,9 | **douglass**  48:4 | **drinking** | 47:11 48:15,20 |
| 220:10,16 | 205:20 215:22 | 428:14 | 49:14 50:8 |
| 234:18 240:10 | 217:15 261:6,8 | **drive**  127:10,11 | 51:2,7,20 52:8 |
| 241:5 243:3 | 261:13,17 | 127:14,16 | 53:8,14 54:5 |
| 266:20 273:19 | **download** | 161:22 162:5 | 54:11 56:1,9 |
| 288:11 289:22 | 368:9 | 169:14 278:19 | 57:1,8 58:5,13 |
| 290:6,15,18 | **draft**  25:5 36:6 | 317:9 340:12 | 61:17 62:9 |
| 291:17 293:3 | 50:1 68:14 | 340:21 348:4,5 | 63:17 64:3,8 |
| 312:11 315:5 | 73:20 99:7,11 | 348:10 405:5 | 65:7,9,21 66:5 |
| 317:8,9 334:22 | 99:15 191:21 | **drop**  149:5 | 67:1,11,19 |
| 335:7 337:5,11 | 232:14 233:16 | 162:15 | 68:1,4,11 69:8 |
| 338:17,19 | 266:4 320:11 | **due**  96:5 326:5 | 69:18 70:7,20 |
| 340:18,19,20 | 323:19 325:8 | **duly**  136:6 | 71:5,11,21 |
| 340:22 341:6 | 325:15,17,19 | 465:5 | 72:11 73:4,11 |
| 341:13,15,17 | 327:8 328:7,19 | **durham**  2:3 8:4 | 73:17 74:7,15 |
| 341:18 342:3,6 | 328:22 329:4 | 8:7 11:4,12 | 74:20,21 77:10 |
| 342:9 347:14 | 329:16,16 | 13:10 16:10 | 78:8,16 79:19 |
| 388:7,12,13 | 330:3,17 | 17:9,17 19:2,6 | 80:15 81:21 |
| 389:4 410:8 | 350:17 408:19 | 19:10 21:6 | 83:10,20 84:10 |
| 423:4,21 424:9 | 423:14 436:6 | 22:2,11 23:3 | 85:3,15 86:7 |
| 460:5 | 437:9 | 23:15 24:14 | 87:8 88:6,21 |
| **doing**  150:7,11 | **drafted**  192:2 | 25:3,14 26:3 | 89:21 91:3,11 |
| 172:10 173:9 | 354:15 423:1 | 26:13,20 27:4 | 91:19 92:1,8 |
| 174:10 175:15 | **drafting**  185:22 | 28:7,16 29:5 | 93:1,4,6,20,22 |
| 247:12 258:9 | 189:17 190:5 | 29:20 31:4,9 | 94:4 95:3,9,20 |
| 258:11 275:21 | 190:12,15 | 32:15,17,19 | 96:2 98:12,18 |
| 344:12 346:12 | 191:2 194:13 | 33:10 34:10,21 | 99:12 100:20 |
| 384:4,17 385:1 | 233:11 316:12 | 35:5 36:5,16 | 101:12,19 |
| 385:6 | 317:1 331:13 | 37:6,21 38:9 | 102:19 103:9 |
| **doj**  157:19 | **drafts**  232:16 | 38:21 39:7,15 | 103:16,20,21 |
| 426:19 | 265:12,16 | 39:21 40:9,16 | 105:8,10 107:2 |
| **don**  20:10,11 | **dragged**  161:3 | 41:1,3,5 42:11 | 108:3,16,22 |
| 20:15 209:20 | 162:18 | 43:1 44:12,18 | 109:21 110:4 |

| | | | |
|---|---|---|---|
| 110:12 111:22 | 173:11,22 | 235:16,21 | 388:21 389:6,8 |
| 112:19 113:3 | 174:8 175:8,19 | 236:4,10 | 392:2,10 394:3 |
| 113:15 114:14 | 176:17 177:9 | 240:17 241:7 | 394:21 395:9 |
| 114:22 116:21 | 178:4,6,8,15,17 | 243:4 244:5,13 | 395:18 398:6 |
| 119:5,10 122:4 | 178:21 179:1,4 | 246:16 249:8 | 399:2,9 400:18 |
| 122:11,16 | 179:8,11,15,16 | 249:20 254:3 | 402:19 403:8 |
| 123:2,10,14,18 | 180:5,21 | 255:5 256:5,13 | 406:2,6,8,11 |
| 124:4,22 125:6 | 182:15 183:2,9 | 257:5 258:18 | 409:2,10,14,20 |
| 125:10,14,18 | 183:16,19 | 259:3,16 | 410:3,12 |
| 126:3,9,19 | 184:4,10,11 | 265:16 272:1,4 | 411:12,18 |
| 127:1,5,9,20 | 186:2,20 | 275:2,9 276:11 | 412:10 413:3,5 |
| 128:2,20 129:2 | 188:14 189:22 | 278:7 284:21 | 414:22 415:6 |
| 129:14,18,22 | 190:19 193:16 | 287:22 288:19 | 415:14 416:3 |
| 130:4,8,12,16 | 196:5,14 197:8 | 289:5,11,17 | 416:14 417:16 |
| 131:12 132:1,5 | 197:19 198:14 | 290:1 291:8,14 | 417:18 418:6 |
| 132:9,13 133:6 | 198:21 199:12 | 293:6 296:2 | 418:22 419:6 |
| 133:14 134:1 | 199:16 200:16 | 299:3,19 | 419:11,17,22 |
| 134:12,21 | 202:6 203:14 | 301:19 302:1 | 420:15,20 |
| 136:13,20 | 204:9,20 | 302:13 305:14 | 421:8,18 422:2 |
| 137:2,15 139:1 | 206:14,21 | 307:1 310:6 | 422:15,21 |
| 141:9,13,15,16 | 207:15 208:17 | 311:6 314:21 | 423:8,15 424:5 |
| 142:3,16 144:1 | 210:16 211:21 | 317:22 319:6 | 424:14 425:6 |
| 144:6 149:8 | 213:3 214:7,20 | 320:17 322:7 | 425:16 427:5 |
| 150:9 151:4,15 | 215:17 216:11 | 333:8 339:5,17 | 428:2 429:2,13 |
| 151:21 152:5 | 216:13 218:7 | 342:19 343:6 | 430:15 431:5 |
| 152:11,16,22 | 218:19 220:14 | 343:12 346:22 | 431:22 432:11 |
| 153:7 154:8,14 | 221:1,17 | 347:6,13 350:1 | 433:8,17,22 |
| 154:21 155:8 | 222:10,19 | 358:1,8,14,17 | 434:1 435:4,11 |
| 156:2,9,14,20 | 223:2 224:2,18 | 359:10,17 | 435:19 436:13 |
| 157:4 158:18 | 225:6,12 226:5 | 360:3,5,16 | 436:17 437:4 |
| 159:4,6 163:3 | 227:12,15 | 361:16,22 | 437:16 438:4 |
| 166:12 168:3 | 229:8 230:19 | 363:15 365:12 | 438:22 439:10 |
| 168:12,22 | 231:22 232:11 | 369:13 371:11 | 439:18 440:15 |
| 169:9 170:5 | 233:14 234:4 | 372:14 373:11 | 441:7,13,19 |
| 172:19 173:3 | 234:13 235:9 | 376:3 379:17 | 442:5,6,9,19 |

443:19 444:3
444:18 445:6
445:19 446:4
446:10,21
447:8,17 448:5
448:11,21
449:5,11,13
450:1 452:2,8
453:11 454:4
455:10,17,22
456:4,8,13,18
457:1,6,11,16
457:21 458:4,9
458:14,22
459:4,9,14,21
460:21 461:2
461:10,22
462:8,15
467:12,19
**durham's**
122:2
**dustin**　56:13
59:22 61:14
82:22 84:12,17
313:19
**duty**　286:7
344:18
**dwell**　357:15
**dynamic**　148:4
149:9 349:14

**e**

**e**　2:1,1,18 3:1
3:11,18,20 4:4
4:8,9 5:2 7:1,1
33:16 52:12

55:8 56:12,12
56:18 57:3,10
57:13,18 58:1
58:7,14,15
59:20 60:15
61:7,18 62:3
63:13,19 64:15
64:19 66:13
74:22 75:4
77:2 78:1 80:9
80:18 81:4,6,8
81:14,15 82:21
83:7,14,19
84:18 85:12,19
103:22 104:15
106:2 108:6,10
108:19 109:3
116:1 119:12
119:15,20
120:22 121:2
121:13,15,19
133:7 136:1,1
139:5 155:17
156:22 166:14
166:15 226:9
227:17,21
229:2,4 230:9
230:12,14
231:12,17
232:4 239:16
239:18,19
241:20,22
243:18 244:1,4
244:12,16,19
245:6,9,15

247:22 248:9
250:20 252:6
252:12,18
254:18 262:21
263:17 269:17
272:18 296:16
296:19 306:3
309:18 314:4
314:11,16
315:10,11
322:3,12,18
323:18 327:7
327:19 328:8
336:9 338:21
339:1,9,19
340:5 341:9,9
350:12,15
351:7 352:3
386:8 391:14
391:21 396:20
396:22 402:1
403:1 407:9
413:6,11,15
414:2,8,8,16,17
415:2,8,10
417:4 419:3,13
420:16 422:7
425:22 434:2,3
434:5 443:3
445:13,14,20
445:21 466:1,1
466:1,2,2
467:1 468:4,4
468:4

**earlier**　9:4 30:8
41:7 50:10
94:17 101:3
131:14 175:20
179:17 181:16
206:1 207:11
207:18 227:2
253:16 268:19
306:7 349:15
377:21 388:11
416:19 428:18
433:3
**earliest**　56:11
**early**　314:17
318:16 325:8
333:6
**ears**　212:2,10
**easier**　231:6,16
381:18
**easy**　245:9
**ed**　4:12 350:17
352:7 353:2,6
353:10,13
354:7,12,15,17
436:7 437:10
437:13 441:8
441:14,14
**edit**　192:14
**education**　10:5
**edward**　395:12
**eeo**　19:18
212:16,20
**effect**　31:2
147:15 451:16
463:6,9

| | | | |
|---|---|---|---|
| **effort**  164:10 | **elevated**  48:22 | 465:14 | 426:18 |
| **efforts**  427:11 | 49:3,6,16,18 | **employee**  16:6 | **entity**  226:2,2 |
| **eight**  14:21 | 50:11 75:18 | 99:22 100:11 | **eocop**  14:22 |
| 21:21 26:5 | 94:6,18 102:14 | 105:6 172:10 | 15:5,8 22:6,14 |
| 193:4 196:18 | 102:16 134:4 | 173:16 270:22 | 22:19 23:6 |
| 197:15,20 | 155:20 177:4 | 341:8,16 | 25:6 27:1,17 |
| 209:11 214:12 | 181:1 428:19 | 362:18 420:5 | 27:22 28:1,1,6 |
| 230:6 273:18 | 429:15 430:22 | 420:22 465:13 | 28:12 29:1,8 |
| 370:15 | **elevating**  22:5 | **employees**  97:2 | 34:22 35:19 |
| **eighteen**  93:19 | 26:22 39:2,10 | 100:14 303:20 | 36:12 38:2 |
| **either**  63:13 | **elevation**  27:18 | 385:11 420:8 | 39:9 42:4,6,6 |
| 81:16 123:4 | 38:1 156:5,16 | **employer's** | 46:3,9,14,20 |
| 155:7 266:18 | 175:21 349:6 | 139:16 | 47:5,14 48:17 |
| 283:19 347:15 | 461:13 | **employment** | 50:1,11 63:14 |
| 375:7,15 | **elevations** | 137:5 138:16 | 63:22 67:6 |
| 382:19 405:18 | 156:11 | 139:14,17 | 68:14 75:14 |
| 422:17 460:12 | **eleven**  370:15 | 219:13,18 | 79:13 86:17 |
| **elaborate**  81:7 | 379:1 | **enclosed**  467:5 | 89:12 91:13 |
| 150:13 | **elizabeth** | **encouraged** | 94:7,17 99:7 |
| **elaine**  62:14 | 209:19 | 299:1 | 102:16 103:4 |
| **elderly**  334:22 | **embarrassing** | **ended**  82:5 | 103:13 106:16 |
| **elected**  24:22 | 66:12,14 67:13 | 100:9,15 | 122:5 124:16 |
| 27:10 | 67:17 305:18 | 326:14 406:20 | 125:2 133:2,8 |
| **electronic**  87:5 | 432:19 | 407:7 | 133:15,19 |
| 231:8 281:1 | **emily**  48:8 | **ends**  68:6 135:1 | 134:4 141:21 |
| **electronically** | 96:20 101:7 | 183:21 265:5 | 151:10 155:20 |
| 87:11 405:1,2 | 205:20 217:20 | 331:6 464:10 | 156:5,11 |
| 405:3 | 254:9,9,10,10 | **enforcement** | 168:14 176:12 |
| **element**  202:20 | 303:19 326:21 | 12:15 221:11 | 177:4,17 |
| **elevate**  22:18 | 432:15 | **engage**  172:14 | 180:17 181:2 |
| 23:6 29:8 | **emily's**  254:11 | **entire**  20:22 | 193:7 194:2 |
| 48:16 50:12 | **employed** | 117:8 199:7 | 195:9,16,20 |
| 75:14 95:5 | 10:14 13:1 | 292:14 | 408:18 409:16 |
| 180:17 | 33:21 114:16 | **entitled**  301:17 | 409:21 410:4 |
| | 133:10 465:11 | 301:22 302:11 | 411:9,14 412:4 |

412:7 418:8
419:14 430:22
432:16 450:12
460:12
**eopoc** 131:19
**equity** 2:15
**equivalents**
307:3
**eric** 42:19
47:17 138:5
166:15 180:1
205:7 217:2
248:22 254:7
255:12,15
282:18 307:10
337:20 362:7
363:1 364:6
383:17 385:20
386:3 389:18
390:1 397:2
407:9 443:2
**errata** 466:9
467:11
**escalation**
27:18
**escorts** 76:15
**especially**
163:21
**esquire** 2:3,3,4
2:4,5,8,12,12
2:13,13,18,21
2:22 467:1,19
467:20
**established**
36:20 114:15

**estate** 334:22
**estimate**
126:13 215:15
235:5,15 295:7
295:22 296:4
297:20 298:2
**et** 77:4
**eup** 82:7
**evaluate** 440:3
**evaluation**
151:2
**evan** 55:13
245:3,5,17
247:14 254:7,8
415:15,18
**evans** 183:5
288:8 289:3,3
289:7
**evening** 159:22
344:9
**event** 253:1,8
309:5
**events** 155:12
191:4 233:12
426:12
**eventually**
354:10 355:19
356:1
**evidence** 108:7
**evidenced**
143:14
**evidences**
108:11
**exact** 147:15
211:19 221:6

408:2 451:18
453:22,22
**exactly** 147:6
168:9 352:13
451:1,12,17
452:11,22
**exam** 388:17
389:15
**examination**
3:2 8:3 136:5
136:11 184:6
237:3 405:22
450:8 459:19
462:22 463:4
**examined** 8:1
136:6 466:5
**example** 60:15
133:1 140:7,11
140:18 177:12
284:11 375:18
411:1
**examples** 24:17
156:10 157:1
205:3 375:17
**exceeds** 151:5
**excel** 100:2
**except** 341:3
**exception**
410:6
**exceptionally**
151:5
**excerpt** 3:12,16
88:10 137:20
**excess** 300:5

**exchange**
169:20 170:1
171:4 319:20
362:14 366:19
369:22 374:13
376:13 382:3
385:19
**excited** 112:20
**exclude** 178:12
179:6 291:5
**excluding**
178:10
**excuse** 282:3
**executive** 15:1
35:18 194:4
**exempt** 300:12
300:13,16
301:8,14
**exempted**
301:12
**exemption**
66:10,18 67:7
118:12,14
141:20 300:22
301:3,4,5,18
302:3,7,12
**exempts** 141:21
**exercise** 310:17
312:7
**exhaustive**
156:16
**exhibit** 3:12,16
11:1,2,10,14
15:22 16:12
33:15 38:12

| | | | |
|---|---|---|---|
| 40:18,20,21 | 193:1,6,10 | 395:21 396:3,3 | 107:10 112:11 |
| 47:2 54:13 | 194:1 196:10 | 406:4,9 407:20 | 124:15 126:4 |
| 56:2,11 59:19 | 198:4 243:16 | 408:1,5,8 | 131:9 167:19 |
| 64:5,6 69:4 | 243:17 244:10 | 412:11 413:16 | 168:6 195:10 |
| 73:13 74:17 | 245:16 247:20 | 413:19 414:3 | 207:21 214:3 |
| 80:16 82:1 | 247:21 251:15 | 416:10,15 | 275:5 291:6 |
| 85:13,17 87:18 | 251:21 252:4 | 417:3,16 | 296:10 402:9 |
| 87:20 88:4,8 | 259:20 263:15 | 419:19 422:10 | 409:11,15 |
| 89:5 91:15 | 263:16 267:6,8 | 425:18 431:6,7 | 440:11 449:19 |
| 93:3,7,20 | 269:8 270:3 | 432:9 433:15 | **experienced** |
| 96:16,18 | 271:6 282:17 | 433:19,21 | 17:19 |
| 100:17,18 | 287:19,21 | 436:10,15 | **experiencing** |
| 102:2,5 103:18 | 292:21 296:15 | 437:6,9 438:16 | 175:2 |
| 105:18 106:2 | 296:15 303:18 | 442:7,8,10 | **expert**  447:6,12 |
| 106:12 108:6 | 303:18 305:22 | 444:19 450:14 | 447:16,18,20 |
| 109:2 111:17 | 307:17 309:18 | **exhibits**   3:7 4:1 | 447:21,21 |
| 113:11,12,17 | 318:9 319:15 | 4:7 5:1 6:22 | **expires**   465:21 |
| 114:19 119:12 | 321:20 322:2,3 | 117:15 318:7 | **explain**   29:14 |
| 121:13 122:8 | 324:5 327:2,6 | 320:7 | 123:19 148:22 |
| 136:16 137:13 | 327:6 328:14 | **exist**   58:9 | 192:9 198:12 |
| 137:17,20 | 334:2,6,8 | 444:13 | 198:20 271:16 |
| 138:21 139:4 | 335:6 350:20 | **existed**   36:21 | **explained** |
| 139:10,11 | 351:2,7 362:1 | 209:14 282:4 | 26:14,16 |
| 141:11 142:19 | 362:5,13 | 408:20 | 197:21 198:16 |
| 142:20 143:14 | 366:14,18,18 | **existence**   189:4 | **explaining**   26:6 |
| 143:17 152:18 | 368:22 369:4,5 | **expand**   326:2 | **express**   88:13 |
| 157:9 159:1,1 | 369:8,10,18,21 | **expect**   259:11 | 88:14,16 |
| 159:2,4,5,12 | 369:22 374:8 | **expectations** | 137:21 156:21 |
| 162:21,22 | 374:12,12 | 26:17 151:6 | 180:8 269:5 |
| 163:1,5 164:16 | 376:9,12,13 | **expected**   40:12 | 272:17 275:13 |
| 166:10,14 | 378:4,7,19 | 212:1 276:3 | 277:9,13,16 |
| 170:3,7 178:18 | 379:2,3 381:21 | 438:6,7 | 278:18 279:1,5 |
| 179:10 180:6 | 382:2 385:14 | **experience** | 279:12 280:4,8 |
| 189:14 191:16 | 385:18 391:9 | 46:19 54:8 | 280:18 446:17 |
| 191:18,21 | 391:13,13 | 83:5,13 84:15 | 447:3 |

**[expressed - final]**                                      Page 29

**expressed**
349:20
**expressing**
448:13
**extant** 115:17
115:17
**extended** 166:2
**extension** 45:4
238:10
**extent** 246:17
347:1,6,10,13
347:17
**external** 434:13
434:18
**extra** 45:7,12
45:16
**extract** 339:22
**extracted** 88:13
**extremely**
418:20
**eye** 1:21 468:1
**eyes** 212:2,10
434:19

**f**

**f** 136:1 337:19
402:1 403:1
466:2
**face** 426:8
435:1 463:18
**fact** 87:3
107:11 108:7
108:11 352:9
376:18 399:16
410:22

**factual** 406:17
438:21
**failed** 402:3
**fair** 191:12
193:8 209:11
213:10 215:15
215:18 219:21
221:16 237:19
238:21,22
240:11 244:11
247:5 272:7
276:10 289:14
293:4 311:22
314:7 345:21
352:6 360:2
365:11,13
369:16 372:2
373:16 384:22
402:12 414:13
**fairly** 275:6
**faith** 149:22
150:8
**fall** 90:14 148:2
**falling** 214:19
**false** 158:15
173:16,17,20
**familiar** 109:18
112:13 267:3
281:17 297:13
364:19
**fan** 356:13,14
364:16,17,18
**far** 287:14
432:21

**fascinating**
430:1
**fast** 263:3
**favorably**
365:8,11,17,19
**faxed** 141:3
**fbi** 76:12 77:3
77:19
**fear** 256:8,12
**february**
186:19 187:3,5
314:18 331:18
346:18 434:2,9
464:6
**federal** 10:15
10:20 334:16
335:2
**fee** 90:1,6,9,15
91:1,4,13
126:5 222:18
223:1,6 300:5
300:14,16,18
303:9
**feedback** 34:11
82:17 150:20
281:4 313:2
**feel** 18:9,13
148:14 172:1
**feeling** 21:19
171:8
**feelings** 407:13
448:7,13 449:1
449:7
**fees** 90:12
223:12 299:2

301:8 302:8,12
**fell** 91:9
**felt** 21:11 69:17
131:6 145:12
145:15 212:4,5
318:22 358:2
407:20
**field** 279:1,5
**fields** 97:22
98:4 100:3
**fieselmann**
434:4,9 435:6
**fifth** 98:21
**fight** 371:1
405:18
**figure** 116:16
183:10
**figured** 161:3
162:18
**file** 116:7
347:15
**filed** 7:8 15:18
16:14 20:4
64:20 97:6
111:8 161:9,14
161:16 186:18
186:19 187:11
326:6 346:8
**files** 424:20
**filing** 161:11
**filled** 328:16
**final** 41:8,13
99:1 110:20
111:5 114:4
132:15 324:5

324:22 325:6
328:21 329:10
329:16 330:22
381:2
**finally**  99:6
**financially**
465:15
**find**  199:6
218:22 244:20
290:19 371:19
377:19 379:19
467:5
**fine**  67:22
258:20 373:1
**finish**  126:16
321:14,16
376:22,22
439:21
**finished**  190:10
321:16 327:13
327:21
**finishing**
382:17
**fired**  428:12
**first**  4:2 8:13
19:12 29:11
30:6 36:13
62:11 63:3
65:5,6 75:4
77:17 89:1
94:9 97:1,2,8
99:10,15 104:6
110:14 115:1
119:20 124:19
162:15 166:20

170:18 182:18
185:4 197:22
209:9 215:1
224:21 246:5
246:22 251:1
259:21 260:5
292:11 300:4
303:19 322:18
325:5,17
328:14 331:20
332:1 334:10
336:3,6 344:16
345:10 351:6
354:9 360:21
364:3 382:12
399:18 446:16
447:3,10 448:2
448:17
**firsthand**  9:17
17:19
**five**  18:21
183:18,19
189:18,19
208:21 209:9
209:13 210:12
210:14 215:11
233:7,8 289:15
297:4,8 321:10
341:4 344:21
370:15 404:6
406:15
**fixed**  277:5
**flack**  3:20 5:2
42:19 47:17
138:5 142:5

166:16 167:6
180:1,15 205:7
215:21 216:8
217:2 248:22
254:7 255:12
255:15,21
256:15 257:8
257:12,16,19
258:10,15
259:15 282:18
282:20 307:10
337:20 362:7,9
362:14 363:1,6
364:6,16,19
365:11,17,19
365:20 366:20
367:1,5,7
369:11,15
370:1,3 371:4
371:7,10,15
372:7,12 374:2
374:4,6 377:22
382:3 383:17
385:20 386:3
389:18 390:1
390:15 391:1
391:14,17,21
392:8,15 393:6
394:2,10 397:2
397:16,20
398:3,10,12
400:16,16
402:3 404:22
407:9 443:2
446:12

**flack's**  139:22
141:18 166:20
364:11,20
365:3,6 394:18
**flag**  62:20
103:1,3,8,12
214:14 246:13
247:14 249:3
251:16 261:16
263:6 264:7
418:7,13
434:11,18
435:7
**flagged**  47:4,14
62:13 63:3
68:14 70:22
71:4 72:7
197:6 199:10
216:5,9,15
217:1,3,4
218:3,6,15
219:1 247:8
248:19 249:6
250:20 253:4
260:13 261:10
261:14 262:20
416:4 418:14
418:14 419:1
419:14 434:12
**flagging**  109:22
110:8 198:5
218:17
**fleurmont**  2:4
**flip**  140:6 250:5
306:2 320:6

| | | | |
|---|---|---|---|
| **floating** 397:7 | 73:7,18 74:3 | 177:5 179:18 | 255:18 257:13 |
| 397:12,13 | 74:10 76:21 | 180:8 188:10 | 257:16,19,22 |
| **florida** 328:5 | 77:6 79:2,11 | 188:13,22 | 258:10,15 |
| **focus** 70:3,14 | 80:19 81:3,17 | 190:18 191:5 | 259:1,1 263:1 |
| 171:4 | 82:7 83:5,17 | 191:22 192:10 | 263:2 265:13 |
| **focused** 54:7 | 83:18,22 84:19 | 192:12 195:11 | 266:3,11 |
| 69:11,15 70:9 | 86:4,17 87:9 | 195:11,18 | 268:17 269:4 |
| **foia** 3:15,18,18 | 87:10,18,19 | 196:16 197:22 | 271:8,10,20 |
| 6:12 8:18 | 88:1,13,14,16 | 198:11,20 | 272:8,15,15,17 |
| 13:18,21 14:4 | 88:17 89:2,4 | 199:14 200:13 | 272:20,21 |
| 14:6,9,13,14,16 | 89:11 90:12 | 201:13 202:13 | 273:9,10,18 |
| 14:17,20 15:2 | 91:9 93:7 99:3 | 203:11 204:8 | 274:1,4,6 |
| 15:11 17:4,12 | 99:6 100:21 | 204:13,18 | 275:11,12,13 |
| 17:20 18:16,17 | 106:6 107:10 | 205:6,10,16 | 276:4 277:9,13 |
| 19:12,19 20:3 | 107:15 109:5,5 | 207:12,19,22 | 277:16 278:15 |
| 20:7,8,15,18 | 109:9,10,17 | 208:3,11 209:3 | 278:18 279:1,3 |
| 21:1,14 22:4 | 110:7 113:21 | 209:5,10,14,17 | 279:5,11,17,22 |
| 23:21 27:6,8 | 118:11,14 | 209:21,22 | 280:3,8,10,14 |
| 27:16,20 28:2 | 120:4 124:15 | 210:4,6,9,14,20 | 280:18 281:15 |
| 28:9 29:1,11 | 124:16 125:1,3 | 211:1,3,6 | 282:5,15 |
| 30:12 33:21 | 126:5,6 131:17 | 212:10 222:16 | 283:12 285:7 |
| 34:4 35:20 | 131:20 133:2 | 222:22 224:16 | 290:8,12 |
| 36:21,22 41:12 | 133:11 134:2 | 225:2,3 226:11 | 291:18 293:3 |
| 41:15 42:6,12 | 137:9,21 138:2 | 226:18 228:2 | 294:5 296:10 |
| 43:22 44:1,6 | 139:8,8,13,21 | 228:13,17 | 297:17,19,22 |
| 44:20,22 46:4 | 141:21 143:13 | 230:5,18 231:6 | 298:6,16,22 |
| 46:4 48:16 | 151:10 155:21 | 232:5 235:13 | 299:8,9,13,22 |
| 50:2,13 54:2 | 156:21 157:6 | 236:18 237:5 | 300:1,11,20 |
| 55:18,21 56:20 | 158:3 160:20 | 237:18 238:5,6 | 301:18 303:1 |
| 57:3,5,22 60:3 | 163:14,20 | 238:12,17 | 309:6 324:14 |
| 60:9 64:14 | 164:21 165:9 | 240:2,7 242:9 | 324:17 326:5 |
| 66:1 68:13 | 165:18 166:21 | 245:16 248:13 | 332:6,9,11,15 |
| 69:16,19,20 | 167:7,8,21 | 252:15 253:7 | 333:5,7 343:9 |
| 70:3 71:17 | 168:15 169:6 | 253:11,17,18 | 349:19 351:10 |
| 72:6,7,15,20 | 170:12 175:4 | 254:2,14,15,17 | 353:17 354:3,6 |

| | | | |
|---|---|---|---|
| 356:2 373:22 | **force**   43:13 | 70:18 71:2,9 | 136:18,22 |
| 377:6,12,17,22 | 169:11 177:13 | 71:19 72:9 | 139:14,16 |
| 378:11,15,17 | **foregoing** | 73:2,9,15 74:4 | 140:16 142:1 |
| 380:10 409:6 | 465:3,5 466:5 | 77:8 78:6 | 142:14 143:21 |
| 410:6,7,8 | **forgive**   254:8 | 80:13 81:19 | 144:4 148:16 |
| 411:8,13 412:1 | **forgot**   82:7 | 83:8,15 84:7 | 150:2,22 |
| 412:3,6 420:9 | 197:11 | 84:21 85:7 | 151:13,19 |
| 421:12 423:11 | **forgotten** | 87:6 88:20 | 152:3,9,14,20 |
| 431:18 432:2,5 | 197:10 | 89:16 90:20 | 153:5 154:6,12 |
| 439:12,15 | **form**   13:8 16:8 | 91:6,17,21 | 154:19 155:3 |
| 442:16 443:5 | 17:5,14 18:22 | 92:6,21 94:2 | 155:22 157:2 |
| 443:10 452:11 | 19:4,8 21:4,22 | 95:1,7,18,22 | 158:16 168:1,7 |
| 453:7 461:14 | 22:7,20 23:8 | 98:9,16 99:8 | 168:17 169:8 |
| 461:17 | 24:12,20 25:8 | 101:8,17 | 172:18 173:1,6 |
| **foiaed**   81:10 | 25:20 26:12,19 | 102:17 103:5 | 173:19 174:6 |
| **foias**   3:11 | 27:2 28:3,14 | 103:14 106:17 | 175:7,18 |
| 54:19 58:16 | 29:3,18 30:19 | 107:16 108:14 | 176:15 177:7 |
| 64:19 86:2 | 31:7 32:10 | 108:20 109:19 | 177:20 180:3 |
| 321:8 | 35:3 36:4,14 | 110:3,10 | 180:19 182:12 |
| **folks**   429:12 | 37:2 38:5,19 | 111:20 113:1 | 182:22 183:7 |
| **follow**   40:13 | 39:4,13,19 | 113:13 116:19 | 186:2,20 |
| 125:2 130:21 | 40:6,14 42:8 | 119:3,8 122:14 | 188:14 189:7 |
| 285:2 287:10 | 42:21 44:10,16 | 122:22 123:8 | 189:22 190:19 |
| 309:5 | 45:2,18,21 | 123:12,16 | 193:16 194:11 |
| **followed**   95:16 | 46:6,11,16,21 | 124:2,18 125:4 | 196:5 197:8,18 |
| 287:12 | 47:9,15 48:18 | 125:8,12,16 | 197:19 198:14 |
| **following**   169:3 | 49:4 50:6,22 | 126:1,7,12,21 | 198:21 199:12 |
| 337:15 387:13 | 51:5,15 52:7 | 127:3,7,18,22 | 199:16 200:16 |
| 414:17 | 53:5,12 54:3,9 | 128:18,22 | 202:6 203:14 |
| **follows**   8:2 | 55:19 56:7,21 | 129:12,16,20 | 204:9,20 |
| 41:6 136:7 | 57:6 58:3,10 | 130:2,6,10,14 | 206:14,21 |
| 209:11 | 62:7 63:15 | 131:10 132:3,7 | 207:15 210:16 |
| **footage**   116:6 | 64:1 65:18 | 132:11 133:4 | 211:21 213:3 |
| 130:18 131:3,8 | 66:3,22 67:9 | 133:12,21 | 214:7,8,20 |
| 131:15,18 | 69:7,13 70:5 | 134:5,19 | 215:17 216:11 |

| | | | |
|---|---|---|---|
| 218:7,19 | 342:19 343:6 | 440:13 441:5 | **forwarding** |
| 220:13,14 | 343:12 350:1 | 441:11,17 | 121:13 |
| 221:1,17 | 358:1,8,14 | 442:1,17 | **forwards** 64:16 |
| 222:10,19 | 359:10,17 | 443:13 444:2 | **found** 163:20 |
| 223:2 224:2,18 | 360:6,16 | 444:16 445:16 | 371:18 372:1 |
| 225:6,12 226:5 | 363:15 365:12 | 446:2,8,18 | **foundation** |
| 227:12 229:8,9 | 369:14 372:14 | 447:5,11 448:3 | 455:17 456:4,8 |
| 230:19 231:2 | 372:22 376:3,4 | 448:8,19 449:2 | 456:13,18 |
| 231:22 232:11 | 379:17 388:21 | 449:8,20 452:2 | 457:1,6,11,16 |
| 233:14 234:4 | 389:6,7 392:2 | 452:8 453:11 | 457:21 458:4,9 |
| 234:13 235:9 | 392:10 394:3 | 455:18 456:5,9 | 458:14,22 |
| 235:16,21 | 394:21 395:9 | 456:14,19 | 459:4,9,14 |
| 236:4,10 | 395:18 398:6 | 457:2,7,12,17 | 461:20 462:6 |
| 240:17 241:7 | 399:2,8,10 | 457:22 458:5 | **four** 18:19 |
| 243:4 244:5,13 | 400:18 402:19 | 458:10,15 | 105:21 106:13 |
| 249:8,20 254:3 | 402:21 403:8,9 | 459:1,5,10,15 | 107:7,12,13 |
| 255:5 256:5,13 | 408:22 409:8 | 460:17 461:8 | 108:8,12 117:9 |
| 257:5 258:17 | 409:12,18 | 461:19 462:5 | 178:19 189:18 |
| 258:18 259:3 | 410:10 411:10 | 462:12 | 189:19 233:6 |
| 259:16 269:1,7 | 412:8 414:19 | **formal** 150:19 | 237:9,10,11 |
| 269:9,12,16 | 415:4,12,20 | 344:16 346:8 | 248:19 273:19 |
| 272:4 275:2,9 | 418:4,10 419:4 | **format** 250:5 | 273:19 274:6 |
| 276:11 278:7 | 419:9,15,20 | **former** 16:6 | 274:10 289:15 |
| 284:5,21 287:1 | 420:12,18 | 105:6 153:20 | 321:10 337:10 |
| 288:19 289:5 | 421:4,5,14,21 | 388:19 389:3 | 344:21 370:14 |
| 289:11,17 | 422:11,19 | 391:18 406:19 | 440:16 449:19 |
| 290:1,9 291:8 | 423:6,12 424:2 | 428:11 | **fourth** 35:13 |
| 291:14 293:6 | 424:12 425:4 | **forms** 138:12 | 250:7,16 251:4 |
| 296:2 299:3,19 | 425:13 427:3 | 138:15,15 | 264:13 382:7 |
| 301:19 302:14 | 428:22 429:6 | **forth** 99:10 | **fox** 264:16,18 |
| 305:14 307:1 | 430:13 431:3 | 100:8 162:9 | **frame** 238:14 |
| 310:6 311:6 | 431:20 433:13 | 303:7 | 238:18 276:16 |
| 314:21 317:22 | 435:2,9,17 | **forward** 121:19 | 332:12 |
| 319:6 320:17 | 437:21 438:19 | 336:10 353:8 | **framed** 240:15 |
| 333:8 339:5,17 | 439:8,13 | 467:11 | |

**free** 43:13
347:22 382:22
**friday** 82:7
322:19 327:11
**friend** 188:4
343:22 362:9
362:11,12
382:22
**frisk** 50:19 63:4
63:6 177:12
221:21 307:12
307:13 309:9
309:13 310:7
310:12 311:9
314:14 434:6
435:8
**frisked** 311:11
**frisking** 310:9
**front** 87:19
126:14 191:16
283:4 413:17
436:16
**frustrated**
258:6
**fulfill** 345:20
**full** 8:10 119:22
164:1,7 229:16
230:2 344:17
**funny** 172:2
**further** 136:7
405:22 450:8
459:19 462:15
465:12
**future** 81:16
429:11,12

**g**

**g** 7:1 127:16
338:1,2 466:1
**gamble** 284:6,7
287:5,11
**games** 65:3,10
66:19
**gamse** 2:4
184:19 461:1
**garage** 388:6,8
**gay** 456:12
**general** 2:14
76:9 90:18
129:6 162:11
285:9 301:14
302:19 329:6
329:12,21
330:4,14,17
342:4,12,18
343:2,10,15
387:22 388:20
427:14
**general's**
157:19 162:10
426:19 463:4
**generally** 48:17
109:18 193:3
193:19 209:10
221:13 271:8
293:12 294:22
296:11 297:14
364:15 368:5
**generating**
213:8

**genital** 428:13
**gerstein** 2:8,9
184:22 185:4,8
186:11
**getting** 79:10
86:16 106:19
328:15 364:3
385:10 394:16
430:4
**girlfriend**
145:13,17
**give** 10:2 23:5
37:4 52:9 73:6
100:5 111:15
143:18 161:1
163:16 235:15
241:21 242:22
243:2 269:21
274:13,15
275:17 278:11
281:7 310:11
313:2 347:22
363:14,16
432:14 435:5
450:16 463:7
**given** 80:11
84:15 102:20
107:9,10
111:11 112:10
124:10 144:7
144:10 153:20
154:16 192:5,8
220:11,22
223:8 242:10
273:8 305:8

357:4 397:17
422:9 431:8
465:9 466:7
**gives** 45:7
270:19
**giving** 79:16,20
100:15 104:19
446:5 447:19
**gmail.com**
467:2
**go** 20:14 24:3
29:13,15 38:12
39:22 47:2
51:3 56:2
61:13,20 68:16
68:22 80:3,6
80:16 86:13
92:19 102:2
104:20 111:14
111:17 113:19
114:3 134:7,17
140:21 141:6
142:8,22
143:17 149:7
152:17 155:7
194:15 196:21
200:8 201:1,7
201:14 205:1
213:21 218:22
228:9 229:12
239:22 241:17
271:5 275:7,15
275:22 276:16
277:9 278:19
280:22 284:4

**[go - guys]**

285:20 286:22
287:18 291:11
292:2,13,14
298:3 311:14
324:10 328:8
328:18 329:22
330:15 336:15
341:4 345:4,14
346:5 350:13
356:3 368:4
377:3 396:13
400:3,3 404:12
412:19 434:19
436:19,20
439:20,21
452:14 453:21
**goal**   311:21
**goes**   30:15
158:9 354:22
**goggins**   8:20,22
**going**   15:21
16:4 24:6,11
25:10,16,22
33:2 35:9
54:12 56:10
57:15 59:18
67:19,20 75:19
76:5 81:22
89:12 91:15
104:18 122:8
122:12 124:9
139:3 146:3,13
146:20 147:7
151:8 158:22
160:8,12,18

161:9 162:20
166:1 191:19
193:3 202:11
217:3 220:11
229:7,16
241:10,10
245:21 259:19
263:2 272:1
274:9 285:6
292:11 308:3
312:6 317:16
318:19 320:8
322:1 324:9
325:19 331:3
332:11,14
335:20 336:10
337:10 343:3
361:20 369:6,6
398:4 400:4,8
406:3 425:17
454:21 455:22
461:6
**good**   8:5,6
37:20 75:20
86:12 104:11
159:21 179:14
183:10 184:8
188:13 265:3
275:6 344:9
364:2 372:21
379:6 385:7
390:8,11,13,19
**goodness**
355:21

**google**   222:9
223:16,18
225:18 226:2
343:1
**googled**   223:11
**googling**   222:6
225:22
**gotten**   168:9
**government**
100:14 161:19
166:7,9 256:8
256:12,22
416:1 420:17
443:18 445:14
445:21
**government's**
100:13 239:17
**governors**
10:15
**granted**   90:6,9
90:16 91:5,8
**granting**   301:2
**great**   115:1
291:7 379:12
**greene**   48:1
205:20 215:22
217:14
**gregory**   345:13
345:14
**grievance**
344:16 346:8
346:14
**grieve**   344:20
**grooms**   209:8

**group**   270:19
292:16 435:7
**grown**   352:10
**gru**   206:8,12,20
220:11,16
**guess**   26:1
51:18,21 89:18
104:16 140:19
149:7 195:2,5
195:6 212:8
213:7 231:9
235:14 244:7
290:4 303:3
332:9 340:13
397:18
**guessing**   42:9
91:10
**guidance**   23:5
30:16 31:20
95:6 134:15
167:6 315:16
422:14
**guidelines**
279:10
**guiding**   438:8
**gun**   48:10,13
49:1,8 100:21
101:4 206:3,9
220:4
**guy**   379:7
**guys**   221:14
328:1

[h - hermann]                                                    Page 36

| h | | | |
|---|---|---|---|
| **h**  468:4 | 113:16 119:11 | 462:2,10 | 294:22 295:4 |
| **haiman**  354:19 | 121:12 137:16 | **happens**  68:15 | 295:15 316:18 |
| 355:2,4,7,11 | 137:19 139:2 | 297:16 425:1 | 317:3,12,15,19 |
| 356:6,9,15 | 163:4 164:15 | **happy**  164:2 | 318:3,19 319:9 |
| 357:20 358:6 | 166:13 170:6 | 327:12,20 | 331:17,19 |
| 359:14 360:13 | 376:12 433:18 | **hard**  87:4 | 424:18,20 |
| 361:4,10 | **handle**  73:7 | 172:3 231:2,7 | 425:1,10 428:4 |
| 400:15,21 | 79:18,21 | 340:12 405:1 | 428:10 |
| 401:2 402:3,7 | 277:21 287:6 | **harm**  440:8 | **hearings** |
| 402:13 403:5 | 345:16 | **harris**  233:21 | 116:12,17 |
| 403:10 404:21 | **handled**  79:17 | 234:3,11 | 182:1 207:10 |
| 407:13,14,19 | 145:9 147:12 | **harrow**  2:9 | 217:18 294:9 |
| 407:20 408:2 | 223:10 268:20 | **head**  14:16 | 294:17 427:9 |
| **haiman's** | 280:15 | 158:8 357:4 | 427:21 429:10 |
| 356:11 357:9 | **handling**  356:2 | 361:4,7 403:6 | **heidi**  313:21,22 |
| **half**  13:2 | 375:20 | **heading**  335:15 | 434:3 435:5 |
| **halfway**  86:6 | **hang**  325:13 | 379:13 | **held**  313:11 |
| **hamline**  10:12 | **happen**  261:21 | **headquarters** | 356:18,20 |
| **hand**  15:21 | 318:15 409:16 | 315:9 | 358:7 442:15 |
| 54:12 56:10 | **happened** | **heads**  161:2 | **hello**  344:15 |
| 59:18 162:20 | 58:12 84:5 | **health**  18:8 | 346:18 |
| 227:4 406:3 | 147:21 190:17 | **hear**  179:22 | **help**  164:2,20 |
| 425:17 | 190:18,18 | **heard**  118:16 | 165:12 167:17 |
| **handed**  16:1 | 191:4 229:5 | 147:20 221:10 | 221:15 345:1 |
| 82:2 179:5,9 | 247:13 284:19 | 247:3 271:13 | 377:1 429:12 |
| 180:6 | 287:4,7 294:17 | 317:5,6 318:21 | **helped**  379:15 |
| **handful**  229:1 | 302:17 310:9 | **hearing**  6:3,5 | 423:9 |
| **handing**  11:13 | 318:16 352:22 | 93:10 102:10 | **helping**  379:13 |
| 33:14 64:4 | 409:11,15 | 104:9 108:12 | 398:19 |
| 74:16 85:16 | 451:5 | 112:3 115:4,12 | **helps**  432:13 |
| 88:7 93:2 | **happening** | 115:16,18 | **herbach**  85:20 |
| 96:15,17 | 174:11 430:19 | 117:8,10 120:5 | 86:1 87:3 |
| 100:16 103:17 | 451:3,4,7,18,19 | 146:14,17,21 | **hereto**  465:15 |
| 106:1 109:1 | 452:1,7,13 | 147:6 161:18 | **hermann**  42:19 |
| | 453:4,5,19 | 207:2,13 | 55:7 181:13 |

182:19 254:12
292:21 293:13
293:21
**hesitate** 467:15
**hey** 158:1
159:17 367:1
370:4 434:10
**hi** 86:1 382:13
**hid** 161:19
317:9
**hidden** 161:21
390:13
**hide** 162:3
**hiding** 169:15
**high** 35:16
50:15 94:12
194:3,18,19,22
195:3,9,15,19
197:4 202:21
203:1,5,7,8
220:1,4 221:21
353:17,20
**highest** 10:5
147:16 151:2
**highlight** 58:16
59:1,10,14
60:19,20 61:2
61:7 63:8,12
63:18,21 103:1
103:3 226:21
227:9 245:2
325:22 414:10
415:15 417:19
417:22 422:7

**highlighted**
60:9,10,16,18
61:9,19 71:17
72:6 73:18
226:22 227:5
248:14 252:19
252:21 264:1
338:21 415:11
419:2,14
**highlighting**
62:2,13 226:12
252:1 322:8
325:19,20
415:2 422:8
**highlights**
244:21
**hillary** 456:12
**hiroko** 260:20
**history** 98:20
**hit** 292:11
**hmmmmm**
382:16
**hold** 297:6
355:14 357:20
358:7 423:22
424:10 452:18
454:14
**holiday** 4:4
**home** 159:22
328:5 340:10
369:11 388:16
**homicides**
249:15
**honestly**
356:18 364:9

**hope** 324:8
370:7
**hoped** 349:1
**hoping** 371:21
**hospital** 167:1
**hostile** 352:10
440:6
**hot** 22:22 23:11
30:21 31:15,16
31:17 59:16
194:21 429:20
**hour** 67:20
331:4
**hours** 178:1,3,5
178:6,7,19,22
179:1 189:16
190:2 214:2
321:10 418:20
450:5
**how's** 166:21
**hrom** 2:5
**huh** 122:10
178:11 209:2
281:12 359:8
361:19
**hundred** 236:2
236:12
**hundreds**
295:10,11
362:7
**hybrid** 229:18
**hyperlink**
157:21

**i**

**idea** 225:5
242:8 298:19
319:11,12,12
354:11 460:8
**identification**
11:3,11 64:7
85:14 88:5
100:19 137:14
138:22 163:2
166:11 170:4
321:21 327:3
334:3 350:21
362:2 366:15
369:1,19 374:9
376:10 378:5
381:22 385:15
391:10 395:22
406:10 433:16
**identified**
23:17 24:4,18
30:9 32:6,21
180:16 181:1
181:11 214:14
216:20 305:10
324:18
**identify** 23:19
30:17 31:20
157:1 406:17
**identities**
427:16
**identity** 52:15
53:16 54:1,7
**illegal** 332:11

**illegible** 283:19
**immediate**
  59:12
**immediately**
  277:19
**impact** 195:3
**implement**
  298:19
**implication**
  372:15,18
**improper**
  332:15
**inaccurate**
  148:14 319:1
**inadvertent**
  418:21
**inadvertently**
  414:21
**inappropriate**
  266:7
**inartful** 292:5
**incident** 41:20
  43:15,17 48:1
  48:3 63:5
  94:12 153:10
  166:22 202:22
  203:5,7,8
  274:18 277:18
  307:12 308:11
  309:10 310:3
  372:6,8 440:4
**incidents** 21:18
  145:6 346:20
**include** 39:1,9
  52:5 156:15

231:20 232:10
232:13,20
241:22 311:1
338:12 410:15
410:19 415:9
**included** 12:6,7
  12:12 104:5
  226:10 231:18
  415:3
**includes** 39:8
  198:18 215:21
**including** 341:8
  415:8
**income** 334:22
**incomplete**
  266:19
**incorrect** 95:6
  95:8,10 133:20
  133:22 411:2
**incorrectly**
  310:22
**increasingly**
  352:10
**index** 118:13
  118:20
**indicate** 99:2
  279:18 292:10
  369:14
**indicated**
  150:20
**indicates** 143:7
  300:5
**indicating**
  35:11 78:3

**indirectly** 15:7
**individual** 32:6
  32:21 201:21
**individual's**
  100:4
**individuals**
  27:9,20 30:9
  39:3,11 75:14
  94:10 154:17
  198:6,18 199:7
  201:20 202:14
  205:3,4 214:15
  215:1,1 216:20
  226:13 259:14
  289:2 306:9,11
  313:7 324:18
  337:16 393:5
  394:11 433:1
  455:4 460:6,9
**infighting**
  213:5,6
**info** 75:7
**inform** 52:18
  125:19 130:17
  269:15 302:21
**informa** 363:17
**informal**
  150:19 346:13
**information**
  9:17 12:1 41:8
  41:14 43:13,14
  43:15,18 44:7
  44:22 45:5,14
  48:10,13 49:20
  50:13 53:11

54:1 66:2
74:11 76:2,20
78:5,11 79:2
80:7 86:17
88:12,17 99:18
103:11 105:5
111:7 117:16
117:17,21
118:3,6,15
142:12 163:14
182:20 185:13
191:8 249:18
252:14 291:1
291:12 294:15
304:6,8 308:16
309:1,4,19
310:2 311:17
311:18,22
312:8,21 313:8
347:8,18
366:11 372:12
375:1,9,12
381:12 383:16
390:2 400:3
408:17 425:9
426:15 427:10
433:6 442:15
**informational**
  34:5 35:8
  191:22
**informed** 57:17
  112:5 124:8
  200:3 329:5
  331:1 408:12

| | | | |
|---|---|---|---|
| **informs** 120:3 | 227:4 229:13 | 422:16 463:11 | 309:11,13,20 |
| **initial** 30:6 | 241:12 243:14 | **instructions** | 309:22 396:8 |
| **initially** 38:6 | 247:15 248:5 | 29:7 52:10,16 | 434:13,18 |
| 49:5,11,15 | 251:17 252:5 | 73:6 74:2 | **interpret** 289:9 |
| 111:6 119:13 | 254:19 265:11 | 80:10 85:5 | **interrogatories** |
| 162:6 165:22 | 287:21 288:11 | 95:16 102:20 | 4:3 |
| 216:5 217:9 | 297:14 303:10 | 123:4 134:15 | **interrogatory** |
| 234:8 302:15 | 306:2 307:8 | 279:3 280:14 | 3:13,17 406:13 |
| 310:18 312:10 | 313:11 321:17 | 280:17 335:15 | **interview** 370:5 |
| **initials** 279:18 | 331:12 334:11 | 336:20 414:9 | **invasive** 428:13 |
| **initiate** 162:16 | 336:4 347:20 | **intended** 325:6 | **investigate** |
| **injured** 167:1 | 351:5 354:19 | 325:6 | 221:14 |
| **injustices** | 358:12 359:3 | **intention** 156:3 | **investigated** |
| 441:21 | 362:6 372:10 | **interactions** | 145:7 247:13 |
| **input** 273:3 | 380:21 394:9 | 356:8 378:10 | **investigating** |
| **inquire** 373:19 | 396:19 398:21 | **interest** 2:15 | 164:11 |
| **inquiries** | 400:14 404:19 | 123:21 221:7 | **investigation** |
| 252:15 | 434:10 450:11 | 364:1 | 293:10,15,22 |
| **inquiry** 143:8 | 454:16 463:3 | **interested** | **investigations** |
| 143:11 | **instance** 345:18 | 143:8,11 | 167:3 251:12 |
| **insert** 434:19 | **instruct** 51:10 | 281:18 282:1,2 | 304:14,15 |
| **inside** 372:12 | 52:14 57:9 | 282:8,12,20 | **investigator** |
| 430:1 | 58:22 77:11 | 297:10 366:5,6 | 444:21 |
| **inspections** | 104:19 399:21 | 366:9 423:17 | **investigators** |
| 55:10 | **instructed** | 424:1,11 439:3 | 164:11 |
| **inspector** 8:5 | 57:12 61:13 | 465:15 | **invited** 72:4 |
| 13:22 14:1,3 | 134:3 279:8 | **interesting** | **invoice** 126:11 |
| 37:3 68:12 | 405:13 463:10 | 158:2 163:21 | 126:18 379:8 |
| 86:1 90:2 | **instructing** | 176:5 371:18 | **invoices** 126:5 |
| 117:4,6 136:14 | 105:2,4 399:13 | 371:19 372:1 | **involve** 25:17 |
| 144:8,10,16,19 | 399:15,19 | **interim** 13:11 | 335:3 |
| 144:21 153:9 | **instruction** | 13:15 146:15 | **involved** 42:1,1 |
| 165:16 184:8 | 61:6 79:16,21 | **internal** 208:4 | 43:8 48:1 |
| 189:16 193:13 | 106:16 337:3 | 308:5,9,14,17 | 94:12 208:6 |
| 197:1 213:20 | 405:14,16 | 308:20 309:2,8 | 293:22 295:19 |

339:8,11 372:6
377:10 410:4
422:16 429:19
**involvement**
70:3
**iphone** 368:3
368:10
**israel** 48:5
217:19
**issue** 147:8
221:22 237:4,8
305:5,12 346:2
**issues** 18:9
50:18,20 81:14
83:22 153:11
153:17 188:17
228:16,20
345:8 411:21
421:1 426:8
**item** 220:5
234:5
**items** 83:17
220:1

**j**

**j** 2:5 352:12
**j.r.** 2:4
**jack** 183:5
288:8 289:2,3
289:3,6
**james** 458:3
**jamison** 262:3
262:6
**january** 18:6
33:16 90:1,5
90:10,10 211:2

248:2 250:8
285:14 333:17
344:15 376:15
**jeb** 1:5 7:10
**jecindc1** 467:2
**jesse** 458:8
**job** 8:18 10:16
10:18 18:11
27:6 188:13,17
229:16 275:6
356:12 357:10
359:4,14,16
384:4,17 385:1
385:7,11
407:15 430:5
468:8
**jobs** 383:6,20
384:4
**john** 2:18 82:16
93:4 178:8,15
179:12 260:14
467:1
**join** 12:17
**joined** 12:14
20:8 22:3
211:8
**jonathan** 2:22
7:13
**journal** 250:11
250:13,17
251:5
**journalist**
371:12
**journalists**
75:13 165:18

212:7 254:13
442:21 443:9
**judge** 400:3
**judicial** 222:14
223:11,16,19
226:2
**july** 89:11
97:17 157:10
157:14 163:5
369:5
**jump** 16:11
**june** 101:21
252:22 348:3
348:14 382:3
426:1 464:6,7
**junior** 273:6
274:16
**justification**
118:5 155:6
301:13
**justifying**
302:18
**justin** 246:22

**k**

**k** 466:1
**kara** 62:14
**kathleen**
360:21,22
361:7
**kaufmann**
20:10,11
209:20 210:2
**kdurham** 2:7
**keep** 38:13
75:19 215:4

275:20 335:20
337:10 357:1
**keeps** 357:2
**kelley** 2:12
**kelly** 246:6
313:18,18,19
426:1
**kept** 363:2
**key** 242:6
**kill** 104:7
260:18
**kimberly**
242:12
**kimbriell** 246:5
**kind** 65:16
83:13 99:13
140:20 155:4
172:15 196:15
352:6 405:17
**kinds** 22:13,17
23:6 24:15
29:7 56:17
97:6
**king** 249:1,14
254:12 350:10
350:12,13,15
350:18 351:8
353:3,9 354:3
437:10 443:3
**king's** 249:12
**knew** 27:13
134:6 147:11
160:7 196:20
225:10,13
287:14 312:20

339:20 340:1
349:13 354:3
393:4 446:12
460:9,15
463:22
**know** 8:22
15:12 20:14
24:2 25:15,21
26:21 35:4
36:9,10 43:6
47:12 51:16
55:20 58:12
59:6 77:20
85:10 86:21
88:14 90:13
92:2 96:12
98:13 101:13
107:3,6,17,21
111:14 121:7
124:13 126:17
128:13 131:2
142:17 147:14
148:18 155:9
160:12 164:13
166:3 168:20
176:7 186:1
187:22 192:2,4
192:18 194:18
198:12 199:19
206:8 208:3
209:5,17,22
210:3,6,9,17,19
212:9 214:22
214:22 220:10
223:21,22

224:4,7,8
225:10 229:5
230:8,16,20
231:10 232:13
233:5 235:3,17
236:11,12,13
242:4 256:6
257:12 258:1
269:6,17
270:13 278:15
280:6 285:6
288:15 289:18
290:2,3 293:9
293:17,20
298:10 299:13
299:16 301:10
303:5 304:9,16
304:19 310:11
312:19 314:13
316:2,5 317:15
321:18 323:7
323:22 324:1
336:8 339:15
346:3 350:10
351:3 352:13
353:9,15
354:19 355:2
355:16,17
361:11 363:6
364:10 365:3
365:15 366:12
368:17 371:15
372:4,7 375:3
375:5 376:1,5
376:7 377:18

380:19,22
382:8,11 385:9
388:18,22
390:22 392:18
392:18,19
393:12,13,15
405:19 410:6
426:5,6 430:16
438:3 447:2
452:11 453:1
453:22 454:16
454:19,22
455:6,6,9,14,16
456:6,10,15,20
457:3,8,13,18
458:1,6,11
459:6,11,16
460:14 462:1,9
**knowledge**
16:20 211:12
373:17 437:15
**known** 42:20
118:7 188:6
364:22 392:15
**knows** 460:9
**krepp** 47:20
205:16 215:22
217:8
**krista** 459:8
**krystal** 2:3 8:7
405:9 467:12
467:19

**l**

**l** 402:1 403:1
466:1
**lambert** 55:14
245:3,6,17
247:14 254:8
415:15,18
**language** 36:9
41:22 167:12
232:10 297:13
328:10
**lanier** 13:16
348:16 395:13
**laptop** 340:19
340:20
**lara** 457:15
**large** 45:4,5
139:3
**lasted** 268:7
**late** 82:7
**lately** 352:11
**latrina** 139:6
268:12 296:16
**laugh** 82:8
**law** 10:6,12
12:14 42:19
109:12 221:10
228:3 229:13
229:17,18
334:14
**laws** 80:19 81:3
232:5
**lawsuit** 9:10
15:14,19 129:4
160:8 161:9,10

161:14 162:15
162:16 163:15
163:20 186:18
187:10,16
188:21 428:9
**lawsuits**  81:11
427:12
**lawyer**  334:11
336:17 338:15
398:21 399:6
446:22 447:2
463:9,15,19
**lawyers**  184:16
**lead**  149:22
384:5
**leader**  439:7
**leaders**  38:3
440:1
**leadership**
285:7 324:13
325:10,11,12
328:10
**leading**  25:20
26:19 61:11
74:13 78:12
79:14 84:21
101:9 108:14
131:22 133:21
156:7,12,18
172:18 410:1
411:16 427:22
429:7 433:2
442:1 447:11
447:14,15
448:9 462:6

**leahigh**  457:5
**learn**  42:16
228:22
**learned**  333:14
**leave**  228:19
285:20 286:1
328:12
**led**  310:11
**leeann**  15:6
19:13 56:13
59:21 60:18
61:14,16 86:2
86:12 107:12
134:16 176:18
245:7 250:2
284:4,4 286:18
306:19 324:16
414:18 421:10
450:12 453:2
460:8
**left**  21:18
170:12 211:1
388:9 414:21
436:18
**legal**  1:21
104:17 105:11
111:9,13 335:3
430:4 446:19
468:1
**legitimate**
293:2
**leon**  119:17
273:15,17
274:1

**lesser**  41:19
42:2
**letter**  98:22
268:11 281:18
281:22 282:21
300:10 302:18
303:9 337:19
338:1,2 424:1
424:11
**letters**  109:5,10
109:12 111:3
150:4 282:12
298:3,6,10
299:18 423:17
**level**  10:5 151:2
**lewis**  164:9
**liaise**  270:20
**lie**  151:16,22
164:1,7 402:4
448:22 449:6
**lieutenant**
283:21,22
286:14,15
287:5,10
346:20
**lieutenant's**
284:7
**light**  392:17
429:5 441:22
**liked**  22:14
77:18 78:3,10
81:6
**likely**  274:22
**limitations**
177:5

**limited**  11:21
11:22 286:7
341:9
**line**  12:9 60:3
75:6 104:1
109:4 139:7
231:21 256:4,8
256:12 292:2,2
384:8,9 431:19
468:9
**linhorst**  2:3
40:22 141:12
178:2,10,12
406:5
**link**  100:13,15
317:4 343:15
**linkedin**  3:8
11:5
**lisa**  33:16
161:15 162:17
201:11 229:3
274:17 285:1
407:6
**list**  32:6,21
47:3 50:18
75:13 86:3
152:6 156:16
164:9,13
180:16 206:12
209:11 214:18
215:10 216:2
218:17 219:7
222:8 244:21
253:22 284:6,8
337:19 391:17

394:10 455:21
460:1,13
**listed** 100:7
219:17,20
248:14 252:20
255:9 264:2
314:3,6 431:19
**listened** 117:13
317:4
**listing** 205:3
226:11
**listservs** 426:10
**litigated** 416:7
**litigation** 80:20
81:3,18 84:20
125:20 128:14
201:22 202:15
232:6 405:19
420:11 421:3
421:13
**little** 171:5
234:9 237:7
239:13 258:1
320:5 338:3
370:4 424:15
**liz** 20:16,17
29:10,10 57:20
209:19 210:2,3
**llp** 1:15 2:5,9
**location** 1:15
**log** 368:7
**lojocano** 93:11
94:11 102:5
113:18 115:5
132:22 263:4

267:9 268:11
294:11 318:22
321:4 416:16
418:1 428:12
429:19
**lojocano's**
112:2,12 113:7
116:7 294:21
295:4 428:12
**long** 13:1 172:3
177:10 213:17
215:5,10 238:5
258:6 261:20
265:2 268:6,8
295:7 321:18
327:17 367:18
397:11 411:14
412:7 418:20
444:21 449:15
460:1
**longer** 276:9
297:10 320:6
381:13 387:6
389:1
**look** 34:2 35:6
50:4 62:10,15
65:1 66:8
67:18 75:4
89:7 96:21
97:16 98:19,20
98:21 102:3
106:12 108:6
110:13 111:18
113:19 115:1
115:10,22

116:1,22
120:10 136:15
138:11 140:2,6
141:10,22
142:10,19
143:6,18 144:2
171:19 176:2
180:10 181:20
182:18 183:3
189:14 190:15
190:22 198:3
214:11 218:14
221:20 226:8
233:2,4 242:5
249:11 278:18
278:20 283:4,8
283:21 284:14
288:6 300:3
303:17 313:7
323:3 327:11
328:7,18,21
336:6 338:16
338:19 363:19
412:16 419:12
427:1,6 429:21
430:1 434:4
444:19
**looked** 40:19
41:7 50:9 62:3
89:5 106:12
131:13 137:10
139:11 142:6
266:22 274:14
340:4,5,5
343:2

**looking** 69:4
91:15 139:15
167:13,16,21
168:10 196:8
200:13 228:15
251:15 257:10
282:17 288:10
290:8 294:8
303:9 314:16
339:8,11
379:16 386:4
391:22 392:5,8
392:12,20
423:14 445:4
**looks** 35:10
141:19 251:18
288:20
**loop** 286:11
**lorenzo** 48:1
205:20 217:14
**lost** 149:21
150:7
**lot** 43:4 48:2,9
48:12 109:8
215:6 220:7
233:5 235:17
248:9 307:22
**lots** 364:1
**loud** 82:8
117:17
**low** 334:22
**lower** 385:11
**lunch** 73:1
306:4 312:13
312:19,20

313:6,10,17
314:4,10 380:3
380:7,11 434:5
**luncheon**  135:3
**lynch**  2:22
**lyons**  20:16,17
20:18 29:10
57:20 61:12
72:2 209:19,19
210:2

**m**

**m**  466:1
**ma'am**  75:21
158:1 203:13
**macfarlane**
260:6,8
**made**  15:12
23:12 24:6
48:2,2,5,8,12
49:19 55:18
62:4 92:12
99:11,14 101:4
107:4 111:5,15
118:4 132:15
132:18 134:13
155:11 164:6
165:9 203:12
204:18 206:2
213:17 227:20
234:19,21
258:9 279:19
290:20,22
294:19 301:7
302:11 309:7
326:21 328:13

385:12 409:5
410:14 418:2
**mail**  3:20 5:2
33:16 52:12
56:12,12 58:14
58:15 59:20
60:15 61:18
62:3 63:13,19
66:13 74:22
75:4 77:2 78:1
80:9 81:4,14
82:21 83:7,14
83:19 84:18
85:12,19
103:22 104:15
106:2 108:6,10
108:19 109:3
119:12,15,20
120:22 121:2
121:13,15,19
139:5 166:14
166:15 226:9
227:17 229:2,4
230:9 231:17
239:18 244:1
244:12,16,19
245:6,9,15
250:20 252:12
252:18 254:18
262:21 269:17
272:18,18
296:16,19
306:3 309:18
314:4,16
315:10 322:3

322:12,18
323:18 327:7
327:19 328:8
336:9 338:21
339:19 340:5
341:9 350:15
351:7 352:3
391:14,21
396:20,22
413:6,11,15
414:2,8,8,16,17
417:4 425:22
434:2,3,5
443:3 445:14
445:21
**mailed**  315:11
350:12 369:11
445:13,20
**mailing**  386:8
**mails**  3:11,18
4:4,8,9 55:8
56:18 57:3,10
57:13,18 58:1
58:7 61:7
64:15,19 80:18
81:6,8,15
133:7 155:17
156:22 227:21
230:12,14
231:12 232:4
239:16,19
241:20,22
243:18 244:4
247:22 248:9
252:6 263:17

314:11 339:1,9
341:9 407:9
415:2,8,10
419:3,13
420:16 422:7
**main**  100:12
213:7,16
**maine**  1:15 2:6
7:11
**maintain**  16:21
87:10
**maintains**
188:22
**majority**  42:5
**make**  26:1
37:11 38:7
67:18 68:19
80:1 108:4
129:6 134:8
151:9 152:6,12
164:10,11
165:21 170:19
170:19 173:4,7
174:1 197:14
199:4 208:9
218:17 223:14
224:15 232:19
239:18 273:2
279:22 280:3,8
281:16 310:13
312:5 322:8
354:2 373:11
379:20 385:12
422:3 438:15
455:5,22

| | | | |
|---|---|---|---|
| **makes** 43:22 | 338:15 417:1,5 | 334:3,5 350:21 | **matt** 313:19 |
| 172:1 330:10 | 417:8,9 418:2 | 351:1 362:2 | **matter** 7:7 8:8 |
| 383:6 434:19 | 428:11 | 366:15,17 | 9:9 32:22 |
| **making** 35:20 | **marijuana** | 369:1,4,19 | 123:21 161:11 |
| 41:14 70:10,11 | 219:11,17 | 370:10,16 | 223:8 336:18 |
| 109:12 118:3 | 363:8,10,13,18 | 374:9,11 | 348:1 396:19 |
| 203:18 213:8 | 366:13 | 376:10 378:5 | 426:13 |
| 216:5 382:13 | **marina** 47:18 | 381:22 382:8 | **matthew** 2:13 |
| 383:19 384:4 | 205:10 217:2 | 385:15,17 | **mayor's** 111:9 |
| 403:1 435:1 | 254:9 314:1 | 391:10,12 | 111:12 298:22 |
| **malign** 172:22 | **mark** 2:21 | 395:22 396:2 | 299:10 |
| **maligned** | 82:22 84:12,17 | 406:4,10 | **mcgill** 456:22 |
| 172:12 | 401:4 | 425:18 433:16 | 457:10 |
| **man** 428:13 | **marked** 5:6 6:1 | 433:18 | **mean** 11:22 |
| **manage** 229:15 | 10:22 11:3,11 | **marking** 322:1 | 18:14 22:12 |
| 276:19 | 11:13 15:22 | **marraco** 47:18 | 27:22 28:9 |
| **management** | 33:15 54:13 | 205:11 215:21 | 31:17 33:12 |
| 140:22 141:1 | 56:11 59:18 | 216:17 217:2 | 36:1 40:2 |
| 283:17,22 | 64:4,7 74:16 | 254:9 314:1 | 41:18 43:11 |
| 286:20 384:3,3 | 82:1 85:14,16 | **martha** 459:13 | 51:21 52:22 |
| 384:18,19,22 | 88:5,7 93:3 | **marvin** 354:19 | 65:10 67:6,16 |
| 385:2,6 | 96:16,17 | 400:21 407:13 | 68:22 79:8,11 |
| **manipulate** | 100:17,19 | 407:14,18 | 79:20 80:2 |
| 275:13 | 103:17 106:1 | 408:2 | 81:1 89:15 |
| **manually** | 109:1,5 113:17 | **maryland** | 98:6 127:11 |
| 291:12 | 119:12 121:12 | 10:10 | 143:3,9 149:10 |
| **march** 42:17 | 137:14,17,19 | **material** 80:18 | 150:10 153:18 |
| 82:4 99:1,5 | 138:22 157:9 | 232:5 239:6 | 154:4 155:4 |
| 103:22 106:11 | 162:21 163:2,5 | 290:22 292:7 | 164:5 173:4 |
| 107:11 108:18 | 164:15 166:11 | 388:2,16 | 174:15 190:14 |
| 113:22 115:6 | 166:13 170:4,6 | **materials** 81:2 | 192:18 194:8 |
| 115:19 120:6 | 179:10 243:15 | 93:10 115:3 | 206:8 208:9 |
| 164:16 180:9 | 247:20 263:15 | 118:12 | 219:21 234:9 |
| 182:3,11 | 296:14 305:22 | **mateya** 2:12 | 240:20 266:16 |
| 252:18 260:1,2 | 321:21 327:3,5 | | 266:21 271:16 |

| | | | |
|---|---|---|---|
| 293:18 304:6 | 214:6 217:3,4 | 69:9,10,15 | 191:4,12 |
| 304:10 309:3 | 218:2,3,4,16 | 71:7,12,16,16 | 233:12,15,18 |
| 310:10 325:10 | 220:12 222:17 | 72:1,8,12,17,22 | 423:1 |
| 328:13 334:20 | 223:1,6,9,22 | 73:1,5,21 | **mental** 375:21 |
| 340:2 341:22 | 224:12 226:13 | 130:21 202:1 | **mentally** |
| 390:10 394:19 | 246:11 247:5 | 202:16 281:13 | 375:19,21 |
| 397:14,15 | 247:16 249:7 | 313:11 316:9 | **mention** 213:1 |
| 411:20 450:12 | 249:22 250:13 | 418:16 419:8 | **mentioned** |
| **meaning** 30:21 | 251:8,13,16 | **member** 10:7 | 162:11 187:22 |
| 31:2 106:19 | 252:15 253:18 | 141:6,7 142:9 | 212:19 213:6 |
| 195:2 239:21 | 254:1 255:2,8 | 164:22 165:5 | 237:2 268:19 |
| 289:9 390:13 | 255:13 260:9 | 218:4 223:9 | 424:19 |
| 391:8 | 261:3 264:18 | 260:8 261:3 | **mentioning** |
| **means** 84:22 | 265:5,8 324:17 | 270:10 271:2 | 241:20 |
| 198:17 363:10 | 331:6,9 366:8 | 287:1 288:8 | **mentor** 344:2 |
| **meant** 28:4 | 429:20 440:1 | 289:2 314:4,9 | **mentoring** |
| 31:16 175:11 | 453:15 | 345:22 | 344:11 |
| 227:10 308:13 | **mediate** 146:10 | **member's** | **mess** 254:7 |
| 308:14 330:8 | **medical** 228:16 | 270:11 | **message** 54:14 |
| 376:2 | 228:20 285:20 | **members** 48:7 | 59:5 82:2 |
| **media** 7:5 | 286:1 | 109:17 127:11 | 146:2,8 148:11 |
| 21:12 22:21 | **meet** 19:15 | 223:1,6 249:6 | 148:18 149:1 |
| 25:1,2 27:9 | 227:10 278:4 | 253:18,22 | 149:13,16 |
| 29:13,14 30:22 | **meeting** 19:17 | 255:2,8,13 | 157:10 159:8 |
| 31:22,22 35:16 | 23:20 30:6 | 284:4,9 312:18 | 163:6 164:17 |
| 48:2 50:16 | 72:13,15 | 312:20 440:7 | 170:8,18 176:3 |
| 59:16 68:6,9 | 213:17,18 | **memo** 5:3 | 270:3 339:22 |
| 75:16 135:1 | 215:1 236:15 | **memoranda** | 349:15,17 |
| 136:9 181:13 | 246:13 247:9 | 399:6 | 366:19 367:10 |
| 183:21 184:2 | 263:6 298:21 | **memorandum** | 367:13 368:18 |
| 194:2,8,8,9,16 | 306:6 313:6 | 396:4 397:6 | 369:5,22 370:3 |
| 195:8,15,18 | 316:9 | 400:15 404:20 | 370:10,19 |
| 197:4 198:7,19 | **meetings** 24:19 | 463:5,7 | 374:13 379:2 |
| 199:9 200:5 | 32:7 33:4 | **memory** 101:15 | 381:12,19 |
| 201:9,16 212:6 | 52:20,21,22 | 155:12 190:16 | 382:10,12 |

385:19 445:7
**messages**  3:10
3:19,22 4:13
4:14,15,16,17
4:18,19,20,21
53:15 64:9
338:12 339:2
339:12,20
340:6 347:2,7
347:9,14
367:14 368:20
370:16 372:11
372:16,18
373:16 407:8
420:17 443:2
443:21 444:5,8
445:1,2
**met**  9:19 19:12
94:5 169:3
204:13,19
227:1,6 245:16
253:4 257:14
276:21 280:10
**michael**  2:3 5:4
42:18 163:9
180:1 181:7
255:17 262:10
333:1 338:3
396:7 406:8
457:20
**michelle**  455:13
456:7
**microphone**
74:19 462:20

**middle**  171:6
333:11 439:22
**mike**  41:3
141:15
**miles**  157:18
**miller**  262:10
262:13
**mills**  33:17,20
34:3 109:4
119:16 157:5
157:11,17
158:7,13,19
159:8,21 160:5
160:11,22
161:10 164:17
187:22 188:3,6
188:9,12
195:22 199:22
200:3,13 201:1
201:12 203:17
229:7 230:17
270:4 273:15
273:22 407:6
426:17 450:20
451:2,11,15
452:6,17 453:1
453:18 461:5
462:2
**milwaukee**
251:4
**mimicked**
391:5
**mind**  357:2
**mine**  34:9 55:6
412:22

**minnesota**
10:13 228:5,10
229:17 230:3,6
**minor**  427:9
**minority**
352:11 439:4
**minute**  37:8
200:20 302:2
344:10 404:2
413:4 432:14
**minutes**  114:5
159:18 178:1
183:17,18,19
219:16 306:1
382:18 404:5,6
450:6
**mischaracteri...**
389:13
**misconduct**
425:5,7 427:10
**mislead**  351:22
**misremember...**
101:6
**missed**  251:19
261:20 263:8,9
263:9,11 350:6
**missing**  313:20
314:1 369:15
**misstates**  32:16
33:8 226:6
462:13
**mistake**  385:12
**mistakes**  383:7
384:5 385:11

**misunderstood**
17:3,7
**mitch**  426:17
**mitchell**  10:12
**moehlman**
457:15
**molc**  124:17
125:2
**molc's**  123:20
124:10,20
329:5 330:18
**moment**  325:13
346:19 347:22
**monday**  72:13
72:22 306:6
313:12
**month**  285:12
287:12
**months**  46:14
149:18 177:13
177:18 321:15
374:18 408:18
**morning**  8:5,6
75:20 78:18
79:6 237:3
265:15 303:20
346:21 379:6
**motion**  405:18
**motivation**
52:11
**move**  222:3
241:10 277:6
283:15 320:9
361:20,22
369:6,17

**moved** 147:9
278:9 316:8,10
**moving** 324:1
**mp** 154:17
**mpd** 2:21,22
3:9 8:18 9:12
11:18 12:17
13:1,3,7 16:7
18:10 31:6,13
31:22 32:8
33:2,5,12 39:3
39:11 40:10
42:20 44:4,6
44:21 50:21
55:8 64:14
65:13,17,22
66:9,17 67:18
70:17 93:11
97:1,21 98:3
100:10,11
103:12 108:8
108:11,17
115:4,5 117:20
118:11,14
124:10 139:14
151:11 152:1
152:13 153:20
153:20 154:10
154:17 155:1
158:3 172:14
172:21 174:17
175:16 183:5
188:21 192:9
198:7,19
199:10 200:6

201:9,16 202:2
204:2,17
210:14 217:11
237:18 238:6,9
238:13,16
239:5 247:13
249:19 270:22
288:9 289:7
297:1,7 298:17
305:19 308:15
312:9 317:10
324:13 325:10
325:11 328:9
341:8,16,18,21
341:22 342:6
343:2 352:9
354:14 355:3
356:6,9 357:21
358:7 362:18
364:12,16
365:1 372:3,4
386:21 387:6
388:12,14,18
388:22 389:20
408:16 410:9
415:19 416:2,8
422:17 425:11
427:2,12,21
429:4 430:11
431:2 432:20
433:5,10 441:3
441:10,16
443:10 444:21
447:9 448:1,7
448:13 449:1

454:18 455:7
460:15 463:8
**mpd's** 14:17
17:3 26:4
130:17 151:10
217:18 304:22
329:6,7,11
330:4,17
**multiple**
279:21

**n**

**n** 2:1 3:1,1 7:1
136:1,1,1
402:1,1 403:1
403:1 466:1,1
466:2,2
**name** 8:7,10
20:9 64:16
172:11,22
216:3 254:11
270:11 283:21
284:1,7 305:11
308:20 311:8
315:7 338:22
354:11 356:1
357:3 360:20
360:21 361:7
390:16 468:5,6
**named** 149:5
214:22 215:2
261:8
**names** 29:22
30:5 47:4 49:8
97:12 99:16
117:16 254:8

304:6 308:18
308:19,21
309:20 311:1,4
311:11,15
326:7 337:19
454:21
**narcotics**
304:13
**narrative** 60:11
308:1
**narratives**
310:5,14
311:10 434:14
435:14
**nathan** 248:21
455:8
**nature** 217:20
336:22
**navigate** 426:7
**nbc** 247:1,3,5
260:6
**near** 181:21
333:7 349:7
**necessarily**
40:11 62:1
**need** 35:10
40:19 153:21
167:20 183:14
183:15,16
193:2 219:15
239:22 249:4
278:11 286:12
290:20 306:1
307:15 316:13
321:15,17

338:11 359:22
387:3 434:12
436:13
**needed**  23:22
29:13,15 43:4
47:22 49:6
85:11 89:20
124:6 167:18
201:7,14 212:2
239:21 266:20
277:5 278:5
281:4,7 290:17
326:1 371:15
**needs**  200:8
201:1 278:21
**nefarious**  257:3
420:3,21
448:12
**negative**  25:11
25:17,22 31:3
31:5,13,21
32:8 33:5,11
38:2,3 52:4
154:4 161:7
195:3 198:7,19
199:9 200:5
201:8,15 202:1
202:16 308:3
353:10,13
356:8 383:16
383:18 391:22
392:5 394:19
400:16 401:1
416:8 425:10
425:11 429:5

431:1 433:5
448:6,13 449:1
449:7 454:17
455:7 458:20
**negatively**  52:2
70:13 217:11
217:18 385:13
**negotiates**
345:4
**neither**  81:6
113:2 161:6
250:19 333:11
465:10
**nets**  384:5
**neutral**  161:1,6
**never**  54:6
148:19 312:12
312:22 315:16
353:8 355:9
426:13
**new**  3:18 49:7
56:19 57:3
60:3,8 62:17
167:3 248:13
261:1 277:7,17
344:11 368:3,4
368:6
**news**  55:1
64:16 194:21
194:22 220:7
379:12 380:14
**newsham**  21:5
21:8,11,18
27:7,12,14
31:13,22 32:8

33:1,5,12
54:15,18 55:10
56:13,18 57:2
57:18 58:2,15
59:2,21 60:17
61:10,14,20
62:4 64:15
78:4 81:1,13
92:4,10,17
96:5 98:14
124:6,9,13
132:19 148:8
148:15 151:11
151:17 152:8
171:19 176:5
176:20 197:7
198:7,19
199:10 200:6
201:9,16 202:2
202:17 204:2
204:17 226:10
230:10,13,14
230:17 234:19
234:22 243:22
244:4,11 248:3
252:8 263:19
306:16,21
307:4 324:15
326:4 343:18
343:22 344:5,8
344:14 345:8
345:19 346:3,5
346:17 347:21
348:4,10,14,22
349:4,8,11,21

352:7,12
353:11,18,20
354:8 365:4,7
365:9,10,16
383:14,17
384:7,13,16
385:8 392:1,6
392:9,13,16
394:14 395:7
395:16 400:17
402:17 403:1,5
408:6 414:16
415:3,10 417:4
418:8 421:9
426:1,16 429:4
436:3 437:19
438:17 439:6
439:15 440:4
440:11 441:3
442:11,14
446:13 448:7
448:14 449:7
**newsham's**
78:10 306:17
365:16 384:22
385:6 438:12
**nice**  349:16
**nick**  2:4
**nicole**  2:22
**nine**  29:17
32:15 180:7
193:4 196:18
197:16,21
198:4 201:18
202:10,11,20

203:20 304:12
370:15 422:9
**noncontact**
344:18 371:1
**nonpublic**
375:9
**nonresponsive**
131:5,7 290:22
291:2
**normal** 214:2
**northeast** 2:9
**northwest** 2:15
2:19 467:1
468:1
**notary** 1:17 8:1
465:1,19
467:18
**note** 89:7,10
96:3 98:6
117:1,4,7
143:7 192:18
193:6 195:14
197:17 281:16
358:15 393:20
**noted** 7:16
**notes** 155:17
281:16
**notice** 25:12
418:17 426:14
**notification**
30:18 297:5,9
**notifications**
426:12
**notified** 112:6
112:12,21,21

113:5 129:3
408:19
**notify** 27:7,12
82:21 84:12
112:1 324:14
**notifying** 56:19
**november**
138:8 283:5
285:20 286:2
374:16
**number** 7:10
11:2,10 47:4
47:21 50:18
64:6 82:5
85:13 87:18,21
88:4 89:1,4
100:18 105:19
106:11 107:9
109:9 110:18
115:10 135:1
137:13 138:1
138:21 139:4,8
139:10 148:6
159:3 163:1,16
164:2 166:10
170:3 183:21
191:15 230:22
249:15 254:21
255:4 265:5,8
293:2 298:15
321:20 327:2
331:6 334:2
337:14 338:7
341:5,14
350:20 351:13

351:18 362:1
366:14 368:22
369:18 374:8
376:9 378:4
381:21 385:14
391:9 395:21
399:16 406:9
407:8,12 423:4
423:22 424:10
431:18 432:2,5
433:15,21
443:1,20 446:7
**numbers** 35:7,8
49:9 86:4
97:13 99:17
100:5,6 304:7
326:8 391:19
393:4,7
**numerous** 13:6
66:10 67:3
**nw** 1:21

**o**

**o** 3:1 7:1 136:1
136:1,1 243:10
243:10 402:1
403:1 466:1,2
466:2
**o'clock** 159:18
183:13
**o'meara** 313:18
313:19 426:2
**oag** 317:5
318:21 418:13
**object** 13:8
16:8 17:5,14

18:22 19:4,8
21:4,22 22:7
22:20 23:8
24:12,20 25:8
25:20 26:12,19
27:2 28:3,14
29:3,18 30:19
31:7 32:10
35:3 36:4,14
37:2 38:5,19
39:4,13,19
40:6,14 42:8
42:21 44:10,16
45:2,18,21
46:6,11,16,21
47:9,15 48:18
49:4 50:6,22
51:5,15 52:7
53:5,12 54:3,9
55:19 56:7,21
57:6 58:3,10
62:7 63:15
64:1 65:18
66:3,22 69:7
69:13 70:5,18
71:2,9,19 72:9
73:2,9,15 74:4
77:8 78:6
80:13 81:19
83:8,15 84:7
84:21 85:7
87:6 88:20
89:16 90:20
91:6,17,21
92:6,21 94:2

| | | | |
|---|---|---|---|
| 95:1,7,18,22 | 168:17 169:8 | 339:5,17 | 443:13 444:2 |
| 98:9,16 99:8 | 172:18 173:1,6 | 342:19 343:6 | 445:16 446:2,8 |
| 101:17 102:17 | 173:19 174:6 | 343:12 347:1 | 446:18 447:5 |
| 103:5,14 | 175:7,18 | 347:17 350:1 | 447:11 452:2,8 |
| 104:18 106:17 | 176:15 177:7 | 358:1,8,14 | 453:11 455:10 |
| 107:16 108:14 | 177:20 180:3 | 359:10,17 | 461:8 |
| 108:20 109:19 | 180:19 182:12 | 360:16 361:16 | **objection**   32:16 |
| 110:3,10 | 182:22 183:7 | 372:14,18,20 | 32:18 33:8 |
| 111:20 113:1 | 186:20 193:16 | 372:22 376:3,4 | 37:5,11,14 |
| 113:13 116:19 | 194:11 197:18 | 379:17 388:21 | 61:11 67:9 |
| 119:3,8 122:14 | 198:14 202:6 | 389:6,7 392:2 | 74:13 78:12 |
| 122:22 123:8 | 208:17 211:21 | 392:10 394:3 | 79:14 101:8 |
| 123:12,16 | 214:8 215:17 | 394:21 395:9 | 112:15 114:11 |
| 124:2,18 125:4 | 218:7 220:13 | 395:18 398:6 | 131:22 156:7 |
| 125:8,12,16 | 220:14 221:1 | 399:2,8,9 | 156:12,18 |
| 126:1,7,12,21 | 224:2 229:9 | 400:18 402:19 | 186:2 188:14 |
| 127:3,7,18,22 | 230:19 231:22 | 402:20,20 | 189:7,22 |
| 128:18,22 | 232:11 233:14 | 403:8,9 408:22 | 190:19 196:5 |
| 129:12,16,20 | 234:4 235:16 | 409:8,12,18 | 197:8,19 |
| 130:2,6,10,14 | 235:21 236:4 | 410:10 411:10 | 198:21 199:12 |
| 131:10 132:3,7 | 236:10 246:17 | 412:8 414:19 | 199:16 200:16 |
| 132:11 133:4 | 249:8 255:5 | 415:4,12,20 | 203:14 204:9 |
| 133:12,21 | 258:17,18 | 418:4,10 419:4 | 204:20 206:14 |
| 134:5,19 | 259:16 272:1,3 | 419:9,15,20 | 206:21 207:15 |
| 136:18,22 | 275:9 278:7 | 420:12,18 | 210:16 213:3 |
| 140:16 142:1 | 284:21 288:19 | 421:4,5 424:2 | 214:7,20 |
| 142:14 143:21 | 289:5,11,17 | 425:4 427:3 | 216:11 218:19 |
| 144:4 148:16 | 290:1,9 291:14 | 428:22 430:13 | 221:17 222:10 |
| 150:2,22 | 293:6 296:2 | 431:3,20 | 222:19 223:2 |
| 151:13,19 | 299:3 301:19 | 433:13 435:2,9 | 224:18 225:6 |
| 152:3,9,14,20 | 302:13,13 | 435:17 437:21 | 225:12 226:5 |
| 153:5 154:6,12 | 305:14 307:1 | 439:8,13 | 227:12 229:8 |
| 154:19 155:3 | 311:6 314:21 | 440:13 441:5 | 234:13 235:9 |
| 155:22 157:2 | 317:22 319:6 | 441:11,17 | 240:17 241:7 |
| 158:16 168:1,7 | 320:17 333:8 | 442:1,17 | 243:4 244:5,13 |

**[objection - office]**                                    Page 52

| | | | |
|---|---|---|---|
| 249:20 254:3 | **obtained** 21:14 | **offering** 348:3 | 162:10 165:9 |
| 256:5,13 257:5 | 341:18 | 348:9 399:20 | 165:22 167:8 |
| 259:3 272:4 | **occasions** 47:22 | **offers** 427:16 | 167:21 169:6 |
| 275:2 276:11 | **occurred** 102:4 | **office** 2:14 8:18 | 170:13 175:4 |
| 291:8 299:19 | 102:11 155:12 | 13:18,21 14:4 | 183:4,5 188:10 |
| 310:6 360:3,6 | 443:4 | 14:7,17 15:1 | 188:13,22 |
| 363:15 365:12 | **octo** 239:10,14 | 15:11 17:4,20 | 191:5 192:12 |
| 366:1 369:13 | 239:17,19 | 19:12,19 20:6 | 194:4 195:11 |
| 371:11 372:21 | 240:3,5,8,11,13 | 20:8 21:1 22:4 | 196:16,21 |
| 373:12 395:11 | 240:16,22 | 23:20 27:16,20 | 199:14 201:13 |
| 410:1 411:16 | 241:6,18,21 | 28:2,9 29:12 | 202:14 203:11 |
| 421:14,21 | 242:11,16 | 29:16 33:21 | 204:8,13,18 |
| 422:11,19 | 243:1,9 274:21 | 35:18,20 36:22 | 207:12,19 |
| 423:6,12 | 288:16 290:6 | 41:12 42:7,13 | 208:4,11 |
| 424:12 425:13 | **october** 14:10 | 44:1 57:5,15 | 210:15,20 |
| 427:22 429:6 | 56:14 143:1,7 | 57:16,22 68:13 | 211:1,3,7,8 |
| 433:2 437:14 | 143:9,12 159:7 | 69:1,20 70:3 | 212:1,11 213:5 |
| 438:18 444:15 | 159:14 226:18 | 72:20 74:10 | 213:11 214:1 |
| 448:3,8,19 | 244:17 271:10 | 76:8 79:11 | 226:18 228:13 |
| 449:2,8,20 | 282:5 283:6 | 87:10,10 89:11 | 240:2,7 242:9 |
| 454:4 455:17 | 318:11 322:4 | 91:2 96:4 99:3 | 243:10 252:14 |
| 456:1,4,8,13,18 | 323:18 324:10 | 99:6 109:17 | 254:21 255:4 |
| 457:1,6,11,16 | 327:8,12,18,19 | 111:9,12,14 | 256:3 267:20 |
| 457:21 458:4,9 | 328:4,4,8,19 | 113:21 120:4 | 271:9 272:8,16 |
| 458:14,22 | 329:4,15 330:3 | 124:15,17 | 273:10 278:15 |
| 459:4,9,14 | 330:6,17 | 125:1,3 126:5 | 280:22 283:17 |
| 460:17 461:19 | 331:16 337:6 | 126:6 129:5 | 285:7,8 286:5 |
| 462:5,12 | 385:19,22 | 131:17,20 | 286:6,9,19 |
| **objectionable** | 386:1 387:7 | 133:2,11 134:2 | 288:8,9 289:3 |
| 430:8 | 413:7,19 414:7 | 137:9 139:21 | 289:4,6,7,9,10 |
| **objections** 4:2 | 467:10 | 140:22 143:13 | 290:8 297:3 |
| **obligatory** | **offer** 34:11 | 145:8,15,18 | 298:22 299:10 |
| 330:19 | 170:15 380:10 | 148:1 151:10 | 303:1 315:8,8 |
| **observed** 169:5 | 426:13 | 155:21 157:6 | 332:6,11,15 |
| | | 157:19 160:20 | 346:1 354:4 |

356:4 376:18
377:12 380:4,8
410:7 411:8,13
412:4,6 423:11
426:19 427:13
427:14 429:10
439:12,15
443:5,10,16
461:14,15,17
463:4
**office's** 17:12
36:21 46:4
**officer** 14:9,13
14:16,20 15:2
18:17 19:13
20:7,15,19
27:7 29:2,11
93:11 94:12
97:13 100:3
107:10 113:6
115:4 116:7
208:14 209:15
209:17,21,22
210:4,6,9
213:19 214:4
225:3 228:2,17
230:5 231:6
235:13 237:5
238:12 253:11
253:17 255:19
271:10,21
272:20 273:10
275:11 282:5
283:12 291:18
294:21 295:4

298:6 305:9,11
324:14,16
326:8 332:9
333:5,7 342:16
344:17,22
349:19 351:10
354:6 355:11
362:21 370:20
371:1 372:5
373:22 378:15
387:6 389:1,4
428:11 465:2
**officer's** 310:8
433:11
**officers** 99:16
100:7 138:16
149:21 150:4,6
164:9 220:21
298:22 304:5,6
304:17,20
305:1,5 308:4
310:21 346:11
383:5,6,20
385:10 388:19
391:18,18
393:1 430:4
433:10,12
438:6
**offices** 7:10
40:12 289:16
380:11 418:19
**official** 147:16
**officially**
334:15,19
376:22

**officials** 24:22
27:10 146:11
153:19,20
154:10
**offline** 82:22
84:12 85:6
256:21 257:3
420:2 421:11
**ogc** 76:5,8,14
330:9 461:6,17
461:18 462:3
**oh** 34:16 40:21
86:9 98:5
110:5 128:11
153:1 178:13
178:13,14
181:4 185:3
190:2,16
213:21 245:13
256:18 263:12
313:22 320:11
322:10 335:20
338:2 352:17
369:6,11
377:18 384:10
404:11 425:18
438:11 439:20
447:15 449:14
462:21
**okay** 9:2 11:9
12:14 18:18
20:7 27:13
32:17 34:16,18
35:12 37:13,19
38:10,14 40:10

67:20,21 68:19
86:10 100:16
105:7 129:7
139:2 140:5
142:21 144:15
155:9 158:22
160:10 163:4
176:4 178:14
179:3,7 182:16
183:12,19
185:3 186:13
186:17 187:18
188:20 189:14
190:5 191:14
193:5,13,20
197:1,14 199:6
200:14 201:11
203:20 208:20
212:19 214:11
216:6 223:5,7
225:17 227:4
232:2 233:2,9
235:4 236:15
243:8,12
245:20 248:12
252:17 259:19
263:5,12 271:5
272:6 281:3,10
287:18 291:4
303:4 307:6
318:17 320:8
324:12 327:1
327:22 328:18
334:1 336:12
337:22 340:4

341:1 342:22
343:17 350:8
352:20 357:16
359:2 364:22
368:17 369:3
370:6,20
371:14 373:19
378:15 381:3
390:1 392:22
404:8 415:1
425:7,19
432:17 436:2
447:9 450:7
455:2
**old** 12:15 277:8
368:6 451:16
451:16
**older** 275:17
**oldest** 42:17
179:22 180:7
**once** 24:4 51:18
51:22 57:16
73:18 126:16
153:12 159:22
161:8 162:13
272:21 290:6
327:13,20
349:15,17
**ones** 59:10
69:21,22
132:18 226:21
226:22 234:18
242:7 245:8
253:14 254:6
255:11 273:7

315:1 372:11
388:1 393:8,10
393:12 418:12
**ongoing** 422:13
**online** 229:20
317:3 420:16
**op** 4:12 350:17
352:7 353:2,6
353:10,13
354:7,12,15,17
436:7 437:10
437:13 441:8
441:14,14
**open** 42:17
180:7
**opened** 343:1
**opening** 237:12
**openings**
237:10,10,11
**operated**
151:10
**operating**
19:13 324:16
**opinion** 17:7,15
123:20 330:14
353:17,20
357:9,11,19
360:1 365:3,6
375:14,15
392:6,21
394:14 399:17
399:20 426:13
438:20 446:17
447:4,12,16,20
447:22

**opinions** 392:9
392:13 394:17
395:4 447:18
**opportunity**
18:11 348:10
**opposed** 208:4
231:7 256:3
374:5 381:8,19
**option** 126:15
**options** 329:7
**order** 167:20
342:18 343:10
387:10,22
389:19 400:7
412:14,21
**ordered** 115:18
**orders** 342:4,12
343:2,15
388:20
**organization**
51:17 55:1
224:1 246:8,11
247:6 250:14
251:8,13 335:1
432:22
**organizations**
460:2
**original** 161:13
467:7,11
**originally**
161:17
**originals** 86:20
**originated**
226:12

**originating**
27:8 324:17
337:6
**orm** 139:6
**orm's** 182:19
**outcome**
465:16
**outdated** 440:6
**outlet** 75:16
**outlets** 364:2
366:9
**outline** 328:15
328:16
**outlined** 422:9
**output** 137:21
**outright** 118:22
**outside** 133:11
137:4 138:16
139:14 219:13
219:18 455:10
463:8
**outspoken** 32:7
33:3 201:22
202:15 218:10
**outstanding**
23:21
**overruled**
66:11 67:5,6
**oversee** 10:19
14:14
**oversight**
418:21
**overuses** 66:9
66:17

**[own - parker]**                                    Page 55

| | | | |
|---|---|---|---|
| **own**  94:22 95:5 | 260:19,19 | 29:17 32:15 | 203:20 205:1,2 |
| 225:18 242:20 | 261:5 262:2,10 | 47:3,8 50:4,5 | 205:5 208:21 |
| 279:14 280:22 | 262:17 264:13 | 51:3,4 56:5 | 209:9,13 |
| **owned**  348:7 | 282:19 283:1,5 | 69:4,5,11 | 210:12,14 |
| | 283:8 284:14 | 71:15 73:12,14 | 211:13,15 |
| **p** | 290:13 292:4 | 80:17 91:16,16 | 214:12 216:21 |
| **p**  2:1,1 7:1 | 292:14 294:4 | 91:20 92:19,20 | 219:5,8 221:20 |
| 466:2 | 296:22 300:4 | 93:15,17 94:1 | 222:3,5 225:17 |
| **p.j.**  248:21 | 325:18 335:15 | 94:16 95:21 | 225:21 226:8 |
| **p.m.**  120:7 | 335:16 336:1 | 96:3 97:11 | 232:2 233:20 |
| 135:2 136:2 | 336:20 337:10 | 102:3,8,15 | 234:15,16 |
| 171:5 174:9 | 338:7 341:4 | 111:18,18 | 307:16 324:11 |
| 175:9 176:3 | 343:2 351:6,18 | 113:11 116:22 | 326:3 328:9 |
| 229:22 261:18 | 387:13 396:13 | 122:12,12,17 | 330:16 352:18 |
| 261:19 265:8 | 396:14 406:15 | 122:19,21 | 352:19 384:10 |
| 344:15 363:21 | 417:12 437:18 | 123:7,11,15 | 406:18 422:9 |
| 387:9 404:17 | 438:5 467:7,12 | 124:1 125:7,11 | 427:7 428:6 |
| 464:11 | 468:9 | 125:15,22 | 438:7 439:1,3 |
| **package**  367:2 | **pages**  3:6 6:3,5 | 126:20 127:2,6 | 439:21 440:16 |
| 367:5,8 | 250:6 295:6,10 | 127:17,21 | **paragraphs** |
| **packages**  103:8 | 295:13,16,19 | 128:17,21 | 18:19 233:2,13 |
| **page**  3:2,7 4:1,7 | 352:2 466:5 | 129:11,15,19 | 292:3 325:22 |
| 5:1 6:1 16:11 | **palm**  55:6 | 130:1,5,9,13 | 328:17,19,22 |
| 18:2 35:7,8 | **pamela**  457:5 | 132:2,6,10,14 | 329:1 428:7 |
| 78:19 79:11 | **panel**  115:17 | 136:16,17,21 | **parentheses** |
| 82:5 89:1,7 | **paper**  237:10 | 137:3 138:19 | 241:1 242:6 |
| 104:7 115:2 | 237:15 280:21 | 139:15 140:12 | **parker**  1:10 |
| 116:1 138:11 | 388:5,7 | 142:4 143:18 | 3:20,21 4:10 |
| 140:19 142:22 | **paperwork** | 143:18,19 | 4:12,21 5:2,2,4 |
| 143:6 171:6 | 284:9 | 144:2,3 152:19 | 5:21 7:6,21 8:5 |
| 181:21 182:18 | **papson**  264:14 | 153:2,3,4,8 | 8:12 16:1 37:3 |
| 214:12 248:18 | **paragraph** | 155:10 193:3 | 68:10,12 86:2 |
| 249:12 250:7 | 18:1,1,4,21 | 196:18 197:15 | 117:4,6 136:4 |
| 250:10,16 | 19:3,7,11 | 198:4 201:18 | 136:10,14 |
| 251:1,12 | 21:10,21 26:5 | 202:8,10,11,20 | 165:16 184:3,8 |
| 259:20,21 | | | |

189:16 193:13
197:1 213:20
227:4 229:13
241:13 243:14
247:15 248:5
251:17 252:5
254:19 265:9
265:11 287:22
288:11 297:14
303:10 306:2
307:8 313:11
321:17 331:10
331:12 334:12
336:4 347:20
351:5,14
354:20 358:13
359:3 362:6
372:10,16
380:21 394:9
396:12,15,19
398:22 400:14
404:19 406:19
450:11 454:16
464:12 466:4
466:20 467:6
468:6
**parker's** 90:2
347:15
**parker00815**
3:19
**parker01214**
387:13
**parker01664**
3:10

**parker02000**
3:22
**parker2005**
6:10
**parker2221**
6:11
**parker289** 4:15
**parker339** 4:16
**parker366** 4:17
**parker580** 4:18
**parker582** 4:19
**parker776** 4:20
**parker821** 6:9
**parker84** 4:13
**parker89** 4:14
**part** 27:6 32:12
65:2 66:9
70:14 82:21
92:15 116:9
163:12,19
164:18 167:11
175:15 201:18
238:16 304:16
313:17 339:8
339:11
**particular**
53:20 88:22
299:10 392:19
429:18
**particularly**
432:4
**parties** 463:8
465:11,14
**partly** 70:6,8
95:8,10

**pass** 164:1
183:11 184:5
339:15 450:2
**passed** 109:12
334:17
**passenger**
428:14
**past** 80:8
110:13,15
117:20 235:2
250:2 271:18
428:8
**patricia** 82:12
**patrol** 14:5
97:14 326:9
**paul** 10:13
**paula** 457:5
**pay** 126:14,15
152:1 230:11
297:5 357:11
**pd1** 139:15
**pd180** 138:15
**pd180b** 138:12
139:16
**pds** 96:12,20
97:12 102:3
103:4,10
432:21 433:9
**pemberton**
345:13,13,14
345:17,22
**penalty** 16:15
**pending** 28:5,8
30:13 43:7
281:15 283:11

293:10,15,17
293:22
**people** 14:19
23:10,12,16,17
23:19 24:15,18
149:5 155:1
171:18 180:15
180:16 191:3
212:3 215:6
216:4 217:8
238:20 275:20
302:4 311:11
314:1 316:2
332:7 339:20
341:2 344:21
349:20 356:19
357:8 358:10
358:22 359:4,5
359:15,19
360:8 364:18
385:4 391:22
392:5 397:8,15
460:3
**perceived**
153:10,16
**percent** 139:4
383:8
**perform** 296:11
315:20
**performance**
151:1 188:18
356:12 357:10
357:10
**performing**
312:7

[period - phillips]

| | | | |
|---|---|---|---|
| **period**  102:11 | 115:16 117:5,7 | 424:20 | 128:12,14 |
| 207:2 235:10 | 117:13 120:5 | **persons**  200:4 | 131:13,19 |
| 289:16 307:13 | 120:21 121:1 | **pertaining** | 132:22 137:22 |
| 337:4 | 123:4 129:9 | 94:11 | 158:2 161:11 |
| **periodic**  106:22 | 145:6 146:8 | **pescovitz**  2:13 | 161:14,18 |
| **periodically** | 175:11 199:8 | **peter**  42:19 | 163:13 165:14 |
| 70:22 | 201:8 204:17 | 55:7 254:12 | 169:4,11,19 |
| **periods**  166:3 | 213:7 217:17 | 262:3 292:21 | 180:1 181:10 |
| **perjury**  16:16 | 218:9 228:10 | 293:21 324:15 | 181:20 184:16 |
| **perloff**  42:18 | 231:9 269:19 | 352:12 440:4 | 185:22 186:18 |
| 163:6,9 170:8 | 310:9 311:9 | **ph**  164:9 | 187:9 188:21 |
| 170:12,15 | 313:20 332:1 | **phillips**  1:3 | 189:4 205:21 |
| 171:17 176:3,5 | 361:6 375:21 | 3:21 4:2,8,10 | 206:2,12,18 |
| 176:9 177:10 | 381:18 438:8 | 4:12 5:2,4,21 | 216:1 217:21 |
| 180:1,22 181:7 | 455:6 456:15 | 7:7 8:9 15:14 | 224:17 225:3 |
| 255:17,21 | 456:20 457:8 | 42:18 48:12,21 | 225:11,14 |
| 256:2,11,17,18 | 457:13,18 | 49:2 58:8 | 231:20 232:9 |
| 259:14 264:5,8 | 458:1,6,11 | 63:12,18,21 | 232:16 234:10 |
| 320:4 333:1 | 459:6,11,16 | 64:10,13 88:11 | 241:20 242:1,2 |
| 338:3 374:13 | **person's**  176:7 | 93:8 94:5 | 243:1,3 262:18 |
| 374:21 375:4 | 176:14 338:22 | 101:4 102:4,9 | 267:9 268:11 |
| 375:22 376:14 | **personal**  166:4 | 105:15 106:3 | 269:7 294:5,7 |
| 376:21 377:16 | 255:9,14,18 | 106:14 107:6 | 295:18 296:16 |
| 377:22 379:4 | 256:3 257:4,9 | 107:15 109:10 | 300:9 301:8,16 |
| 379:16 380:2,7 | 258:4,16 259:2 | 109:15,18,22 | 302:7,10,21 |
| 381:7 420:1,5 | 259:13 340:10 | 110:1,6,9 | 316:14 317:18 |
| 445:8,13 446:5 | 378:1,11,17 | 111:2 112:2,7 | 318:14,18 |
| **perry**  2:22 7:13 | 446:17 447:4 | 112:8,14,21,22 | 319:4,5,12 |
| **person**  19:15 | **personally** | 113:5,18 114:8 | 320:2,11,12 |
| 24:4 31:12,21 | 118:8,16 | 115:2 117:6 | 322:4 323:12 |
| 32:5,20 51:17 | 165:18 284:12 | 118:19 119:7 | 323:20 325:16 |
| 52:12,13 59:4 | 305:6 356:10 | 119:16,21 | 326:4 327:7,12 |
| 59:7 63:22 | **personnel** | 120:3,19 121:4 | 327:14 331:15 |
| 81:5 84:5,8 | 114:13 116:7 | 121:6,14 | 332:21 333:21 |
| 100:10 107:22 | 116:10 347:15 | 125:20 128:4,5 | 351:14 378:9 |

**[phillips - police]**                                          Page 58

| | | | |
|---|---|---|---|
| 378:10,16 | **phrase** 221:10 | **plaintiff** 1:4 2:2 | 287:19 297:3 |
| 396:12,15 | 450:11 453:9 | 3:3 4:2 7:7 8:3 | 303:18 306:2 |
| 406:14,16 | **physical** 10:19 | 8:8 136:12 | 319:16 321:18 |
| 407:2 410:14 | 370:22 | 347:3,18 406:1 | 324:1 336:2,15 |
| 410:18 411:1 | **physically** | 459:20 | 341:5 401:5 |
| 416:16 417:20 | 68:22 461:11 | **plaintiff's** 3:7 | 434:18 450:16 |
| 417:22 419:18 | **pick** 345:1 | 4:1 243:15,17 | 451:1 462:20 |
| 428:8,19 429:3 | 361:13 | 244:10 245:15 | 467:5,10,14 |
| 429:22 430:6 | **picked** 190:9 | 247:20,21 | **plus** 188:10 |
| 430:11,17,21 | **picture** 434:20 | 251:15,20 | **point** 13:17 |
| 467:3 468:5 | **piece** 291:12 | 252:4 259:19 | 20:18 35:13 |
| **phone** 52:11 | 370:6 | 263:15,16 | 58:22 165:16 |
| 59:7 84:9 | **pieces** 43:21 | 267:5,8 270:3 | 183:10 209:20 |
| 100:6 112:4 | 309:19 | 271:5 287:18 | 222:1 223:15 |
| 121:2 123:5 | **piling** 277:8 | 287:21 292:21 | 258:3 310:5 |
| 129:8,10 | **ping** 82:12 | 296:15,15 | 328:22 336:4 |
| 163:16 166:7,9 | **pio** 247:11 | 303:17,18 | 418:19 |
| 255:9,14,18 | 252:13 | 305:22 309:18 | **pointed** 49:2 |
| 256:3,22 257:4 | **pio's** 363:22 | 324:5 406:9 | 413:10 418:13 |
| 257:9 258:5,16 | **pissed** 164:19 | 433:15 450:14 | **points** 117:10 |
| 259:2,14 | 165:4,6 270:6 | **plan** 278:9 | 213:16 |
| 267:18 268:1,4 | **pitman** 66:13 | **planning** 221:5 | **police** 5:3 12:20 |
| 272:18 327:13 | **pittman** 270:12 | **played** 65:3,11 | 13:12,12,14 |
| 327:20 339:2 | 270:13,15 | 66:20 | 15:1 35:19 |
| 339:22 363:22 | 425:22 426:5 | **please** 7:18 | 36:1 41:13 |
| 367:15,18,20 | 426:16 | 8:10 60:8 61:2 | 42:5 98:7,11 |
| 368:4,6,6 | **place** 26:7 | 117:1,4,7 | 157:18 167:2 |
| 378:2,11,17 | 84:18 298:6 | 205:2 208:22 | 194:5 208:13 |
| 381:8,9,19 | 375:1 | 211:14,18 | 213:19 214:3,5 |
| 391:18 393:4,6 | **placed** 32:5,20 | 214:18 222:4,8 | 221:13 324:15 |
| 443:16,18 | 162:4 297:6 | 226:8 233:3 | 342:16 349:1 |
| 446:6 451:13 | 376:1 | 234:15 244:20 | 353:18 370:5 |
| 451:14 | **places** 306:3 | 245:21 248:12 | 370:21 386:4 |
| **phones** 367:22 | **plainclothes** | 249:4 254:8 | 396:6,8 406:20 |
| | 370:20 | 267:6 271:6 | 408:12 409:5 |

426:10,12,18
427:10,16
430:2
**policies**  17:3,8
17:12 26:10
40:11 169:5
386:4,9 423:10
423:14
**policy**  22:4
26:5,6,21
27:18 29:16
36:13 38:17
39:2,9,10,17
40:2 47:14
50:21 90:18,21
152:6,12
175:21 189:1,3
189:9 193:11
196:11,17
197:5 201:21
203:21 204:8
205:6,8,11,14
205:17 206:3
219:2,10 227:2
227:6,11 235:5
235:8 236:22
245:11,17
246:14 247:9
253:5 263:7
324:14 331:16
331:21 332:2
333:15,20
375:20 386:22
406:21 407:5
409:4 450:18

462:10
**polygraph**
402:9
**poorly**  385:7,9
402:13
**portion**  1:11
3:6 118:12
401:5 403:12
**portions**
118:13
**position**  130:18
171:14 355:14
355:16,18
357:8,10,20
358:7 359:20
360:15,22
361:12
**positions**
356:17,20,21
**positive**  161:7
392:9,17
394:19 395:8
395:16
**possession**  44:8
108:13,18
117:16 341:7
389:15
**possible**  296:12
344:10 370:7
383:3 409:4
414:15
**post**  55:7 75:6
75:10,11,13,16
75:17 77:7
78:11 181:14

246:9 262:7,14
437:11
**pot**  363:2,7,10
365:21
**potential**  24:10
24:11 25:18
172:3,7 204:1
204:16 373:20
**potentially**
25:10,16 33:1
53:11 81:16
162:14 204:3
420:22
**powerpoint**
34:12 35:8
36:6 38:18
39:8,17 50:9
191:19 197:11
198:1,4 203:2
**practice**  36:21
57:14,17
114:13,15,16
152:7,13 194:2
195:8,12 196:1
197:2,3,16
207:12 226:17
280:8 282:3,4
282:11 294:14
294:16 298:5
298:19 304:22
415:9
**practiced**
334:14
**practices**  17:3
17:12 169:6

193:15 423:10
423:13 439:12
**predict**  52:11
**preface**  336:10
**prefer**  381:7
**preferred**
271:21 272:8
**premise**  293:18
**prepare**  25:9
25:12 308:4
380:15
**prepared**  70:11
70:12 176:21
214:6 265:13
**presence**  118:5
**present**  2:21
73:19 117:5,7
128:3 243:3
305:4,11
**presentation**
34:4,5,12 35:1
36:7 39:18
50:10 191:19
191:22 192:4
192:14 197:17
198:5 203:2
**presented**
117:15 118:16
197:12
**preserving**
37:13
**press**  38:2
212:4 399:7
425:11

**presume**
297:10
**pretty** 23:1
149:11 190:6
218:10
**prevent** 311:21
**previous** 378:9
385:3
**previously** 5:6
6:1 15:22
31:12 33:14
54:13 56:11
59:17 80:11
82:1 93:3
96:15,17 97:12
113:16 119:11
136:6 137:16
157:9 198:6,18
199:9 200:4
201:8,15
243:15 247:20
263:15 305:22
326:7 405:11
422:9 463:3
**primary** 70:2
**print** 281:14
**printed** 87:14
**prior** 9:19,21
12:3 13:20
14:1 22:10
23:14 25:12
28:22 35:19
47:18,19 56:19
57:15 78:4
98:8 114:16

133:2 149:12
150:14,21
165:16 226:11
284:22 285:12
285:17 286:8
462:13
**privacy** 65:19
65:19,20 66:9
66:17 67:7
221:7
**private** 291:1
308:15 311:22
**privilege** 65:20
65:20 104:20
105:6 162:10
221:11
**privileged**
105:5 121:22
**pro** 335:1
**probably** 79:16
106:20 154:1
215:18 269:18
274:18 280:5
333:10 381:13
401:3 402:15
**problem**
179:13 389:17
**problems**
164:22 356:5
**proceed** 89:12
124:10
**proceeded**
463:6
**process** 10:20
80:3,6 102:21

126:16 209:14
239:15 265:20
266:4 291:7,20
294:20 295:1
298:17 316:12
377:12,15,20
379:19,22
383:7 409:21
423:20 424:8
451:5,6 452:13
452:18 453:5,6
453:21
**processed**
73:19 106:22
107:20 166:3
182:14 209:10
211:7 239:21
321:8 377:13
**processes**
210:15,20
211:3
**processing**
14:14 88:17
108:1 126:17
126:18 165:10
207:22 257:22
318:22 321:3
**produce** 309:7
347:16
**produced**
81:16 88:10
180:8 290:7
322:11 347:2
347:16 352:1
396:18

**producing**
294:21
**product** 322:9
**production**
337:11
**productions**
351:4
**professional**
355:19,21,22
357:2 361:1,2
361:5 396:7
403:6
**professor** 42:19
**profile** 3:8,9
11:5 35:16
50:15 94:12
194:3,18,19,22
195:3,9,15,19
197:4 202:21
203:1,5,7,8
220:1,5 221:22
**profiled** 370:21
**program**
229:18 292:1
**programmed**
269:4
**promise** 169:19
169:22
**promoted**
403:5,11
**promotion** 12:7
12:9
**promotional**
388:17 389:15

| | | | |
|---|---|---|---|
| **prompt** 453:18 | 409:7 | **public's** 427:9 | 320:14,21 |
| **prompted** | **provides** 86:3 | **published** 12:9 | 321:2,6 361:12 |
| 452:11 | 119:21 | 31:12,21 198:6 | 369:7 371:1 |
| **proofreading** | **providing** 25:5 | 198:18 199:9 | 381:12 390:20 |
| 330:11 | 74:2 87:5 | 200:5 201:8,15 | 390:21 391:1,4 |
| **proper** 144:12 | 105:14 156:10 | 354:17 402:14 | 393:16 394:5 |
| **property** 55:9 | 383:16 | **pull** 239:19 | 412:21 462:19 |
| **proposed** 27:21 | **provision** 45:3 | 275:15,22 | **puts** 292:10 |
| 68:17 69:16 | 45:13,17 | 413:16 416:10 | **putting** 43:14 |
| 78:4 85:9 92:3 | **provisions** | 417:3 431:6 | 83:6,14 218:16 |
| 98:7 134:9 | 90:11,14 91:9 | 432:8 436:10 | 391:5 |
| 199:2 320:10 | **provocative** | 450:15 | |
| 320:12 | 440:6 | **pulled** 74:19 | **q** |
| **proposing** | **pry** 228:15 | 387:10 460:12 | **qualifications** |
| 92:10 372:3 | **psa** 344:21 | 460:13,19 | 357:17 |
| **protection** | **public** 2:15 8:1 | **pulling** 245:7 | **qualified** |
| 10:17 | 22:15 24:10 | **purpose** 25:4 | 356:17,19,22 |
| **provide** 24:17 | 25:18 28:10 | 74:1 309:15,17 | 357:6,8,20 |
| 29:7,22 30:5 | 35:20 41:21 | **pursuant** 47:14 | 358:10,22 |
| 30:16 31:19 | 48:9 66:2 96:4 | 219:2 297:7 | 359:4,6,14,15 |
| 53:22 111:1 | 96:11,13 103:2 | **pursue** 405:15 | 359:20 360:2,9 |
| 120:11 141:4 | 103:7 109:11 | **pursuing** | 360:12 361:6 |
| 142:12 156:4 | 116:12,15 | 297:11 | 361:10 407:14 |
| 167:12 279:3 | 117:9 118:4,7 | **pursuit** 386:4 | **question** 16:13 |
| 280:13 288:17 | 118:15 123:21 | 386:22 | 56:4 60:22 |
| 297:21 405:13 | 131:9 212:5 | **put** 82:20 83:4 | 102:22 105:9 |
| 426:14 | 252:14 308:6,8 | 85:11 164:10 | 105:17 110:5 |
| **provided** 87:4 | 308:13,14,19 | 169:13 191:8 | 186:21 190:1 |
| 95:14,15 | 309:10 310:1 | 193:2 218:2 | 190:20 193:17 |
| 106:10 118:20 | 311:19,19,22 | 219:21 241:1 | 198:22 199:17 |
| 137:21 139:21 | 312:11 315:5 | 242:2,22 243:1 | 200:17 202:7 |
| 150:3 182:10 | 315:10 342:13 | 245:5,8 275:16 | 208:15,16 |
| 182:17 297:20 | 342:15 408:17 | 275:18 280:17 | 209:1 224:3 |
| 347:9,18 390:2 | 420:10 421:2 | 281:9 317:14 | 225:7 226:1 |
| 393:6 406:13 | 429:9 465:1,19 | 319:13 320:14 | 256:16 293:7 |
| | | | 293:18 299:4 |

302:1,14
305:15 319:7
320:18 333:9
339:6,18
342:20 343:7
343:13 358:5
358:18,20
359:11,18
360:1,17
372:15,19
373:2,6,12
390:17 392:3
392:11 394:22
395:10 398:7
399:3,10,12,12
399:19 400:4
400:19 404:20
405:12,15
408:14 424:4
433:11 436:1
444:20 450:15
452:3,9 453:12
463:2,6,10,13
**questionable**
437:19 438:9
438:17
**questioned**
124:20 147:8
147:13 426:9
438:12
**questions** 21:13
122:2 179:17
184:9,13
185:21 189:10
191:15,20

212:7 214:6
227:16 230:22
231:11 254:15
256:8 258:8,9
267:12 271:7
294:4 336:11
336:15 341:22
343:17,19
345:5 360:19
364:2 375:7
376:7 400:9,12
405:7,20
407:12 410:13
410:16 411:6
411:19 412:19
415:7 423:2
434:11 437:7
443:1,6 445:11
446:14 447:19
449:14 450:17
459:22 462:15
467:14
**quick** 434:11
436:13,17,20
460:22
**quicker** 238:21
266:10
**quickly** 240:8
268:20 296:12
405:10
**quite** 49:9
100:1 254:4,13
315:1 443:16
444:21

**quon** 4:8 323:4
323:7,12
**quon's** 323:9
**quota** 276:2
**quote** 242:2
243:1 394:11
**quoted** 163:22
300:11
**quotes** 242:6
390:7,20,21
391:2,4,6

**r**

**r** 1:17 2:1 7:1
136:1 465:2,19
467:18 468:4,4
**raise** 282:10
304:1
**ran** 364:6
**range** 275:18
288:10 348:7
348:10
**rank** 13:20
**ranking** 147:16
**ranks** 12:19
**rapport** 374:7
443:15
**reach** 163:13
318:5
**reached** 316:14
316:16,17
317:12,18
318:1 319:4
320:4 345:15
377:19

**reaching**
377:16
**reaction** 323:16
**read** 46:1 158:1
163:19 274:12
296:5 308:1
310:12 313:1
318:8 323:14
338:10 373:3,7
443:20 454:21
460:1 463:21
466:5
**reading** 4:4
32:13 78:2
315:20 444:11
**ready** 69:17,22
82:12 240:11
316:5
**real** 394:6
436:20
**realize** 162:1
265:2 317:11
**realized** 161:21
162:13
**really** 71:7
107:18 161:15
211:9 356:7
374:22 391:7
430:8 439:14
**reask** 105:8
206:15 342:22
358:5
**reason** 10:2
18:9 38:1
49:17 66:4

131:6 149:20
150:5,8 155:5
161:20 187:15
187:15 201:6
206:6,13,18
209:3 220:21
221:2 231:18
238:16 247:17
248:11 249:5
293:16 299:17
299:21 305:7
310:8 317:7
353:19 383:4
399:18,21
408:3,6 414:15
418:7 421:11
428:19 468:9
**reasonable**
214:5,9 220:9
282:14 408:11
423:20 424:6,8
**reasons** 18:8
65:14,16,16
81:9 264:10
266:14,15,17
266:18 267:2,4
293:2 310:11
442:20 443:8
**reassigned**
108:2 208:3,11
209:5
**reassignment**
108:4
**reassuring**
258:12

**recall** 50:12
97:5,6 99:13
105:14 127:14
129:4,9 169:1
179:19 182:4
184:13 187:18
212:13,17
213:14 214:19
219:8 222:22
223:15 225:2
226:1 227:15
227:18,22
230:13 231:3
231:13 234:2
238:5,9 253:7
253:10,20
254:6 261:11
265:15,21
267:10,14
268:6,10,21
283:14 284:18
286:4 287:22
294:20 295:3
298:21 299:7,8
300:9 301:2,16
302:10 303:21
307:20 309:1
314:7,9 343:19
344:8,12,14
345:2,7 346:17
347:20 348:3,9
348:13,22
349:3 364:11
366:10 367:7
375:12,17

407:2,10,16
408:14 410:16
411:3 413:15
416:20 423:2
424:21 428:21
432:1,4 436:4
436:8 437:7
442:12 443:6
443:22 444:4,7
445:11 446:14
449:16 453:17
458:19
**recalls** 347:5
**recap** 225:21
**receive** 85:5
151:3 154:4
231:1 244:11
252:1 297:8
**received** 12:11
13:6 51:19,22
52:16 64:15
78:1 98:21
107:7 110:19
113:21 134:15
137:9 138:7
143:13 226:11
237:18 241:19
244:20 246:2
253:10 260:1
282:20 300:1
341:7 464:3
**recess** 68:7
135:3 183:22
265:6 331:7
404:15 437:1

**recognize**
334:7
**recollection**
160:4 190:6
298:18 301:7
309:12,14
310:4 313:5
319:3 423:10
**reconsideration**
120:11,19
121:9
**recopy** 140:22
**record** 7:3,17
8:11 37:14
40:1 68:5,8
117:17 131:9
134:22 136:8
140:14,20
141:3 162:7
165:12 166:6
183:20 184:1
204:14 224:15
265:4,7 331:5
331:8 373:3,7
404:12,13,16
412:2 434:22
436:20,21
437:2 461:1
464:9 465:9
**recorded** 166:8
256:9,12
**recordings**
93:9 115:3
**records** 21:13
24:11 25:13,18

25:19 27:11
28:10 32:22
38:7 50:19
67:18 92:4
94:11 109:11
113:7,7 114:13
116:10 118:6
123:20 129:6
130:19,20
132:16 137:5,9
139:20,20
140:2,7 141:22
142:5 156:22
177:13 201:22
202:15 203:22
204:16 206:11
206:20 226:14
231:1 258:22
259:5 263:3
324:19 326:5
428:10
**recoveries** 49:8
**recovery** 48:10
48:13 49:1
100:22 101:4
206:4,9 220:4
**recreate** 141:7
142:9
**red** 292:10
**redact** 76:13
77:4 291:3,12
292:3,3,7
294:14 295:15
295:20 309:19
310:19,20

311:15 312:8
312:22
**redacted** 6:5
104:12 118:14
291:17 292:11
295:4 296:6,7
342:15 343:3
386:21 387:3,4
389:19
**redacting**
118:6 292:14
296:5 312:21
**redaction**
117:22 291:6
292:2 312:7
**redactions**
129:7 290:16
290:20,21
296:12 310:16
312:11,12
315:14,20,21
315:22 316:7
387:3 449:15
449:18
**redirect** 455:11
**redo** 284:5,9
287:1
**reduce** 298:16
299:22
**reduced** 272:12
465:7
**reducing** 278:3
**reelection**
145:4

**refer** 76:20
133:16,19
198:5 233:1
**reference** 75:10
76:8 79:1
102:8 133:8,9
133:10 245:9
307:15
**referenced**
148:6 450:19
**referencing**
45:20 66:18
87:3 148:7
435:15
**referred** 5:6
6:1 306:7
**referring** 100:9
138:19 165:13
189:11 192:17
194:1,19 197:2
197:5 232:2
241:5 307:16
330:5 363:6
375:4,6 377:6
380:18 383:14
384:6,13
451:21 453:2,3
**refers** 188:22
306:4
**reflect** 385:7,9
402:6,13
**reflected**
385:13
**reflects** 392:16

**refresh** 160:4
423:9
**refreshed**
191:4
**refreshes**
190:16
**refused** 140:14
146:3,9 347:16
**refuses** 440:7
**regard** 212:19
450:14
**regarding**
21:13 96:20
138:15 165:18
175:20 179:18
227:21 253:18
254:1 321:2
341:2 345:8
348:1 363:7
373:17 400:15
440:2 467:9
**regardless**
204:2
**regina** 284:6,7
**regis** 393:13,16
**regret** 164:21
**regrets** 164:20
165:11
**regular** 280:7
**regularly** 53:3
55:17,21 62:20
103:1,3 313:10
349:20 416:6
**reinstate** 384:5

**reiterated**
  29:12
**reiteration**
  80:10
**related**  8:17
  64:19 83:4,17
  83:22 93:10
  115:3 158:3
  185:21 203:8
  293:14 426:12
  465:10
**relates**  293:9
**relating**  301:9
**relationship**
  149:11,12
  343:18 349:16
  436:3
**relationships**
  77:19
**relative**  465:13
**relayed**  146:2,8
**releasable**  92:4
**release**  23:22
  28:10,17,19,21
  35:20 41:22
  42:3 44:7,15
  45:10 49:12
  65:14,16 66:2
  68:19 70:1
  74:6,10 75:6
  76:14,19,20
  78:4 79:12
  82:21 86:17
  89:19 98:8
  107:3 111:10

114:13 131:17
132:16,17,18
133:2,3 207:13
220:16 221:7
234:18,18
271:19 277:21
294:19 315:3,4
315:17 316:6
317:7,8 409:17
425:9
**released**  21:15
  22:10,15 23:14
  23:14 25:13
  26:2 28:2 41:9
  41:15,20 43:6
  43:9,18,19
  65:13 69:17
  70:10,12,15
  76:1 78:5,11
  79:18,22 80:4
  80:7 107:14
  130:22 131:3
  140:15 142:5
  176:21 196:22
  199:3 212:3,9
  258:7 293:4,11
  293:12,16
  314:15 315:16
  416:7 420:9
  442:16
**releases**  69:16
  78:20 79:1,5
  79:11,18,22
  106:19 107:1

**releasing**  44:21
  66:12 67:13,17
  76:20 79:2
  82:6
**relevant**  109:12
  337:4 394:1
**rely**  190:11
**relying**  347:1,7
  347:14
**remainder**
  405:21
**remains**  32:5
  32:21
**remarks**
  278:19,22
  281:9
**remember**  20:4
  20:9,15,16
  43:7,12 46:22
  77:14 79:7
  105:13 107:5,8
  107:19 111:4,4
  111:15 112:17
  112:18 121:1,8
  122:3 124:14
  131:4,5,6
  147:14 155:19
  160:17 166:5
  168:20 175:22
  180:2 185:10
  185:17 186:4,7
  186:15,16,17
  211:19 214:21
  219:16 221:3,6
  222:11,13,15

222:15,20
223:3 224:20
233:12 242:7
243:6 244:6,8
248:11 254:11
280:5 284:10
287:8 294:17
295:8 301:10
303:3 307:6
315:7,21 316:4
317:5 318:8,8
323:17 325:7
331:17 332:22
333:2,6 345:5
346:10,13,16
348:2,6,12
355:18 356:1
360:20 364:9
364:10,13,14
375:5 380:19
381:1 393:11
393:11,14
397:10 423:13
423:18 435:18
435:20,22
450:21 451:12
452:12,22
453:20,22
**remembered**
  215:5,7
**remove**  147:22
  168:15
**removed**
  145:17

**removing**
168:20
**repeat** 195:13
424:3 441:12
**repeatedly**
203:22 204:15
315:15
**rephrase**
293:19 302:5
452:5 455:3
**replied** 76:11
**replies** 58:19
**report** 3:14
14:22 15:4,7
21:3 61:13
75:6,10 96:19
113:18 182:21
246:2 250:8
260:1 274:18
277:18,18
306:14,20,21
308:2,5,8,9
309:10,11
311:20 313:3
315:11 364:13
371:17,21
372:7 390:2,17
416:16 432:12
**reported** 1:17
27:13 42:10
149:21 306:18
306:18 307:3
**reporter** 1:17
7:14,18 186:5
186:8 219:13

272:2 373:3,7
374:6 447:14
463:17 467:18
**reporters**
219:14 373:21
374:5 388:20
389:5
**reporting**
47:18,19
364:12,20
415:19 422:18
461:17 462:4
**reports** 41:20
41:21 63:5
72:14 166:22
167:1,2 266:8
306:10,12
307:12 308:1,7
308:10 309:2,8
309:13,20,22
310:1 312:6
313:2 315:12
435:8
**repository**
72:18 239:17
**represent** 8:8
88:9 109:9
181:22 223:5
237:21 263:1
406:12
**representation**
227:20
**representing**
184:16

**represents**
336:18 432:22
**reputation**
195:4
**reputationally**
305:18
**request** 3:14,14
3:18 6:12
22:21,22 27:21
30:14 37:9
41:15 42:17
43:12,22 44:2
44:22 47:22
48:3,3,8,11,17
48:22 49:3,5
49:11,18 53:7
53:10,10,20
62:4,15,20
63:4,13,18,22
65:12 66:1
68:17,19 69:19
72:5,16 76:21
77:6,12 79:3
81:17 83:5
84:19 88:18
89:1,18 90:13
90:19 91:8
93:7,14 96:19
96:20 97:10,17
98:15,22 99:3
99:21 100:21
101:4,20 102:3
102:5,9,14,15
103:10 105:15
106:7,20,20

107:4,15
109:10,11
110:1,8,18,19
112:2,7,13,22
113:5,6,9,17,18
113:21 114:4,8
114:18 118:13
118:22 119:7
119:21 120:11
120:19 121:9
121:15 131:13
131:19 132:22
133:1 134:9
137:4 138:1,7
138:12,18
139:8,14,22
141:18 155:19
161:21 166:2
166:20,22
168:5,15
176:14 180:10
181:20 182:1,6
182:20 183:4
192:10 198:17
200:8,14 201:1
202:17 203:2
204:19 205:7
205:10,13,16
206:3,7,11,19
207:4,7 216:4
216:10,22
218:5 219:11
219:12 223:9
223:10 224:16
227:9 238:6,13

238:17,21
239:5,18,20
240:1 241:19
242:14 245:2,5
245:13,16
246:5,22 247:8
247:15,16
249:12,22
250:10,16
251:1,4,12
252:20,22
253:7,10,13
254:17 257:16
258:12 260:5
260:20 261:5
261:13,16
262:2,10,17,20
263:2,3 264:13
266:12 267:9
267:17 268:11
271:18 272:19
274:4,8,11,12
274:19,21
275:7,17 276:6
276:15 277:1,7
277:16,17
278:16 280:1
280:14,20
281:21 282:18
282:21 283:2
283:11,15,16
284:11,16,19
285:1,3,10
287:9 288:14
289:14,21

292:20 294:5,7
294:11 295:18
297:6,11,12,17
297:19,22
300:3,4,18,22
301:2,9,11
303:1,2,5,19
304:1 305:17
307:6,9,10,16
307:18,21
309:7,15
314:13,20,22
318:22 321:4
324:17 326:21
343:9 377:1,6
377:17 408:19
409:6 410:8
411:4 416:15
416:16,22
417:20 418:1,7
419:19 420:2
428:20 429:3
429:15,18
430:17,17
431:8,18 432:2
432:5,12,15,19
433:7 442:16
445:15,22
446:1
**requested** 24:5
32:22 45:6
48:9 55:6,7
90:2 97:12
111:3 167:2
204:3,15

211:10 217:9
302:7 326:7
373:4,8
**requester**
25:18 43:22
52:11,15,19
53:11,20 54:7
74:11 76:21
100:10 126:14
138:4 142:12
181:13 201:7
201:15 202:21
203:6 204:14
222:9 225:18
239:16 247:11
282:1 290:7
293:4 315:5
409:7
**requesters** 24:9
25:6 26:22
28:11,22 29:8
47:4,13,13
51:11,14 52:10
53:4,16 54:2
55:22 70:16
80:7 86:18
167:19 168:4
222:6 259:10
299:22 303:10
303:14 378:1
380:10 409:17
443:12,16
445:20
**requesting**
23:10,11 30:11

53:16 94:11
97:1 115:10
203:7 217:7
249:14 288:7
293:14,21
**requests** 14:15
22:5,9,13,17
23:6,12,21,22
24:1,6 25:2
26:22 27:8,11
28:1,5,11,22
29:8,13,15
30:10,12,18
31:11 35:17,17
38:1 39:2,11
41:19,20 42:2
42:13 43:3,7,8
45:14 46:5
48:6,13,14
49:7,19 50:2
50:10,13,16
53:4,17 54:2
55:9,18,22
56:20 57:3
58:8 59:1,14
60:4,9,9,10,12
60:16,21 61:2
61:7,8,9,19
62:2,13,21
63:8 66:11
67:3 69:16
70:22 71:4,18
72:7,7,16,21
73:8,19 74:3,9
79:13 85:10

| | | | |
|---|---|---|---|
| 87:17 88:12 | 246:18 248:13 | 430:21 434:6 | 148:10 149:14 |
| 91:13 92:11 | 248:13,19 | 443:11 452:14 | 160:22 161:5 |
| 93:8 94:6,18 | 249:5 250:19 | 453:7 454:8 | 163:19 167:8 |
| 95:5,13 96:5 | 251:16 252:15 | 460:11 461:6 | 177:11 238:6 |
| 96:21 97:7 | 252:19 253:19 | **required** 30:18 | 238:13,17 |
| 103:4,13 | 254:2,14,15 | 44:1 48:16 | 297:21 303:2 |
| 107:20 108:1 | 257:19 258:1,7 | 50:12 53:22 | 370:6 382:16 |
| 115:2 117:20 | 258:15 259:1,5 | 94:6,17 239:10 | 410:7 434:17 |
| 134:3,7 165:10 | 259:11 261:9 | 315:19 324:14 | **responded** 99:3 |
| 165:19 168:4 | 263:22 264:4,7 | **requirement** | 99:6 230:14 |
| 176:8 177:3,12 | 268:19 269:3 | 44:13 | 276:15 390:18 |
| 179:18,22 | 272:15,21 | **requires** 44:4,6 | 420:3 |
| 180:7,11,11 | 273:6,8 275:12 | 117:21 439:5 | **responding** |
| 181:18 193:7 | 275:18,22 | **research** 51:11 | 69:20 269:7 |
| 194:3,3,9,9,16 | 276:4,9,9,19 | 51:14 52:10,15 | 309:6,15 |
| 194:18,19 | 277:2,3,8,8,10 | 52:19 | **responds** 77:16 |
| 195:1,9,15,19 | 277:12,22 | **resending** | 82:15 159:21 |
| 196:21 197:4,6 | 278:10,11 | 434:10 | 387:15 |
| 198:5 199:8 | 280:11 281:3 | **reserve** 10:15 | **response** 3:13 |
| 200:4,22 | 281:15 282:15 | 10:20 184:4 | 3:16 25:12 |
| 201:14 203:22 | 283:18 285:4 | 334:16 335:2 | 27:21 41:15 |
| 207:22 209:10 | 288:1,2 298:15 | 405:7,21 | 44:22 64:14 |
| 210:15,20 | 298:16 300:1 | 449:11 450:1 | 66:1 68:14,18 |
| 211:4,7 214:14 | 303:8 304:12 | 454:14 459:18 | 76:21 79:2 |
| 216:8,14,18,22 | 324:18 326:6 | **resigned** 108:1 | 81:17 84:19 |
| 217:4 218:17 | 336:21 337:5 | **respect** 9:14 | 88:11 98:7 |
| 219:1 222:16 | 337:11 353:17 | 92:3 150:17 | 99:1,7 105:15 |
| 222:17 224:11 | 356:3,4 363:18 | 151:9 169:5,10 | 106:6 107:14 |
| 224:12 225:2 | 378:12,17 | 411:3 424:18 | 117:20 120:12 |
| 225:11,14 | 408:13 412:1 | 431:18 | 121:14 131:18 |
| 226:11,12,20 | 414:10 415:2 | **respond** 44:2 | 167:11 168:14 |
| 227:5 230:18 | 415:11 416:4 | 45:14 46:4 | 250:1 254:16 |
| 235:1,6 236:18 | 419:2,13 | 65:2 74:2 | 266:19 269:2,9 |
| 237:18 239:2 | 421:12 423:21 | 75:20 77:6 | 269:10,12,16 |
| 239:10 244:20 | 424:9 430:20 | 120:9 139:22 | 297:8 300:10 |

355:20,21
377:16 378:8
390:14 391:7
394:10 409:6,7
420:10 421:12
440:3 442:16
**responses**  4:2
25:5 28:10,21
50:1 73:7,20
87:17 92:10
168:19 176:7
176:13 199:3
258:13 265:13
265:17 266:4
266:21 267:1,2
269:1,7 288:16
289:19 408:19
409:17
**responsibilities**
10:18 14:12
27:6
**responsibility**
42:7 355:22
357:2
**responsible**
72:18 203:17
204:12 242:9
438:8 467:8
**responsive**
130:18 141:17
240:1 290:19
338:17,20
340:18 341:14
423:21 424:9

**responsiveness**
290:18
**rest**  104:12
184:4 393:14
405:8 449:11
450:1
**restraints**
176:20
**result**  111:6,12
177:18 425:10
428:11
**results**  52:19
240:16
**resumed**
136:11
**retained**
252:21
**retaliate**
172:10
**retaliated**
153:12,18
154:1,3,18
155:1 174:18
174:22
**retaliation**  9:11
9:13
**retire**  18:6
376:16
**retired**  157:14
162:2 209:4
210:7 284:18
285:14 287:13
314:15 333:17
341:19 374:19

376:19 378:14
393:2,3,17
394:15 461:16
**retirement**
169:3 284:22
285:12,18
286:2,9 317:11
**retiring**  165:17
348:17
**returning**
225:17 344:17
**reveal**  105:5
121:22 304:22
**revenge**  16:6
152:7,13 408:2
**reversed**
352:10
**review**  22:5,10
22:14,19 23:7
24:10 25:6
27:1,17,22
28:1,2 29:9
34:22 35:19
36:13 38:2
42:4,6 46:3,5,9
46:15,20 47:5
47:14 48:17
49:13 50:11
60:12 68:14
75:15,18 80:9
87:13 94:7,18
97:22 98:8
102:16 103:4
103:13 109:4
115:5 133:7,8

133:9,10,15,19
134:7 143:19
155:17,20
156:5,11 177:4
177:17 180:17
181:2 193:7
196:22 200:9
231:6 237:10
237:11 249:4
265:12,19
266:3,12
290:12,15,17
290:19 309:17
313:7 336:3
352:5 409:16
409:21 411:9
411:14 412:1,4
412:7 418:8
430:22 432:15
432:16 434:5
450:12,12
460:12
**reviewed**  30:12
47:22 48:4,8
48:11,14 50:1
67:6 199:1,2,2
232:16 316:1
444:13 452:15
**reviewing**
231:10 265:16
266:7 310:5
**reviews**  134:4
316:3
**revised**  4:4

**rich** 157:18
184:8
**richard** 2:12
467:12,20
**richard.sobie...**
2:16
**rid** 383:5
**right** 31:15
44:15 51:8
65:6 71:18
142:8 164:19
167:15 174:10
175:12,15
179:2 182:20
186:8 188:1,10
189:1,5 191:18
193:11,22
195:16 196:8
196:12 203:18
204:19 206:4
207:14,19,22
209:15 210:21
211:16 212:21
213:20 214:11
216:1,2 220:2
222:3,6 224:9
224:13 226:3
227:7,11 228:3
228:7,13,17,20
230:10 232:17
233:22 234:21
236:16,19
239:8,11 240:2
240:3 241:1,6
241:17 242:20

242:22 243:2
243:19 244:12
244:14,17
245:3 246:3,11
246:14 247:9
247:22 248:4
248:19 249:1
249:16 250:11
250:14,17,20
251:9,13 252:4
252:6,9 253:5
254:22 257:17
257:20 258:1
259:9,15 260:6
260:9 261:1,6
261:10,14,21
261:22 262:14
262:21 263:7
263:17 264:2,5
264:14,18
266:1,11,12
267:18 268:15
270:6 271:11
271:14 272:12
273:10,20
274:2,6 276:17
278:8 279:12
280:1,11,15
281:1 282:21
283:2,6,12
284:12,16
285:15 286:11
287:16,17
288:4 290:13
291:1,13 292:8

292:15 293:16
294:5,9,12,15
295:20 296:20
297:16,17,22
298:3 301:15
302:8 303:11
304:17 305:2,5
305:12 306:4
306:11 308:15
308:16,18
309:8,21 312:5
314:5,17
316:15 318:12
318:19 319:1
320:1 321:4,11
322:4,19
323:20 324:1,2
326:12,15
327:9,15 328:2
328:10 329:16
331:13,16
332:15 333:17
333:19 334:11
334:17 335:5,7
335:10,13
337:20 338:2,4
338:8,12 339:9
339:12 342:1,4
342:7,10,13,18
343:4 346:9,12
347:6 348:17
348:20 349:8
349:11,21
351:8,11,19
352:2,12 354:4

354:22 355:12
359:6 362:7,19
363:11 364:8
367:16 368:13
369:16 370:1
370:11 373:20
374:14,16,19
376:16,19
377:7,9 378:2
379:4,10,16
381:19 382:4,9
382:14,15,19
382:20 383:1,2
383:14,17
384:7,14,17
385:2 386:7,18
387:5,7,12,17
391:15,19
392:1 396:4,22
398:4,13,21
400:17 402:4
402:14,18
403:5 404:1
406:3 429:16
447:10 448:2
455:3,19
459:17
**rights** 446:16
447:3 448:17
**risk** 140:22
141:1 283:17
283:22 286:20
**road** 253:1,8
377:2 379:9

robert 270:12
406:20 425:22
robinson
242:12,15
rockets 251:1
role 9:14 22:14
210:2 341:7
345:20
rolling 45:10
106:19
ronald 233:21
234:11
rookie 346:19
room 436:19
rose 12:19
roster 97:2
rotation 273:8
roughly 215:15
238:1
rover 348:7,11
row 98:21
113:20
rows 114:3
rpr 1:17 467:18
rude 37:16,17
37:18
rulebook 430:3
rules 427:8
ruling 124:17
124:20 125:2
330:18
run 77:18 78:3
80:8 213:11
235:2 250:1
298:21 396:14

414:17
running 145:4
145:5 325:14
ryals 426:18
ryan 233:21
234:3,11

**s**

s 2:1 3:1 7:1
136:1,1,1
468:4
safe 76:13,19
safety 220:21
305:4,12
sanitize 45:1
saray 273:15
sat 276:22
285:5,7 345:13
save 174:11,16
174:17 340:14
340:19,20,21
saved 98:21
340:22
saw 60:21
137:8 158:3
177:3 182:1
269:8,9 428:14
443:11
saying 131:5
147:20 158:9
163:22 314:6
319:1 330:2
345:5 346:15
384:16 411:19
411:21 452:12
458:19 462:9

says 35:16
40:19 41:7
54:22 55:5,10
58:15 64:17
77:17 82:20
86:12,20 89:10
89:22 90:5,15
97:22 98:21
113:20 114:4
115:15 117:13
139:13 166:20
170:18 171:7
171:17 177:10
194:2 232:3
246:1 259:22
283:2,9 289:6
297:1,3 324:13
326:3 327:12
327:20 335:21
336:21 337:3
337:14 341:5
363:1,10
367:11 368:17
379:12 382:13
382:21 386:4,7
390:1,12 427:8
428:8 430:6
434:10
scanned 141:3
schedule 150:7
150:11 346:14
348:1
scheduling
346:12

schiller 457:20
school 10:12
228:3 229:13
229:17,18
321:13
scope 455:11
scott 260:5
458:3
sean 93:11
115:4 263:3
428:11
search 239:10
239:14 240:3,5
240:15,22
241:18,20
242:3,5,10,16
243:1 288:16
288:17 339:1,8
339:11,19
340:1,17
341:13 428:13
searches 240:8
240:13 339:14
339:16
searching
192:11
seat 428:14
second 3:13,16
34:3,17 37:5
37:10 66:8
94:10 120:10
128:9 139:15
181:21 186:14
233:4 234:16
249:11 250:10

| | | | |
|---|---|---|---|
| 259:21 260:19 | 94:13 96:7,22 | 214:16 223:20 | 380:5,16 381:4 |
| 260:19 262:2 | 97:3,19 98:2 | 226:15 232:7 | 383:9 384:12 |
| 262:17 264:13 | 101:1,22 | 239:22 242:6 | 385:21 386:5,9 |
| 292:20 307:17 | 102:12 104:3 | 244:22 246:1,6 | 386:11,15 |
| 325:13 370:3 | 104:12,13 | 246:17 248:5 | 387:3,14 390:5 |
| 438:6 439:2,2 | 105:18 106:4,8 | 248:12,16,19 | 393:18 396:13 |
| 440:17 | 109:6,14 | 249:12 251:2,6 | 396:16 406:22 |
| **secret** 196:3 | 110:15,16,21 | 251:12 253:2 | 413:8,13,21 |
| 427:17 | 114:1,6 115:7 | 254:18 259:22 | 414:5,17 |
| **section** 2:15 | 115:13,20 | 260:3,21 262:4 | 415:16 416:17 |
| 89:8 279:11 | 116:3 117:2,11 | 262:11 270:7 | 417:6,13 426:3 |
| 297:7 | 117:18 118:1,9 | 275:15,16 | 426:15,21 |
| **security** 10:20 | 118:17 119:18 | 278:5 281:22 | 427:18 428:6 |
| **see** 23:13,13 | 120:1,6,13 | 282:18 283:7 | 428:16 430:9 |
| 24:2,5 30:1,10 | 121:17 126:14 | 290:19 292:22 | 434:7,15 |
| 30:14 32:9 | 132:20 137:6 | 296:17 300:7 | 436:19 438:10 |
| 33:6,18 34:6 | 137:11 138:1,4 | 306:3 308:2,22 | 440:9,21 445:9 |
| 35:13,21 41:10 | 138:9,12,13 | 311:14 314:20 | **seek** 329:11 |
| 47:6 54:16,20 | 139:7,13,18 | 322:6,18,20 | 344:4 |
| 55:3,11,15 | 140:9 142:22 | 323:5 324:13 | **seeking** 16:6 |
| 56:15 58:14,19 | 143:7,10 | 324:20 325:19 | 22:22 137:4 |
| 60:1,6,8,13 | 153:14 157:12 | 326:3,10 329:8 | 253:7 329:19 |
| 62:3,18 64:11 | 157:21 158:2,5 | 329:13 330:20 | 332:8 345:7 |
| 64:21 65:4 | 158:11 159:9 | 335:14 336:20 | 348:13 |
| 66:15 67:14 | 159:15,19 | 337:1,8,11,12 | **seen** 11:15 |
| 75:2,8,20 76:6 | 160:2 163:7,17 | 337:17 338:7 | 154:16 423:4 |
| 76:16 77:21 | 164:3 165:1 | 338:11 341:11 | **seidman** 458:8 |
| 78:21 80:21 | 166:17 167:4 | 351:6,15,20 | **select** 392:22 |
| 82:9,13,18 | 170:9,19,21 | 362:16 363:4 | **semester** |
| 83:1 84:13 | 171:7,12,21 | 364:4 366:21 | 229:21 230:2 |
| 85:21 86:5,9,9 | 172:5 174:13 | 367:3,10 370:8 | **send** 49:7 53:15 |
| 86:14 87:1,18 | 175:13 177:1 | 370:12,17 | 55:2 56:18 |
| 88:2,22 89:13 | 177:15 179:14 | 371:2 372:10 | 57:9,12,21,22 |
| 90:3,7,15 92:5 | 180:13 194:2,6 | 372:13 373:10 | 61:8 126:5,10 |
| 92:12 93:12 | 202:4 204:5 | 377:4 379:21 | 126:13 157:17 |

**[send - shortage]**                                    Page 73

227:16 229:7
239:19,20
244:3 269:2,11
269:15 281:22
303:13,14
323:12,19
353:2 367:5
374:4 377:13
387:16 389:5
397:2,16,21
398:4,9,12,15
414:16 424:1
424:11 464:2
**sending**  57:2
57:18 195:8
197:3 226:19
282:11 298:5
327:8 367:7
388:19 389:18
391:17 399:6
426:11 434:13
434:17
**sends**  58:15
386:14,20
426:16
**senior**  10:17
273:4 274:14
**sense**  77:19
211:6
**sensitive**  35:17
50:11,13,20
194:4 195:1,2
195:9,15,19
197:4 198:10
198:17 427:21

432:20 433:6
**sensitivity**
433:6
**sent**  27:22 34:3
35:1,18 55:8
55:14 61:16,18
64:19 98:7,10
99:16,17,18
104:1,6,15
105:19,21
106:13 107:11
108:18 130:19
141:2 143:9,12
147:19,20
149:16 164:17
182:2 194:4
195:16,19
206:3 209:3
226:9 229:2,3
230:9,12
261:18,19
266:11 268:10
298:11 299:18
301:13,13,14
302:18,19
303:10 328:1
336:8,9 338:14
343:9 349:15
349:17 391:21
394:9 400:14
402:2,16
404:22 413:6
413:11,19
414:1,3,9
415:1 416:22

417:4 426:17
460:14
**sentence**  41:6
209:9 232:3
234:16 297:1
384:2 440:17
440:18
**sentinel**  251:5
**separate**
357:16
**september**  1:13
7:4 54:15
322:19 344:9
370:1 468:7
**sergeant**  9:12
145:14 286:13
**sergeants**
370:21
**serve**  18:16
**service**  96:12
96:13
**services**  14:5
**set**  4:2 72:17
**seven**  19:7,11
21:10 142:22
193:4 196:18
197:15,20
211:13,15
324:11 328:9
338:7 370:15
**seventh**  145:1,7
145:14,18
147:16 344:5
345:9,21 346:8

**several**  48:6
150:4 189:20
190:2 212:21
213:2 219:14
288:1 315:15
363:18 366:8
397:7,15
**shaking**  158:8
**share**  371:9
373:20 375:9
**shared**  127:10
127:14 278:19
375:13
**shari**  1:17 7:14
465:2,19
467:18
**sharing**  158:8
371:4,6 372:12
375:2 376:1
**she'd**  22:9
**sheet**  34:3,9,15
34:19 62:11
110:14,15
466:9 467:11
**sheriff**  253:1,8
377:2 379:9
**shield**  157:19
426:20
**shift**  344:19,21
**shit**  82:11
**shop**  345:12
**short**  93:5
107:21 237:16
**shortage**
344:19

**shorter** 276:10
455:5
**shortly** 120:12
148:5 187:10
**show** 10:22
81:22 100:16
157:8 158:22
243:14 247:10
247:12,19
251:20 263:14
296:14 305:21
322:1 334:5
351:1 362:4
366:17 369:3
374:11 385:17
391:12 396:2
412:11 431:13
460:5
**showed** 208:10
417:11 443:2,3
**showing** 327:5
**shown** 407:8
431:7 443:1
**shows** 97:17
425:22
**shyla** 55:5
**sic** 18:3 40:18
48:7 88:1
109:22 132:16
175:9
**sick** 344:22
**side** 76:14,19
369:7 405:18
**sides** 178:20
237:17

**sideways**
140:21 141:4
**siding** 260:18
**sign** 16:15,18
129:6
**signature**
254:19 418:17
465:18 467:7,9
467:11,17
468:22
**signed** 159:13
318:11 466:9
467:11
**significance**
59:2 60:10,21
226:21 245:8
245:10 248:14
252:19 263:22
**significant**
427:11
**similar** 49:19
49:19 85:5
**simple** 145:3
208:10 250:1
273:7 274:15
274:19 277:19
**simpler** 274:15
**simply** 17:2
**simpson** 361:11
361:14
**sincere** 440:3
**single** 104:5
155:19 156:5
227:17 244:12

**sir** 344:9
346:18
**sit** 68:16
345:11 346:3
**sitting** 189:19
**situation**
200:12 345:16
**situations**
132:17 234:17
**six** 13:2 19:3
89:7 283:8
341:5,14
370:15
**skip** 18:19 33:2
**slack** 345:1
**slide** 35:9 36:11
36:15,20 40:18
192:17
**slow** 176:6
379:20
**small** 277:4
**smaller** 271:22
272:9
**smear** 172:15
**smeared**
140:19 283:19
**smith** 458:13
458:16
**smooth** 346:4
**smoother**
213:11
**sobiecki** 2:12
13:8 16:8 17:5
17:14 18:22
19:4,8 21:4,22

22:7,20 23:8
24:12,20 25:8
25:20 26:12,19
27:2 28:3,14
29:3,18 30:19
31:7 32:10,12
32:16 33:8
34:8,16,20
35:3 36:4,14
37:2,10,15,18
38:5,19 39:4
39:13,19 40:6
40:14 42:8,21
44:10,16 45:2
45:18,21 46:6
46:11,16,21
47:9,15 48:18
49:4 50:6,22
51:5,15 52:7
53:5,12 54:3,9
55:19 56:7,21
57:6 58:3,10
61:11 62:7
63:15 64:1
65:18 66:3,22
67:9 69:7,13
70:5,18 71:2,9
71:19 72:9
73:2,9,15 74:4
74:13 77:8
78:6,12 79:14
80:13 81:19
83:8,15 84:7
84:21 85:7
87:6 88:20

| | | | |
|---|---|---|---|
| 89:16 90:20 | 152:3,9,14,20 | 222:21 223:4 | 321:1,22 |
| 91:6,17,21 | 153:5 154:6,12 | 224:6 225:1,9 | 322:10,14,16 |
| 92:6,21 94:2 | 154:19 155:3 | 225:16 226:7 | 322:17 325:9 |
| 95:1,7,18,22 | 155:22 156:7 | 227:14 229:11 | 327:4 331:2,11 |
| 98:9,16 99:8 | 156:12,18 | 230:21 232:1 | 333:13 334:4 |
| 101:8,17 | 157:2 158:16 | 232:15 233:10 | 335:19 339:7 |
| 102:17 103:5 | 168:1,7,17 | 233:17 234:6 | 340:3 342:21 |
| 103:14 104:18 | 169:8 172:18 | 234:14 235:12 | 343:8,16 347:4 |
| 105:3 106:17 | 173:1,6,19 | 235:18 236:1,6 | 347:12,19 |
| 107:16 108:14 | 174:6 175:7,18 | 236:14 240:19 | 350:3,9,22 |
| 108:20 109:19 | 176:15 177:7 | 241:9 243:7,13 | 352:16,21 |
| 110:3,10 | 177:20 180:3 | 244:9,15 | 358:4,11 359:1 |
| 111:20 112:15 | 180:19 182:12 | 246:20 249:10 | 359:12,21 |
| 113:1,13 | 182:22 183:7 | 250:3 251:22 | 360:10,18 |
| 114:11 116:19 | 184:7,9 186:9 | 252:3 254:5 | 361:18 362:3 |
| 119:3,8 121:21 | 187:1 188:16 | 255:7 256:10 | 363:20 365:14 |
| 122:14,22 | 189:8 190:4 | 257:1,7 258:21 | 366:3,16 369:2 |
| 123:8,12,16 | 191:1 193:18 | 259:7,18 | 369:16,20 |
| 124:2,18 125:4 | 194:17 195:7 | 260:14,16 | 371:13 372:20 |
| 125:8,12,16 | 196:6 197:13 | 263:13 265:1 | 373:5,9,18 |
| 126:1,7,12,21 | 198:2,15 199:5 | 265:10 272:5 | 374:10 376:11 |
| 127:3,7,18,22 | 199:13,20 | 275:4,10 | 378:6,22 380:1 |
| 128:18,22 | 200:18,21 | 276:13 278:13 | 382:1 384:21 |
| 129:12,16,20 | 202:10,12 | 285:13 288:22 | 385:16 389:2 |
| 130:2,6,10,14 | 203:16 204:11 | 289:8,13,20 | 389:16 391:11 |
| 131:10,22 | 204:22 206:15 | 290:5,9,11 | 392:7,14 394:8 |
| 132:3,7,11 | 206:17 207:3 | 291:10,16 | 395:5,14,20 |
| 133:4,12,21 | 207:17 208:16 | 293:8 296:9 | 396:1 398:8,20 |
| 134:5,19 | 208:19 210:18 | 299:6 300:2 | 399:4,13,20 |
| 136:18,22 | 212:12 213:9 | 302:5,6,16 | 400:1,5,8,13,22 |
| 140:16 142:1 | 214:10 215:3 | 305:16 307:5 | 401:4 402:1 |
| 142:14 143:21 | 215:19 216:16 | 310:15 311:13 | 403:3 404:1,6 |
| 144:4 148:16 | 218:12,21 | 312:4 314:2 | 404:9,12,18 |
| 150:2,22 | 220:17 221:9 | 315:18 318:4 | 405:6,20 |
| 151:13,19 | 221:19 222:12 | 319:10,19 | 408:22 409:8 |

**[sobiecki - specialist]**                                    Page 76

| | | | |
|---|---|---|---|
| 409:12,18 | 455:12,19 | 133:9 137:17 | **source**  257:10 |
| 410:1,10 | 456:2,11,16,21 | 139:16 153:1 | 264:18 347:7 |
| 411:10,16 | 457:4,9,14,19 | 159:1 176:2 | 390:16 |
| 412:8 413:10 | 458:2,7,12,18 | 181:4,5 183:17 | **sources**  390:2,7 |
| 414:19 415:4 | 459:2,7,12,17 | 186:5 213:21 | 390:10,13,18 |
| 415:12,20 | 460:1,17 461:8 | 245:14 246:16 | 390:18,20 |
| 417:11 418:4 | 461:19 462:5 | 256:19 260:15 | 391:1,4 |
| 418:10 419:4,9 | 462:12,16 | 263:2 272:2 | **southwest**  1:15 |
| 419:15,20 | 467:13,20 | 281:11 282:19 | 2:6 7:11 |
| 420:12,18 | **sobiecki's** | 304:10 322:7 | **space**  368:14 |
| 421:5,14,21 | 412:18 | 335:20 346:22 | 368:15 |
| 422:11,19 | **solely**  204:12 | 354:2 369:13 | **speak**  124:6 |
| 423:6,12 424:2 | **solutions**  1:21 | 378:8 384:9 | 145:20,22 |
| 424:12,16 | 468:1 | 386:13 414:2 | 146:6,13 148:4 |
| 425:4,13 427:3 | **somebody** | 424:16 425:18 | 149:13,14 |
| 427:22 428:22 | 147:22 311:7 | 425:20 426:6 | 166:8 174:16 |
| 429:6 430:13 | 464:3 | 428:7 432:8 | 174:19,20 |
| 431:3,9,13,20 | **soon**  55:2 | 437:17 438:5 | 186:11,13 |
| 433:2,13 435:2 | 147:19 149:16 | 439:20 441:12 | 381:7 394:11 |
| 435:9,17 | 258:13 | 442:7 444:7 | 394:19 |
| 437:14,21 | **sorry**  9:5 15:22 | 461:3 462:16 | **speaking**  76:12 |
| 438:18 439:8 | 16:12 21:7 | 462:21 463:17 | 77:3 148:3 |
| 439:13 440:13 | 28:20 32:12 | 464:6 | 153:9 234:2 |
| 441:5,11,17 | 34:8,20 36:17 | **sought**  162:12 | 255:3 364:15 |
| 442:1,17,22 | 39:5,22 40:7 | 162:13 226:13 | 372:21 |
| 443:13,20 | 40:21 44:5 | 326:5 329:6,19 | **special**  253:11 |
| 444:2,11,15 | 51:8 71:13 | 330:2,3,7 | 259:8 304:14 |
| 445:16 446:2,8 | 73:13 74:20 | 345:18 | 446:6 |
| 446:18 447:5 | 77:1 83:11 | **sound**  238:1 | **specialist**  20:3 |
| 447:11,15 | 86:8,11 87:20 | 330:10 | 110:8 198:11 |
| 448:3,8,19 | 93:21 96:16,22 | **sounded** | 212:20 213:2,7 |
| 449:2,8,20 | 98:2 103:2 | 330:12 | 239:22 242:13 |
| 450:10 452:4 | 108:9 110:5 | **sounds**  65:2 | 242:15 266:11 |
| 452:16 453:16 | 112:21 113:12 | 330:6 390:8,11 | 268:17 275:7 |
| 454:9,13,15 | 116:12 117:5 | 390:13,19 | 276:1 277:6 |

278:4,10,14
279:14,17
281:8 290:12
**specialists**
195:11,18
196:20 198:20
237:15,16
265:13 266:3
273:1,5,6,13,19
274:1,2,6,7,10
274:14,16
276:2,21 279:4
279:7,21
291:11 296:11
**specific** 21:18
29:22 30:9
53:3 72:5
90:11,19 94:10
118:14 167:20
168:10,16
182:21 207:2
221:3 226:13
247:12 276:1
329:20 364:18
393:1 411:1
416:1 430:17
**specifically**
33:3 85:8
131:14 216:3
217:12 376:5
**specified**
307:13
**speculate** 312:3
**speculating**
312:2

**speculation**
112:16 395:11
425:14 429:7
445:17 449:21
**speed** 379:20
**spell** 243:9
**spelling** 232:14
**spend** 189:17
**spent** 126:18
189:20 230:6
233:5 321:10
**spirtos** 459:3
**split** 412:15
**spoke** 48:7
148:19,19
153:11,17,21
154:5 185:4
187:8,16
230:17 233:21
234:11 301:12
328:1,6 329:21
332:3 381:9
**spoken** 9:22
117:17 184:12
184:15,19,22
187:5 381:14
**spread** 189:20
**spreadsheet**
88:10 100:3
110:15 111:2
111:10,11,16
180:7 181:17
**spreadsheets**
275:14

**st** 10:12
**stack** 313:3
412:15,17,22
416:11 460:13
**stacy** 62:16
456:17
**staff** 13:15
72:13,22 147:2
148:20 268:14
272:22 281:13
306:6,17 393:2
393:3 394:15
**staffed** 107:21
**staffing** 237:2,4
237:8 238:18
411:7,8,13,21
412:3,6
**stamp** 62:14
396:11
**stand** 93:4
308:3 426:9
**standard** 203:9
204:19 415:9
**standardize**
43:16 44:14
**standing** 284:2
**start** 18:2
193:22 224:22
229:12 245:7
272:14 273:17
297:2 298:9
299:1 316:22
378:13 407:7
**started** 190:8
223:13 226:18

226:19 253:17
258:10 298:10
299:18 321:12
325:5 328:15
405:10 453:15
461:17
**starting** 140:3
**starts** 35:9
386:3 396:12
**state** 8:10 10:7
94:5 137:4
146:16 314:7
**stated** 164:8
299:20 320:19
337:4 438:3
**statement**
36:11,19 83:3
151:16,22
153:12 164:6
172:4 208:18
320:15,16
361:17 383:19
384:1 429:22
451:20
**statements**
155:11 416:7
**states** 1:1
427:12
**stating** 16:18
**station** 370:21
**status** 278:15
445:15,21,22
**statute** 44:4,6
44:20 90:12
91:10 141:21

177:5 222:16
223:1 238:6
293:3 300:11
300:17,20,21
410:7
**statutes**  420:9
**statutory**
238:13,17
276:15
**stay**  158:10
202:11 308:14
372:22 427:17
461:1
**stayed**  280:21
**stefanie**  85:19
**stenographic**
7:17
**stenotype**
465:7
**steps**  209:11
**sternback**
313:19
**sternbeck**
56:13 57:19
59:22 61:15
243:22 248:3
252:9,11
263:20 413:12
414:4
**steward**  345:12
**sticker**  159:5
**stop**  50:19 63:4
63:5 177:12
221:20 307:12
307:13 309:9

309:12 310:7
310:12 311:9
314:13 434:6
435:8
**stopped**  148:2
190:9 311:8,10
**stopping**
183:10 310:9
**stored**  388:3
404:22
**stories**  64:17
257:10 258:11
373:21 426:7
**story**  31:3,5
167:16,18
219:14 258:9
364:6 370:7
371:5,6,8,9,16
372:2 374:5
383:3 385:5
397:18,22
398:1,18
**straight**  141:1
141:8 142:10
142:11 283:20
**strategic**  65:2
65:10 66:19
221:5,5
**strategies**
221:8
**street**  1:21 2:9
2:15 250:11,13
250:17 468:1
**streets**  430:5

**strike**  185:19
185:20 196:15
198:12 200:11
201:4 204:14
206:7 210:12
219:22 239:4
240:13,20
245:14 249:3
257:14 267:4
269:14 272:6
295:2 298:8
309:16 316:21
339:4 350:14
361:21,22
396:20 452:19
**structure**  273:9
**studied**  387:22
388:2
**study**  388:1,16
**stuff**  81:5 158:4
214:2 325:5
388:10
**subject**  9:9
46:5 60:3 75:5
98:22 104:1
109:4 139:7
201:20 202:21
203:6 205:7,11
205:13,17
219:9 236:21
252:21 258:22
323:3 326:6
420:9 431:19
**submit**  134:9

**submits**  297:17
**submitted**  58:8
96:6 97:17
101:20 225:3
257:16,19
297:19
**submitting**
240:22 242:17
**subpart**  137:3
138:19
**subpoena**  4:11
334:10 335:6
338:17,20
340:18
**subset**  194:9
**substance**
141:17 332:17
366:10
**suggest**  232:9
234:10 410:18
**suggested**
232:13
**suggestions**
232:19 410:14
**suing**  9:11,12
158:3
**suite**  1:21 2:9
2:15,19 467:1
468:2
**sunday**  229:21
229:21 327:18
**super**  163:20
**superior**  15:14
316:15

supervise 14:19
supervising
296:10
supervision
42:6
supervisor
20:13,22 134:9
146:7 188:18
209:4,7 237:14
266:7 273:22
274:2
supervisors
20:5 176:6
237:13
supervisory
273:12
supplemental
308:12
support 15:13
150:5
supposed 30:17
31:20 61:20
78:19 271:19
312:22 313:1
434:11
sure 36:10 38:7
39:8 68:4
70:10,11 80:1
129:7 144:10
144:11 153:2
164:1 195:14
197:14 210:4
212:18 213:22
222:1 223:14
224:15 243:5

249:21 274:16
310:13 311:3
312:5 322:8
354:2 370:5
385:13 387:2
403:1 404:11
416:1 422:3
424:6 439:16
surplus 19:18
212:17
surprise 228:22
289:21 295:9
295:11
surprised
42:16,22 43:2
179:21
surprising 58:6
surrounded
394:16
survey 394:13
394:15
susceptible
80:19 81:2
84:18 232:5
suspect 66:13
310:2,3
suspect's
308:20
suspects 309:19
suspended
406:20
swanson 459:8
swear 7:18
switched
367:22

sworn 7:22
136:6 151:16
151:22 355:11
362:21 465:5
system 279:14
427:15
systems 428:9

**t**

t 3:1,1 136:1
243:10 402:1
403:1 466:1,2
468:4,4
tab 15:22 432:8
tabuchi 260:20
tactic 440:3
tactical 221:5
tactics 440:2
take 25:2 43:20
45:13 46:9,14
46:20 67:19
68:1,2,16,21
109:8 114:18
120:10 134:21
164:10 177:11
178:8 183:9,18
193:1 207:7
228:19 233:4
264:21 267:5
276:9,10 277:2
285:6 290:4
291:7 292:6
295:14,20
296:4 306:1
319:15 324:10
331:2 338:10

341:16 347:12
388:12,13
389:4,11 404:2
425:18 436:13
436:17 449:18
453:6 454:8
460:21
taken 7:6 135:3
202:18 225:14
377:17 405:11
433:12 465:3,6
465:12
takes 296:8
talk 37:4,11
38:10 48:21
76:5 77:17
85:1,11 87:16
120:18,21
148:3 149:14
159:18 161:10
161:13 185:7
185:11,15
187:12 211:13
222:5 231:17
256:21 257:3
258:11 259:4
271:8 274:17
316:11 328:4
329:22,22
345:15 346:6
376:8 420:2
443:17
talked 161:12
162:17 185:13
187:2,17

201:11 220:1
224:11 227:2
239:1 259:5,10
309:20 312:13
327:14 328:3
332:7 353:16
377:21 388:11
393:14 410:22
416:19 424:15
424:16 430:16
450:19
**talking**   77:13
96:12 97:11
120:16 140:12
160:19 166:6
171:1 174:20
187:19 225:22
235:4 240:13
243:18 258:10
259:1 269:22
318:17,21
319:21 320:1
326:18 331:12
335:17 363:8
374:22 376:6
378:13 402:3
417:14 435:13
446:11 452:10
452:13,18
453:20 454:7
462:3
**tangible**   420:13
**tapes**   115:11,16
**taught**   279:9

**taylor**   393:13
**team**   164:21
384:3,3,18,19
385:1,2,6
**technical**   10:19
**technicalities**
144:11 384:6
**technician**   2:22
7:2 68:5,8
74:18 134:22
136:8 178:5
183:20 184:1
265:4,7 331:5
331:8 368:5
404:13,16
436:21 437:2
450:5 462:19
464:9
**technology**
243:11
**tell**   19:21 22:18
59:9 61:19
62:12 76:1
92:9 113:4,8
146:4 158:13
158:19 160:14
160:18 166:6
185:19 186:19
200:7,10,22
201:4,6,13
202:13 211:18
214:1 221:14
231:20 237:7
238:8 239:13
241:6 256:11

269:11 284:15
299:20 303:13
312:8 319:5
332:20 334:7
354:14 365:20
368:7 380:14
387:14 390:2
390:15 451:1
454:22 460:2
**telling**   84:16
85:1 301:16
302:10 348:22
363:3 364:7
407:2
**tells**   240:2
**temporarily**
344:17
**ten**   14:21 47:3
47:8 205:1,2,5
215:15,21
216:21 370:15
382:18
**tenure**   333:7
**teresa**   323:9
**term**   27:17
133:15 189:9
271:13 435:13
**terminated**
383:20 385:4
**termination**
383:7 428:12
**terms**   144:12
190:5 203:9
204:15 212:16
222:18 223:9

241:1,20
242:10 259:13
278:3 288:17
461:13
**terry**   233:21
**test**   402:4
414:17
**testified**   8:1
17:2,10 30:8
54:6 70:2,21
71:6 95:4
101:3 133:18
136:7 147:10
155:9 175:20
206:1 207:11
207:18 217:11
217:12,13,17
253:16 267:16
276:14 321:10
349:14 366:2
372:17 373:15
389:9 432:20
**testify**   147:5
164:12
**testifying**
101:13,14
**testimony**   10:3
117:14 149:20
200:2 226:6
431:11 435:12
435:20,22
444:4,7 447:6
462:13 465:4,6
465:9 466:6,7

| | | | |
|---|---|---|---|
| **testing** 402:10 | 443:1 444:5,8 | 190:17 231:12 | 266:6 282:14 |
| **text** 3:10,19,22 | 444:22 445:2,7 | 261:21 277:5 | 284:1 295:14 |
| 4:13,14,15,16 | 451:13 | 308:18 326:1 | 300:15,16 |
| 4:17,18,19,20 | **texted** 187:13 | 346:4 392:1,5 | 301:1,4 305:3 |
| 4:21 43:13 | 339:21 340:2 | 394:20 395:8 | 305:6,7 307:11 |
| 53:15 54:14 | 362:7 369:14 | 441:9,15 | 316:8,13,16 |
| 59:5,6 64:9 | 380:20 | **think** 9:5 12:8 | 331:18 332:3 |
| 65:6 66:8 82:2 | **texting** 344:8 | 17:7 20:16 | 333:22 334:9,9 |
| 147:19,20 | 344:14 346:17 | 23:1 27:9 30:3 | 349:14 353:12 |
| 148:10,22 | 347:20 381:8 | 43:3 45:7 57:7 | 353:13,19 |
| 149:13,16 | **tgv** 251:1 | 62:12 63:2 | 355:21 356:16 |
| 157:10 159:7 | **thank** 21:9 41:3 | 74:18 78:13,18 | 356:21 357:5 |
| 163:6 164:16 | 141:15 179:11 | 79:15,15 80:10 | 357:12,22 |
| 170:7,18 176:3 | 186:8 218:1 | 84:22 85:1 | 358:6,13 |
| 191:7 270:3 | 260:14 321:19 | 94:20 99:10,16 | 359:14,19 |
| 318:7,9,10 | 322:10,11 | 99:20 100:4,9 | 360:8,12 |
| 319:20 320:5 | 361:3 387:16 | 100:14 101:3 | 361:12 364:17 |
| 323:1 338:12 | 398:4 405:6 | 111:5,8,10,11 | 365:8,10,19 |
| 339:1,12,20,21 | 406:8 412:20 | 125:21 138:20 | 366:2,6 371:14 |
| 340:6 347:2,7 | 434:10 442:5 | 149:18 153:3 | 372:5 373:16 |
| 347:8,14 | 464:8 467:15 | 160:16,17 | 377:21 383:18 |
| 349:15,17 | **thanks** 158:7 | 168:19 171:17 | 385:5 389:17 |
| 362:13 363:22 | 374:21 379:12 | 172:21 178:4 | 392:4,6,8,12 |
| 366:19 367:1 | **theresa** 454:17 | 181:16 182:13 | 394:1 395:7 |
| 367:13,14 | 454:19 | 185:17 186:3,6 | 399:5 402:6 |
| 368:18,20 | **thing** 174:11 | 186:12 187:16 | 404:2,19 |
| 369:5,22 370:3 | 187:17 377:11 | 188:12 192:17 | 410:22 412:18 |
| 372:16,17 | 377:14 405:17 | 193:21 206:22 | 414:20 415:7 |
| 374:13 376:13 | 431:17 | 214:4 217:10 | 417:11 420:21 |
| 379:2 380:13 | **things** 26:14,16 | 217:12,13 | 424:13 429:8 |
| 381:12,15,16 | 28:17 49:10 | 219:4,13,16 | 435:10 443:14 |
| 381:19 382:2 | 83:6,13 85:6 | 220:9 225:13 | 443:15 451:18 |
| 382:12 383:3 | 87:14 158:9 | 232:12,21 | 453:13,14 |
| 385:18 389:22 | 160:19 173:5,7 | 238:7 256:1 | 454:13,19 |
| 394:10 407:8 | 174:3,21 175:3 | 257:2 258:14 | 458:16 460:18 |

[thinking - together]                                    Page 82

| | | | |
|---|---|---|---|
| **thinking**  375:8 | **threatened** | 155:21 166:3 | 444:22 449:15 |
| 375:16 | 125:20 128:14 | 169:22 175:10 | 450:2,3,4,4,16 |
| **thinks**  365:16 | **threats**  258:9 | 176:19 177:5 | 451:9 454:13 |
| **third**  55:14 | **three**  8:16 | 178:9,16 | 463:10 |
| 229:19 261:5 | 18:19 60:9 | 179:12 183:13 | **timekeeper** |
| 262:2 352:17 | 92:20,20 93:15 | 184:5 185:4 | 179:14 |
| 352:19 370:19 | 120:4 155:12 | 186:14 187:8 | **times**  8:15 |
| 384:9 386:14 | 178:1,2,2,5,6,7 | 202:14 207:2 | 62:17 72:14 |
| 427:7 | 178:22 179:1 | 223:13 228:12 | 99:10 100:9 |
| **thirds**  229:19 | 183:16 214:13 | 228:16 229:16 | 148:7 186:10 |
| 229:20 | 237:15,15 | 230:5,8 231:5 | 187:2 217:11 |
| **thought**  18:11 | 316:9 335:15 | 233:5,13 | 237:13 261:1 |
| 18:15 34:16 | 335:16 336:1 | 235:11,13 | 362:7 367:22 |
| 69:22 76:4 | 336:20 337:3 | 237:4 238:12 | 381:6,9 |
| 107:13 172:2 | 370:14 376:15 | 238:14,18 | **timing**  267:13 |
| 174:1,3 256:16 | 427:11 439:22 | 239:8 249:4 | **tip**  397:4,17 |
| 258:19 266:19 | 449:19 450:5 | 265:3,20 266:1 | **title**  6:3,5 10:16 |
| 299:21 313:2 | **threw**  145:5 | 266:4 271:20 | 144:7,9,10,15 |
| 356:18,18 | **throated**  164:1 | 272:20 276:15 | **titled**  157:18 |
| 357:7 358:9,21 | 164:7 | 286:5 291:7 | **today**  9:19,21 |
| 361:5,9 366:5 | **thrown**  388:10 | 292:18 295:20 | 10:3 78:2 82:7 |
| 394:6 402:12 | 426:8 | 296:1,4,8 | 82:8 101:13 |
| 438:16 | **thursday**  82:8 | 307:14 321:17 | 115:19 159:18 |
| **thoughts**  325:4 | 468:7 | 328:6 331:20 | 184:12,17,20 |
| 353:14 394:5 | **tighten**  331:3 | 333:19 337:4 | 185:1 197:12 |
| **thousand**  236:7 | **time**  1:14 7:3 | 338:11 339:3 | 233:5 271:14 |
| 237:22 | 8:13 9:2 18:18 | 339:15,15 | 306:7 344:16 |
| **thread**  54:14 | 20:22 23:9 | 341:8 347:12 | 367:2 370:6 |
| 56:12 75:1 | 38:6 39:6 46:3 | 349:19 353:21 | 379:8,9 423:5 |
| 82:2 85:19 | 63:3 87:9 90:6 | 362:19 373:21 | 444:14 |
| 119:13,15 | 90:16 100:1 | 378:15 381:3 | **today's**  7:3 |
| 159:8 166:15 | 102:11 106:21 | 383:8 397:11 | 464:10 |
| 170:8 320:5 | 107:22 109:9 | 403:4,10 405:7 | **together** |
| **threat**  128:9 | 112:12 124:19 | 405:8,21,21 | 281:14 328:17 |
| 146:22 166:7 | 126:17 146:16 | 409:6 422:14 | |

**told** 19:18
21:11 22:4,8,9
26:4 27:5
31:10 36:12
37:22 49:12
59:15 61:8
63:9,10 81:4
85:9 92:3
129:5 141:5
145:19 146:5
146:12,18
147:2 148:13
164:14,18
165:3 167:15
171:10 172:14
172:21 196:14
211:22 220:19
224:12 225:19
267:17 269:19
270:5 284:4,8
286:22 287:5
288:4 295:9
299:12 301:15
303:14 310:18
310:20 313:6
316:18 317:13
317:14,17
318:2,18
320:21 321:3
321:15 326:20
329:21 330:13
330:15 331:15
331:20 332:1
332:10 333:1,4
345:11 346:3

363:17 365:18
366:11 398:3
407:4 421:16
421:19 461:5
463:22
**tomorrow**
82:16
**tonight** 374:22
**took** 57:16
99:20,22
178:14 212:8
239:8 280:20
284:3 328:5
411:15 412:7
**tool** 292:2
**top** 65:4 89:22
97:21 98:3
120:9 178:21
214:12 246:1
250:8 262:10
288:6 297:2
382:7 386:3
396:4 427:8
429:22 434:3
**topic** 23:1,11
30:21 31:15,16
31:17 59:16
194:21,22
429:20
**toprera** 8:12
**total** 119:7
249:14
**touch** 393:8,10
393:12

**toward** 32:8
33:5
**towards** 103:12
202:2,17
352:11
**track** 51:9
88:16 215:4
275:11,20
281:3,8
**trained** 430:6,7
**training** 48:5,6
217:18 299:9,9
299:10,14,15
430:5
**transcript** 6:22
115:18 116:11
182:16 294:22
295:3,7,12,15
**transcription**
466:7
**transcripts**
102:10 104:2,6
104:9 105:14
106:11,13
107:7,12,14
108:8,12 112:3
115:11 116:6
182:2,10,14
207:1,13 294:8
294:12,15
424:19,20
430:18
**transfer** 15:10
368:5

**transferred**
13:17,21 14:4
72:3
**transitioned**
166:4
**transparency**
439:5
**transparent**
439:7
**treated** 222:17
253:13 375:20
443:11
**treatment**
154:4 253:11
259:9 446:6
**trees** 104:7
260:18
**trial** 320:20
**trick** 341:22
**tried** 148:3
258:11 296:11
339:21 445:1
**trouble** 170:19
170:20
**true** 12:14
16:19,22 17:4
17:6,13 18:4
18:21 19:3,7
21:21 29:17
47:8 50:5 51:4
54:8 56:5
64:18 69:5
70:4,6,8 71:1,8
73:14 91:16,20
92:20 94:1

| | | | |
|---|---|---|---|
| 95:21 111:18 | 455:5 | 21:17 22:4,14 | 112:6,22 113:4 |
| 113:12,14 | **trying**  104:7 | 22:18 23:5 | 113:8 114:9 |
| 122:13,17,19 | 146:10 148:22 | 24:18 26:4,9 | 119:6 120:18 |
| 122:21 123:7 | 170:19 199:6 | 27:5,8 29:6,13 | 123:3,19 124:5 |
| 123:11,15 | 218:22 231:17 | 29:15,21 30:16 | 124:8 125:19 |
| 124:1 125:7,11 | 287:15 358:19 | 36:12 37:22 | 128:4,6,8,10,13 |
| 125:15,22 | 359:3 441:20 | 42:7 49:21 | 129:3 130:17 |
| 126:20 127:2,6 | **tuesday**  53:1 | 50:3 51:10,13 | 132:19 134:16 |
| 127:17,21 | 71:6,16 73:5 | 52:9,16,18 | 137:8 140:13 |
| 128:17,21 | 73:20 236:15 | 53:4,15,19 | 142:6 168:18 |
| 129:11,15,19 | **tuesday's**  246:2 | 54:6,14,22 | 176:12 177:4 |
| 130:1,5,9,13 | 259:22 | 55:13,17 56:13 | 182:2,10 197:6 |
| 132:2,6,10 | **tuned**  318:19 | 56:19 57:19 | 199:11 200:6 |
| 136:17,21 | **turn**  40:17 | 58:1,15,19,22 | 201:14 202:18 |
| 143:19 144:3 | 93:17 145:22 | 59:9,21 61:14 | 207:5,8 211:16 |
| 150:1 152:19 | 192:9,16 | 61:19 62:4 | 211:19 213:10 |
| 153:4 155:10 | 208:20 211:10 | 63:11 67:4 | 213:14 214:13 |
| 162:3 164:12 | 234:15 245:20 | 70:2 71:13,17 | 218:6,15,18 |
| 173:5 176:10 | 246:21 248:18 | 72:1,4 73:6,20 | 219:1,21 |
| 272:6 319:9 | 250:7,22 | 75:1 76:1,4 | 220:10 222:9 |
| 320:21 352:8 | 251:11 259:20 | 77:5,11,16 | 223:15,21 |
| 408:9 418:11 | 260:17 262:1,9 | 78:2,17 79:8 | 224:8,12,13,17 |
| 465:8 466:6 | 262:16 264:12 | 80:6,17 81:2 | 225:10,19 |
| **trust**  375:1 | 282:19 283:1 | 81:13 82:3,11 | 226:1,10,20 |
| 376:1 | 294:3 296:22 | 82:20 83:6,14 | 230:10,13 |
| **trusted**  147:10 | 325:18 329:1 | 83:21 84:11,15 | 231:1 232:4 |
| **truth**  171:10,15 | 335:9 336:1 | 84:16 85:6 | 234:2,19,21 |
| 172:14,21 | 338:6 351:17 | 87:4,13,17 | 236:16 243:21 |
| 383:5 | 437:18 | 89:18 92:2,9 | 248:3 252:9 |
| **truthful**  10:3 | **turned**  289:22 | 92:16 95:4 | 263:20 265:16 |
| 188:7 | 316:7 353:7 | 96:5 98:10,14 | 267:17,21 |
| **try**  32:17 51:17 | 370:22 | 104:1,15 | 272:11 277:4 |
| 172:21 178:8 | **turner**  15:6 | 105:11,15 | 280:10 281:5 |
| 193:14 283:15 | 19:13,15 20:12 | 106:10 107:12 | 286:21 287:14 |
| 320:6 346:4 | 20:21 21:3,11 | 108:7,10 112:1 | 298:14 299:17 |

303:13 304:2
306:10,14,22
312:8 313:6
316:8 324:16
325:11 326:5
329:5,18
330:18 331:1
413:11 414:2,3
414:10 418:2
419:7 421:10
421:19 422:8
429:9 430:19
435:7,16
439:16 450:12
453:2 454:8
460:8,12 461:3
**turner's** 69:1
70:14 83:3
235:6 265:19
268:3 298:19
311:21 414:18
418:16
**turning** 370:6
**turnover** 237:9
411:7
**twenty** 13:2
117:9 233:6,7
233:8
**twice** 110:6
186:12 229:21
**twitter** 241:12
241:15
**two** 8:19,19
18:4,8 55:10
60:10 64:15

94:5 144:22
146:11 147:5
149:5,18
188:10 193:14
213:16 229:19
229:20 230:2,2
237:12,14
264:4 273:4,6
273:12 274:13
274:16 286:8
289:16 302:4
308:4,7,10
312:15 314:1
316:9 338:7
339:14 346:20
370:14,21
374:18 379:9
393:14 403:11
418:18,19
428:7 434:11
438:5 443:17
459:22
**type** 22:9 98:22
376:7
**typed** 338:22
**types** 426:8
**typewriting**
465:7
**typical** 126:4
**typically** 32:5
32:20 84:4
415:1

**u**

**u.s.** 7:8
**ugh** 435:1
**uh** 122:10
209:2 281:12
359:8 361:19
**ultimately**
121:3
**unanticipated**
463:3
**unaware** 21:14
389:3
**uncertainty**
348:19
**under** 16:15
97:21 98:3,20
147:9,11 148:2
198:10 222:16
222:22 235:7
238:5 277:15
278:18 293:3
335:1 383:21
385:3 407:4
465:8
**undercover**
305:9,10
**underperfor...**
150:21
**understand**
22:12 25:4
40:4 62:2 78:2
78:9 79:8,10
84:16 144:12
147:17 149:1
171:1 193:14

193:19 197:14
200:12 201:19
205:4 216:7
223:14 311:3
359:13 367:15
387:4 394:18
397:20 399:22
448:17
**understanding**
24:13 40:8
80:5 81:12,20
115:15 189:10
229:6 230:1
290:21 391:1,3
395:1 441:2
454:7,10,12
**understood**
24:9 80:2
**unfair** 372:5
**unfortunately**
35:6
**unhappy**
137:10 140:13
145:8 173:9
**union** 345:4,5,8
348:1 370:5
**unit** 7:5 48:10
48:13 68:6,9
135:1 136:9
183:21 184:2
206:4,9 210:3
220:4 265:5,8
331:6,9
**united** 1:1
427:12

**units** 72:17
192:8,12 211:9
304:19 305:1
**universe** 199:7
**unofficial**
38:16 39:2,10
40:2 197:5
**unprofessional**
142:6
**unqualified**
358:6,13
407:21
**unreasonable**
408:16
**unredacted**
93:8 342:17,18
343:10,14
387:15,17,19
388:19 389:18
**unsolved**
249:15
**untrue** 317:13
410:20 437:13
**unusual** 124:16
269:20
**unwritten**
38:16 39:1,10
196:11 197:5
**upcoming**
146:14
**update** 89:12
299:15 377:11
377:14
**updated** 12:2,4
12:6 379:8

**updates** 254:14
277:1
**upgrade** 368:2
**upgraded**
167:2
**upset** 151:11
151:17 346:11
408:6
**upsetting** 440:4
**upstairs** 49:13
68:16,21,22
99:19 134:7,11
134:14,18
200:8 201:2,7
277:4 280:20
452:14 453:7
453:21 454:2,3
460:19 461:6,7
**upstanding**
438:7
**url** 386:14
**use** 25:19 27:17
43:12 53:11
59:13 66:11
67:12,16
133:15 177:13
185:5,12 189:9
241:2 242:6,7
279:4,11
350:14 362:12
375:2 390:1,4
394:18 429:11
453:9
**used** 45:6 52:2
52:3 70:13,16

81:10 88:16
95:12 103:11
133:18 160:8
172:2 202:14
211:19 212:13
212:17,18
269:6 271:13
279:15 312:12
410:9 429:4,11
431:1 435:12
453:14
**uses** 201:21
**using** 134:14
134:17 144:11
257:3
**usually** 52:13
177:11 217:7
218:8 280:19
281:9 368:2
**utilized** 18:10
18:12,14

**v**

**v** 382:13
**va** 167:3
**valid** 399:21
**vargas** 454:17
454:19
**various** 117:10
433:6
**vaughn** 118:13
118:20
**vendette** 1:10
4:9 7:6,21 8:12
55:5 68:10,10
136:4,10 184:3

184:3 265:9
331:10 464:12
466:4,20 467:6
468:6
**vendetteparker**
341:10
**vendor** 377:13
**verbally** 52:20
59:8 85:2,4
123:4 124:7,8
381:15
**veritext** 1:21
7:15 468:1
**version** 231:8
252:1 281:1
324:10 328:2
329:10
**versions** 308:5
**versus** 7:7 9:8
209:6 430:4
**victim** 145:1
**victims** 308:18
308:19
**video** 2:22 7:2
68:5,8 74:18
134:22 136:8
178:5 183:20
184:1 252:22
265:4,7 331:5
331:8 377:13
404:13,16
436:21 437:2
450:5 462:19
464:9

**videographer**
  7:13
**videos**  377:2
  379:7,9
**videotaped**
  1:10
**viehmeyer**  2:21
  104:16 108:7
  108:11 182:3
  182:11
**view**  409:3
**views**  356:11
**volume**  45:4,5
**voluminous**
  239:2,6 274:21
  288:13 289:16
**volunteer**
  334:21
**volunteers**
  271:3
**vs**  1:5 467:3
  468:5

**w**

**w**  3:18 466:1
**wait**  37:8
  192:20 200:20
  302:2 320:11
  454:14
**waiting**  54:22
  89:19
**waive**  90:12
**waiver**  90:1
  91:13 300:14
  300:18

**waivers**  90:6,9
  90:15 91:1,4
**waiving**  300:16
**walk**  17:22
  176:6 272:19
  315:9
**walked**  269:18
**walking**  269:21
**wall**  250:11,13
  250:17
**want**  10:22
  18:18 24:10
  30:14 37:4,15
  37:17 38:12
  40:17 65:13
  66:2 68:2 69:3
  82:4,20,21
  83:4,19 84:11
  86:21 87:16
  126:15 136:15
  142:17 157:8
  163:15 171:4
  174:18,22
  178:15,19
  193:13 195:6
  197:2,14
  200:12 205:4
  214:5 216:6,6
  220:15 221:14
  223:14 224:10
  224:15 233:4
  234:20 244:7
  246:16 264:21
  271:8 292:7
  306:1 312:5

316:11 322:8
  336:11 351:3
  351:22 352:5
  354:2 359:13
  363:19 371:17
  380:15 381:11
  390:4 400:2
  405:14,17,19
  407:7 412:11
  412:15 422:3
  425:21 427:7
  437:17 439:20
  450:15 455:5
**wanted**  23:12
  23:13 24:5
  25:9,11,15
  30:10 37:10
  38:7 43:5,8,16
  49:7 51:16
  63:4 73:7
  78:14,14 80:2
  80:3,6 92:12
  140:21 141:6
  142:8 145:17
  145:22 146:6
  147:9 149:3
  152:1,7,13
  163:12 166:5
  167:17 213:10
  214:13 223:22
  224:8 235:2
  241:2,4 266:22
  272:11 275:15
  275:16 278:15
  280:14 298:14

304:9,16,19
  308:1 310:12
  311:14 315:4
  330:8,14
  340:14 392:6
  393:2 394:13
  394:15 395:3
  397:20 398:1
  398:18 408:2
  418:12
**wanting**  231:1
  231:12
**wants**  294:12
  344:20
**washington**
  1:16,22 2:6,10
  2:16,19 7:12
  55:7 75:11,16
  75:17 77:7
  78:11 181:14
  246:8 260:6
  262:6,13
  437:11 467:2
  468:2
**watch**  153:22
  222:14 223:12
  223:16,19
  226:3 383:21
**watched**
  117:14
**watchlist**
  152:12 189:1,3
  189:9 193:11
  196:11,17
  201:20 203:21

204:8 205:6,7
205:11,14,17
206:2,2,19
219:2,9 227:1
227:6,10 235:5
236:21 245:11
245:17 246:14
247:9 253:5
263:7 331:16
331:21 332:2
333:20 406:21
407:5 409:4
450:18 453:10
453:14
**water** 241:5,6
**way** 32:8 33:5
33:11 63:22
64:18 98:13
107:11 150:7
150:11,21
155:7 169:1
202:1,16
210:19 224:7
230:9,16
240:15 266:22
278:6 293:20
330:9,12
332:12 377:2
380:14 412:3
438:3 441:22
453:5
**ways** 419:2
442:14
**wc.com** 2:7

**we've** 36:19
45:6 67:20
192:17 243:18
271:13 331:3
351:4 372:21
444:13
**web** 341:21
**website** 11:18
100:12,13
249:19 342:1,4
342:7 386:21
389:19
**week** 49:6 58:1
226:12 227:17
244:21 251:18
276:3,21,22
278:5 376:19
414:1,3
**week's** 56:19
**weekly** 23:20
52:22 56:17
57:2,10,12,18
58:1,7 60:15
61:7,13,18
63:13,19 69:9
69:10,15 71:12
71:22 73:5
226:10 227:15
227:17,21
229:2,3 230:9
230:12 243:18
244:3,12,16
245:13,15
247:22 252:5
252:17 263:17

281:13 415:2,8
415:10 418:16
419:3,8,12
422:7
**weeks** 46:9
58:8 229:1
230:2,6 285:17
286:8,9 408:17
**weigh** 168:14
**weighed** 168:18
**welcome** 68:12
136:14 252:2
265:11
**went** 23:9,21
24:1 38:6,8
69:17 99:9
100:8 134:11
134:14 141:1
215:2 229:19
229:20 247:10
247:11 277:3
277:20 283:16
285:1 286:12
303:6 315:6,7
330:7,10
332:10 333:15
338:21 343:1
346:5 353:8
422:14 432:16
454:2,3 460:11
**west** 8:20 9:1
**whatsoever**
225:5
**white** 348:7,10
370:21

**williams** 1:15
2:5 7:11
**willing** 126:14
**willingness**
297:5
**wills** 334:21
**withdraw**
16:12 24:16
26:15 28:18,20
30:4 32:3 44:5
44:19 49:22
56:3 60:22
61:5 66:6
69:10 71:14
79:9 83:12
84:3 102:21
103:2 107:9
108:9 112:5
119:14 137:18
144:8 150:15
162:21 168:13
174:2 181:5
410:4 414:13
424:7,17
431:12 442:21
461:4
**withdrawing**
405:14 463:11
**withdrawn**
283:2 297:12
405:16
**withhold**
408:17
**withholding**
64:19

| | | | |
|---|---|---|---|
| **witness**  7:19,22 | 87:7 89:17 | 152:10,15,21 | 244:14 249:9 |
| 9:16 13:9 16:9 | 90:21 91:7,18 | 153:6 154:7,13 | 249:21 254:4 |
| 17:6,15 19:1,5 | 91:22 92:7,22 | 154:20 155:4 | 255:6 256:7,14 |
| 19:9 21:5 22:1 | 94:3 95:2,8,19 | 156:1,8,13,19 | 256:17,20 |
| 22:8,21 23:9 | 96:1 98:10,17 | 157:3 158:17 | 257:6 258:19 |
| 24:13,21 25:9 | 99:9 101:10,18 | 168:2,8,18 | 259:4,17 |
| 25:21 27:3 | 102:18 103:6 | 173:2,7,20 | 263:11 275:3 |
| 28:4,15 29:4 | 103:15 104:19 | 174:7 176:16 | 276:12 278:8 |
| 29:19 30:20 | 105:2 106:18 | 177:8,21 179:5 | 284:22 288:20 |
| 31:8 32:11 | 107:17 108:15 | 179:9 180:4,20 | 289:6,12,18 |
| 35:4 36:15 | 108:21 109:20 | 182:13 183:1,8 | 290:2,10 291:9 |
| 38:6,20 39:5 | 110:11 111:21 | 183:11,15 | 291:15 296:3 |
| 39:14,20 40:7 | 112:17 113:2 | 184:5 186:3,7 | 299:5,20 |
| 40:15 41:4 | 113:14 114:12 | 186:22 188:15 | 301:21 302:3 |
| 42:9,22 44:11 | 116:20 119:4,9 | 190:2,21 | 302:15 307:2 |
| 44:17 45:3,22 | 121:22 122:3 | 194:14,16 | 308:21 310:7 |
| 46:7,12,17,22 | 122:10,15 | 197:9,20 199:1 | 311:5,7,11 |
| 47:10,16 48:19 | 123:1,9,13,17 | 199:18 203:15 | 313:22 314:22 |
| 49:5 50:7 51:1 | 124:3,19 125:5 | 204:10,21 | 318:1 319:8,18 |
| 51:6,16 53:6 | 125:9,13,17 | 206:22 207:16 | 320:19 333:10 |
| 53:13 54:4,10 | 126:2,8,13,22 | 210:17 211:22 | 335:17 339:19 |
| 55:20 56:8,22 | 127:4,8,19 | 213:4 214:9,21 | 343:14 350:2,7 |
| 57:7 58:4,11 | 128:1,19 129:1 | 215:18 216:12 | 352:20 358:2,9 |
| 61:12 62:8 | 129:13,17,21 | 216:14 218:8 | 358:16,21 |
| 63:16 64:2 | 130:3,7,11,15 | 218:20 220:15 | 359:19 360:4,7 |
| 65:8,19 66:4 | 131:11 132:4,8 | 221:2,18 | 363:16 365:13 |
| 67:10,22 69:14 | 132:12 133:5 | 222:11,20 | 371:12 373:13 |
| 70:6,19 71:3 | 133:13,22 | 223:3 224:4,20 | 373:15 376:5 |
| 71:10,20 72:10 | 134:6,20 | 225:8,13 | 379:18 384:19 |
| 73:10,16 74:5 | 136:19 137:1 | 227:13 229:10 | 388:22 389:11 |
| 74:14 77:9 | 140:17 142:2 | 230:20 232:12 | 389:14 392:4 |
| 78:7,13 79:15 | 142:15 143:22 | 233:9,15 234:5 | 392:12 394:4 |
| 80:14 81:20 | 144:5 148:17 | 235:17 236:11 | 395:1,12 |
| 83:9,16 84:8 | 150:3 151:1,14 | 240:18 241:8 | 398:18 399:14 |
| 84:22 85:8 | 151:20 152:4 | 243:5,10 244:6 | 399:16,21 |

| | | | |
|---|---|---|---|
| 400:20 402:22 | 457:3,8,13,18 | 453:22 454:1 | 237:11,14 |
| 403:10 405:13 | 458:1,6,11,16 | **work**  126:6,10 | 273:7 304:7 |
| 409:1,9,13,19 | 459:6,11,16 | 145:20 149:4 | **worried**  171:11 |
| 410:2,11 | 460:18 461:9 | 239:15 247:11 | 172:11 |
| 411:11,17 | 461:21 462:7 | 266:8 275:21 | **worry**  147:3 |
| 412:9 414:20 | 462:14 463:19 | 281:4 285:11 | **write**  15:13 |
| 415:5,13,21 | 465:4,6,9 | 322:9 335:2,3 | 16:5 19:11,17 |
| 416:13 417:17 | 467:8 468:6 | 355:4,6 389:20 | 21:10 22:3 |
| 418:5,11 419:5 | **witnessed** | 392:19 | 27:5 29:21 |
| 419:10,16,21 | 17:19 154:22 | **worked**  26:15 | 31:10 32:4,20 |
| 420:13,19 | 160:19 175:16 | 26:16 40:10 | 33:11 60:8 |
| 421:6,16 422:1 | 176:12 423:11 | 157:5 188:9 | 66:9 67:12 |
| 422:13,20 | 439:12 441:2,9 | 191:5 211:9 | 71:15 73:13,18 |
| 423:7,13 424:3 | 441:15,21 | 346:1 355:5,8 | 80:16 92:2 |
| 424:13 425:5 | **witnessing** | 355:9,9,15,17 | 104:11 117:6,7 |
| 425:15 427:4 | 174:21 175:3,3 | 377:9 | 137:8 142:4 |
| 428:1 429:1,8 | **wonderful** | **working**  30:9 | 153:1,8 155:11 |
| 430:14 431:4 | 361:14 | 42:12 82:16 | 158:1,20 |
| 431:21 433:3 | **wondering** | 149:12 163:14 | 159:17 165:11 |
| 433:14 435:3 | 376:22 | 167:16 174:17 | 169:11 172:1,4 |
| 435:10,18 | **word**  117:14 | 188:13 190:17 | 174:9 176:18 |
| 436:12 437:15 | 167:7 172:2 | 211:11 212:1 | 201:21 209:10 |
| 438:2,20 439:9 | 212:14,17,18 | 257:11 278:16 | 214:13 215:8 |
| 439:14 440:14 | 292:14,15 | 284:12,16 | 248:12 252:18 |
| 441:6,12,18 | 362:12 453:14 | 285:5,17 | 263:22 320:12 |
| 442:2,18 | **wording** | 287:15,15 | 334:21 353:5,6 |
| 443:14 444:17 | 166:21 167:8 | 321:11 349:16 | 353:10,12,14 |
| 445:4,18 446:3 | 167:17 168:5 | 353:4 375:8,8 | 354:7 369:10 |
| 446:9,20 447:7 | 168:10,16,19 | 375:15,16 | 379:6 387:9 |
| 447:13 448:4 | 221:4,6 | 418:19 | 392:15 407:19 |
| 448:10,20 | **words**  134:17 | **works**  355:3 | 408:1,5,8 |
| 449:4,10,22 | 147:15 200:7 | 389:1 | 421:10 437:17 |
| 450:2 452:10 | 211:19 256:20 | **worn**  99:22 | 437:18 438:5 |
| 453:13 454:6 | 292:16 296:8 | 116:2,6 130:22 | 439:1,2,3 |
| 456:10,15,20 | 352:6 451:18 | 131:3,8,14,18 | 441:8,14 |

**[write - zoom]**                                    Page 91

| | | |
|---|---|---|
| 442:10 | 375:22 437:10 | **z** |
| **writes** 54:18 | **y** | **zip** 340:21 |
| 55:13 64:14 | | 405:5 |
| 76:4 78:17 | **yeah** 8:22 | **zoom** 2:5,13,13 |
| 82:6,11 84:11 | 28:13 34:18 | |
| 86:1 109:14 | 62:6,16 65:5 | |
| 117:4 119:21 | 88:1 120:14 | |
| 120:3 158:7 | 144:14 155:14 | |
| 163:12 176:3,5 | 178:4,6 212:22 | |
| 370:4 374:21 | 220:3 232:21 | |
| 380:2 426:5 | 239:3 265:1,1 | |
| 429:22 | 284:13 301:5 | |
| **writing** 77:15 | 313:18 322:15 | |
| 196:7 317:14 | 342:22 343:5 | |
| 319:11,14 | 355:20 363:9 | |
| 320:15,22 | 363:10 389:10 | |
| 321:3 325:5 | 403:9 435:21 | |
| 381:12 400:16 | 455:22 462:17 | |
| **written** 40:3,11 | **year** 9:4,4,5 | |
| 218:13 279:10 | 151:2 177:14 | |
| 281:16 330:10 | 177:18 180:9 | |
| 430:3 | 237:22 283:12 | |
| **wrong** 17:11 | 288:10 289:15 | |
| 51:8 87:20 | 314:20 367:19 | |
| 175:5 | 368:3 428:8 | |
| **wrongs** 175:16 | **years** 12:15 | |
| **wrote** 27:21 | 13:2 45:13 | |
| 36:9 38:11,15 | 46:20 155:13 | |
| 97:11 120:15 | 188:10 213:20 | |
| 155:15 162:5 | 214:4 344:18 | |
| 164:5,18 | 403:11 408:18 | |
| 169:11,16 | 423:22 424:10 | |
| 197:10 234:17 | 449:19 | |
| 270:4 280:19 | **york** 62:17 | |
| 330:3 354:1 | 261:1 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.