# EXHIBIT 5

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3      -----------------------------:

4      AMY PHILLIPS,                 :

5                   Plaintiff,       :

6            vs.                     : Civil Action No.:

7      DISTRICT OF COLUMBIA,         : 22-277(JEB)

8                   Defendant.       :

9      -----------------------------:

10

11

12          Videotaped Deposition of ROBERT CONTEE

13                   Washington, D.C.

14              Tuesday, August 8, 2023

15                    12:41 p.m.

16

17

18

19

20     Job No. PA-6040760

21     Pages 1 - 179

22     Reported by:  Robert M. Jakupciak, RPR

1          A     No.  Not entirely, no.  That's not --

2     ultimately yes, the Chief is responsible for

3     everything, but there are different layers within

4     the EOCOP.  You have an Executive Assistant Chief,

5     there is a Chief of Staff, there is a Chief

6     Operating Officer, but so not everybody reports

7     directly to the Chief.

8          Q     Okay.  Do you work with Leeann Turner?

9          A     I did.

10         Q     She was already the Chief Operating

11    Officer when you became the Chief of Police;

12    correct?

13         A     She was.  Yes.

14         Q     And she reported directly to you; is that

15    correct?

16         A     She did, yes.

17         Q     Did you ever communicate with Ms. Turner

18    about FOIA requests when you were Chief of Police?

19         A     In general I'm sure I did at some point,

20    yes.

21         Q     What -- I'll withdraw that.

22               In general what kinds of requests did you

Page 22

1              Just so I'm clear, the MPD FOIA office
2        reported directly to ODC; correct?
3              A    That's correct.
4              Q    And did you ever communicate with Mr.
5        Viehmeyer about FOIA when you were the Chief of
6        Police?
7                   MR. SOBIECKI:   Object to form.
8              A    Occasionally.  But it's not a, any
9        specific conversations that I recall.  Just in
10       general when you take an assessment of the
11       department in terms of how people are doing in their
12       areas, you know.  I don't recall any red flags being
13       raised, like hey, we have got this issue, this is
14       not being done or the world is on fire kind of
15       thing.
16             Q    I know you said you don't recall any red
17       flags being raised.  Were any FOIA requests ever
18       elevated to you by Mr. Viehmeyer?
19                  MR. SOBIECKI:   Object to form.
20             A    Not that I can recall in the two and a
21       half years that I was there.  I don't recall any
22       specific FOIA requests being raised.

1      you identify as the most knowledgeable about the

2      management of the FOIA office by ODC or EOCOP during

3      the first seven months as Chief of Police?

4                  MR. SOBIECKI:  Object.

5          A    General counsel, Mark Viehmeyer, would be.

6          Q    What were the circumstances under which

7      FOIA requests or responses were referred from the

8      FOIA office to ODC or EOCOP for review?

9                  MR. SOBIECKI:  Objection.  Lack of

10     foundation.

11         A    I don't recall FOIA responses coming to

12     the EOCOP's office for review in my time as, in my

13     time as Chief.  Not one -- it's not like one that

14     stands out or anything like that.  I can't think of

15     one that the Chief had that, hey, here is a FOIA

16     request that the Chief needs to review.  I just

17     don't recall that in my time.

18         Q    Do you know every time the FOIA office

19     elevated something to EOCOP for review during your

20     time as Chief of Police?

21                 MR. SOBIECKI:  Object to form.

22         A    No.

1        Q    So if something was elevated for EOCOP,

2   you may not know the circumstances under which those

3   FOIA requests or responses were referred from the

4   FOIA office to ODC or EOCOP; is that correct?

5              MR. SOBIECKI:  Object.

6        A    So I wouldn't know every instance.  Like I

7   said, my primarily focus is on fighting crime and

8   saving lives and we have people, Mark Viehmeyer

9   specifically, assigned that duty, that task to

10  review those cases.

11             And that's a duty that's delegated.  He is

12  a competent attorney in my opinion and his team of

13  attorneys and so forth down there.  It's something

14  that they were responsible for handling.

15       Q    Specifically with respect to FOIA requests

16  that may have been elevated for EOCOP review, you

17  would not have known every time that happened;

18  correct?

19             MR. SOBIECKI:  Objection.  Calls for

20  speculation.

21       A    I wouldn't know every time that it

22  happened.

1        Q    And you personally didn't manage the FOIA
2   office at any point in the first seven months of
3   your role as the Chief of Police; correct?
4        A    Not at any time in my role as Chief of
5   Police.
6        Q    Is it accurate that you were never
7   involved in decision-making concerning FOIA requests
8   when you were the Chief of Police?
9        A    That is correct.
10       Q    And is it accurate that you were not
11   involved in the processing of any FOIA requests as
12   the Chief of Police?
13       A    That's correct.
14       Q    Were you ever briefed on the extent of the
15   delays in response to FOIA requests?
16            MR. SOBIECKI:   Objection.
17       A    Not that I recall specifically about any
18   delays.  Generally if we would have, and I'm just
19   talking about department-wide on things.  If there
20   was, oh, a delay in this area, a delay in that area,
21   again before something like that would make it to
22   the Chief of Police it had to be pretty significant.

1      Nothing like that really made it up to my attention

2      that we were severely deficient in an area and not

3      fulfilling requests in a timely fashion.

4           Q    You filed a declaration in a FOIA lawsuit

5      that requested the release of the Lewis list;

6      correct?

7           A    I don't remember that.

8                MS. DURHAM:  I am going to hand you what

9      will had been marked as Exhibit 265.

10               (Plaintiff Exhibit Number 265

11                was marked for identification.)

12     BY MS. DURHAM:

13          Q    I'm not going to ask you any questions

14     about this.  I just want to know if this looks like

15     a declaration that you submitted?  And if you are

16     uncertain about whether or not this is about the

17     Lewis list, I will point you to paragraph 4.

18               MR. SOBIECKI:  Chief, please take whatever

19     time you need to review this.

20               MS. DURHAM:  Of course.

21               THE WITNESS:  Okay.

22

Page 34

1        BY MS. DURHAM:

2             Q    All right.  I think my question was you

3        filed a declaration in a FOIA lawsuit that requested

4        the release of the Lewis list; is that correct?

5                  MR. SOBIECKI:  Object to form.

6             A    Where I'm requesting the release of the

7        Lewis list?

8             Q    Nope.

9             A    Could you restate that, please?

10            Q    The plaintiff in this case was requesting

11       the release of the Lewis list?

12            A    Yes.  That's correct.

13            Q    And you filed a declaration?

14            A    Yes.  Okay.  Yes.

15            Q    And the Lewis list refers to a database

16       maintained by the U.S. Attorney's Office for the

17       District of Columbia that identifies allegations of

18       misconduct against MPD officers; is that correct?

19            A    Yes.

20            Q    And it's a database -- I'll withdraw that.

21                 And you opposed the release of the Lewis

22       list to the public in response to the FOIA request

```
 1    because you were concerned that it could be

 2    embarrassing and humiliating; is that correct?

 3              MR. SOBIECKI:  Object to form.  Calls for

 4    a legal conclusion.  The Chief was not representing

 5    the District in that lawsuit.

 6              MS. DURHAM:  I don't understand the

 7    objection, but I will reask my question.

 8    BY MS. DURHAM:

 9         Q    In your declaration you opposed the

10    release of the Lewis list to the public in response

11    to a FOIA request because you were concerned that it

12    could be embarrassing and humiliating; is that

13    correct?

14              MR. SOBIECKI:  Object to form.

15         A    I think that there were, that there is

16    more to it than that, just that.  Yeah, obviously

17    that's stated there.  I'm trying to think back to

18    2018.  But anyway, yes, I did file the declaration.

19         Q    And you filed it in opposition of the

20    release to the record because you were concerned

21    about undue embarrassment and humiliation to the

22    officers; correct?
```

1          MS. LYNCH:  Object to form.  Relevance.

2     A    As was stated in the declaration.

3          (Plaintiff Exhibit Number 23

4           was marked for identification.)

5   BY MS. DURHAM:

6     Q    I'm handing you what's previously been

7   marked as Exhibit 23.  If you look at the top of the

8   document, this is an email from Mark Viehmeyer to

9   Kelly O'Meara, Leeann Turner and others on June

10  25th, 2020.

11         Do you see that?

12    A    Yes.

13    Q    And do you see that the subject line is

14  City Paper?

15    A    Yes.

16    Q    And if you look at Bates ending in 581 --

17    A    Say that one more time.  581?

18    Q    Yes.

19    A    Okay.

20    Q    We see an article entitled How the D.C.

21  Police Department, DOJ, and D.C. Attorney General's

22  Office Shield Cops' Bad Acts.

Page 37

1              Do you see that?

2         A    Yes.

3         Q    If you look at the very bottom paragraph,

4    do you see where it says:  Winkle Hobie Hong,

5    director of MPD's Disciplinary Review Division, is

6    willing to email the monthly schedule to individual

7    requesters, but that hasn't always been the case

8    with his predecessors, says Amy Phillips, a D.C.

9    public defender who has taken a personal interest in

10   police misconduct and is speaking with City Paper on

11   her on behalf.

12             Do you see that?

13        A    Yes.

14        Q    And Amy Phillips is the plaintiff in this

15   case; is that correct?

16        A    Yes.  I don't know Amy Phillips, but yes,

17   she is the plaintiff in this case.

18        Q    Well, you don't know here personally.  Is

19   that what you are saying?

20        A    If she walked in this room, I wouldn't

21   know who she is.  I don't know who she is.

22        Q    But you've heard of this lawsuit?

Page 105

1      report or the request was closed on September 2nd,

2      2021; correct?

3           A    Yes.

4           Q    And that was done at the time that you

5      were Chief of Police; correct?

6           A    Yes.

7           Q    The practice of elevating certain draft

8      responses to EOCOP for review continued during your

9      tenure as Chief of Police; correct?

10               MR. SOBIECKI:  Objection.  Lack of

11      foundation.

12          A    Say that again.  Can you repeat the

13      question, please?

14          Q    The practice of elevating certain draft

15      responses to EOCOP for review continued during your

16      tenure; correct?

17          A    No.

18               MR. SOBIECKI:  Objection.  Lack of

19      foundation.

20          A    I would say that unless, and the short

21      answer is I don't know.  I can't say what didn't

22      come to me.  No requests for FOIA were directed to

1    me in my tenure as the Chief of Police.

2        Q    Okay.  And I'm handing you what has been

3    marked as Exhibit 274.

4             (Plaintiff Exhibit Number 274

5              was marked for identification.)

6    BY MS. DURHAM:

7        Q    And this is another spreadsheet excerpt

8    provided by the District and it's for FOIA Number

9    2018-FOIA-07383.

10            Do you see that?

11       A    Yes.

12       Q    And this request was submitted to MPD's

13   FOIA office on September 12th, 2018.

14            Do you see that?

15       A    Yes.

16       Q    And the requesters name is Scott

17   Macfarlane; correct?

18       A    Yes.

19       Q    It indicates that Scott Macfarlane is a

20   member of the news media; correct?

21       A    Yes.

22       Q    And on page 2 the request description says

Page 117

1     Q    Did you discuss anything related to this
2    case?
3     A    I had the media interview.  Sorry.  Forgot
4    about that.  There was an interview with Channel 7,
5    I think it was Channel 7.  I had a sit-down with Sam
6    Ford when this allegation was first made that about
7    whether or not I had this secret list.  I had a
8    discussion with Sam Ford about it.  But that was
9    early on.  I don't remember exactly when but it was
10   early on.
11    Q    Aside from the media interview you are
12   referencing and your conversations with your
13   attorneys, did you discuss anything related to this
14   case with any current or former MPD employees?
15    A    I saw Chief Newsham in passing once and I
16   did say hey, did you forget to tell me about a list?
17   And he was like, you know, kind of threw his hands
18   up in response.  But that's the only person that I
19   had a conversation with about it, outside of
20   counsel.
21    Q    When did that interaction happen?
22    A    That was early on, like around the time of

1    the -- I don't remember specifically where we were,

2    but it was not long after I did the interview with

3    the media.  Because it was being talked about and

4    obviously they were linked in this allegation.

5              It was, hey, this occurred before this guy

6    became chief, but now he is the chief this has

7    continued.  I'm like -- so that's when I said to

8    him, hey, do you have a list or something you forgot

9    to tell me about.

10        Q    And he threw his hands up?

11        A    Like threw his hands up and just like

12   shook his head.

13        Q    Have you read the Complaint filed in this

14   litigation?

15        A    No.

16        Q    Were you ever provided -- other than your

17   deposition preparation and preparation for the media

18   interview with Mr. Sternbeck, were you ever provided

19   any information about the Complaint?

20        A    No.

21        Q    Have you read any of the articles or

22   reports about Ms. Phillips's allegations?

Page 119

1          A     No.   Outside of the media reporting that

2     was done by Sam Ford, but aside from that, I was

3     kind of shocked because again I don't know who Ms.

4     Phillips is.

5          Q     But you are aware that there were a number

6     of news articles and news stories about Ms.

7     Phillips's allegations; correct?

8          A     Yeah.   So I'm aware that there are a

9     number of news articles.   There are a lot -- MPD is

10    in the news every day and I don't read every

11    article, specially about what I felt were false

12    accusations, right.

13               When it went for the accusations being I

14    cared on a practice that I know I didn't carry on,

15    it wasn't really worth my time when we have people

16    dying in the streets in the District of Columbia.   I

17    was more focused on fighting violent crime in our

18    city and not reading news articles about FOIA.

19         Q     You are aware that the Complaint alleges

20    that a practice was carried on during the course of

21    your administration; correct?

22               MR. SOBIECKI:   Objection.   Form.

1      small clip of that questioning.

2      BY MS. DURHAM:

3          Q     So in that video that we just looked at?

4          A     That's what she said, that they should be

5      handled expeditiously.

6          Q     Thank you.  Did you ever discuss Ms.

7      Phillips's allegations with Mayor Bowser?

8          A     No.  I don't recall discussing this with

9      the Mayor.  The Mayor is focused on violent crime

10     and as the Chief of Police, she expects me to deal

11     with matters related to MPD.  As the MPD chief, I

12     expect our general counsel to deal with matters of

13     FOIA.  The Mayor and in our conversations primarily

14     focuses on personnel, fighting violent crime, any

15     major things we have happening in the city.

16         Q     Did anyone from EOCOP ever discuss Ms.

17     Phillips's allegations with anyone from Mayor

18     Bowser's office?

19             MR. SOBIECKI:  Objection.  Calls for

20     speculation.

21         A     I don't know.  I didn't.  But I don't know

22     if other people within the EOCOP umbrella had other

Page 131

1     conversations but I didn't.

2          Q    During the interview you said there is no

3     watch list; correct?

4          A    Yes.

5          Q    How were you concern that there --

6     withdraw that question.

7               I'll represent to you that you sat for

8     this interview on February 3rd, 2022, the day after

9     Ms. Phillips filed her Complaint.  Does that sound

10    familiar?

11         A    Does what sound familiar?  The date?

12    Yeah, it was in very close proximity.  I don't

13    remember the date, but it was in very close

14    proximity to when the initial allegation was made.

15         Q    How were you certain that there wasn't a

16    watch list just one day after Ms. Phillips filed her

17    Complaint?

18               MR. SOBIECKI:  Objection.  Vague.  What do

19    you mean by watch list?

20         A    Because the allegation was that I was

21    continuing on with this watch list thing and I had

22    never seen a watch list, I didn't have a watch list,

1        and if it's something that I'm supposed to be doing,

2        I think I would know if I was carrying on a practice

3        with a watch list.

4                    That was specific -- I felt like when the

5        allegation was made, when you said is carried on or

6        when they said it's carried on by now Chief Contee,

7        that was directed to me and I knew what I was and

8        was not doing in February of 2022.

9            Q    The allegation is that the practice

10       continued under your, during your tenure; is that

11       correct?

12                   MR. SOBIECKI:  Objection.  The chief said

13       he never saw the Complaint.

14           A    I haven't seen the Complaint, so I'm not

15       sure specifically how it's outlined in the

16       Complaint.

17           Q    So when you say the allegation was that

18       you personally maintained a watch list, what are you

19       referring to?

20           A    So the media when they talked to me,

21       that's the way that they talked about this.  They

22       talked about me specifically carrying on this

1        practice after Chief Newsham transitioned from the

2        department.

3                You know, before you sit down and do these

4        media interviews, sometimes these journalists, as

5        they are having this -- clearly they want to ask you

6        questions sort of, that you don't have an

7        opportunity to prepare for, but oftentimes it's

8        small talk.  They are kind of getting to the meat of

9        like bottom line did you have a watch list and that

10       was what they were focused on, do I have a watch

11       list.  And like I said to him, no, I don't.

12               I can't speak to what somebody did because

13       I don't know before I got into the seat, but from

14       January 2nd, 2021 up to the time of that interview

15       no one hadn't presented me with a watch list, hey

16       look, here is kind of our bible for who we don't

17       respond to FOIA requests on.  That's absolutely

18       false.

19       Q     So you were responding to questions about

20       your personal involvement in the watch list?

21       A     Absolutely.

22       Q     Who did you speak to before you did this

Page 134

1      interview other than Dustin?  Sorry.  Withdraw that.

2              Who did you speak to before you did this

3      interview other than Mr. Sternbeck and your counsel?

4              MR. SOBIECKI:  Objection.

5      A    That would have been it primarily.

6      Conversations that I would have had.  I don't recall

7      talking to anyone else.

8              If anybody -- if anybody, and I don't

9      remember specific conversation with them, but maybe

10     I'm asking around at that point.  I'm just trying to

11     recall.  At that point I may have asked Leeann

12     Turner what are they talking about or what is this

13     or something like that.

14             But I don't remember a specific

15     conversation where questions were asked and

16     answered.  I was really focused on the office of

17     general counsel at the time, because when I became

18     chief, that's who FOIA, it was under the office of

19     general counsel at the time.  And then again Dustin,

20     who is getting the information from the media saying

21     hey, this is what we are going to talk to the chief

22     about, it was my intention to really -- and also

Page 135

1   like this is going to be a lawsuit at some point as

2   we move through this process where I'm going to be

3   sitting here doing a deposition.

4           I wanted to stay in the line of what I

5   knew and what I know and that is that there is not a

6   practice or policy that I knew about that continued

7   on while I was Chief of Police.  So I don't know if

8   that answers your question.

9           I could have, like I said, had a

10  conversation with Leeann only because she has

11  historical knowledge of the chief's office.  But I

12  don't recall a specific conversation.

13      Q    So you are not sure one way or the other?

14      A    No.

15      Q    If you actually spoke to her?

16      A    No.  I know I spoke to Dustin and I know I

17  spoke to counsel for certain.

18      Q    When you told Mr. Segraves that since the

19  day you became chief until February 3rd, 2020 when

20  you sat for the interview that, quote, no one is

21  briefing me about this FOIA request from some watch

22  list -- withdraw that question.

                                                          Page 136

1              You had no awareness about the FOIA

2      requests that were elevated from the FOIA office to

3      OGC; correct?

4              MR. SOBIECKI:  Objection.  Lack of

5      foundation.

6         A    No.

7         Q    And you had no awareness about how certain

8      requests were selected for elevation to OGC;

9      correct?

10             MR. SOBIECKI:  Objection.  Lack of

11     foundation.

12        A    No.

13        Q    And we looked at earlier examples of

14     emails during your time as the assistance chief of

15     ISB.  I apologize if I don't have your title exactly

16     correct.

17        A    No.  You are perfect.

18        Q    Do you recall those emails from Ms.

19     Parker?

20        A    Yes.

21        Q    Did you ever ask Inspector Parker why

22     certain requests were being elevated to EOCOP for