**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMY PHILLIPS,<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>    **Defendant.** | **No. 1:22-cv-00277-JEB** |

## <u>DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Pursuant to LCvR 7(h)(1), Defendant District of Columbia (the District) submits this statement of undisputed material facts in support of its motion for summary judgment.

## I.    <u>The District Makes Public Records Available.</u>

1.     The District's Freedom of Information Act (FOIA) provides that "a public body . . . shall within 15 [business] days" of a request "reasonably describing any public record" either make the record available or notify the requester that it will not produce the record.  D.C. Code § 2-532(c)(1).

2.     Extensions of time to respond are permitted.  *Id.* § 2-532(d)(1).

3.     If the request is for body-worn camera (BWC) footage, MPD "shall [respond] within 25 days."  *Id.* § 2-532(c)(2)(A).

4.     District law tolled FOIA deadlines during the COVID-19 emergency, which occupied about a year of the relevant period in this case.  Def.'s Ex. 22, Memo. re: Guidance for D.C. FOIA Compliance at 5.

5.     FOIA contains exemptions that may result in withholding or redacting records.  D.C. Code § 2-534(a).

6.      An agency may charge fees for processing requests.  *Id.* § 2-532(b).

7.      Or the agency may waive fees if "furnishing the information can be considered as primarily benefiting the general public."  *Id.*

8.      To decide whether to waive fees, the agency necessarily considers the identity of the requester and the uses she might make of the information.  *Id.*

9.      Nonetheless, the Metropolitan Police Department (MPD) only rarely collects fees and only routinely attempted to charge fees for a short period during the events in this case.  Def.'s Ex. 10, Latrina Crumlin Dep. Tr. (Crumlin Dep.) at 141–144; Def.'s Ex. 1, Leeann Turner Dep. Tr. (Turner Dep.) at 193–94, 681–82; Def.'s Ex. 2, Vendette Parker Dep. Tr. (Parker Dep.) at 222–23, 297–300.

10.     The head of each agency (in this case, the Chief) is responsible for issuing "reasonable rules . . . concerning the time and place of access" to public records.  D.C. Code § 2-532(a); *see also* Def.'s Ex. 11, Decl. of Leeann Turner (Turner Decl.) ¶¶ 3–7.

11.     The Chief has never delegated his FOIA policymaking authority.  Turner Decl. ¶¶ 3–7.

12.     Any person denied records may appeal the denial to the Mayor's Office of Legal Counsel (MOLC) and thereafter may seek production through the Superior Court of the District of Columbia.  D.C. Code § 2-537(a), (b).

13.     The number of FOIA requests directed at MPD increased by 66% between FY2018 and FY2022 (from 1,252 in FY2018 to 2,084 in FY2021).  Def.'s Ex. 21, FOIA Annual Reports at 2, 31.

14.     The average number of days a request was pending with MPD jumped from 97 in FY2018 to 225 in FY2022, with increases each year in between.  *Id*. at 2, 6, 15, 23, 31.

15.     Public agency reports show that the citywide average was 40.3 days (FY2020) and 58.5 (FY2021) and 49.42 (FY2022).  *Id.* at 11, 19, 27.

16.     In FY2021 and FY2022, a dozen agencies had averages over 100 days; six had averages over 200 days in FY2021, seven in FY2022.  *Id.* at 22–25, 30–32.

**II.     MPD Processes FOIA Requests**

17.     MPD's FOIA Office, led by the FOIA Officer, processes FOIA requests, collects responsive records from other MPD units, and reviews and redacts records.  Def.'s Ex. 20, Performance Oversight Hearing Responses at 2, 4; Crumlin Dep. at 44, 57–58; Turner Dep. at 123.

18.     Since October 2017, the Office has had three FOIA Officers: Insp. Vendette Parker, Lisa-Archie Mills (acting only), and Brandynn Reaves.  Def.'s Ex. 16, Def.'s 2d Am. Resps. & Objs. to Pl.'s 1st Set of Interrogs. (Def.'s 2d Am. Resps.) at 11; Turner Dep. at 590; Def.'s Ex. 12, Decl. of Lisa Archie-Mills (Archie-Mills Decl.) ¶¶ 2, 3; Parker Dep. at 14.

19.     Insp. Parker began working in the Office in April 2017, after then-Chief Peter Newsham demoted her from her commander position in the field when she "lost the morale" in her district, and "concerns" had arisen "about the ways officers were being treated" by her. Def.'s Ex. 4, Peter Newsham Dep. Tr. (Newsham Dep.) at 328, 331–32.

20.     Insp. Parker had no prior experience processing FOIA requests.  Parker Dep. at 207–08, 211; Turner Dep. at 154–55.

21.     She took over as the FOIA Officer in October 2017.  Parker Dep. at 14.

22.     In that position, she regularly expressed to colleagues how much she disliked Chief Newsham.  Parker Dep. at 349–50.

23.     Insp. Parker reported directly to Leeann Turner, who was then, and still is, MPD's Chief Administrative Officer (formerly called the Chief Operating Officer).  Turner Decl. ¶ 1;

3

Parker Dep. at 14–15.

24.     Turner is a member of what MPD employees call the Executive Office of the Chief of Police (EOCOP or COP), the office of the Chief and his/her leadership team.  Def.'s Ex. 19, MPD Annual Reports at 3, 10; Def.'s Ex. 6, Matthew Bromeland Dep. Tr. (Bromeland Dep.) at 29; Newsham Dep. at 32; Def.'s Ex. 5, Robert J. Contee III Dep. Tr. (Contee Dep.) at 16.

25.     The Chiefs during the events in this case were Chief Newsham (September 2016 to December 2020), Chief Robert J. Contee III (January 2021 to May 2023), Interim Chief Ashan Benedict (May 2023 to July 2023), and Chief Pamela Smith (July 2023 to present).  Archie-Mills Decl. ¶ 13.

26.     EOCOP is also an organizational unit for reporting purposes that includes other units, including the Office of the General Counsel (OGC) and the FOIA Office.  Performance Oversight Hearing Responses at 2, 7.

27.     Insp. Parker left MPD more than four years ago, in January 2020.  Def.'s Ex. 14, Decl. of Vendette Parker (Parker Decl.) ¶ 2.

28.     Archie-Mills then became acting FOIA Officer.  Archie-Mills Decl. ¶ 2.

29.     Later, supervision of the Office moved from Turner's portfolio to OGC, where it remains.  Turner Dep. at 592–93; Performance Oversight Hearing Responses at 7.

30.     Reaves took over as FOIA Officer in May 2022.  Archie-Mills Decl. ¶ 3.

31.     Requesters submitted requests using an online platform called FOIAXpress, which Office staff used to track the status of each request.  Crumlin Dep. at 41–42; Def.'s 2d Am. Resps. at 16.

32.     Through FOIAXpress, staff would routinely generate a report of all FOIA requests received in the prior week, showing basic information (*e.g.*, requestor name, the request, and

processing status).   Crumlin Dep. at 45–46, 124–25, 129; Turner Dep. at 231–35.

33.     During Insp. Parker's tenure, the FOIA Officer would then circulate the report to the Chief, Turner, and MPD's Director of Communications.  Def.'s Ex. 26, Selection of Weekly FOIA Emails at 1, 5, 12, 15, 31, 35–40, 42, 45–46, 48; Def.'s 2d Am. Resps. at 5.

34.     Insp. Parker would also meet weekly with Turner to discuss FOIA requests.  Parker Dep. at 60–70; Turner Dep. at 236; Def.'s Ex. 25, Selection of Email Concerning L. Turner and V. Parker Weekly Meetings; Def.'s 2d Am. Resps. at 6.

35.     Sometimes, Turner would ask Parker about a particular request to try to move it along toward closure or to get a status update.  Turner Dep. at 58–59, 130–32, 371–72, 404–07; Def.'s Ex. 24, Selection of Emails from L. Turner at 1–22.

36.     Sometimes, she would help Insp. Parker identify the right units to contact for new requests, help prod along those units, or suggest how to find better or additional information (including for requests by requesters on the alleged "watchlist").  Turner Dep. at 140–41, 156; Emails from L. Turner at 23–37.

37.     Sometimes, she would ensure that any data reported was accurate and consistent with information that MPD had reported in other contexts.  Turner Dep. at 60–61, 165–67, 181–82, 434–37, 471–75; Emails from L. Turner at 38–60.

38.     Sometimes, she would review proposed redactions or responsive documents and approve the package.  Emails from L. Turner at 43, 52, 61.

39.     Sometimes, she would ask Insp. Parker to wait to send a response so she could inform the Chief of the response before he received questions from the public about it—this would be a matter of hours or maybe days, not more.  Turner Dep. at 143–46, 187–88, 190, 361, 402–03; Def.'s Ex. 7, Lisa Archie-Mills R. 30(b)(6) Dep. Tr. (Archie-Mills 30(b)(6) Dep.) at 415;

Bromeland Dep. at 282; *see also* Parker Dep. at 212 (testifying that the aim of elevating requests was to make the Chief aware of records that "had been released" in case he was "approached by different media or different journalists and asked questions" about the records).

40.    Other times, she would give the Chief a heads up after the response went out or was approved to go out.  Turner Dep. at 165–67, 320–21.

41.    Sometimes, she would discuss policy issues with the Chief, OGC, or other MPD leaders, such as MPD's agency-wide interpretation of exemptions.  Turner Dep. at 539–45; Emails from L. Turner at 62–63.

42.    Sometimes, she would ask questions about information that had already been released, after the fact, to better understand and to ensure the integrity of MPD operations.   Turner Dep. at 295–98, 473–75; Emails from L. Turner at 64–65.

43.    This varied engagement was commonly called "EOCOP review" or "elevating a request" because the questions or pending requests would literally and figuratively be taken upstairs for discussion in Turner's office.  Turner Dep. at 399–400; Parker Dep. at 48–49, 68–69, 134, 266–67, 460.

44.    It is not true that EOCOP review always caused delays.  Parker Dep. at 46, 266; Turner Dep. at 190.

45.    Any delays were unintentional.  Turner Dep. at 187–88, 361; Parker Dep. at 65–66; Archie-Mills 30(b)(6) Dep. at 415; Bromeland Dep. at 282; Emails from L. Turner at 67–68.

46.    There is no evidence that Turner discussed the viewpoint or prior or anticipated speech of any FOIA requesters with Insp. Parker.  *See* Turner Decl. ¶ 9.

47.    There is no evidence that any of Turner's directions to Insp. Parker were connected to the viewpoint of the requesters.  *See id.* ¶¶ 9–10.

48.     Requests would come to Turner's attention because of the information requested—because it was unusual, within her knowledge base, something her office was responding to, something a supervisor or executive should know about, or, in the words of a presentation created by the FOIA Office, "high profile" or "sensitive."  Def.'s Ex. 23, FOIA Informational Presentation (Presentation) at 15; Turner Dep. at 170–84, 267–71; 281, 285, 293, 300–01, 319–20, 351–54, 359–60; Parker Dep. at 103, 206–07, 225.

49.     This presentation explained to MPD employees outside the FOIA Office how to maintain their records and respond to inquiries from the FOIA Office.  Presentation; Def.'s Ex. 8, Lisa Archie-Mills Fact Dep. Tr. (Archie-Mills Fact Dep.) at 45–46; Parker Dep. at 192.

50.     Among the many things explained in 19 slides, the presentation contained one bullet point stating: "Media and high profile requests (or any other requests deemed sensitive) are sent to [EOCOP] for review by the COP, prior to the FOIA office making a release to the public."  Presentation at 15.

51.     This presentation was drafted solely by FOIA Office employees and lacked any force of law.  Def.'s Ex. 15, Def.'s 1st Resps. & Objs. to Pl.'s 3d Set of Interrogs. at 4.

52.     No one in EOCOP approved this statement, adopted it, or ever read it before this lawsuit.  Newsham Dep. at 145; Turner Dep. at 168–69; Archie-Mills Fact Dep. at 45–46.

53.     Insp. Parker testified that the PowerPoint "doesn't include the unwritten, unofficial policy of elevating certain requests from individuals critical of MPD."  Parker Dep. at 39.

54.     Relatedly, requests from media entities were also more likely to come to Turner attention, as she regularly liaised with MPD's communications teams.  Turner Dep. at 293; Parker Dep. at 251.

55.     About a year into Insp. Parker's tenure, in response to one of the weekly reports

described above, Chief Newsham asked, "[c]an we highlight the FOIA's that I should be alerted to?"   Weekly FOIA Emails at 1.

56.     Turner replied, "yes," and she asked Insp. Parker to identify new requests that Insp. Parker thought would be of interest.   *Id*.; Parker Dep. at 58–59.

57.     In her email conveying the next weekly report, Insp. Parker highlighted requests of which she thought EOCOP should be aware.  Weekly FOIA Emails at 1, 11.

58.     In total, Insp. Parker sent 13 such emails including a weekly report and "highlighted" requests.  Def.'s 2d Am. Resps. at 4–5; Weekly FOIA Emails at 11–44.

59.     She highlighted 34 individual requests—out of 1,130 requests MPD received between October 10, 2018, and August 10, 2019—from 24 different requesters.  Weekly FOIA Emails at 11–44; Def.'s Ex. 35, FOIAXpress Report Excerpt re: All Requests Between Oct. 15, 2018, and Aug. 10, 2019 (All Requests).  The first email she sent with "highlights" included new FOIA requests as of October 15, 2018, through October 19, 2018.  Weekly FOIA Emails at 11.  The last weekly email she ever sent included new FOIA requests as of August 4, 2019 through August 10, 2019; it did not include any highlights.  *Id*. at 45.

60.     Amy Phillips was not one of those requests highlighted in emails, even though Phillips made eight requests during that period, each listing the "Public Defender Service" (PDS) as the requesting entity.  Weekly FOIA Emails at 11–44; Parker Dep. at 263; Def.'s Ex. 34, FOIAXpress Report re: A. Phillips Requests (Phillips Rep.).

61.     Nor did Insp. Parker highlight any requests from PDS.  Weekly FOIA Emails at 11–44.

62.     Reporter Eric Flack filed seven requests between October 10, 2018, and August 10, 2019, but Insp. Parker highlighted only four of them.  Weekly FOIA Emails at 11–44 (all); *id*. at 12

(highlighting three Flack requests); *id.* at 30 (highlighting one Flack request); All Requests at 3–6,

13, 23 (Rows 60, 72, 76, 103, 118, 257, 481 showing seven total Flack requests).

63.     Similarly, reporter Evan Lambert filed nine requests during that same period, but

Insp. Parker highlighted only two of them.  Weekly FOIA Emails at 11–44 (all); *id.* at 11, 42

(highlighting on Lambert request each); All Requests at 1, 13, 16, 19, 33, 35, 45 (Rows 19, 20, 268,

269, 335, 401, 688, 728, 948).

64.     Insp. Parker highlighted all sorts of requesters without knowing anything about their

views of MPD.  Parker Dep. at 415, 454–60 (testifying she did not know various individuals or

whether they had ever said anything negative about MPD); Weekly FOIA Emails at 11–47

(highlighting many of those same individuals).

### III.    Phillips Makes FOIA Requests.

65.     Amy Phillips enjoys a "hobby" of making FOIA demands of MPD.  Def.'s Ex. 3,

Amy Phillips Dep. Tr. (Phillips Dep.) at 18.

66.     One of her friends called her "the queen of foia-ing mpd."  Def.'s Ex. 27,

Messages Between A. Phillips & M. Thorne.

67.     Another friend asked her, "[w]hat are the many ways I can screw with the police

here through FOIAs," to which Phillips explained her ways and that she "learned it all just

by . . . filing a bunch of things that got rejected and generally making an ass of myself."  Def.'s

Ex. 28, Messages Between A. Phillips & J. Brand.

68.     She also explained to confidants that she made FOIA demands not because she

has particular use for the documents, but "to troll MPD," Def.'s Ex. 29, Messages Between A.

Phillips & J. Blanks, and to prove a "principle," Def.'s Ex. 30, Messages Between A. Phillips &

E. Flack.

69.     She refused to explain in this case how, if at all, she has used records she has obtained to benefit the public.  Def.'s Ex. 17, Pl.'s Resps. To Objs. to Def.'s 2d Set of Interrogs. at 4–5.

70.     She is not interested in "big picture policy questions."  Phillips Dep. at 68.

71.     Rather, as she told one fellow requestor, "I'm after the higher ups" in making FOIA demands of MPD.  Def.'s Ex. 31, Emails Between A. Phillips & M. Ryals.

72.     Phillips tweets from a personal Twitter account with little more than 3,000 followers—none associated with MPD.  *See* Phillips's Dep. at 15.

73.     Sometimes, she tweets about MPD.  Am. Compl. ¶ 10.

74.     There is no evidence that anyone from MPD ever read her tweets or any other social media posts.  Phillips Dep. at 24–25; Newsham Dep. at 362; Turner Decl. ¶ 9; Contee Dep. at 37, 119; Bromeland Dep. at 270; *see* Parker Dep. at 222, 241.

75.     There is no evidence that anyone at MPD took note of her attendance at hearings and thought it evinced a critical viewpoint.  Turner Decl. ¶ 9; *see* Bromeland Dep. at 260–70.

76.     There is no evidence that anyone in EOCOP used her FOIA requests to predict whether she was a critic of MPD.  Turner Decl. ¶ 9; Turner Dep. at 64–66; *see also* Phillips Dep. at 170–71 (testifying that "it would be hard to draw conclusions about my beliefs if the only piece of information you had about me was the information contained in" a FOIA request); Def.'s Ex. 9, Margaret Kwoka Dep. Tr. (Kwoka Dep.) at 107 (testifying that the information the FOIA Office gathers from requesters [*e.g.*, the request description, the requester's identity] "would not permit an inference about each individual requester's potential critique or whether the information they would receive would prompt public criticism if made more broadly available").

77.     EOCOP witnesses denied knowing of Phillips's speech—in fact, Chief Newsham and Chief Contee did not even know who Phillips was before her lawsuit.  Turner Decl. ¶ 9; Newsham Dep. at 362, 367; Contee Dep. at 37, 119; Bromeland Dep. at 270.

78.     "EOCOP [n]ever consider[ed] whether or not a requester had been critical of MPD or Chief Newsham when determining how to respond to a FOIA request."  Turner Dep. at 361; *see also* Turner Decl. ¶ 10; Archie-Mills 30(b)(6) Dep. at 415; Bromeland Dep. at 282.

79.     MPD did not delay responses to Phillips requests because MPD wanted to avoid criticism or because of Phillips's speech.  Turner Decl. ¶ 10; Turner Dep. at 187–88; Parker Dep. 65–66; *see id.* at 43 (explaining why certain Phillips's requests took time to process).

80.     Turner did not instruct FOIA employees to invoke exemptions and deny Phillips's requests in an effort to prevent release of information that MPD did not want out.  Turner Decl. ¶ 10; Turner Dep. at 186–87.

81.     There is no evidence that MPD charged Phillips fees because of her speech. Turner Decl. ¶ 10; *see* Parker Dep. at 91 (testifying that charging fees was a policy "for everyone"); *see also id.* at 303; Crumlin Dep. at 141–44; Turner Dep. 637–38.

82.     There is no evidence that anyone in EOCOP discussed whether to delay, deny, or burden Phillips's requests because of her speech.  Turner Decl. ¶ 10.

83.     MPD witnesses consistently denied that a FOIA watchlist, like Phillips alleged, existed.  Newsham Dep. at 342, 344–45; Contee Dep. at 131–36; Turner Dep. at 64–65, 216, 219; Bromeland Dep. at 282; Archie-Mills Fact Dep. at 559–64.

84.     No Chief ever knowingly discussed or got involved in Phillips's FOIA requests. Newsham Dep. at 362–63; Contee Dep. at 31–32, 105–06, 130–32.

85.     The first the Chiefs heard of an alleged watchlist was Phillips's complaint.

Contee Dep. at 119; Newsham Dep. at 362.

86.     Phillips made 16 FOIA requests during the relevant period.  Phillips Rep.; Def.s'

Ex. 36, Select Documents re: A. Phillips Requests (Phillips Requests) at 41–51.

**A.     <u>Request No. 2018-FOIA-06213</u>**

87.     In July 2018, Phillips requested "copies of each screen of the D.C. Metropolitan

Police Department's Online Reporting Tool."  Phillips Requests at 1.

88.     At that time, the standard language used by the MPD FOIA Office in its emails

acknowledging the receipt of a FOIA request included a "fee notification" and stated that, if the

requestor did not notify the FOIA Office that they were willing to pay any fees that may be

incurred by the request within 5 days, the FOIA Office would "close the request as

constructively withdrawn."  *Id.* at 5–6.

89.     Phillips requested a fee waiver, which Insp. Parker denied because Phillips did not

state how the requested documents will benefit the general public.  *Id.* at 3.

90.     Phillips was not willing to pay the fee, so her request was administratively closed.

Phillips Rep. at 1.I.[1]

91.     There is no evidence that this request was highlighted for or reviewed by EOCOP.

**B.     <u>Request No. 2018-FOIA-06463</u>**

92.     In July 2018, Phillips requested policy documents from 15 broad categories

following Chief Newsham's testimony before the D.C. Council.  Phillips Requests at 8–11.

93.     Phillips never responded regarding her willingness to incur any fees as outlined in

the acknowledgement letter, so the request was administratively closed.  Phillips Rep. at 2.I.

---

[1]     Pin citations to the Phillips Rep. refer to the row and column.

12

94.     There is no evidence that this request was highlighted for or reviewed by EOCOP.

**C.     Request No. 2019-FOIA-00893**

95.     In November 2018, Phillips requested "any and all documents related to [Adverse] Action Hearings by the MPD Disciplinary Review Division, from January 1, 2017, to present."  Phillips Requests at 12.

96.     An adverse action hearing (AAH) is a disciplinary proceeding for MPD officers. *See generally* MPD, Gen. Order No. GO-PER-120.21, *Sworn Employee Discipline* (Nov. 27, 2022), http://tinyurl.com/zczwnrxw.

97.     Because this request required working with Disciplinary Review Division (DRD) and reviewing several thousands of transcript pages for redactions—during COVID-19 disruptions and staffing changes—the request took significant time to complete.  Archie-Mills Decl. ¶ 4; *see also* Parker Dep. at 106 (explaining this was a "backlogged request" and "[w]e couldn't get it out to her at one time"); *id.* at 107–08 (explaining that "we were short staffed during that time" and there were staffing changes).

98.     There is no evidence that this request was highlighted for or reviewed by EOCOP.

99.     Phillips was granted a fee waiver for this request, despite the scale of effort and cost to respond to it.  Phillips Request at 15.

**D.     Request No. 2019-FOIA-03684**

100.    In March 2019, Phillips requested materials related to the AAH for MPD Officer Sean Lojacono.  Am. Compl. ¶ 21.

101.    At the time, unspecific to Phillips or her Lojacono request, MPD had a policy that the agency did not release individual officers' personnel records.  Turner Dep. at 515–16, 660; Parker Dep. at 114.

102.    MPD understood AAH materials to be a disciplinary record and thus part of a personnel file.  Turner Dep. at 535–36, 539.

103.    Consistent with that position, MPD denied Phillips's request the same day it came in using a form response that was sent to other requesters.  Turner Dep. at 535–36; Parker Dep. at 114, 268–69; Crumlin Dep. at 165.

104.    There is no evidence that anyone in MPD discussed internally whether release of the Lojacono records in response to Phillips's request could lead to criticism or embarrassment of MPD.

105.    There is no evidence that anyone in MPD discussed internally whether MPD should delay or deny Phillips's request for the Lojacono records because she was a critic of MPD.

106.    Insp. Parker did not "flag" this request in her weekly emails "as meeting the watchlist policy."  Parker Dep. at 263; *see id.* at 63 (agreeing that she did not "ever highlight Phillips's request in person or any other way for EOCOP").

107.    Phillips appealed to MOLC.  Phillips Requests at 19.

108.    MOLC disagreed with Phillips's key argument and affirmed MPD's denial in part and remanded in part for MPD to release or redact certain records.  *Id.* at 20–26.

109.    Because MOLC's decision seemed to require a shift in MPD policy regarding personnel records, Turner advised OGC to determine how to respond to MOLC's decision.  Turner Dep. at 541–43.

110.    While MPD was working on responding to Phillips's request and less than three months after the MOLC decision, Phillips brought a FOIA claim against the District in D.C.

Superior Court.  Compl., *Phillips v. District of Columbia*, No. 2019-CA-004054-B (D.C. Super. Ct. June 20, 2019).

111.    Before that case was resolved, MPD began producing records.  Def.'s Ex. 13, Decl. of Teresa Quon-Hyden (Quon Decl.) ¶¶ 8, 22, 31.

112.    Eventually, Phillips voluntarily dismissed her case with prejudice.  Stipulation of Dismissal, *Phillips v. District of Columbia*, No. 2019-CA-004054-B (D.C. Super. Ct. Jan. 12, 2022).

**E.**    **Request No. 2019-FOIA-03997**

113.    In March 2019, Phillips requested "documents that provide schedules of public Adverse Action Hearings, past, present, and future."  Phillips Rep. at 7.F.

114.    The next day, a request for documents was sent to DRD.  *Id.* at 7.I.

115.    Once the documents from DRD were received, reviewed, and processed, the FOIA Office produced responsive documents to Phillips in April 2019.  *Id.*

116.    There is no evidence that this request was highlighted for or reviewed by EOCOP.

**F.**    **Request No. 2019-FOIA-04241**

117.    In April 2019, Phillips requested "unredacted copies of any and all copies of Calendars of Adverse Action Hearings from October 2018 to present" and "any documents providing the dates, times, and locations of any and all Adverse Action Hearings for which dates have been set in the future."  Phillips Requests at 27.

118.    Because this request required searches performed by the Office of the Chief Technology Officer and reviewing several thousands of transcript pages for redactions—during COVID-19 disruptions and staffing changes—the request took significant time to complete. Archie-Mills Decl. ¶ 5.

119.    There is no evidence that this request was highlighted for or reviewed by EOCOP.

### G.   Request Nos. 2019-FOIA-05296 and 2019-FOIA-06574

120.    In May 2019, Phillips submitted a FOIA request, assigned No. 2019-FOIA-05296, seeking "a copy of the Metropolitan Police Department's file containing 'all letters of denial of requests for public records.'"  Phillips Rep. at 9.F.

121.    In July 2019, Phillips submitted an additional FOIA request, assigned No. 2019-FOIA-06574, seeking "to review the the [*sic*] 'file of all letters of denial of requests for public records'" since 1976.  *Id.* at 10.F.

122.    With Phillips's consent, No. 2019-FOIA-05296 was administratively closed as a duplicate because the records sought in No. 2019-FOIA-06574 included those sought in Phillips's earlier request.  *Id.* at 9.I.

123.    The FOIA Office explained to Phillips and MOLC, when she appealed, that MPD did not keep denial records after a certain period, the best way to fulfill the request would be to provide a report generated from FOIAXpress, and MPD would nonetheless offer to search for and redact actual denial letters, if, per the FOIA statute, Phillips covered the significant costs. Phillips Requests at 29.

124.    MOLC remanded to MPD to search for and produce the actual denial letters—but only going back to 2012—if Phillips paid the costs.  *Id.* at 30.

125.    Phillips refused to pay the costs and pursue further searches or productions. Archie-Mills Decl. ¶ 6.

126.    There is no evidence that this request was highlighted for or reviewed by EOCOP. Parker Dep. at 111 ("I know this one didn't go to the Chief's office . . . .").

### H.   Request No. 2019-BWC-00233

127.    In July 2019, Phillips requested "body-worn camera footage related to the arrest of Charles Whitney."  Phillips Rep. at 3F.

128.     The FOIA Office denied the request as "part of an ongoing enforcement proceeding."  Phillips Requests at 31–32.

129.     There is no evidence that this request was highlighted for or reviewed by EOCOP.

**I.     Request No. 2019-BWC-00240**

130.     In August 2019, Phillips requested "BWC footage related to" the arrest of Brandon Savoy.  Phillips Rep. at 4.F.

131.     The FOIA Office denied the request as "part of an ongoing enforcement proceeding."  Phillips Requests at 33–34.

132.     There is no evidence that this request was highlighted for or reviewed by EOCOP.

**J.     Request No. 2020-BWC-00106**

133.     In January 2020, Phillips requested "all BWC associated" with the arrest of Leo Weekes.  Phillips Rep. at 11.F.

134.     In July 2020, the FOIA Office provided the requested video, subject to redactions. *Id.* at 11.I.

135.     There is no evidence that this request was highlighted for or reviewed by EOCOP.

136.     Insp. Parker was no longer employed at MPD when this request was processed. Parker Decl. ¶ 2.

**K.     Request No. 2021-FOIA-00403**

137.     In October 2020, Phillips requested "unredacted copies of emails, including attachments to those emails, sent to or from MPD Chief of Police Peter Newsham, from January 1, 2018, to present, that contain the name Amy Phillips."  Phillips Rep. at 12.F.

138.     It appears that the FOIA specialist inadvertently fell behind on responding to this request, which required an OCTO search, but FOIA deadlines were tolled at the time due to COVID-19.  *See* Phillips Requests at 35–37.

139.    There is no evidence that this request was highlighted for or reviewed by EOCOP.

140.    Insp. Parker was no longer employed at MPD when this request was processed. Parker Decl. ¶ 2.

**L.    Request No. 2021-FOIA-05236**

141.    In May 2021, Phillips requested "unredacted copies of emails, including attachments to those emails" from "January 1, 2017, to present, that contain the name Amy Phillips, Amy E. Phillips, or Amy Elizabeth Phillips" that were sent to or from or copied any of seven MPD employees.  Phillips Requests at 38.

142.    This request required an extensive OCTO search followed by review of responsive documents and redactions.  *Id.* at 39.

143.    There is no evidence that this request was highlighted for or reviewed by EOCOP.

144.    Insp. Parker was no longer employed at MPD when this request was processed. Parker Decl. ¶ 2.

**M.    Request No. 2022-FOIA-04751**

145.    In March 2022, Phillips requested any documents identifying officers who were assigned to three special teams and the training materials for those special teams.  Phillips Requests at 41.

146.    Due to the amount of material requested and the sensitive nature of the material requested (*e.g.*, information relating to undercover officers and law enforcement techniques) that needed to be reviewed for exemptions, this request took a significant amount of time to complete.  Archie-Mills Decl. ¶ 7.

147.    There is no evidence that this request was highlighted for or reviewed by EOCOP.

148.    Insp. Parker was no longer employed at MPD when this request was processed. Parker Decl. ¶ 2.

**N.     Request No. 2023-FOIA-03097**

149.    In February 2023, Phillips requested "[a]ny and all emails with drd-hearing.admin@dc.gov or Hobie.Hong@dc.gov in the TO, FROM, or CC lines related to the scheduling or rescheduling of any [DRD] Hearings or [AAHs]" in 2023.  Phillips Requests at 43.

150.    This request requires an OCTO search of emails, which takes a significant amount of time, and then review by the FOIA Office, so the request is still pending; although Phillips has received a partial response.  Archie-Mills Decl. ¶ 8.

151.    There is no evidence that this request was highlighted for or reviewed by EOCOP.

152.    Insp. Parker was no longer employed at MPD when this request was processed. Parker Decl. ¶ 2.

**O.     Request No. 2023-FOIA-06096**

153.    In May 2023, Phillips made another request seeking the same records as Request No. 2023-FOIA-03097.  Phillips Requests at 51.

154.    This request requires an OCTO search of emails, which takes a significant amount of time, and then review by the FOIA Office, so the request is still pending; although Phillips has received a partial response.  Archie-Mills Decl. ¶ 9.

155.    There is no evidence that this request was highlighted for or reviewed by EOCOP.

156.    Insp. Parker was no longer employed at MPD when this request was processed. Parker Decl. ¶ 2.

**IV.    Phillips Collaborates with Insp. Parker.**

157.    Phillips suspected that MPD was "improperly delaying" her requests; although, she did not have "have any specific information that [she] was on a list or receiving special scrutiny."  Phillips Dep. at 98–99.

158.     For Phillips's Lojacono lawsuit, she sought advice from her friend Michael

Perloff, an attorney with the ACLU.  *Id.* at 89.

159.     Perloff introduced Phillips to Insp. Parker, who had recently left MPD.  *Id.* at 35.

160.     Both before and after her departure, Insp. Parker developed her own relationships

with frequent FOIA requesters, like Perloff and Flack.  Parker Dep. at 165–72, 253–59, 373–78.

161.     She advised them about how to FOIA MPD and fed them stories about MPD.  *Id.*

at 165–72, 382–400.

162.     She—after departing MPD—supplied Flack with confidential MPD documents

that she still had in her possession.  *Id.* at 385–400.

163.     In Phillips's Lojacono lawsuit, the District had explained its production process to

the court and suggested that Insp. Parker's initial search and production were inadvertently

inadequate.  Quon Decl. ¶¶ 21, 23, 30.

164.     Phillips enlisted Insp. Parker to write a declaration for her.  Phillips Dep. at 132.

165.     Insp. Parker agreed because she was upset with how the District described her

work.  Parker Dep. at 161–62, 169, 318–23.

166.     Insp. Parker's declaration described how, in her view, she was not responsible for

any delays with the Lojacono request because she had looped in EOCOP about that request, who

was responsible for the release decisions.  Parker Decl. ¶ 49.

167.     Insp. Parker stated that, prior to the request, "Turner advised me of an unofficial,

unwritten policy that required the FOIA officer to notify Chief Newsham and Turner of any

FOIA request originating from the media, certain identified individuals, or requests for certain

records."  *Id.* ¶ 8.

168.    The purpose of this notification was to ensure that Chief Newsham was aware of records that had been released in case he was asked about them by the press or public.  Parker Dep. at 212.

169.    Insp. Parker would "highlight[ ]" requests in emails to Chief Newsham and Turner.  Parker Decl. ¶ 13.

170.    Insp. Parker testified that email highlighting would have been the only way she highlighted Phillips's requests for review.  Parker Dep. at 62–63.

171.    It was solely up to Insp. Parker which requests were highlighted.  *Id.* at 202–04.

172.    Insp. Parker admitted that there was not a way to "go back and find out which requests [she] flagged for Turner pursuant to the watchlist policy."  *Id.* at 218–19.

173.    Once a request was highlighted, Insp. Parker had "no knowledge of whether Turner and Chief Newsham actually met to discuss" any of the requests.  Parker Decl. ¶ 17; *see also* Parker Dep. at 27, 92, 439.

174.    Insp. Parker never told anyone of this practice until she left MPD.  Parker Decl. ¶ 53.

175.    Insp. Parker notified Turner of Phillips's Lojacono request, although not through a highlighted email.  *Id.* ¶ 18; Parker Dep. at 262–63.

176.    Insp. Parker notified Turner because the Lojacono disciplinary proceeding was a "high-profile" incident, Parker Decl. ¶ 18, and Phillips had previously requested other records, like Gun Recovery Unit (GRU) records and AAH transcripts, that EOCOP had asked to be made aware of because such records were either exempt or could reveal law enforcement and investigation strategies, Parker Dep. at 49, 206–07, 217, 220–21.

177.    There is no evidence that Insp. Parker researched or was aware of Phillips's viewpoint or speech.  *See id.* at 222 (testifying that she only ever googled one requester, who was not Phillips), 241 (testifying that she did not have a Twitter account).

178.    Nor is there evidence that Insp. Parker alerted Chief Newsham or Turner to any speech by Phillips.  Turner Decl. ¶ 9; *see* Parker Dep. at 112, 225.

179.    Phillips had "several phone conversations" and emails with Insp. Parker about the content of her declaration.  Phillips Dep. at 134.

180.    Phillips reviewed drafts and made suggestions about what to include.  Parker Dep. at 232.

181.    Phillips had no knowledge herself of "what the specific practices are within MPD's FOIA Office."  Phillips Dep. at 83.

182.    Insp. Parker did not originally allege that the notification procedure was "unofficial" and "unwritten."  *Compare* Parker Decl. ¶ 15, *with* Def.'s Ex. 32, Oct. 8, 2021, Email from V. Parker to A. Phillips & Attach. (Oct. 8, 2021 Email).

183.    Insp. Parker added those descriptors later.  *Id.*

184.    Insp. Parker originally wrote that "Phillips came to the attention of Chief Newsham and Turner" when she "requested all the names and badge numbers for every officer assigned to each patrol district."  Parker Dep. at 326.

185.    But "after talking to" Phillips, Insp. Parker changed her account of how Phillips came to the attention of Chief Newsham and Turner.  *Id.*

186.    Insp. Parker did not originally allege that "[t]he Chief and Turner were averse to e-mails as they created material susceptible to FOIA laws or discovery in litigation."  *Compare* Parker Decl. ¶ 15, *with* Oct. 8, 2021 Email.

187.     Insp. Parker added that line later.  *Id.*

188.     Insp. Parker originally included that "[f]ive months prior to being assigned to the FOIA office, Chief Newsham made a statement publicly regarding me that was false and belittling."  Def.'s Ex. 33, Oct. 17, 2021, Email from V. Parker to A. Phillips, Attach. ¶ 46.

189.     After discussing that line with Phillips, Insp. Parker dropped it "because it would have been a distraction."  Phillips Dep. at 142.

## V.     <u>Phillips Hires a Law Professor.</u>

190.     After fact discovery, Phillips disclosed an expert witness, Prof. Margaret Kwoka. Ex. 37, Expert Rep. of Margaret Kwoka (Kwoka Rep.).

191.     Prof. Kwoka is a law professor in Ohio who studies federal FOIA.  *Id.* at 1–2.

192.     Prof. Kwoka offered two opinions.  Kwoka Dep. at 8–9.

193.     Prof. Kwoka first opined that the alleged watchlist policy caused delays.  Kwoka Dep. at 216; Kwoka Rep. at 19.

194.     She reached this opinion by analyzing a spreadsheet produced by the District in discovery.  Kwoka Rep. at 5–7.

195.     That spreadsheet logged select information from FOIAXpress for each FOIA request (*e.g.*, requester name, description of request, request age) during the relevant period.  *Id.*

196.     Prof. Kwoka used that spreadsheet to perform a two-step method to determine "which requesters were likely affected by the policy and what harms, if any, the policy caused for those requesters."  *Id.* at 5.

197.     At step one, Prof. Kwoka categorized which requests were likely subject to the policy, which she understood to be that media, "high profile," and "sensitive" requests were sent to EOCOP.  *Id.* at 6, 9.

198.     Relying on her own interpretation of those terms, Kwoka Dep. at 58, she assumed that any request was subject to the policy if it appeared, to her, to have a "purpose" of "obtaining information" "to share it, in some form, with the broader public," Kwoka Rep. at 10.

199.     She called these "oversight requests." *Id.* at 9.

200.     Prof. Kwoka acknowledged that requesters of varying viewpoints—including pro-police viewpoints—request records that could be considered "high profile and "sensitive." Kwoka Dep. at 81–82.

201.     That is, a policy of elevating "high profile" and "sensitive" requests "does not appear to turn on whether you can identify a potential critique." *Id.* at 80.

202.     She also created categories for requests she was "certain were subject to the policy": (1) Phillips's requests; (2) requests that had a note in the log saying "File Cabinet," "File Folder" or "EOCOP review"; and (3) requests made by individuals named in the Parker declaration.   Kwoka Rep. at 15–16.

203.     As explained in testimony that Prof. Kwoka did not review, the designations "File Folder" or "File Cabinet" indicate only that the comments field had included privileged information that was removed by counsel when the District produced the spreadsheet in discovery.   Archie-Mills R. 30(b)(6) Dep. at 196–202; Kwoka Dep. at 191.

204.     There is no evidence that Prof. Kwoka consulted any evidence confirming that "EOCOP review" meant EOCOP review of a request because it was media, high profile, or sensitive.

205.     At step two, Prof. Kwoka compared the response times for each category.   Kwoka Rep. at 15–16.

206.    Because the response times for oversight requests and the three categories were higher than for non-oversight requests, she concluded that the alleged policy caused delays.  *Id.* at 16.

207.    The only other potential cause she tried to control for was complexity.  *Id.* at 17.

208.    Some of the FOIA logs are tagged "complex."  Kwoka Rep. at 17–18.

209.    This tag was sometimes added by FOIAXpress to any request with a response time that exceeds the statutory maximum.  Archie-Mills 30(b)(6) Dep. at 392–94.

210.    Prof. Kwoka, however, assumed that this tag meant that FOIA employees viewed the request as complex.  Kwoka Dep. at 195.

211.    Because those "complex"-tagged requests had shorter response times than requests Prof. Kwoka categorized as subject to the policy, she concluded that complexity was not the cause of delay.  Kwoka Rep. at 18.

212.    Prof. Kwoka's second opinion was that the alleged policy is not "necessary" or "justified by the statute's requirements."  Kwoka Rep. at 8.

213.    To reach that conclusion, she compared the alleged policy—as she understood it—to (1) FOIA practices she had encountered in her research, (2) a federal guide to FOIA best practices, and (3) a few policies that had been investigated in federal agencies.  *Id.* at 23–28; Kwoka Dep. at 14–16.

214.    She concluded that the policy was atypical because its "defining feature" was that the head of the agency has "ultimate authority" over FOIA.  Kwoka Rep. at 23.

215.    She did not consider that this Court had ruled that District law—not the alleged policy—placed final authority over FOIA with the Chief.  *Phillips v. District of Columbia*, No. 22-cv-277, 2022 WL 1302818, at *8–9 (D.D.C. May 2, 2022); Kwoka Dep. at 245–46.

Date: February 16, 2024.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]
AMANDA C. PESCOVITZ [1735780]*
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

---

*     Admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver). Practicing under the direct supervision of Matthew Blecher, a member of the D.C. Bar, pursuant to D.C. App. R. 46-A(d)(2).