# EXHIBIT 41

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
 3        _____
                                  :
 4        AMY PHILLIPS,           :
                                  :
 5             Plaintiff,         :
                                  :
 6          v.                    : Civil Action No.
                                  :  22-277 (JEB)
 7        DISTRICT OF COLUMBIA,   :
                                  :
 8             Defendant.         :
          _____:
 9
10                  Thursday, June 15, 2023
11
                    Video-recorded deposition of LATRINA
12
          CRUMLIN, taken at the law offices of Williams &
13
          Connolly LLP, 680 Maine Ave SW, Washington, DC,
14
          beginning at 9:35 a.m., Eastern Standard time,
15
          before Ryan K. Black, a Registered Professional
16
          Reporter, Certified Livenote Reporter and Notary
17
          Public in and for the District of Columbia.
18
19
20
21
22
23
24
25
```

```
 1              "Please assign this to me.  Do not close out."
 2              A.   Mm-hmm.
 3              Q.   And then the next email you responded,
 4         "Okay"?
 5              A.   Mm-hmm.
 6                   THE VIDEOGRAPHER:  Sorry, counsel.
 7         I think your hair is touching the microphone.
 8                   MS. HROM:  Is that better?
 9                   THE VIDEOGRAPHER:  That's better.
10                   MS. HROM:  Thanks.
11         BY MS. HROM:
12              Q.   What did you take Inspector Parker to
13         mean when she said "do not close out"?
14              A.   Do not close out.
15              Q.   What does "close out" mean?
16              A.   Close out the request.  There's an open
17         phase and then there's a closing phase, so ...
18              Q.   Would it have been normal for you to
19         close out the request after he responded?
20              A.   She may not have been necessarily
21         talking to me.  I probably just responded okay
22         just -- just to acknowledge her email.
23              Q.   Who was she directing this to?
24              A.   Anyone that's on this email chain
25         between -- it looks like all the supervisors on
```

Page 153

1        here, and it was initially assigned to, it looks

2        like, Shania at one point and maybe Lisa might

3        have reassigned it to herself.  So I see Lisa's

4        on here and Saray.  Saray didn't do anything for

5        it.  So most likely she's probably just telling

6        Lisa don't -- do not close it out.

7             Q.   Why did she take Ms. Hughes off?

8             A.   She may have reassigned it to herself.

9        That happens -- that happens a lot.  That's

10       normal routine.

11            Q.   Do you know why things would have been

12       reassigned?

13            A.   I'm not sure, no.

14                 MS. HROM:  All right.  I'm going to mark

15       Exhibit 53.

16                 (Exhibit No. 53, a document Bates

17       Numbered DC_2022-cv-00277-000151466, was

18       introduced.)

19                 THE WITNESS:  Thank you.

20                 THE REPORTER:  You're welcome.

21       BY MS. HROM:

22            Q.   So this is an email that you sent to

23       Lisa Archie-Mills on June 3rd, 2020?

24            A.   Mm-hmm.

25            Q.   And the subject line is Re:

1     2020-BWC-00256?

2          A.    Correct.

3          Q.    And you wrote, "Lisa, Evan Lambert is

4     asking for all BWC footage from the Swann Street

5     protest.  How should I proceed?"

6          A.    Okay.

7          Q.    Who is Evan Lambert?

8          A.    Evan Lambert is a -- a news -- a news

9     journalist as well.

10         Q.    Why did you -- why did you flag this

11    request to Lisa Archie-Mills?

12         A.    Most likely because I knew that it was

13    an ongoing situation with the Swann Street

14    protest, and -- that's it, yeah.  That's why.

15         Q.    Did it have anything to do with the fact

16    that Evan Lambert was a journalist asking for

17    that footage?

18         A.    Nope.

19         Q.    Why did you use his name when asking

20    about the request?

21         A.    Because that's -- that's normal for me

22    to do.  She can look at the -- she can look up

23    the requester by the -- by the number that we --

24    that's generated to the requester, but, however,

25    I chose to use Evan Lambert name.

Page 155

1    Q.   So why didn't you write, "Lisa, the

2    request number seeks footage from the Swann

3    Street protest"?

4    A.   I don't know what I was thinking that

5    day, so, you know.

6    Q.   Was there an email before this in the

7    chain?

8    A.   You don't see it, so it's not -- it

9    doesn't exist, I don't believe.

10   Q.   I asked because the subject line is

11   "Re."  Is there a previous conversation about

12   this particular request?

13   A.   I do this with every request.  The

14   subject is "Re:" Blah, blah, blah.  I do this

15   with every -- every request and email that I send

16   out.

17   Q.   When you wrote this email to Lisa

18   Archie-Mills, did you know that Evan Lambert was

19   a journalist?

20   A.   Mm-hmm.  I knew that.

21   Q.   Are you aware of whether Lisa

22   Archie-Mills knew he was a journalist when you

23   sent this email?

24   A.   Yes.  We all -- you live in Washington,

25   D.C.  We all know who Evan Lambert is.

Page 167

1          A.   No, I was not.

2          Q.   Do you know what she asked OGC about

3     this request?

4          A.   Nope, I don't.

5          MS. KELLEY:  Objection to the extent

6     that calls for privileged information.

7          You've already answered it, so.

8     BY MS. HROM:

9          Q.   Did you have any other communications

10    about this request before you sent this email?

11         A.   Any other communication as far as?

12         Q.   With anyone about the request?

13         A.   I guess just that department.  That's

14    it.

15         Q.   Did you have any communications about

16    this request after this email was sent?

17         A.   Nope.  I went -- I went on to the next

18    request.

19         Q.   All right.  So let's go back to the

20    exhibit that was previously marked 55 -- oh, is

21    it 54?  Okay.  54.

22         MS. HROM:  Do you have 54?

23         MS. KELLEY:  I just want to check it's

24    the right one.

25         MS. HROM:  It is the right one we're

Page 168

1          referencing.
2                    MS. KELLEY:  It says "I will call you."
3                    MS. HROM:  Yes.
4          BY MS. HROM:
5               Q.   All right.  So as we've done before,
6          we're going to start at the end.  So on the
7          second page -- so on September 9th, 2020, on
8          Page 2 of your document -- it's the first email
9          in the chain -- you wrote to Lisa Archie-Mills
10         Subject: RE: FOIA request.
11              A.   Mm-hmm.
12              Q.   Do you see that?
13              A.   Yes, I see it.
14              Q.   And you write, "Lisa, please advise how
15         I should move forward with processing Eric Flack
16         requests."  Do you see that?
17              A.   Yes.
18              Q.   And Eric Flack is a journalist; is that
19         right?
20              A.   That's correct.
21              Q.   And you knew that at the time you sent
22         this email?
23              A.   Yes.  And that's why I used his name.
24              Q.   And was -- Lisa Archie-Mills, she also
25         knew he was a journalist?

Page 169

```
 1          A.   Yes.
 2          Q.   And you didn't include any FOIA number
 3    related to Mr. Flack's request here, correct?
 4          A.   Yeah.  There is.  There is --
 5               (Whereupon witness reads the document in
 6    a low voice to herself.)
 7          Q.   Sorry.  I didn't understand your answer.
 8    So there's no -- there's no request number for
 9    Eric Flack's request in this email, correct?
10          A.   Right.  I didn't use -- I didn't use the
11    FOIA number.  I used his name.
12          Q.   And you -- you believed that Lisa
13    Archie-Mills would know what you -- why did you
14    send Lisa Archie-Mills this question about how to
15    deal with Eric Flack's request?
16          A.   How to move forward with processing
17    his request, because I don't -- I don't know if
18    what he was requesting was that information
19    releasable or is it something that they're not
20    going to give out to -- I mean, if it's an open
21    investigation or something like that, I just
22    wanted to get her feedback off that.
23          Q.   Who is the "they" who are not going to
24    give out information to him?
25          A.   Well, if this is -- whatever Mr. Flack
```

Page 170

1        was asking for may have been an ongoing
2        investigation or something that just happened, so
3        it needs to have -- not have, but normally we'll
4        check out whatever it is and determine if it's
5        open or closed or is this information releasable
6        to the public at the -- at the moment.
7             Q.   But you don't see that in the email,
8        correct?
9             A.   No.  It's not -- it's not written in the
10       email -- wait a minute.  Oh, yeah, I see this --
11       I see his request right here that he wrote, yeah.
12            Q.   All right.  So in the next email in
13       the chain that's on Page ending 132, Lisa
14       Archie-Mills responds to you and she writes,
15       "Hi, Latrina.  With regards to Mr. Flack's
16       request, Theresa sent us an email on how to
17       respond.  I updated the notes in FX this morning
18       after receiving her email."  Do you see that?
19            A.   Yes.
20            Q.   So does FX mean FOIAXpress?
21            A.   That's correct.
22            Q.   And so, Ms. Archie-Mills was telling you
23       to go look at FOIAXpress?
24            A.   That's correct.
25            Q.   What did the note in FOIAXpress say

Page 171

1        about how to handle Eric Flack's request?

2                MS. KELLEY:  Objection.  To the extent

3        that calls for privileged information, you

4        shouldn't -- if you recall --

5                MS. DURHAM:  You cannot coach the

6        witness.  That's totally inappropriate.

7                MS. KELLEY:  Okay.  I'm explaining to

8        her --

9                MS. DURHAM:  You're coaching the

10       witness.

11               MS. KELLEY:  -- what she can answer.

12               MS. DURHAM:  You cannot coach the

13       witness like that.

14               MS. KELLEY:  I understand that you don't

15       like what I'm saying.  I'm here to tell you

16       that --

17               MS. DURHAM:  You are coaching.

18               MS. HROM:  -- if you recall what the

19       comments say and they involve any advice from the

20       Office of General Counsel, you should not relay

21       that information.  If you recall anything else,

22       you may answer the question.

23               MS. DURHAM:  We object to the coaching

24       of the witness beyond the privileged instruction

25       that would be appropriate here.

Page 175

```
 1           A.   I've done it with multiple requests, not
 2      just Eric Flack.
 3           Q.   But including Eric Flack?
 4           A.   He's -- you see I questioned her this
 5      time because I needed her feedback, "how should I
 6      proceed?"  It's not just with Eric Flack.  It's
 7      with any request that I feel like I need to have
 8      further assistance with.
 9               (Brief Pause in the proceedings.)
10      BY MS. HROM:
11           Q.   So you asked Lisa Archie-Mills for her
12      assistance handling Evan Lambert's request,
13      correct?
14           A.   If I -- if I need her assistance on a
15      request, period, I'm going to ask her for her
16      assistance.
17           Q.   But that's not my question.  You asked
18      her for assistance with, specifically, Evan
19      Lambert's request, correct?
20           A.   Multiple requests that comes in, I'll
21      ask her for input.
22           Q.   But specifically Evan Lambert's request?
23           A.   He's not been singled out as a -- like,
24      I'm talking about all requests that I have --
25      that I might need assistance with.
```

Page 176

1          Q.   All right.  So looking back at the
2     document we were just looking at, Page 133, your
3     first email, you were asking here for advice on
4     how to move forward with Eric Flack requests,
5     correct?
6          A.   That's correct.
7          Q.   So you -- and earlier we looked at a
8     document where you asked Lisa Archie-Mills for
9     assistance processing Evan Lambert's request,
10    correct?
11         A.   That's correct.
12         Q.   And earlier we also looked at an email
13    where you were told how to deal with Amy
14    Phillips' request, correct?
15         A.   I didn't see that.
16         Q.   We looked at an email that you sent
17    that you said Vendette Parker gave you the
18    information --
19         A.   Yes.  Uh-huh.
20         Q.   For how to handle it, correct?
21         A.   Mm-hmm.
22         Q.   And we saw an email where you were asked
23    to assign Marina Marraco's requests to Lisa
24    Archie-Mills, correct?
25         A    Yes, sir.

Page 177

```
 1            Q.   Did you ever ask Lisa Archie-Mills for
 2       assistance with respect to other media requests?
 3            A    Yes.  With multiple requests, all -- all
 4       -- not all of the time, but majority of the time
 5       if it was something high profile and I know that
 6       it's open for sure, I want to know what should I
 7       -- how should I proceed with it.
 8            Q.   Did you ever ask her for assistance with
 9       respect to sensitive requests?
10            A.   What do you mean sensitive?
11            Q.   Well, if we look at 133 --
12            A.   Mm-hmm.
13            Q.   -- in the bold italic type --
14            A.   Right.
15            Q.   It references Use of Force Policies?
16            A.   Mm-hmm.
17            Q.   Would that be the type of sensitive
18       topic that you'd seek assistance with?
19            A.   Well, if it says Use of Force, that's --
20       that's like -- that's beautiful for me because I
21       know exactly where to send it to, right?  But
22       the fact that we -- we both read these requests,
23       I probably wanted her input like, hey, do we
24       -- because some of this information is online, so
25       that's probably why I -- I asked her to take a
```

Page 178

1      look at it, if there's information online.

2           Q.   So if we turn back to 132, the very

3      top email in the chain, the last-in-time, Lisa

4      Archie-Mills responds to you and says, "I will

5      call you"?

6           A.   Mm-hmm.

7           Q.   Why did she call you instead of just

8      responding in an email?

9                MS. KELLEY:  Objection.  Calls for

10     speculation.

11     BY MS. HROM:

12          Q.   Did she end up calling you after this?

13          A.   I'm quite sure she did.  I don't recall

14     the conversation in total, but, yeah.

15          Q.   Is this consistent with the policy of

16     not putting certain things in email at MPD?

17               MS. KELLEY:  Objection.  Assumes facts

18     not in evidence.

19               You may answer.

20     BY MS. HROM:

21          Q.   So we -- we looked at a policy earlier

22     in a presentation created by Lisa Archie-Mills

23     that noted that -- here, I can actually -- I can

24     read it to you.

25          A.   I remember.

Page 180

1            or your desk phone at MPD?

2            A.   Most likely we were at -- we were

3       working from home remotely so it might have been

4       on my cell phone.

5            Q.   Was it common for her to write that

6       she'll call you instead of just responding by

7       email?

8            A.   Yeah.   That's common.

9            Q.   Was that something that was common when

10      -- when you asked how to deal with a request?

11           A.   I'm sorry?

12           Q.   Was it common for her to respond, "I

13      will call you" when you asked her about requests?

14           A.   Yes.   We correspond daily.   Every day.

15           Q.   Via phone, as well?

16           A.   Via phone, as well, yes.

17           Q.   Another question on 132.   So in the

18      -- in the email that was sent at 2:50 p.m.

19      when Lisa Archie-Mills says, "With regards to

20      Mr. Flack's request, Theresa sent us an email on

21      how to respond" --

22           A.   Mm-hmm.

23           Q.   -- who is Teresa?

24           A.   Teresa is one of MPD's attorneys.

25           Q.   What's her full name?

Page 181

```
 1              A.    Theresa Kwon.

 2              Q.    Do you interact with Ms. Kwon?

 3              A.    No.

 4                    MS. HROM:  All right.  Can we take a

 5        little break?

 6                    THE WITNESS:  Okay.

 7                    MS. KELLEY:  A five-minute little break.

 8                    THE VIDEOGRAPHER:  We're going off the

 9        record.  This is the end of Media Unit 6.  The

10        time is 2:25 p.m.

11                    (Recess taken.)

12                    THE VIDEOGRAPHER:  We're back on the

13        record.  This is the beginning of Media Unit 7.

14        The time is 2:41 p.m.

15                    MS. HROM:  All right.  So my questioning

16        is concluded.  I'll pass the witness to

17        Ms. Kelley, and we'll reserve time for recross.

18                              EXAMINATION

19        BY MS. KELLEY:

20              Q.    Okay.  Can you pull up Exhibit 53?  It

21        should say 53 on the sticker in front of you

22        there.

23              A.    All right.

24              Q.    All right.  And this is an email from

25        you to Lisa Archie-Mills?
```

Page 182

1             A.    Correct.

2             Q.    And it involves something you called

3       here the Swann Street Protest?

4             A.    Mm-hmm.

5             Q.    Can you tell me what the Swann Street

6       Protest was?

7             A.    I believe -- how can I -- it was a -- I

8       don't know -- I don't know if it was an

9       ambassador or something -- he's something in

10      politics, and they protested out in front of his

11      house for, like, weeks.

12            Q.    Were there -- do you recall if there

13      were more than one FOIA request about the Swann

14      Street protest?

15            A.    Yeah.   There were more than -- more than

16      one FOIA request about the Swann Street Protest,

17      yes.

18            Q.    Do you recall how many?

19            A.    I don't recall how many.   I know some of

20      the people that were there, they were arrested,

21      so they were putting in their own requests for

22      pictures of their mug shots and things like that,

23      so ...

24            Q.    I believe you said earlier maybe this

25      was an open investigation.   What does that mean?

Page 183

1          What's an open investigation?

2              A.    It's currently being investigated by

3     MPD.

4              Q.    If something is currently being

5     investigated by MPD, does the FOIA Office release

6     records about that incident?

7              A.    No.

8              Q.    Ever?

9              A.    I mean, from -- since I've been there,

10    it definitely has to go through the Office of

11    General Counsel.

12             Q.    Okay.  Let's look at Exhibit 45, if you

13    can dig that up.

14             A.    Okay.

15             Q.    So this says in the body, "Dear

16    Mrs. Marraco" at the top.

17             A.    Mm-hmm.

18             Q.    This mentions FOIA number 2018FOIA02863.

19             A.    Mm-hmm.

20             Q.    Do you recall what this FOIA was about?

21             A.    I do not.

22             Q.    Do you have any specific memory of

23    sending out this email?

24             A.    No, I do not.  I send out dozens of

25    emails daily.

1          Q.   Do you have any specific memory about

2     why it's assigned to Lisa Archie-Mills?

3          A.   From what I can remember, it most likely

4     is because I think at one point they wanted all

5     media requests to be handled by either the

6     Inspector or Lisa -- Lisa Archie-Mills.

7          Q.   Do you have any specific memory about an

8     assignment in this case?

9          A.   Nope.  I don't remember what -- what

10    Marina was requesting.  I don't have no knowledge

11    of it.  From 2018, no, I don't.

12         Q.   I'm not going to pull it up, but you

13    spoke with plaintiffs's counsel for a bit about a

14    final response letter that you sent to Amy

15    Phillips.  Do you remember that?

16         A.   Say that again.

17         Q.   You spoke with plaintiff's counsel about

18    a final response letter --

19         A.   Yes.

20         Q.   Yeah.  And you said you're quite sure

21    that Vendette Parker would have e-mailed the

22    language to you?

23         A.   Yeah.  That's correct.

24         Q.   Why did you say you were quite sure of

25    that?

Page 185

1          A.   Because I don't know the exemptions code

2     to use to send anyone a denial letter.

3          Q.   Do you have a specific memory of her

4     sending you an email with that language?

5          A.   As far as like what date did she send

6     this language to me or --

7          Q.   Do you remember reading an email from

8     her with that language in it?

9          A.   Yes, I do.

10         Q.   Is it possible you got the language some

11    other way?

12         A.   Nope.

13         Q.   Do you recall if you ever sent other

14    final response letters that referenced privacy

15    exemptions?

16         A.   I believe so.

17         Q.   Is it possible those final responses

18    contained the same language?

19         A.   Yes.

20              THE VIDEOGRAPHER:  I'm sorry, Counselor.

21    Could you fix your hair, please?

22              MS. KELLEY:  Just one second.

23              No further questions, but, of course, we

24    might follow up if you do.

25         ///

Page 186

                    FURTHER EXAMINATION

1

2       BY MS. HROM:

3           Q.   All right.  I do have just a few

4       questions for you, Ms. Crumlin.

5           A.   Mm-hmm.

6           Q.   So if you could go back to Exhibit 53.

7               Did you elevate other requests about the

8       Swann Street Protest?

9           A.   No, because once I get the answer the

10      one time, I know how to move forward with that

11      request.

12          Q.   And here you specifically call out the

13      requester, Evan Lambert, correct?

14          A.   Yes.

15              MS. HROM:  All right.  No further

16      questions.

17              MS. KELLEY:  Okay.  We'd like to read

18      and sign.  And we need an invoice.  This is not

19      an order.  We just need the invoice and then

20      we'll release the funds and then we'll contact

21      you.

22              THE VIDEOGRAPHER:  Please stand by.

23      We're off the record at 2:48 p.m. and this

24      concludes today's testimony given by Latrina

25      Crumlin.  The total number of media units used

Page 187

1           was seven and will be retained by Veritext.

2                    (Deposition concluded -- 2:49 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25